# EXHIBIT A

| | |
|---|---|
| IN THE MATTER OF THE | ) |
| ARBITRATION UNDER THE 2013 | ) |
| UNCITRAL ARBITRATION RULES | ) |
| BETWEEN | ) |
| | ) |
| Benthos Master Fund, Ltd. | ) |
| | ) |
| Claimant, | ) |
| | ) |
| against | ) |
| | ) |
| Aaron Etra | ) |
| | ) |
| Respondent. | ) |

**<u>FINAL AWARD</u>**

April 9, 2020

**Table of Contents**

I.      Introduction .................................................................................................................. 1

II.     Parties and Counsel ..................................................................................................... 2

III.    Arbitration Agreement and Applicable Law ............................................................... 3

IV.     Procedural History and Prior Procedural Orders ........................................................ 3

V.      Factual Background ..................................................................................................... 4

VI.     Claimant's Position and Requested Relief ................................................................ 14

VII.    Respondent's Position and Requested Relief ............................................................ 16

VIII.   Analysis and Decision ............................................................................................... 17

   A.      Respondent's March 13, 2020 Email ................................................................... 17

   B.      Respondent's Liability ......................................................................................... 17

      1.      Applicable legal standard ................................................................................. 17

      2.      Respondent failed to strictly comply with the Escrow Agreement .......................... 19

      3.      Respondent acted in gross negligence or willful misconduct .................................. 22

      4.      No indemnification and/or fees earned .............................................................. 26

      5.      Damages ........................................................................................................ 27

   C.      Pre-Award and Post-Award Interest ..................................................................... 28

   D.      Costs .................................................................................................................. 31

IX.     Relief Awarded ......................................................................................................... 32

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement contained in Section General, D. of an Escrow Agreement entered into by and between Claimant Benthos Master Fund, Ltd. ("Benthos", or "Buyer", or "Claimant"), and Respondent Aaron Etra ("Etra", or "Escrow Agent", or "Respondent"; Claimant and Respondent together hereinafter the "Parties") and non-party to this arbitration Valkyrie Group LLC ("Valkyrie" or "Seller") as of August 1, 2018 ("Escrow Agreement", Claimant's Exhibit ("Cl. Ex.") 2) and discussed in more detail in this Final Award, and having duly heard the proofs and allegations of the Parties, FIND and issue this FINAL AWARD in New York, New York as follows:

## I.    Introduction

1.      As of August 2, 2018, Benthos and Valkyrie entered into a BTC Agreement, also signed by Valhalla Venture Group, LLC as "Guarantor" ("Bitcoin Agreement").  Annex A of said BTC Agreement is the above mentioned Escrow Agreement entered as of August 1, 2018. Cl. Ex. 2.

2.      Buyer, the Claimant, put US$5 million in escrow with the Escrow Agent, Respondent, but never received any bitcoins as contemplated under the Bitcoin Agreement.

3.      Upon a Petition For Preliminary Injunctive Relief in Aid Of Arbitration filed in the United States District Court for the Southern District of New York ("SDNY"), Case No. 18 CV 9401, and the subsequent proceedings held in the SDNY, on November 15, 2018, Respondent returned to Claimant an amount of $400,000 (Cl. Ex. 42).

4.      Not having been reimbursed the remaining $4.6 million, Claimant initiated arbitration with a Notice of Arbitration dated June 28, 2019 (Cl. Ex. 1) pursuant to Article 3 of the 2013 UNCITRAL Arbitration Rules ("UNCITRAL Rules").

5.      On August 21, 2019, the Permanent Court of Arbitration at The Hague, Netherlands designated the International Chamber of Commerce's International Court of Arbitration ("ICC Court") as the appointing authority in this matter pursuant to Article 6(2) of the UNCITRAL Rules.

6.      On October 24, 2019, the ICC Court appointed the undersigned arbitrator as sole arbitrator pursuant to Article 8 of the UNCITRAL Rules.

7.      On November 14, 2019, the undersigned arbitrator received the file of this arbitration from the ICC Court.

## II.      Parties and Counsel

8.      The Claimant Benthos Master Fund, Ltd. is a private investment firm that had registered offices at 168 18th Ave., San Francisco, CA 94121.  Claimant's principals include CEO Gerald Fong ("Fong") and COO Mihir Deo ("Deo").  Statement of Claim ("SoC"), p. 2.

9.      The Claimant is represented by Steven R. Popofsky and Joshua K. Bromberg of the firm Kleinberg, Kaplan, Wolff & Cohen, P.C.:

> 551 Fifth Avenue, 18th Floor
> New York, NY 10176
> United States
> Tel: 1 (212) 986-6000
> SPopofsky@kkwc.com
> JBromberg@kkwc.com

10.     The Respondent is Aaron Etra, an attorney licensed to practice law in New York since 1966 (Cl. Ex. 6) with the following contact details:

> 445 Park Avenue, 9th Floor
> New York, NY 10022
> United States
> Tel: 1 (917) 856-3500
> aaron@etra.com

11.     The Respondent acted pro se in and throughout these proceedings and

communicated with the arbirator through the above mentioned email.

### III.     Arbitration Agreement and Applicable Law

12.     Claimant brings this arbitration under Section General, D. of the Escrow

Agreement, providing as follows:

> This Escrow Agreement shall be governed by, and construed in accordance
> with, the laws of New York State, without regard to the principles of conflict
> of laws thereof.  Any disputes which cannot be resolved amicably, will be
> finally decided by arbitration in accordance with UNCITRAL Rules, by a
> single arbitrator, sitting in New York, NY, U.S.A., and shall be enforceable in
> any court of competent jurisdiction.

### IV.     Procedural History and Prior Procedural Orders

13.     The procedural history is set out in the arbitrator's Procedural Orders Nos. 1

through 4 (dated November 18, 2019, December 6, 2019, March 5, 2020, and March 17, 2020),

the contents of which are restated herein by reference thereto.

14.     A preliminary conference was held on December 5, 2019.

15.     On January 15, 2020, Claimant duly submitted and served on Respondent its

Statement of Claim together with its 61 exhibits.

16.     Respondent did not submit any Statement of Defence ("SoD"), or any other

documents or other evidence relied upon by the Respondent.

17.     Respondent made objections submitted via email on November 16 and 18, 2019,

all of which were denied in Procedural Orders No. 2 and No. 3.

18.     Based on the lack of a SoD, Claimant requested an emergency hearing duly held

March 3, 2020 requesting that no late submission shall be admitted from Respondent, including

both evidence and legal argument, and Claimant shall be relieved from the in-person hearing on

March 17/18, 2020 and the arbitrator shall render an award based on the evidence and argument in front of the arbitrator at that time.  Such requests were denied in Procedural Order No. 3.

19.     In response to the arbitrator's email to the parties containing Procedural Order No. 3, on March 13, 2020, Respondent submitted an email to the arbitrator which will be discussed in more detail below.

20.     The "hearings with opening statements from each side and witness testimony" duly noticed in Procedural Orders No. 2 and 3 were held and completed at the arbitrator's offices of K&L Gates LLP in New York, New York on March 17, 2020.  Claimant appeared through counsel and presented its witnesses of fact Fong and Deo.  Respondent failed to appear or present any witness.

21.     Subject to the parties' cost submissions and comments thereon, the hearings in this matter were closed in accordance with Article 31 of the UNCITRAL Rules with Procedural Order. No. 4 on March 17, 2020.

22.     On March 27, 2020, Claimant duly submitted its costs per UNCITRAL Rules Article 40.

## V.     Factual Background

23.     The arbitrator received the SoC, its 61 exhibits accepted into evidence at the March 17, 2020 hearings and the testimony of Fong and Deo.

24.     The arbitrator incorporates the following parts of the SDNY's Memorandum & Order dated June 20, 2019, docket citations omitted, as factual findings in this Final Award (Cl. Ex. 46):

> "Benthos entered into two interrelated agreements for the purchase of Bitcoin from a third party, with Etra acting as escrow agent for the transaction.

4

The first contract (the 'Bitcoin Agreement'), was between Benthos, as Buyer, and a non-party [*to the SDNY litigation*] entity known as Valkyrie Group LLC ('Valkyrie'), as Seller, for the purchase of 10,000 Bitcoin. The first tranche of the transaction was to be for $5,000,000.00 worth of Bitcoin. The Seller's principals were a father-and-son team named Hugh and Brandon Austin, who held themselves out to be brokers capable of locating third parties willing to sell quantities of Bitcoin.

The Bitcoin Agreement, cross-referenced to an accompanying Escrow Agreement, provided that within 24 business hours after execution, Benthos was to send $5 million to Etra's IOLA account. Etra's fee for serving as Escrow Agent was one percent of any funds deposited in escrow – specifically, $50,000.00. Under the Escrow Agreement, if Benthos had not received its Bitcoin within 15 business days of the release of funds from the Escrow Account, Hugh Austin or Valhalla Venture Group, LLC (an affiliate of the Seller) would return the $5,000,000.00 to Benthos.[1]

On August 6, 2018, Benthos wired $5,000,000.00 to Etra's IOLA account. On August 7, 2018, Etra wired $3,000,000.00 to an unknown account, purportedly for the purpose of obtaining Bitcoin.[2] Shortly thereafter, Respondent Tracy Evans informed Benthos that the Bitcoin could not be obtained without releasing an additional $2,850,000.00, in addition to the first $3,000,000.00 that had already been released.[3] Benthos declined to send the additional $850,000.00.

On August 24, 2018, Etra wired an additional $1,600,000.00 from the IOLA account to another unknown account. On August 28, 2018, Benthos demanded the return of its $5,000,000.00.[4]

On August 31, 2018, Benthos demanded that Etra provide him with all details concerning the release of the escrow funds, all communications between himself and all parties involved in the Bitcoin Agreement, and information about the storage facility and Dmitri. According to Benthos, Etra failed to provide any useful information or documentation. On October 12, 2018,

---

[1] The corresponding provision in the Escrow Agreement reads as follows: "It is understood that Valhalla, represented by Hugh Austin and his estate, will guarantee to make available to [Benthos] the sum of five million dollars USD, if and to the extent that [Benthos] has not received the [Bitcoin] for which it has provided the funds for this transaction within 15 business days … of such funds being removed from escrow[,] Valhalla or Hugh Austin will make this payment available to [Benthos] immediately after such period and without recourse."

[2] This action triggered the 15-day clock under the Escrow Agreement, making August 27, 2018 the date by which either Benthos would receive the Bitcoin, or the $5,000,000.00 would be returned.

[3] Tracy Evans informed Petitioner that the third party Bitcoin holder from whom Valkyrie planned to purchase Bitcoin was one Russian oligarch named 'Dmitri Kaslov.' Evans failed to provide any additional information about this individual. Evans claimed the Bitcoin was being held in a 'storage facility' located in Dubai and operated by one 'Minh Hoang Le'. Again, Evans failed to provide any additional identifying information. Tracy Evans claimed Dmitri was unable to release less than 1,000 Bitcoin from the storage facility in any single transaction. Because the price of 1,000 Bitcoin then exceeded $5,000,000, it was apparently impossible to withdraw exactly $5,000,000.00 worth of Bitcoin.

[4] At this point [August 28, 2018], Etra had released $4,600,000.00 to unknown accounts, and $400,000.00 remained in escrow in Etra's IOLA account.

Benthos terminated the Escrow Agreement and again demanded the return of Benthos' funds.

25.     On November 15, 2018, Respondent returned $400,000 to Claimant. Cl. Exs. 41, 42.

26.     The $3,000,000 and $1,600,000 wire recipient is an entity identified as "HK ZHIXUAN TRADING LIMITED" and the instructions for the two funds were signed by a certain "Dmitri Kaslov".  The August 7, 2018 instruction (Cl. Ex. 42) provided as follows:

> Dear Attorney Aaron Etra:
>
> Pursuant to transaction codes **CDKTEBPA073118XXX AND CDKTEBPA073118SUB, please transfer a total of** $3,000,000.00 [three million dollars] of the $5,000,000.00 (five million dollars) of funds you have received in your attorney IOLA account to the banking coordinates listed below, for the benefit of my colleagues who are responsible, under my direction, for the first initial asset management steps called for in said agreements

27.     The August 24, 2018 instruction was identical to the above cited August 7, 2018 instruction, except that it stated "$1,600,000.00 [one million six hundred thousand dollars]" instead of the $3,000,000.00 sum provided for in the August 7, 2018 instruction. Cl. Ex. 42.

28.     The Bitcoin Agreement and Escrow Agreement negotiation drafts did not include the identity of the seller until the day of execution, August 4, 2018.  Respondent had instructed Brandon Austin to "insert your company name and contact details" as the Seller on August 3, 2018.  Cl. Ex. 10.

29.     On August 4, 2018, at 12:43 PM, Brandon Austin sent the "executed Agreement" containing Valkyrie Group, LLC as the Seller to Claimant.  Within that same string of emails, the Buyer/Claimant, then sent the (counter)signed agreement to Brandon Austin at 1:58 PM and Respondent wrote at 2:55 PM that same August 4, 2018: "Dear Brandon, Thank you for the message and the attachment.  The Agreement looks fine and I am prepared to sign it (most expeditiously, by authorizing Tracy to affix my electronic signature and initials) when I receive

6

the KYC from Benthos Master Fund, Ltd." Cl. Ex. 9.  Claimant's KYC was provided on August 4, 2018.  Cl. Ex. 43, at pages 5 and 6 of 17.

30.     On August 6, 2018, Etra had marked up a draft instruction letter with the above restated words and transmitted such self-revised instructions letter to Tracy Evans.  Etra deleted "needed to release and deliver the BTC" from the prior draft.  Cl. Ex. 51.

31.     The Bitcoin Agreement and Escrow Agreement contained a different transaction code than the instructions relied upon by Respondent. Cl. Exs. 2, 42 ("CDKTEBPA080218SUB" as opposed to the instructions' "CDKTEBPA073118XXX" and "CDKTEBPA073118SUB").

32.     Etra was concerned about the inclusion of a Hong Kong entity as the recipient of payments in the instruction letters.  On August 5, 2018, at 2:41 PM, Etra wrote to Tracy: "Please also appreciate that we have verbally and now in the agreement stated that the funds would be applied to assist in delivering the BTC and we have told persons about Dubai and stabilizing an instrument.  Sending funds to a trading company in HK, albeit run by a friend of Dmitri's, may not be viewed as consistent with that effort and commitment.  I am concerned about the appearance as well as the practicality of such transfer to HK, and certainly about consequences if any delay or problems arise at any stage of the transaction." Cl. Ex. 49.  Ten minutes later, Etra further elaborated: "I am concerned about a transfer to a HK trading company under current circumstances where the funds are not coming from HK, have to go to Dubai, and need to be seen consistent with obtaining the BTC and stabilizing an instrument."  Cl. Ex. 52.

33.     The contemplated transactions are described in Section 16 of the Bitcoin Agreement (Cl. Ex. 2, pgs. 6 and 7 of 16):

Section 16

The Procedures:

16.1 On the signing of this Agreement and the Escrow Agreement annexed hereto as ANNEX A (the "Escrow Agreement") by both Parties

7

[Valkyrie/Seller and Benthos/Buyer], they agree to and are contractually obligated to follow and adhere to the terms and conditions of this Agreement and the procedures set forth below and in the Escrow Agreement.

16.2 This is an exchange of 10,000 BTC (the "Product") to be transferred from Party One [Seller] to Party Two [Buyer] for a cash consideration in USD, at the market price per BTC as fixed below minus Party One's total discount of Gross:6% Net:4% to Party Two. This 10,000 BTC represents a contract that could be completed in as short a time as will be agreed to by Party One and Party Two after the initial tranche of $5,000,000 worth of BTC.

16.3 The Parties agree there is a consultant/facilitator fee of 2% as stated in 16.2 above of 4%.to be paid through this Agreement by the Escrow Agent as per Annex C. Further, both parties agree that this is the only consultant fee to be paid through this Agreement, and the Parties hereby indemnify each other and the Escrow Agent, and agree to hold them free of and fully harmless from any claims, costs and expenses relating to or raised by any other persons or parties.

16.4 In summary, under clause 16.2, Party Two will pay to Party One [in USD] the sum calculated by multiplying the number of BTCs by the value of the BTCs according to the Market Price as specified hereunder, MINUS the Buyer's discount of four percent (Gross: 6% Net: 4%).

For the Buyer to determine the BTC price on any particular day for the purposes of this contract, PARTY TWO [Buyer] will use the price reported on BLOCKCHAIN.INFO at 9:00 AM New York time upon confirmation of Buyers funds being sent to Escrow.

1. Within the next 24 business hours after Party One and Party Two and Escrow Agent have signed this Agreement and the Escrow Agreement, Party Two will send to the ESCROW AGENT named in the ESCROW AGREEMENT by wire transfer in USD an amount totaling the price of $5,000,000 worth of BTCs post-discount (corresponding to a pre-discount value of $5,208,333.33), minus the discount given to the Buyer of Net 4%, in this case totaling $5,000,000. Upon completion of the wire transfer by Party Two, Party One and the ESCROW AGENT will be sent a copy of the documentation confirming transmission of the wire.

2. On notice from the Escrow Agent to Party One that the requisite sum has been received from Party Two and credited to the Escrow account, before the intended transaction date and time, Party One will arrange for undertaking the delivery of the requisite amount of Party One's BTCs to the wallet address of Party Two (as specified in ANNEX B), at 9:00AM New York time or immediately upon such notice from the Escrow Agent, whichever is later. The Seller may pull out an amount of money from escrow in order to secure the BTC from its BTC-backed instrument.

3.   After the time required for all six confirmations in the Bitcoin blockchain network the quantity of which minimizes any risk to the integrity of the BTCs for Party Two, which is usually completed within a period of 16 hours, the requisite BTCs are to be delivered to the respective Wallet(s) as provided for herein (ANNEX B for Party Two), thereupon completing the $5,000,000 worth of BTC transaction and deeming all escrowed funds from Party Two for this transaction duly earned and to be then fully released by the Escrow Agent to Party One.

34.   The relevant fund release instruction provisions in the Escrow Agreement

between Claimant, Respondent and the Seller Valkyrie Group, LLC include:

"[T]he Agreement calls for an escrow to be established to hold the sum to be transferred to the Escrow Agent pursuant to the relevant provisions of the Agreement, thus representing the funds which serve to secure the process and procedures for the purchase of the Product (the "Deposit" or "Deposited Funds"), and for the Escrow Agent to follow the instructions given by the Seller on the disbursement of the Deposit, only if such instructions relate to pulling money to secure the BTC for the Buyer from the Seller's BTC-backed instrument. The Buyer's funds shall not be used for any other purpose than to secure the BTC for the Buyer; (Cl. Ex. 2, second Whereas clause, page 9).

"Seller and Buyer understand and agree that the funds of Deposit made and held by the Escrow Agent will be called upon by the Seller from the Escrow Agent by instructions and are needed to secure the BTC for the Buyer from the Seller's BTC-backed instrument, and the funds shall not be used for any other purpose, and that without such application the Product cannot be obtained for the benefit of the Buyer; (Cl. Ex. 2, fourth Whereas clause, page 9).

"Upon receipt of confirmation of funds received by the Escrow Agent, Seller will give further instructions to the Escrow Agent for the application of the Deposit funds as provided for in the Agreement, with the understanding that such instructions must relate to pulling out money in order to secure the BTC from its BTC-backed instrument" (Cl. Ex. 2, page 11, with the quoted language underlined in the Escrow Agreement).

"The Parties expressly and fully agree and irrevocably consent to the right of the Escrow Agent to follow the sole instructions of the Seller, provided the Seller is doing so with the intention of securing the BTC for the Buyer from its BTC-backed [instrument], and that these instructions are with respect to the application of the funds representing the Deposit once received from the Buyer, and transferred as provided for in the Agreement and herein" (Cl. Ex. 2, second bullet point on page 12).

"If the Escrow Agent is reasonably uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any of the

Parties hereto or to the Agreement with respect to the Escrowed Deposit, which, in the opinion of its legal counsel, conflict with any provisions of the Agreement or this Escrow Agreement, the Escrow Agent shall promptly send a written request to each affected Party for clarification of such uncertainty or conflict. The Escrow Agent may refrain from taking any action (other than to hold the Deposit in accordance with the terms and conditions hereof) until such uncertainty or conflict shall have been eliminated in the reasonable opinion of the Escrow Agent, shall have been directed otherwise in writing by all affected parties or by a final order or judgment of a court of competent jurisdiction, whichever occurs first" (Cl. Ex. 2, first bullet point on page 13).

35.    Additional provisions in the Escrow Agreement (Cl. Ex. 2) include:

• Designation as Escrow Agent; Acceptance of such Designation:

• Seller and Buyer hereby jointly agree to appoint and empower the Escrow Agent to assist them in meeting their contractual obligations set forth in the Agreement. The Escrow Agent accepts the appointment and shall be bound by the terms and conditions set forth in this Escrow Agreement. (Cl. Ex. 2, first and second bullet point on page 10).

Compensation of Escrow Agent and Escrow Agent.

• The non-refundable fee of the Escrow Agent (the "Escrow Fee") shall be fixed at One Percent (1%) of the Deposited Funds, payable in full to the Escrow Agent from and on receipt of the Deposit. The (1%) will not affect or change the discount given to Party Two from Party One as per Paragraph 16.2 of the Agreement, and, therefore, no additional funds need be sent by Party Two to the Escrow Agent. Should Seller fail to provide the Buyer with BTC, Buyer shall not be responsible for any payments to any Party. More specifically, an amount of USD equal to Buyer's payment into Escrow shall be returned by Party One to Buyer in the event of nonperformance from the Seller without any fee being removed therefrom by any Party. (Cl. Ex. 2, third and fourth bullet point on page 10).

• Termination of Escrow. This Escrow shall terminate upon the earliest to occur of:

1.  Receipt by the Escrow Agent of written notice signed by either the Seller or Buyer expressly terminating such Escrow because the transaction could not be consummated and the Deposit funds need to be returned without the disbursement of any fee to the Escrow Agent from the Buyer. Any payments or fees owed to the Escrow Agent will be paid by Parties other than the Buyer, and the Buyer shall not be required to pay any such payments or fees. (Cl. Ex. 2, second bullet point on page 11).

• The Escrow Agent's Liability. In performing any of its duties hereunder, the Escrow Agent shall not incur any liability for any damages, losses or expenses

whatsoever, except for its gross negligence or willful misconduct, and shall not incur any such liability with respect to any action taken or omitted in reasonable reliance upon any instrument, including without limitation any written notice, acknowledgment or instruction expressly provided for in this Escrow Agreement, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which the Escrow Agent shall reasonably believe to be genuine, to have been signed or presented by a proper person or persons, and to conform with the provisions of this Escrow Agreement. (Cl. Ex. 2, bottom paragraph on page 11)

• The duties, responsibilities and obligations of the Escrow Agent hereunder shall be limited to those expressly set forth herein and no duties, responsibilities or obligations shall be inferred or implied. The Escrow Agent shall not be subject to, nor required to comply with, any other agreement between or among any or all of the parties hereto, including the Agreement, even though reference thereto may be made herein, or to comply with any direction or instruction (other than those contained herein or delivered in accordance with this Escrow Agreement) from any party hereto or any entity acting on its behalf. The Escrow Agent shall not be required to and shall not expend or risk any of his own funds or otherwise incur any financial liability in the performance of any of its duties hereunder. (Cl. Ex. 2, third bullet point on page 12).

• <u>Underlying Disputes Concerning Escrow</u>. Without limiting the generality of the foregoing, the Escrow Agent shall act, with respect to the Deposit received by the Escrow Agent, as a stakeholder only and shall not be liable for payment of any interest or any court cost in any action that may be brought to recover the Deposit held. (Cl. Ex. 2, second bullet point on page 13).

• <u>Indemnity of the Escrow Agent</u>. The parties herein agree to hold the Escrow Agent fully harmless and agree to indemnify the Escrow Agent from and against any loss, liability, expense (including but not limited to reasonable attorney's fees and expenses), claims, or demands arising out of or in connection with the transactions contemplated hereby, except for the Escrow Agent's and/or the Escrow Agent's gross negligence or willful misconduct. The foregoing indemnity shall survive the resignation or removal of the Escrow Agent pursuant hereto and the termination of the Agreement and this Escrow Agreement. (Cl. Ex. 2, fourth bullet point on page 13.

36.     On August 19, 2018, Seller sent to Buyer a proposed amendment to the Bitcoin Agreement incorporating the additional $850,000 asked for.  Cl. Exs. 17, 18.

37.     On August 24, 2018, the same day as on the second instruction letter from Dmitri

Kaslov for another payment of $1,600,000 to "HK ZHIXUAN TRADING LIMITED" (Cl. Ex.

42), Respondent wrote to Buyer, Seller and Tracy Evans (Cl. Ex. 19):

> Dmitri enabled Tracy and me to speak with the transfer storage representative
> he named to discuss what might be done to enable the delivery of BTC from
> Dmitri's wallet to Brandon's wallet, notwithstanding the lack of available
> additional funds.
>
> After some discussion, the gentleman said that he would use his best efforts to
> secure the delivery of BTC from Dmitri's wallet to Brandon's wallet within
> some 16-18 hours if funds currently held in escrow were wired today.  Dmitri
> has instructed me to do so and I am writing to all persons concerned in the
> transaction to ensure, in advance, that all are alerted and that there is no
> objection from anyone to my doing so, even though this procedure and any
> instructions or other communication from anyone other than Dmitri is not
> required by the arrangements in place and because nobody has brought
> forward additional funds.

38.     Not having received any bitcoin, on August 28, 2018, Claimant sent a "Legal

Action Notice" (Cl. Ex. 21) to Seller and Respondent setting forth as follows:

> This email serves as notice that Benthos Master Fund, Ltd., represented by its
> CEO, Gerald Fong, is seeking funds in the amount of $5,000,000 USD, either
> in the form of Bitcoin or in the form of USD, from either Valkyrie Group,
> LLC, represented by its President, Brandon Austin, or Valhalla Venture
> Group, LLC, represented by its CEO, Hugh Austin, pursuant to the terms of
> the agreement signed by all three parties on August 4, 2018 with transaction
> code CDKTEBPA080218SUB.
>
> …
>
> Aaron Etra, the escrow attorney for the transaction, removed Benthos's funds
> from escrow on August 7, 2018, which means that 15 business days have now
> passed without delivery of Bitcoin to Benthos.

39.     On August 31, 2018, in response to Claimant's request for detailed information

pertaining to Respondent's release of Claimant's funds (Cl. Ex. 24), Respondent replied that he

"need[s] to be guided by the provisions of the agreements in place." Cl. Ex. 25.

40.     On August 31, 2018, Claimant's attorney at the time, Mr. Mark Hyland, informed

Respondent that "given … the circumstances, please be advised that you may not release any

remaining funds in the escrow account without the express consent of Benthos Master Fund, Ltd." Cl. Ex. 27.  On September 3, 2018, Mark Hyland further wrote to Respondent: "Given the current circumstances, which indicate possible fraudulent activity, … [y]ou have obligations to the Buyer here, who clearly has been victimized." Cl. Ex. 27.  Respondent responded to Fong with express reference to the Escrow Agreement.  Cl. Ex. 28 ("I trust you have provided him [Mark Hyland] with the Escrow Agreements Benthos has entered into and have given him no basis for his allegations.").

41.     On October 8, 2018, Respondent described the relevant part of the Escrow Agreement to Claimant's Fong as follows:  "As you well know, the agreement to which Benthos is a party provides for the Escrow Agent to take instructions on the application of these funds from your contracting party.  Under these circumstances, please direct your requests with respect to the Benthos funds to Valkyrie…" Cl. Ex. 32.

42.     Claimant sent a Notice of Termination of Escrow to Seller and Respondent on October 12, 2018.  Cl. Ex. 33.

43.     Within 26 minutes of receipt of Claimant's Notice of Termination, Respondent sent an email to Seller Valkyrie providing: "As the other contracting party to the relevant agreements with Benthos, and the one whose instructions on the escrow funds I am committed to follow, please advise how you intend to deal with this notice, specifically, instructing me with respect to the funds still on escrow deposit." Cl. Ex. 35.

44.     Later that day, Respondent addressed Seller and Buyer as follows (Cl. Ex. 36):

"Gerald & Brandon,

Gerald, after the discussion we had with Tracy, I received the communication from your lawyer and one from the new buyer …

I have asked Valkyrie for instructions regarding the request in the communication from you and your lawyer to send back the remaining

escrowed funds, as, pursuant to your agreement with Valkyrie, instructions regarding such funds needs to come from Valkyrie."

45.     On October 15, 2018, the SDNY issued an Order to Show Cause for Temporary Restraining Order and Preliminary Injunction (Cl. Ex. 37):

> 4. Further directing respondent Aaron Etra to, within 48 hours:
> a.  Provide copies of all communications between and among any of himself, Valkyrie Group LLC, Valhalla Venture Group LLC, Brandon Austin, Hugh Austin, Tracy Evans, "Dmitri," and Ming Hoang Le, or any of their affiliates, representatives and/or agents, concerning the Bitcoin Agreement, the Escrow Agreement, and/or the funds deposited by Benthos into Etra's IOLA account.

46.     In response, Respondent did not provide any communication from Valkyrie Group LLC.  Cl. Exs. 41, 43.  Counsel for Claimant inquired of Respondent as to the missing communication from Valkyrie Group, LLC only to learn in unambiguous terms from Respondent that: "[t]he clear conclusion is that there is no deficiency in what has been provided to your firm." Cl. Ex. 44, 45.

## VI.     Claimant's Position and Requested Relief

47.     Claimant argues that Etra violated the Escrow Agreement by not following the sole instruction of the Seller, Valkyrie "to secure the BTC for the Buyer", and asserts the loss of the $4.6 million is the result of a fraud.  While already the initial $3 million of Claimant's funds were released in violation of the Escrow Agreement because the release instruction was given by the non-party "Dmitri Kaslov" to the benefit of a Hong Kong trading company that is not mentioned in the Bitcoin and Escrow Agreement, the release of the additional $1.6 million to that same Hong Kong trading company upon the same non-party, Dmitri Kaslov instruction are no different and even came well after the effort was made by Seller of asking for an additional $850,000 for the securing of the bitcoin.

48.     Claimant further asserts that Respondent's less than forthcoming and spotty compliance with the SDNY's ordered disclosures is indicative of Respondent's intention to hide what really happened.  Claimant stresses that Respondent "appeared before the federal judge and lied to her face repeatedly. He returned the $400,000 only when given a 'direct order' upon threat of 'jail' ('bring your toothbrush'), and then produced not a single solitary communication with his confederates notwithstanding the court's warning ('you tell them everything you were supposed to tell them weeks ago'" (Cl. Ex. 40).  SoC, pg. 30.

49.     Relying on breaches of contractual and fiduciary obligations between Claimant and Respondent, Claimant requests damages in excess of $5 million plus legal fees and costs, as follows (SoC, at pgs. 36 - 38):

> "The primary amount owed by Etra to Benthos is the $4.6 million he improperly transferred out of escrow. Benthos is entitled to interest, at the New York State statutory rate of 9%, from October 12, 2018, when Benthos formally terminated the Escrow Agreement and demanded its money back in accordance with the contractual requirements.
>
> [T]he fees incurred in pursuing and obtaining the information upon which this arbitration is built are compensable as damages proximately incurred by reason of that independent breach. ... Benthos calculates those legal fees (omitting any claim for reimbursement of prior counsel's legal fees), through December 4, 2018 – the date that Etra (belatedly) provided the last of the documents Judge Batts deemed sufficient to avert contempt of court – as $110,583.50.
>
> Benthos is also entitled to interest on the $400,000 improperly withheld by Etra between October 12, 2018 and November 16, 2018 when he paid that over under "direct order" of Judge Batts.
>
> Benthos is entitled to recover its costs of the arbitration, including reasonable legal fees. The administrative costs of the arbitration, including the arbitrator's fees and the fees paid to the PCA and ICC, should be allocated, in the arbitrator's discretion 100% to Etra given his breaches of contract and demonstrated lack of good faith.

VII.    Respondent's Position and Requested Relief

50.    Respondent failed to submit a statement of defense in accordance with Article 21

of the UNCITRAL Rules.  Per Article 30(1)(b) of the UNCITRAL Rules, the arbitrator treats

such failure in itself not to constitute an admission of the claimant's allegations.

51.    On March 13, 2020, Respondent wrote to the arbitrator and counsel for the

Claimant setting forth as follows:

> Gentlemen:
>
> Let me restate once again, as I have done since the start of attempts of
> Messers.  Popofsky and Bromberg to initiate an arbitration proceeding against
> me with respect  to a transaction involving their client Benthos Master Fund,
> Ltd. ("Benthos"):
>
> 1.    I am not a party to the transaction;
> 2.    No party to the transaction other than Benthos has been brought into the
> arbitration proceeding;
> 3.    I have not consented to participate in the arbitration proceeding;
> 4.    Consequentially, there is no jurisdiction for the arbitration proceeding;
> 5.    Continuing any such arbitration proceeding is an abuse of due process
> and the rule of law;
> 6.    Attempting to ensnare me in such a proceeding is only another  and the
> latest attempt by Messers. Popofsky and Bromberg to harass and injure me
> financially, and not to resolve a dispute between their client and the parties to
> the transaction.
>
> In addition, asking for a financial contribution to the expenses of such
> arbitration, calling for the payment of fees to an arbitrator, requiring anyone to
> incur legal fees and expenses on engaging counsel, calling for anyone to
> appear at a hearing and incurring  any expense in connection with doing so, is
> a miscarriage of justice.  For an attorney to propose such an arbitration or to
> participate  as an arbitrator in  such a proceeding, is clearly contrary to all
> precepts of professionalism and legal ethics.
>
> Best,
> Aaron Etra

VIII.   Analysis and Decision

**A.      Respondent's March 13, 2020 Email**

52.      In relevant part, Respondent's March 13, 2020 procedural comments restate his previous objections made to the arbitrator in his November 16 and 18, 2019 emails and the objections, including the jurisdictional objection, have been duly considered, analyzed and denied by the arbitrator in Procedural Orders No. 2 and 3.  The arbitrator sees no reason to reconsider the decisions stated in the previous procedural orders.

53.      While in some court proceedings, judgment can be made against a party that has transgressed the rules of the court procedure without the court ruling formally on the merits of the dispute, this is generally not available in arbitration.  *See* Article 30 of the UNCITRAL Rules.  It stands to be tested whether a party against whom an arbitration has been commenced benefits when refusing to participate in it and to fail in presenting its defense.  The failure of the Respondent to submit a defense and to participate in the March 17, 2020 hearings to which he has been given adequate notice since transmission of Procedural Order No. 2 on December 6, 2019[5] does not impede the arbitrator from continuing the proceedings on the basis of what is presented to him and the absence of the Respondent does not relieve the Claimant from the obligation to present its evidence to sustain the claims that it has made.

**B.      Respondent's Liability**

**1.      Applicable legal standard**

54.      The New York law on the obligations of the escrow agent is well settled.  In the 1933 New York Court of Appeals seminal decision in *Farago v. Burke* (262 N.Y. 229, 233) the court ruled: "The law makes the depositary a trustee for both parties (*Stanton v. Miller*, 58 N.Y.

---

[5] Indeed, at the end of Procedural Order No. 3, which the above quoted email from Respondent responded to, set forth the remainder of Procedural Order No. 2, including "March 17/18, 2020: Hearings with opening statements from each side and witness testimony" as well as location and starting time.

192); it imposes upon him a duty not to deliver the escrow to any one except upon strict compliance with the conditions imposed, and even subjects him to damages for his failure".

55.    "An escrow agent not only has a contractual duty to follow the escrow agreement, but additionally becomes a trustee of anyone with a beneficial interest in the trust" with "a duty not to deliver the property held in escrow to anyone except upon strict compliance with the conditions imposed in the escrow agreement." *Sasidharan v Piverger*, 2016 NY Slip Op 08387, *citing Baquerizo v Monasterio*, 90 AD3d 587, 587 (*quoting Takayama v Schaefer*, 240 AD2d 21, 25). "Thus, an escrow agent can be held liable for breach of the escrow agreement and breach of fiduciary duty as escrowee" (*Takayama v Schaefer*, 240 AD2d, 21, 25; *see also Baquerizo v Monasterio*, 90 AD3d at 587; *Grinblat v Taubenblat*, 107 AD2d 735, 736).  It is well settled that an escrow agent owes the parties to the transaction a fiduciary duty. *Greenapple v. Capital One*, NA., 92 A.D.3d 548, 549; *Talansky v. Schulman*, 2 A.D.3d 355, 359.  As a fiduciary, the escrow agent has a strict obligation to protect the rights of the parties for whom the agent acts as escrowee. *Grinblat v. Taubenblat*, 107 A.D.2d 735, 736.  Upon delivery of the subject of the escrow to the escrow agent, "the escrow agent becomes the fiduciary of both parties and owes them the highest kind of loyalty." *Muscara v. Lamberti*, 133 A.D.2d 362, 363.  An escrow agent is "obligated to secure the funds and . . . [is] absolutely prohibited from disposing of them unilaterally." *Iannizzi v Seckin*, 5 AD3d 555, 556 (*quoting Takayama v Schaefer*, 214 AD2d 21, 25).

56.    In *Bardach v. Chain Bakers* (265 App. Div. 24, 27), the court elaborated on the escrow agent's duty to disclose: "[m]uch more could be written showing the misconduct of defendant Sherman as escrow holder. Such a relationship is that of a fiduciary and Sherman owed the plaintiff the highest kind of loyalty. He was under a duty to disclose the situation which had come to his notice. He not only failed to disclose it and was silent when he knew the plaintiff

18

was being defrauded, but by his conduct he actively aided the prosecution of the fraud both in what he said to the plaintiff and in disposing of the escrow moneys so as to prevent other people from drawing the plaintiff's attention to the situation."

57.    To impose liability, the condition precedent to such "liability clearly contemplated by the escrow agreement" must be satisfied (*Roossin v. Rodin*, 140 N.Y.S.2d 315, 316). The plaintiff must show the escrow agent breached its duty under the escrow agreement, or breached its fiduciary duties to either the seller or the buyer (*Takayama v Schaeffer*, 240 A.D.2d 21 [2nd Dept 1998], *Grinblat v. Taubenblat*, 107 A.D.2d 735).

58.    In conclusion, a fraud finding is not necessary to impose liability on the escrow agent for Claimant's requested relief and the analysis below will thus focus on the Escrow Agreement and Respondent's fiduciary duties.

59.    The Escrow Agreement does not negate Respondent's fiduciary duties.  By accepting the appointment as the parties' escrow agent, Respondent also accepted fiduciary duties to Buyer.  The language of the third bullet point on page 12 of the Escrow Agreement is inapposite ("The duties, responsibilities and obligations of the Escrow Agent hereunder shall be limited to those expressly set forth herein and no duties, responsibilities or obligations shall be inferred or implied.").

**2.    Respondent failed to strictly comply with the Escrow Agreement**

60.    Having presented instructions from Dmitri Kaslov dated August 7, 2018 and August 24, 2018 for the release of $3 million and $1.6 million of Buyer's funds put in escrow with Respondent (Cl. Ex. 42), Respondent failed to strictly comply with the Escrow Agreement's requirement that the Seller, Valkyrie Group LLC acting through Brandon Austin instruct the escrow agent about the release of the funds from escrow.  In fact, Respondent did not only fail to strictly comply with the Escrow Agreement, Respondent failed to comply altogether.

61.     In the Escrow Agreement, the Seller instruction requirement is set forth in the following provisions: "Seller and Buyer understand and agree that the funds of Deposit made and held by the Escrow Agent **will be called upon by the Seller from the Escrow Agent by instructions** and are needed to secure the BTC for the Buyer from the Seller's BTC-backed instrument, and the funds shall not be used for any other purpose, and that without such application the Product cannot be obtained for the benefit of the Buyer" (Cl. Ex. 2, fourth Whereas clause, page 9, emphasis in bold added).   "Upon receipt of confirmation of funds received by the Escrow Agent, **Seller will give further instructions to the Escrow Agent for the application of the Deposit funds** as provided for in the Agreement, with the understanding that such instructions must relate to pulling out money in order to secure the BTC from its BTC-backed instrument" (Cl. Ex. 2, page 11, with the quoted language underlined in the Escrow Agreement, emphasis in bold added).   "The Parties expressly and fully agree and irrevocably consent to **the right of the Escrow Agent to follow the sole instructions of the Seller, provided the Seller is doing so with the intention of securing the BTC for the Buyer from its BTC-backed [instrument]**, and that these instructions are with respect to the application of the funds representing the Deposit once received from the Buyer, and transferred as provided for in the Agreement and herein." (Cl. Ex. 2, second bullet point page 12, emphasis in bold added)

62.     Respondent knew who the Seller is – he instructed Brandon Austin to include his and Valkyrie's details in the Bitcoin and Escrow Agreements on August 3, 2018 himself.  Cl. Ex. 10.  Consequently, the absence of any communication from Brandon Austin of Valkyrie Group LLC instructing Respondent to follow Dmitri Kaslov's instructions to release Buyer's funds to a Hong Kong entity thus is determinative.  There is only one communication from Seller after the conclusion of the Bitcoin and the Escrow Agreement, Seller's requested amendment for the minimum purchase size to be increased by $850,000 (Cl. Exs. 17, 18).  But that does not

constitute an instruction from the Seller to Respondent to release either $3,000,000 or $1,600,000 to a Hong Kong entity.

63.     In addition, despite the SDNY's order to produce any and all communication between Respondent and Valkyrie Group, LLC as well as Brandon Austin relating to the transaction in dispute here, Respondent failed to produce any communication from Seller to him. Counsel for the Claimant even reminded Respondent about such glaring absence (Cl. Ex. 44), yet, Respondent confirmed that he had made a full production (Cl. Ex. 45).

64.     It must then reasonably be concluded that no communication exists between Respondent and Brandon Austin and/or Valkyrie Group, LLC regarding instructions to release Buyer's funds.  In fact, it can also reasonably be concluded that Respondent failed to make any effort to obtain instructions from the Seller or raise the Escrow Agreement conflicting instructions with the parties to the Bitcoin Agreement.  *See* Cl. Ex. 2, first bullet point on page 13 ("If the Escrow Agent is reasonably uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands . . . which . . . conflict with any provisions of the Agreement or this Escrow Agreement, the Escrow Agent shall promptly send a written request to each affected Party for clarification of such uncertainty or conflict.").  Respondent's August 24, 2018 email to Buyer and Seller prior to the release of the $1.6 million does not qualify as such request for clarification.  Indeed, Respondent mistakenly wrote in there that nobody other than Dmitri's instruction is required by the arrangements in place.  Cl. Ex. 19.  Respondent also failed to make any effort to reclaim the $3 million and $1.6 million transfers from either Dmitri Kaslov and/or the recipient of those funds, HK ZHIXUAN TRADING LIMITED.

65.     In conclusion, by releasing $4.6 million of Claimant's funds then held in escrow by Respondent on August 7, 2018 and August 24, 2018, the arbitrator finds that Respondent breached his duties under the escrow agreement as well as his fiduciary duties to the Claimant.

21

### 3.      Respondent acted in gross negligence or willful misconduct

66.      I will now turn to the issue of whether Respondent acted in gross negligence or willful misconduct.  Difficult issues can arise when one of the parties to the escrow is also the lawyer's client.  The Hawaiian Supreme Court put it well when it stated "[w]e caution attorneys about the potential for conflicts of interest in situations such as this where an attorney for one party also purports to act 'as escrow' for the transaction between the attorney's client and another party." *Fong v. Oh*, 172 P.3d 499, 512 (Hawaii 2007).  *See also* New York City Bar Association, Formal Opinion 1986-5, Lawyer as Escrow Agent, July 14, 1986.

67.      Cl. Ex. 54 contains an engagement letter entered into on August 10, 2018 between the Valhalla Venture Group signed for by Hugh Austin and Respondent.  However, the majority of the funds were released on August 7, 2018 already and the Seller is Valkyrie Group, LLC, acting through Brandon Austin.  While the Valhalla Venture Group, LLC is listed in Annex C of the Bitcoin Agreement and identified as the possible recipient of the 2% consultant/facilitator fee per Section 16.3 of the Bitcoin Agreement, it is unclear whether this engagement letter covers any of the prior work done by Respondent in association with the transactions in dispute here.  It is equally unclear whether any of Respondent's work after August 10, 2018 is the subject of this engagement letter.

68.      In the Escrow Agreement, the parties agreed to limit the Escrow Agent's liability to his acts and omissions resulting from gross negligence or willful misconduct.  Cl. Ex. 2, bottom paragraph on page 11.

69.      Gross negligence is "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing".  *Colnaghi, U.S.A. v Jewelers Protection Servs.,* 81 NY2d 821, 823-824.  As a trustee, an escrow agent owes his fiduciary "the highest kind of loyalty".  *Bardach v Chain Bakers, Inc.,* 265 App Div 24, 27, *affd* 290 NY 813.  Disbursing money to parties other than

the party designated in the [contract document], personally appropriating $120,000, continuing to withdraw funds after written notice that further withdrawals were not authorized, and failing to respond to Plaintiffs' repeated inquiries could demonstrate 'gross negligence or willful misconduct' such that a [fact-finder] 'could return a verdict' in Plaintiffs' favor". *Qube Films*, 2016 WL 881128 at *5. *See also, e.g. S.A. De Obras y Servicios v. Bank of Nova Scotia*, 170 A.D.3d 468, 473 (complaint sufficiently alleged that defendant['s] conduct evinced a reckless disregard for plaintiff's rights insofar as [defendant] failed to comply with, or actively disregarded, its own policies), *citing Internationale Nederlanden v. Bankers Trust*, 261 A.D.2d 117 (the First Department held that gross negligence could be found to exist where defendant "was well aware that millions of dollars were at stake," "minor errors of form could have drastic consequences," and defendant "reassured [plaintiff] that everything was in order, until it was too late for [plaintiff] to do anything about it").

70.     In the SDNY proceedings, Respondent attempted to justify his release of money with an alleged consent by the Claimant.  In particular, Respondent informed Claimant on August 17, 2018, that "[p]er your request on the call, I confirm that two transfers have been made to date, per instructions, from the $5 Million received in escrow: one of $3 Million and one of $250,000, leaving $1,750,000 remaining in escrow." (Cl. Ex. 57).  While Claimant's Fong initially replied "Great, thank you." (*id*.), Respondent's attempt to potentially be able to make a good faith showing of Claimant's informed consent is defeated not only by the lack of detail provided in this email, which an escrow agent needs to engage in in order to discharge his fiduciary duty of full disclosure, but Fong had no information about the $250,000 release in advance: "[o]ne additional question – what, was the purpose of the second transfer (the $250,00 one)?  We were previously only aware of the first one." *Id*.)  Fortunately for the Respondent, the $250,000 were eventually paid back into the escrow account (Cl. Ex. 59) so that the arbitrator does not need to analyze Claimant's allegations about the dubious circumstances of this

transaction, but important for a finding of gross negligence or willful misconduct, with the $250,000 transfer, Respondent engaged in conduct unworthy of an attorney acting as an escrow agent in that he is "absolutely prohibited from disposing of [funds in escrow] unilaterally." *See Iannizzi* 5 AD3d 555, 556, *supra*. It has already been established that Respondent cannot rely on any Seller instructions and it cannot be overemphasized that "the escrow agent becomes the fiduciary of both parties and owes them the highest kind of loyalty." *Muscara v. Lamberti*, 133 A.D.2d 362, 363. Providing two liners of information, that are not only far from a complete disclosure of the underlying available information, and engaging in months of conduct withholding full disclosure of that information until the threat of sanctions by a federal judge, taken together, is a display of the opposite of the owed "highest kind of loyalty" – it is a showing of disloyalty.

71.     If such disloyalty does not already suffice to qualify Respondent's misconduct to the level of gross negligence or willful misconduct, Respondent was not only informed about the instructions letter preparation process on a real time basis, but he even took an active role in their finalization. Indeed, Respondent edited the very instruction letters now relied upon himself and advised about concerns how they may be perceived by the parties to the Bitcoin and Escrow Agreements. *See* Cl. Exs. 49-53. Respondent showed reckless disregard of the rights of Claimant by his very own blessing of instructions from a non-party (Cl. Ex. 51). While doing so, Respondent failed not only to secure an instruction from the Seller, Valkyrie Group, LLC, but he also failed to match the transaction codes of the instruction letters with the transaction code underlying the Bitcoin Agreement transaction.

72.     Perhaps most shocking and clearly supporting a finding of gross negligence or willful misconduct then, when he wanted to, Respondent was well aware of whose instructions would have lawfully permitted him to release funds from escrow. The relevant communication

are set forth in the Factual Background.  *Supra*, at paras. 39-44.  It is clear from his later correspondence, on August 7, 2018, and August 24, 2018, Respondent chose to disregard his duties intentionally.

73.     Not in compliance with the duties imposed on an escrow agent, on August 24, 2018, Respondent even started ill-informed attempts to make sure that there were no objections from what he called "all persons concerned in the transaction", although – Respondent erroneously also stated - "this procedure and any instructions or other communication from anyone other than Dmitri is not required by the arrangements in place." Cl. Ex. 42.

74.     Respondent's initial invocation of the provisions of the Escrow Agreement were self-serving and done in response to Claimant's requests to be repaid escrowed funds.  See Cl. Exs. 25, 28.  On October 8, 2018, Respondent even wrote: "[a]s you well know, the agreement to which Benthos is a party provides for the Escrow Agent to take instructions on the application of these funds from your contracting party.  Under these circumstances, please direct your requests with respect to the Benthos funds to Valkyrie…"  Cl. Ex. 32.

75.     Having received Claimant's October 12, 2018 Notice of Termination of Escrow Agreement (Cl. Ex. 33), Respondent most clearly remembered the provisions from the Escrow Agreement allowing him to release funds.  26 minutes after receipt of Claimant's Notice of Termination, Respondent sent an email to Seller Valkyrie providing: "As the other contracting party to the relevant agreements with Benthos, and the one whose instructions on the escrow funds I am committed to follow, please advise how you intend to deal with this notice, specifically, instructing me with respect to the funds still on escrow deposit." Cl. Ex. 35.

76.     Not only must it be demanded from an attorney in good standing registered with the New York bar to know his obligations as an escrow agent, the record shows that he actually did, albeit in an attempt to evade from the obvious, *i.e.* having to return Claimant's funds put in

25

escrow with him.  One would have hoped that Respondent had sent similar messages to Seller, Valkyrie Group, LLC prior to releasing $3 million and $1.6 million of Claimant's funds, or, at a minimum, requests to Seller confirming the instructions relied upon by Dmitri Kaslov, but the evidence in that respect is missing and, in fact, the contemporaneous facts show no such attempts were ever made by Respondent.  Respondent's sole attempt in obtaining instruction from Seller is contained in Cl. Ex. 36: "I have asked Valkyrie for instructions regarding the request in the communication from you and your lawyer to send back the remaining escrowed funds, as, pursuant to your agreement with Valkyrie, instructions regarding such funds needs to come from Valkyrie."  It bears emphasizing that such request was limited to "the remaining escrowed funds".

77.    Respondent's prior release of the $4.6 million of Claimant's funds were executed by Respondent despite better knowledge of not having been instructed by Seller.  Respondent's conduct certainly meets the above cited *Colnaghi,* standard of "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing."  *See supra Colnaghi, U.S.A.,* 81 NY2d 821, at 824.  But more than that, the evidence supports a finding that Respondent released Claimant's funds while engaging in willful misconduct against better knowledge.

**4.    No indemnification and/or fees earned**

78.    The escrow agreement's indemnification provisions in favor of the Respondent exclude his acts of gross negligence or willful misconduct.  *See supra*, para. 35.  In light of the aforesaid finding of willful misconduct, the Escrow Agreement's indemnification in favor of Respondent then does not negate Claimant's claim.

79.    Respondent's indemnification in section 16.3 of the Bitcoin Agreement does not serve Respondent either.  The 2% consultant/facilitator fee payable to Valhalla Venture Group, LLC would have been triggered only upon the facilitation of the transaction.  It did not occur.

80.     Moreover, in the absence of Seller's delivery of bitcoin to Claimant, Respondent is not entitled to his non-refundable fee of 1% of the Deposited Funds, i.e. $50,000, contemplated in the fourth bullet point of the Escrow Agreement ("Should Seller fail to provide the Buyer with BTC, Buyer shall not be responsible for any payments to any Party." Cl. Ex. 2, page 10 of 16).  More specifically, in case of termination of the escrow agreement due to the failure to consummate the underlying bitcoin transaction, the parties expressly provided that no fee should be payable to Respondent by Claimant ("The Escrow shall terminate upon … 1. Receipt by the Escrow Agent of written notice signed by either the Seller or Buyer expressly terminating such Escrow because the transaction could not be consummated and the Deposit funds need to be returned without the disbursement of any fee to the Escrow Agent from the Buyer.  Any payments or fees owed to the Escrow Agent will be paid by the Parties other than the Buyer, and the Buyer shall not be required to pay any such payments or fees." Cl. Ex. 2, page 11 of 16).

### 5.     Damages

81.     Before interest and costs, Claimant claims damages of $4.6 million released in breach of the Escrow Agreement by Respondent plus $110,583.50 incurred in legal fees associated with the SDNY proceedings through December 4, 2018, the date that Respondent (belatedly) provided the last of the documents Judge Batts deemed sufficient to avert contempt of court.

82.     The loss of $4.6 million has been aptly proven (*see* Respondent's confirmation of Claimant's $5 million transfer, Cl. Ex.43, at page 5 of 17 and Respondent's proof of return of $400,000, Cl. Ex. 42).

83.     At the March 17, 2020 hearing, Deo confirmed that $110,583.50 in attorneys' fees were necessary for Claimant to obtain both the instructions wrongly relied upon by Respondent as well as the proof of lack of instructions from the Seller.

84.     Before interest and costs, Claimant's compensable damages are $4,710,583.50.

**C.     Pre-Award and Post-Award Interest**

85.     In the SoC, Claimant alleges that it is entitled to interest, at the New York State statutory rate of 9%, from October 12, 2018, on the $4.6 million.  Claimant further alleges that it is entitled to that same 9% interest on the $400,000 improperly withheld by Respondent between October 12, 2018 and November 16, 2018.  SoC, at pages 36 *et seq*.

86.     Neither the Bitcoin or Escrow Agreement address any party's entitlement to interest or the applicable interest rates.  The Escrow Agreement's second bullet point on page 13 is not applicable to Claimant's interest claim since it addresses disputes concerning entitlement to the funds in escrow, not the escrow agent's obligation to return such funds due to a violation of his own duties.  Cl. Ex. 2 ("Underlying Disputes Concerning Escrow. Without limiting the generality of the foregoing, the Escrow Agent shall act, with respect to the Deposit received by the Escrow Agent, as a stakeholder only and shall not be liable for payment of any interest or any court cost in any action that may be brought to recover the Deposit held.").

87.     The UNCITRAL Rules do not address interest either.  It is commonly recognized that arbitrators sitting in New York under the UNCITRAL Rules are afforded discretion to award pre-award and post-award interest.  *See generally* New York City Bar Committee on International Commercial Disputes Report "Awards of Interest in International Commercial Arbitration", June 21, 2017.  *See also CME v. The Czech Republic*, Final Award, March 14, 2003, at pgs. 154 *et seq*., available at https://www.italaw.com/sites/default/files/case-documents/ita0180.pdf.

88.    In exercising the discretion afforded, the arbitrator determines that New York's

statutory prejudgment interest provisions are not determinative for the award of pre-award and

post-award interest.  The text of C.P.L.R. Sections 5001 and 5002 contains numerous terms

(including references to "the court's discretion," "the cause of action," "the jury," and "the clerk

of the court") indicating that these sections are intended to apply only to court proceedings, not

arbitration.   In addition, the legislative history of C.P.L.R. Section 5004, which sets the

prejudgment interest rate applicable under Sections 5001 and 5002, indicates that the New York State

legislature adopted a fixed rate of nine percent in part in consideration of factors that are not directly

related to the compensatory purpose of an award of interest.  The initial adoption of a fixed rate of

six percent in 1972 reflected a desire to simplify the calculation of interest by the courts, the 1981

adjustment to nine percent responded to market rates jumping into the high teens.  *See generally* New

York City Bar Committee on International Commercial Disputes Report "Awards of Interest in

International Commercial Arbitration", *Id.*

89.    Today's market rates and for that matter those in place at the time of Respondent's

breaches are nowhere close to the statutory rate of nine percent.   An award of 9% pre- and post-

award interest materially overcompensates Claimant for the loss suffered.  Indeed, the parties' intent

as to the economic value of the underlying funds and contemplated transaction beyond the nominal

face value as expressed in Section 16.4 of the Bitcoin Agreement is indicative.  It reads: "In

summary, under clause 16.2, Party Two will pay to Party One [in USD] the sum calculated by

multiplying the number of BTCs by the value of the BTCs according to the Market Price as

specified hereunder, MINUS the Buyer's discount of four percent (Gross: 6% Net: 4%).  *See*

*Greenfield v. Phillies Records, Inc.*, 98 N.Y.2d 562, 569 ("The fundamental, neutral precept of

contract interpretation is that agreements are construed in accord with the parties' intent."); *Slatt*

*v. Slatt*, 64 N.Y.2d 966, 967 ("In adjudicating the rights of parties to a contract, courts . . . are

required to discern the intent of the parties[.]")

29

90.     Claimant's financial motivation to put its funds in escrow with Respondent is expressed in its expectation to be able to work with bitcoins at a 4% net discount.  New York courts have held that the purpose of pre-award interest is to compensate the prevailing party for the loss of use of money that the prevailing party was entitled to receive from the date its claim arose until the date of the award. *See, e.g.*, *NML I*, 17 N.Y.3d at 266 ("[T]he function of prejudgment interest is to compensate the creditor for the loss of use of money the creditor was owed during a particular period of time."); *Kassis v. Teachers' Ins. & Annuity Ass'n*, 786 N.Y.S.2d 473, 474 ("The purpose of prejudgment interest is to compensate parties for the loss of the use of money they were entitled to receive, taking into account the time value of money."). An award of pre-award interest of 4% per annum, simple thus serves as a fair and just compensation for Claimant's $4.6 million damages deposited by Claimant and owed since the termination of the Escrow Agreement on October 12, 2018.

91.     The additional interest claim on the $400,000 is denied.  Due to Respondent's return thereof, albeit having been belated, the $400,000 no longer form part of Claimant's damages resulting from Respondent's breaches of his contractual and fiduciary duties, and the arbitrator declines to exercise his discretion to award compensatory pre-award and post-award interest without the underlying principal forming part of the awarded damages.

92.     Accordingly, the arbitrator finds that Claimant is entitled to daily pre-award interest of $504.11 from Respondent on the damages of $4.6 million for 80 days for the period of October 12, 2018 until December 31, 2018, 365 days for the period from January 1, 2019 until December 31, 2019 and 99 days for the period from January 1, 2020 until this 9th day of April 2020, totaling 544 days and amounting to $274,235.84.

93.     Should Respondent fail to voluntarily comply with the award within 30 days of the date of this Final Award, Claimant shall also be entitled to post-award interest at the same

interest rate of 4% simple interest per annum until satisfaction of the award, including on the full damages, the pre-award interest accrued and the costs awarded here below.

**D.     Costs**

94.     Pursuant to Article 40(1) of the UNCITRAL Rules, the arbitral tribunal shall fix the costs of arbitration in its award.

95.     On March 27, 2020, the Claimant submitted its table of costs amounting to $ $249,956.16, comprised of $176,445.50 in legal and other costs incurred by Claimant in relation to the arbitration per Article 40(2)(e) of the UNCITRAL Rules, $4,692.66 incurred by the Claimant in relation to travel and other expenses of witnesses (Article 40(2)(d) of the UNCITRAL Rules, $13,318 in fees and expenses of the appointing authority as well as those of the Secretary-General of the PCA per Article 40(2)(f) of the UNCITRAL Rules, and $55,000 paid in deposits for the arbitrator's fees and costs, also substituting for Respondent's half.

96.     On April 7, 2020, the Claimant made a further $19,785.62 deposit payment per Article 43(2) of the UNCITRAL Rules, also substituting for Respondent's part.  The  Claimant thus advanced all of the fees and expenses of the arbitral tribunal per Article 40(2)(a) of the UNCITRAL Rules, a total of $74,785.62.

97.     All of the costs of arbitration incurred by the Claimant are reasonable and approved.  Discharging its mandate under Article 40(1) of the UNCITRAL Rules, the total arbitration costs are fixed at $269,741.78, of which Claimant has paid $269,741.78.

98.     Per Article 42(1) of the UNCITRAL Rules, the costs of arbitration shall in principle be borne by the unsuccessful party.  Upon Claimant's proper proof of having incurred the total costs of arbitration, Claimant is entitled to reimbursement of $269,741.78 from Respondent.  *See also* Article 42(2) of the UNCITRAL Rules.

IX.   Relief Awarded

WHEREFORE, for the reasons set forth above, the undersigned arbitrator AWARDS, as follows:

1) Respondent is ordered to pay to the Claimant within 30 days of the date of the Final Award, damages in the amount of $4,710,583.50 plus $274,235.84 in accrued pre-award interest on the $4.6 million calculated at 4% simple interest per annum since October 12, 2018, *i.e.* a total of $4,984,819.34.

2) Respondent is further ordered to pay Claimant within 30 days of the date of this Final Award Claimant's costs of arbitration incurred in the amount of $269,741.78.

3) Should Respondent fail to comply with the above orders set forth in points 1) and 2), starting on May 1, 2020, Respondent is ordered to pay Claimant additional post-award interest on the amount of $5,254,561.12 at 4% simple interest per annum.

4) All other claims are hereby denied.

I hereby certify that this Final Award was made in New York, New York, USA.

Dated: April 9, 2020

Martin F. Gusy
Sole Arbitrator

32