# EXHIBIT B

**BTC AGREEMENT: TRANSACTION CODE N°**
**<u>CDKTEBPA080218SUB</u>**

This BTC agreement (the "Agreement") is entered into as of this 2nd day of August 2018 BY AND BETWEEN:

**The Seller of 10,000 BTC R+E CONTRACT:**

<u>**Valkyrie Group LLC**</u>**, whose registered address is 21005 63RD AVENUE EAST, BRADENTON, FL 34211, represented by its duly authorized representative, BRANDON AUSTIN , PRESIDENT, PASSPORT/DL# A235-075-95-410-0 whose domicile address is 21005 63RD AVENUE EAST, BRADENTON, FL 34211**

**AND the Buyer of 10,000 R+E BTC CONTRACT:**

**Benthos Master Fund, Ltd., whose registered address is 168 18th Ave., San Francisco, CA 94121, represented by its duly authorized representative, Gerald Fong, CEO, PASSPORT #417556998, whose domicile address is 20199 Guava Ct., Saratoga, CA 95070**
**hereinafter termed as Party Two.**

**Each of Party One and Party Two is a "Party" and collectively they are the "Parties" to this Agreement.**

**WHEREAS**, as a condition and inducement to Party One and Party Two entering into a transaction, both Parties have contemporaneously entered into this Agreement,

**NOW, THEREFORE**, in consideration of the understanding set forth above, the mutual promises and covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Party One and Party Two hereby agree as follows:

**Section 1**

### DEFINITIONS AND INTERPRETATION

1.1     Definitions. In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

1.2     "Party One and Party Two" has the meaning set forth in the Preamble above;

1.3     "Agreement" has the meaning set forth in the Preamble above;

1.4     "Business Day" means any day that is not a Saturday, a Sunday or public or bank holiday on which banks are closed in London;

1.5     "Contract" means any agreement, contract, lease, indenture, instrument, note, debenture, bond, mortgage or deed of trust or other agreement, commitment, arrangement or understanding;

1.6     "Control" (including the terms "Controlled by" and "under common Control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise, including the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person or securities that represent a majority of the outstanding voting securities of such Person;

1.7     "Indemnities" has the meaning set forth below;

1.8     "knowledge" means, with respect to any party, the actual knowledge of such party's executive officers after due diligence, including inquiry of such party's counsel and other officers or employees of such party;

1.9     "Law" means the Laws of New York State without giving effect to its conflict of laws;

1.10    "Material Adverse Effect" means any event, circumstance, development, change or effect that, individually or in the aggregate, has or would reasonably be expected to have a material adverse effect on (a) the business, properties, assets, liabilities, operations, results of operations or financial condition of a Party, taken as a whole, or (b) the authority or ability of a Party to perform its obligations provided, however, that for purposes of clause (a) above, in no event shall any of the following exceptions, alone or in combination with the other enumerated exceptions below, be deemed to constitute, nor shall be taken into account in determining whether there has been or will be, a Material Adverse Effect:

Any effect resulting from compliance with the terms and conditions of, or from the announcement of the transactions contemplated by this Agreement and/or any other Transaction Document between the Parties, (ii) any effect that results from changes affecting any of the industries in which the Party or its Subsidiaries operate generally or the economy generally and which can be reasonably demonstrated to be unavoidable, (iii) any effect that results from changes affecting general worldwide economic or capital market conditions and which can be reasonably demonstrated to be unavoidable, provided that any such changes in (ii) and (iii) do not disproportionately affect the Party in any material respect relative to other similarly situated participants in the industry in which they operate, (iv) any pandemic, earthquake, typhoon, tornado or other natural disaster or similar force major event,

1.11    "Material Contract" has the meaning set forth below.

1.12    "Person" means any individual, partnership, corporation, association, joint stock company, trust, joint venture, limited liability company, organization, entity or Governmental Authority;

1.13    "Public Documents" has the meaning set forth below.

1.14    "Subsidiary" of any Person means any corporation, partnership, limited liability company, joint stock company, joint venture or other organization or entity, whether incorporated or unincorporated, which is Controlled by such Person and, for the avoidance of doubt, the Subsidiaries of any Person shall include any variable interest entity over which such Person or any of its Subsidiaries effects Control pursuant to contractual arrangements and which is consolidated with such Person in accordance with generally accepted accounting principles applicable to such Person;

1.15    "Tax" has the meaning set forth below.

**Section 2**

**Recitals**

**Information.**

Seller _BA_     Buyer _YJ_                                   Page 3 of 16

2.1     Both Party One and Party Two have been furnished access to all materials and information they have requested from the other Party in order to evaluate whether to proceed with the Agreement and is relying solely on their own counsel and other advisors for legal, financial and other advice with respect to the transactions contemplated by this Agreement and the other transaction documents.

**Section 3**

**Consents.**

3.1     In connection with the entering into and performance of this Agreement neither Party is required to obtain any consent, authorization or order of, or make any filing or registration with (a)  any Governmental Authority in order for it to execute, deliver or perform any of its obligations under or contemplated hereby or thereby or (b) any third party pursuant to any agreement, indenture or instrument to which the  Party or any of its Subsidiaries is a party, in each case in accordance with the terms hereof or thereof other than such as have been made or obtained, and (b) (ii) such consents, authorizations, orders, filings or registrations that, if not obtained or made, would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**Section 4**

**Financial Statements.**

4.1     Not applicable unless a financial consideration is required, in which case due diligence will take place.

**Section 5**

**No Undisclosed Liabilities.**

5.1     Both Parties do not have any liabilities or obligations other than (a) liabilities or obligations reflected on, reserved against, or disclosed (excluding those discharged or paid in full prior to the date of this Agreement), (b) liabilities or obligations that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and (c) liabilities in the ordinary course of business consistent with past practices and any liabilities incurred pursuant to this Agreement.

**Section 6**

**Intellectual Property.**

6.1     Both Parties own or possess adequate rights or licenses to use all Intellectual Property necessary to the conduct of their businesses as now conducted, and such Intellectual Property represents all material intellectual property rights necessary to the conduct of their business as now conducted.

6.2     There are no infringements or other violations of any Intellectual Property by any third party, except for such infringements and violations which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. The conduct of the business of each Party and its Subsidiaries as currently conducted does not infringe or otherwise violate any proprietary right or Intellectual Property of any third party, except for such infringements and other violations which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Page 4 of 16

Seller    Buyer

**Section 7**

**Litigation.**

7.1     There are no pending or, to any Party's knowledge, threatened, Proceedings of any nature against either of the Parties which would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect on either of the Parties and their ability to perform its obligations hereunder, or any Proceedings that seek to restrain or enjoin the consummation of the Agreement. There is no Judgment outstanding against either of the Parties, any of their equity interests, material properties or assets, except for any Judgment which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on either of the Parties.

**Section 8**

**Further Assurances.**

8.1     Each of the Parties shall use its reasonable best efforts to fulfil or obtain the fulfilment of the conditions precedent to the consummation of the transactions contemplated by this Agreement in a timely basis, including the execution and delivery of any documents, certificates, instruments or other papers that are reasonably required for the consummation of such transactions, and will cooperate and consult with the other and use its reasonable best efforts to prepare and file all necessary documentation.

**Section 9**

**Representations and Warranties; Covenants.**

9.1     The representations and warranties of both Parties shall be true and correct in all material respects (except for those representations and warranties that are qualified by materiality or Material Adverse Effect, which shall be true and correct to such extent) as of the date of this Agreement and as of the Closing Date as though made at that date (except for those representations and warranties that speak as of a specific date, which shall be so true and correct in all material respects as of such specified date);

**Section 10**

**BTC Agreement.**

10.1    Both Parties shall have performed, satisfied and complied in all material respects with the covenants and agreements contained in the Agreement.

**Section 11**

**Termination.**

11.1    This Agreement may be terminated, and the transactions contemplated by this Agreement abandoned at any time prior to the closing, by unanimous agreement of both Parties, should either Party have made misrepresentations resulting in the signing of this Agreement, should there be an irrevocable breakdown between both Parties and should either Party be in material breach of clauses of this Agreement and, following discussion, those breaches and difference are not remediable or reconcilable.

**Section 12**

**For the avoidance of doubt.**

12.1    The Parties hereto agree and acknowledge that Party One and Party Two will be liable to a third party for Indemnified Liabilities resulting from any breach of a representation, warranty, covenant or undertaking by the relevant Party under this Agreement.

**Section 13**

**Governing Law.**

13.1    This Agreement shall be governed by, and construed in accordance with, the laws of New York State without giving effect to its conflict of laws. All disputes or disagreements which cannot be settled amicably shall be determined by binding arbitration under UNCITRAL Rules by one arbitrator sitting in New York, NY, U.S.A. and shall be enforceable in any court of competent jurisdiction.

**Section 14**

**Severability.**

14.1    If any provision of this Agreement is found to be invalid or unenforceable, then such provision shall be construed, to the extent feasible, so as to render the provision enforceable and to provide for the consummation of the transactions contemplated hereby on substantially the same terms as originally set forth herein, and if no feasible interpretation would save such provision, it shall be severed from the remainder of this Agreement, which shall remain in full force and effect unless the severed provision is essential to the rights or benefits intended by the Parties. In such event, the Parties shall use commercially reasonable efforts to negotiate, in good faith, a substitute, valid and enforceable provision or agreement, which most nearly affects the Party's intent in entering into this Agreement.

**Section 15**

**Entire Agreement/ Notices.**

15.1    This Agreement, together with all the schedules and exhibits hereto and thereto and the certificates and other written instruments delivered in connection herewith from time to time on and following the date hereof, constitute and contain the entire agreement and understanding between all Parties with respect to the subject matter hereof and thereof and supersedes any and all prior negotiations, correspondence, agreements, understandings, duties or obligations between both Parties respecting the subject matter hereof and thereof. This Agreement may be amended or revised only by a written agreement signed by both Parties. All communications and notices between the Parties will be in writing and sent by E-Mail to the persons and addresses set forth below, effective on confirmed dispatch, or to such persons and E-Mail addresses as are notified pursuant hereto.

**Section 16**

**The Procedures:**

16.1    On the signing of this Agreement and the Escrow Agreement annexed hereto as ANNEX A (the "Escrow Agreement") by both Parties, they agree to and are contractually

Seller _BA_       Buyer _YJ_

obligated to follow and adhere to the terms and conditions of this Agreement and the procedures set forth below and in the Escrow Agreement.

16.2   This is an exchange of 10,000 BTC (the "Product") to be transferred from Party One [Seller] to Party Two [Buyer] for a cash consideration in USD, at the market price per BTC as fixed below minus Party One's total discount of Gross:6% Net:4% to Party Two. This 10,000 BTC represents a contract that could be completed in as short a time as will be agreed to by Party One and Party Two after the initial tranche of $5,000,000 worth of BTC.

16.3   The Parties agree there is a consultant/facilitator fee of 2% as stated in 16.2 above of 4%.to be paid through this Agreement by the Escrow Agent as per Annex C.  Further, both parties agree that this is the only consultant fee to be paid through this Agreement, and the Parties hereby indemnify each other and the Escrow Agent, and agree to hold them free of and fully harmless from any claims, costs and expenses relating to or raised by any other persons or parties.

16.4   In summary, under clause 16.2, Party Two will pay to Party One [in USD] the sum calculated by multiplying the number of BTCs by the value of the BTCs according to the Market Price as specified hereunder, MINUS the Buyer's discount of four percent (Gross: 6% Net: 4%).

**For the Buyer to determine the BTC price on any particular day for the purposes of this contract, PARTY TWO [Buyer] will use the price reported on BLOCKCHAIN.INFO at 9:00 AM New York time upon confirmation of Buyers funds being sent to Escrow.**

1. Within the next 24 business hours after Party One and Party Two and Escrow Agent have signed this Agreement and the Escrow Agreement, Party Two will send to the ESCROW AGENT named in the ESCROW AGREEMENT by wire transfer in USD an amount totaling the price of $5,000,000 worth of BTCs post-discount (corresponding to a pre-discount value of $5,208,333.33), minus the discount given to the Buyer of Net 4%, in this case totaling $5,000,000. Upon completion of the wire transfer by Party Two, Party One and the ESCROW AGENT will be sent a copy of the documentation confirming transmission of the wire.

2. On notice from the Escrow Agent to Party One that the requisite sum has been received from Party Two and credited to the Escrow account, before the intended transaction date and time, Party One will arrange for undertaking the delivery of the requisite amount of Party One's BTCs to the wallet address of Party Two (as specified in ANNEX B), at 9:00AM New York time or immediately upon such notice from the Escrow Agent, whichever is later. The Seller may pull out an amount of money from escrow in order to secure the BTC from its BTC-backed instrument.

3. After the time required for all six confirmations in the Bitcoin blockchain network the quantity of which minimizes any risk to the integrity of the BTCs for Party Two, which is usually completed within a period of 16 hours, the requisite BTCs are to be delivered to the respective Wallet(s) as provided for herein (ANNEX B for Party Two), thereupon completing  the $5,000,000 worth of BTC transaction and deeming all escrowed funds from Party Two for this transaction duly earned and to be then fully released by the Escrow Agent to Party One.

4. After the first transaction, the Parties will conduct additional transactions under the same terms defined herein. The schedule of these transactions will be determined by the Parties after completion of the initial transaction of $5,000,000 worth of BTC but is understood to be weekly. These additional transactions will continue until such time

Page 7 of 16

Seller _BA_    Buyer _GJ_

   as either Party gives notice to the other Party that they do not wish to continue the additional transactions or until Seller has sold more than 10,000 BTC to Buyer.

5. To request other arrangements after the initial transaction, Party Two needs to request in writing that Party One increase the amount of BTCs per transaction and/or the possible frequency thereof, and can also request specific rolls and/or extensions, and/or any other specifics, etc. Party One reserves the right to either accept the request made by Party Two, counter the request, or decline the request altogether. Party Two reserves the right to accept, counter, or decline Party One's new offer, and/or request to continue with $5,000,000 worth of BTCs weekly or to not continue after the initial transaction.

6. GUARANTEE: It is understood that Valhalla, represented by Hugh Austin and his estate, will guarantee to make available to Party Two the sum of five million dollars USD, if and to the extent that Party Two has not received the BTC for which it has provided the funds for this transaction within 15 business days or a reasonable amount of time as agreed upon by both Parties, whichever is shorter, of such funds being removed from escrow. Valhalla or Hugh Austin will make this payment available to Party Two immediately after such period and without recourse.

This Agreement is dated as of the date first above written by the duly authorized representatives of the Parties as set forth below:

Signed for and on behalf of

**(Party One)**
NAME: Valkyrie Group LLC
BY: Brandon Austin
Title of Representative: President
Florida License #: A235-075-95-410-0
Issue Date: 10/24/14
Expiry Date: 11/10/2022
E-Mail Address: baustin@smallcapnation.com

FOR AND ON BEHALF OF Valhalla Venture Group LLC. (Guarantor):
NAME: Hugh Austin
TITLE: CEO
PASSPORT NO/DL: 551-885-225
ISSUE/EXPIRY DATE: 07/11/12 - 09/19/2020
E-MAIL ADDRESS: haustin@valhallaventuregroup.com
SIGNATURE:
_____

Signature:
___*Brandon Austin*_____

Signed for and on behalf of

**(Party Two)**
NAME: Benthos Master Fund, Ltd.
BY: Gerald Fong
Title of CEO
Passport 417556998
Issue Date 13 Jul 2010
Expiry Date: 12 Jul 2020
E-Mail Address: gerald@benthoscap.com
Signature: _____

Seller _BA_    Buyer _GF_

Page 8 of 16