UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BENTHOS MASTER FUND, LTD.,

                           Petitioner,

           - against -

AARON ETRA,

                           Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 20-cv-03384 (AJN)

**DECLARATION OF
STEVEN R. POPOFSKY**

**I, Steven R. Popofsky**, declare the following:

1. I am affiliated with Kleinberg, Kaplan, Wolff & Cohen, P.C., counsel to Petitioner and judgment creditor Benthos Master Fund, Ltd. I respectfully submit this declaration in support of Petitioner's motion to hold Respondent in conditional contempt of court for his refusal to comply with judgment enforcement subpoenas for documents and information.

## Introduction

2. It may be shocking to the Court, but is no longer shocking to Benthos and its counsel, that this longtime member of the New York Bar, Respondent Aaron Etra, does not take seriously his legal obligations. He has made clear in the past that he will respond to nothing less than the threat of imminent incarceration for contempt of court. We therefore respectfully request that a conditional order of contempt be issued making clear to him the consequences if he does not promptly cease defying lawful subpoenas.

## The Judgment At Issue

3. Petitioner holds a judgment against Respondent in the amount of $5,254,561.12 (Dkt. 15), pursuant to the Court's August 12, 2020 Memorandum and Order (Dkt. 14)

confirming an arbitration award rendered on April 9, 2020. On August 26, 2020, the Court allowed Petitioner to undertake judgment enforcement activities immediately (Dkt. 21).

### The Underlying Arbitration Award

4.  Respondent, an attorney, served as Escrow Agent in a transaction pursuant to which Benthos transferred $5 million to his escrow account and was supposed to receive a quantity of Bitcoin in response (Dkt. 14 at 1). The arbitrator, in his lengthy and detailed award (Dkt. 1-1), found that Respondent's subsequent transfer of $4.6 million of Benthos's money to Hong Kong and China was, in the words of the Court in its confirmation order, "unauthorized and a breach of Respondent's contractual and fiduciary duties" (Dkt. 14 at 4). As further described by the Court, the arbitrator also found that "the breach was either the result of gross negligence or willful misconduct" by Respondent (*id*.).

### The Subpoenas Defied By Respondent

5.  On August 27, 2020, Benthos served Respondent with a subpoena duces tecum (Exhibit 1 annexed hereto) and a restraining notice with information subpoena (Ex. 2).[1] The subpoena duces tecum was comprehensive and sought documents, to the extent they may exist, responsive to 59 separate categories. The information subpoena, similarly, sought written responses under oath to 36 questions. Respondent – a practicing lawyer, who has chosen not to retain counsel in connection with judgment enforcement – at no time has served any objections to any of the document or information requests.

---

[1] Respondent also was served with a restraining notice (Ex. 2). Benthos has reason to believe he is also in violation of the restraining order, in addition to his demonstrated defiance of the two subpoenas at issue here, and reserves the right to seek appropriate relief once sufficient supporting evidence is assembled to present to the Court. This motion relates only to the subpoenas for documents and information, which Respondent has ignored virtually in their entireties.

**Accommodations Offered By Benthos**

6. Responses to the document and information subpoenas were due on September 21, 2020. On September 2, 2020, Respondent wrote to Benthos's counsel seeking a five-week extension, until October 31st (Ex. 3), such that no responses at all would be due for more than two months after service of the subpoenas (while Respondent was making no effort to satisfy the outstanding $5 million judgment). Benthos's counsel responded the next day that "if you timely provide substantial responsive documents and information and need a reasonable bit of additional time to complete your responses, we would respond reasonably. . . . You should be getting your financial records (and other material) together, and preparing responses to the information subpoena" (Ex. 4).

7. On September 15th, Respondent wrote to request "rescheduling all required action on my part for dates as late as possible beginning with the week of October 12th" (Ex. 5). Benthos's counsel replied the next day (Ex. 6):

> Mr. Etra, as I wrote to you 13 days ago, "if you timely provide substantial responsive documents and information [on the due date of September 21,] and need a reasonable bit of additional time to complete your responses, we would respond reasonably." Material such as – by way of example only – bank and brokerage account statements, credit card statements, real estate ownership and rent records, vehicle use and ownership, available cash and current living expenses, and recent tax returns are all readily available to you and could easily be assembled and provided.

8. Counsel also wrote to Respondent, at that same time, "[T]he arbitration award was rendered in April, and . . . the judgment was issued on August 13 – you are a lawyer and were at all times well aware of what would be required of you. Have you begun gathering responsive material at all?" (*id*.).

9.     Respondent replied the next day, September 17th, answered counsel's question with an unequivocal "yes," and stated that "I will provide material on the [due date of] the 21st."[2]

## Respondent's Non-Compliance

10.    On the date his subpoena responses were due, September 21, 2020, Respondent provided no responses whatsoever to the information subpoena, and produced one (1) single solitary document: a 2½ page unsigned purported "personal financial statement" (Ex. 8) that he said he had prepared four months earlier.  He produced no bank statements (although the "financial statement" claimed that he had "checking accounts" worth $35,000, among other accounts); no credit card statements (although the "financial statement" claimed $18,000 in liabilities for "credit cards"); no tax returns; and literally nothing else concerning his finances or responsive to the subpoena duces tecum.

> Benthos's counsel then wrote to Respondent as follows (Ex. 9):
>
> Mr. Etra, what you have attached is a tiny, tiny fraction of what you were required to supply pursuant to the subpoena duces tecum, and you have sent no responses whatsoever to the information subpoena. Furthermore the two-page statement you have sent was, by your own admission, prepared by you in May, four months ago. Last week, I asked you whether you had "begun gathering responsive material," and you responded "yes." That appears to have been untrue. The subpoenas were served on August 27 and you appear to have done nothing at all to comply with either of them.
>
> On September 3 and again on September 16, I wrote to you that "if you timely provide substantial responsive documents and information [on the due date of September 21,] and need a reasonable bit of additional time to complete your responses, we would respond reasonably." I further gave you examples last week of material that should be

---

[2] Respondent peppers virtually all of his communications with continued denials of his liability.  In his September 17th e-mail, to choose one particularly outrageous example, he sought to blame Benthos itself for the loss of its money, notwithstanding that he not only had sent its escrowed funds to the Far East without authorization and without informing Benthos, but also concealed those transfers when information was requested at a time when it might have been possible to trace and recover the funds.  As discussed below, he disclosed what he had done with the funds entrusted to his attorney escrow account only when threatened with imprisonment by the late Judge Batts.  Nonetheless, he wrote on September 17th that "you and your clients know full well by this time that, at all times, I have acted honorably, without personal benefit and always trying to assist the parties, including Benthos, to remedy the problem of their own creation and for which I had no responsibility" (Ex.7).

"readily available to you and could easily be assembled and provided," including "bank and brokerage account statements, credit card statements, real estate ownership and rent records, vehicle use and ownership, available cash and current living expenses, and recent tax returns." You have provided virtually none of that.

Even in the hopelessly sparse two-page document you just sent, more questions are raised than answered, including (without limitation) to whom you pay your "housing and rent" charges, your wholly unidentified "other income sources" (which you claim constitute virtually the entirety of your monthly income), and what "checking account," "savings accounts," "stocks" and "investment accounts" you admit to having. . . .

This is not a game. T]he time when your gamesmanship might buy you time is long since past. We told you on August 28, and again on September 3, that you did not appear to be taking this seriously, and your virtually non-existent purported response today – after telling us last week that you were gathering material and would provide it today – confirms that beyond any doubt.

You have now failed to even try to comply with two subpoenas – whether you are in compliance with the restraining order remains to be seen, although we have our doubts – and we will give you one opportunity to remedy that before seeking to have you held in contempt of court. We expect – without prejudice to requiring complete responses shortly thereafter – a substantial response this week, including at least the items referred to in the second and third paragraphs above. Failing that, we will move to have you held in contempt of court without any further warnings. We do not believe Judge Nathan will look kindly upon your patent non-compliance, but the risk is yours if you wish to test that.

11.     On September 27th, Respondent produced a one-page "Property Tax Notice" from Haywood County, North Carolina (Ex. 10), attached to an e-mail stating, "I have no car. I am a renter, of one apartment, and do not own a home. I am attaching the one piece of real estate, in North Carolina that is worth $2,000 (see attached). I have a few shares of stock which generate a few hundred dollars of income each year. My one credit card, on which is owed some $18,000, was closed when your contact to M &T Bank resulted in all my accounts being first on hold and then closed (I will try to send you a photo of that card account). What I sent you is truly the picture, with the details not going to add up to more" (Ex. 11). That same day, Respondent sent a portion of one page of a credit card statement (Ex. 12), without even identifying the full

5

account number or providing the rest of that statement (or the other credit card and bank statements subpoenaed).

12. Respondent has produced no other documents, not even the ones Petitioner's counsel had identified as presumably "readily available." Nor has he even attempted to respond to any of the requests in the information subpoena.

### Respondent is a Sophisticated Lawyer and Businessperson

13. Before addressing Respondent's history of non-compliance, it bears repeating that he is, by his own admission on his website, "an attorney and businessman" who "has been a practicing lawyer since 1966. His specialization is in the establishment and representation of overseas interests in the United States as well as international transactions," and he has "practiced, taught and engaged in Law, Business, Trade, Development and International Organizational Affairs in the U.S., U.K., Switzerland, the Netherlands and Africa. He holds a J.D. degree from Columbia University, a LL.M. from New York University and a B.A. from Yale University." He is the "President/CEO" of a New York corporation "engaged in real estate development, brokerage, management, marketing and consultancy as well as project development, management and advisory services." See Exhibit 13 annexed hereto, Respondent's very distinguished *curriculum vitae* presented to the public as late as this month on his webpage aaron.etra.com.

14. In light of the foregoing, as well as the sophisticated scam Respondent orchestrated that gave rise to the underlying judgment here,[3] it is unlikely that Respondent's net worth is truly only $39,000 as he claims. Anything is possible, of course, but Benthos is without

---

[3] He is also evidently a serial misuser of funds entrusted to him as Escrow Agent. In 2016, New York's Appellate Division affirmed summary judgment against him for conversion of escrowed funds which he "intentionally retransferred" without authorization and which "were never recovered." *Grasshoff v. Etra*, 135 A.D.3d 574 (1st Dep't. 2016). At oral argument in the lower court, Respondent claimed that the money had appeared in his escrow account by "mistake" but then, according to the judge, he "sent [it] . . . to . . . a friend of [his] . . . who profited illegally from that transaction" (Ex. 14 at 7).

doubt entitled to full compliance with its subpoenas in order to probe the veracity of that implausible claim. Respondent is an experienced "attorney and businessman" who understands full well the need to comply with subpoenas, and knows how to do so. He also, unfortunately, knows how to manipulate, stall, and frustrate. His brazenly improper conduct in 2018 demonstrates why this Court should cut him no slack in 2020.

## Respondent Defied and Lied to Judge Batts, Until Threatened With Imprisonment

15. In late August 2018, after Benthos had not received its contracted-for Bitcoin, and after Respondent was not giving straight answers (to say the least) about what was going on, Benthos hired counsel to request information from its Escrow Agent, Respondent Etra, about the whereabouts of the $5 million it had entrusted to him (Ex. 15):

> Benthos demands that you immediately provide us with all details concerning the release of the Escrow Funds including but not limited to all banking and wire instructions, the identity, address and bank account information of all recipients of any portion of the Escrow Funds, [and] all communications . . . concerning the Contract or monies held in escrow.

16. It goes without saying that any legitimate Escrow Agent, including specifically a member of the Bar, would have – and should have – responded to a request for "all details concerning the release of the Escrow Funds" by providing, of course, precisely that: all details concerning the release of the Escrow Funds. Not Respondent. He provided none of the requested information, and continued to falsely assure Benthos that delivery of its Bitcoin was imminent.

17. On September 28, 2018, Benthos's counsel wrote again, to an individual whom Respondent had identified as being his counsel (but who then denied acting as such) (Ex. 16):

> [W]e . . . expect responses from Mr. Etra (through you or otherwise), in his capacity as Escrow Agent, to at least the following questions:

    1.      Of the $5 million deposited by our client into Mr. Etra's escrow account pursuant to the Escrow Agreement, how much, if any, is Mr. Etra presently holding in escrow, and is he willing to return those remaining funds to our client upon demand?

    2.      If Mr. Etra is holding money in escrow and is not willing to return it to our client upon demand, is he willing to commit in writing not to transfer any of that money without our client's written consent (or a court order)?

    3.      Identify all transfers or disbursements made to date from the $5 million escrowed with Mr. Etra, including at a minimum (i) the recipients of each transfer, (ii) the amount transferred on each occasion, (iii) the written instructions upon which each transfer was made, (iv) written confirmation of each transfer, and (v) the bank account information and wire transfer information (if any) associated with each transfer.

. . . As an Escrow Agent, [Mr. Etra] has very serious responsibilities and obligations, of which he and you are surely aware. Providing basic information about funds in his care and custody should not be difficult, and we are truly perplexed why it was not provided in response to the August 31st letter. Please do not make it necessary for us to resort to judicial remedies.

18.    No information was provided, again. After a series of further lies and excuses by Respondent, Benthos formally terminated the parties' Escrow Agreement and demanded return of any funds remaining in escrow (Ex. 17).

19.    Respondent refused to return the balance of funds he was holding in escrow (later determined to be $400,000). Accordingly, on October 15, 2018, Benthos filed in this court a Petition For Preliminary Injunctive Relief In Aid of Arbitration. Eventually the late Honorable Deborah Batts ordered Respondent Etra (and his co-respondent) to provide the following information, "regarding transfers . . . made to date from the $5 million deposited by [Benthos] into Etra's IOLA Account" (Ex. 18) "on or before Friday, October 26, 2018 at 5:00 p.m." (Ex. 19, referring to Ex. 18):

    (a)    the recipients of each transfer,
    (b)    the amount transferred on each occasion,
    (c)    the written instructions upon which each transfer was made,
    (d)    any written confirmation received of each transfer,

> (e) the bank account information and wire transfer information (if any) associated with each transfer,
>
> (f) the identities, if known to Etra, of any subsequent recipients of Benthos's escrowed funds pursuant to any transfers made of such funds by Etra's transferees, and
>
> (g) the current or last known whereabouts of the said previously-escrowed funds;
>
> [and] . . .
>
>> a. provide copies of all communications between and among any of himself, Valkyrie Group LLC, Valhalla Venture Group LLC, Brandon Austin, Hugh Austin, Tracy Evans, "Dmitri," and Ming Hoang Le, or any of their affiliates, representatives and/or agents, concerning the Bitcoin Agreement, the Escrow Agreement, and/or the funds deposited by Benthos into Etra's IOLA account;
>>
>> b. . . .; and
>>
>> c. disclose the name, address, telephone number, website and identities of principals of any storage company at which any of the funds deposited into escrow by Benthos, or any Bitcoin intended for Benthos, has been held.

20. Etra provided no information or documents on October 26, 2018 as ordered (Ex. 20), and he made no effort to comply with the court's order at any time before (or during) his appearance at a hearing before Judge Batts on November 15, 2018.

21. The transcript of that court appearance is annexed as Exhibit 21. The full flavor of Respondent's dishonesty and defiance, a member of the Bar standing before a federal judge, cannot be conveyed by summary, but the following points bear emphasis:

- Judge Batts pointed out to Etra that as a lawyer, "You are an officer of the court. You have ignored court orders. You have not done anything that the Courts have ordered you to do" (Ex. 21 at 19).

- The judge told Etra (and his co-respondent) that "[You] have given the Court no reason – no reason – to expect that [you]'re going to obey Court orders. Everything that has been ordered by either Judge Castel or by me you have ignored. . . . [I]t seems to me that you are in contempt of Court. . . . [Y]ou will be subject to being incarcerated. . . . Flagrant ignoring of Court orders [is] inappropriate, unacceptable and will be dealt with

9

accordingly," and she directed Plaintiff's attorneys to file a contempt motion. (Ex. 21 at 5, 8, 19-20).

- Etra lied directly to Judge Batts's face at least three times during the short hearing:

    o   Etra insisted to Judge Batts that "[Mr. Popofsky's] client [Benthos] has been wanting us to do what we have [done]" – i.e., continue with the underlying Bitcoin transaction, meaning he was making the serious allegation that the undersigned counsel was proceeding in contravention of his client Benthos's wishes (Ex. 21 at 11). When asked by the judge, "What proof do you have that his client wants you to do this?" (id.), he replied, "Response from his client, we have correspondence which we are happy to submit. . . . Your Honor, here is a correspondence from me to his client and the confirmation from his client . . ." (Ex. 21 at 12). That e-mail was dated more than three months prior to the court hearing (Ex. 21 at 13), from a time that (as Etra well knew) was before Benthos had retained counsel. When called out on that, Etra then claimed, "I have subsequent correspondence right up through the middle of October, your Honor . . . [w]hich was sent to their client and response from their client" (id.); but when he was required to hand that over, it similarly was dated almost three months earlier (id.), on August 25, 2018 – hardly the "middle of October."

    o   Etra walked into the court hearing and stated, "My counsel was planning to come to the hearing but as of yesterday he was completely laid low and has been unable to even communicate except via e-mail" (Ex. 21 at 2), notwithstanding that, as set forth by Benthos's counsel in court, that individual actually had called Benthos's counsel at approximately 4:00 PM that prior day and stated that he was "only a friend of Mr. Etra's, . . . will not make an appearance for Mr. Etra, . . . does not represent Mr. Etra," and – most importantly – did not claim any illness and (quite obviously) was not at all "unable to even communicate except via e-mail."

    o   After Benthos's counsel complained that Etra had "given nothing" in response to what he had been ordered to do by the court, Etra responded falsely, "Your Honor, that is totally incorrect" (Ex. 21 at 11). In fact it was totally correct.

- Etra still resisted, incredibly, returning the $400,000 he was continuing to hold in escrow (Ex. 21 at 21).

- Judge Batts gave Etra a "[d]irect order" in no uncertain terms: "Listen to me: Return the $400,000 to the plaintiff immediately" (Ex. 21 at 24).

10

- The judge also set a briefing schedule for a contempt of court motion and told Etra, "I am telling you, do not make any plans for the holiday because if you do not comply with the order signed . . . by me on October 19th, . . . you will be going to jail" (Ex. 21 at 22).  She concluded (Ex. 21 at 24), "I am warning you, . . . pack your toothbrush."

22. Following Judge Batts's direct order and threat of jail, Etra did wire the $400,000, finally, to Benthos's counsel.  He did not comply with the rest of the judge's order, after which Benthos moved to hold him in contempt of court.  In response to that contempt motion, Respondent finally produced some responsive e-mails and documents.  His production was woefully incomplete in several substantive respects, and gave rise to subsequent correspondence with the Court.  Ultimately, Judge Batts ruled that the high standard for civil contempt had not been met, and that "[a]lthough Etra's efforts may not have produced perfect compliance, Benthos has failed to demonstrate that [in the end] Etra deliberately disregarded . . . the Court's Orders" (Ex. 22 at 8-10).

## Relief Sought On This Motion

23. It is evident from all of the foregoing – in both 2020 and 2018 – that (i) Respondent is determined to defy Benthos's subpoenas, and to conceal from his judgment creditor documentation and truthful information about his current and historical finances, for as long as possible; (ii) he is reasonably skilled at doing so; (iii) he will not comply for so long as he feels he can get away with resisting; and (iv) he is cavalier, to say the least, about obeying court orders.  It is thus more than reasonable to infer that he will respond only to the risk of a contempt finding and the ensuing coercion of threatened incarceration.

24. Accordingly, a mere court order will play right into Respondent's strategy of delay.  It will take some time before this motion can be heard and decided, and if the Court orders Respondent to comply with the subpoenas, it will give him an additional period of time in which to do so – and then he will not do so.  Benthos will then have to take the additional time

(and incur the additional expense) of yet another motion, for contempt, which itself will take time to be heard and decided; and only if and when the Court gives Respondent a deadline to comply and threatens contempt for further defiance, could Benthos (perhaps) expect some documents and information.

25. We respectfully urge the Court not to let Benthos be further victimized by this master manipulator. Instead of the prolonged process above, on which Respondent is relying to buy him yet more time – during which he will have continued opportunity to move any hidden assets (and we know he travels to Europe frequently) – we should proceed straight to the endgame: Respondent should be told, in no uncertain terms, that if he does not comply, in full, with the judgment creditor's outstanding subpoenas by an imminent date certain, he will be held in contempt of court and incarcerated until he complies. That, and only that, is likely to produce some level of compliance.

In accordance with 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 12, 2020.

                                                        */s/ Steven R. Popofsky*
                                                         Steven R. Popofsky