**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**BENTHOS MASTER FUND, LTD.,**

Petitioner,

- against -

**AARON ETRA,**

Respondent.

Case No. 20-cv-03384 (AJN)

**REPLY DECLARATION OF STEVEN R. POPOFSKY**

**STEVEN R. POPOFSKY hereby declares the following:**

1. I am affiliated with Kleinberg, Kaplan, Wolff & Cohen, P.C., counsel to Petitioner and judgment creditor Benthos Master Fund, Ltd. I respectfully submit this reply in further support of Benthos's motion to hold Mr. Etra in conditional contempt of court for his refusal to comply with judgment enforcement subpoenas for documents and information.

**Summary of Reply**

2. Judgment debtor (and lawyer, and Escrow Agent) Aaron Etra asserts many things in his opposing submission (unsworn and filed late). Virtually every assertion is demonstrably false, disingenuous, and/or legally irrelevant. But more important is what he does not assert: There is not even the pretense that he has actually complied with the judgment-enforcement subpoenas, nor even a contention that he has really tried to do so. Instead, we have a litany of purported reasons he should not be required to do so.

3. Each of his main themes will be addressed below.

Underlying Culpability

4. It is infuriating that Benthos is still being met with protests that Mr. Etra is "truly blameless" and has "acted honorably" with "absence of any responsibility on my part." It is undisputed that Benthos deposited $5 million with Mr. Etra as Escrow Agent; that he sent $4.6 million of those funds, without authorization, to Hong Kong, from which the money disappeared into China; that when he was asked, early on, where he had disbursed the escrowed funds, he refused to answer (indeed, he complained about being bothered on a holiday weekend); that he defied a federal Order to Show Cause directing him to provide documents and information about the escrowed funds; that when he was asked to return the remaining $400,000 he was holding in escrow, he refused; and that he only returned those funds when threatened with imminent incarceration by a federal judge ("pack your toothbrush"), before whom he lied repeatedly and shamelessly; and that the court proceeding came about only after a series of increasingly incredible lies and evasions and delaying tactics (see Ex. 1 at pp. 14-19).

Non-Participation in Arbitration

5. Mr. Etra signed a contract with an arbitration clause. When Benthos invoked arbitration under the applicable UNCITRAL rules, he argued to the Permanent Court of Arbitration at The Hague that he should not be required to arbitrate. The Permanent Court of Arbitration at The Hague rejected that argument, and designated the International Chamber of Commerce's International Court of Arbitration as the appointing authority. Mr. Etra then argued to the International Court of Arbitration that he should not be required to arbitrate. The International Court of Arbitration rejected that argument, and offered the parties a roster of potential arbitrators. Mr. Etra refused to take part in arbitrator selection, and an arbitrator was duly appointed.

6. The arbitrator offered Mr. Etra the opportunity to respond to Benthos's Statement of Claim. He declined to do so. The arbitrator did not default him, but convened a hearing, in person, requiring Benthos's principals to fly across the country in the early stages of the pandemic to give testimony. Mr. Etra declined to appear at the hearing, in person or remotely. The arbitrator then issued a detailed and thoughtful ruling, which was subsequently confirmed by this Court.

"Offshore Cayman Islands Investment Vehicle"

7. Mr. Etra implies he is the victim of some huge international behemoth; nothing could be further from the truth. Benthos is – was – an investment fund founded by a few recent college graduates in their mid-twenties. They raised funds from friends and families to trade in cryptocurrencies. Their first real trade was this one, in which Mr. Etra and his henchmen bilked them out of almost all the funds they had raised. They were humiliated before their investors and had to close down the fund and take jobs to pay their rent. They had trusted that the involvement of an Escrow Agent with such a distinguished resume would ensure that their funds would be handled legitimately, but they were wrong, and have had to bear the consequences. Not that this matters legally, but Benthos's young principals are the underdogs here, with Mr. Etra, the adjudicated wrongdoer, having abused their trust in him as their Escrow Agent.

The Distinguished Resume

8. The Court will be well aware that people with impressive backgrounds can be crooks. Indeed, an impressive background and status as "longtime . . . member of the bar" serves only to enhance the credibility of a con man perpetrating fraudulent schemes.[1]

[1] As the Court was advised previously, this was not the first time Mr. Etra was caught mishandling escrow funds – see the moving declaration, Dkt. 24 at p. 6 n.3 and Dkt. 24-14 – and notably, in his lengthy opposition here, while protesting repeatedly how "honorable" he is, he did not deny that prior sordid episode.

<u>"Seven Hours of Deposition and "500 Pages"</u>

9. Mr. Etra was deposed on the merits (only the merits) of the underlying dispute, in a state-court action against one of his co-conspirators, Tracy Evans. The deposition was not one for judgment enforcement and did not address his finances (except to the extent that Benthos's money had flowed through his attorney escrow account). In fact, when questioning veered near that area at all, Mr. Etra refused to answer such questions.

10. And similarly, the documents he produced under threat of contempt from Judge Batts again related to the merits – he has made no prior document production, in any proceeding, of the documents demanded in the present subpoena duces tecum relating to the state of his financial affairs.

<u>The Jewish Holidays</u>

11. The notion that the undersigned would not accommodate religious observance is offensive, and not true, and Mr. Etra's attempt to hide behind religion should be condemned. The subpoenas duces tecum and for information were served on August 27, 2020. The first day of Rosh Hashanah was Saturday, September 19, two days before his responses were due. When Mr. Etra asked for a blanket extension until October 31 (more than two months after having been served), he was told that if he were to provide some "readily available" material, such as "bank and brokerage account statements, credit card statements . . . and recent tax returns" (among other things), he could have reasonable additional time to complete his production (see the moving declaration, Dkt. 24, at paras. 6-7). When asked whether he had "begun gathering responsive material at all," Mr. Etra responded with an unequivocal "yes," and stated that "I will provide material on the [due date of] the 21st" (see id. paras. 8-9 and exhibits cited).

12. The "yes" was a lie, and the "material" he "provide[d]" on the 21st consisted of one document – a 2½-page purported financial statement prepared four months previously. None of that had anything to do with the Jewish holidays.

13. Furthermore, because Mr. Etra had written to "request rescheduling all required action on my part for dates as late as possible beginning with the week of October 12th, which will be my first post-holidays" (Dkt. 24-5), and then had again stated that "I would like to [speak] with you during the week of October 12th" (Dkt. 24-7), we adjourned his scheduled deposition from the subpoenaed date of September 30th until October 15th, "inasmuch as you repeatedly acknowledged your availability during the week of October 12" (Dkt. 24-11 at p. 3). That deposition date was after conclusion of all the autumn Jewish holidays, and yet Mr. Etra refused to testify (more about that later).

"October 31st"

14. Mr. Etra writes in his opposition that "to complete the various subpoenas, the 59 separate categories in petitioner's subpoena [duces] tecum, with details and documents, and the written responses to the 36 other questions in petitioner's information subpoena, . . . would take us to October 31st" (Dkt. 28, para. 20).

15. Here we are. This reply is being filed on October 30, and no compliance is in sight. We are dealing here with a master manipulator, and his defiance needs to be reined in.

"Readily Available" Documents

16. Mr. Etra complains that Benthos "believe[s] that I should have documents readily available notwithstanding the lockdown and my condition" (Dkt. 28, para. 6). In the first place, the recipient of a subpoena is obligated to produce more than documents that are merely "readily available." If he does not have his financial records on his computer, and/or in a drawer in his

home or office, he is obligated to make reasonable efforts to obtain them from his financial institutions, accountants and others.

17. But in any event, in this day and age, many financial records are available at the click of a mouse, and Mr. Etra (from his own submission) is no exception: when he wants to come up with a document electronically, he is perfectly capable of doing so. See, e.g., the one-page excerpt he provided at Exhibit C (Dkt. 28) from his credit card records, evidently accessed from HSBC's website on October 22, 2020, and at least the second page of the two-page excerpt he provided at Exhibit D from his M&T bank account statement, also evidently accessed from that bank's website. Where is the rest of his credit card statement? Where is the rest of his bank statement? Where are his other credit card statements, and his other bank statements, and his tax returns, and everything else that has been subpoenaed?

18. Mr. Etra knows very well how to access his financial records. He has chosen not to do so.

<u>Judge Batts's "Favorable Decision"</u>

19. As demonstrated above and in the moving declaration (Dkt. 24 at paras. 19-21 and Exs. 18-21), Mr. Etra disobeyed Judge Batts's Order to Show Cause and lied to her in open court. He returned Benthos's $400,000 only upon being threatened with contempt of court – "pack your toothbrush" (Dkt. 24-21 at pp. 22-24) – and under the same threat, he eventually produced some documents and information about the escrowed funds, sufficient to avoid being held in contempt.

20. Mr. Etra tries to spin that as some sort of exoneration. It was not. What it was, however, was a stark demonstration of the <u>only</u> thing that motivates Mr. Etra to comply with his legal obligations.

"Good Faith and Achievable Settlement Efforts"

21. Benthos has repeatedly indicated its willingness to settle its judgment against Mr. Etra, if it receives something tangible in return. Mr. Etra's idea of settlement is that Benthos lift all of its restraints and give up enforcing its judgment for a year, during which period he will "work toward raising" money (see, e.g., Dkt. 28 at p. 14). Rather than compose a new explanation for the Court as to why Benthos – burnt already from having accepted Mr. Etra's previous assurances that it should sit tight, refrain from action and all will be well in the future – cannot take that seriously, the following is how we have previously explained it to Mr. Etra (Dkt. 28, Ex. G at p. 2; emphasis in original):

> [I]f you have the ability to raise money to satisfy the judgment, in whole or in part, as you claim, you should be doing so. You do not need Benthos to forbear from enforcement efforts in order to go about obtaining funds (if you do not have them available, which of course we do not believe in any event).
>
> Given your history of lying repeatedly to Benthos, lying repeatedly to the federal judge, refusing to provide basic information notwithstanding your status as a member of the bar and an Escrow Agent, stalling and delaying, and offering one dishonest excuse after another, it would be insanity for Benthos to forbear from judgment enforcement based solely on your promise to come up with money at the end of that time period. Of course, at that time you would send no money and would offer more dishonest excuses. Benthos's principals – to whom you lied and pretended, time after time with a straight face – and Benthos's lawyers, who have observed your lawless misconduct at close range for two years now, are unanimous in telling you to stop wasting everyone's time making such suggestions.
>
> If, on the other hand, you wish to offer an amount of actual money, in exchange for some period of forbearance, we would perhaps be willing to consider that, depending on how much money and for how long. Absent such a proposal, you can stop asking about forbearance – we will continue enforcing the judgment.

The Purported Financial Statements

22. There is (of course) no principle of law holding that a judgment debtor can provide a summary financial statement, of the type Mr. Etra has supplied (Dkt. 28 Ex. B), in lieu of producing actual financial records such as current and historical bank statements, credit card

records and tax returns, among the many other items of documents and information reasonably subpoenaed from Mr. Etra (as to which, it bears repeating, this "practicing lawyer" served no objections).

23. Regardless, as noted in the moving declaration, while it is conceivable that Mr. Etra – who has engaged in law and business in New York for over 50 years, who (at least until the pandemic) flew around the world regularly in pursuit of his business interests, who admits to having retained and paid at least two sets of lawyers in recent years, and who is prominent in cryptocurrency circles and has a history of dishonesty – truly has a net worth of only $18,800, it is not very likely. In any event, without doubt a judgment creditor has the right to test the veracity of such a claim.

Mr. Etra's Health, and
His Deposition

24. On October 14, 2020, the day before Mr. Etra's adjourned deposition date, when we sought to confirm his intention to appear (remotely), he informed us that "I am not in a position to do anything with additional stress until my doctors clear me" (Ex. 2). He gave no indication that he had done anything seeking to be "clear[ed]," and we were forced to cancel the court reporter at the last minute.[2] The only doctor's note ever provided was the one attached to the opposition (Dkt. 28, Ex. A), which was undated but had previously been provided to us on September 24, 2020. A doctor there stated that Mr. Etra "has elevated blood pressure and we recommend avoiding stress as much as possible."

[2] This occurred after the filing of the instant motion addressed to the subpoena duces tecum and the information subpoena. (We were unaware when we made this motion that Mr. Etra would refuse to appear for his deposition, as to which he had been sent the link for the remote appearance days earlier.) Thus we are not necessarily seeking relief for that non-appearance through this motion, but it appears most efficient to bring the situation to the Court's attention at this time.

25. That is no ground for refusing to appear at a remote deposition, sitting in his own home in front of his computer answering questions. It is no ground for refusing to comply with two subpoenas, and for refusing to produce virtually any documents or information required therein (much of which documents and information, again, is easily obtainable from his computer, physical files and/or financial institutions and accountants).

26. Just last week, Mr. Etra, who admits that he is still "a 'practicing lawyer'" (Dkt. 28, para. 14), composed an 18-page, 30-paragraph advocative court filing with multiple attached exhibits, and navigated the court's electronic filing system, all on his own without benefit of counsel. He regularly fires off lengthy e-mails, including over a dozen to us in recent weeks. He e-mailed a barrage of arguments, repeatedly, to the arbitrator and to the Permanent Court of Arbitration at The Hague and to the International Court of Arbitration. During the underlying events less than two years ago, he negotiated and signed contracts, flew repeatedly to and from Europe if not Asia as well, held personal meetings, participated in dozens if not hundreds of phone calls and sent and received hundreds of e-mails, all of which culminated in the disappearance of Benthos's money for which he has been adjudicated legally responsible. He testified in person at a deposition last year and he appeared in court before Judge Batts. And the credit card statements and other documents he is working so assiduously to conceal will undoubtedly show further international travel and extensive business activities.

27. Once again, the Court is dealing here with a master of delay, whose frauds appear dependent on his ability to convince people to buy his excuses. The Court should not be fooled.

**Conclusion**

28. In his opposition, Mr. Etra quotes the late Judge Batts that to hold a party in contempt, it must be shown that "'the contemnor was not reasonably diligent in attempting to comply'" (Dkt. 28, para. 27). Mr. Etra's opposition effectively admits that he has not even

"attempt[ed]" to comply with the subject subpoenas, much less done so "reasonably diligent[ly]." He argues instead that he should be excused from complying.

29. The Court should reject that argument out of hand, and grant the motion.

In accordance with 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 30, 2020.

/s/ Steven R. Popofsky
Steven R. Popofsky