# Exhibit 1

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Arbitration Between          :
                                                  :
Benthos Master Fund, Ltd.,                        :
                         Claimant,                :
                                                  :
            - against -                           :
                                                  :
Aaron Etra,                                       :
                                                  :
                         Respondent.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## <u>STATEMENT OF CLAIM</u>

**KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.**
Steven R. Popofsky
Joshua K. Bromberg
551 Fifth Avenue, 18th Floor
New York, New York 10176
Telephone:     (212) 986-6000
Facsimile:     (212) 986-8866

*Attorneys for Claimant*

## Table of Contents

Page

Nature of the Case ........................................................................................................... 1

The Parties .......................................................................................................................... 2

Etra and His Accomplices Bait the Trap .......................................................................... 2

The Contract and Escrow Agreement ............................................................................... 6

Benthos Pays $5 Million, and Receives No Bitcoin ........................................................ 8

Benthos Is Told That It Needs to Pay An Additional $850,000 In Order
to Obtain Release of the Bitcoin For Which It Already Had Paid $5 Million ............................ 9

Benthos Hires Counsel To Pursue Its Legal Rights and
Seek Information About the Whereabouts of Its $5 Million ...................................................... 11

The Escrow Agent Etra Stonewalls Benthos's Request For
Information, Professes To Be Offended, and Threatens To
Charge Benthos For His Retention of Counsel .......................................................................... 12

Etra and Evans Present a Series Of
Ever-Shifting and Increasingly Incredible Excuses ................................................................... 14

Benthos Terminates the Escrow and
Goes To Federal Court In Aid of Arbitration ............................................................................. 18

Etra Defies, and Lies To, the Federal Court, and
Is Threatened By the Judge With Contempt and Imprisonment ................................................. 21

To Avoid Federal Prison, Etra Returns $400,000 and
Provides Documents and Information, Albeit Incomplete .......................................................... 23

(Some Of) What Etra Was Hiding ............................................................................................. 25

Etra's Transfers of Benthos's Escrowed Funds Violated
the Terms Of the Escrow Agreement In Multiple Respects ....................................................... 28

Etra Is Liable to Benthos Under Longstanding and Unambiguous Law
Regarding the Fiduciary and Contractual Obligations of Escrow Agents .................................. 31

Etra Also Is Liable For the Actions Of His Co-Conspirators ..................................................... 35

Benthos Is Entitled to Damages In Excess of $5 Million,
Plus Its Legal Fees and Costs In Connection With This Arbitration .......................................... 36

Conclusion .................................................................................................................................. 38

```
------------------------------------------- x
In the Matter of the Arbitration Between      :
                                              :
Benthos Master Fund, Ltd.,                    :
                         Claimant,            :
                                              :
            - against -                       :                    STATEMENT OF CLAIM
                                              :
Aaron Etra,                                   :
                                              :
                         Respondent.          :
------------------------------------------- x
```

Claimant Benthos Master Fund, Ltd., by its undersigned attorneys, respectfully submits this Statement of Claim to set forth its arbitration case against Respondent and Escrow Agent Aaron Etra.

**Nature of the Case**

Benthos respectfully refers the arbitrator to the Notice of Arbitration dated June 28, 2019, for a brief summary of this case. That Notice accompanies this Statement of Claim as Exhibit 1.

The parties' contract that was attached to the Notice of Arbitration accompanies this Statement of Claim as Exhibit 2, and consists of two parts. The first part is the underlying contract, denominated the "BTC Agreement," between Benthos as the "Buyer" of Bitcoin on one hand, and its contractual counterparty, Valkyrie Group LLC, as the "Seller" on the other hand. As constructed by the parties, attached to that contract as "Annex A," on "Page 9 of 16," was the subject "Escrow Agreement," entered into "by and among . . . Valkyrie Group LLC, . . . Benthos Master Fund, Ltd. . . [and] Aaron Etra, Esq., whose office is at 445 Park Avenue – 9th Floor, New York, NY 10022."

Because the two documents were presented as one and numbered on consecutive pages, they are treated together as one exhibit (Ex. 2, as noted) to this Statement of Claim.

## The Parties

Claimant Benthos is a private investment firm based in San Francisco.  Benthos was founded in 2018 by a small group of friends led by two individuals, Gerald Fong and Mihir Deo, who had recently graduated from the University of California at Berkeley.  They raised money from a circle of acquaintances with the plan of investing primarily in cryptocurrency.

As a result of the events described in this Statement of Claim, Benthos has been driven out of business and is winding up its affairs, and its investors have lost virtually all of their money.

Respondent Aaron Etra is a New York lawyer who has been licensed to the bar since 1966.  He has an undergraduate degree from Yale University, a JD from Columbia Law School and an LLM "Master of Law" degree from NYU Law School.

## Etra and His Accomplices
## Bait the Trap

In the summer of 2018, Benthos's principals were introduced to an individual named Hugh Austin, who identified himself as the Chief Executive Officer of a company called "Small Cap Nation," described as "a Valhalla Venture Group Company."  Hugh claimed to be an investment professional with connections in the world of family offices and high net worth individuals, and with the ability to locate parties willing to sell large quantities of Bitcoin to Benthos.

Shortly thereafter, Hugh brought Benthos a proposed transaction, which in the end was not consummated on the seller's end, for the purchase of over $5 million worth of Bitcoin at a 3% discount to the market price.  Once Benthos had established that it was ready, willing and able to purchase that quantity of Bitcoin, the scheme to defraud it was put into motion.

On July 31, 2018, Hugh called Gerald Fong and told him that he had a different and better deal with an additional 1% discount.  Hugh's son Brandon Austin followed up that same day to the same effect with an e-mail attaching a draft "contract for the Citi Bank Aaron Etra deal.  As Hugh stated, you're getting a better discount (4%)" (Ex. 3).  Brandon's e-mail identified himself as a Partner and Vice President of Marketing at "SCN Corporate Connect, a Valhalla Venture Group Company," with an address on East 86th Street in Manhattan.

The contract attached to that e-mail was the first of several drafts transmitted to Benthos over the ensuing few days.  The drafts contained many blanks, including the identity of the seller, but Respondent Etra was identified as the Escrow Agent in every draft (collectively Ex. 4).  Etra's website at the time showed an office at 445 Park Avenue and a home address at 945 Fifth Avenue, an exclusive luxury apartment building facing Central Park with listed rents of up to $20,000 per month (Ex. 5).  Etra's website also touted his pedigree as a graduate of three distinguished institutes of higher education, his membership in the U.S. Supreme Court bar, his history as a law professor and his service to a host of respected public institutions including the United Nations (Ex. 6[1]).

Benthos initially was told that the contract seller would be a Russian oligarch named "Dmitri" – who purportedly  had accumulated a large quantity of Bitcoin and was looking to sell it quickly at a discount – acting through his agent in New York named Tracy Evans, a convicted felon whom Etra had known for years.[2]

---

[1] A screenshot of Mr. Etra's current website at http://aaron.etra.com/ is annexed as Exhibit 6.

[2] Evans was convicted on multiple felony counts, including grand larceny, in connection with what the First Department described as a "long term, systematic and sophisticated" scheme to defraud New York State out of Medicaid monies by "utilizing numerous corporations which used fictitious principals and multiple addresses."  *People v. Evans*, 199 A.D.2d 191, 192 (1st Dep't 1993).  We know that this is the same Tracy Evans with whom Etra worked, also likely

When Benthos accordingly sought background information on "Dmitri," pursuant to "Know Your Customer" ("KYC") and anti-money laundering procedures, the Austins changed course and said that he would not be a contracting party.

To this day, Benthos has no idea whether "Dmitri" exists or, more likely, is simply a name and e-mail address utilized by Etra, Evans and the Austins. The history and the nature of the relationships among Etra and his co-conspirators all remain shrouded in mystery. But we do know that the day before Brandon's July 31st e-mail and initial draft contract, Etra, Evans, the Austins and supposedly "Dmitri" had engaged in series of communications involving Evans agreeing to "affix [Etra's] signature to a "paymaster agreement" pursuant to which Etra would act as "coordinator/paymaster . . . for the receipt, holding and disbursement of funds received on behalf of" the Valkyrie Group LLC, another supposed Austin family entity (Ex. 8).[3]

In any event, Benthos met with Etra in person in New York on Friday, August 3, 2018. Together with a purported employee of the Austins' entity Valhalla, Etra met with them in the 43rd floor lounge, with a sweeping view of the East River, in a building at Dag Hammarskjold Plaza where Etra claimed to then be residing. Benthos believed Etra to be an accomplished, reputable and respected New York lawyer and trusted him and was prepared to move forward with the contemplated Bitcoin transaction in which Etra would serve as Escrow Agent for Benthos's funds.

---

"utilizing . . . fictitious principals" as described in this Statement of Claim, because Evans admitted to living for over two decades at 280 Park Avenue South, Suite 22A, the same address listed in a 1993 order stripping Evans of her real estate license due to that conviction. *See* Ex. 7 (publicly available at https://docs.dos.ny.gov/ooah/decisions/rebrokers/evans.pdf).

[3] Etra later expressly wrote that he would "authorize[] Tracy to affix my electronic signature and initials" to the Escrow Agreement once he received "KYC" information from Benthos, asking also for a copy of that same information from Valkyrie and providing his standard form for that purpose (Ex. 9).

Benthos had various questions about the draft contracts, and engaged in discussions with the Austins to obtain certain explanations and to request some revisions.  On that same day, August 3, 2018, Etra sent Brandon Austin a draft agreement "for completing the arrangements with your buyer" (Ex. 10).  Hugh Austin then forwarded a draft to Benthos "with discussed changes, which were approved by Aaron" (Ex. 11).  And Hugh later sent yet another draft to Benthos, writing that "I just spent the last hour making the final edits with Aaron and Tracy" (Ex. 12).  Brandon's brother John then texted Fong as follows (Ex. 13 at 1):

> Hey man, I just went over the contract line by line with Aaron and Tracy and was able to get it as close as I could. Please take a look when u get a chance and call me so I can go over it if you have any questions. But I have to be honest I don't think they will be up for changing it anymore than we already have. So take a look and lmk if you want to move forward.

Fong texted back that evening, "Can't look now, but will let you know.  Thanks," whereupon John Austin replied less than one minute later, "Ok, do u want to touch base with me real quick so I can go to bed?"  Fong responded, "Hey! Sorry can't tonight, I can tomorrow first thing" (*id.* at 2).  John Austin then replied (*id.*):

> No worries, Hugh will be up early and probably will touch base with you before I do but just keep in mind we kept your changes the best we could and Aaron and Tracy tried to be very fair. We all really want to make this work!

At 10:48 the next morning (Saturday the 4th of August), having not yet heard back from Benthos, John Austin texted again:

> Gerald, we need to know by 2:30 if you guys are serious, we r all trying to be as accommodating as possible but we don't want to loose our relationship with Aaron or Dimitri […] I need an answer by 2:30.

At 1:56 PM that afternoon, Benthos committed to sign (*id.* at 4), and thereafter did so on the same date, August 4th (Ex. 14).  At no time during the pre-contract period, to its regret, did Benthos consult or utilize independent legal counsel.

## The Contract and Escrow Agreement

Both the base "BTC Agreement," on pages 1-8 of Exhibit 2, and the Escrow Agreement,

on pages 9-17[4], were dressed up with a plethora of fancy legal-sounding terms that were

essentially meaningless.  (As one example only, the "Escrow Agreement" heading on page 9 was

followed, for no discernible reason, by "Transaction Code No. CDKTEBPA080218SUB.")  The

material terms, for purposes of this arbitration, were as follows:

- Benthos was to deliver $5 million to the Escrow Agent Aaron Etra, within "24 business hours" of full execution (Ex. 2, BTC Agreement, Sect. 16.4(1), page 7).

- Upon  "notice from the Escrow Agent to Party One [the Seller Valkyrie] that the requisite sum has been received from [Benthos] and credited to the Escrow Account," the Seller was to "arrange for undertaking the delivery of the requisite amount of Party One's BTCs [Seller's Bitcoins] to the wallet address of Party Two [Benthos] (as specified in ANNEX B [on page '17 of 16']), at 9:00AM New York time or immediately upon such notice from the Escrow Agent . . ." (Ex. 2, BTC Agreement, Sect. 16.4(2), page 7).

- "It is understood that Valhalla, represented by Hugh Austin and his estate, will guarantee to make available to [Benthos] the sum of five million dollars USD, if and to the extent that [Benthos] has not received the [Bitcoin] for which it has provided the funds for this transaction within 15 business days . . . of such funds being removed from escrow.  Valhalla or Hugh Austin will make this payment available to [Benthos] immediately after such period and without recourse" (Ex. 2, BTC Agreement, Sect. 16.4(6), page 8).

- "[T]he [BTC] Agreement calls for . . . the Escrow Agent to follow the instructions given by the Seller on the disbursement of the Deposit [*i.e.*, the $5 million Benthos was to deliver to Etra in escrow], only if such instructions relate to pulling money to secure the BTC for the Buyer from the Seller's BTC-backed instrument.  The Buyer's funds shall not be used for any other purpose than to secure the BTC for the Buyer" (Ex. 2, Escrow Agreement, second Whereas clause, page 9).

- "Seller and Buyer understand and agree that the funds . . . held by the Escrow Agent will be called upon by the Seller from the Escrow Agent by instructions and are needed to secure the BTC for the Buyer from the Seller's BTC-backed

---

[4] For the arbitrator's information, Etra's signature was inserted electronically at the time of execution and therefore may not appear when the document is printed in hard copy form.

instrument, and the funds shall not be used for any other purpose . . ." (Ex. 2, Escrow Agreement, fourth Whereas clause, page 9).

- "Seller, Buyer, and the Escrow Agent have entered into this Escrow Agreement in order to facilitate the consummation of the transactions contemplated by the [BTC] Agreement . . ." (Ex. 2, Escrow Agreement, fifth Whereas clause, page 10).

- Etra was to receive a fee of 1% of the escrowed funds, or $50,000 (Ex. 2, Escrow Agreement, fourth bullet point on page 10).

- "Upon receipt of confirmation of funds received by the Escrow Agent, Seller will give further instructions to the Escrow Agent for the application of the Deposit funds [i.e., Benthos's $5 million] as provided for in the Agreement, with the understanding that such instructions must relate to pulling out money in order to secure the BTC from its BTC-backed instrument" (Ex. 2, Escrow Agreement, first full paragraph on page 10, with the quoted language underlined in the Escrow Agreement).

- "This Escrow shall terminate upon the earliest to occur of:

  1. Receipt by the Escrow Agent of written notice signed by either the Seller or Buyer expressly terminating such Escrow because the transaction could not be consummated and the Deposit funds need to be returned without the disbursement of any fee to the Escrow Agent from the Buyer. . . .

  Or

  2. The disbursement of the Deposit funds, provided the Seller is disbursing such funds to secure the BTC from its BTC-backed instrument, as provided for in the Agreement and hereunder;

  Or

  3. The Confirmation from both Seller and Buyer that they have completed the transaction to their satisfaction and no longer require Escrow services" (Ex. 2, Escrow Agreement, second bullet point on page 11).

- "[T]he Escrow Agent shall not incur any liability for any damages, losses or expenses whatsoever, except for its gross negligence or willful misconduct, and shall not incur any such liability with respect to any action taken or omitted in reasonable reliance upon any instrument . . . not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which the Escrow Agent shall reasonably believe to be genuine . . ." (Ex. 2, Escrow Agreement, last bullet point on page 11).

7

- "The Parties expressly and fully agree and irrevocably consent to the right of the Escrow Agent to follow the sole instructions of the Seller, provided the Seller is doing so with the intention of securing the BTC for the Buyer from its BTC-backed [instrument], and that these instructions are with respect to the application of the funds representing the Deposit once received from the Buyer, and transferred as provided for in the Agreement and herein" (Ex. 2, Escrow Agreement, second bullet point on page 12).

- "If the Escrow Agent is reasonably uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands . . . which . . . conflict with any provisions of the Agreement or this Escrow Agreement, the Escrow Agent shall promptly send a written request to each affected Party for clarification of such uncertainty or conflict. The Escrow Agent may refrain from taking any action (other than to hold the Deposit in accordance with the terms and conditions hereof) until such uncertainty or conflict shall have been eliminated in the reasonable opinion of the Escrow Agent, shall have been directed otherwise in writing by all affected parties or by a final order or judgment of a court of competent jurisdiction, whichever occurs first" (Ex. 2, Escrow Agreement, first bullet point on page 13).

- "Neither this Escrow Agreement nor any term, condition, covenant, [or] agreement . . . hereof may be changed, waived, discharged, or terminated orally but only by an instrument in writing signed by each Party hereto. . ." (Ex. 2, Escrow Agreement, para. B on page 14).

- "This Escrow Agreement, together with all documents referred to herein, constitutes the entire agreement between the parties hereto with respect to the subject matter hereof" (Ex. 2, Escrow Agreement, para. C on page 14).

- "This Escrow Agreement shall be governed by, and construed in accordance with, the laws of New York State, without regard to the principles of conflict of laws thereof.  Any disputes which cannot be resolved amicably, will be finally decided by arbitration in accordance with UNCITRAL Rules, by a single arbitrator, sitting in New York, NY, U.S.A., and shall be enforceable in any court of competent jurisdiction" (Ex. 2, Escrow Agreement, para. D on page 14).

### Benthos Pays $5 Million, and Receives No Bitcoin

On August 6, 2018, Benthos wired $5 million to Etra's attorney IOLA account, per the wire instructions provided in the Escrow Agreement (Ex. 15).  Benthos was then advised orally that $3 million of those funds had been promptly transferred by Etra in order to obtain an initial quantity of Bitcoin under the parties' contract.  Unsuspecting, Benthos then began discussing with Etra and Evans its intention to buy more Bitcoin in further tranches with additional funds.

But Benthos received no Bitcoin.

**Benthos Is Told That It Needs to Pay**
**An Additional $850,000**
**In Order to Obtain Release of the Bitcoin**
**For Which It Already Had Paid $5 Million**

In mid-August 2018, Evans told Benthos that delivery was delayed because an additional $850,000 would be required in order for any of the Bitcoin purchased by Benthos to be released. Supposedly "Dmitri," the claimed ultimate source of the Bitcoin which the Seller Valkyrie was going to provide to Benthos, could or would not release fewer than 1,000 Bitcoin in any single transaction, and because the price of 1,000 Bitcoin then exceeded $5 million, it was said to be impossible for "Dmitri" to make available "only" $5 million worth of Bitcoin.

Etra confirmed that information in a barely-comprehensible e-mail, as follows (Ex. 16):

> Gerald, Mihir, Hugh, Brandon & Tracy,
>
> We are all responsible for not realizing the consequences of asking Dmitri to agree to pegging the BTC price to the time of delivery without adapting the fixed payment formula to ensure that enough funds would be available to meet Dmitri's stated need for sufficient funds to enable him to obtain release, of at least 1,000 BTC at any one time. The request was made and granted in good faith and none of us was wise enough to think through what should have also been done if the first payment was a fixed sum rather than to be recalculated at the time the price was set.
>
> Having taken a very open book approach to this transaction and wanting all to come out well, which is both achievable and desirable, let us resolve to continue to work together in undertaking what needs to be done in that spirit. I am committed to do so.

It was entirely unclear, of course, why Benthos itself was deemed one of the parties who were "all responsible" for Benthos not receiving the Bitcoin for which it had contracted and paid.

Brandon Austin then e-mailed to Benthos on August 19 a "requested amendment . . . reflecting the new minimum purchase size" (Ex. 17). That "requested amendment" stated that

the Seller "agrees to increase the discount offered [by an additional 2%] moving forward on future tranches under the Agreement" (Ex. 18), and provided (among other things) that

> Upon receipt of the additional $850,000 needed to secure the BTC from the BTC-Backed Instrument, Seller will proceed to conclude the first tranche of the transaction by delivering the Buyers coins, equivalent to $5,850,000 worth of BTC priced at 9:00AMEST on the delivery date, plus an additional 6% ($351,000) worth of BTC priced at the 9:00AM EST price of BTC on the delivery date [*id.* at para. 1.4].

Benthos, thankfully, declined to agree to pay an additional $850,000 in order to obtain the Bitcoin for which it already had paid the contracted-for sum of $5 million.[5]

A few days later, on August 24, Etra informed Benthos that "Dmitri" had "enabled Tracy and me to speak with the transfer storage representative he named to discuss what might be done to enable the delivery of BTC from Dmitri's wallet to Brandon's wallet, notwithstanding the lack of available additional funds" (Ex. 19).  That "transfer storage representative" was another shadowy individual, supposedly named Minh Hoang Le, whom Benthos was told was in charge of "Dmitri's" Bitcoin at a "storage facility" in Dubai.  Benthos was never allowed to communicate directly with "Minh," if in fact there ever has been such a person performing such a function.  According to Etra:

> After some discussion, ["Minh"] said that he would use his best efforts to secure the delivery of BTC from Dmitri's wallet to Brandon's wallet within some 16-18 hours if funds currently held in escrow were wired today. Dmitri has instructed me to do so. . . . [id.]

And on that date Etra transferred an additional $1.6 million of Benthos's escrowed funds.

---

[5] No one ever explained to Benthos at the time, nor has anyone ever articulated since that time, any coherent basis for the $850,000 figure, and we suggest that the arbitrator not waste his time in that regard.  Nor has anyone pointed, then or since, to any contractual authorization for the demand to be deemed – by Etra or anyone else – as in any way legitimate in the absence of an executed amendment.

The following day, Saturday the 25th of August, Fong e-mailed Etra to ask "when can we expect the coin to be released? . . . Does ['16-18 hours'] mean coin will be sent over the weekend?  We are curious so we can make preparations on our end.  We are eager to complete this first transaction and proceed to the next tranche as soon as possible" (Ex. 20).  Etra replied merely that the "bank" and "transfer storage people" have been "extremely cooperative"; that "We will see the fruits of their best efforts in the business days ahead"; and "Let us continue the collaboration necessary to complete the first tranche and learn its lessons for future tranches" (*id*).

Benthos received no Bitcoin – not in "16-18 hours," and not at all.

### Benthos Hires Counsel To Pursue Its Legal Rights and Seek Information About the Whereabouts of Its $5 Million

By this point Benthos was losing faith, and sought legal advice.  When fifteen business days had passed since Etra had begun transferring the escrowed funds, on August 28 Benthos e-mailed him and the Austins invoking the "Guarantee" clause of the BTC Agreement (Ex. 2, page 8).  Copying counsel, Benthos requested in that e-mail "either" delivery of the Bitcoin or return of its $5 million:  "Should neither occur by Thursday, August 30, . . . Benthos will pursue any and all actions legally afforded to it . . ." (Ex. 21).[6]

On Friday, August 31, 2018, Benthos's then-counsel wrote formally to Valkyrie and Brandon Austin (Ex. 22), asserting material breach, demanding immediate delivery of Bitcoin or the immediate return of Benthos's funds, and stating that "Given the present circumstances, our

---

[6] Still hoping that the excuses Benthos was hearing were legitimate, Fong wrote to Etra, as a courtesy, to let him know that the e-mail had been advised by counsel "because our funds have been locked up for so long, and at this point we're getting close to the time when our auditors and investors will hold us legally accountable for losing the funds.  We remain enthusiastic about getting this deal done (. . . and, hopefully, many future tranches), but unfortunately we do need to pursue the avenues we have . . ." (Ex. 21).

client is concerned that there may be more than a simple breach of contract by Valkyrie"; and to Valhalla and Hugh Austin (Ex. 23), invoking "Valhalla's obligations as guarantor"; and to Etra (Ex. 24). The relevant portions of the letter to Etra are as follows:

> Pursuant to the terms of the Contract, Benthos agreed to purchase Bitcoin ("BTC") in the amount of $5 million on or about August 4, 2018. Benthos deposited $5 million into your escrow account ("Escrow Funds"), the proceeds to be used to purchase the BTC. Virtually all of the Escrow Funds have been released per your authorization. Under the terms of the Contract, delivery of the BTC was due August 22. We believe you are aware that Valkyrie has defaulted.
>
> Benthos demands that you immediately provide us with all details concerning the release of the Escrow Funds including but not limited to all banking and wire instructions, the identity, address and bank account information of all recipients of any portion of the Escrow Funds, all communications between or among you, Valkyrie Group LLC, Valhalla Venture Group LLC, Brandon Austin and Hugh Austin or any of their affiliates or representatives concerning the Contract or monies held in escrow. Please also provide any information in your possession, custody or control regarding (i) the storage capacity housing the BTC and the instrument backed by the BTC and (ii) Mr. Dmitri, including full name, address and passport information.

That letter was followed immediately by a "follow-up" e-mail from Benthos's counsel to Etra that "given . . . the current circumstances, please be advised that you may not release any remaining funds in the escrow account without the express consent of Benthos Master Fund, Ltd" (Ex. 25 at 2).

**The Escrow Agent Etra
Stonewalls Benthos's Request For Information,
Professes To Be Offended, and
<u>Threatens To Charge Benthos For His Retention of Counsel</u>**

It goes without saying that any legitimate Escrow Agent, including specifically a member of the Bar, would have – and should have – responded to a request for "all details concerning the release of the Escrow Funds" by providing, of course, precisely that: all details concerning the release of the Escrow Funds.  Not Aaron Etra.

Instead, Etra responded to Benthos's counsel by asserting that:

12

> [Y]our action and demands will require me to engage counsel, whose costs and expenses will be for the account of your client who has precipitated the need for my doing so.  I will be calling on your client to meet these obligations, including any retainer from said counsel and my own time and expenses, before proceeding further.  Please advise if I and counsel should submit those charges to you for the most timely settlement."  [Ex. 26]

Benthos's counsel replied as follows on Monday, September 3:

> Given the current circumstances, which indicate possible fraudulent activity, you cannot release any escrow funds. You have obligations to the Buyer here, who clearly has been victimized.  In addition, the terms of your escrow appear to be unconscionable, as no escrow agent in these circumstances can justify the fee you purport to charge.  As an attorney, I trust you are aware of your professional obligations, which include not charging a fee that is unreasonable.  Benthos is not responsible for your retention of an attorney here. We suggest that you work toward getting the Seller to honor its obligations rather than your own self interest.  [Ex. 27 at 1-2]

Etra then fired off defiant e-mails to Benthos's lawyer and to Gerald Fong.  While $5 million of Benthos's funds were missing and Etra was refusing to answer questions about the whereabouts of those funds, he complained twice about being e-mailed "on a legal holiday" (Labor Day), and wrote as follows:

> Gerald,
>
> Benthos cannot expect the full cooperation I have been giving and you continue to ask me to provide, if communications like the ones below come from Mark Hyland on your behalf, even on a legal holiday.
>
> I trust you have provided him with the Escrow Agreements Benthos has entered into and have given him no basis for his allegations.
>
> Please appreciate the negative impact of these communications at the very time when collaboration is most needed. I cannot continue to do my part with you until his allegations are withdrawn and he ceases and desists from these sorts of communications.
>
> I have had to appoint counsel because of his action on behalf of Benthos, this latest sent on a legal holiday and adding personal and professional allegations against me. This expense is indeed covered in the Escrow Agreement and raises the cost to the parties of the exercise we are trying to implement to resolve matters.

(Ex. 28 at 1-2)

> Dear Mr. Hyland,
>
> Please consult the Escrow Agreements which your client has signed as to what the responsibilities are of the respective parties to it.
>
> You are now making allegation[s], including as to both my obligations and my fees which are totally unacceptable and unfounded.
>
> I am forwarding these communications to my counsel, Michael D. Hess, Esq. for action he deems appropriate.  His appointment is indeed covered by the provisions of the Escrow Agreement entered into by your client and has been precipitated by your action, including this completely unconstructive and adversarial communication, which are inconsistent with communications from your client and deter all concerned from the cooperative effort reasonable persons would choose rather than the likes of the communications from you.

(Ex. 29)

**Etra and Evans Present a Series Of
Ever-Shifting and Increasingly Incredible Excuses**

Following Etra's early-September refusal to respond to Benthos's requests for documents and information concerning the $5 million of escrowed funds entrusted to his care, Etra and Evans took over communications with Benthos.  Over the ensuing weeks, they offered increasingly convoluted, and decreasingly credible, explanations and promises involving primarily the supposed search for and negotiations with a purported "second buyer."  That individual – unidentified, of course – was supposedly coming in to save the day by providing the additional $850,000 allegedly required by "Minh," on behalf of "Dmitri," to obtain release of the Bitcoin for delivery to Benthos.

During this period Etra and Evans refused to make "Minh" available by phone, forwarded (or merely cut and pasted) purported emails from him containing no discernible email address, and claimed that he was rarely available because he was working so hard and traveling between Dubai (the site of the supposed Bitcoin "storage facility") and Sydney, Australia.

Benthos desperately wanted to believe the story being peddled by Etra and Evans that this was all due simply to logistical complications being remedied by the "second buyer," whose additional funds would finally obtain release of the Bitcoin for which Benthos had paid. Nonetheless, it retained litigation counsel (the undersigned), who tried again on behalf of Benthos to find out what was going on.  On Friday, September 28, 2018, counsel wrote to Michael Hess, whom Etra had identified as his lawyer, in pertinent part as follows (Ex. 30):

> We understand that you represent Mr. Etra in this matter.  If that is not correct, please so advise us immediately.  We would like to arrange a telephone conversation (or meeting) with you on Monday, October 1.  Please let us know your availability.  During that call and immediately thereafter, we will expect responses from Mr. Etra (through you or otherwise), in his capacity as Escrow Agent, to at least the following questions:
>
> 1.    Of the $5 million deposited by our client into Mr. Etra's escrow account pursuant to the Escrow Agreement, how much, if any, is Mr. Etra presently holding in escrow, and is he willing to return those remaining funds to our client upon demand?
>
> 2.    If Mr. Etra is holding money in escrow and is not willing to return it to our client upon demand, is he willing to commit in writing not to transfer any of that money without our client's written consent (or a court order)?
>
> 3.    Identify all transfers or disbursements made to date from the $5 million escrowed with Mr. Etra, including at a minimum (i) the recipients of each transfer, (ii) the amount transferred on each occasion, (iii) the written instructions upon which each transfer was made, (iv) written confirmation of each transfer, and (v) the bank account information and wire transfer information (if any) associated with each transfer.
>
> If you are not able or willing to speak with us on Monday, please provide the requested information by the end of that day.  As an Escrow Agent, your client has very serious responsibilities and obligations, of which he and you are surely aware.  Providing basic information about funds in his care and custody should not be difficult, and we are truly perplexed why it was not provided in response to the August 31st letter.  Please do not make it necessary for us to resort to judicial remedies.

On Monday, October 1, Etra assured Benthos, through their respective counsel, that the matter would be resolved "by the end of this week" (i.e., by October 5).  The next day, Etra

reiterated through the same channels his confidence that the transaction would be completed "this week," which was then updated to "within 48 hours," on the representation that Etra had a "signed contract" – which, of course, no one would allow Benthos or its counsel actually to see – from the "second buyer," who was "a woman" (unidentified, of course), and who was supposedly providing "additional financing to complete the whole deal," "probably tomorrow [Wednesday, October 3], at latest Thursday [October 4]." He also acknowledged that he still had $400,000 of Benthos's $5 million in escrow.

On Wednesday, October 3, Evans confirmed to Benthos by phone that "the woman signed" a commitment to provide the additional $850,000 that was supposedly needed. Of course no one would provide a copy of that "signed" commitment to Benthos.

On Friday, October 5, Evans told Benthos by phone that Etra had "received the signed paperwork" and had "signed as well" – needless to say, no one would provide any of that to Benthos either – and that she was "aiming to wire today."

On Monday, October 8, Evans reported to Benthos, again by phone, that the wire from the second buyer's account "to Aaron's account" had been "initiated Friday afternoon," but "won't arrive in the account until Tuesday." Etra "typically waits a day" before initiating international wires and therefore the money would be sent to "the storage company on Wednesday," thereby accomplishing the release of Benthos's Bitcoin.

Benthos then e-mailed Etra and Evans that day asking for "copies of all wiring information including the second buyer to Etra, receipt into Etra's account, and your instructions on Wednesday to send out the money" (Ex. 31, asking also for "written confirmation that the $400k in Aaron's escrow will not be withdrawn in any capacity and that it will remain there until further instructions from us"). Having read this far, the arbitrator will not be surprised that no

"cop[y] of . . . wiring information" was sent, and that Etra did not confirm that he would

safeguard the remaining $400,000.  Instead, Etra responded as follows, in its entirety (Ex. 32):

> Gerald,
>
> As you well know, the agreement to which Benthos is a party provides for the
> Escrow Agent to take instructions on the application of these funds from your
> contracting party. Under these circumstances, please direct your requests with
> respect to the Benthos funds to Valkyrie, who I am copying on this message,
> along with my attorney since you have copied yours.
>
> With respect to the new buyer, the arrangement relevant to Benthos is that such
> buyer has required that the Escrow Agent have control over the wallet which
> receives the BTC, in order to ensure delivery to such buyer. Valkyrie has agreed
> to give the Escrow Agent such control for the delivery of all BTC, which includes
> the BTC to which Benthos is entitled for the funds it has provided. I trust that
> Benthos will be pleased with these arrangements, achieved after the considerable
> effort to find the funds needed to achieve the release of the 1,000 BTC minimum,
> which were not forthcoming from Benthos and Valkyrie. The relevant details of
> this process will be conveyed to you as it progresses, without violating the
> confidence owed to the new buyer.
>
> I hope you will appreciate the need for full cooperation on the part of all
> concerned, rather than unilateral demands or threats from lawyers, and wish to
> thank you in advance for doing so and enabling the resolution of this outstanding
> matter relevant to the initial BTC as collaboratively and expeditiously as possible.

On Tuesday and Wednesday, October 9 and 10, 2018, Evans told Benthos by phone that

the money from the purported "second buyer" had not yet arrived (recall that supposedly the

wire had been "initiated" the preceding Friday).  During the second call, on the 10th, Fong and

Deo told Evans that they doubted the existence of any "second buyer," and asked at least for a

writing confirming that such a buyer actually had "signed" a "contract" as they had been told.

She responded that she would have to "talk to Aaron" about doing so.

No such written confirmation was forthcoming (no surprise).  But on Friday, October 12,

Etra told Benthos directly on the phone that he had been "frequently talking with" the purported

second buyer, although now Etra identified the "second buyer" as a man ("he"), whereas

previously the "second buyer" had been said to be "a woman."  In any event, Etra told Benthos

that the additional funds purportedly required to obtain release of the Bitcoin – funds which, it

should not be forgotten, Benthos had previously been told had been "initiated" on "Friday

afternoon," October 5 pursuant to a "signed" contract – "should be sent on Monday [October

15]."

Benthos asked Etra to send a copy of the supposed contract, or at least to identify the

supposed buyer, or to send something – anything – verifying what he was saying.  Etra refused.

**Benthos Terminates the Escrow and**
**Goes To Federal Court In Aid of Arbitration**

Following that last conversation between Etra and Benthos on October 12, 2018,

Benthos's counsel transmitted later that day a formal Notice of Termination of Escrow stating, in

pertinent part (Ex. 33):

> Please be advised that Buyer is, on the date hereof, terminating the Escrow in
> accordance with the Escrow Agreement [Ex. 2, page 11 of 16] because the Seller
> and guarantors are in breach of the BTC Agreement . . . and accordingly the
> transaction referred to in the Escrow Agreement and the BTC Agreement was not
> consummated within the required time.  Accordingly, the Deposit funds need to
> be returned to the Buyer immediately. . . .
>
> This Notice of Termination is without prejudice to Buyer's rights against any and
> all parties in connection with the Escrow Agreement and/or the BTC Agreement,
> and all such rights are expressly reserved.  The Escrow Agent is specifically
> cautioned that he is liable for any and all damages, losses and expenses (including
> reasonable attorneys' fees) caused to the Buyer by the Escrow Agent's willful
> misconduct and/or gross negligence, and that (without limitation) failure to
> immediately return the Deposit funds (including but not limited to such portion of
> those funds that may still be in the Escrow Agent's possession, custody or
> control) pursuant to this Notice of Termination of Escrow shall be deemed willful
> misconduct and legal action will be taken against the Escrow Agent to remedy
> same forthwith.

That Notice of Termination of Escrow was accompanied by an e-mail from counsel

requesting proof by 12:00 Eastern time on Monday, October 15, "that one or more wire transfers

18

have been initiated [per wire instructions attached] returning our client's funds previously deposited into escrow" (Ex. 34).

Etra responded to the foregoing not by returning the $400,000 he was still holding in escrow, but by purporting to ask the Austins to "instruct[] me with respect to the funds still on escrow deposit" (Ex. 35).  That same evening, Friday, October 12, Etra wrote to Fong, copying Brandon Austin and Evans, still refusing to return the $400,000; for some reason requesting that Brandon <u>not</u> instruct him to do so; pretending that the Bitcoin was about to be delivered; and asking Fong to "confirm that Benthos still wishes to receive the BTC to which it is entitled . . ." (Ex. 36):

> The new buyer . . . [expects] to wire funds to me . . . 'on Monday morning.'
>
> [I]nstructions regarding [the escrowed funds] need[] to come from Valkyrie.[7]
>
> I believe it is in the interested of all concerned for me, as Escrow Agent, to send the funds from the new buyer to the transfer storage house to achieve the release and delivery of the BTC due to Benthos and the new buyer with as few complications as possible.  As the funds from the new buyer are to come to the account in which the remaining escrow funds from Benthos are held, I do not want to jeopardize the transfer out to the transfer storage from that account with making any other transfers depleting that account in advance or at the same time[.]
>
> Therefore, I request you, Brandon, on behalf of Valkyrie to not instruct me to make any transfers from the escrow funds other than to the transfer storage house until that transfer has been acknowledged and applied by the transfer storage house to the release and delivery of the applicable BTC.  I further request you, Gerald, on behalf of Benthos, to agree with this approach and to so notify me and Valkyrie in writing.
>
> Gerald, please also confirm that Benthos still wishes to receive the BTC to which it is entitled for the total funds it has escrowed, as I will be in control of the

---

[7] Of course that was legally incorrect.  Benthos had terminated the escrow in compliance with the parties' contract (Ex. 2, page 11 of 16) and thus at a minimum, the remaining escrowed funds "need[ed] to be returned . . ." (*id.*).

Valkyrie wallet for the disbursement of BTC delivered to that wallet.  The message conveyed by your lawyer raised that as a question.

Etra and his confederates had exhausted Benthos's patience, and its credulity.  The following business day, Monday, October 15, 2018, Benthos filed a Petition For Preliminary Injunctive Relief In Aid of Arbitration against Etra and Evans in the United States District Court for the Southern District of New York.  On that date, the Honorable P. Kevin Castel signed an order requiring Etra and Evans to appear before Judge Deborah Batts on October 25, 2018, and in the interim he temporarily enjoined and restrained Etra and Evans "from directly or indirectly transferring or continuing to transfer any portion of the $5 million previously deposited by [Benthos] into Etra's IOLA account" (Ex. 37).

The order signed by Judge Castel required Etra to show cause on October 25 why an order should not be entered as follows, among other things (*id.*):

> Directing [him] to disclose within 48 hours the following information regarding transfers or disbursements made to date from the $5 million deposited by [Benthos] into Etra's IOLA account:
>
> (a)  the recipients of each transfer,
> (b)  the amount transferred on each occasion,
> (c)  the written instructions upon which each transfer was made,
> (d)  any written confirmation received of each transfer,
> (e)  the bank account information and wire transfer information (if any) associated with each transfer,
> (f)  the identities, if known to Etra, of any subsequent recipients of Benthos's escrowed funds pursuant to any transfers made of such funds by Etra's transferees, and
> (g)  the current or last known whereabouts of the said previously-escrowed funds;
>
> [and] . . .
>
> 2.  Further directing [him] to, within 48 hours:

20

a.    provide copies of all communications between and among any of himself,
      Valkyrie Group LLC, Valhalla Venture Group LLC, Brandon Austin,
      Hugh Austin, Tracy Evans, "Dmitri," and Ming Hoang Le, or any of their
      affiliates, representatives and/or agents, concerning the Bitcoin
      Agreement, the Escrow Agreement, and/or the funds deposited by Benthos
      into Etra's IOLA account;

b.    disclose the full name of Dmitri, as well as any other names by which he
      has identified himself, and his home and business addresses and all of his
      phone numbers and e-mail addresses known to Etra; and

c.    disclose the name, address, telephone number, website and identities of
      principals of any storage company at which any of the funds deposited
      into escrow by Benthos, or any Bitcoin intended for Benthos, has been
      held.

Evans requested an adjournment and on October 19, 2018, Judge Batts adjourned the
scheduled October 25, 2018 hearing to November 15, 2018, but required both Etra and Evans to
"submit all information [requested by the Order to Show Cause] on or before Friday, October 26,
2018 at 6:00 PM" (Ex. 38).

**Etra Defies, and Lies To, the Federal Court, and**
**Is Threatened By the Judge With Contempt and Imprisonment**

Etra provided no information or documents on October 26, 2018 as ordered, and Benthos
so advised Judge Batts (Ex. 39).  In fact, he made no effort to comply with the court's order at
any time before (or during) his appearance at the hearing on November 15.

The transcript of the parties' ensuing court appearance accompanies this Statement of
Claim as Exhibit 40.  Claimant urges, and respectfully requests, that the arbitrator read the 24-
page transcript in its entirety, for it is of supreme significance here and its full flavor cannot be
conveyed by summary.

Nonetheless, the following points bear emphasizing:

•    Judge Batts pointed out to Etra that as a lawyer, "You are an officer of the court.
     You have ignored court orders.  You have not done anything that the Courts have
     ordered you to do" (Ex. 40 at 19).

21

- The judge told Etra (and Evans) that "[You] have given the Court no reason – no reason – to expect that [you]'re going to obey Court orders. Everything that has been ordered by either Judge Castel or by me you have ignored. . . . [I]t seems to me that you are in contempt of Court. . . . [Y]ou will be subject to being incarcerated. . . . Flagrant ignoring of Court orders [is] inappropriate, unacceptable and will be dealt with accordingly," and she directed Plaintiff's attorneys to file a motion to hold Etra (and Evans) in contempt of court. (Ex. 40 at 5, 8, 19-20).

- Etra joined with Evans in the blatant falsehood she told to the federal judge: ". . . [Y]esterday, although it seems like unfortunately it was the day before the Court date, they did give us a signed contract last night that, for the other 250 [Bitcoins] that would make up the entire amount, so therefore they could go forward and everybody would get their Bitcoins and this would be over.  This happened last night, [Benthos is] not aware of it, but we didn't have a signed contract until last night" (Ex. 40 at 18).

- Etra lied directly to Judge Batts's face at least three times during the short hearing:

  - After Benthos's counsel complained that Etra had "given nothing" in response to what he had been ordered to do by the court, Etra responded falsely, "Your Honor, that is totally incorrect" (Ex. 40 at 11).  In fact it was totally correct.

  - Etra insisted to Judge Batts that "[Mr. Popofsky's] client [Benthos] has been wanting us to do what we have [done]" – i.e., continue with the underlying transaction, meaning he was alleging that the undersigned counsel was proceeding in contravention of the client Benthos's wishes (Ex. 40 at 11).  When asked by the judge, "What proof do you have that his client wants you to do this?" (id.), he replied, "Response from his client, we have correspondence which we are happy to submit. . . . Your Honor, here is a correspondence from me to his client and the confirmation from his client . . ." (Ex. 40 at 12).  That e-mail was dated August 17, 2018 (Ex. 40 at 13), more than three months prior to the court hearing and (as Etra well knew) even before Benthos had retained counsel.  When called out on that, Etra then claimed, "I have subsequent correspondence right up through the middle of October, your Honor . . . [w]hich was sent to their client and response from their client" (id.); but when he was required to hand that over, it similarly was dated almost three months earlier (id.), on August 25, 2018 – hardly the "middle of October."

  - Etra walked into the court hearing and stated, "My counsel [Mr. Hess] was planning to come to the hearing but as of yesterday he was completely laid low and has been unable to even communicate except via e-mail" (Ex. 40 at 2), notwithstanding that, as set forth by Benthos's counsel in court, Mr. Hess actually had called Benthos's counsel at approximately 4:00 PM that

22

prior day and stated that he was "only a friend of Mr. Etra's, . . . will not make an appearance for Mr. Etra, . . . does not represent Mr. Etra," and – most importantly – did not claim any illness and (quite obviously) was not at all "unable to even communicate except via e-mail."

- Etra still resisted, incredibly, returning the $400,000 he was continuing to hold in escrow (Ex. 40 at 21).

- Judge Batts gave Etra a "[d]irect order" in no uncertain terms:  "Listen to me: Return the $400,000 to the plaintiff immediately" (Ex. 40 at 24).

- The judge also set a briefing schedule for a contempt of court motion and told Etra (and Evans), "I am telling you, do not make any plans for the holiday because if you do not comply with the order signed . . . by me on October 19th, . . . you will be going to jail" (Ex. 40 at 22).  She concluded (Ex. 40 at 24), "I am warning you, . . . pack your toothbrush."

**To Avoid Federal Prison,
Etra Returns $400,000 and
Provides Documents and Information, Albeit Incomplete**

Etra did wire $400,000, finally, to Benthos's counsel following Judge Batts's direct order and threat of jail.  He provided a two-page sheet (Ex. 41) with some, but far from all, of the information set out in the Order to Show Cause (Ex. 37) and required by the court's orders.  He provided some limited documentation about his wire transfers (Ex. 42) – from which Benthos learned for the first time that he had sent the bulk of its money to China Citic Bank in Hong Kong (about which more below), on "Instructions of "D[mitri] Kaslov" (ditto) – but did not explain how he had received them, or that he had had a hand in drafting them.

And, truly unbelievably by that juncture, in response to the court orders requiring "copies of all communications between and among any of himself, Valkyrie Group LLC, Valhalla Venture Group LLC, Brandon Austin, Hugh Austin, Tracy Evans, 'Dmitri,' and Min[] Hoang Le" (Exs. 37-38), Etra gave Benthos only a 16-page compilation of e-mails solely between himself and Benthos (Ex. 43), providing no communications – literally zero – between himself and the others on which Benthos had not already been copied.

Benthos's counsel then wrote to Etra informing him that "[t]he documents and information you have provided are deficient," and itemizing the deficiencies with citations to the Order to Show Cause (Ex. 44).  Etra responded, again incredibly, that "You are now continuing [your] threatening approach notwithstanding full cooperation and fulfillment of the requirements of the Order from Judge Batts" (Ex. 45).  He provided not a single additional document or item of information with that e-mail, and concluded as follows:

> [Y]ou are continuing to harass me personally on this matter with no basis for doing so as I have been rendering continuing service, far in excess of that called-for as Escrow Agent, for no personal gain from your client but rather for their benefit and that of the party with whom they contracted.
>
> I reserve the right to seek redress from the action of your . . . colleague and yourself.

Benthos then moved to hold Etra in contempt of court, as invited and directed by Judge Batts, and sought a forensic examination of his computer and a federally-supervised deposition. As of the making of that motion, Etra had provided no communications whatsoever – apart from the 16 pages of e-mails between himself and Benthos (which Benthos clearly did not need, and which in any event were only a fraction of the e-mails that had passed between them) – "between and among any of himself, Valkyrie Group LLC, Valhalla Venture Group LLC, Brandon Austin, Hugh Austin, Tracy Evans, 'Dmitri,' and Min[] Hoang Le, or any of their affiliates, representatives and/or agents, concerning the Bitcoin Agreement, the Escrow Agreement, and/or the funds deposited by Benthos into Etra's lOLA account" (Ex. 37 at ¶ 4(a)), as ordered by the Court on October 19 (Ex. 38) and again at the hearing on November 15.

In response to the motion, Etra finally produced (in hard copy, not in electronic form) some responsive e-mails and documents.  His production was woefully incomplete in several substantive respects – which was evident at the time, and was confirmed later when Tracy Evans

produced in state-court litigation various documents that Etra had continued to withhold – and gave rise to subsequent correspondence with the Court.  Ultimately, Judge Batts ruled that the high standard for civil contempt had not been met, and that "Although Etra's efforts may not have produced perfect compliance, Benthos has failed to demonstrate that Etra deliberately disregarded . . . the Court's Orders" (Ex. 46 at 8-10).

Neither Etra nor Evans ever produced the "signed contract" they had told Judge Batts had "happened last night" (Ex. 40 at 18); nor, for that matter, the contract they had told Benthos was "signed" on October 5, nor confirmation of the wire they had claimed was "initiated" that "afternoon."  The price of Bitcoin dropped dramatically after the summer of 2018 (from a high of $9,845.54 per Bitcoin to well below $4000 – see www.coindesk.com/price/bitcoin), and so the purported excuse that Benthos's $5 million was insufficient to get the (invented, and extra-contractual) "minimum" 1000 Bitcoins released from the "storage facility" was no longer even theoretically tenable; yet Benthos never received any Bitcoin.  Nor has the remaining $4.6 million of its money been returned.  The Austins and their entities have defaulted on Benthos's lawsuit against them (Ex. 47), but they are likely judgment-proof, and Benthos has a lawsuit pending against Evans but she too is unlikely to have reachable assets.

### (Some Of) What Etra Was Hiding

Much about how this scam came about and was executed remains unknown, and likely will remain so, unless the FBI gets to the bottom of it.  But what we do know – including from documents eventually obtained at much cost after great delay – is more than enough to hold Etra liable for breaching his legal, contractual, ethical and fiduciary duties to Benthos as an attorney escrow agent.

It turns out that, as set forth in detail below, Etra's first wire transfer of Benthos's funds, $3 million on August 7, 2018, was made on wire instructions purportedly from "Dmitri" (not from the contractual "Seller" Valkyrie Group LLC, as required), with those instructions revised by Etra and sent back to himself; that the money inexplicably was sent to a Chinese bank in Hong Kong; and that prior to the transfer, Etra expressed "concern," on three separate occasions in writing, about the "appearance as well as the practicality" of sending funds to a Hong Kong company "run by a friend of Dmitri's."

The wire instructions for that first $3 million transfer are set forth in Exhibit 42.  They were signed on August 7, purportedly by "Dmitri Kaslov," and directed the funds to "HK Zhixuan Trading Limited" through China Citic Bank International in Hong Kong, a subsidiary of the CITIC Group in Beijing (Ex. 48).  That information was forwarded to Etra by Evans, purportedly from "Dmitri" in an e-mail stating:

> I am sending you the banking for the Austin deal. . . . It is the same as the Ko deal.  [Ex. 49, second page, apparently attaching Ex. 50, "Bank Details As Per Dmitri's Instructions For BTCs."]

The "Ko deal" was, presumably, another Bitcoin scam ("Hello Tracy . . . kindly ask Mr Ko to wire the 9.8 and I will give the equivalent in BTC. . . . Here is the signatory to the company account, who is one of my associate[s]. . . . I will not tolorate [*sic*] any more delay after a sign[ed] and seal[ed] Agreement" [Ex. 49, second and third pages]).  Etra told Evans what to "include in the letter of instructions from Dmitri" and then sent her a "revised instructions letter" (Ex. 51).  In any event, Etra wrote three times prior to the transfer about his "concern[s]":

> I am concerned about a transfer to a HK trading company under current circumstances where the funds are not coming from HK, have to go to Dubai, and need to be seen as consistent with obtaining the BTC and stabilizing an instrument.

(Ex. 52, first page.)

> [S]ending the funds to an individual in HK rather than to a firm in Dubai seems unusual for these purposes.

(Ex. 49, first page.)

> Please also appreciate that we have verbally and now in the agreement stated that the funds would be applied to assist in delivering the BTC and we have told persons about Dubai and stabilizing an instrument. Sending funds to a trading company in HK, albeit run by a friend of Dmitri's, may not be viewed as consistent with that effort and commitment.

> I am concerned about the appearance as well as the practicality of such transfer to HK, and certainly about consequences if any delay or problems arise at any stage of the transaction.

(Ex. 49, first page.)

Nonetheless, on August 7, 2018, Etra transferred the first $3 million of Benthos's money after being told by "Dmitri," through Evans, "to proceed with the wire before 9am" (Ex. 53).

Three days after that first wire transfer to the Chinese bank in Hong Kong, Etra and Hugh Austin entered into an engagement letter whereby Etra agreed to represent Hugh's Valhalla Venture Group "in connection with your business activities," at an hourly rate of $500 and with a "require[d] . . . initial non-refundable retainer of $20,000.00" (Ex. 54).[8]  It is hard not to suspect some relationship between those two events.

Also in the days following that first transfer, Etra made a second transfer of $250,000, to Citibank in Houston for the credit of a company known as "Invictus Agro Business Ltd" (Ex. 55).  The instructions were signed on August 9 purportedly by "Dmitri Kaslov" (id.), who had provided the payee information to Evans to "send to Aaron" (Ex. 56).  Etra did not disclose that transfer to Benthos until eight days later, whereupon Fong inquired, "[W]hat was the purpose of

---

[8] Etra did not likely trouble himself much over the ethical implications of charging a "non-refundable retainer."  *See, e.g.*, New York State Bar Ass'n Ethics Opinion No. 599 (March 16, 1989), available at https://www.nysba.org/CustomTemplates/Content.aspx?id=5352.

the second transfer (the $250,000 one)?  We were previously only aware of the first one."  Etra

replied, uninformatively, that "Dmitri was asked to make this second transfer to a domestic U.S.

destination while the first international transfer had yet to arrive" (Ex. 57).

Etra did not explain to Benthos by whom "Dmitri" supposedly "was asked" to make that

transfer.  More importantly, he also did not disclose (then, or ever) that the Citibank account to

which the $250,000 was directed, account No. 36887918, was, peculiarly, a clearing account for

a bank in Nigeria (Ex. 58).[9]

Finally, on August 24, 2018, Etra transferred the additional $1.6 million to the

aforementioned Chinese bank in Hong Kong, upon wire instructions – also purportedly signed by

"Dmitri Kaslov" – identical to those in connection with the first transfer (Ex. 42, third page).

### Etra's Transfers of Benthos's Escrowed Funds
### Violated the Terms Of the Escrow Agreement In Multiple Respects

Most simply, yet dispositively, the Escrow Agreement signed by Etra required him "to

follow the sole instructions of the Seller," Valkyrie (Ex. 2, Escrow Agreement, second bullet

point on page 12), yet he took escrow instructions from a non-party to the contract, "Dmitri

Kaslov" (if, again, such a person indeed exists at all).

At least three other clauses in the Escrow Agreement also required Etra to take

instructions from the "Seller" (Ex. 2, Escrow Agreement, second and fourth Whereas clauses on

page 9 and first full paragraph on page 11), and there is nothing in the Escrow Agreement

authorizing Etra to take instructions from the contractual non-party "Dmitri Kaslov."  Moreover

the Escrow Agreement recited that it was "the entire agreement between the parties hereto with

respect to the subject matter hereof" (Ex. 2, Escrow Agreement, para. C on page 14), and that

---

[9] That transfer may have been some kind of test, because the $250,000 eventually was returned to
Etra's escrow account (Ex. 59).

"Neither this Escrow Agreement nor any term, condition, covenant, [or] agreement . . . hereof may be changed, waived, discharged, or terminated orally but only by an instrument in writing signed by each Party hereto. . ." (Ex. 2, Escrow Agreement, para. B on page 14).[10]

Furthermore the Escrow Agreement provided expressly, in at least three places, that the escrowed funds could be disbursed only "to secure the BTC for the Buyer" and that "the funds shall not be used for any other purpose" (Ex. 2, Escrow Agreement, fourth Whereas clause, page 9; see also *id*., first full paragraph on page 11 and second bullet point on page 12). We would not be here today except that the funds manifestly were not used or disbursed by Etra for that purpose.

Etra knew that. Recall that before sending any money at all, he wrote that any transfers "need to be seen as consistent with obtaining the BTC" (Ex. 52), and that "the agreement stated that the funds would be applied to assist in delivering the BTC. . . . Sending funds to a trading company in HK . . . run by a friend of Dmitri's . . . may not be viewed as consistent with that . . . commitment" (Ex. 49, first page).

And his final transfer of Benthos's funds to the Chinese bank in Hong Kong – $1.6 million as late as August 24, 2018 – came well after the demand for an additional $850,000, on top of Benthos's contractual $5 million, purportedly in order to get any of Benthos's promised Bitcoin released (not to mention after the mystery $250,000 transfer to Nigeria and the unexplained return of those funds). To the extent Etra may contend in this arbitration – however implausibly – that he is not a primary actor and perpetrator of this fraud upon Benthos, by the

---

[10] The Escrow Agreement also provided that "If the Escrow Agent . . . shall receive instructions, claims or demands . . . which . . . conflict with any provisions of the Agreement or this Escrow Agreement, the Escrow Agent shall promptly send a written request to each affected Party for clarification of such uncertainty or conflict" (Ex. 2, Escrow Agreement, first bullet point on page 13). Etra never sought to invoke that clause.

time he made that $1.6 million transfer on August 24, it was screamingly obvious that something was wrong.

Yet he plowed ahead and took instructions yet again from a non-party to the contract, a person he had never met and indeed had no evidence even existed, in violation of the express terms of the Escrow Agreement; and those funds too certainly were not used "to secure the BTC for the Buyer."

And then just one week later, when he was asked the simplest of questions for an Escrow Agent to answer – essentially, "Where is our money and to whom have you sent it?" – he refused to respond (and acted offended to boot). And when asked the same questions a month later, again he refused to respond. He then joined in a litany of lies to Benthos and its counsel about the alternately male and female "second buyer" who repeatedly had "initiated" wires and "signed" contracts. And when Benthos terminated the Escrow Agreement and demanded its money back, he refused to return even the $400,000 he still held. And when ordered by a federal court to provide that same basic information he previously had refused to provide, again he refused to do so. He then appeared before the federal judge and lied to her face repeatedly. He returned the $400,000 only when given a "direct order" upon threat of "jail" ("bring your toothbrush"), and then produced not a single solitary communication with his confederates notwithstanding the court's warning ("you tell them everything you were supposed to tell them weeks ago" (Ex. 40 at 20)). Only after Benthos actually moved to hold him in contempt of court and for related relief – including a forensic examination of his computer, which he must have dreaded for very good reasons – did he finally cough up some documents, while still concealing some that Evans produced and others that might help explain what really happened here.

This is not a difficult case.

**Etra Is Liable to Benthos Under Longstanding and Unambiguous Law
Regarding the Fiduciary and Contractual Obligations of Escrow Agents**

"Under New York law, an escrow agreement creates a fiduciary relationship between the escrow agent and the parties to the escrow transaction." *Qube Films Ltd v. Padell*, No. 13-cv-8405 (AJN), 2016 WL 881128 at *4 (S.D.N.Y. March 1, 2016).  "The escrow agent as trustee owes 'the highest kind of loyalty.'" *Nat'l Union Fire Ins. Co. v. Proskauer Rose*, 634 N.Y.S.2d 609, 614 (Sup. Ct. N.Y. Co. 1994), citing *Bardach v. Chain Bakers*, 265 A.D. 24 (1st Dept. 1942), *aff'd*, 290 N.Y. 813 (1943), and *Oppenheim v. Simon*, 57 A.D.2d 1006 (3d Dept. 1977). Etra, "as a fiduciary, ha[d] 'a strict obligation to protect the rights of'" Benthos, for which he "act[ed] as escrowee" (*Greenapple v. Capital One*, 92 A.D.2d 548, 549 (1st Dep't 2012)), and his "duty was to strictly execute the terms of the escrow agreement." *Nat'l Union*, 634 N.Y.S.2d at 615, citing the New York Court of Appeals in *Farago v. Burke*, 262 N.Y. 229 (1933), and the Second Department in *Schuman v. Conforti*, 30 A.D.2d 968 (2nd Dept. 1968).

"Compliance with the contract is paramount." *Madison 68 Realty v. 11 East 68th Street LLC*, No. 650752/2014, 2017 WL 4329873 at *7 (Sup. Ct. N.Y. Co. Sept. 29, 2017). "[A]n escrow agent has a duty not to deliver the monies in escrow except upon strict compliance with the conditions imposed by the controlling agreement." *Greenapple*, 92 A.D.2d at 549, citing *Farago*. Escrowed funds are "to be kept by the [escrow agent] . . . until the performance of a condition or the happening of an event, [and] then [are] to be delivered by the escrow agent" as set forth in the contract. The escrow agent must "part with [the escrow] only on a specified condition" – here, instructions from "the Seller" for the "purpose" of "securing" the Bitcoin for Benthos – and "the promisor [Benthos] retains a contingent right to repossess the property when the specified condition does not occur":

The interest of ownership remains in the person depositing property into escrow until the conditions of the escrow agreement are fulfilled.

*Nat'l Union*, 634 N.Y.S.2d at 614.  Because Etra was "required to act in a manner that complied with the obligations set out in the escrow agreement" (id. at 618) and did not do so, ownership of the escrowed funds remained with Benthos, and Etra had no right to send them to a Chinese bank in Hong Kong, in exchange for nothing, upon instructions not from the Seller but supposedly from non-party "Dmitri Kaslov."

Indeed, "[t]he primary objective of the fiduciary (trustee) should be preservation of the escrow funds," and an "escrow agent is obligated to exercise that degree of care which a prudent person of discretion and intelligence would employ in their own like affairs" (id.).  Etra failed miserably to live up to those standards, and he is not rescued by the contractual limitation of his liability to "gross negligence or willful misconduct" – <u>Etra's entire course of conduct has been suffused with willfulness</u>.[11]

---

[11] That state of mind and improper conduct has persisted even through commencement of this arbitration, which Etra sought to block entirely and managed to delay for several months.  The correspondence history with the Permanent Court of Arbitration at The Hague ("PCA"), the International  Court of Arbitration ("ICC") and this arbitrator has all been made a part of the record of the arbitration and will not be exhibited here.  A sampling of Etra's missives, however, include letters to the PCA on August 12 and 13, 2019 in which he alleged that he needed time "to be represented by counsel" whom he never bothered to retain; the risible claim in his August 13th letter to have made "extensive and continuing efforts to assist [Benthos]"; the outrageous assertion in his September 26, 2019 e-mail to the ICC that he "has made every effort to have any possible funds returned to Claimant" – an assertion that would surely astonish Judge Batts, who had to threaten him with "being incarcerated" ("I am warning you, . . . pack your toothbrush"); his claim on October 2, 2019 to the ICC that he "has tried to assist all parties to the transaction in a selfless . . . manner" ("selfless" is defined by the Cambridge English Dictionary as "caring more about other people's needs and interests than about your own"); and his attempt, as late as November 16, 2019, to prevent Benthos from obtaining adjudication of its legal rights by urging the sole arbitrator, "Your withdrawal at this point and under these circumstances would be the honorable and correct action."

Etra's documented and indisputable behavior, set forth in detail in this Statement of

Claim, is more than sufficient for the arbitrator to hold him liable.  *See*, *e.g.*, the First

Department's holding in *Greenapple*, 92 A.D.3d at 549-550:

> [I]nsofar as the complaint alleges that [the escrow agent law firm] failed to ensure
> that the [relevant] documents were in fact executed by plaintiff prior to releasing
> her deposit [the allegation was that the escrow agent released a buyer's escrow
> upon a forged document], it sufficiently states that [the law firm] failed to strictly
> comply with the conditions imposed by the escrow agreement, which mandated
> release of the monies only upon a writing signed by the plaintiff.  Additionally,
> notwithstanding that the [underlying] agreement . . . premises [the escrow agent's]
> liability only upon demonstration of gross negligence or willful misconduct, the
> complaint nevertheless states a cause of action for breach of fiduciary duty under
> this diminished standard of care insofar as it alleges that [the law firm] enabled,
> aided and abetted [the seller] in a scheme to convert plaintiff's deposit by
> intentionally, wantonly, and recklessly disregarding its fiduciary duties.  Since the
> complaint alleges that [the escrow agent law firm] intentionally participated in the
> scheme to convert plaintiff's deposit, it sufficiently alleges that [the firm] was
> grossly negligent (*Colnaghi, U.S.A. v Jewelers Protection Servs.,* 81 NY2d 821,
> 823-824 (1993) (gross negligence is 'conduct that evinces a reckless disregard for
> the rights of others or smacks of intentional wrongdoing') . . ., thereby breaching
> the duty of trust and loyalty it owed plaintiff as her fiduciary (*Bardach v Chain
> Bakers, Inc.,* 265 App Div 24, 27 (1942), *affd*  290 NY 813 (1943) (as a trustee,
> an escrow agent owes his fiduciary "the highest kind of loyalty")).

So too here.[12]  *See also, e.g., Qube Films*, 2016 WL 881128 at *5 ("disbursing money to parties

other than the party designated in the [contract document], personally appropriating $120,000,

continuing to withdraw funds after written notice that further withdrawals were not authorized,

and failing to respond to Plaintiffs' repeated inquiries could demonstrate 'gross negligence or

willful misconduct' such that a [fact-finder] 'could return a verdict' in Plaintiffs' favor");

*Schuman*, 30 A.D.2d at 969 (escrow agent "was derelict in his fiduciary duty to defer

---

[12] In the *Bardach* case, cited in 2012 by the First Department in *Greenapple*, the escrow agent
"ma[de] unauthorized payments out of the escrow mon[ies]" and "was under a duty to disclose
the situation which had come to his notice.  He not only failed to disclose it and was silent when
he knew the plaintiff was being defrauded, but by his conduct he actively aided the prosecution
of the fraud both in what he said to the plaintiff and in disposing of the escrow mon[ies]"
improperly.

disbursement of the escrow fund until the eventual fulfillment of the escrow agreement. We deem [his] premature disbursement of the escrow fund incompatible with his obligation as an impartial trustee of the escrow fund"); *S.A. De Obras y Servicios v. Bank of Nova Scotia*, 170 A.D.3d 468, 473 (1st Dept. Mar. 12, 2019) ("complaint "sufficiently alleged that defendant['s] conduct evinced a reckless disregard for plaintiff's rights insofar as [defendant] failed to comply with, or 'actively disregarded, its own policies'"), citing *Internationale Nederlanden v. Bankers Trust*, 261 A.D.2d 117 (1st Dept. 1999) (the First Department held that gross negligence could be found to exist where defendant "was well aware that millions of dollars were at stake," "minor errors of form could have drastic consequences," and defendant "reassured [plaintiff] that everything was in order, until it was too late for [plaintiff] to do anything about it").

Nor is this the first time Etra has played fast and loose with money entrusted to him in escrow. In 2016, the First Department affirmed summary judgment against him for conversion of escrowed funds which he "intentionally retransferred" without authorization and which "were never recovered." *Grasshoff v. Etra*, 135 A.D.3d 574 (1st Dept. 2016). The transcript of oral argument of that motion in the lower court reveals that Etra claimed the money had appeared in his escrow account by "mistake" but then, according to the judge, he "sent [it] . . . to . . . a friend of [his] . . . who profited illegally from that transaction." (Ex. 60 at 7). Etra also contended that his signature on the underlying agreement establishing the escrow had been forged, but he submitted no expert testimony and the lower court said there was "absolutely not an iota of proof" supporting that claim ("You have provided nothing, nothing in support, nothing, nothing") (*id.* at 5). To avoid a disputed issue of fact, plaintiff moved for summary judgment only on his conversion claim, and the court granted the motion:

> Once the money has appeared in Mr. Etra's bank account, under Mr. Etra's theory
> of life, it was a mistake that it arrived. . . . [T]hen what you have to do as an

attorney admitted to practice law in the State of New York . . . and particularly a person who has an escrow fund into which the mistake appeared [is] to do whatever is necessary to . . . return the money . . . [and] not to take the money that appeared by mistake . . . and then send it on to my friend . . . [who] never returned it" [id. at 9-10].[13]

In sum, there are ample grounds to support a finding that Etra breached his contractual and fiduciary obligations to Benthos in his capacity as Escrow Agent.

### Etra Also Is Liable
### For the Actions Of His Co-Conspirators

In this transaction, Etra intentionally aligned himself, and worked hand in glove, with the Austins, Evans, and (to the extent these individuals may actually exist) "Dmitri" and "Minh."[14] Etra and the others were part and parcel of a conspiracy and scheme to defraud Benthos, a goal towards which they worked in concert at all times to accomplish by, among other things, creating the illusion of a legitimate transaction for the purchase of $5 million of Bitcoin.

Each of the co-conspirators, including Etra, took the overt acts described in this Statement of Claim, among other acts, in furtherance of the scheme. As Etra and the others

---

[13] That is reminiscent of Etra's own characterization here that he was wiring Benthos's money to a Hong Kong company "run by a friend of Dmitri's" (Ex. 49).

[14] The Austins and Evans too are no strangers to fraud. Evans, whom Etra claimed was the U.S. agent for "Dmitri," is a convicted felon as noted above, and Etra worked with her day and night for months in his dealings with Benthos. The Austins for their part appear to have perpetrated this same Bitcoin scam on victims other than Benthos. In March of 2019, Valkyrie and Hugh and Brandon Austin were sued in the Northern District of Georgia by a plaintiff which had contracted with Valkyrie to purchase a quantity of Bitcoin, and which sent the purchase funds to an escrow agent who sent a substantial portion of those funds overseas, after which the funds disappeared: "When Valkyrie failed to provide the Bitcoin, [plaintiff] repeatedly reached out to all involved demanding it either receive the Bitcoin or a refund of its monies, and received nothing but a run-around. Everyone assured [plaintiff] the Bitcoin or money was coming, no doubt to buy time so they could complete their fraud." The escrow agent "finally responded . . . not by . . . return[ing] Plaintiff's money . . . , but rather to provide more false assurances . . . [including] that "'I have received written confirmation from my seller that the coins will be delivered on or before the end of business today.'" Ultimately the escrow agent returned some of plaintiff's money, "but [the escrow agent] (or other Defendants) retained the [remainder]." See Ex. 61 at 2, 11.

knowingly participated with and materially assisted each other, the actions of all of them in furtherance of the fraud are legally attributable to Etra. *See, e.g., Silverboys, LLC v. Skordas*, 2019 WL 587426 at *4 (Sup. Ct. N.Y. Cnty. Feb. 11, 2019) (where defendant substantially assisted in a fraud, plaintiff could assert a claim for aiding and abetting, or for conspiracy "to connect the actions of separate defendants with an otherwise actionable tort," quoting *Alexander & Alexander of N.Y., Inc. v Fritzen*, 68 N.Y.2d 968, 969 (1986)).

### Benthos Is Entitled to Damages In Excess of $5 Million, Plus Its Legal Fees and Costs In Connection With This Arbitration

Etra having had a fiduciary duty to Benthos and having breached that duty, he is liable for the damages incurred by Benthos as a result of his breach. *See, e.g., Meisel v. Grunberg*, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009), citing *Whitney v. Citibank*, 782 F.2d 1106, 1115 (2d Cir. 1986). The arbitrator should seek to "plac[e] [Benthos] in the same condition it would have been in had the wrong not occurred." *Nat'l Union*, 634 N.Y.S.2d at 619 ("Had [the escrow agent] maintained the collateral plaintiff would be safe from any loss").

The primary amount owed by Etra to Benthos is the $4.6 million he improperly transferred out of escrow. Benthos is entitled to interest, at the New York State statutory rate of 9%, from October 12, 2018, when Benthos formally terminated the Escrow Agreement and demanded its money back in accordance with the contractual requirements. If the arbitrator decides the case on April 17, 2020, thirty days after the hearing, the interest on that principal amount will be $626,671.25.[15]

---

[15] At the barest minimum, if Etra somehow were to manage escaping liability for the first $3 million he transferred upon non-compliant instructions and not for the purpose of securing Bitcoin for Benthos as contractually required, he is surely liable for the $1.6 million he transferred weeks later, well after telling Benthos (absurdly and suspiciously) that an extra-contractual $850,000 would be required in order to obtain "release" of the Bitcoin for which it already had paid the precise sum required by the contract. That would not make Benthos whole,

In addition, however, Etra's independent violation of his obligation as escrow agent to provide information to Benthos gave rise to the federal action in aid of arbitration.  Had Etra, a fiduciary, provided the documents and information requested (twice) by Benthos's counsel, as he was required to do, that federal proceeding would not have been necessary; and then even within that proceeding, he obstructed to the maximum extent as set forth above.  Accordingly, the fees incurred in pursuing and obtaining the information upon which this arbitration is built are compensable as damages proximately incurred by reason of that independent breach.  *See, e.g., De Azevedo v. Angel,* No. 600304/2009, 2011 WL 3565828 (Sup. Ct. N.Y. Co.. July 18, 2011). Benthos calculates those legal fees (omitting any claim for reimbursement of prior counsel's legal fees), through December 4, 2018 – the date that Etra (belatedly) provided the last of the documents Judge Batts deemed sufficient to avert contempt of court – as $110,583.50.  We will provide the back-up for that figure (with privileged material redacted) at or after the hearing as may be directed by the arbitrator.

Furthermore, Benthos is also entitled to interest on the $400,000 improperly withheld by Etra between October 12, 2018 and November 16, 2018 when he paid that over under "direct order" of Judge Batts.  That interest is $3,452.06.

The total damages that should therefore be assessed against Etra, as of April 17, 2020 (with interest accumulating thereafter), is $5,340,706.80.  In addition to that, under the UNCITRAL Rules governing this arbitration, Benthos is entitled to recover its costs of the arbitration, including reasonable legal fees.  See Article 42 ("The costs of the arbitration shall in principle be borne by the unsuccessful party") and Article 40 ("The term 'costs' includes . . .

---

but the interest on that $1.6 million alone, from October 12, 2018, would total $225,863 as of April 17, 2020.

legal and other costs incurred by the parties in relation to the arbitration to the extent that the arbitral tribunal determines that the amount of such costs is reasonable").  The administrative costs of the arbitration, including the arbitrator's fees and the fees paid to the PCA and ICC, should be allocated, in the arbitrator's discretion (*id.*), 100% to Etra given his breaches of contract and demonstrated lack of good faith.

Benthos will seek to make a submission to the arbitrator with regard to all arbitration-related fees and costs as may be directed at the appropriate time.

### Conclusion

For the reasons set forth above, Etra should be deemed in breach of his contractual and fiduciary obligations to Benthos as its Escrow Agent; he should be found independently liable as well for the wrongful acts of his co-conspirators; and his actions and inactions should be deemed willful misconduct and/or gross negligence and he should be held liable to Benthos accordingly.

As the arbitrator will appreciate, Etra almost certainly will not pay any award voluntarily, without compulsion of a court order or judgment.  He has succeeded already in unduly delaying Benthos's vindication of its legal rights, through stonewalling its requests for documents and information and contesting the legitimacy of this arbitration.  Benthos thus respectfully requests an award of damages as calculated in this Statement of Claim, and as amended during the hearing or otherwise, at the earliest possible moment following the closing of the record.

Dated:  January 15, 2020

**KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.**

By: _____

Steven R. Popofsky
Joshua K. Bromberg
551 Fifth Avenue, 18th Floor
New York, New York 10176
Telephone:    (212) 986-6000
Facsimile:     (212) 986-8866
*Attorneys for Claimant*

38