M7dWben1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   BENTHOS MASTER FUND, LTD.,

4                   Petitioner,

5            v.                          20 Civ. 3384 (VEC)

6   AARON ETRA,

7                   Respondent.
                                         Conference
8   ------------------------------x
                                         New York, N.Y.
9                                        July 13, 2022
                                         12:00 p.m.
10
    Before:
11
                        HON. VALERIE E. CAPRONI ,
12
                                         District Judge
13

14                           APPEARANCES

15  KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
         Attorneys for Petitioner
16  BY:   STEVEN R. POPOFSKY

17  AARON ETRA, Respondent *Pro Se*

18  DAVID E. PATTON
         Federal Defenders of New York, Inc.
19       Civil Contempt Attorney for Respondent
    BY:   AMY GALLICCHIO
20       Assistant Federal Defender

21

22  Also Present:  Mihir Deo
                   Juliet Remi
23

24

25

M7dWben1

```
 1              (Case called)
 2              MR. POPOFSKY:  Steven Popofsky, your Honor, for the
 3      petitioner.  Good morning.
 4              THE COURT:  Good morning.
 5              MR. POPOFSKY:  With me is one of the principals of my
 6      client, Mihir Deo, and a legal assistant from my firm, Juliet
 7      Remi.
 8              THE COURT:  Good morning, Mr. Popofsky, Mr. Deo,
 9      Ms. Remi.
10              Defendant, Mr. Etra, are you representing yourself?
11              You are an attorney, so you kind of know, should know
12      how to act in a courtroom.
13              MR. ETRA:  I am, your Honor.  I've never been a
14      litigator.
15              THE COURT:  OK.  You're allowed to take your mask off
16      when you're speaking.
17              Are you Aaron Etra?
18              MR. ETRA:  Yes, I am.
19              THE COURT:  E-T-R-A?
20              MR. ETRA:  Yes.
21              The doctors do ask me to keep my mask on.
22              THE COURT:  Well, that's fine.  I've been waiting on
23      that doctor's note that you promised for the last week.
24              MR. ETRA:  I did.  I sent it to the clerk, your Honor.
25              THE COURT:  Well, we don't have it.
```

M7dWben1

1          OK.  This is not what I intended.  Therefore, we're

2     going to do this on the record.

3          Mr. Etra, at the moment, you $10,300 to the

4     government, to the Court, as a contempt sanction.  I just want

5     you to understand that.  That number is going to get bigger or

6     you're going to go to jail or you're going to have fully

7     complied.  That's where we are today.

8          Do you understand that?

9          MR. ETRA:  Yes, your Honor.  I have requested that

10    those fees be waived.

11         THE COURT:  Yes.  That's denied.

12         OK.  Here's the thing.  I have a whole stack of items

13    that you were required to produce a long time ago.  So my

14    question is whether they have or have not been produced.

15         MR. ETRA:  Yes.

16         THE COURT:  One of the items you said you were going

17    to bring today -- did you bring any records with you today?

18         MR. ETRA:  I brought with me, your Honor, what I

19    submitted to you.

20         THE COURT:  No, no, no.  Did you bring any additional

21    records today?

22         MR. ETRA:  I -- as I say, your Honor, I brought with

23    me all the things that I put in the 98 pages of submissions

24    plus the 15 pages submitted to you.  All of those --

25         THE COURT:  All right.  Look, Mr. Etra.  In your

M7dWben1

```
1    submission that you filed, it's dated July 10.  It's titled

2    responses to 1 through 13 in order July 7, 2022.  Do you

3    understand the submission I'm referring to?

4              MR. ETRA:  I believe that, revised with one on July

5    11, your Honor, which completed the items -- I don't recollect

6    which ones, but I believe they were items one and two.  I

7    submitted in addition to those, which brought that submission

8    to, I believe, 98 pages, which was submitted along with the

9    response to the order to show cause.  So if your Honor would be

10   so, would look at July 11 submissions, which were two -- one,

11   as I say, were the responses to 1 through 13 and also the

12   additional 15 pages that your Honor permitted me to submit in

13   response to your order to show cause.

14             THE COURT:  Hang on.

15             MR. ETRA:  All of those --

16             THE COURT:  Hang on.

17             Did you also produce them to Mr. Popofsky?

18             MR. ETRA:  Yes.

19             THE COURT:  Mr. Popofsky, did you receive a full set

20   of monthly statements for the M&T account ending in 3443 from

21   August 2020 to the present?

22             MR. POPOFSKY:  I did receive what was represented to

23   be a full set for that particular account, your Honor, which,

24   of course, raised some other questions.  But yes, the answer to

25   that, that particular item is yes.
```

M7dWben1

| 1 | THE COURT:  All right.  The next item is a full set of

2 | monthly statements for the account into which Mr. Etra receives

3 | his social security payments from August 2020 to the present if

4 | that's not the M&T account ending in 3443.

5 | Did you receive those?

6 | MR. POPOFSKY:  It does appear --

7 | THE COURT:  OK.  Hang on.  Here's the thing.  I would

8 | have hoped that you would have gone through all these things so

9 | that you could tell me exactly what's missing.  But --

10 | MR. POPOFSKY:  The thing --

11 | THE COURT:  When you're saying it appears --

12 | MR. POPOFSKY:  Yes.  Yes.  I believe the answer to

13 | that is yes, your Honor.

14 | THE COURT:  Did you receive -- all right.  The next

15 | one is this HSBC Aaron Etra 41 book credit account.

16 | MR. POPOFSKY:  No, your Honor.  He claims -- he's got

17 | an explanation here.

18 | THE COURT:  Yes, I know he's got an explanation.  The

19 | question is what is that account?  Why do you think there is

20 | such an account?

21 | MR. POPOFSKY:  Because we have prior statements that

22 | indicate transfers to and from that account, historical bank

23 | statements that indicate transfers that identify such an

24 | account.

25 | THE COURT:  That identify it to Aaron Etra 41 --

M7dWben1

1           MR. POPOFSKY:  Book 41 credit, correct.

2           THE COURT:  Book 41 or 41 book?

3           MR. POPOFSKY:  Oh, I'm sorry.  I was looking at his

4    response.

5           41 book, yes.  He said there have been problems in

6    obtaining copies.  He says hopefully the most recent request

7    will provide any missing information.  That's what he wrote on

8    Monday at midnight.

9           THE COURT:  OK.  So the answer is no, this hasn't been

10   produced.

11          MR. POPOFSKY:  That is correct.

12          THE COURT:  Is that correct, Mr. Etra; that has not

13   been produced?

14          MR. ETRA:  Your Honor, to the best of my knowledge,

15   there is no separate account; that those are, in fact, book

16   entries that the bank establishes.  It's not an account, but I

17   asked for the bank's explanation of that, because that's just

18   my -- I don't know for sure.  I have asked HSBC for all records

19   for all accounts and to ask them the question am I correct to

20   think it's a book entry or book debit, a book -- it's their own

21   internal procedures as far as that account.

22          THE COURT:  Have you produced anything --

23          MR. ETRA:  Yes.

24          THE COURT:  -- that proves one way or the other --

25          MR. ETRA:  Yes, I produced everything.

M7dWben1

| | |
|---|---|
| 1 | THE COURT:  -- about what that book 41 credit |
| 2 | reference is? |
| 3 | MR. ETRA:  Yes. |
| 4 | THE COURT:  The answer's no.  No, you haven't. |
| 5 | MR. ETRA:  No, no. |
| 6 | THE COURT:  You just said you haven't. |
| 7 | MR. ETRA:  No, no.  Your Honor, I've submitted |
| 8 | everything that's on my records. |
| 9 | THE COURT:  No, no.  That's not the question.  You |
| 10 | were under an obligation to go get things. |
| 11 | MR. ETRA:  Yes, but -- |
| 12 | THE COURT:  So you have not produced anything that |
| 13 | explains the Aaron Etra 41 book credit account. |
| 14 | MR. ETRA:  Yes, your Honor.  I submitted all the |
| 15 | papers on which those were referenced, and I had also submitted |
| 16 | those to Judge Parker.  So yes, I've submitted everything, both |
| 17 | before and now, yet again, but that's correct to say that |
| 18 | there's nothing that indicates there was such an account.  And |
| 19 | I've asked HSBC to try to come up with some explanation or some |
| 20 | indication or anything that would deal with that, other than |
| 21 | what I think, there is no such an account, but rather, those |
| 22 | are book -- as they say, those are book entries that the bank |
| 23 | creates for itself rather than an account.  But I don't know. |
| 24 | As I say, every single account that has that |
| 25 | reference, I've submitted to either your Honor and Judge Parker |

M7dWben1

1 or both.  I further --

2    THE COURT:  I'm more concerned about presenting it to

3 Mr. Popofsky.

4    MR. ETRA:  Yes, and Mr. Popofsky.  The same submission

5 to your Honor was to Mr. Popofsky.  So yes, I have.

6    THE COURT:  OK.  So that is the same answer to No. 4,

7 a full set of monthly statements --

8    MR. ETRA:  Yes, your Honor.

9    THE COURT:  -- for HSBC Aaron 41 book debit account --

10    MR. ETRA:  Yes.

11    THE COURT:  -- from August 1.

12    MR. ETRA:  Yes.

13    THE COURT:  -- to the present.

14    MR. ETRA:  Yes, your Honor.

15    THE COURT:  Mr. Popofsky.

16    MR. POPOFSKY:  Yes, we have the same thing, your

17 Honor.  We have prior bank statements that indicate transfers

18 to such an account, and he said he has no recollection of there

19 being any such separate accounts, telling us this two years

20 later.

21    THE COURT:  I got it.  Here's the thing.  I want to

22 get through this, so stop all of that.  OK?  I've got it.  He's

23 a grifter.  He stole your money and he's not giving it back,

24 and he's not cooperating in discovery and it's taken

25 threatening to arrest him to get him to appear as he's

M7dWben1

```
1    required.  So you don't need to do any of that.  Just answer my
2    questions.  OK?
3               MR. POPOFSKY:  I understand, your Honor.
4               THE COURT:  OK.  So there has not been produced to you
5    an adequate explanation from the bank, from HSBC, in terms of
6    what the Aaron Etra 41 book debit references in those accounts
7    are, correct?
8               MR. POPOFSKY:  That's correct, your Honor.
9               THE COURT:  All right.  Then we get to HSBC accounts.
10   Do you have a complete set of monthly statements for the HSBC
11   account ending 9990?
12              MR. POPOFSKY:  He says results are being awaited.
13              THE COURT:  I don't care what he says.
14              MR. POPOFSKY:  No, I do not.  Nothing.
15              THE COURT:  Mr. Etra, you have not produced a full set
16   of monthly statements for the HSBC account ending in 9990, is
17   that correct?
18              MR. ETRA:  Your Honor, I --
19              THE COURT:  That's a yes or no.  Is that correct?
20              MR. ETRA:  Yes, but I --
21              THE COURT:  OK.
22              MR. ETRA:  -- requested of the bank because I believe
23   there was no such account that had any activity in it.  But
24   I've tried to get -- HSBC, as you may know, has closed down in
25   the U.S. with only a few activities still left.
```

M7dWben1

1          THE COURT:  You know what, Mr. Etra?  If you had done

2     what you were supposed to do, you would have had all these

3     documents before HSBC closed down.

4          MR. ETRA:  I --

5          THE COURT:  OK.  The HSBC account ending 6096.  That's

6     the same answer; you have not produced it yet.  Correct?

7          MR. ETRA:  I've produced everything in my --

8          THE COURT:  Have you produced --

9          MR. ETRA:  I --

10          THE COURT:  -- complete monthly statements for the

11    HSBC account ending in 6096?  Yes or no.

12          MR. ETRA:  I think that's -- the answer is no.

13    That's -- I believe that's -- your Honor, I've submitted

14    everything that I have in my possession to, to you and to

15    Mr. Popofsky.  I'm not trying to conceal anything, and --

16          THE COURT:  Have you priced a full set of monthly

17    statements for HSBC bank account ending in 6100?

18          MR. ETRA:  Again, your Honor, to my -- the only

19    accounts that I have I produced to Mr. Popofsky and to your

20    Honor.  I -- again, I'm not --

21          THE COURT:  That's not consistent with your response.

22    Your response is, we will be checking all of these accounts --

23          MR. ETRA:  Yes.

24          THE COURT:  -- that are all closed --

25          MR. ETRA:  Yes.

M7dWben1

1          THE COURT:  You can't talk at the same time as I do.

2          MR. ETRA:  Sorry.

3          THE COURT:  We will be checking all of these accounts,

4    all closed now, again with the bank to try to obtain the

5    outstanding statements from these closed accounts.

6          MR. ETRA:  Yes, your Honor.

7          THE COURT:  So you have not produced the account

8    ending in 6100, correct?

9          MR. ETRA:  I believe I have produced that one, your

10   Honor.  Again, I -- I'm really --

11         THE COURT:  Hang on a second.

12         Mr. Popofsky, have you gotten the HSBC account --

13         MR. POPOFSKY:  No.

14         THE COURT:  -- ending in 6100?

15         MR. POPOFSKY:  No, your Honor.  I think you're reading

16   from his response two days ago.  The response that came after

17   that said results are awaiting.

18         THE COURT:  I don't have it.  Here's the thing.  I

19   don't have the response that came after that.

20         MR. POPOFSKY:  I know.  So I'm just telling you.  He

21   says results are being waited.  So the answer is no, I don't

22   have them, and he acknowledges that.

23         MR. ETRA:  Your Honor, could I request that that July

24   11 document be looked at?  Because --

25         THE COURT:  I don't have it.  You were ordered to

M7dWben1

1    respond --

2                MR. ETRA:  I --

3                THE COURT:  -- in a way so that I would have your

4    paperwork.  You chose not to do that.  That is consistent with

5    your conduct throughout.

6                MR. ETRA:  Your Honor --

7                THE COURT:  So whatever you did on the 11th, I don't

8    have.

9                MR. ETRA:  Your Honor, I -- I -- I did it on a, on the

10   11th, which I believe was --

11               THE COURT:  You did it on what?

12               MR. ETRA:  I did it with everything I had, and then I

13   further revised it for the 12th to make sure you had all the

14   items that I had in my possession so I was complete on the date

15   that I was required to do that.  I really did.  And

16   Mr. Popofsky received it, and I'm sorry that your Honor did not

17   because it was sent to the *pro se* office at the same time.

18               THE COURT:  OK.

19               MR. ETRA:  So I think I was timely, and I certainly

20   tried to be timely with 98 pages worth of documents.

21               THE COURT:  OK.  So the HSBC account ending in 7955,

22   do you have that?  Was that in the same boat?

23               MR. POPOFSKY:  No.  Same.  All No. 5 are all the same,

24   your Honor.  He's awaiting response.

25               THE COURT:  That's what he said on the 11th.

M7dWben1

1          MR. POPOFSKY:  That's what he said, so we don't have

2     them.

3          THE COURT:  So, no.

4          MR. POPOFSKY:  Correct.

5          THE COURT:  That entire block, correct?

6          MR. POPOFSKY:  Correct.

7          THE COURT:  That entire block you have not produced

8     yet, right, Mr. Etra?

9          MR. ETRA:  I did produce some -- whatever I had from

10    those other accounts, and as Mr. Popofsky correctly said, I'm

11    awaiting any -- the full thing so I can compare it to what I

12    have as opposed to what is on that list, because I do believe

13    that some of those accounts are either not accounts or accounts

14    that were never used.  So in order to be complete disclosure,

15    which I've tried to do --

16         THE COURT:  Stop.  Mr. Etra, I'm going to say to you

17    the same thing I said to him.  Stop.  I just want to get

18    through this.  This is not a matter of are you a good guy, a

19    bad guy.  What you are is someone who doesn't follow orders.

20    That is clear.  So all I want to do is find out what you have

21    produced and what you haven't produced.

22         Mr. Popofsky, where did all these account numbers come

23    from?

24         MR. POPOFSKY:  They came from some, from statements

25    that he previously produced, partial statements that indicated

M7dWben1

1    transfers in and transfers out from his --

2              THE COURT:  To these accounts.

3              MR. POPOFSKY:  Correct, from his 26 accounts.

4              THE COURT:  OK.

5              All right.  Then we get to a full set of monthly

6    statements for the Uni-Credit account from August 1 to the

7    present, or if it's closed, through the closing.

8              Has that been produced?  The response from the 10th

9    gives me a whole story about they're not his accounts.

10             Mr. Popofsky, what do you know about those accounts?

11             MR. POPOFSKY:  Yes.  He said that the Uni-Credit

12   account and the Sberbank account for No. 7 were controlled by a

13   fiduciary, presumably in Europe, and are not his accounts.  And

14   he says he hasn't been able to secure anything from the

15   fiduciary other than the two-page untranslated statement.  He

16   says that --

17             THE COURT:  Stop.

18             I'm sorry.  My question to you is what do you know

19   about those accounts --

20             MR. POPOFSKY:  All right.

21             THE COURT:  -- not what Mr. Etra --

22             MR. POPOFSKY:  I know nothing.  I know nothing about

23   those --

24             THE COURT:  Well, you know something about it, or it

25   wouldn't be on the list.

M7dWben1

1          MR. POPOFSKY:  I apologize, your Honor.

2          He once said that he had a European account.  One of

3     the judges -- I forget which one -- ordered him to produce

4     information about his European accounts.  He produced a

5     two-page untranslated statement from his Sberbank account.  So

6     that's all I know about that account.

7          The Uni-Credit account was another account that was

8     referenced.  I believe he mentioned Uni-Credit in one of his

9     information responses, but he did not produce any actual

10    statements relating -- he just said that he had a Uni-Credit

11    account.  So we asked for information about the Uni-Credit

12    account, and he is now saying that he doesn't have it and he

13    can't get it, and it relates to clients.

14         And your Honor, could I just be heard on the issue of

15    clients for one minute?

16         THE COURT:  No, not right now.

17         Mr. Etra, you told one of my colleagues that you had a

18    European account.  You identified the Sberbank in response to

19    an order to produce information about your European bank

20    account, and you identified the Uni-Credit account as yours.

21    So what's the story?

22         MR. ETRA:  Your Honor, my statement, which is the

23    truth, is that a European fiduciary has helped me with respect

24    to clients' funds.

25         THE COURT:  So you were lying to the prior --

M7dWben1

```
 1              MR. ETRA:  No.

 2              THE COURT:  -- judges when you said you had a European

 3    bank account.

 4              MR. ETRA:  I said that I had, I had the European

 5    fiduciary to be able to use his accounts for clients' funds.

 6    That was -- that is what I said.

 7              THE COURT:  That's what you said?  So if I go back and

 8    look at the transcript --

 9              MR. ETRA:  OK.

10              THE COURT:  -- that's what I'm going to find?

11              MR. ETRA:  Your Honor, again, I'm trying to explain to

12    you.  Whether my words were a complete explanation -- I'm

13    trying to do that to your colleague and to yourself -- to

14    explain the situation.  I'm not trying to do anything other

15    than that, and that is the situation.  There's a European

16    fiduciary, who funds -- whose clients' accounts, whose services

17    I have used for that purpose.  And it's his account.  It's not

18    my account, and I've been trying my best.

19              Both accounts, by the way, your Honor, are closed.

20              THE COURT:  Both accounts are what?

21              MR. ETRA:  Are closed.

22              He has closed those accounts.  I have nothing to do

23    with opening them, operating them or closing them.  And I've

24    asked him.  And he gave me this Sberbank closing statement.  It

25    was translated.  I believe it does have English language in it.
```

M7dWben1

| 1 | THE COURT:  You believe what?

2 | MR. ETRA:  The Sberbank closing account has English on

3 | it.  So it doesn't require translation.  And essentially, it's

4 | the closing of this account.  That's the best explanation.  I'm

5 | happy to give you any more explanation that I can, but the

6 | reality is he operates -- he operated those two accounts, both

7 | of which he closed.

8 | THE COURT:  OK.  I have no sworn statement to that

9 | effect.  I have no idea whether any of that is true.  What I do

10 | know is that the full set of monthly statements from those two

11 | accounts has not been produced.

12 | MR. POPOFSKY:  No monthly statements from those

13 | accounts have been produced, your Honor.

14 | THE COURT:  Right.

15 | OK.  I think the April and May 2019 statements for the

16 | J.P. Morgan brokerage account were produced.  Correct?

17 | MR. POPOFSKY:  He says they were.  I'm not contesting

18 | that, your Honor.

19 | THE COURT:  That was in the July 10 submission, unless

20 | you're contesting the accuracy or the --

21 | MR. POPOFSKY:  I'm OK with the J.P. Morgan, with those

22 | two monthly statements.

23 | THE COURT:  OK.

24 | Then we get to the closing statements for City

25 | National Bank account.  This is the one -- so let's start with

M7dWben1

1   the City National Bank.  He says he submitted a final statement

2   showing a zero balance to Magistrate Judge Parker and to

3   Mr. Popofsky.

4           In fact, do you have the information on the City

5   National Bank account?

6           MR. POPOFSKY:  For present purposes, your Honor, we

7   can just talk about Citibank, let the first four go.  He sent

8   some material as to the first four:  City National, M&T,

9   Metropolitan Commercial Bank and TD Bank.

10          THE COURT:  Metropolitan, he did not provide the

11  closing statements.  He provided a letter.  He provided

12  letters.

13          MR. POPOFSKY:  That's correct, your Honor.  I was

14  trying not to nitpick in the interest of moving this along.  He

15  provided a letter, correct.

16          THE COURT:  If that's adequate, that's adequate.

17          MR. POPOFSKY:  I'm OK with that, your Honor.

18          THE COURT:  OK.

19          We've got the Citibank bank accounts ending in 0330,

20  0669, 1370, 4852 and 687.  Have those been produced?

21          MR. POPOFSKY:  No.  Nothing, your Honor.  He says he's

22  working on it.

23          THE COURT:  Is that the same situation in the July 11

24  submission?

25          MR. POPOFSKY:  Yes, your Honor.

M7dWben1

1          THE COURT:  All right.

2          Mr. Etra, what's the story with Citibank?

3          MR. ETRA:  Citibank, again, I submitted to Judge

4   Parker all that I had.  Mr. Popofsky's asked for some more.

5   I've gone back to Citibank and asked them to look at what was

6   given and to give anything that's missing.  They agreed to do

7   that, and they hope to provide it to me sometime during the

8   course of this week, which I'll immediately provide to

9   Mr. Popofsky.

10         THE COURT:  OK.  So you're still in contempt on that.

11         Next is tax returns, all filed tax returns or

12   communications with the IRS or the New York State Department of

13   Taxation and Finance.

14         He seems to have produced tax returns, correct?

15         MR. POPOFSKY:  No, your Honor.  He sent us some

16   documents that purport to be tax returns without signatures or

17   dates, so it appears to me that he retyped them.  He did

18   finally -- after several orders, he did finally sign the

19   authorization form, so we will get those from the IRS

20   eventually.

21         What he submitted to us, again, No. 1, was unsigned

22   and, No. 2, he left out 2017.  Your Honor will recall that when

23   we sent him the IRS authorization form that the Court ordered

24   him to fill out, we filled it out for 2017 through 2021.

25   Despite the fact that he told your Honor last week that his

M7dWben1

1    computer was broken, he managed to redo our form and cleverly

2    omit 2017.  So the form he sent back to us said 2018 to 2021.

3                THE COURT:  I recall that last week, but he's given

4    you a release now.

5                MR. POPOFSKY:  Yes, but he didn't send the 2017

6    return.  He sent us purported returns for later years.  He

7    didn't send 2017.

8                I would also note, your Honor --

9                THE COURT:  But the requirement in the order was all

10   filed tax returns from August 1, 2018.  That might not include

11   the 2017 return.

12               MR. POPOFSKY:  The order for the authorization

13   included 2017.

14               THE COURT:  But you've got the authorization.

15               MR. POPOFSKY:  I have it now, your Honor, yes.

16               Let me just add one other thing, your Honor.  In a

17   prior discovery response he stated that he had not filed tax

18   returns.  Then when he was ordered to produce them, he now

19   admits that he did file tax returns.  But yes, we now have the

20   authorization in.  We're waiting on the IRS.

21               THE COURT:  OK.  So that's done.

22               The next is proof of all funds that Etra has received

23   from any closed bank account, including HSBC account ending

24   6509, by check or otherwise, from August 2020.

25               You provided information that you received from HSBC,

M7dWben1

 1    but what about from anyone else?

 2                Mr. Etra.

 3                MR. ETRA:  Those were the only ones, your Honor, that

 4    I received any funds.

 5                MR. POPOFSKY:  Your Honor, this relates to the

 6    question of how he's been living for these two years after the

 7    judgment.  He's clearly spending money, and we have no

 8    visibility into where he's getting that money, other than the

 9    social security payments.  That is why I served the subpoena on

10    him in May, because he didn't comply with two years worth of

11    things.  We served a new subpoena, information subpoena, with

12    just two requests, and one of the requests was tell us month by

13    month since the judgment was entered all your expenses.  He

14    ignored that subpoena.

15                Now, I don't have a motion on that because the motion

16    related to things from a year and a half ago that he hasn't

17    complied with.  But he was served with a subpoena in May.  He

18    totally ignored it, like he ignores everything else.  So I

19    don't know how he's been living for two years, but he's getting

20    money from somewhere, your Honor.  And this also relates to the

21    European accounts and the clients.  I know you said you didn't

22    want to get into that now, but at some point I would like to

23    discuss the client issue, because it's very important.

24                THE COURT:  OK.

25                All right.  That's a question mark.

M7dWben1

1          Next is current information, current contact

2    information with specificity for -- I don't know how to

3    pronounce her last name, Troselj.

4          Mr. Etra, according to the July 10, you were to

5    discuss this at the show cause hearing.

6          MR. ETRA:  Yes.  And I wrote your Honor.  Did your

7    Honor receive the communication that I sent to her on the 12th

8    of July?

9          THE COURT:  I don't even yet have the July 11.  So the

10   answer is no.

11         MR. ETRA:  I have it in my possession, if I could give

12   it to your Honor now.

13         THE COURT:  OK.  Do you want to hand it up?

14         MR. ETRA:  Yes.

15         MR. POPOFSKY:  Your Honor, I would ask Mr. Etra to

16   confirm that what he's handing you is something I have.

17         THE COURT:  Have you provided this to Mr. Popofsky?

18         MR. ETRA:  I have not.  And as I indicated in my

19   response, I would give this to your Honor *in camera*.

20         MR. POPOFSKY:  I object, your Honor, to Mr. Etra

21   giving anything to the Court *ex parte* or *in camera*,

22   particularly given the history here.

23         THE COURT:  OK.

24         MR. POPOFSKY:  He's been ordered to provide this

25   information.  I'm entitled to it.  My client's entitled to it,

M7dWben1

1    and there should be no *in camera* or *ex parte* documents.

2                THE COURT:  All right.  Well, I'm going to take it *in*

3    *camera*, and then we'll deal with it.

4                MR. ETRA:  And Mr. Popofsky continues to make

5    allegations that are incorrect about my compliance and my

6    functioning gratuitously.

7                THE COURT:  No, he's not.  Your compliance is abysmal.

8                MR. ETRA:  No.  Your Honor, I have submitted --

9                THE COURT:  Just hand over the document.  I'd like to

10   get out of here at a reasonable hour.

11               Oh, I'm sorry.  Mr. Etra, you've made a bunch of

12   representations during the course of this hearing, so I'm going

13   to ask you to stand and be put under oath.  And that way if you

14   say anything that's false, it's perjury.  And I will refer you

15   to the U.S. Attorney's Office.

16               So stand up.

17               Raise your right hand.

18               (Defendant sworn)

19               THE COURT:  All right.  Have a seat, Mr. Etra.

20               Mr. Etra, do you want to correct any of the statements

21   that you've made to me?  So far is everything you've said to me

22   during the course of this hearing truthful and complete?

23               MR. ETRA:  Yes, your Honor.

24               Would it be OK if your Honor -- I provided material

25   that --

M7dWben1

1          THE COURT:  You have got to speak into the microphone,

2     Mr. Etra.

3          MR. ETRA:  Oh.  I'm sorry, your Honor.

4          Would it be of value to your Honor for me to give you

5     my copy of the, my version of the 1 through 13 document?

6          THE COURT:  No.  I now have everything that the *pro se*

7     office has.

8          OK.  Your request that I not order you to provide

9     contact information for Ms. -- again, I don't know how to

10    pronounce it -- Troselj is denied.

11         I have the information here.  Is there any reason why

12    I shouldn't turn it over to Mr. Popofsky?

13         Mr. Etra.

14         MR. ETRA:  Well, I put all the reasons in that

15    communication to you, your Honor.

16         THE COURT:  OK.  Is this accurate information on her

17    whereabouts?

18         MR. ETRA:  To the best of my knowledge and belief,

19    yes.

20         THE COURT:  When was the last time you had contact

21    with her?

22         MR. ETRA:  I'm trying to remember.  I believe it was

23    on the weekend.

24         THE COURT:  You believe it was when?

25         MR. ETRA:  Over this past weekend.

M7dWben1

1          THE COURT:  Over the past weekend.  OK.

2          Please provide the contact information for her.

3          MR. POPOFSKY:  Thank you.

4          THE COURT:  OK.

5          The next item is all information that Mr. Etra has

6    heretofore withheld as privileged that are responsive to

7    petitioner's previously served subpoena *duces tecum* or "all

8    escrow agreements entered into" by Mr. Etra and "all documents

9    concerning Mr. Etra's banking records," including, but not

10   limited to, "credit applications and records and statements for

11   any checking, savings, money market, certificates of deposit,

12   investments, bonds, retirement accounts, safe deposit boxes or

13   other financial assets maintained with any banking or financial

14   firm or institution, whether in Mr. Etra's name individually,

15   jointly, in trust, as custodian, as nominee, as a beneficiary

16   or in conjunction with any other person or persons".

17          Is it accurate that you have said that you have no

18   savings, money markets, certificates of deposit, investments,

19   retirement accounts, safety deposit boxes or financial assets,

20   but you say you want to request the ability to discuss *in*

21   *camera* information regarding clients' funds?

22          Mr. Etra.

23          MR. ETRA:  Yes, your Honor.

24          THE COURT:  What has been withheld as privileged?

25          MR. ETRA:  Yes.

M7dWben1

1           THE COURT:  What has been withheld as privileged?

2           MR. ETRA:  Funds of clients and agreements with them.

3           THE COURT:  OK.  The agreements with them, why are

4    they privileged?  An escrow agreement, why is an escrow

5    agreement privileged?

6           MR. ETRA:  It's an attorney-client relationship that

7    the escrow agreement reflects.

8           THE COURT:  There's something in the escrow agreement

9    that reflects you providing advice to these clients?

10          MR. ETRA:  Yes.

11          THE COURT:  That seems unlikely.  How many escrow

12   agreements are there?

13          MR. ETRA:  I don't keep track of the number, your

14   Honor, because many times they're entered into, and if there's

15   no --

16          THE COURT:  You've got to talk into the microphone.

17          MR. ETRA:  I'm sorry, your Honor.

18          THE COURT:  Pull the microphone down so it's in front

19   of your face --

20          MR. ETRA:  Thank you, your Honor.

21          THE COURT:  -- and speak up.

22          MR. ETRA:  Yes.  Yes, your Honor.

23          THE COURT:  How many escrow agreements are there?

24          MR. ETRA:  I don't have the number.  At any one time

25   there can be several, your Honor.

M7dWben1

|    |                                                                         |
|----|-------------------------------------------------------------------------|
| 1  | THE COURT:  These are documents that you have withheld                   |
| 2  | as privileged.                                                           |
| 3  | MR. ETRA:  Yes, your Honor.                                               |
| 4  | THE COURT:  Do you have a list of them?                                   |
| 5  | MR. ETRA:  I -- I -- I don't have a list.  I could                        |
| 6  | make a list.                                                             |
| 7  | THE COURT:  Have you segregated them?                                     |
| 8  | MR. ETRA:  Yes.                                                           |
| 9  | THE COURT:  Where are they?                                               |
| 10 | MR. ETRA:  Most of them are digital agreements, your                     |
| 11 | Honor.                                                                    |
| 12 | THE COURT:  Most of them are digital agreements?                          |
| 13 | MR. ETRA:  Yes.                                                           |
| 14 | THE COURT:  OK.  So they can be produced immediately.                     |
| 15 | MR. ETRA:  Yes.  The current ones, yes.  Ones that no                     |
| 16 | longer in force, I don't have any -- they're tend -- they're             |
| 17 | not kept on an extended basis.                                           |
| 18 | THE COURT:  I don't know what that means.  You were                       |
| 19 | under a subpoena; you could not have destroyed any documents             |
| 20 | since the subpoena was served.                                           |
| 21 | MR. ETRA:  I --                                                           |
| 22 | THE COURT:  If you did, that's a whole other problem.                     |
| 23 | MR. ETRA:  Yes.  I didn't destroy anything.  As I                        |
| 24 | believe I conveyed to your Honor, my one laptop computer was             |
| 25 | damaged, and whatever was on it -- in fact, much of it -- was,           |

M7dWben1

1    in fact, purged on the repair.

2            THE COURT:  I don't believe that.

3            MR. ETRA:  I'd be happy to share with your Honor the

4    Apple information.

5            THE COURT:  That doesn't prove anything to me.

6            MR. ETRA:  I --

7            THE COURT:  You've managed to produce lots of paper

8    work to me.

9            MR. ETRA:  Yes.

10            THE COURT:  So you've got a working computer.

11            MR. ETRA:  I received it back from Apple, your Honor,

12    in the shape I referred to.  Again, there's nothing that I'm

13    trying to conceal here.

14            THE COURT:  OK.  As I understand it, the primary items

15    that have not been produced -- Mr. Popofsky, correct me if I'm

16    wrong -- are the escrow agreements that were withheld as

17    privileged; the Citibank accounts --

18            MR. POPOFSKY:  Before your Honor gets away from the

19    privilege issue, there were also bank statements that were

20    withheld as privileged.

21            THE COURT:  Is that right?

22            MR. POPOFSKY:  Response to subpoena *duces tecum* 49,

23    all documents concerning your banking records, including, but

24    it's not limited to a whole bunch of things that your Honor

25    read before.  And he wrote, attached other than objection for

M7dWben1

```
 1   privilege of accounts.  And in his most recent submission, he
 2   said again he wants to discuss with your Honor information
 3   regarding clients' funds and other elements here.
 4            So there are banking records that he has also, that he
 5   admits he has withheld as privileged.
 6            THE COURT:  Have banking records been withheld as
 7   privileged?
 8            Mr. Etra, have banking records been withheld as
 9   privileged?
10            MR. ETRA:  Yes, your Honor.  Those are the clients'
11   funds accounts, yes.
12            THE COURT:  What do you mean the clients' funds
13   accounts?  In the escrow agreement, escrow funds --
14            MR. ETRA:  IOLA.
15            THE COURT:  -- or something else?
16            MR. ETRA:  IOLA accounts, your Honor.
17            THE COURT:  I'm sorry.  What?
18            MR. ETRA:  IOLA accounts, which are all clients'
19   funds.
20            THE COURT:  Your IOLA accounts?
21            MR. ETRA:  Yes.
22            THE COURT:  Where are your IOLA accounts?
23            MR. ETRA:  Those are the accounts that hold the
24   clients' funds.  They are --
25            THE COURT:  You've got to speak up and speak into the
```

M7dWben1

1   microphone.

2           MR. ETRA:  OK.  I'm sorry, your Honor.

3           I'm not, obviously, in the best of health and I don't

4   have a lot of speaking power.

5           THE COURT:  Where are your IOLA accounts?

6           MR. ETRA:  I have -- I think I have one -- one or two

7   IOLA accounts that are still current.

8           THE COURT:  Where?  What bank is the IOLA account held

9   in?

10          MR. ETRA:  Again, I would like to disclose that *in*

11  *camera* to your Honor.

12          THE COURT:  No.  That's not privileged.

13          MR. ETRA:  These are all clients' funds, your Honor.

14          THE COURT:  These are all what?

15          MR. ETRA:  Clients' funds.

16          THE COURT:  They were their funds too.  I don't care

17  that they're clients' funds.  That doesn't make the identity of

18  the bank that holds an IOLA account for you privileged.

19          What bank holds your IOLA accounts?

20          MR. ETRA:  M&T Bank, Piermont Bank.

21          THE COURT:  What's the other bank?

22          MR. ETRA:  Piermont.

23          MR. POPOFSKY:  Piermont.

24          THE COURT:  Piermont?

25          MR. ETRA:  Yes.

M7dWben1

1           THE COURT:  How do you spell that?

2           MR. ETRA:  P-I-E-R-M-O-N-T.

3           THE COURT:  How many accounts are at M&T?

4           MR. ETRA:  One account, your Honor.

5           THE COURT:  And how many accounts are at Piermont

6     Bank?

7           MR. ETRA:  One account, your Honor.

8           MR. POPOFSKY:  Your Honor, he qualified his prior

9     answer by saying current accounts.

10          THE COURT:  Yes.

11          Where is Piermont Bank?

12          MR. ETRA:  Piermont Bank is in New York.

13          May I call your Honor's attention to the fact that the

14    Piermont account is -- Piermont Bank is the one in which the

15    social security payments are made, and that was -- that account

16    into which those go was fully disclosed.

17          THE COURT:  You've received Piermont Bank accounts?

18    I've never heard of Piermont Bank.

19          MR. POPOFSKY:  He says a Piermont Bank account in

20    response to the order about where the social security payments

21    are received.  That has, obviously, nothing to do with what

22    we're talking about now, IOLA accounts.

23          MR. ETRA:  It's the same bank.  So obviously --

24          MR. POPOFSKY:  But a different account.

25          THE COURT:  All right.  How many IOLA accounts have

M7dWben1

1    been closed between -- when was all this, 2017?

2            MR. POPOFSKY:  The subpoenas started, requested

3    information beginning in 2017.

4            MR. ETRA:  Your Honor --

5            THE COURT:  How many IOLA accounts have been closed

6    since 2017 to the present?

7            MR. ETRA:  Your Honor, 2017 has nothing to do with

8    this matter.  This matter only arose in 2018.

9            THE COURT:  Mr. Etra, answer my questions.  We're not

10    rearguing this.  How many IOLA accounts have been closed since

11    2017?

12            MR. ETRA:  I believe there was one in Citibank, and I

13    believe there was one in HSBC.

14            THE COURT:  And were those the accounts that you were

15    referencing, that you were withholding because they were

16    privileged?

17            MR. ETRA:  Yes.

18            THE COURT:  OK.  My order required you to disclose

19    information that you had withheld as privileged.  You have not

20    done that, so you are out of compliance with that order as

21    well.  The escrow agreements and the purportedly privileged

22    bank accounts have not been produced, and you are in contempt

23    for failing to produce those.

24            The Citibank bank accounts -- that's the Citibank

25    accounts ending 0330, 0669, 1370, 4852, and 8687 -- none of

M7dWben1

1    those accounts, none of those closing statements have been

2    produced.  Correct?

3            MR. ETRA:  I believe some of those closing statements

4    have been produced, your Honor, but not all the account

5    information.  Again, I've requested of Citibank and HSBC to

6    give everything that they have on all accounts, and as soon as

7    I receive those, I will disclose them, in addition to, as I

8    say, hundreds of those pages have already been disclosed to

9    your Honor and prior courts and Mr. Popofsky.  So nothing has

10   been concealed on any of those.

11           THE COURT:  All right.  We've also got -- monthly

12   statements for Uni-Credit and Sberbank have not been produced,

13   nor have you adequately produced something that would excuse

14   you from production.

15           MR. ETRA:  If your Honor would advise me what I could

16   do on that, because --

17           THE COURT:  I'm not.  Here's the thing.  I'm not

18   providing you with legal advice.  I'm trying to enforce my

19   order.

20           MR. ETRA:  And I'm trying to comply, your Honor.

21           THE COURT:  No, you're not.

22           MR. ETRA:  I have --

23           THE COURT:  OK.

24           Full set of the HSBC accounts has not been produced,

25   correct; monthly statements have not been produced?  Correct?

M7dWben1

1          MR. ETRA:  All of my documentation have been produced.

2     And if there's any blanks, I've tried to ask the bank to just

3     supply it so that could be compared.  But I've provided

4     everything in my possession or that I could find or that I

5     could get from the situation with the closed branches and --

6          THE COURT:  Here's the thing.  It's easy to know

7     whether you've produced all of the monthly statements of an

8     account because you would have produced all the monthly

9     statements from a particular date to the date where it zeroed

10    out and closed.  So saying you've produced all that you've got

11    without saying that you've produced all of them is useless to

12    me, because it means you haven't produced them all.

13         Mr. Popofsky, is it correct that there are M&T Bank

14    statements from August 1 to the present that have not been

15    produced?

16         MR. POPOFSKY:  Mr. Etra sent us, at midnight the other

17    night, M&T -- a bunch of M&T statements.  If that's -- as to

18    that account, he appears to have complied with that portion of

19    the directive.

20         THE COURT:  Which account was that?  Is that 6100?

21         MR. POPOFSKY:  That was -- no.  That seems to end in

22    3433.

23         THE COURT:  That's not even on the list.

24         MR. ETRA:  It's the No. 1 --

25         MR. POPOFSKY:  Yes.  It was your No. 1 in your --

M7dWben1

1         THE COURT:  I was on item No. 5 --

2         MR. POPOFSKY:  All right.

3         THE COURT:  -- on my order, which is a full set of

4    monthly statements for the HSBC accounts ending in 9990, 6096,

5    6100, 7955, 6401, 6410, 6509.

6         MR. POPOFSKY:  Right.  As we discussed on the record

7    earlier, those results are being awaited, according to

8    Mr. Etra, meaning he has not provided them.

9         THE COURT:  OK.  Then there's the whole book

10   credit/book debit account problem.

11        Have I correctly identified the four primary batches

12   of noncompliance?  The escrow agreements and the bank accounts,

13   all of the Citibank account information, the monthly accounts

14   for Uni-Credit and Sberbank, and the HSBC monthly statements

15   for all of the accounts listed in the paragraph 5.

16        MR. POPOFSKY:  Also, the 41 book credit and 41 book

17   debit, your Honor.  In Nos. 3 and 4.

18        THE COURT:  All right.  So here's the thing about

19   that.  It's very unclear to me what that is.  I think probably

20   because --

21        Mr. Etra, just to be clear, you see that gentleman in

22   the back row with the hat on?

23        MR. ETRA:  Yes, your Honor.

24        THE COURT:  He's a U.S. Marshal.  He's here to take

25   you into custody because you have failed to comply with my

M7dWben1

1    order.

2         As to the book entry credit, I'm not holding him in

3    contempt on that.  I'm going to rephrase the order.  We're

4    going to talk about how it should be phrased.  He's not in

5    contempt of that order.  These are the four items that he is in

6    contempt over.

7         Mr. Etra, would you like to explain to me why I should

8    not have that gentleman in the hat take you into custody as a

9    coercive sanction to get you to comply with my orders?

10        It is clear that financial sanctions aren't working.

11   You now owe the Court over $10,000, and you still have not done

12   what you're required to do.  You gave me excuses for failing to

13   appear last week.  You lied to me about why you did not appear,

14   and you have showed up today without items that you knew you

15   were required to bring and that you have access to, including

16   the escrow agreements and the bank statements that you're

17   withholding as privileged.  So tell me why I should not remand

18   you into custody.

19        MR. ETRA:  Your Honor, as I hope you fully understand,

20   I have during the four years of this matter provided hundreds

21   of pages of data.  But you're requesting me to do, I've spent

22   all the time since I received that order very late on the 7th,

23   until I supplied all the information, 98 pages of information,

24   and another 15 pages of response.  My time was spent in doing

25   that with diligence, with respect, and as one person can do.

M7dWben1

1      I'm only one person, living by myself, functioning by

2    myself.  And I believe I did comply.  As I understood your

3    order, if I appeared today, that custody issue would not be

4    raised.  I didn't appear the other day because my health did

5    not permit it, and when my -- I spoke to my doctors that

6    morning, with my blood pressure being what it was, they said

7    under no circumstances go out.

8      Your clerk asked for a letter from, from the hospital,

9    which I supplied.  So my appearance or my nonappearance was

10    something that was essentially ordered of me not to do, not to

11    go out into public.  You said you must come to this hearing,

12    which I have come -- again, not with their consent and really

13    against their orders, to not go out in public under my

14    condition.  So as far as appearance goes, your Honor, I believe

15    I've been fully compliant.

16      As far as providing materials, again, I've been fully

17    compliant within the capabilities of one person.  I'm just one

18    person functioning by myself.  I've given everything that I've

19    had over the years, including now, to your Honor and to

20    Mr. Popofsky.  The two batches that we referred to, the

21    Citibank and the HSBC, have been requested of them immediately.

22      THE COURT:  Immediately when?  Immediately --

23      MR. ETRA:  Immediately upon your order being received,

24    and they have said that they will provide it to me.  And I

25    believe they will.  And there's no reason why I would not

M7dWben1

1    immediately provide it to your Honor and to Mr. Popofsky.

2             THE COURT:  What record do you have to prove that that

3    request was made?

4             MR. ETRA:  Your Honor, it took me many phone calls --

5             THE COURT:  So none.

6             MR. ETRA:  -- to find --

7             THE COURT:  You have no proof.

8             MR. ETRA:  I don't --

9             THE COURT:  And the escrow agreements and the IOLA

10   bank account statements that you've acknowledged that you have

11   access to.

12            MR. ETRA:  I've asked to discuss that with you *in*

13   *camera*, your Honor.

14            THE COURT:  That doesn't excuse you from failing to

15   bring them.

16            MR. ETRA:  I don't -- again, I would follow your

17   orders, your Honor, as I have.  I believe I've been more than

18   compliant.  I'm one person.

19            THE COURT:  You're not compliant.

20            MR. ETRA:  I'm -- and I -- any suggestion that I'm not

21   using my best effort is truly not recognizing what I am doing

22   and have done.

23            THE COURT:  OK.

24            MR. ETRA:  And I am one person dealing with this, and

25   any suggestion that I stole money on this matter is completely

M7dWben1

1    not only unproven but incorrect.

2            THE COURT:  Any suggestion that you what?

3            MR. ETRA:  That I stole any money here.

4            THE COURT:  Again, we're not rearguing that.

5            MR. ETRA:  I understand that, your Honor, but there

6    was a suggestion that I did, and I really, really react as

7    strongly as possible to that, because it's incorrect.

8            THE COURT:  OK.  Here's what we're going to do.  I'm

9    remanding you into custody today.  You're in civil contempt.

10   The keys to your release are in your own pocket.  When you

11   produce the materials that you were required to -- those are

12   the four groupings; there will be an order later that explains

13   it -- then you'll be released from prison.

14           MR. ETRA:  Your Honor --

15           THE COURT:  This is coercive contempt.

16           MR. ETRA:  Your Honor --

17           THE COURT:  You hush and listen to me.  OK?

18           MR. ETRA:  Yes, your Honor.

19           THE COURT:  Marshals, I'm going to ask you to hold him

20   in the cell downstairs.

21           I'm going to ask the Federal Defenders to come talk to

22   you because I don't like to remand people into prison without

23   them being represented by an attorney.  I'm going to ask

24   everybody to come back.  We're going to have you back.

25           Come back at 3 o'clock -- I'll take you right after

M7dWben1

1  the 3 o'clock, which shouldn't take that long -- in case the

2  attorneys on that, who will now be asked to represent Mr. Etra,

3  have something to say.

4          MR. POPOFSKY:  Your Honor, could I be heard?

5          THE COURT:  One thing you wanted to talk about in

6  terms of the --

7          MR. POPOFSKY:  Yes.  There's a couple things.  It'll

8  take less than five minutes of your time, your Honor.

9          Mr. Etra said he worked very hard since July 7, but of

10  course, the obligations have been outstanding for two years

11  now.

12          THE COURT:  I know that.

13          MR. POPOFSKY:  This is what he does for a living,

14  these escrow accounts, your Honor, and at least twice that we

15  know of, he's been found to have taken funds improperly from

16  escrow accounts.  So the escrow accounts and the quote/unquote

17  clients are the key, and the European accounts are the key,

18  your Honor.  This is what he does for a living.  He steals

19  people's escrow money.  And so he says clients.

20          Here's the thing, your Honor.

21          THE COURT:  He said clients relative to what?

22          MR. POPOFSKY:  He says he's got clients' money in

23  these accounts in Europe and in these escrow accounts, in these

24  IOLA funds.

25          If he has clients, your Honor, they must be paying him

M7dWben1

1    fees because he doesn't work for free.  He charged my -- he

2    enters into escrow agreements, he gets money.  If he has

3    clients, he's been getting fees.  If he's been getting fees,

4    that's what he's been living on.

5            We don't know any of that.  We have no visibility into

6    any of that because he hasn't shown us a single thing.  I have

7    an information.

8            THE COURT:  Hang on a second.  That would be the fifth

9    item that he's in contempt for for failing to show transfers in

10   of funds?

11           MR. POPOFSKY:  Well, I don't know if he's -- I don't

12   know what they are.  I'm not talking about contempt.  What I'm

13   asking your Honor is to order him to respond to the information

14   subpoena that he was served with in May, which asked him

15   specifically, which he ignored --

16           THE COURT:  You're going to have to make a motion to

17   compel on that.  Right?  You need to make a motion.  Your

18   subpoena is not self-executing.

19           MR. POPOFSKY:  I understand.  I was hoping that, given

20   the history, you would order him to identify -- whether we're

21   talking about the subpoena or otherwise, your Honor, I think,

22   has the inherent authority to order him to submit an affidavit

23   that says these are my monthly expenses since the judgment was

24   entered.

25           THE COURT:  I'm confident that I do.  But I would

M7dWben1

1    prefer to enter that order on a clean record so that the order

2    of exactly what he has to produce is clear and unambiguous,

3    because my guess, given Mr. Etra's track record, is that we may

4    be back here even after he purges these contempts.  So I want a

5    clear, unambiguous record of what he is being required to

6    produce.

7            MR. POPOFSKY:  I understand, your Honor.  We will do

8    that, and we will ask him to identify the clients for whom he's

9    performed services, how much they paid him, in exchange for

10   what services, where that money went and where that money is

11   now.  We will ask for a specific order for that information.

12           And the other thing we'll ask for, your Honor,

13   although perhaps you could order it today, I would ask to have

14   him turn over the computer that he -- for forensic examination,

15   the computer that he says information has been lost on.  We

16   should have the ability to give that to an expert for forensic

17   examination.

18           THE COURT:  Again, you're going to need to include

19   that in the request.

20           MR. POPOFSKY:  OK.  We will do so.

21           THE COURT:  What's the date of my order?  The prior

22   order, the first order.

23           MR. ETRA:  Your Honor --

24           THE COURT:  Hang on a second.

25           MR. ETRA:  Your Honor --

M7dWben1

1              Your Honor --

2              THE COURT:  Hang on.  Do you not understand what that

3    means?  That means wait a minute.

4              MR. ETRA:  Yeah.

5              THE COURT:  OK?

6              Mr. Etra, you wanted to say something?

7              MR. ETRA:  Yes, your Honor.

8              I'm referring to your order, where it says explicitly

9    that if I appear on July 13, no arrest warrant will be issued.

10             THE COURT:  I'm not issuing an arrest warrant.  I'm

11   asking them to take you into custody.

12             MR. ETRA:  And I'm really not of good health to do

13   this.

14             THE COURT:  You really should have thought about that

15   when you failed to show up with everything you were required to

16   have.

17             MR. ETRA:  I -- I --

18             THE COURT:  You've been playing this game too long,

19   Mr. Etra.

20             MR. ETRA:  Your Honor, there's been no games played.

21   If I was playing games, I would not be here.  If I took any

22   money, I would not be here.  If I took any money, I would not

23   be working to try to fund a settlement.  If I took any money, I

24   wouldn't be compliant.  I would be long since somewhere else.

25             I mean this whole thing doesn't make any sense if your

M7dWben1

1    Honor considered that if I was -- what I've been accused of,

2    the last thing in the world I would be doing is what I am

3    doing -- being compliant, getting all the records; and that I

4    can only function in letting me get from the banks that are

5    going to provide that information, rather than putting me into

6    custody, to use the time to continue the efforts to comply.

7    And I have.  The history of four years has not been

8    noncompliance.  If I wanted to avoid this, both Mr. Popofsky

9    and your Honor know what I could do personally, and I haven't,

10   because I've been consistent in trying to be compliant, to try

11   to provide things and, most importantly, to try to get some

12   money to redress the damage that his client, albeit a business

13   loss that they can afford, is something that I feel morally

14   I've been wanting to do.  And that's why -- that's what I've

15   been doing.

16          So to characterize me as stealing money, to

17   characterize me as noncompliant, to put me into custody when

18   I've been putting every waking moment to comply with all of

19   these things, just the concept of taking my one laptop away,

20   while it's the one thing that I can do to comply, it's -- it's

21   beyond belief to even think that, so unless --

22          THE COURT:  OK.  Mr. Etra, I suggest that you tell all

23   this to the attorney that I'm going to have come visit you in

24   the pens, and maybe he or she will be able to persuade me that

25   given the fact that you allegedly have made requests, maybe you

M7dWben1

1   can prove to them something that would allow them to prove that

2   to me, that there are actually documents coming.  You've got

3   the problem, though, that you haven't produced the escrow

4   agreements, you haven't produced the bank statements that you

5   say that you have, because you've withheld them as privileged.

6           So you're remanded into custody.

7           Don't take him to MDC.  I want him back in my

8   courtroom at 3 o'clock.  OK?

9           All right.  Thanks, everybody.

10          MR. POPOFSKY:  Thank you, your Honor.

11          (Recess for second call)

M7dWben1

AFTERNOON SESSION

3:20 p.m.

1

2

3          THE COURT:  Good afternoon.  Please be seated.

4          Are these Colon family people who are here?

5          MS. GALLICCHIO:  No, your Honor.  These are interns

6    and a paralegal from my office.

7          THE COURT:  OK.  Welcome, Federal Defenders interns.

8          Ms. Gallicchio, I have found your client in civil

9    contempt because he has failed to comply with many orders to

10   produce material.

11         At the morning session, we went through a number of

12   items to try to figure out exactly what was outstanding and

13   what isn't.  I think the review that we did this morning wasn't

14   accurate in the sense that the petitioner had not had an

15   opportunity to go through some of the paperwork that Mr. Etra

16   dropped on him last night and this morning.  I've now had a

17   opportunity to go through some of the paperwork.  It is clear

18   that there are other items where he is in contempt because he

19   has failed to produce required documents.

20         Mr. Deo, I'm going to ask you to move slightly that

21   way so I can see Mr. Etra.  Thank you.

22         For example, one of the requirements was that he

23   produce documents showing essentially every bank account that

24   he has.  That was the requirement.  He produced records from

25   the bank account into which currently his social security

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300

1    checks about are being deposited.  It's a bank called Piermont.

2          On their face, those records show that he has another

3    Piermont account, because there are internal transfers from

4    that account to another account at Piermont.  He didn't produce

5    those records.  I don't know why; he just didn't.  I mean I do

6    know why.  He's in contempt.  That's why he didn't.  But those

7    were clearly covered by the requirement.

8          He failed to produce documents that he has determined

9    are privileged -- that are not -- including escrow agreements

10   and IOLA accounts that he is purporting to have other clients'

11   money in.

12         He has failed to produce Citibank closing statements

13   for five different accounts.  He says he's made the request.

14   I'm a Citibank customer, so I actually went online to see what

15   the story is on getting old statements.  You can make an online

16   request for statements going back to 2014 and get them in two

17   hours.  So his explanation of having to jump through lots of

18   hoops does not ring true.

19         He failed to produce monthly statements for two

20   European bank accounts, one at Uni-Credit and one at Sberbank.

21   This morning I asked Mr. Popofsky why he thought Mr. Etra had

22   an account, because he's telling us now he doesn't have an

23   account; that that account is held by somebody else.  I have a

24   copy of his deposition, which was taken by Benthos, April 12,

25   2019:

M7dWben1

1      "A.   I bank in several banks.

2      "Q.   Do you have a European bank account?

3      "A.   Yes.

4      "Q.   At what bank is that account?

5      "A.   That bank is a bank in Europe.

6      "Q.   What bank is it?

7      "A.   That bank has nothing to do with this transaction."

8              And on and on and on.  He never identifies what the

9      bank is, but that's the explanation for why the petitioners

10     believed that those two banks are bank accounts of his.  No

11     explanation of why it was in 2019 he testified, under oath,

12     that he had a bank account in Europe, and he has failed to

13     produce the records associated with the European bank account

14     that he swore under oath he had.

15             He has not produced HSBC monthly statements for the

16     accounts that are listed in item five of my order.  And as to

17     No. 2, this was sort of -- we didn't discuss this this

18     morning -- there are a couple of different orders that require

19     him, when you put them together, to produce all bank accounts

20     into which social security checks have been deposited.

21             His submission implies that they were going into his

22     M&T bank account, but a random inspection of those accounts

23     does not show any social security checks.  And the Piermont

24     account into which social security checks were deposited was

25     only opened in July 2021.  So unless he didn't draw social

M7dWben1

1      security before 2021, there is some missing bank account.

2                  I see him nodding now.

3                  So, Ms. Gallicchio, the issue that I put to him this

4      morning was -- and by the way, he also now owes in fines that

5      have been accruing since the first order that started at $50 a

6      day and then increased to $1,000 a day, doubling every two

7      days.  He now owes $10,300 to the Court for failure to comply

8      with the order.

9                  The issue is I'm out of choices.  I can't see anything

10     other than custody that is going to persuade Mr. Etra that he

11     is not in charge and he has to produce the documents that he

12     has been ordered and ordered and ordered to produce.  So I

13     remanded him into the marshal's custody.

14                 I called the Federal Defenders, because I don't like

15     to put people in jail without them having competent counsel to

16     advise them.

17                 Ms. Gallicchio, with that, you have the floor.

18                 MS. GALLICCHIO:  Thank you.

19                 May I.

20                 THE COURT:  You may, of course.

21                 MS. GALLICCHIO:  Thank you.

22                 Obviously --

23                 THE COURT:  You just met your client.

24                 MS. GALLICCHIO:  -- I just met my client.  He has

25     clearly a long, complicated history.  And I did speak with

M7dWben1

1    counsel briefly to get some historical background, and I did

2    scour the docket a bit just to get a sense of what's been going

3    on.  And clearly it's long and complicated.

4        I did have a brief opportunity to meet with my client

5    down in the holding cell.  Obviously this period of

6    incarceration was very traumatizing for him, as one could

7    imagine, particularly given the fact that he's never been

8    incarcerated before.  He's 81 years old.  He has a plethora of

9    medical conditions, and certainly the fear of being

10   incarcerated is enough to scare the daylights out of anyone,

11   him in particular.

12       I've explained to him he must comply.  I've explained

13   to him that the Court can keep him incarcerated indefinitely,

14   until he does comply under civil contempt, which he also

15   understands.

16       He has indicated that he, at least in the last

17   submission, made -- put a lot of work into and made diligent

18   attempts to comply.  He's one man.  There are a lot of demands

19   upon him.  I understand --

20            THE COURT:  He can hire counsel.

21            MS. GALLICCHIO:  I'm sorry?

22            THE COURT:  He can hire somebody to help him.

23            MS. GALLICCHIO:  Well, I don't know if that's true or

24   not.  I hear the Court saying that.  I don't know what his

25   financial picture is.

M7dWben1

| | |
|---|---|
| 1 | THE COURT:  I understand.  You've been here three |
| 2 | hours. |
| 3 | MS. GALLICCHIO:  I've been here three hours. |
| 4 | So what I'm asking the Court is to release him today |
| 5 | and give him another deadline.  And I get that this has been |
| 6 | ongoing, but I'm hoping that jail is not what anyone here wants |
| 7 | to see for this gentleman and compliance, of course, is what |
| 8 | everyone wants.  As I said, I do think that the last several |
| 9 | hours in jail were traumatizing for him.  So if the Court would |
| 10 | give him three weeks -- |
| 11 | THE COURT:  No. |
| 12 | MS. GALLICCHIO:  -- which is what he's requesting, I |
| 13 | would ask that that be what the Court consider. |
| 14 | THE COURT:  Ms. Gallicchio, I've considered that.  I'm |
| 15 | not giving him three weeks.  I am prepared to give him some |
| 16 | time. |
| 17 | MS. GALLICCHIO:  OK. |
| 18 | THE COURT:  But with some caveats.  I want to hear |
| 19 | today from him why, when he knew that he had another account at |
| 20 | Piermont into which money was being transferred, that account |
| 21 | wasn't produced today with the other Piermont account. |
| 22 | MS. GALLICCHIO:  OK. |
| 23 | THE COURT:  He's produced the documents from Piermont, |
| 24 | so why isn't that -- how does he overcome what, to me, is him |
| 25 | just sticking his finger in the Court's eye, saying, well, this |

M7dWben1

1    one wasn't specified, even though it's clearly in the catchall,

2    and therefore, I'm not producing it.  Why did he not produce,

3    at the same time he produced Piermont account 1, Piermont

4    account 2 into which money moves from A to B?

5         MS. GALLICCHIO:  Right.  What I would ask the Court

6    maybe to consider is, rather than potentially walking himself

7    into another contempt charge by answering that question, give

8    him an opportunity to produce it without having to answer that

9    question.

10        THE COURT:  Here's the thing, perhaps.

11        I get the feeling that Mr. Etra thinks that he can do

12   this song and dance and get away with it, and he needs to

13   understand that he has played the last string --

14        MS. GALLICCHIO:  Yes.

15        THE COURT:  -- that there are no more chances, no more

16   excuses.  If I see, or they come to me -- I figured this out

17   just looking at the accounts, because Mr. Popofsky has said,

18   which is not an unreasonable thing for him to say, given the

19   fact that he's got a $5 million judgment against the man for

20   absconding with escrow funds, and in all of the accounts that

21   he has produced, with court orders making it very clear that

22   this is the equivalent of a total examination of his finances,

23   every bank account needs to be turned over.  In the bank

24   accounts he's turned over, there's no indication of how the man

25   lives.  There are no outflows.

M7dWben1

1          The one, single Piermont account he produced has money

2     coming in and then large cash going out, but nothing going out

3     for rent, for food, for a MetroCard, for an Uber, to American

4     Express, to Visa.  So he is clearly hiding his finances.  My

5     point is -- and again, I know you've only been here three

6     hours, you're with Federal Defenders; I get all that.  But what

7     I want, if he hasn't heard it from me loud and clear and three

8     hours in the federal pen didn't do it, that Mr. Etra comes to

9     understand that we're not play 20 questions anymore.

10          MS. GALLICCHIO:  OK.

11          THE COURT:  There is a clear order to disclose every

12     single bank account he has.  That's the catchall of the order.

13     It deals with escrow accounts and IOLA accounts but also every

14     other account.  Not just safe deposit boxes, not just

15     certificates of deposit.  Every other bank account.

16          MR. POPOFSKY:  Not just current, your Honor.  Not just

17     current, right?

18          THE COURT:  And not just current, correct.  Everything

19     from 2018 forward.

20          MR. POPOFSKY:  I think it was 2017, your Honor.  He

21     seems to be -- as you know, he's gone to great lengths to try

22     to hide 2017.  So we are particularly interested then in 2017.

23          THE COURT:  Perhaps, but I'm dealing with the subpoena

24     that you served and the order that I issued, which does not go

25     back to 2017.  For some of these it does, but my point is I'm

M7dWben1

1    not playing 20 questions with him.  If they find a single

2    reference in all of these records to some other bank account

3    and when the next dump of bank accounts comes in it doesn't

4    include that bank account, that's not just civil contempt at

5    that point.  That's really criminal contempt, because then he

6    is willfully hiding bank accounts.

7         I cannot fathom, Mr. Etra, the reason why we did not

8    get the other Piermont account -- in a million years, I don't

9    understand it -- beyond willfully hiding assets, and I've had

10   it.

11        MS. GALLICCHIO:  I get that.  I get it.  I think he

12   gets it from the last several hours in custody, and I

13   anticipate he will comply.

14        THE COURT:  I anticipate that if he does not comply,

15   he is going to go to jail, and he can try to figure out how to

16   do all this from the MDC, which is going to be difficult.

17        MS. GALLICCHIO:  If not impossible.

18        THE COURT:  And just to be clear to you,

19   Mr. Popofsky --

20        MS. GALLICCHIO:  Right.

21        THE COURT:  -- the reason I'm willing to give him one

22   last chance is because it's going to take a lot longer for him

23   to do any of this if he's sitting at the MDC than if he is out,

24   so that he can walk into Citibank and explain the situation.

25        Perhaps you could also help him, Ms. Gallicchio, on

M7dWben1

what might be adequate proof of things as opposed to just his

representation.

          MS. GALLICCHIO:  Right.

          THE COURT:  His representation on any fact means

nothing to me, because he clearly will say whatever he thinks

is convenient at the time, including:  "I have a European bank

account"; "I don't have a European bank account"; bank account?

What bank account?  Not my bank account.  It was a fiduciary's

bank account."

          So a representation from Aaron Etra means nothing in

this court.  Proof of some of these things, if they really are

obtainable, fine.  But it needs to be proof, original

documents, original ink signatures, wet signatures, etc.

          MR. POPOFSKY:  Your Honor.

          THE COURT:  Mr. Popofsky.

          MR. POPOFSKY:  May we separate -- I understand what

you're saying, and I don't oppose it.

          Our goal is not to see Mr. Etra rot in jail.  Our goal

is to get information and then money.  In whatever order your

Honor is going to issue, could you please separate the things

that he admitted this morning he intentionally withheld and has

at the click of a mouse -- specifically, the bank statements

and escrow agreements that he claimed were privileged?  Those

do not entail going to a bank, making a request, going to an

escrow agent.  His counsel can get that from him in 24 hours

M7dWben1

1    and produce it to me 24 hours later.

2            I understand some of the other stuff she has to go

3    through some procedural hoops, but I would ask that, your

4    Honor.  I would also remind the Court, in your Honor's order of

5    May 16, Dkt. 108, you also asked for a notarized -- directed

6    that he file a notarized affidavit that he had no other open

7    accounts.

8            THE COURT:  We know he does have other open accounts.

9            MR. POPOFSKY:  Yeah, but maybe -- but my suggestion is

10   that the next time, when counsel obtains everything, if we're

11   optimistic that she will, that that should be accompanied by

12   that affidavit that your Honor already ordered on May 16.

13           THE COURT:  To be clear, Ms. Gallicchio represents him

14   for purposes of whether he was going to remain remanded.  She

15   is not representing him for purposes of complying with the

16   court order.

17           Mr. Etra, do you understand that?

18           I am not appointing Ms. Gallicchio to represent you in

19   connection with this matter.  She was appointed to represent

20   you, to sit down in the pen, to make sure you understood the

21   gravity of the situation and to make the argument that she just

22   made -- that you should not be kept in civil contempt today in

23   custody.

24           THE RESPONDENT:  Yes, your Honor.

25           THE COURT:  Do you understand that?

M7dWben1

1          THE RESPONDENT:  Yes, your Honor.

2          THE COURT:  OK.  So she does not represent you

3     generally in connection with this matter.  To the extent you

4     can hire counsel, I really recommend that you do it.

5          (Defendant conferred with counsel)

6          THE COURT:  You are the best example of someone who

7     represents themselves has a fool for a client and a fool for a

8     lawyer.  You don't know what you're doing in terms of dealing

9     with a court, as evidenced by the fact that you ended up

10    spending three hours in the pen.  So to the extent you have the

11    capability of hiring counsel, I recommend you do so.  I

12    obviously can't force you to do so.

13         I also recommend that if you're going to continue to

14    represent yourself, that you please register on ECF.  It allows

15    you to file electronically.  It allows us to deliver orders to

16    you electronically, and it avoids the delays that are

17    associated with giving documents to the *pro se* office.  I can't

18    force you to use ECF, but I strongly recommend that you

19    register and use ECF.

20         Mr. Popofsky has asked for some sort of triage on the

21    items that Mr. Etra should have ready access to and be able to

22    produce by Friday.  For example, it seems to me that the other

23    Piermont account that we know about, there's no reason why that

24    can't be produced right away.  And the escrow agreements and

25    IOLA bank accounts that he has, I don't see any reason why they

M7dWben1

1    can't be produced right away.

2          MR. POPOFSKY:  Historical as well.  Just to make clear

3    that he understands we're not talking just about current

4    accounts but historical during this period.

5          MS. GALLICCHIO:  Your Honor, that's item 13?

6          THE COURT:  Item 13, yes.

7          MR. POPOFSKY:  Yes.

8          THE COURT:  Item 13.  Item 13 has a lot in it.

9          MR. POPOFSKY:  No.  That's it, your Honor.  Item 13,

10    documents previously withheld as privileged.

11          THE COURT:  Correct.  And it has other stuff in it as

12    well, because that's where the catchall is.

13          OK.  Is there any reason why I cannot and should not

14    order the production of the previously withheld privileged

15    documents, which are escrow agreements and IOLA bank accounts

16    by Friday?

17          Ms. Gallicchio.

18          MS. GALLICCHIO:  If I could have a moment, your Honor?

19          THE COURT:  Of course.

20          (Counsel and defendant conferred)

21          MS. GALLICCHIO:  Your Honor, would you give him until

22    Monday?

23          THE COURT:  Why?

24          MS. GALLICCHIO:  Well --

25          THE COURT:  This is classic Etra.  Right?  This is

M7dWben1

1    exactly what Mr. Etra does.

2              MS. GALLICCHIO:  We have one full day, tomorrow.  It

3    has to be produced on Friday.  Tomorrow's Thursday, so we're

4    already --

5              THE COURT:  Yes, but these are documents that were

6    called for a long time ago.  He said he was withholding them as

7    privileged.  They should be readily available to him.  I'm not

8    quite sure why they are not readily available to him.

9              (Counsel and defendant conferred)

10             MS. GALLICCHIO:  He'll do it by Friday.

11             THE COURT:  OK.  By Friday, copies of all escrow

12   agents and IOLA, past and present, back to --

13             What's the date on the subpoena?  Is it January 1,

14   2018?

15             MR. POPOFSKY:  I have to check that, your Honor, to be

16   sure.  I will let him know.

17             THE COURT:  Can we look?  It's the subpoena at Dkt.

18   60-1, requests No. 32 and 49.

19             MR. POPOFSKY:  I think there would be a general

20   statement at the beginning with a time frame, actually.

21             THE COURT:  All right.  We'll pull it up.

22             MR. POPOFSKY:  Because I have his response, but I

23   don't have the subpoena.

24             Your Honor, from his response, it looks like the

25   request began in 2018, so I'll go with that for the moment to

M7dWben1

1    move things along.

2               THE COURT:  August 1, 2018, through the present, and

3    the escrow agreement or IOLA account that was open at any point

4    in time during that period -- August 1, 2018, to the present --

5    must be produced by Friday at 6:00.

6               The other Piermont bank account which we know about,

7    that you know about too -- you moved money from the account

8    that, your social security check into, that account -- you know

9    what account I'm talking about, Mr. Etra?

10              THE RESPONDENT:  Yes, your Honor.

11              THE COURT:  Is it a checking account or a savings

12   account?

13              THE RESPONDENT:  It is a checking account.

14              THE COURT:  So the Piermont checking account that's

15   referenced in the account documents that you gave us as d/b/a

16   2060 must be produced by Friday, all monthly statements for

17   that account from inception to current.

18              It was opened in 2020, right?

19              THE RESPONDENT:  I believe so, your Honor.

20              THE COURT:  Any other bank accounts you have at

21   Piermont?

22              THE RESPONDENT:  I believe that's the IOLA account,

23   your Honor.

24              THE COURT:  You also have an IOLA account there.  OK.

25   So that goes in with the other.

M7dWben1

1          Everything else that we've gone through -- do you need

2     me to go through them point by point?  It will end up in an

3     order.  Do you want me to go through them now, when you've got

4     a lawyer to talk to?

5          THE RESPONDENT:  Yes, your Honor.

6          THE COURT:  OK.  Everything else then is the closing

7     statements for the Citibank account.  If you can't get a

8     closing statement, the monthly statements will do.  There

9     should be no problem getting monthly statements even for a

10    closed bank account.

11         Monthly statements for the two European accounts.

12    That's at Uni-Credit and Sberbank.

13         The HSBC monthly statements, the HSBC monthly

14    statements for the accounts that are listed in item 5.  That's

15    seven different bank accounts.

16         What other bank accounts were your social security

17    checks deposited into before you opened the Piermont account?

18         THE RESPONDENT:  I believe it's the 3433 that, all the

19    statements of which were provided.

20         THE COURT:  No.  There's no social security deposits

21    in those.  At least there are some months where there are not.

22    Those are the ones I looked through, and I didn't see a regular

23    deposit from the United States government.  Some of those

24    months didn't have regular deposits at all.

25         THE RESPONDENT:  Right.

M7dWben1

```
1            THE COURT:  So where did your social security checks
2    get deposited?
3            THE RESPONDENT:  I believe it was that account.  I can
4    check.
5            THE COURT:  I'm sorry.  Say what?
6            THE RESPONDENT:  I believe it was that account.  I can
7    check.  I don't recollect any other account.
8            THE COURT:  Well, here's the thing.  You'd better find
9    out.  You'd better figure it out, because one of the things
10   you've got to produce is monthly bank accounts that show where
11   your social security check was deposited before you opened the
12   Piermont account.
13           Do you understand that?
14           THE RESPONDENT:  Yes, your Honor.  I --
15           THE COURT:  Is there any fuzz, any lack of
16   understanding of that requirement?
17           THE RESPONDENT:  No, your Honor.  I think the answer
18   to that will also come when I can get the materials from
19   Citibank and HSBC, because that may be the bank.  I will
20   diligently look for those, of course.
21           THE COURT:  You will what?
22           THE RESPONDENT:  I will --
23           THE COURT:  You've got to speak up.
24           THE RESPONDENT:  I'm sorry, your Honor.
25           I will diligently look -- when I get those materials,
```

M7dWben1

1   I'll try to track down any social security check.

2   　　　　　THE COURT:  OK.  Here is the definition of that piece

3   of it.  It is all monthly bank accounts for the account into

4   which your social security checks were deposited prior to the

5   time you opened the Piermont account.  If those accounts show

6   transfers to another account, you've got to produce that other

7   account also.

8   　　　　　Again, so there is no fuzz on this, you don't get to

9   have any bank accounts that aren't produced.  Every bank

10  account that you have used in any way, shape or form since

11  August 1, 2018, must be identified and produced.

12  　　　　　Now, you know -- and I don't know -- whether there is

13  a whole other set of accounts that aren't these.  You're

14  shaking your head, saying no, we've got the universe -- is that

15  right -- other than the Piermont account that you admit you

16  didn't produce?

17  　　　　　THE RESPONDENT:  The Piermont account, your Honor, was

18  the IOLA account that I believe was privileged.

19  　　　　　THE COURT:  No, not the IOLA account.

20  　　　　　You're not moving money from your personal bank

21  account to the IOLA account to pay personal living expenses.

22  　　　　　THE RESPONDENT:  No.

23  　　　　　THE COURT:  Right?

24  　　　　　THE RESPONDENT:  Correct.

25  　　　　　THE COURT:  Are you?

M7dWben1

1          THE RESPONDENT:  No.

2          THE COURT:  That would be illegal, right?

3          THE RESPONDENT:  Correct.

4          THE COURT:  Yes.  So you didn't do that?

5          THE RESPONDENT:  No.

6          THE COURT:  So there is a Piermont checking account

7    that is not an IOLA account that has not been produced that's

8    going to be -- you're going to produce that by Friday at 5

9    o'clock.

10          Let me ask you again.  Are there any other accounts?

11   And the reason that I'm pressing you on this, Mr. Etra, is

12   because I'm about to set a deadline for the rest of these

13   accounts based on what I know of what you've told me, which is

14   that it is a manageable universe of monthly accounts that you

15   need to gather and produce.  So if this is the universe, I know

16   what deadline I'm going to set.

17          Do we have the universe?

18          THE RESPONDENT:  Yes, your Honor.

19          THE COURT:  OK.  Fine.  Then -- today is Wednesday --

20   everything else is going to be due on Tuesday of next week.

21   Today is the 13th, so everything else is due on July 19, by

22   6:00 p.m.

23          Now, rather than doing what we did today, which is you

24   trying to figure out on the fly what you have and what you

25   don't have, I'm setting a status conference on Thursday.

M7dWben1

1    Thursday, July 21.

2              Does your client have a preference, Ms. Gallicchio, of

3    morning or afternoon?

4              (Counsel conferred with defendant)

5              MS. GALLICCHIO:  Your Honor, the morning is fine.  I'm

6    assuming the Court would want me to appear on that day.

7              THE COURT:  I think I would, because if everything

8    hasn't been produced --

9              MS. GALLICCHIO:  Right.

10             THE COURT:  -- there's going to be again a request why

11   I shouldn't remand him.

12             MS. GALLICCHIO:  Any time in the morning is fine with

13   me.

14             THE COURT:  You're OK with coming anytime in the

15   morning?

16             MS. GALLICCHIO:  Yes.

17             THE COURT:  Let's make it 10:30, July 24.

18             Does that work for you, Mr. Popofsky?

19             MR. POPOFSKY:  I will be out of town, your Honor.  I

20   will arrange for someone to cover it, of course.

21             THE COURT:  OK.  Let me tell you what I expect you to

22   do.  You're the petitioner's attorney.  Between Friday

23   afternoon at 6:00 and Tuesday afternoon at 6:00, you should

24   have all of the documents.  What I need you to do is to

25   review -- I don't care what he says he produced, because we

M7dWben1

1    know from going through them today that what he says and what's

2    in the batch are not necessarily the same thing.  So I need you

3    to review everything that comes in, and on Thursday morning, at

4    10:30, you're either going to tell me you've gotten everything,

5    or you're going to tell me you don't have everything.  And if

6    you don't have everything, you're going to give me chapter and

7    verse of exactly what you don't have.

8            MR. POPOFSKY:  Your Honor, could I ask for more than a

9    day to do that, given the entire history here and the fact I'll

10   need someone else to cover it?  He has his deadlines, but it's

11   a little bit onerous to ask us, in one day, to go through

12   everything and be able to comprehensively tell you.

13           THE COURT:  That's fine.  This is for your benefit.

14           MR. POPOFSKY:  Yes.  Could we carry that into the

15   following week, your Honor?  That way we can do it not in a

16   crazy rush.

17           THE COURT:  All right.  July 28.

18           MR. POPOFSKY:  Thank you, your Honor.  That will also

19   give us the opportunity, if there is an issue, to try to

20   address it directly before bringing in your Honor.

21           THE COURT:  OK.

22           Ms. Gallicchio, how about the 28th?

23           MS. GALLICCHIO:  Yes, that's fine.

24           THE COURT:  OK.  July 28 at 10:30.

25           MR. POPOFSKY:  Thank you, your Honor.

M7dWben1

| | |
|---|---|
| 1 | THE COURT:  I've got a hearing that's starting on |
| 2 | Monday.  I don't know if it's going to be finished by then. |
| 3 | It's possible that we'll get shoved around a little.  If it |
| 4 | does, what I'll do is I'll just shove it to the lunch break. |
| 5 | MS. GALLICCHIO:  Sure.  That's fine. |
| 6 | THE COURT:  OK?  But we'll let you know when we know |
| 7 | that. |
| 8 | I think that's everything from me. |
| 9 | Mr. Popofsky, anything from you? |
| 10 | MR. POPOFSKY:  No, your Honor, although I just would |
| 11 | inquire about the affidavit.  Are you going to direct him to |
| 12 | serve a notarized affidavit with these documents? |
| 13 | THE COURT:  Yes. |
| 14 | MR. POPOFSKY:  With the second set. |
| 15 | THE COURT:  With the second set. |
| 16 | MR. POPOFSKY:  That says this is everything. |
| 17 | THE COURT:  You need to produce a sworn affidavit that |
| 18 | says you have now produced all of your financial records, all |
| 19 | of your bank accounts that were open from August 1, 2018, to |
| 20 | the present at any time; that there are no other bank accounts, |
| 21 | either in the United States or anywhere else in the world. |
| 22 | MR. POPOFSKY:  That are or were open during that |
| 23 | period. |
| 24 | THE COURT:  Correct.  That are or were open during |
| 25 | that period. |

M7dWben1

1          MR. POPOFSKY:  Thank you, your Honor.

2          THE COURT:  OK.

3          MS. GALLICCHIO:  Your Honor, with respect to the fine

4     that has been accruing, I don't know what the status of that is

5     and whether the Court, if it's still ongoing or --

6          THE COURT:  It's still ongoing.

7          MS. GALLICCHIO:  -- if the Court would consider

8     staying that for this time period.

9          THE COURT:  Well, I'm not inclined to stay it for this

10    time period.

11         Here's the thing.  He has been given ample -- ample --

12    time to produce these documents.  And he didn't do it.  Now, I

13    think the reality is that what finally woke him up was the fact

14    that the order said I was going to send a marshal out to arrest

15    him.  But to the extent there are still financial penalties

16    accruing, that provides Mr. Etra an incentive to get everything

17    done.  If, in fact, he fully complies, as required, then ask me

18    to release him from the fine.

19         MS. GALLICCHIO:  OK.

20         THE COURT:  But otherwise, if everything isn't in -- I

21    mean it has some coercive influence, I believe.  I believe it

22    has a coercive influence.  He wants me to release it, so it

23    must have some coercive influence.  So I'm not going to.  If he

24    produces everything, then ask me whether I'll relieve him from

25    the obligation to pay it.

M7dWben1

1          MS. GALLICCHIO:  Understood.  Thank you.

2          THE COURT:  OK?

3          Do you understand that, Mr. Etra?  Fines are still

4     accruing.

5          THE RESPONDENT:  Yes, your Honor.

6          THE COURT:  OK.  Anything further from the petitioner?

7          MR. POPOFSKY:  No.  I thank you, your Honor, for your

8     time, effort and attention and that of your staff.  I know this

9     was difficult for your Honor.  I appreciate it.

10          THE COURT:  Again, Mr. Etra, I urge you to register

11     for ECF.  It's not intrusive to you.  It doesn't affect you in

12     one way or the other, but it will make your life easier,

13     because it will allow you to file automatically, rather than

14     going through the *pro se* office, which just creates delays in

15     everybody getting what they want.

16          To the extent you can have any influence,

17     Ms. Gallicchio, please do.

18          MS. GALLICCHIO:  OK.

19          THE COURT:  Mr. Etra, do you have any questions?

20          THE RESPONDENT:  No, your Honor.

21          THE COURT:  Ms. Gallicchio, thank you.  And thank the

22     Federal Defenders for stepping in on short notice to help out

23     with Mr. Etra.

24          Thanks, everybody.

25          (Adjourned)