UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
**BENTHOS MASTER FUND, LTD.,** :
:
                 Petitioner, :
: Case No. 20-cv-03384 (VEC)
       - against - :
:
:
**AARON ETRA,** :
:
                 Respondent. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

---

**PETITIONER'S MEMORANDUM OF LAW IN OPPOSITION
TO RESPONDENT'S MOTION TO QUASH AND IN SUPPORT OF PETITIONER'S
CROSS-MOTION**

---

                                   **KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.**
                                   500 Fifth Avenue
                                   New York, New York 10110
                                   Telephone:   (212) 882-9882
                                   Facsimile:    (212) 986-8866

                                   Attorneys for Petitioner
                                      **BENTHOS MASTER FUND, LTD.**

Petitioner respectfully submits this memorandum of law in opposition to Mr. Etra's motion to quash and in support of its cross-motion for relief with regard to Mr. Etra's apparent spoliation of evidence and demonstrated ongoing violations of the restraining notice served upon him two years ago.

### Preliminary Statement

The judgment debtor has presented no legal grounds whatsoever for the Court to deem his Escrow Agreements "privileged" so as to allow him to continue to withhold them from his judgment creditor.

However, his affidavit raises the serious concern that if the Court orders production of those documents, he will claim that he no longer has them available anyway. If (or when) that occurs, the Court should take appropriate action as urged below, including requiring Mr. Etra to deliver his computer for forensic examination by an expert of Benthos's choosing at his expense.

The Court also should take whatever action it deems appropriate in connection with Mr. Etra's two-year, ongoing, knowing and flagrant violations of the restraining notice served upon him when the $5 million judgment was issued. Additional bank statements, produced only two weeks ago after he withheld them for two years, have revealed even more such violations than had become known in July when other long-withheld statements had been produced.

### The Scope of Judgment Enforcement Is Broad

As a threshold matter, the Second Circuit has confirmed that "the judgment creditor must be given the freedom to make a broad inquiry to discover hidden or concealed assets of the judgment debtor." *First City, Texas Houston, N.A. v. Rafidain Bank*, 281 F.3d 48, 54 (2d Cir. 2002); accord, *Libaire v. Kaplan*, 760 F. Supp. 2d 288, 293 (E.D.N.Y. 2011) ("the scope of post-judgment discovery is broad, and a judgment creditor is entitled to a very thorough examination

of a judgment debtor with respect to its assets") (internal quotation marks, alterations, and citations omitted); *Argonaut Ins. Co. v. Manetta Enters., Inc.*, 2021 WL 3603395 (E.D.N.Y. Aug. 13, 2021) ("'broad post-judgment discovery in aid of execution is the norm in federal and New York state courts'").

By the express terms of Rule 69, "[a] judgment creditor may rely on federal or state discovery procedures in order to obtain information relevant to the satisfaction of a judgment." *Fed. Ins. Co. v. CAC of NY, Inc.*, No. 14-CV-4132 (DRH) (SIL), 2015 WL 5190850, at *2 (E.D.N.Y. Sept. 4, 2015) (citation omitted); see also Fed. R. Civ. P. 69(a)(2). "'Rule 69 was intended to provide the post-judgment creditor with an efficient means of uncovering the existence of assets upon which he may levy to satisfy the judgment.'" *Minpeco, S.A. v. Hunt*, 1989 WL 57704, at *1-2 (S.D.N.Y. May 24, 1989).

In New York, at "any time before a judgment is satisfied or vacated," a judgment creditor "may compel disclosure of all matter relevant to the satisfaction of the judgment, by serving upon any person a subpoena[.]" C.P.L.R. § 5223. This is "a broad criterion authorizing investigation through any person shown to have any light to shed on the subject of the judgment debtor's assets or their whereabouts." *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012) (quoting David D. Siegel, *New York Practice* § 509 (5th ed. 2011)); see also *Petrocelli v. Petrocelli Elec. Co., Inc.*, 121 A.D.3d 596 (1st Dep't 2014) (petitioner was "entitled to broad discovery . . ., particularly since the evidence is largely within the possession of the judgment debtors and the transferees").

The documents at issue here are not at all far-reaching; they are merely agreements through which the judgment debtor has allowed hundreds and hundreds of thousands of dollars to pass through his escrow account. He has used some of those funds improperly for personal

purposes, including transfers to his wife, his landlord, Home Depot and American Express (Dkt. 136 at 3-5), and in any event, the Court can infer that since he is doing substantial dollar-figure business with these "clients," he must have received some fees in connection therewith (id. at 4 and 6-7). Benthos reasonably requires these documents – which Mr. Etra has withheld for two years notwithstanding a subpoena and multiple Court Orders – because (among other reasons) they will disclose contact information for the "clients" who have sent and received those funds and likely compensated Mr. Etra for his Escrow Agent services.

He has not claimed to be providing those services for free (and that would hardly be plausible). Yet to this day, he has succeeded in concealing those fees. He has been spending money freely these past two years – including multiple trips to Europe, even during the heart of the Covid pandemic (see Dkt. 136 at 5-8 and pages 7-8 below) – and the source of his income for those travels remains unknown, notwithstanding the best efforts of Benthos and the federal court. We are entitled to pursue all available leads to uncover assets of the judgment debtor that he continues to hide.

<b>No "Privilege" Has Been Established,<br>And None Exists</b>

It is respondent's burden to establish the "attorney-client privilege" he asserts in his Notice of Motion and supporting papers, and he has not remotely done so. Indeed, the facts and arguments he present demonstrate that no such privilege exists.

Mr. Etra's argument, such as it is, amounts to this (Etra Aff.[1] para. 9): "Each and every one of these clients, is a non-party, irrelevant, and has nothing to do with Benthos or anyone connected in any way to Benthos, and Petitioner should have no need of their Escrow Agreement arrangements with Respondent." We have patiently explained to Mr. Etra many times – and, as

---

[1] Mr. Etra supports his motion with an un-notarized document he terms an "affidavit."

a lawyer, surely he understands – that "connec[tion] . . . to Benthos" is utterly unnecessary in judgment enforcement. We are no longer litigating the case that gave rise to the judgment, and we have long since given up tracing the $4.6 million he improperly sent from his escrow account that ended up in China. We are entitled, of course, to identify potential assets of his wherever they may be.

In any event, he makes no claim (nor could he) that the Escrow Agreements he has withheld contain attorney-client communications consisting of the giving or seeking of legal advice. To the contrary, (i) he admits that these were "business transaction[s]" and he does not appear to have been functioning as a lawyer at all; (ii) there are no communications involved; and (iii) the Second Circuit has "consistently held that, 'absent special circumstances, client identity and fee information are not privileged.'" *In re Grand Jury Subpoena*, 781 F.2d 238, 247 (2d Cir.) (*en banc*), *cert. denied*, 475 U.S. 1108 (1986).

Mr. Etra also argues that he supposedly had a subjective belief that the information in the Escrow Agreements "would be protected under applicable law," and that his clients "would believe" the same (Etra. Aff. paras. 12-13). Subjective "belie[fs]" do not create attorney-client privilege where none exists (and as a lawyer, he knows or should know that), and he does not identify the "applicable law" because there is none.

There is thus no legal basis to grant Mr. Etra's motion to quash the subpoena (and in effect void all the prior Court Orders) vis-à-vis the Escrow Agreements, nor (*a fortiori*) to "seal the accounts from which [supposedly] privileged information has been taken."

## Mr. Etra is Openly Signaling That He Will Not Turn Over Most of the Subpoenaed Escrow Agreements Even If Ordered To Do So By This Court

Quite troublingly, although not surprisingly, Mr. Etra is setting the stage to claim that he no longer has access to the Escrow Agreements the Court may require him to produce. See paragraphs 11-12 of his affidavit, where he makes two pertinent points.

First, he writes that "All Escrow Agreements expire automatically after a year when there [*sic*] are to be deleted. Most of the aforesaid list of 31 are much older than a year."

Second, "Those few that were in the one-year period, all were prior to Respondent's computer breakdown on June 29, 2022. . . . They were not recoverable by Apple," which "replace[ed] the equipment with an updated operating system result[ing] in client data being lost."

There is a lot to unpack in those assertions:

- To start with, the Court Order was expressly not limited to Escrow Agreements for the 31 "clients" identified in that order (which was taken from bank statements belatedly produced by respondent, two years late, only after multiple court orders and a brief period of incarceration for contempt of court). See the Court's emphasis in Dkt. 144 at page 3 ("These escrow agreements include, *but are not necessarily limited to*, agreements with [the 31 identified individuals and entities]"). Mr. Etra was (and will be, if his motion is denied) obligated to produce "all escrow agent agreements as to which Respondent is or was a party, whether the escrow agreement is still in effect or not, in effect from August 1, 2018 to the present" (Dkt. 132 page 2, carried forward in Dkt. 144 at 2). Just because petitioner and the Court have been able to identify some such agreements does not mean that list is exhaustive, as noted specifically by the Court.

- Indeed, documents produced by Mr. Etra on August 10, 2022, in response to Dkt. 144, revealed a host of additional escrow transactions, totaling literally millions of dollars, as reflected in bank statements previously withheld from yet another IOLA account (Dkt. 147-6 and 147-7 (duplicates)). Petitioner is not going to list all of those apparent "clients" here, but Escrow Agreements for all of them are encompassed in the Court's prior Orders.

- He writes that the Escrow Agreements "expire automatically after a year when [they] <u>are to be deleted</u>" (emphasis added). He notably does not state that they "were" so deleted; he just seeks to have the Court infer that. (And it would be odd for a lawyer, if he were

5

12272712.4 - 08/26/22

engaged in legitimate transactions – business or legal or both – to be deleting client documents on a regular basis after only one year.)

- He indicates that Escrow Agreements "in the one-year period" appear to have been "lost" and "not recoverable" as a result of his "computer breakdown on June 29, 2022." Interestingly, that was eight days after Mr. Etra had been ordered to produce the Escrow Agreements, and two days before that production was due.

- Also interestingly, his Apple Product Service Summary indicates that the cause of what Mr. Etra describes as the "breakdown" was "Liquid Damage." Mr. Etra does not explain how that supposedly came about.

- Somehow, notwithstanding the purported "delet[ions]" and "lost" client data, Mr. Etra has managed to produce two Escrow Agreements for two of his many dozens of "clients."

- We have no explanation of how many Escrow Agreements are responsive to the subpoena and court orders; nor how many were purportedly "deleted," and when; nor how many were purportedly "lost" after June 29, 2022. Nor has Mr. Etra indicated whether he could otherwise provide contact information for the "clients" whose Escrow Agreements he is apparently poised to claim he no longer has.

With regard to any responsive documents that may in truth have been "deleted," the Court should be aware that Mr. Etra first "objected" to producing Escrow Agreements back on January 29, 2021 (see Dkt. 60-1 at p. 12), on the grounds of "privilege" (id. at p. 8, No. 32). He made no claim then – or ever thereafter until this Court cracked down on him very recently – that responsive documents did not exist because they had been "deleted." And he knew (again, he is a lawyer) that once these documents had been requested (in August of 2020, two full years ago), he should not be "delet[ing]" anything.

And with regard to any "client data" now claimed to have been "lost" on or after June 29, 2022, had Mr. Etra complied with his legal obligations, including the multiple court orders from Judge Nathan, in the twenty-two months preceding the purported "computer breakdown," the documents now claimed to be "lost" would long since have been provided to Benthos.

Mr. Etra's credibility is, needless to say, non-existent (as the Court has recognized on the record). Accordingly, should the Court deny his motion to quash, Benthos respectfully requests

6

that the Court order that if he claims that any Escrow Agreement called for by the court orders at Dkt. 132 and Dkt. 144 (again, "all escrow agent agreements as to which Respondent is or was a party, whether the escrow agreement is still in effect or not, in effect from August 1, 2018 to the present") is no longer within his possession, custody or control, he should be required:

1. To use his best efforts to obtain any such document within twenty days of the Court's order, and for any such document not obtained and produced, to submit an affidavit detailing his efforts in that regard and attaching all supporting documentation (including electronic messages, requests and responses);

2. To identify, for each such document, the information that was filled in on the blank lines on page 1 of each agreement (see the form agreement he has attached to his motion papers);

3. To state, for each such document, the date it was purportedly deleted or lost;

4. For each purportedly deleted document, to state the date and manner of deletion; and

5. In connection with any such documents purportedly lost due to a "computer breakdown," (i) to provide an affidavit specifying in detail the cause of the purported breakdown, including but not limited to the circumstances surrounding any "Liquid Damage," and (ii) to make his computer available, within twenty days of the Court's order, to an expert selected by Benthos for forensic examination at Mr. Etra's expense.

**Mr. Etra's Willful and Prolonged Defiance
Of the Restraining Notice
<u>Should Not Go Unremedied</u>**

In August of 2020, Mr. Etra was served with a restraining notice in connection with the judgment entered by Judge Nathan. (See Ex. 8 to Dkt. 136 previously submitted to the Court, also exhibited at Dkt. 24-2.) We will not recite its contents here, but it is incontestable that over the past two years, Mr. Etra has violated the restraining notice willfully, repeatedly, intentionally and flagrantly, and he undoubtedly is continuing to do so. See, e.g., Dkt 136 at 3-8 and the accompanying exhibits (all previously submitted to the Court).

In addition, on August 10, 2022, Mr. Etra produced previously-concealed bank statements for his Piermont Bank "DDA 2060" account with activity beginning in July 2020

7

through June 2021 (Dkt. 147-2). Those statements reveal that for over ten months, while under the restraining notice, Mr. Etra was spending money freely in New York and around the world, including at least <u>five</u> separate trips to Europe – at least three of which were during the heart of the Covid pandemic and pre-vaccines (while Mr. Etra was claiming to be physically restricted in his ability to comply with judgment enforcement).

He was spending those tens and tens of thousands of dollars, including on airline tickets, hotels and other expenditures in Croatia as well as on clothing and many other purchases in New York, while under the restraining notice and while intentionally withholding the evidence of his violations despite a subpoena and multiple court orders. The statements produced only last month and discussed in Dkt. 136 revealed that he has continued, through the most recent statements provided (for June 2022), to take in and spend tens of thousands of dollars, including (among other things) a $4923 payment to American Express. Benthos still does not know where he is getting all that money from, but he is spending it in defiance of the restraining notice, and daring this Court to do something about that.

This ongoing deliberate misconduct should not be tolerated. Mr. Etra owes Benthos more than $5 million, of which it has been able to collect less than a measly $10,000 through the lucky seizure from one bank account. Meanwhile he has been living it up, traveling internationally and spending money that belongs to Benthos, all with total impunity.

The restraining notice itself, a standard form, provides that "disobedience of this restraining notice is punishable as a contempt of court." No amount of coercive sanctions can remedy the past violations – which, it should be stressed, would not have been able to occur had he not withheld the inculpatory documentation for two years, in the face of multiple orders from

the federal court, until faced with incarceration.  At the hearing on July 13, 2022, the Court mentioned criminal contempt and we ask the Court to now determine whether that is appropriate.

With regard to the undoubtedly ongoing violations, we respectfully appeal to the Court's judgment and discretion as to what might be necessary and sufficient to put a stop to them and to deter future violations.  Surely it is not true that the Court is powerless and that Mr. Etra is untouchable.[2]  Something must be done.

### Conclusion

Benthos thanks the Court for its consideration and ongoing attention to this matter, and respectfully requests that the motion to quash be denied and the cross-motion be granted.

Dated: August 26, 2022

**KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.**

By: _____
    Steven R. Popofsky
    Joshua K. Bromberg

500 Fifth Avenue
New York, New York  10110
Telephone:   (212) 880-9882
Facsimile:   (212) 986-8866
Email:       SPopofsky@kkwc.com
             JBromberg@kkwc.com

Attorneys for Petitioner
   **BENTHOS MASTER FUND, LTD.**

---

[2] He has not changed his *modus operandi* one whit.  The day before the most recent court appearance, at which Mr. Etra feared he would be incarcerated again, he had a colleague call Benthos's counsel requesting an adjournment, saying that he "fully expected" to send Benthos "at least" a "minimum $100,000" "this week" – claiming he had been "expecting" to have that money "today" – and that he was "confident" he would have at least seven figures to settle the matter, and "can help end this situation in the next day or two," "if you can stop something from happening tomorrow."  At the hearing, the Court did not incarcerate Mr. Etra and allowed him to move to quash the subpoena with regard to the Escrow Agreements, making that motion returnable in September.  Needless to say, the $100,000 never appeared and Mr. Etra's colleague has not been heard from since.  (Popofsky Decl. paras. 3-4)

9