UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                   :

BENTHOS MASTER FUND, LTD.,          :     Case No. 20V-03384(VEC)

                                   :

                Petitioner,   :

       -against-                 :     DECLARATION OF AARON ETRA

                                   :

Aaron Etra,                        :

                                   :

                Respondent.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                   :

I, AARON ETRA, under the penalty of perjury, declare the following:

    1.     I am the Respondent in the above-captioned action and respectfully submit this Reply in response to Petitioner's opposition papers and in further support of Respondent's motion to quash all or, at minimum, that part of Petitioner's subpoena that requests all or any part of privileged documents and related information, personal and financial, as the release of such material as would (i) invade the protection of the attorney-client privilege; and (ii) subject the party served to undue burden; and in opposition to Petitioner's Cross Motion for other relief.

    2.    The Court, in Judge Caproni's most recent Order of August 2, 2022 reminded the parties that if Respondent brought a Motion to Quash, that the parties "**must** brief only the narrow legal issue of whether the escrow agreements are privileged recognizing that the names of clients, which Petitioner represented at the August 2, 2022 hearing was the only material it sought".

    3.    While Respondent followed this Court's requirement, Petitioner did not, and instead of briefing on the narrow legal issue of whether the escrow agreements are privileged

as Respondent did, Petitioner chose to include a cross motion for the spoilation of documents, and within that cross motion, brought in a varying culmination of requests, including but not limited to, a contempt of court paper without directly calling it so, but basically asking for it in his relief, and including several arguments to support that relief, including many about a restraining /enforcement action -- all outside the narrow issue of the privileged escrow agreements, as well as including new information about an out of court settlement conversation that also had nothing to do with the narrow issue of privilege.

4.     Petitioner also combined both his opposition to Respondent's Motion to Quash as to whether the escrow agreements are privileged, and his support of his Cross Motion for spoilation of documents, and other such issues as described above, in the one Memorandum of Law, cleverly hoping that the Court would be so convinced by the superfluous and allegations/mis-statements outside the scope of the Court's limited parameters, as to give Petitioner additional license for its so duplicative and over-reaching enforcement and restraining action, which is not even the subject matter herein of privilege, violating the Court's order.

5.     This approach puts yet more undeserved and inappropriate burdens and choices on this pro se Respondent, with varying consequences.   Should Respondent follow Petitioner's lead and go all over the place in his Reply papers, he would be violating the narrow scope of the Court's instructions for the motion, thereby also violating the court's order.   For Respondent not to respond to any of the detailed and out of the scope statements and contentions of Petitioner's statements, he runs the risk of the Court being completely prejudiced by what the Petitioner has submitted, carrying over to his Motion to Quash for the privileged documents.

6.      Therefore, for the reasons stated thus far, Respondent is asking the Court to deny Petitioner's Cross Motion entirely.   Respondent should not have to prepare a defense to those additional issues in Petitioner's opposition, and if it is decided for any reason that he should have to mount such a defense, Respondent had no litigation experience to prepare such a defense, and no funds to engage an attorney for this type of case that could run into hundreds of thousands, and if this defense is needed, Respondent renews his request to the Court to assign an attorney that could handle this type of matter.

7.      Respondent wishes at this time to take this limited opportunity to make an effort to reduce the misinformation and/or correct any mis-statements of Petitioner, that were included throughout his papers to severely prejudice the Court against Respondent.

8.      As to the spoilation of documents claim in Petition's Cross Motion, the Court needs to know the absurdity of this implication that Respondent would have in any way wanted to make his computer inoperable.  We live in a world of electronics where periodically our equipment goes wrong beyond our control.   Respondent chose Apple as his choice of computer because of the reports on its reliability over the standard PC, and relied on those reports for choosing an Apple computer as the one computer he would need and rely on for his basic working platform.  Respondent does not ever put any liquids near his computer and is extremely careful with the handling of his computer.

9.      When he first took it to Apple at Grand Central at the end of June, after the problem first developed and it was no longer operable, they said they would try to solve it in that facility if it were possible, as it looked without external sign of damage.  After Apple's first tech review, Respondent was told that the computer would need to go to a higher tech service for repair, because they detected more major internal conditions, including possible damage

by an accumulation of condensation within the computer, and all of these conditions needed

more major remediation. In fact, the higher tech service had to change major parts in the

computer and had to install a new operating system in connection with which they had warned

that data could be lost. Having the one computer, inoperable, there was no other choice to

make but for Apple to do what they had to do to make the computer functional.

10.    Respondent did inform the Court of this incident in his letter the first week of

July at the time of the incident [see attached letter]:

> On top of everything [when he was hit by a bus], my computer died, which is my
> only computer and contains all my records and data.   It had to be left with Apple
> for extensive repairs [see Apple receipt], and should be in their shop for about a
> week or so.  I am currently only able to use my cellphone to communicate by voice
> and text, including with Your Honor, but cannot access documents or files on my
> computer.

11.    This was a nightmare breakdown because at the time, Respondent was not sure

what was going to be retrievable and what was not. But after the two thorough inspections,

the conclusions and remedial action of the 2 Apple tech facilities, which work with this

equipment on a daily basis, concluded that the operating system and other parts needed to be

replaced.  Whatever they did worked giving Respondent a totally functional computer with a

new operating system, but unfortunately losing valuable data.

12.    This laptop is my only computer and I am completely dependent on it. It is also

my health lifeline to communicate with the hospital and my doctors. It also houses private and

privileged material.  Therefore, any request to take it for any period of time as mentioned in

Petitioner's Cross Motion, would deprive Respondent of the use of this essential tool for no

valid purpose, as the Respondent has been compliant in providing anything required that was

on his computer.

13.    Also, in response to other prejudicial statements made by Petitioner also outside the scope of the Motion, Respondent wants to remind this Court that this case has gone on since 2018 and before 4 judges, to whom Respondent has made clear, including by providing hundreds and hundreds of pages of bank statements, other documents such as copies of outstanding rent notices and copies of sums due to credit card companies, that he had before, during those years, and now.  There was since 2018 and is now no way for Respondent at 81 to personally and alone ever generate a sum anywhere near the size of the judgment.  Petitioner has demonstrated, in filings with all the judges and as recently as in the papers they have last been filed with this Court, that Petitioner knows independently from outside the Court, in addition what has been provided by Respondent over these four years, all about these very limited resources of Respondent and his activities, making it of no value to Benthos and of continuing significant damage to Respondent, further enforcement action and restraint, rather than support for settlement efforts, which Petitioner's counsel periodically recognizes and the Court has been  respectfully requested to also support.

14.    While outside the scope of the privileged escrow agreements, but brought up by the Petitioner in great detail, it should be clear that Petitioner truly needs no further assistance from the Court by way of enforcement action or restraining orders supported by the Court, because with the full knowledge of Petitioner's counsel, repeatedly conveyed to Plaintiff's counsel, and actually recognized by Mr. Popofsky directly, it has been crystal clear that the only option of any value to Benthos was for Respondent to seek outside help to meet the goal that was clear from the very outset of this matter, which was to find funds for a settlement.

15.    There is now and has been one source that was willing to help, in spite of Petitioner's egregious accusations in court papers, public pronouncements, and the internet,

maligning Respondent for this failed business transaction for which he was not responsible. This person is Melvin Dussel, who also wrote a letter to Judge Parker (attached) making clear his admirable intentions.   It is in that very constructive spirit that Mr. Dussel called Mr. Popofsky the day before Respondent's recent court date. This constructive effort has now been misconstrued by Mr. Popofsky to prejudice the Court, making it necessary for Respondent to unnecessarily explain.  When the call was made by Mr. Dussel to Mr. Popofsky, Mr. Dussel believed that his source of these funds, sufficient for the settlement amount called for by Mr. Popofsky, were going to be available within the following days, and he wanted to discuss how to implement the settlement with Mr. Popofsky, and stop the pain and injury that Respondent has been facing because of the overbearing enforcement and restraining action. As a caring person, Mr. Dussel saw no reason why Respondent should have to suffer further unnecessarily when he believed that he would have at a minimum, a substantial good faith deposit for Petitioner in a few days.   What Mr. Dussel did not foresee at the time was that the main party for his source of funds would have to get additional medical procedures because of his long term Covid, so that he would be able to travel, which was necessary to obtain the funds, and because his health took a turn for the worse, everything was delayed.  Currently, we wait for the imminent progress, to finalize these arrangements.

### CONTRARY TO PETITIONER'S CONTENTION, THE ESCROW AGREEMENTS ARE PRIVILEGED

16.    Petitioner, as mentioned above, in his Memorandum of Law violated the Court's August 2nd order in that it contained material outside the scope of the Motion to Quash to the narrow issue of whether or not the escrow agreements were privileged.    Also stated in that Order was that Respondent's Reply was to be restricted to 5 pages, as Your Honor could not have known at the time that Petitioner's opposition papers would not only include a Cross Motion, but include all the superfluous material that Respondent is being forced to respond to

in order to dispute the prejudicial and mis-statements, such as the details of the Apple computer damage, the settlement attempt by Mr. Dussel, the Restraining order, all while still making it necessary to respond to what should be the only part of the motion -- whether the escrow agreements were privileged.

17.    Therefore, Respondent, through no fault of his own, has to exceed the 5-page limit as it already took most of the 5 pages just to respond to Petitioner's papers on the above-referenced issues, rather than doing the Reply on what should be the only issue, privilege as to the escrow agreements.   Respondent also will not endeavor to deal with Petitioner's complex caselaw for any such arguments, because as mentioned earlier, that would require extensive legal research by one knowledgeable in such.  Respondent has no legal assistance, research tools or representation, and cannot afford any of these assets without the assistance of the Court to grant such help.

18.    Therefore, Respondent will address the one such argument that Petitioner made that was relevant to the Escrow Agreements, which is, that Respondent's Escrow Agreements are not privileged because they are business documents, an argument that is simply incorrect. Respondent's Escrow Agreements do deal with the client's activities as all interactions between attorney and client do.  As explained in Respondent's Motion, these Agreements reflect and follow private attorney-client discussions and consultations before each such Escrow Agreement is finalized with the client.   This if followed by attorney-client contacts during the 12-month term of each agreement.

19.    Attorney-client privilege is not limited to designated subjects or content. It cannot be If it is to serve its purpose. Nor can documents created as part of the privileged interaction be excluded from its coverage. The circumstances here, of which the agreements

are a part, are fully within the desired ambit of the privilege in enabling an attorney and his client to discuss and document together matters on which the confidentiality and non-disclosure offered by the privilege are so important.   These principles are clear and even though Respondent is unable to support these statements with caselaw for the reasons explained above, these basic principles of law and equity are clearly on the side of Respondent.

20.    In looking at the widest possible scope of subject matter and content of the attorney-client privilege, one notes its current extension to matters in the documents of Mar-A-Lago as well as other activities, including business/taxes of Donald J. Trump and his enterprise in New York State.

**WHEREFORE**, it is respectfully requested that this Court grant Respondent's motion to quash Petitioner's subpoena as to the Escrow Agreements or any part thereof, and seal the underlying Escrow Attorney bank statements from M&T Bank and Piermont Bank, from which the Escrow Agreement list of names was procured by Petitioner, and also recognize that any consideration of Plaintiff's counsel's other claims, allegations, demands for enforcement and restraint are untimely, inappropriate, violative of due process,  unduly burdensome, injurious, cruel and inhumane, hence unconstitutional. Thus, no determination, and certainly no support of them should take place at this point in time and without more briefing, based on all the submissions to date of Plaintiff and Respondent; and for this Court to deny Petitioner's Cross Motion in its entirety, and for such other and further relief as the Court deems just and proper.

Dated:  September 16, 2022                                    Respectfully submitted,

                                                             Aaron Etra, pro se
                                                             240 East 47th Street, #12A
                                                             New York, New York 10017
                                                             Telephone: (917) 856-3500
                                                             Email:  aaron@etra.com