UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- x
                                         :
**BENTHOS MASTER FUND, LTD.,**           :
                                         :
                         Petitioner,     :
                                         :   Case No. 20-cv-03384 (VEC)
            - against -                  :
                                         :
                                         :
**AARON ETRA,**                          :
                                         :
                         Respondent.     :
                                         :
---------------------------------------- x

## PETITIONER'S MEMORANDUM OF LAW
## WITH REGARD TO RESPONDENT'S FOREIGN BANK ACCOUNTS
## PURSUANT TO THE COURT ORDERS AT DKT. 146 AND 188

KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
500 Fifth Avenue
New York, New York  10110
Telephone:    (212) 880-9882
Facsimile:    (212) 986-8866

Attorneys for Petitioner
   **BENTHOS MASTER FUND, LTD.**

Petitioner Benthos Master Fund, Ltd. respectfully submits this memorandum of law in connection with Judge Parker's August 3, 2022 Order at Dkt. 146, as supplemented on the record on October 6 and by Dkt. 188 the next day.

## The Legal Issue

As framed by Judge Parker (Dkt. 146; emphasis by the Court), the issue at hand is whether respondent Aaron Etra had "the right, authority, *or practical ability* to obtain" bank statements for foreign accounts at UniCredit (or an "affiliate" thereof) and Sberbank that previously had been identified (albeit incompletely) by Mr. Etra.

## How We Got Here

On August 3, 2022, upon reference from Judge Caproni, Judge Parker scheduled an in-person hearing for October 6 (Dkt. 146) "to address the question of whether Respondent has control over the documents in question," and ordered that "[t]he parties shall be prepared to present witness testimony and evidence as well as argument." The Court added that:

> Specifically, Respondent shall bring witnesses (e.g. Mr. Helmut Allesch and clients) who can provide testimony regarding the accounts in question, including testimony as to the identity of any owners, managers, fiduciaries, and/or beneficiaries of the accounts. Respondent shall also bring documents regarding the accounts at issue, including documents showing what type of accounts they are . . ., who owns and/or manages the accounts, the identity of any individual or entity with a beneficial interest in the account, documents appointing Allesch as fiduciary, and any client agreement between Petitioner and the clients whose accounts are maintained at the banks. Respondent shall be prepared to authenticate any documents provided. Additionally, to the extent any documents are not in English, Respondent shall provide a certified English translation.

The Court also ordered that "[t]o the extent any witness resides abroad and needs to testify via teleconference or video, the parties shall inform the Court by letter by no later than **Friday, September 30, 2022**" (emphasis by the Court). Neither party so informed the Court.

Two days before the scheduled hearing, Mr. Etra wrote to the Court enclosing material previously submitted to Judge Caproni (including a July 16, 2022 letter from Helmut Allesch), requesting that the hearing be "cancelled" because his submission purportedly "makes the facts as clear as can be, and . . . there is nothing more I can provide as evidence or that needs to be said by me about the ownership or operation of the accounts. . . ." The Court denied his request (Dkt. 185).

On the morning of the hearing, Mr. Etra wrote to the Court that "I woke up this morning shivering, sneezing and coughing" and asked the Court to "Please advise what you want me to do regarding the hearing." Petitioner suggested that the hearing be held remotely, and the Court agreed and scheduled a Teams videoconference. (Dkt. 186)

When the remote hearing convened, Mr. Etra called in by phone only, and claimed to be "in bed" and was coughing.[1]  When the Court stated that the hearing would be adjourned, and that the earliest available or offered date would be November 9, petitioner's counsel stated that since he was going to present petitioner's case, on the existing record, solely upon cross-examination of Mr. Etra, presentation of documentary exhibits and argument, petitioner could present its case on papers to speed things along.  The Court agreed (Dkt. 188).

Petitioner is proceeding on the understanding that briefing is on the existing record.  Mr. Etra did not claim to be sick before the "morning" of the October 6 hearing date, and previously had stated that he had "nothing more [to] provide" than what he submitted on October 4; and of course he had not identified any remote witnesses by the deadline of September 30.  Accordingly, while Mr. Etra is free to submit argument in response to this brief, petitioner has not agreed that by virtue of his sudden illness on October 6, everything that came before may be disregarded and that he may reopen the record in response to this brief.  He should not be permitted to do so.

**The Relevant Facts Giving Rise To the Inference Urged by Petitioner**

The Court should conclude, based upon the following undisputed and indisputable facts, that Mr. Etra had "the practical ability" to obtain the bank statements in question.

---

[1] The Court noted on the record that at the previous remote evidentiary hearing conducted by Judge Parker, on February 16, 2022, Mr. Etra also claimed that illness precluded his effective participation.  At that time, when the judge took over questioning Mr. Etra and asked him difficult questions about why someone who purported to live a simple life had over two dozen accounts open during a two-year period, he began coughing so incessantly that the Court terminated the remote hearing.  After the recent hearing, the Court ordered that he provide "a doctor's note stating that he was in fact unable to participate in the Evidentiary Hearing due to health reasons" (Dkt. 188).  Presumably the Court will determine whether he has complied.

**Mr. Etra Himself Disclosed the Accounts In Question**

Mr. Etra is a licensed attorney and a member of the Bar of the State of New York. (See Ex. 4, Dkt. 95, at p. 27.) On Apr 12, 2019, he gave deposition testimony – pursuant to subpoena and under oath – in a state-court case brought against Mr. Etra's co-conspirators in the underlying fraudulent scheme that gave rise to the judgment being enforced in this matter. (See Exhibit 1.)[2]

At that deposition, after stating that "I bank in several banks," he was asked the following questions and gave the following answers:

> Q. Do you have a European bank account?
>
> A. Yes.
>
> Q. At what bank is that account?
>
> A. That bank is a bank in Europe.
>
> Q. What bank is it?
>
> A. That bank has nothing to do with this transaction.
>
> . . .
>
> Q. Just to be clear, sir – are you refusing to tell me the name of the European bank at which you hold an account?
>
> A. I am not refusing. I am saying it has nothing to do with this transaction and is not relevant.
>
> Q. That may be well be true, sir, but I am asking you the name of the bank. Are you going to answer the question?
>
> A. It is a confidential arrangement between me and my bank.
>
> Q. The identity of the bank is a confidential arrangement between you and the bank?
>
> A. It is a confidential arrangement because it has nothing to do with the transaction, nothing to do with Benthos, nothing to do with anything that we are discussing here.

(Ex. 1, Dkt. 56-5, at pp. 249, 251)

Subsequently, during judgment enforcement, Mr. Etra responded on January 8, 2021 to an Information Subpoena (Ex. 2). Request No. 1 was "List all bank accounts, brokerage accounts,

---

[2] The exhibits cited in this brief were previously supplied to the Court, and to Mr. Etra, on October 6.

3

investment accounts, checking accounts, savings accounts, and all other accounts, whether in the United States or any other country, in which Etra has (or had) an interest, whether in Etra's name individually, jointly, in trust, as custodian, as nominee, as a beneficiary or in conjunction with any other person or persons . . . since August 1, 2018." In response, Mr. Etra wrote (emphasis added):

M&T Bank, Citibank, HSBC, <u>Uni-credit affiliate</u>,<br>JP Morgan, City National Bank, TD Bank.[3]

Mr. Etra himself, in that response, told petitioner about his account at a "Uni-credit affiliate."

Mr. Etra also told petitioner about the Sberbank account. (In other words, it is not that petitioner identified these two accounts and asked Mr. Etra about them and he denied that they were his.) On November 23, 2021, Mr. Etra supplied two pages of a partly-untranslated Sberbank statement, as demonstrated by Exhibit 3 (Dkt. 86) at 5-6.

On March 14, 2022, Judge Parker issued a Report and Recommendation stating, among other things, that "The untranslated two-page document supposedly pertaining to his European accounts is insufficient." (Ex. 4, Dkt. 95, at p. 24) Judge Parker recommended that Mr. Etra be ordered to produce "the full set of monthly statements for the Uni-Credit account . . ." and "the full set of monthly statements for the . . . [Sberbank] account . . . for which a two-page untranslated document was previously provided" (id. at p. 32). On May 16, 2022, Judge Caproni adopted those recommendations verbatim and ordered that those statements be produced (Ex. 5 at 5).

On July 14, 2022, after several other interim orders and massive non-compliance on the part of Mr. Etra, Judge Caproni again ordered him to produce the Uni-Credit and Sberbank statements. (See Ex. 6, Dkt. 132, at p. 4) He did not do so.

**Mr. Etra's Concealed European Trips**

Between August 2020 and May 2022, Mr. Etra flew to Europe on no fewer than <u>nine</u> (9) separate extended trips (Ex. 7), at least three of which were before Covid vaccines were available

---

[3] That response, twenty-one months ago, turned out to have omitted many other accounts, including those through which Mr. Etra banked on a daily basis, some of which were pried out of Mr. Etra only after he violated multiple court orders, and others of which he identified only after having been incarcerated by Judge Caproni for repeated contempt of court. See, e.g., Ex. 17 at p. 54: "I cannot fathom, Mr. Etra, the reason why we did not get the other Piermont account – in a million years, I don't understand it – beyond willfully hiding assets."

4

12289295.8 - 10/13/22

(August-September 2020, November 2020, and December 2020-January 2021) – meaning that at the age of almost 80 and in claimed ill-health, he was flying around the world, for weeks at a time, while neither he nor anyone else was vaccinated and while people were dying of Covid left and right.

He also traveled to Europe in April 2022, just after Judge Parker's recommendation that he be ordered to produce the Uni-Credit and Sberbank statements, and again in May 2022, just after Judge Caproni issued such an order.

Mr. Etra spent thousands of dollars on those trips, but did not disclose the trips or the spending until two months ago, in August 2022, after Judge Caproni incarcerated him for contempt of court.[4]  Indeed, he had concealed those expenses and those trips since September of 2020, when his responses to Benthos's initial judgment-enforcement subpoenas were due.  (See also Ex. 2, next-to-last page, where his response to No. 27, which inquired specifically about "transportation" expenses among others, did not disclose any transportation expenses whatsoever.)

Over the past two years, hundreds and hundreds of thousands of dollars passed through Mr. Etra's attorney escrow accounts, pursuant to Escrow Agreements he had with over three dozen individuals and entities from all over the world, including (in Europe alone) Spain, Croatia, the UK and Portugal.  (See Dkt. 182, Dkt. 182-1, Dkt. 136 at 3-4 and Exs. 3 and 4 to that letter.)[5]

Mr. Etra concealed that flow of funds through his escrow accounts for two years, until this past July after Judge Caproni incarcerated him.  (See Dkt. 140-1, item No. 1, referring to statements produced only on July 19, 2022 and not denied in Mr. Etra's response at Dkt. 141.)  Furthermore he concealed the actual Escrow Agreements containing the names and locations – all those European and international locations – of the people and entities with whom he was doing business

---

[4] We have his records only through June of 2022, as he has refused to produce more recent statements notwithstanding having been subpoenaed and ordered to do so.  Indeed, as late as October 7, he served documents purporting to be responsive to a recent subpoena duces tecum (discussed further below, and see Dkt. 192), but he produced no new, recent or current bank statements (i.e., no statements since the ones he produced in July after his incarceration).  He likely has continued his frequent European travels in recent months.

[5] Those exhibits were provided to Judge Caproni and can be made available to Judge Parker if necessary.

until the end of September 2022.  (See Dkt. 182 and 182-1.)  And even then, he produced only around one-quarter of the Escrow Agreements required.  (See Dkt. 183 and Dkt. 184 at 2.)

**The Sberbank Document Supplied By Mr. Etra**

Sberbank is a Russian bank.[6]  Mr. Etra had sought to utilize Sberbank in the underlying transaction with Benthos that gave rise to the judgment being enforced here (see Ex. 8).  And in that underlying transaction, Mr. Etra claimed that the seller of the Bitcoin for which Benthos entrusted $5 million to his escrow account was a Russian named "Dmitri" (Dkt. 1-1 at para. 24).[7]

The Sberbank statement initially was sent to petitioner by Mr. Etra in November of 2021 (Ex. 3).  In August 2022, he provided it again, together with a letter from someone named Helmut Allesch.  See Ex. 10 at 11-15.[8]  The version of the Sberbank statement Mr. Etra sent at that time contained red typing that was not on the original version provided months earlier, with Mr. Etra explaining (Ex. 10, p. 11, ¶ 13) that "the red typing" was done "for clarity/legibility purposes."

Considerable language on the statement was retyped in red.  For example, in the upper right, "SEPA PAYMENT ORDER" was on the original statement and then retyped in red, although it was not necessary for it to be retyped at all as it was totally clear and legible in the original.  Similarly, just below that, "ORDERING CUSTOMER'S DATA" was in very legible English on the original; and the same is true of virtually all the other red typed entries – they all were just repeating, in red English, what was already there quite legibly in black English.

However, what was not set forth in red (or at all) for "clarity/legibility purposes" was the actual amount in the account.  Indeed, Mr. Etra gave petitioner a wholly unnecessary retyping of the English words "Amount in the currency of the account," and of the English words "Amount in words," but did not provide in English what that amount (which is in a foreign language in words, and is not in fact legible in words or numbers) actually was.

---

[6]The Court can take judicial notice of this fact, given the extensive publicity surrounding sanctions placed on Sberbank as a result of the Russian invasion of Ukraine.
[7]Similarly Uni-Credit is a bank that services Eastern Europe; see Ex. 9 ("UniCredit is a pan-European Commercial Bank with a unique service offering in Italy, Germany, Central and Eastern Europe").
[8]Mr. Allesch, in his letter, misspelled the name of the bank whose account supposedly was his (Ex. 10, Dkt. 141 at 12).

6

In addition, the stamped date on the Sberbank statement (in the upper right, above the foreign words, faint but legible) is the 20th of November 2018, which was five days after the parties appeared in court in front of the late Judge Batts, who ordered Mr. Etra to return $400,000 of petitioner's money that he was refusing to return, and who threatened to incarcerate him if he did not comply. ("Mr. Etra, pack your toothbrush.") See Ex. 11, Dkt. 24-21, last page.

**Mr. Etra's Failure To Provide Documents In Response to Subpoena**

On August 2, Mr. Etra was served with a supplemental subpoena duces tecum and supplemental information subpoena. The former called for (inter alia) "All documents concerning communications since the date of the Judgment . . . sent or received by You concerning [inter alia] . . . petitioner's judgment enforcement efforts, to or from any person or entity whatsoever . . . including, but not limited to . . . Helmut Allesch." (Ex. 12, at 5, Request No. 1; emphasis added). Request No. 1 of the information subpoena asked for assorted information about any "legal, 'paymaster,' escrow-related or other services" he has performed over the past five years (Ex. 13), and the document subpoena requested "all documents, including . . . written communications, concerning [those] services referred to in item No. 1 of the . . . Information Subpoena" (Ex. 12, Request No. 5).

Documents responsive to those requests likely would have revealed what has been going on with the escrow accounts, Mr. Etra's extensive services in (and trips to) Europe and abroad, details of his compensation (how much and to where), and – critically – who had practical control over the Sberbank and Uni-Credit accounts and his interactions with Mr. Allesch in that regard. Not at all surprisingly, however, Mr. Etra produced not a single such responsive document – zero.[9]

Specifically, the purported responses Mr. Etra finally served on October 7 contained not a single e-mail or text exchange with Mr. Allesch, not a single phone record, and literally nothing – nothing at all – concerning the Uni-Credit account, or the Sberbank account (other than the same

---

[9] Mr. Etra repeatedly sought to delay and then quash his obligation to respond to the subpoenas. See Exs. 14 and 15, Dkt 158 et seq. and 164 et seq., and Ex. 16 (Dkt. 174) at p. 13, where Judge Caproni denied the motions to quash, holding that they were untimely, but that "Even overlooking Etra's procedural default, his objections to Petitioner's subpoenas are groundless."

old two-page untranslated statement), or any purported efforts by Mr. Etra to obtain the statements he had been ordered to produce.[10]

Thus, even though he had been told that "We have a court hearing scheduled for October 6th. The subpoenaed material (and/or your refusal to provide it) will be an important part of the preparation for that hearing" (Ex. 14), and notwithstanding Judge Parker's August 3 Order (Dkt. 146), Mr. Etra has chosen to produce no admissible evidence on the issue for decision. The negative inference is glaring, and should be drawn by the Court.

## Argument

The Court set the standard in Dkt. 146: Does Mr. Etra have "the right, authority, or practical ability [emphasis by the Court] to obtain" the statements for the UniCredit and Sberbank accounts initially brought to petitioner's attention by Mr. Etra? The Court should conclude that he did.

As a threshold matter, Mr. Etra has not actually denied, clearly and unambiguously, his ability to obtain the statements if he wanted them, and certainly has not done so under oath. He presented the Court only with a hearsay letter from someone named Helmut Allesch purportedly in Austria, and then disregarded the Court's directive – or strong suggestion – that he "bring witnesses (e.g. Mr. Helmut Allesch and clients) who can provide testimony about the accounts in question . . . [and] shall also bring documents regarding the accounts at issue" (Dkt. 146 at p. 2).

In other words, when offered the opportunity to have Mr. Allesch, or anyone else, appear in support of his position, he chose not to avail himself of that opportunity, despite having had more than two months to prepare. He was not willing to have Mr. Allesch, or any other witness, testify under oath and subject themselves to cross-examination.

Judge Caproni told Mr. Etra on July 13 that "monthly statements for Uni-Credit and Sberbank have not been produced, nor have you adequately produced something that would excuse

---

[10] Mr. Etra sent his non-responsive responses to the pro se office, which filed only his cover letter (Dkt. 189). Petitioner accordingly filed his attachments at Dkt. 192. He merely produced again the old letter from Mr. Allesch that raised more questions than it answered and was hearsay in any event, thereby giving rise to the order for this hearing as to which Mr. Etra declared "there is nothing more I can provide as evidence or that needs to be said by me."

8

you from production" (Ex. 17 at p. 33). Nothing has changed since then, as Mr. Etra has presented no admissible evidence whatsoever on his behalf. However, a denial under oath, even if assumed, would be far outweighed by the host of facts and circumstances from which the Court can infer that he had the practical ability to obtain the statements, if he wanted to do so.

- Most significant – and, we respectfully submit, itself dispositive – is his failure to produce <u>any</u> documents bearing on this issue, including communications between himself and Mr. Allesch (that letter did not suddenly materialize in Mr. Etra's in-box out of thin air), notwithstanding a clear and precise subpoena, following which he was told expressly that his responses (or failure to respond) would be used in this hearing.

But there is much more:

- He previously admitted, under oath, having at least one European bank account.

- He himself identified these two accounts to petitioner as his. (There would have been no reason to identify accounts in which he had no interest, or to involve Mr. Allesch gratuitously.)

- Hundreds and hundreds of thousands of dollars flowed through his attorney escrow accounts over the past two years, in transactions involving many international individuals and entities, including several in Europe.

- He traveled repeatedly to Europe over the past two years, including at least three times when he and the rest of the world were unvaccinated at the height of the Covid pandemic. He must have been doing very important business there.[11]

- Two of those trips were right after Judge Parker recommended, and then after Judge Caproni confirmed, that he was ordered to produce the statements.

- He deliberately hid all of those international and European escrow transactions, and all of those European trips, from petitioner for two years, going to extreme lengths to conceal them: He violated several successive orders from different federal judges; he refused to identify multiple bank accounts that he was actively operating on a daily basis; and he withheld all of those statements until after Judge Caproni incarcerated him to coerce some minimal level of compliance.

- He sought to use Sberbank in his underlying fraudulent business transaction with petitioner. Sberbank is a Russian bank and he had claimed that the money he misappropriated from his escrow account was going to go to a Russian individual named Dmitri who was supposedly going to deliver Bitcoin in exchange for the money.

---

[11] On October 6, he wrote to this Court that "My travels have been limited to…sources of therapy…where it is available" (Dkt. 186 at 3). That strains credulity, and the Court need not accept it, particularly given the absence of any corroborating expenses in Ex. 7 (which shows plenty of restaurant and hotel expenses), or any corroborating evidence at all, as well as the length and frequency of the trips, the restrictions on (and inadvisability of) travel early in the pandemic, and the high-quality medical care known to be available in New York and the United States.

12289295.8 - 10/13/22

- He faux-helpfully provided petitioner with a second copy of the untranslated two-page Sberbank statement, previously found insufficient, with red retyping of words that needed no retyping at all, for what he disingenuously termed "clarity/legibility purposes"; yet he chose not to provide the account's amount, which was not "legib[le]" or "cl[ear]" on the face of the statement.

- The Sberbank statement, supposedly "closing" the account (Ex. 3 ¶ 3), bore a date that was 5 days after the late Judge Batts had ordered him to return $400,000 to petitioner.

Against all of foregoing, the Court has (at most) Mr. Etra's say-so. If this issue were being determined on a clean slate, his uncorroborated say-so would not be credible in light of the above. But of course Mr. Etra is a known quantity at this point, with credibility that is non-existent and an established proclivity for dishonesty:

- In 2016, the Appellate Division affirmed that he had misappropriated funds (in an unrelated matter) from his attorney escrow account (*Grasshof v. Etra*, 135 A.D.3d 574 (1st Dept. 2016)), just as the arbitrator found he had done here.

- After Judge Parker's evidentiary hearing in this matter, she wrote in her Report and Recommendation that his testimony was "not credible" (Ex. 4 at 19).

- Judge Caproni told Mr. Etra on July 13, 2022, that "I cannot fathom…the reason why we did not get the other Piermont account – in a million years, I don't understand it – beyond willfully hiding assets" (Ex. 17 at 54).

- Judge Caproni also told Mr. Etra at that hearing that "you lied to me"; and she stated that "His representation on any fact means nothing to me, because he clearly will say whatever he thinks is convenient at the time, including: 'I have a European bank account'; 'I don't have a European bank account'; bank account? What bank account? Not my bank account. It was a fiduciary's bank account.'" So a representation from Aaron Etra means nothing in this court." (Ex. 17 at 36, 55).

- Finally, Judge Caproni quite recently wrote that "<u>Given Etra's tendency to prevaricate, his say-so is of virtually no value</u>" (Ex. 16 n.8; emphasis added).

Accordingly, the Court should infer that Mr. Etra has the practical ability to obtain the bank statements at issue.

Dated: October 13, 2022          **KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.**

By: _____
Steven R. Popofsky
500 Fifth Avenue
New York, New York  10110
Telephone:  (212) 880-9882
Email:  SPopofsky@kkwc.com

10