UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BENTHOS MASTER FUND, LTD.,

                        Petitioner,

              - against -

AARON ETRA,

                        Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 20-cv-03384 (VEC)

**DECLARATION OF
STEVEN R. POPOFSKY**

I, **STEVEN R. POPOFSKY**, declare the following:

1. I am affiliated with Kleinberg, Kaplan, Wolff & Cohen, P.C., counsel to Petitioner and judgment creditor Benthos Master Fund, Ltd. I respectfully submit this declaration in support of petitioner's motion to hold Respondent (a Member of the Bar) in civil and criminal contempt of court, and to impose effective remedies to not only coerce compliance, but also prevent future non-compliance and punish past willful and egregious non-compliance, with various court orders, subpoenas and restraining notices.

**The Judgment At Issue**

2. Benthos holds a judgment against Respondent in the amount of $5,254,561.12 (Ex. 1), plus accumulating interest, pursuant to the Court's August 12, 2020 Memorandum and Order (Ex. 2) confirming an arbitration award rendered on April 9, 2020.

3. Respondent has paid nothing on the judgment. Benthos has been able to collect only roughly $8,000 from other sources.

**The Underlying Arbitration Award**

4. Respondent served as Escrow Agent in a transaction pursuant to which Benthos, an investment fund run by several then-recent college graduates, transferred $5 million to his escrow account and was supposed to receive a quantity of Bitcoin in response (Ex. 2 at 1). The arbitrator, in his lengthy and detailed award (Ex. 3), found that Respondent's subsequent transfer of $4.6 million of Benthos's money to Hong Kong and China was, in the words of the Court in its confirmation order, "unauthorized and a breach of Respondent's contractual and fiduciary duties" (Ex. 2 at 4). As further described by the Court, the arbitrator also found that "the breach was either the result of gross negligence or willful misconduct" by Respondent (*id*.).

**The Subpoenas and Restraining Notices Defied By Respondent**

5. On August 27, 2020, Benthos served Respondent with a subpoena duces tecum (Ex. 4) and a restraining notice with information subpoena (Ex. 5).

6. After almost two years of non-compliance, defiance, concealment and repeated misrepresentations, on August 2, 2022 Benthos served a more specific subpoena duces tecum (Ex. 6) and another restraining notice with more specific requests in an information subpoena (Ex. 7).

**Background of Applicable Court Orders**

7. On May 16, 2022, this Court (Caproni, D.J.) issued an order (Ex. 8) adopting in part a Report and Recommendation of Magistrate Judge Parker dated March 14, 2022 (Ex. 9). Those documents recount the sorry history of Mr. Etra's contumacious behavior up to those points in time, all of which behavior should be deemed incorporated by reference herein, but which was summarized by Judge Caproni on September 26, 2022 (Ex. 10 at 1):

> [For] over two years . . . Etra has repeatedly failed to produce documents and information about his finances and has persistently and flagrantly disregarded court orders.

2

8. On July 7, 2022, this Court issued an Order To Show Cause (Ex. 11) requiring (among other things) Mr. Etra to appear in court on July 13, 2022 with regard to events that had occurred prior to issuance of that Order To Show Cause (including Mr. Etra's failure to appear at a hearing on July 7 as previously ordered).

9. The Court held a two-part hearing on July 13, 2022, the transcript of which is attached as Ex. 12. Among other things, the Court held Mr. Etra in contempt of court and incarcerated him in between the first and second parts of that hearing (see Exs. 42 and 43).

10. Further events and orders ensued, including (among other things) the Court convening another hearing on August 2, 2022, following which Mr. Etra was held in contempt again; was ordered to produce certain Escrow Agreements or move belatedly to quash the subpoena calling for their production (Ex. 38); Mr. Etra moved to quash in that regard with his motion denied (Ex. 10); and Mr. Etra moved to quash the subpoena duces tecum and the information subpoena served on August 2, 2022 and those motions were denied as well (id.).

### Ongoing, Willful and Egregious Violations Of Restraining Notices

11. Just prior to the court appearance on July 13, 2022, under threat of incarceration – but not yet actually having been incarcerated – Mr. Etra produced bank statements for an account at Piermont Bank ending in 0362 that he had previously concealed, notwithstanding petitioner's subpoena and multiple court orders from Judge Nathan and Judge Caproni (see Ex. 44 at pp. 48 et seq.).

12. Indeed, until July of 2021, Mr. Etra had hidden from Benthos, and Benthos's lawyers had not otherwise been aware, that he banked at Piermont Bank at all. He had identified some bank accounts (albeit incompletely) – as in, for example, Ex. 45 at p. 2, No. 1 – and over time, in response to repeated court orders, he produced some (also incomplete) statements from

3

12307998

many other banks (see, e.g., Ex. 9 at paras. 6-36), but he conveniently omitted, during all of those 20-plus months, to identify the bank through which he was conducting his day-to-day life.

13. Judge Caproni noticed on July 13 that those statements reflected transfers to another Piermont account that he had not produced at all (Ex. 12 at 46-47):

> [O]ne of the requirements was that he produce documents showing essentially every bank account that he has. That was the requirement. He produced records from the bank account into which currently his social security checks about are being deposited. It's a bank called Piermont.
>
> On their face, those records show that he has another Piermont account, because there are internal transfers from that account to another account at Piermont. He didn't produce those records. I don't know why; he just didn't. I mean I do know why. He's in contempt. That's why he didn't. But those were clearly covered by the requirement.

14. Mr. Etra thereafter produced statements for that other Piermont account (ending in 2060) that he had concealed until after his incarceration, as well statements for two IOLA accounts (M&T ending in 3441 and Piermont ending in 2292) that he similarly had long concealed, all in flagrant violation of the subpoena duces tecum and multiple court orders.

15. Review of those withheld statements made clear why Mr. Etra had sought to conceal them.

Piermont Bank Account Ending in 2060  (Exhibit 13)

16. From this one account alone, Mr. Etra spent liberally while under the restraining notice.  He concealed all of that spending from Benthos, notwithstanding our multiple subpoenas, motions and applications and notwithstanding multiple court orders, and while he was complaining of "the constraints they have placed on my ability to live decently" (Ex. 14 at para. 2).

- Mr. Etra traveled to Europe at least <u>nine times</u>, while he was asserting to Judge Nathan that Benthos had rendered him "unable to . . . purchase basic necessities" (Ex. 15 at p. 2). Those trips took place in August-September 2020; November 2020; December 2020-

4

12307998

January 2021; March-April 2021; June-July 2021; August-September 2021; November 2021; April 2022; and May 2022.[1]

- While traveling in Europe, he bought airline tickets, stayed in expensive hotels, and made substantial expenditures including restaurant meals and cash withdrawals. He insolently testified recently (before Judge Parker, on November 9, 2022) that "I'm entitled to travel," without addressing his "right" to do so using his creditor's money.

- In New York, he ate many restaurant meals, took many taxis, frequented a hair salon and paid monthly for the Regus office referred to in footnote 1.

- He paid large Verizon Wireless bills for many months, undoubtedly in connection with his extensive and concealed business activities.

- He spent money on legal work, such as "Delaware Corp" and "Wyoming Secretar[y of State?]," apparently creating corporations.

- As recently as June 2022, he received $1200 from "Wise Inc From Regent Exhibitions Limited" and seems to have paid $4923.86 to American Express ("AMEX EPAYMENT ACH PMT W2214").

- There are many other expenditures of hundreds of dollars that are unexplained (as well as some that are somewhat explained, such as $447.33 to "Reed Exhibitions" in November 2021). There are payments (in January and March 2021) to an "Applecard" as to which he provided no corresponding statements. On one day alone (September 23, 2021), he made a series of "mobile capture deposits" totaling almost $1000, without any indication of where he got the money from for those deposits.

17. All of that spending was well beyond subsistence living expenses and well in excess of any Social Security payments he received. Benthos knew about none of that, as he deliberately hid it from his judgment creditor as well as from the federal courts. Those monies belonged to Benthos.

18. But there is more.

---

[1] The first three of those international flights and sojourns took place before Covid vaccines were available. Mr. Etra was almost 80 years old at the time and since judgment enforcement has commenced, he has repeatedly told several judges that he was under various forms of physical and Covid-related incapacity. For example, in between the first and the second of his unvaccinated trips to Europe in 2020, he forwarded to Judge Nathan an e-mail to the undersigned stating that "I am squarely in the most threatened group," and he told Judge Nathan at that time that "with covid-19 a special risk for me, I was not going to an office anymore." Office: too dangerous. Flying to Europe: No problem. See also, e.g., Ex. 16: "Respondent is under doctors' orders not to go to public places."

12307998

M&T IOLA Account Ending 3441 (Ex. 17)

  19. Statements from this account revealed the following (among other things):

- Mr. Etra made three payments of rent to his landlord (two of them substantial), from his IOLA account and while under the restraining notice (September 2020 $4052.79; January 2022 $5000; and July 2021 $150).[2]

- In September 2021 he made a half-dozen payments to Paypal, including for "Apple.com bill," "Adobe Inc" and "GeniusBrand"; in December 2021 he made a payment to American Express of $1307.80; in February 2022 he made another payment to American Express, of $1219.95, and he paid Home Depot $928.58; and on three separate occasions in 2022 (February, May and June) he made payments to Regus Management for his office referenced above.

- In January 2022, Mr. Etra's IOLA account was debited $10,000 for "Citibk Ck Webxfr Transfer [ending in] 4331."

- Mr. Etra also received funds in, and transferred funds out, in connection with a plethora of other transactions after the judgment and restraining order.[3] See, as examples only and among other things, Ex. 17 at October 2020 ($26,000 received from "Oceanix Inc.," $25,000 of which was sent to "Dorax Investments Company," and two "Counter Withdrawals" totaling $1300); August 2021 ($204,000 and $19,200 received from "Transfer Pass LLC" and $125,000 transferred to "Motherland Investment Portfolio"); September 2021 ($73,940 and $19,170 transferred to "Motherland Investment Portfolio" and $4,080 received from "Desmond Hines," $4,000 of which was then transferred to "Audious Kashesha"); December 2021 (almost $200,000 received from various sources, including the "Tennessee Bar Foundation" and "George Michael Du Plooy," and over $100,000 sent to more than a half-dozen recipients, including $35,000 to "Premier Plus Transport LLC"); January 2022 ($10,000 received from an unidentified "ACH Dispute Credit" and $10,000 transferred to a Citibank account); March 2022 (over $10,000 transferred out in multiple transactions and another "ACH Dispute Credit" for $3000); and multiple months with $150 deposits from clients – clearly income to Mr. Etra and not client funds – evidently from clients "register[ing] with me for paymaster services for a period of 12 months" as described in Exhibit 19.

---

[2] In March 2019, albeit before the restraining notice, Mr. Etra twice sent $1000 from his IOLA account to his wife. And in September 2021 he appears to have received a Social Security payment into his IOLA account (Ex. 18).

[3] While it is possible that some or most of those transactions involved only client funds, we cannot be sure because Mr. Etra has concealed most details, including critically the flow of funds, regarding his escrow arrangements, and has not disclosed the fees he received for any escrow services (see the discussion of the information subpoena violations below). It is certain that he concealed all of these transfers for as long as he could so that Benthos could neither investigate nor even inquire.

6

12307998

Piermont IOLA Account Ending 2292 (Ex. 18)

20.     Similarly, statements from this account revealed the following (among other things):

- In October 2021, this account received $30,000 from "Day Law & Associates," of which $10,000 was transferred that same day to Mr. Etra's "business checking" account at Piermont ending in 2060.

- In April 2022 this account received $5000 from "Renato Corzo" and two days later Mr. Etra transferred that same amount to his "business checking" account.

- In June 2022 Mr. Etra sent two wires totaling $6771 to "McHenry Savings Bank."

- In December 2021 and January 2022 he transferred $3000 and $5000 respectively to "Adam Klein."

- In August 2021, Mr. Etra transferred $2000 from this account to his "business checking" account, and in September and December 2021 he did the same with two $1000 transfers.

- In December 2021 he verified a Paypal account with a few small transfers back and forth, although he has not provided statements for any Paypal accounts.

## Mr. Etra's Perjurious Concealment of the Above Accounts

21.     All three of the accounts described above were open and active during all of 2022 (and earlier), through at least the end of June (which is the last month for which he has provided statements). Two of those accounts were at Piermont Bank, the very existence of which (as noted above) Mr. Etra had concealed as one of his banks until incarcerated by Judge Caproni. Yet on February 16, 2022, at a hearing before Judge Parker, Mr. Etra testified – under oath – "that he has only one open bank account: M&T bank account ending in x3443. Etra stated that all of his other accounts have been closed." Ex. 9 at para. 33.

## Undoubted Continuing Violations

22.     As discussed immediately below ("Willful Disobedience of Subpoena Duces Tecum"), when ordered to comply with petitioner's most recent specific subpoenas, which sought (as Mr. Etra well understood) his current bank statements – i.e., those generated after the

7

statements through June 30, 2022 that he finally produced in July under the Court's coercion – he simply ignored that aspect of the subpoena. He also informed the Court recently that his Piermont Bank account – the one that the Court had finally pried out of him; the one that revealed the bulk of his spending, including the international travel; and the one that he had deliberately concealed for as long as he felt he could – has been closed. (Ex. 20)

23. Thus, Benthos has zero visibility – precisely as Mr. Etra intends – into his recent and current finances, over the past four-plus months (and counting), including almost certainly continued expenditures in violation of the initial restraining notice (Ex. 5) as well as the more recent restraining notice (Ex. 7) – both of which stated, on their face, "TAKE FURTHER NOTICE that disobedience of this restraining notice is punishable as a contempt of court."

24. And Mr. Etra is unrepentant: In September of this year, he admitted that he "took . . . fees" during the past "four years of this matter" (see Exs. 21 and 22); in October (Ex. 23 at No. 3), he blithely referred to "[unspecified] [c]lient payments earned and having been deposited . . ."); and in November, as referenced in paragraph 16 above, he testified that he is "entitled to travel."

## Willful Disobedience of Subpoena Duces Tecum

25. As noted immediately above, Mr. Etra has quite deliberately refused to produce any bank statements for the period since June 30, 2022, which was the last date covered in the statements he produced over the summer under judicial compulsion. Current bank statements are, of course, the easiest thing to produce of everything for which Mr. Etra ever has been subpoenaed: They do not require going to former banking relationships; they do not require digging into old records; and (even if one credits Mr. Etra's claims of physical incapacitation,

8

12307998

which Benthos decidedly does not[4]) in this electronic age, they require literally no effort at all beyond a few computer clicks.

26. Yet in response to a subpoena served in early August, it is now (as of submission of this motion) mid-November and he has succeeded – yet again – in concealing his finances for all of this time. July, August, September, October (and shortly November and beyond); the man must bank somewhere. Where are the statements?

27. Furthermore the importance of current bank statements was made expressly clear to Mr. Etra, not once but twice – although quite obviously the significance was not lost on him (that is why he is concealing them).

28. First, the August 2 subpoena (Ex. 6), which contained only nine items, sought "all monthly [bank] statements" including those "*continuing after the date of this subpoena*" (emphasis in the subpoena so that Mr. Etra would not overlook the obligation); and petitioner's memorandum of law in opposition to his motion to quash (Ex. 24 at 5) stated quite clearly as follows:

> Benthos hereby withdraws that portion of document subpoena Request No. 2 addressing documents between August 1, 2018 and June 30, 2022 (but only that portion). The aim of Request No. 2 of Dkt. 156-2 was and is to get (i) the documentation between August 1, 2017 and August 1, 2018 and (ii) current and ongoing statements, because Mr. Etra produced statements through the end of June 2022, under this Court's compulsion, but clearly has no intention of disclosing his ongoing finances – which of course will reveal continued violations of the restraining notice and continued expenditures of funds from unknown sources – absent an unambiguous court order to that effect.

---

[4] Judge Parker has commented on this. See Ex. 27: "Respondent has . . . not submitted any credible medical evidence regarding any purported health issue or procedure." See also Ex. 28: "For the reasons stated in Petitioner's letter at ECF No. 199 [Ex. 46, demolishing Mr. Etra's fabricated claim of medical incapacitation] . . ., Respondent's request for an extension of time . . . is DENIED."

9

12307998

29. Petitioner underestimated (to its chagrin) Mr. Etra's defiance. The Court did in fact issue an unambiguous court order to that effect (Ex. 10, particularly at 15-16 and 15 n.12), and then denied Mr. Etra's requests for extensions (see Dkt. Nos. 177, 181, 184, and 190). Still he produced no current bank statements.

30. Second, on October 27, 2022, petitioner filed, and sent to Mr. Etra, a letter-motion requesting the relief sought in this more formal motion (which the Court required to be brought). In that letter-motion (Dkt. 202), petitioner expressly wrote what is repeated almost verbatim above, making crystal clear (what Mr. Etra knew anyway) that petitioner is highly focused on the current/recent bank statements (and on knowing where he has been banking since the Piermont account was closed).

31. <u>Still he produced no current bank statements</u>. Still he is undoubtedly violating the restraining notices.[5]

Communications Concerning Judgment Enforcement and
Related Matters (Subpoena Duces Tecum Request No. 1)

32. The very first request in the recent document subpoena (Ex. 6) sought Mr. Etra's post-judgment communications regarding petitioner's judgment-enforcement efforts:

> All documents concerning communications since the date of the Judgment (August 13, 2020) sent or received by You concerning (i) Your financial status, (ii) any attempts (by anyone) to obtain or provide funds from which to satisfy the Judgment (in whole or in part), (iii) any and all Court orders issued in this matter since August 13, 2020, and (iv) petitioner's or petitioner's counsel's judgment enforcement efforts, to or from any person or entity whatsoever (excluding communications with financial institutions seeking copies of statements), including but not limited to Mel Dussel, Helmut Allesch, Tracy Evans, Dmitri Kaslov (or any such person who has used that name), Minh Hoang Le (or any person who has used that name), and Koraljka Troselj.

---

[5] See Petitioner's Memorandum of Law, Dkt. 153, at 9 n.2: "[Mr. Etra] has not changed his *modus operandi* one whit."

12307998

Mr. Etra's motion to quash that subpoena was denied, as set forth above, and he was ordered to respond.

33.     However, in response to subsection (iv), Mr. Etra produced <u>nothing more than petitioner's own subpoenas</u>.  See Ex. 26 at p. 1, item 1(iv): "Copies of petitioner's enforcement efforts, etc. (attached) (Mr. Popofsky's subpoenas)"; Ex. 30 (the subpoenas that he produced back to us on October 7).

34.     Mr. Etra is a graduate of Columbia Law School and an intelligent man (intelligent enough to scam multiple victims, not limited to Benthos, out of monies entrusted to his escrow account, among other things).  He can read a document request and knows very well that the request quoted above was seeking <u>his communications with others</u>, not copies of Benthos's own prior subpoenas.

35.     And if by any remote chance he was truly confused, counsel's letter of October 27 (Ex. 29) would have cleared that right up.  But Mr. Etra produced nothing truly responsive on October 7 when required, nor has he produced anything since.[6]  It is inconceivable that Mr. Etra has not exchanged any written or electronic communications with <u>anyone</u> over the past 27 months "concerning . . . petitioner's or petitioner's counsel's judgment enforcement efforts."

---

[6] On October 7, to make it appear on the surface like he had not produced zero in response to the cited request, he insulted the Court's intelligence by purporting to produce a bunch of pages in response, even though those pages were only copies of petitioner's subpoenas.  He did the same thing with regard to request No. 2 of the subpoena duces tecum for bank statements.  He knew full well that in petitioner's memorandum of law opposing his motion to quash (Ex. 24, Dkt. 161 at p. 5), we withdrew that portion of the request that sought bank statements after 2017 through June 30, 2022 (and the Court noted that in its decision (Ex. 10 n.12) – we stated very explicitly, as quoted above, that "The aim of Request No. 2 of Dkt. 156-2 was and is to get (i) the documentation between August 1, 2017 and August 1, 2018 and (ii) current and ongoing statements" (id.) – yet to "pad" his response, he re-produced a bunch of 2018-2022 bank statements previously produced, while producing nothing new or responsive to the actual request for 2017 and post-June 2022 statements.

36. Similarly, in response to subsection (ii), he produced nothing more than one letter his business colleague Mel Dussel sent to the Court last spring (see Ex. 26 at p. 1, item 1(ii) and Ex. 30). Obviously, if Mr. Dussel has been seeking to raise funds for Mr. Etra to pay part of the judgment in settlement (as Mr. Etra repeatedly has represented to Your Honor and to Judge Parker that he is doing[7]), Mr. Etra and Mr. Dussel have been communicating in that regard. See also Ex. 31 at para. 3, recounting Mr. Dussel's call to the undersigned on the eve of the last hearing, when Mr. Dussel requested an adjournment of the next day's in-person hearing on the basis that he "fully expected" to send Benthos "at least" a "minimum $100,000" "this week" – claiming he had been "expecting" to have that money "today" – and that he was "confident" he would have at least seven figures to settle the matter, and "can help end this situation in the next day or two," "if you can stop something from happening tomorrow."

37. Not to mention that Mr. Dussel would not have written to the Court out of the blue – obviously, Mr. Etra solicited (if not wrote) the letter from Mr. Dussel that he repeatedly has submitted, yet Mr. Etra has produced not a single solitary communication between himself and Mr. Dussel. He knows that was required, but does not want to reveal those communications, so he simply stonewalls. As always.

38. Speaking of letters that did not descend upon the Court as though from heaven, Mr. Etra has relied heavily on a hearsay letter from Helmut Allesch (Ex. 32 at p. 6, among many other times, including Ex. 33 at p. 5: "Mag. Allesch's letter makes the facts as clear as can be"), purporting to support Mr. Etra's claim of non-control of the foreign bank accounts he identified to Benthos in the first place (see Ex. 34 at pdf pages 4-5). Subpoena duces tecum request No. 1(iv) sought specifically "communications since the date of the Judgment . . . sent or received by

---

[7] See, as one example only, Dkt. 159 at para. 16.

12

12307998

You concerning . . . petitioner's or petitioner's counsel's judgment enforcement efforts, to or from any person or entity whatsoever . . ., including but not limited to . . . Helmut Allesch [and others]" (emphasis added).  He produced no e-mails or text messages with Mr. Allesch – nor from anyone else, as noted above – but again it is inconceivable that none exist.

39. Furthermore, subsection (iii) of subpoena duces tecum Request No. 1 – "communications. . . concerning . . . any and all Court orders issued in this matter since August 13, 2020" – also would require communications with Mr. Allesch, because Mr. Etra was ordered (repeatedly) to produce the European bank account statements and claims that he was unable to obtain them from Mr. Allesch.

40. Beyond Mr. Allesch, however, surely Mr. Etra has communicated with someone over these two years regarding all of the court orders.  (In any event he has not even stated, for whatever little that might be worth, that he has never done so – he just produces nothing and hopes that gets ignored in the shuffle).

41. He also produced no communications concerning his "financial status" (subsection (i)), except one letter purportedly from his landlord.  That landlord, however, produced a dozen such communications (see Ex. 47), including one from March 2021 when Mr. Etra wrote that he was "Working on clearing" his rent debt "this week," and another where the landlord wrote, "Use this invoice," indicating that Mr. Etra had requested one from him, presumably for use in this case – Mr. Etra did not produce that request, nor any of his communications that the landlord sent to us separately.

42. Once again, Mr. Etra simply does what he wants, and dares the Court to punish him.

2017 Bank Statements

43.     Item 2 of the subpoena duces tecum also sought Mr. Etra's bank statements for the last five months of 2017.  Mr. Etra repeatedly has sought to avoid disclosure of his finances during that year (see, e.g., Ex. 35), and petitioner made known its focus on this aspect of the subpoena in the brief cited above (Ex. 24 at 5).  Yet Mr. Etra produced zero bank statements from 2017; and given that he opened and closed over two dozen accounts between 2018 and 2022 (see, e.g., Dkt. 60 at 1; Dkt. 95 at 17), it is highly likely that he had many in 2017 as well.

44.     In any event, he does not state that he had no bank accounts during the relevant time period in 2017, and (of course) such a statement would not be credible (from almost anyone, much less from this serial account-opener).  Again, he just defies so many obligations that he hopes not all of them will be noticed, or at least that he can (as usual) endlessly delay the date on which he has to comply.

45.     And notwithstanding that 2017 was several years ago, time constraints are no excuse (on this aspect or the subpoenas generally).  The subpoena was served many months ago, on August 2; the court denied repeated extension requests and then denied his motion to quash on September 26 and then denied still further requests to extend his time to comply.  On October 7, he asked for "a reasonable time after the end of the holidays on October 18th" (Ex. 36), and while the Court denied that request (Ex. 37), he produced nothing in the days after October 18 until petitioner's letter-motion on October 27, and has produced nothing since that letter expressly called out all his non-compliance.

Documents Concerning His Escrow Services

46.     Item No. 5 of the subpoena duces tecum sought "All documents, including but not limited to agreements and written communications, concerning" the services for which Mr. Etra

14

12307998

took monies into escrow (emphasis added).[8]  Other than a very partial production of the required Escrow Agreements themselves (discussed below), Mr. Etra did not produce a single responsive document, meaning zero e-mails or text messages with more than three dozen purported clients who signed agreements with him and in most cases sent him money (sometimes very large sums of money, as demonstrated by the bank statements discussed above that he produced after his brief incarceration).

47.     Once again, the business from those 41 escrow "clients," from all around the world (Spain, Australia, the UK, Croatia, Portugal, the U.S., Peru, Canada, etc.), did not materialize out of thin air.  Clearly Mr. Etra communicated, extensively, with most or all of those "clients" regarding the monies they were sending him, what he was going to do for them, and what was going on with their money.  To choose only the most outlandish example, Ex. 40 at pp. 33-36 states on its face that one "Patrick Creamer" of London would be transferring "$5Billion USD" (yes, "Billion," not "Million") into Mr. Etra's escrow account, together with several other massive transfers.  The level of contrived detail is very reminiscent of Mr. Etra's underlying scam against Benthos, and it is difficult not to suspect another scam in the works here – and of course Mr. Etra must have been charging a hefty fee for all this purported activity.  Whatever the true story is – and we can all be confident we do not know it, and Mr. Etra is not going to tell us

---

[8] The specific request was for documents "concerning the services referred to in item No. 1 of the accompanying Information Subpoena" (Ex. 7), and that item No. 1 (to which Mr. Etra also did not respond properly, as discussed below) was as follows:  "Identify (i) the name and full contact information (address, telephone, e-mail and otherwise) for every "client," or other individual or entity, for which You have performed any legal, "paymaster," escrow-related or other services from August 1, 2017 through the present; (ii) for each such individual or entity, the precise nature of the services performed; (iii) for each such individual or entity, specifically what compensation You (or any affiliated person or entity, including but not limited to Koraljka Troselj) received for those services; (iv) where such compensation was paid to, in each instance separately (including names, addresses, account numbers, and Your responsible contact officers at each such institution); (v) all subsequent transfers of such compensation received; and (vi) the current whereabouts of all such compensation."

15

– there surely were written electronic communications exchanged between Mr. Creamer and Mr. Etra about that Escrow Agreement, those multiple transfers stated, and Mr. Etra's services in connection with it (as with <u>all</u> of the others), yet he has, once again, deliberately chosen to withhold all of such communications, thereby forcing Benthos to incur yet more legal fees chasing him.

<u>Other Deficiencies</u>

48.  While the text above has focused on the most egregious of Mr. Etra's failures to comply with the recent subpoena duces tecum, there are several other deficiencies as well (in addition to the Escrow Agreements themselves, addressed separately below).  He produced only a single rent statement (Ex. 48) in response to No. 6 (communications exchanged with his residence landlord since the date of the judgment), but as noted above, his landlord actually produced a dozen of those (Ex. 47).  Nor has he represented that he has had no written communications with his office landlord in response to No. 7, and that is highly unlikely so the Court can infer that he is withholding those communications as well.  He has not remotely produced all his credit card records (No. 3); and while his bank statements reflect periodic payments to American Express (including from his IOLA account; see Ex. 25 at 4), and he identified "AMEX" as one of his credit cards in his response to the recent subpoenas (Ex. 23 at Nos. 6 and 7), including Ex. 26 at No. 3 where he stated ". . . AMEX . . . (attached)," he did not in fact "attach" any American Express statements.

**<u>Willful Disobedience of Information Requests</u>**

49.  Mr. Etra double-talked his way around responding meaningfully to Information Request No. 1 (Ex. 7 at p. 6, quoted in footnote 8).  His response is set forth at Ex. 23.  In particular, but without limitation, the subpoena sought "(iii) "for each . . . individual or entity [for whom he performed escrow services], specifically what compensation You . . . received for

16

those services; (iv) where such compensation was paid to, in each instance separately (including names, addresses, account numbers, and Your responsible contact officers at each such institution; [and] (v) all subsequent transfers of such compensation received."

50.     Petitioner was seeking, of course, to "follow the money" (to coin a phrase). The Court can readily see for itself that Mr. Etra's response does not provide the information required. It is plainly not sufficient – and particularly not after leading Benthos on wild goose chases for two years, and being held repeatedly in contempt of court – for Mr. Etra to just say, in essence, "look at my bank statements and figure it out, if you can." It was his job at this point, not his creditor's, to tease out the requisite information, if indeed it can be found in his statements, and plainly it cannot be found in any event: For example, he has not specified who paid him what, and where each payment went from "each [payor] separately." He identifies three bank accounts to which "such compensation was paid" (Ex. 23, item 1(iv)), but those statements merely show occasional incoming unidentified funds, and in other instances there is no way to tell whether deposits were escrow pass-throughs or fees.

51.     This is just more game-playing, long after having been told that the Court would not tolerate that behavior (see Ex. 12, passim). He also refers (in Ex. 23, item 3) to "Client payments earned and having been deposited into Piermont Bank account ending in #2060 [and] M&T ending in 3433," but he produced no "3433" account and the 2060 account (not identified in response to item i(iv)) has hundreds of transactions that cannot be sorted out to understand who paid him what in connection with his escrow services.

52.     It is impossible to catalog all of Mr. Etra's violations. In response to Information Request No. 4 in Ex. 7 ("List all bank accounts . . . in which You have (or had) an interest . . . since August 1, 2017"), he made no pretense of attempting a "list" but merely wrote "The bank

17

accounts for which I have an interest are attached" (Ex. 23) and then re-produced previously-produced statements from only a fraction of the more than two dozen accounts long ago identified, re-producing some statements twice to pad his production, but (as noted above) neither producing nor even identifying any bank or other accounts during 2017 – which, again, is a period he has taken pains in the past to conceal and as to which his attention was expressly drawn in Ex. 24 at 5.  And he plainly lied in Ex. 23 about his "current monthly living expenses" (No. 2 in the information subpoena, Ex. 7), claiming "transportation" costs of only $75-300, conveniently ignoring the frequent flights to Europe.  He claims to be paying no rent for his luxury high-rise, and it is unclear whether he claims to be making "Credit Card Payments monthly" but we have no record of such monthly payments.  He is paying for an "Office Rental" but claims to be sick in bed when he needs to appear (in person or remotely) in court.  And it is nice that he is paying $500 per month for "Apartment Cleaning and laundry and dry cleaning" when he owes Benthos more than $5 million and has never paid a penny on that judgment.

### Spoliation Of At Least Escrow Agreements

53.   The Court is well aware of the lengthy and extensive efforts, by Benthos and by the Court, to get Mr. Etra to provide copies of his Escrow Agreements with his "clients."  Multiple court orders, both general and specific, were violated and then Mr. Etra was afforded the opportunity to belatedly move to quash the subpoenas in that regard, and his motion was denied (Ex. 10).

54.   We are now aware of 41 Escrow Agreements.  31 were identified by the Court in Ex. 38, and Mr. Etra identified ten more in Ex. 39 and confirmed 41 (by his account) in Ex. 23.  He has produced only thirteen seemingly complete agreements, and five more that do not include client identifying information and/or are only partial (Ex. 40).  He is in contempt of court, yet again.

55. His apparent explanation for the missing Escrow Agreements is that "data was lost" in late June of this year – conveniently just around the time it was becoming clear to him that Your Honor was serious about compelling compliance, and almost two years after he was subpoenaed – due to "Liquid Damage" (as described by Apple and otherwise unexplained by Mr. Etra); and he also made some convoluted assertions about material having been "deleted" although he never had made that claim before. See Ex. 41 at paras. 11-12 and Ex. 39. Those points were addressed by petitioner at pages 5-7 of Dkt. 153, and to the extent that he may repeat those arguments in opposition to this motion, or claim that other required material is missing for similar dubious reasons, we will address and refute them again on reply.

56. But the only way to hope to find out what actually happened to Mr. Etra's computer, and possibly to retrieve purportedly missing documents he has been ordered to produce, is through the forensic examination of his computer and cellphone(s) discussed in the accompanying memorandum of law and requested in the Notice of Motion.

**Prior Judicial Findings
Regarding Mr. Etra's Credibility and Misconduct**

57. Apart from all the adjudicated and/or admitted violations of multiple court orders, subpoenas and restraining notices, and apart from Mr. Etra's demonstrated perjury, the record should also include the following:

- After conducting an evidentiary hearing, Judge Parker wrote that Mr. Etra's testimony was "not credible." Ex. 9 at 19.

- At the hearing on July 13, 2022, Judge Caproni stated, "you lied to me," and "His representation on any fact means nothing to me, because he clearly will say whatever he thinks is convenient at the time, including: 'I have a European bank account'; 'I don't have a European bank account'; 'bank account? What bank account? Not my bank account. It was a fiduciary's bank account.'" So a representation from Aaron Etra means nothing in this court. . . ." Ex. 12 at 36, 55.

- At that same hearing, Judge Caproni also stated, "you've been playing this game too long, Mr. Etra"; "I can't see anything other than custody that is going to persuade Mr.

19

- Etra that he is not in charge and he has to produce the documents that he has been ordered and ordered and ordered to produce"; that he was "just sticking his finger in the Court's eye"; "Mr. Etra thinks that he can do this song and dance and get away with it"; and "I cannot fathom, Mr. Etra, the reason why we did not get the other Piermont account – in a million years, I don't understand it – beyond willfully hiding assets."  Id. at 43, 49, 51, 52, 54.

- Ten weeks later, Judge Caproni wrote that Mr. Etra had "exhausted the Court's patience"; that he had exhibited a "continuing . . . pattern of delay"; and that the "notion" that he was under improper "duress because, having failed to properly object or move to quash . . . , he was ordered to produce relatively few documents after receiving myriad extensions, is ludicrous."  Ex. 10 at footnotes 1, 3, 11.

- Finally, Judge Caproni also wrote (id. at 16 n.8) that "Given Etra's tendency to prevaricate, his say-so is of virtually no value."

## **Conclusion**

For the reasons set forth above and in the accompanying memorandum of law, the exhausted but determined judgment creditor respectfully seeks the relief requested in the accompanying Notice of Motion.

In accordance with 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 15, 2022

                                                                          */s/ Steven R. Popofsky*
                                                                           Steven R. Popofsky