Exhibit 25



**Steven R. Popofsky**
*E-Mail: spopofsky@kkwc.com*
*Direct Dial: 212.880.9882*

July 25, 2022

<u>**VIA ECF AND E-MAIL**</u>
Hon. Valerie Caproni
United States District Court
40 Foley Square, Room 240
New York, NY 10007

  **Re:** **Benthos v. Etra, 20-CV-3384**

Dear Judge Caproni:

  We thank Your Honor for your continuing attention to this matter, amidst your crowded docket of important cases, and write in accordance with that portion of Dkt. 132 (the "July 14 Order") directing petitioner to "submit a letter to the Court setting forth any continued deficiencies in Respondent's productions." The very many deficiencies are catalogued below, as Mr. Etra continues to conceal bank accounts and financial activity and to treat court orders as optional.[1]

  Just as importantly, however, is what these latest partial productions expose: Mr. Etra – a member of the Bar – has been flagrantly violating the restraining order served on him almost two years ago; he has been cavorting in Europe (as recently as late May); he has engaged in dozens of client transactions, with hundreds of thousands of dollars flowing through his attorney escrow accounts – and <u>still</u> no indication of the fees he must be earning from all that activity – and has been funding his lifestyle in part through transfers from his IOLA account to his business checking account (as foreshadowed by an exchange he had with Your Honor in court on July 13).

  During all of this time, he has been insisting to several judges of this Court that he is both impecunious and honorable. It is hard to decide which of those representations is more risible.

**Failure to Produce All Escrow Agreements and Bank Statements**
<u>**Improperly Withheld as "Privileged"**</u>

  The Court ordered on July 14:

---

[1] "[T]he Court's prior orders . . . did not direct Mr. Etra to comply . . . if it was convenient" (Judge Nathan, Dkt. 59).



Hon. Valerie Caproni
July 25, 2022
Page 2

> Respondent must produce to Petitioner all documents that he has heretofore
> withheld as "privileged" that are responsive to Petitioner's previously-
> served subpoena *duces tecum.* This includes, as discussed at the hearings on
> July 13, 2022:
>
> - all escrow agent agreements as to which Respondent is or was a party,
>   whether the escrow agreement is still in effect or not, in effect from August 1,
>   2018 to the present. . . .

Of course that was not the first (nor the second, third or fourth) court Order requiring such
documents; it was only the latest and most specific.

    Mr. Etra admits his defiance of that aspect of the July 14 Order.  It appears that his non-
compliance is quite extensive, because his bank statements (discussed below) demonstrate that
he has been doing substantial business in his escrow account – involving many clients and six-
figure transactions – as to which he has intentionally withheld the corresponding Escrow Agent
Agreements that clearly are in his possession.

    In Exhibit 1 (exhibits are being transmitted to the Court but not filed on the public
docket), Mr. Etra explained his "two forms of escrow agent Agreements" (titled
"Coordinator/Paymaster Agreements"); attached two blank forms; and provided only two such
actual signed agreements, stating that "[only] [t]wo clients have allowed me to release their
information."  But the multiple court orders requiring production of those agreements – including
but not limited to the very specific July 14 Order, which was issued after the Court heard and
expressly rejected Mr. Etra's "privilege" claim – simply did not allow him to unilaterally decide
to withhold responsive documents contingent upon his clients' purported permission.

    The bank statements he produced responsive to the second part of the July 14 Order[2]
confirm his non-compliance.  He did produce, finally, statements for four accounts
demonstrating (some of) his financial activity during the subpoena period.  What those
statements reveal, devastatingly, is set forth immediately below.  Preliminarily, however, we
should note that Mr. Etra still is not disclosing all his IOLA accounts.  One of Benthos's
principals recalled that in September 2018, while in the process of conspiring to defraud
Benthos, Mr. Etra sent an e-mail stating that "I have met on other business with the bankers at
Metropolitan Commercial Bank (MCB), where my IOLA account is operational. . . . To use the
MCB account for escrowing/paymastering crypto-currency transactions, the bank will look to

---

[2] "monthly statements for all bank accounts that were previously withheld as 'privileged,'
including all Interest on Lawyer Accounts ('IOLA' accounts), whether in Respondent's name
individually, jointly, in trust, as custodian, as nominee, or as a beneficiary, individually or with
other persons or entities, from August 1, 2018 until the present."



Hon. Valerie Caproni
July 25, 2022
Page 3

have a relationship with the source of the funds" (Ex. 2).  He has not produced any statements for that self-described IOLA account.

But what he has produced is damning enough:

<u>Information in M&T IOLA Account Ending 3441 (Feb. 2019-June 2022)</u> [Exhibit 3]

- Mr. Etra received funds in, and transferred funds out, in connection with a plethora of apparent client transactions.  See, as examples only and among other things, Ex. 3 at March 2019 (over a half-dozen client transactions involving almost $50,000) April 2019 (at least three client transactions involving over $15,000); June 2019 (at least three client transactions, <u>including</u> $455,000 received from an unknown source ("Web Xfer From Chk [ending in] 3433") and then sent to "Thorgood Law Firm IOLTA"); July 2019 (another half-dozen client transactions involving around $35,000); August 2019 (multiple client transactions, including a $200,000 "incoming Chips funds transfer" from "Razur 7711 LLC," a $150,000 transfer out to an unknown recipient, and $16,800 sent to "Qingdao Zhiqiang Industrial Limited"[3]); June 2020 and thereafter (repeated receipt of thousands of dollars from "Fisher Enterpris ACH Pmt" and repeated $1200 "Outgoing Chips Funds Transfer[s]" to unidentified recipients); October 2020, after the judgment and the restraining order ($26,000 received from "Oceanix Inc.," $25,000 of which was sent to "Dorax Investments Company," and two "Counter Withdrawals" totaling $1300[4]); August 2021 ($204,000 and $19,200 received from "Transfer Pass LLC" and $125,000 transferred to "Motherland Investment Portfolio"); September 2021 ($73,940 and $19,170 transferred to "Motherland Investment Portfolio" and $4,080 received from "Desmond Hines," $4,000 of which was then transferred to "Audious Kashesha"); December 2021 (almost $200,000 received from various sources, including the "Tennessee Bar Foundation" and "George Michael Du Plooy," and over $100,000 sent to more than a half-dozen recipients, including $35,000 to "Premier Plus Transport LLC"); January 2022 ($10,000 received from an unidentified "ACH Dispute Credit" and $10,000 transferred to a Citibank account); March 2022 (over $10,000 transferred out in multiple transactions

---

[3] Recall that Mr. Etra's breach of fiduciary duty giving rise to the judgment was the unauthorized transfer of Benthos's funds to an account in Hong Kong through which they passed into China and disappeared.

[4] These were not the only "Counter Withdrawals" in the statements.  Was Mr. Etra withdrawing cash in person from his IOLA account?  No matter; many worse IOLA violations are addressed below.



Hon. Valerie Caproni
July 25, 2022
Page 4

and another "ACH Dispute Credit" for $3000); and multiple months with $150 deposits from clients, evidently clients "register[ing] with me for paymaster services for a period of 12 months" as described in Exhibit 1.

***Where are the Escrow Agent Agreements for all of those clients?  And – because Mr. Etra surely was not working for free – what fees did he receive for all of those client transactions and where did those fees go?***

- In March 2019, Mr. Etra twice sent $1000 <u>from his IOLA account to his wife</u>; in September 2021 he made a half-dozen payments to Paypal, including for "Apple.com bill," "Adobe Inc" and "GeniusBrand"; in December 2021 he made a payment to American Express of $1307.80; in February 2022 he made another payment to American Express, of $1219.95, and he paid Home Depot $928.58; and on three separate occasions in 2022 (February, May and June) he made payments to Regus Management.[5]

- Mr. Etra made five payments of rent to his landlord (four of them substantial) from his IOLA account (April 2019 $3978.44; July 2020 $4039.75; July 2021 $150; September 2020 $4052.79; and January 2022 $5000[6]).  The last three such payments were made <u>after</u> he was under the restraining order.

- In January 2022, Mr. Etra's IOLA account was debited $10,000 for "Citibk Ck Webxfr Transfer [ending in] 4331."  This appears – although of course with Mr. Etra one never can be sure – to have been a transfer to a Citibank account.  Mr. Etra never has disclosed a Citibank account with that number, nor has he produced any Citibank statement for January 2022 at all, and he wrote in his July 11, 2022 production that "All of my accounts at Citibank, as well as my branch, have been closed for years" (Dkt. 129 at p. 84).

<u>Information in Piermont IOLA Account Ending 2292 (July 2021-June 2022)</u> [Exhibit 4]

- In October 2021, this IOLA account received $30,000 from "Day Law & Associates," of which $10,000 was transferred that same day to Mr. Etra's "business checking" account at Piermont ending in 2060.

---

[5] Regus Management provides co-working office space.  Mr. Etra also made many regular monthly payments to Regus from his non-IOLA account and evidently maintains some sort of business office, in addition to his luxury apartment building where he impressed petitioner's principals with his penthouse view.
[6] The latter two payments are also reflected in a rent statement Mr. Etra provided, evidently from his landlord, in his recent production on July 11th.



Hon. Valerie Caproni
July 25, 2022
Page 5

- In April 2022 this IOLA account received $5000 from "Renato Corzo" and two days later Mr. Etra transferred that same amount to his "business checking" account.[7]

- In June 2022 Mr. Etra sent two wires totaling $6771 to "McHenry Savings Bank."

- In December 2021 and January 2022 he transferred $3000 and $5000 respectively to "Adam Klein."

- In August 2021, Mr. Etra transferred $2000 from his IOLA account to his "business checking" account, and in September and December 2021 he did the same with two $1000 transfers.[8]

- In December 2021 he verified a Paypal account with a few small transfers back and forth, although he has not provided statements for any Paypal accounts.

- In September 2021 he appears to have received a Social Security payment into his IOLA account.

Information in M&T IOLA Account Ending 7045 (April 2022-June 2022) [Exhibit 5]

Mr. Etra received small funds from two clients into this account (included here for the sake of completeness only) in May of 2022.

**Misconduct Revealed From the Newly-Disclosed
Piermont Bank Account Ending in 2060  [Exhibit 6]**

Until two weeks ago, Mr. Etra had concealed the existence of any relationship with "Piermont Bank" (a bank he evidently began using because he knew that Benthos was aware of his other banks).   As late as July 11, in response to the Court's July 7 order (Dkt. 126), he identified one account at Piermont Bank but concealed this one, producing these statements only after Your Honor noticed transfers to and from "DDA 2060" and required production accordingly.

---

[7] On the next business day, Mr. Etra sent $2000 from that business checking account to American Express; and he spent in total around $4500 from his business checking account in May of 2022 after having transferred that $5000 on April 29.

[8] The recipient of the first transfer is not identified in the IOLA statement, which says only "internal," but there is a corresponding $2000 deposit on the same date in the business checking account statements ending in 2060 (Ex. 6).  The other two transfers are reflected as "transfer to . . . 2060."



Hon. Valerie Caproni
July 25, 2022
Page 6

As a preliminary matter, this production begins with a statement for July 2021, reflecting a "beginning balance" of $7154.23. There is no indication of where those funds came from. Indeed, July 2021 was eleven months after the judgment, and Mr. Etra conspicuously fails to represent that that was the date the account was opened – in contrast to the three other statements he produced together with this one on July 15, as to each of which he stated expressly "when it was opened."

This appears to be the main account through which he has been living, and spending money, at least during the past year. (We should not become inured to the breathtaking scope of Mr. Etra's two-year defiance of subpoenas and court orders: Until thrown in prison, he had repeatedly and intentionally withheld this account and the wealth of information contained in it.)

It is impossible to summarize the <u>hundreds</u> of transactions in these statements month-by-month, and we respectfully request that the Court skim the statements to get a flavor of their contents. The most significant overall takeaways are as follows:

- From this one account alone, during the one-year period provided of July 2021 through June 2022, Mr. Etra spent many tens of thousands of dollars, <u>after</u> being served with a restraining notice (Ex. 6). He concealed all of that spending from Benthos, notwithstanding our multiple subpoenas, motions and applications and notwithstanding multiple court orders, and while he was complaining of "the constraints they have placed on my ability to live decently" (Dkt. 28, para. 2; see also, among very many similar examples, Dkt. 54 at p. 2, where he asserted to Judge Nathan that Benthos had rendered him "unable to . . . purchase basic necessities").

- He has bought airline tickets, traveled to Europe (more than once, including as recently as late May), stayed in expensive hotels there, and made substantial expenditures in Europe including restaurant meals and cash withdrawals. That international travel, apart from the serious financial issues it raises, happens also to bely his multi-year claims of physical and Covid-related incapacity (see, as one example only, Dkt. 131: "Respondent is under doctors' orders not to go to public places").

- In New York, he has eaten many restaurant meals, taken many taxis, frequented a hair salon and (as noted above) maintains an office through Regus for which he pays monthly.

- He has paid large Verizon Wireless bills for many months, undoubtedly in connection with his extensive and concealed business activities.

- He funded this account in part through transfers from his Piermont 0362 account. For example, on August 18, 2021, he transferred $8000 from that 0362 account to this 2060



Hon. Valerie Caproni
July 25, 2022
Page 7

account – but where did he get those funds from?  When he disclosed the Piermont 0362 account for the first time just before the July 13 court hearing, he represented that it was "opened" in "August 2021" (see Dkt. 129 at p. 48), but if that is true, it was opened with a "beginning balance" of $7474.88 (id. p. 49), with no indication of where those funds had come from.

- He has spent money on legal work, such as "Delaware Corp" and "Wyoming Secretar[y of State?]," apparently creating corporations.  Of course, we still have no evidence whatsoever of any receipt of fees for such legal work.

- As recently as <u>last month</u>, he received $1200 from "Wise Inc From Regent Exhibitions Limited" and seems to have paid $4923.86 to American Express ("AMEX EPAYMENT ACH PMT W2214").  Other than one page from 2018 previously produced (Ex. 7), Mr. Etra never has produced American Express statements, and certainly never anything reflecting that apparent payment.[9]

- There are many other expenditures of hundreds of dollars that are unexplained (as well as some that are explained, such as $447.33 to "Reed Exhibitions" in November 2021).  There are payments (in January and March 2021) to an "Applecard" as to which he provided no corresponding statements.  On one day alone (September 23, 2021), he made a series of "mobile capture deposits" totaling almost $1000, without any indication of where he got the money from for those deposits.  His spending is clearly <u>well</u> beyond subsistence living expenses and <u>well</u> in excess of any Social Security payments he may have received.  (See below regarding Social Security.)

*Mr. Etra never has paid one single solitary penny to Benthos on the judgment for $5,254,561.12 (plus interest) that was entered by Judge Nathan on August 13, 2020 (Dkt. 15, 32).  He has violated the restraining order (Ex. 8) that was served on him on August 27, 2020 literally hundreds and hundreds of times.  During all of this almost two-year period, he intentionally defied multiple court orders which, if complied with, would have exposed the foregoing much earlier than July 2022, and would have provided manifold leads for non-party discovery related to Mr. Etra's finances.  Benthos has incurred tens and tens of thousands of*

---

[9] It does appear that the Court's July 14 Order – which was based on Mr. Etra's non-compliance with most of the Order at Dkt. 126, which in turn was based on Mr. Etra's non-compliance with the Order at Dkt. 116, which in turn was based on Mr. Etra's non-compliance with the Order at Dkt. 113, which in turn was based on Dkt. 108, which in turn was based on Dkt. 95 – did not expressly require production of credit card statements.  However, the initial subpoena duces tecum on which all subsequent proceedings were based most certainly did call for credit card records (see Dkt. 24-1 at p. 6 item No. 4), and multiple orders since then have required such production.



Hon. Valerie Caproni
July 25, 2022
Page 8

*dollars of legal fees, with no end in sight, as a direct result of the foregoing. And we still have no idea of what fees Mr. Etra has earned from his extensive legal work and (still-withheld) Escrow Agent Agreements, or where that money has gone.*

<u>**International Bank Accounts**</u>

The Court undoubtedly recalls reading back to Mr. Etra his 2019 sworn testimony admitting he had a European bank account (he subsequently admitted at least one more). In any event, the Court's July 14 Order required Mr. Etra to produce:

- All monthly statements for the Uni-Credit account from August 1, 2018 to the present, or, if that account has been closed, statements from August 1, 2018, through the closing, . . . [and]

- All monthly statements for the SberBank bank account (for which a two-page untranslated document was previously provided, *see* Dkt. 86 at 5–6) from August 1, 2018 to present, or, if that account has been closed, statements from August 1, 2018, through the closing. . . .

In response to that Order, Mr. Etra has produced literally zero documentation for the Uni-Credit account that he himself had previously identified.[10] With regard to Sberbank – another Russian bank (see fn. 10, supra) – Mr. Etra provided no monthly statements whatsoever. Instead, he re-produced the "two-page untranslated document" that the Court had found patently inadequate, together with a short, meaningless and non-responsive letter he had solicited (if not drafted) from a purported "fiduciary, based in Austria":

Dear Mr. Etra,

I am a fiduciary, based in Austria, who operates fiduciary/trust accounts for clients' funds in several European countries and banking groups including those of Sperbank and Uni-Credit.

---

[10] It is worth noting that Uni-Credit is a Russian bank, and that the underlying scam in connection with which Mr. Etra was found to have breached his fiduciary duty involved a supposed Russian named "Dmitri," who Mr. Etra claimed to know (but who likely never existed), and who was supposedly going to supply Bitcoin in exchange for the millions of dollars that Benthos entrusted to Mr. Etra's escrow account. Needless to say, "Dmitri" never delivered any Bitcoin, but Mr Etra sent the money to Hong Kong without authorization and then spent weeks making increasingly ludicrous excuses for "Dmitri's" non-compliance (see Dkt. 29-1 at pp. 9-20).



Hon. Valerie Caproni
July 25, 2022
Page 9

> You have asked me to function for various clients of yours, for whom I have held funds in escrow in my accounts. The clients have always been identified to me and to my satisfaction.
>
> I can confirm that you have never asked me to hold any funds for, from or due to Benthos Master Capital Fund, Ltd., nor have I ever received any funds in any way associated with that party or its activities[.][11]
>
> You have also asked me to provide monthly and closing statements for some of my accounts which I advised have been closed. I have replied that, regrettably, the only such statement I can provide is the attached one for my closed Sperbank account, which I confirm I sent to you in response to your requests.
>
> I hope this communication is of value.

(Exhibit 9)  That letter is not compliance with the July 14 Order.

### Social Security Payments

In its July 14 Order, the court directed unambiguously that "Among the records that must be produced . . . are monthly bank statements for the account into which Respondent's social security checks were deposited prior to the time such payments began to be deposited into his account at Piermont Bank."

Mr. Etra produced no such statements.  None.

In his latest production, on July 19, 2022, he wrote that "regarding my prior social security funds for the relevant period before they went to Piermont, those were received in the Citibank Account [ending in] 8687 (see below for its closing date)" (Exhibit 10).  He produced only one page for that account (see the last page of id.), reflecting an "ending balance" of $0.00 on March 25, 2019 and apparently describing that as the "closing date."  Earlier this month, in Dkt. 129 at p. 48, he produced Piermont statements beginning in August 2021 and wrote, "See below from August 2021 when the account was opened. . . ."  So he made no effort to provide any bank statements reflecting Social Security deposits between March 2019 and August 2021.

---

[11] It is utterly irrelevant, of course, if Mr. Etra's European banker did or did not ever receive funds relating to the petitioner Benthos, because (i) we are engaged in judgment enforcement regarding Mr. Etra's finances, having long since given up on tracing petitioner's funds which Mr. Etra without authorization transferred to Hong Kong (from which they then disappeared into China); and (ii) the July 14 Order required production of European bank statements and this gratuitous comment (which Mr. Etra clearly directed be written) is merely an attempt at misdirection, to divert attention from the patent defiance of this aspect of the July 14 Order.



Hon. Valerie Caproni
July 25, 2022
Page 10

But it gets worse. Petitioner does have several months of statements from the Citibank account ending in 8687 (from a prior subpoena to Citibank). Those statements (Exhibit 11) are from June 26, 2018 through the March 25, 2019 closing of the account referenced above. Not one of those statements reflects deposits of Social Security funds.

### HSBC Account Statements

The July 14 Order required Mr. Etra to produce all monthly statements for a variety of different identified HSBC accounts since August 1, 2018. He produced instead a narrative asserting that he was "resubmitting" previously-provided sporadic HSBC statements – which are more than two years stale, and the prior insufficiency of which led directly to the several court orders in that regard that were based on Magistrate Judge Parker's Report and Recommendation (Dkt. 95) – and recounting his purported efforts to comply with this aspect of the July 14 Order (Ex. 12). Other than the conclusory, and clearly false, "attest[ation], under the penalty of perjury, that the documents ordered to be produced by Tuesday July 18, 2022 . . . have been produced as required . . ." (Ex. 13), Mr. Etra makes no pretense of contending that he has complied with the Order by providing complete or remotely current statements. This is, nonetheless, the least of his defalcations.

### Respondent's Declarations

Mr. Etra was ordered to "file a sworn statement, executed under penalty of perjury, certifying that the documents ordered to be produced in the two paragraphs above" – which included "all documents that he has heretofore withheld as 'privileged' that are responsive to Petitioner's previously-served subpoena *duces tecum*," including "all escrow agent agreements" and "monthly statements for all bank accounts . . ." – "were produced as required."

He filed nothing, but the "affirm[ation]" he provided (Ex. 14) that "the documents ordered to be produced by Friday July 15, 2022 contained in the July 13th [sic], 2022 order of Judge Caproni, have been produced as required," was false, as demonstrated above.

He also was ordered to "file a sworn statement, executed under penalty of perjury, certifying that the documents ordered to be produced [by Tuesday, July 19] were produced as required."

Similarly, he filed nothing, but the "attest[ation]" he provided (Ex. 13), that "the documents ordered to be produced by Tuesday July 18, 2022 contained in the July 13th [sic], 2022 order of Judge Caproni, have been produced as required," also was false, also as demonstrated above.



Finally, he also was ordered to provide "A notarized declaration, submitted under penalty of perjury, attesting to the fact that Mr. Etra has no other open bank or brokerage account that he has not disclosed to Petitioner." He did provide such a declaration (Ex. 15). We know that he has not disclosed international accounts, and therefore there is no way to tell whether or not any of those accounts remain open. But he is getting money from somewhere.

<u>**Conclusion**</u>

Due to Your Honor's hard-earned familiarity with the sad history of this matter, we have not repeated the litany of Mr. Etra's misconduct in this letter, but ask that it be deemed incorporated by reference for the record. Benthos is at its wit's end, and its faith in the legal system has been badly shaken. For almost two years now – after misusing (not for the first time in his career) funds entrusted to his escrow account – this Member of the Bar has defied not only subpoenas but multiple court orders of increasing exasperation and severity from multiple federal judges. Benthos incurs more and more legal fees as its counsel files motion after motion, writes letter after letter, and now makes court appearance after court appearance. Yet here we still are.

We recognize that the Court's tools are not unlimited. Even after Your Honor mentioned "criminal contempt" to Mr. Etra on July 13, he continued to willfully defy the Court's orders. We trust that the Court will exercise its sound discretion with regard to coercion and punishment.

We do make three further requests:

      First, we ask that without requiring the expense of a more formal motion, the Court require Mr. Etra to disclose (i) the name and full contact information (address, telephone, e-mail and otherwise) for every "client," or other individual or entity, for which he has performed any legal, "paymaster," escrow-related or other services from August 1, 2018 through the present; (ii) for each such individual or entity, the precise nature of the services performed (together with producing all documents, including but not limited to agreements and written communications, concerning those services); (iii) for each such individual or entity, specifically what compensation Mr. Etra (or any affiliated person or entity, including but not limited to his wife or ex-wife in Croatia) received for those services; (iv) where such compensation was paid to, in each instance separately (including names, addresses, account numbers, and his responsible contact officers at each such institution); (v) all subsequent transfers of such compensation received; and (vi) the current whereabouts of all such compensation.

      Second, we ask that Mr. Etra be ordered to deliver to us, promptly each month, all monthly statements for all outstanding accounts he maintains going forward that relate in any way to his finances, including any he may open subsequently, and



Hon. Valerie Caproni
July 25, 2022
Page 12

          including but not limited to any and all Piermont Bank accounts and IOLA
          accounts wherever located.

          Third, we ask that the Court advise us whether this letter can suffice for an
          application to hold Mr. Etra in further contempt of court for the demonstrated
          multiple flagrant violations of the restraining order, or whether the Court will
          require a formal motion in that regard.

      Benthos is under no illusions at this point.  Everything that has been produced in drips
and drabs, and everything that still has been concealed, should have been disclosed two years
ago.  Benthos cannot recover that time; it cannot recover its legal fees; and it may not ever
recover its judgment from what Mr. Etra has secreted away, likely in Europe.  But Benthos
cannot give up and let Mr. Etra victimize it twice – once on the underlying scam that deprived it
of $4.5 million, and now by defying judgment enforcement – with impunity.  We implore the
Court to impose such measure of justice as is within its power.

          Respectfully submitted,

          Steven R. Popofsky

Enclosures

cc :  Alisa Benintendi
     Aaron Etra (via e-mail, with enclosures)