# Exhibit 29



**Steven R. Popofsky**
*E-Mail: spopofsky@kkwc.com*
*Direct Dial: 212.880.9882*

October 27, 2022

**VIA ECF**
Hon. Valerie Caproni
United States District Court
40 Foley Square, Room 240
New York, NY 10007

**Re: Benthos v. Etra, 20-CV-3384**

Dear Judge Caproni:

There seems no end to respondent Aaron Etra's willful refusal to comply with subpoenas, court orders and other legal obligations. It is extraordinarily frustrating to the judgment creditor Benthos – and grossly unfair – that it has to incur legal fees, over and over and over again, to obtain basic financial information subpoenaed more than two years ago. Even worse, we now know that during all of that time period (and continuing through the present), he has been earning and spending tens upon tens of thousands of dollars – including on nearly a dozen extended trips to Europe – in blatant defiance of restraining notices lawfully served upon him.

Mr. Etra is thumbing his nose not only at the entity to which he owes over $5 million, but at this Court and its authority as well. In purported response to recent subpoenas with which he was ordered repeatedly to comply, he has (among other things detailed below) produced no current bank statements. When required to provide documents "concerning . . . petitioner's . . . judgment enforcement efforts" – as well as documents concerning "attempts (by anyone) to obtain or provide funds from which to satisfy the Judgment," and concerning "all Court orders issued in this matter" – "to or from any person whatsoever . . ., including but not limited to Mel Dussel" (whom Mr. Etra has repeatedly told the Court is raising funds for him to partly satisfy or "settle" the Judgment) "[and] Helmut Allesch" (from whom Mr. Etra provided a letter, obviously solicited if not written by Mr. Etra, regarding the foreign bank accounts he identified to us but now claims are not his) – what did Mr. Etra produce? Copies of our subpoenas; nothing else.

The details of his continued defiance (more extensive than the highlights above) are summarized below. The young principals of Benthos, victimized by Mr. Etra repeatedly in this matter, implore the Court not to require additional full-blown extensive

and expensive formal motions before the court takes action against this serial contemnor. Every one of these repeated applications requires tremendous time and effort (among other things, there are so many violated orders, so many deficient responses and so many communications from Mr. Etra, all of which need to be located and cited every time, as is apparent in this submission), and the undersigned respectfully submits that the existing docket, supplemented by this letter, provides sufficient basis for the Court to direct Mr. Etra to show cause – as requested in the Conclusion below – and then to take such action as Your Honor may deem appropriate.

**<u>Escrow Agreements and Spoliation</u>**

The Court will likely recall the lengthy and extensive efforts, by Benthos and by Your Honor, to get Mr. Etra to provide copies of his Escrow Agreements with his "clients." Multiple court orders, both general and specific, were violated and then Mr. Etra was afforded the opportunity to belatedly move to quash the subpoenas in that regard, and his motion was denied (Dkt. 174).

We are now aware of 41 Escrow Agreements (and there are undoubtedly more). 31 were identified by the Court in Dkt. 144, and Mr. Etra identified ten more in Dkt. 182 and confirmed 41 (by his account) in Dkt. 192-5. He has produced only thirteen seemingly complete agreements, and five more that do not include client identifying information and/or are only partial (Dkt. 182-1). He is in contempt of court, yet again.

His apparent explanation for the missing Escrow Agreements is that "data was lost" in late June of this year – conveniently just around the time it was becoming clear to him that Your Honor was serious about compelling compliance, and almost two years after he was subpoenaed – due to "Liquid Damage" (as described by Apple and otherwise unexplained by Mr. Etra); and he also made some convoluted assertions about material having been "deleted" although he never had made that claim before. See Dkt. 150 at paras. 11-12 and Dkt. 182. Those points were already addressed by petitioner at pages 5-7 of Dkt. 153 and we respectfully request that the cross-motion at Dkt. 151, previously denied without prejudice to renewal (Dkt. 154), be deemed renewed at this time.

**Ongoing, Willful and Egregious Violations**
**<u>Of Restraining Notices</u>**

Petitioner also respectfully requests that the other prong of its previous cross-motion (id., also denied without prejudice to renewal; see also Dkt. 172), regarding



violations of the restraining notice served on Mr. Etra two years ago, be renewed and that he be required to respond to it. See Dkt. 153 at pages 7-9; see also Dkt. 136. And subsequent to that cross-motion, Mr. Etra admitted that he "took . . . fees" during the past "four years of this matter" (see Dkt. 170 and 172; see also Dkt. 192-5 at No. 3, blithely referring to "[unspecified] [c]lient payments earned and having been deposited . . .").

We are not talking here about trivial or technical violations, nor about Mr. Etra needing money to eat. <u>He flew to Europe at least 9 times</u> (Dkt. 147-2[1]), spending money that belongs to Benthos. He concealed all of that – withholding for two years those extensive bank statements that he of course knew he was required to produce (and had been ordered multiple times by Judge Nathan to produce) – until his profligate expenditures were revealed in a supplemental document production only after he was incarcerated briefly for his contempt.

<u>And he is keeping it up</u>.[2] As discussed below, when ordered to comply with petitioner's most recent specific subpoenas, which sought (as Mr. Etra well understood) his current bank statements – i.e., those generated after the statements through June 30, 2022 that he finally produced in July under the Court's coercion – he simply ignored that aspect of the subpoena. He also informed the Court recently that his Piermont Bank account – the one that the Court had finally pried out of him; the one that revealed the bulk of his spending, including the international travel; and the one that he had deliberately concealed for as long as he felt he could – has been closed. (Dkt. 169) Thus, Benthos has zero visibility – precisely as Mr. Etra intends – into his current finances, including almost certainly continued expenditures in violation of the initial restraining notice (Dkt. 24-2) as well as the more recent restraining notice (Dkt. 156-1) – both of which state, on their face in the New York standard form, "TAKE FURTHER NOTICE that disobedience of this restraining notice is punishable as a contempt of court."

Furthermore the importance of current bank statements was made expressly clear to Mr. Etra: The August 2 subpoena (Dkt. 156-2), which contained only nine items, sought "all monthly [bank] statements" including those "***continuing after the date of this subpoena***" (emphasis in the subpoena so that Mr. Etra would not overlook the

---

[1] August-September 2020; November 2020; December 2020-January 2021; June-July 2021; August-September 2021; November 2021; April 2022; May 2022. Recall that in December of 2020, he told Judge Nathan that Benthos had rendered him so impecunious that he was "unable to . . . purchase basic necessities" (Dkt. 54 at p. 2).

[2] See Petitioner's Memorandum of Law, Dkt. 153, at 9 n.2: "[Mr. Etra] has not changed his *modus operandi* one whit."



Case 1:20-cv-03384-VEC-KHP Document 202 Filed 10/27/22 Page 4 of 12

obligation); and in petitioner's memorandum of law in opposition to his motion to quash (Dkt. 161 at 5), we stated quite clearly as follows:

> Benthos hereby withdraws that portion of document subpoena Request No. 2 addressing documents between August 1, 2018 and June 30, 2022 (but only that portion). The aim of Request No. 2 of Dkt. 156-2 was and is to get (i) the documentation between August 1, 2017 and August 1, 2018 and (ii) current and ongoing statements, because Mr. Etra produced statements through the end of June 2022, under this Court's compulsion, but clearly has no intention of disclosing his ongoing finances – which of course will reveal continued violations of the restraining notice and continued expenditures of funds from unknown sources – absent an unambiguous court order to that effect.

Well, the Court issued an unambiguous court order to that effect (Dkt. 174, particularly at 15-16 and 15 n.12), and then denied Mr. Etra's requests for extensions (see Dkt. 177, 181, 184, 190). Still no current bank statements.[3] Still undoubted violations of the restraining orders. Surely the Court is not powerless to punish the past violations and enjoin future ones.

**Willful Disobedience of Subpoena Duces Tecum**

It is hard to decide which is the more audacious of Mr. Etra's responses to the subpoena duces tecum (Dkt. 156-2).

Current Bank Statements

As noted immediately above, Mr. Etra has quite deliberately refused to produce any bank statements for the period since June 30, 2022, which was the last date covered in the statements he produced over the summer under judicial compulsion. Current bank statements are, of course, the easiest thing to produce of everything for which Mr. Etra ever has been subpoenaed: They do not require going to former banking relationships; they do not require digging into old records; and (even if one credits Mr. Etra's claims of physical incapacitation, which Benthos decidedly does not[4]) in this electronic age, they

[3] He also produced no bank statements from 2017, although they were not only subpoenaed and ordered to be produced, but his attention was drawn to 2017 specifically in Dkt. 161 at 5 as noted above.

[4] See Dkt. 199 and Judge Parker's response at Dkt. 201.



require literally no effort at all beyond a few computer clicks. And the Jewish holidays, which Mr. Etra sought to use as an excuse repeatedly and pretextually,[5] would not preclude even the most pious rabbi from making those clicks – if motivated to do so.

Yet in response to a subpoena served in early August, it is now almost November and he has succeeded – yet again – in concealing his finances for all of this time. July, August, September (and shortly October); the man must bank somewhere. Where are the statements?

At this point, it should no longer be sufficient to just order Mr. Etra to "now do it." He has been so ordered time and time again (and time and time again after that). This is just an endless loop, where every time Benthos (or the Court) identifies something required but not produced, Mr. Etra stalls and stalls and stalls until eventually his back is to the wall, and then it starts all over again. He produced the Piermont statements (which revealed a host of misconduct; see Dkt. 136) only after being incarcerated, and now presumably will produce the July-October statements when ordered, and then he will not produce any subsequent statements and we will be right back here again, with more delay and more expense to a judgment creditor already owed over $5 million. There must be some sanction for this behavior.

Communications Concerning Judgment Enforcement

The very first request in the recent document subpoena sought Mr. Etra's post-judgment communications regarding petitioner's judgment-enforcement efforts:

> All documents concerning communications since the date of the Judgment (August 13, 2020) sent or received by You concerning (i) Your financial status, (ii) any attempts (by anyone) to obtain or provide funds from which to satisfy the Judgment (in whole or in part), (iii) any and all Court orders issued in this matter since August 13, 2020, and (iv) petitioner's or petitioner's counsel's judgment enforcement efforts, to or from any person or entity whatsoever (excluding communications with financial institutions seeking copies of statements),

[5] The Court already noted that there were many non-holiday days over the past month (Dkt. 177). Revealingly, however, Mr. Etra sent a letter to the Court (Dkt. 195) on October 17, the Jewish holiday of Shemini Atzeret, a day on which observant Jews do not work, notwithstanding his repeated pretextual invocation of the "Jewish holidays" to support various extension requests. See also Dkt. 176, recounting Mr. Etra's underlying misconduct against Benthos that occurred during the Jewish holidays of 2018, when Mr. Etra had no compunction at all about working so as to defraud Benthos out of almost $5 million.

Case 1:20-cv-03384-VEC-KHP Document 202 Filed 10/27/22 Page 6 of 12

including but not limited to Mel Dussel, Helmut Allesch, Tracy Evans, Dmitri Kaslov (or any such person who has used that name), Minh Hoang Le (or any person who has used that name), and Koraljka Troselj.

In response to subsection (iv), Mr. Etra produced nothing more than petitioner's own subpoenas. See Dkt. 192-3 at p. 1, item 1(iv): "Copies of petitioner's enforcement efforts, etc. (attached) (Mr. Popofsky's subpoenas)"; Dkt. 192-11 (the subpoenas that he produced back to us on October 7).

Mr. Etra is a graduate of Columbia Law School and an intelligent man (intelligent enough to scam multiple victims, not limited to Benthos, out of monies entrusted to his escrow account, among other things). He can read a document request and knows very well that the request quoted above was seeking his communications with others, not copies of Benthos's own prior subpoenas. But to stall – as usual – and to make it appear on the surface like he had not produced zero in response to that request, he insulted the Court's intelligence by purporting to produce a bunch of pages in response.[6]

Similarly, in response to subsection (ii), he produced nothing more than one letter his business colleague Mel Dussel sent to the Court last spring (see Dkt. 192-3 at p. 1, item 1(ii) and Dkt. 192-11). Obviously, if Mr. Dussel has been seeking to raise funds for Mr. Etra to pay part of the judgment in settlement (as Mr. Etra repeatedly has represented to Your Honor and to Judge Parker that he is doing), Mr. Etra and Mr. Dussel have been communicating in that regard. See also Dkt. 152 at para. 3, recounting Mr. Dussel's call to the undersigned on the eve of the last hearing, when Mr. Dussel requested an adjournment of the next day's in-person hearing on the basis that he "fully expected" to send Benthos "at least" a "minimum $100,000" "this week" – claiming he had been "expecting" to have that money "today" – and that he was "confident" he would have at least seven figures to settle the matter, and "can help end this situation in the next day or two," "if you can stop something from happening tomorrow." Not to mention that Mr. Dussel would not have written to the Court out of the blue – obviously, Mr. Etra solicited (if not wrote) the letter from Mr. Dussel that he repeatedly has submitted, yet Mr. Etra

[6] He did the same thing with regard to request No. 2 of the subpoena duces tecum for bank statements. He knows full well that in our memorandum of law opposing his motion to quash (Dkt. 161 at p. 5), we withdrew that portion of the request that sought bank statements after 2017 through June 30, 2022 – we stated very explicitly, as quoted above, that "The aim of Request No. 2 of Dkt. 156-2 was and is to get (i) the documentation between August 1, 2017 and August 1, 2018 and (ii) current and ongoing statements" (id.) – yet to "pad" his response, he re-produced a bunch of 2018-2022 bank statements previously produced, while producing nothing new or responsive to the revised request for 2017 and post-June 2022 statements.



has produced not a single solitary communication between himself and Mr. Dussel. He knows that was required, but does not want to reveal those communications, so he simply stonewalls. As always.

Speaking of letters that did not descend upon the Court as though from heaven, Mr. Etra has relied heavily on a letter from Helmut Allesch (Dkt. 185 at p. 6, among many other times, including Dkt. 192-10 at p. 5: "Mag. Allesch's letter makes the facts as clear as can be"), purporting to support Mr. Etra's claim of non-control of the foreign bank accounts he identified to Benthos in the first place (see Dkt. 193 at pdf pages 4-5). Subpoena duces tecum request No. 1 sought specifically "communications since the date of the Judgment . . . sent or received by You concerning . . . petitioner's or petitioner's counsel's judgment enforcement efforts, to or from any person or entity whatsoever . . ., including but not limited to . . . Helmut Allesch [and others]" (emphasis added). He produced no e-mails or text messages with Mr. Allesch, but it is inconceivable that none exist. Once again, Mr. Etra simply does what he wants, and dares the Court to punish him.

2017 Bank Statements

Item 2 of the subpoena duces tecum also sought Mr. Etra's bank statements for the last five months of 2017. Mr. Etra repeatedly has sought to avoid disclosure of his finances during that year (see, e.g., Dkt. 115), and petitioner made known its focus on this aspect of the subpoena in the brief cited above (Dkt. 161 at 5). Yet Mr. Etra produced zero bank statements from 2017; and given that he opened and closed over two dozen accounts between 2018 and 2022 (see, e.g., Dkt. 95 at p. 17), it is highly likely that he had many in 2017 as well.

And time constraints are no excuse (on this aspect or the subpoenas generally). The subpoena was served on August 2; the court denied repeated extension requests and then denied his motion to quash on September 26 and then denied still further requests to extend his time to comply. On October 7, he asked for "a reasonable time after the end of the holidays on October 18th" (Dkt. 189), and while the Court denied that request (Dkt. 190), he has produced nothing more in the many days after October 18 in any event. He just says whatever seems necessary to stall in the moment.

Documents Concerning His Escrow Services



Item No. 5 of the subpoena duces tecum sought "All documents, including but not limited to agreements and written communications, concerning" the services for which Mr. Etra took monies into escrow.[7] Other than a very partial production of the required Escrow Agreements themselves (discussed above), Mr. Etra did not produce a single responsive document, meaning zero e-mails or text messages with more than three dozen purported clients who signed agreements with him and in most cases sent him money (sometimes very large sums of money, as demonstrated by the bank statements he produced after his brief incarceration).

Once again, the business from those 41 escrow "clients," from all around the world (Spain, Australia, the UK, Croatia, Portugal, the U.S., Peru, Canada, etc.) did not materialize out of thin air. Clearly Mr. Etra communicated, extensively, with most or all of those "clients" regarding the monies they were sending him, what he was going to do for them, and what was going on with their money. To choose only the most outlandish example, Dkt. 188-1 at pp. 33-36 states on its face that one "Patrick Creamer" of London would be transferring "$5Billion USD" (yes, "Billion," not "Million") into Mr. Etra's escrow account, together with several other massive transfers. The level of contrived detail is very reminiscent of Mr. Etra's underlying scam against Benthos, and it is difficult not to suspect another scam in the works here – and of course Mr. Etra must have been charging a hefty fee for all this purported activity. Whatever the true story is – and we can all be confident we do not know it, and Mr. Etra is not going to tell us – there surely were written electronic communications exchanged between Mr. Creamer and Mr. Etra about that Escrow Agreement, those multiple transfers stated, and Mr. Etra's services in connection with it – as with all of the others – yet he has, once again, deliberately chosen to withhold all of them, thereby forcing Benthos to incur more legal fees chasing him and obtaining yet another court order. This never ends.[8]

---

[7] The specific request was for documents "concerning the services referred to in item No. 1 of the accompanying Information Subpoena" (Dkt. 156-1), and that item No. 1 (to which Mr. Etra also did not respond properly, as discussed below) was as follows: "Identify (i) the name and full contact information (address, telephone, e-mail and otherwise) for every "client," or other individual or entity, for which You have performed any legal, "paymaster," escrow-related or other services from August 1, 2017 through the present; (ii) for each such individual or entity, the precise nature of the services performed; (iii) for each such individual or entity, specifically what compensation You (or any affiliated person or entity, including but not limited to Koraljka Troselj) received for those services; (iv) where such compensation was paid to, in each instance separately (including names, addresses, account numbers, and Your responsible contact officers at each such institution); (v) all subsequent transfers of such compensation received; and (vi) the current whereabouts of all such compensation."

[8] There are other deficiencies in Mr. Etra's response to the subpoena duces tecum (in addition to item 4, the Escrow Agreements, addressed separately above), although the text above has focused on the most egregious of those deficiencies. He has not represented that the single rent statement he produced (Dkt. 192-7) in response to No. 6 (communications with his residence landlord) is all that there is, nor that he has had no written communications with



**Willful Disobedience of Information Requests**

Mr. Etra double-talked his way around responding meaningfully to Information Request No. 1 (Dkt. 156-1 at p. 6, quoted in footnote 7). His response is set forth at Dkt. 192-5. In particular, but without limitation, the subpoena sought "(iii) "for each . . . individual or entity [for whom he performed escrow services], specifically what compensation You . . . received for those services; (iv) where such compensation was paid to, in each instance separately (including names, addresses, account numbers, and Your responsible contact officers at each such institution; [and] (v) all subsequent transfers of such compensation received."

We were seeking, of course, to "follow the money" (to coin a phrase). The Court can readily see for itself that Mr. Etra's response does not provide the information required. It is plainly not sufficient – and particularly not after leading us on wild goose chases for two years, and being held repeatedly in contempt of court – for Mr. Etra to just say, in essence, "look at my bank statements and figure it out, if you can." It was his job at this point, not ours, to tease out the requisite information, if indeed it can be found in his statements, and plainly it cannot be found in any event: For example, he has not specified who paid him what, and where each payment went from "each [payor] separately." He identifies three bank accounts to which "such compensation was paid" (Dkt. 192-5, item 1(iv)), but those statements merely show occasional incoming unidentified funds, and in other instances there is no way to tell whether deposits were escrow pass-throughs or fees.

This is just more game-playing, long after having been told that the Court would not tolerate that behavior. He also refers (in Dkt. 192-5, item 3) to "Client payments earned and having been deposited into Piermont Bank account ending in #2060 [and] M&T ending in 3433," but he produced no "3433" account and the 2060 account (not

---

his office landlord in response to No. 7. Given that he produced zero e-mails or text messages with either landlord, the Court can infer that he is withholding such communications. He claims to owe his residence landlord over $100,000 in rent, yet he has not been evicted, and it is (again) inconceivable that there are no written communications addressing that situation. He has not remotely produced all his credit card records (No. 3); and while his bank statements reflect periodic payments to American Express (including from his IOLA account; see Dkt. 136 at 4), and he identified "AMEX" as one of his credit cards in his response to the recent subpoenas (Dkt. 192-5 at Nos. 6 and 7), including Dkt. 192-3 at No. 3 where he stated ". . . AMEX . . . (attached)," he did not in fact "attach" any American Express statements.

Case 1:20-cv-03384-VEC-KHP Document 202 Filed 10/27/22 Page 10 of 12

identified in response to item i(iv)) has hundreds of transactions that cannot be sorted out to understand who paid him what in connection with his escrow services.[9]

**Conclusion**

The exhausted but determined judgment creditor respectfully requests that the Court direct Mr. Etra to show cause as follows:

1. Why he should not be sanctioned, as appropriate in the Court's discretion, for the spoliation of the missing Escrow Agreements.

2. Why he should not be sanctioned, as appropriate in the Court's discretion – but not excluding criminal contempt of court (because he is literally impervious to monetary fines) – for his willful violations of the restraining notices over more than a two-year period, during which he has spent tens (if not hundreds) of thousands of dollars that rightfully belonged to his judgment creditor, which has been incurring legal fees all that time seeking to secure his basic compliance with straightforward subpoenas and court orders.

3. Why he should not be enjoined from continuing to violate the restraining notices going forward.

4. Why he should not be ordered to forward all income he receives, from "clients" and otherwise (excluding Social Security payments) to his judgment creditor.

[9] It is impossible to catalog all of Mr. Etra's violations. In response to Information Request No. 4 ("List all bank accounts . . . in which You have (or had) an interest . . . since August 1, 2017"), he made no pretense of attempting a "list" but merely wrote "The bank accounts for which I have an interest are attached" (Dkt. 192-5) and then re-produced previously-produced statements from only a fraction of the more than two dozen accounts long ago identified, re-producing some statements twice to pad his production, but neither producing nor even identifying any bank or other accounts during 2017 – which, again, is a period he has taken pains in the past to conceal and as to which his attention was expressly drawn in Dkt. 161 at 5. And he plainly lied in Dkt. 192-5 about his "current monthly living expenses" (No. 2 in the information subpoena), claiming "transportation" costs of only $75-300, conveniently ignoring the frequent flights to Europe. He claims to be paying no rent for his luxury high-rise, and it is unclear whether he claims to be making "Credit Card Payments monthly" but we have no record of such monthly payments. He is paying for an "Office Rental" when he claims to be sick in bed whenever he needs to appear (in person or remotely) in court. And it is nice that he is paying $500 per month for "Apartment Cleaning and laundry and dry cleaning" when he owes Benthos more than $5 million and has never paid a penny on that judgment.



5. Why he should not be found, yet again, in contempt of court and incarcerated until he complies with the two August 2, 2022 subpoenas (and the ensuing court orders directing such compliance), at least to the extent of (i) producing all current bank statements since the last statements produced that ended June 30, 2022; (ii) identifying, and demonstrating a good-faith effort to produce, all bank, brokerage and other accounts in which he had an interest from August 1 through December 31 of 2017; (iii) producing a substantially complete response to Item No. 1 of the recent subpoena duces tecum seeking various post-judgment communications (Dkt. 156-2); (iv) producing a substantially complete response to Item No. 5 of the recent subpoena duces tecum seeking documents (apart from the Escrow Agreements themselves) concerning his escrow services (id.); and (v) providing a substantially complete response to Information Request No. 1 seeking information about (among other things) the compensation he received for his escrow services (Dkt. 156-1).

6. Why he should not be ordered to surrender his passport, and/or be enjoined from traveling outside of the United States (unless he can demonstrate to the Court's satisfaction that his airline tickets and trip expenses are being paid by a third party independent of any funds belonging to the judgment debtor), pending satisfaction of the judgment or substantial compliance with all outstanding subpoenas and court orders relating to the judgment.

7. Why he should not be found in criminal contempt of court – again, fines are irrelevant to him – for his past willful violations of multiple court orders.

8. Why he should not be directed specifically to comply with those portions of the August 2, 2022 subpoena duces tecum (Dkt. 156-2) that (i) direct that "This request shall be deemed continuing in nature, and you shall promptly produce in the form of supplementary document productions any document demanded herein that subsequently is discovered or obtained by, or becomes available to, you or your attorneys subsequent to your response to this request"; (ii) direct that "This subpoena . . . includes documents created,



> dated, sent or received subsequent to the date of this subpoena"; and (iii) as to request Nos. 2 and 3 (monthly bank and credit card statements), require production of "All [responsive] documents . . . continuing after the date of this subpoena."

Should the Court require Benthos to proceed in any other manner, we will of course comply, but we implore the Court to consider the immense and unreasonable burdens that Mr. Etra's two-year campaign of defying subpoenas and court orders – multiple specific court orders – has unfairly imposed on this judgment creditor. On behalf of my client's principals, I thank the Court again for its continuing attention to this matter amidst Your Honor's crowded docket.

Respectfully yours,

[signature]

Steven R. Popofsky

cc: Aaron Etra (by ECF and e-mail)