```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


In re:                              :
                                        Docket #20cv3384
BENTHOS MASTER FUND, LTD.,          : 1:20-cv-03384-VEC-KHP

                    Plaintiff,      :

   - against -                      :

ETRA,                               : New York, New York
                                      November 9, 2022
                    Defendants.     :

------------------------------------ :


                      PROCEEDINGS BEFORE
                THE HONORABLE KATHARINE H. PARKER,
                 UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
                        BY:  STEVEN POPOFSKY, ESQ.
                        500 Fifth Avenue
                        New York, New York  10110

For Defendant:          AARON ETRA, PRO SE




Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com

Proceedings recorded by electronic sound recording; Transcript
produced by transcription service.
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| Aaron Etra | 5 | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| **Plaintiff** | | | | |
| 1 | Excerpt from deposition | 9 | | |

1                          PROCEEDINGS                    3

2            THE CLERK:  Calling case 20cv3384, Benthos

3   Master Fund versus Aaron Etra.  Beginning with counsel

4   for the plaintiffs, please make your appearance for

5   the record.

6            MR. STEVEN POPOFSKY:  Steven Popofsky, Your

7   Honor, Kleinberg, Kaplan, Wolff & Cohen for the

8   petitioner. With my is my legal assistant, Ellie

9   Taylor.  Good afternoon.

10           HONORABLE KATHARINE H. PARKER (THE COURT):

11  Good afternoon.

12           THE CLERK:  And can the defendant please make

13  his appearance for the record.

14           MR. AARON ETRA:  I'm Aaron Etra, Your Honor.

15           THE COURT:  Nice to see you.  Okay, thank you

16  for coming in today.  Judge Caproni has referred one

17  issue for me to resolve which is whether Mr. Etra has

18  custody or control of certain bank accounts at

19  Sberbank and UniCredit, such that he would be in

20  contempt of Judge Caproni's order at ECF number 132 to

21  produce statements from those accounts.  As the party

22  seeking production of those documents, Benthos, bears

23  the burden of demonstrating that Mr. Etra has

24  possession, custody and control, so this proceeding is

25  solely addressing those accounts.

PROCEEDINGS                                    4

1

2              Now, before we get started I have just a

3     couple of questions, I'm going to ask them first of

4     Mr. Popofsky, do you have actual bank account numbers?

5              MR. POPOFSKY:  No, Your Honor, we have only

6     what Mr. Etra told us.

7              THE COURT:  So you submitted a brief on this

8     issue and Mr. Etra submitted a response to the issue,

9     if there are items that you -- I'll hear argument from

10    you now and if you would like to question Mr. Etra

11    specifically he can be placed under oath and you can

12    ask him those questions.

13             MR. POPOFSKY:  Yes, Your Honor, since we're

14    here and it's convenient here, I'd like to do that.

15             THE COURT:  Okay, so Mr. Etra, what I'm going

16    to ask you to do is to come up and sit right here.

17    And, Mr. Popofsky, I want you to limit your questions

18    solely to these accounts, I don't want to hear about

19    anything else in this case, the questions have to be

20    focused like a laser on whether Mr. Etra has

21    possession, custody or control of accounts at these

22    two banks, okay?

23             MR. ETRA:  I understand, Your Honor, but part

24    of, part of my argument, given the situation, is that

25    Your Honor is going to have to draw some negative

```
 1                          PROCEEDINGS                    5
 2  inferences, so I believe some context is required but
 3  we'll, I'm sure if I ask a question that you deem
 4  objectionable you'll tell me. But I do, I need some
 5  context to establish --
 6           THE COURT:  I'm quite familiar with the
 7  issues, so I don't want you to repeat things in the
 8  papers that you submitted. If there is particular
 9  testimony you want from Mr. Etra, you can proceed now
10  and I'm going to ask my deputy, Mr. Etra, to place you
11  under oath.
12  WHEREUPON,
13                    A R R O N   E T R A,
14  was duly sworn or affirmed to testify as follows:
15           THE CLERK:  Please state your name for the
16  record.
17           THE WITNESS:  Aaron Etra.
18           THE CLERK:  Thank you, sir.
19           THE COURT:  Okay, go ahead, you can stand at
20  the podium, Mr. Popofsky.
21           MR. POPOFSKY:  We have some documents that we
22  may be introducing as exhibits.
23           THE COURT:  Okay.
24           MR. POPOFSKY:  Can we hand those up to you?
25           THE COURT:  Yes. Yes, you may.
```

```
 1                      PROCEEDINGS                6

 2          MR. POPOFSKY:  These were, these were

 3  delivered to Mr. Etra the morning of the last hearing

 4  as well, Your Honor.

 5          THE COURT:  Okay.  Give this to Mr. Etra so he

 6  has it in front of him.

 7  DIRECT EXAMINATION BY

 8  MR. POPOFSKY:

 9      Q:  Good afternoon, Mr. Etra.

10      A:  Good afternoon, Mr. Popofsky.

11      Q:  You're a licensed attorney, correct?

12      A:  I am.

13      Q:  A member of the New York State Bar?

14      A:  Yes.

15          THE COURT:  Can you speak into the microphone,

16  please, Mr. Etra?

17      A:  Sorry, can I move this chair closer?

18          THE COURT:  You can, yes, move your chair

19  closer and just move the microphone closer. There you

20  go.

21      A:  Thank you.

22          THE COURT:  And go slowly, please.  Okay.

23      Q:  On April 12, 2019, you gave deposition

24  testimony in a state court case brought by Benthos

25  against Hugh Austin and others, correct?
```

```
 1                      ETRA - DIRECT (By Mr. Popofsky)        7
```

 2        A:   You'll have to refer me to what you're

 3   referring to, Mr. Popofsky.

 4        Q:   Do you recall giving the deposition in a state

 5   court case against Hugh Austin a few years ago?

 6        A:   I do. Yes.

 7        Q:   You testified pursuant to subpoena and under

 8   oath at that time, correct?

 9        A:   I believe you did subpoena me, yes.

10        Q:   And you testified under oath, correct?

11        A:   I did.

12        Q:   And were you asked the following questions to

13   which you gave the following answers?

14             THE COURT:  Wait a minute, Mr. Popofsky, that,

15   what -- that's cross examination, this is not --

16             MR. POPOFSKY:  He's an adverse witness --

17             THE COURT:  Yes, but you haven't asked him a

18   direct question on which he's provided an answer for

19   which a cross examination question is appropriate. So

20   ask him the question, if he answers it consistent,

21   there's no reason to go through prior statements.

22             MR. POPOFSKY:  Your Honor, I'm just

23   introducing the fact that he testified he had a

24   European bank account.

25             THE COURT:  Well ask him the question right

ETRA - DIRECT (By Mr. Popofsky)       8

1

2  now and if you want to cross examine him on that, then

3  cross examine him on that, but that's not the

4  appropriate way to start a questioning.

5       Q:  Mr. Etra, as of 2019, did you have a European

6  bank account?

7       A:  I had access to an account that I referred

8  clients to, yes.

9       Q:  Did you have a bank account, yourself?

10      A:  I did not.

11      Q:  In April of 2019, after you testified I bank

12  in several banks, were you not asked the following

13  questions to which you gave the following answers:

14  "Question:  Do you have a European bank account?

15  Answer:  Yes"?

16      A:  That was the basis for my answer, yes, Mr.

17  Popofsky.

18      Q:  And -- and were you asked at what bank is that

19  account to which you responded that bank is a bank in

20  Europe?

21      A:  I don't recollect the answer, Mr. Popofsky, if

22  you could refer me to it then I can say yes or no, I

23  don't recollect what I said.

24      Q:  Yes.

25          MR. POPOFSKY:  Your Honor, could I offer into

```
 1                    ETRA - DIRECT (By Mr. Popofsky)      9
 2   evidence Exhibit 1 in the booklet which are excerpts
 3   from that deposition?
 4          (Plaintiff's Exhibit 1 marked for
 5   identification.)
 6      Q:  The language I quoted from, Mr. Etra, is on
 7   page 249, it's excerpted, we don't have 250 pages in
 8   the exhibit, you can look at Exhibit 1, page 249.
 9          THE COURT:  Mr. Etra, you have a booklet in
10   front of you with exhibit tabs, I think counsel is
11   referring to exhibit tab 1, if you want to take a look
12   at that.
13      A:  Do I have to do that or can I just answer his
14   questions?
15          THE COURT:  Well he's asked you if you recall
16   this testimony and you said you don't --
17      A:  No.
18          THE COURT:  So you can take a look at it to
19   see if it refreshes your recollection.
20      A:  I'm sorry, I can't seem to find what --
21          THE COURT:  Exhibit 1.
22      A:  Exhibit 1, okay.
23          THE COURT:  There's some, why don't you just
24   take a minute and read through the deposition
25   testimony.
```

```
 1                      ETRA - DIRECT (By Mr. Popofsky)      10

 2        Q:  It's at the top of page 249, Mr. Etra, it's

 3   the first page after the cover page in Exhibit 1.

 4             THE COURT:  But feel free to read the entire

 5   --

 6        A:  Okay, my Exhibit 1 has only a limited number

 7   of pages.

 8             THE COURT:  Right, why don't you read through

 9   those pages.

10        A:  Okay.  Okay, I now see 249.

11             THE COURT:  Okay, go ahead, proceed with your

12   questions, Mr. Popofsky.

13        Q:  And in 2019 was there a European bank at which

14   you held an account?

15        A:  No.

16        Q:  Could you turn to page 251 in the document

17   you're looking at --

18        A:  Mr. Popofsky, the answer to that question is I

19   think further elucidated in this and I can, if you ask

20   me a direct question I can explain it to you as well.

21        Q:  Please turn to page 251, beginning on line 5,

22   were you asked this question and did you give this

23   answer:  "Question:  Just to be clear, sir, are you

24   refusing to tell me the name of the European bank at

25   which you hold an account?  Answer:  I am not
```

ETRA - DIRECT (By Mr. Popofsky)     11

 1

 2   refusing, I am saying it has nothing to do with this

 3   transaction and is not relevant." And then a few

 4   lines below that did you make the statement, "It is a

 5   confidential arrangement between me and my bank"?

 6       A:  Yes, and as I say to you now, that is in

 7   respect of the accounts to which I referred clients

 8   and that's a confidential arrangement between them,

 9   that bank and the fiduciary.

10       Q:  Could you please turn to what's been marked as

11   Exhibit 2 in your booklet, please? Do you have that,

12   Mr. Etra?

13       A:  I do.

14       Q:  I'm sorry, I might not have heard your

15   response, do you have that?

16       A:  I'm to Exhibit 2, yes, Mr. Popofsky.

17       Q:  Yes, okay. And do you see the first page

18   indicates this is a document you submitted to us

19   during judgment enforcement, correct?

20       A:  I see it, yes.

21       Q:  All right, turning to the second page of

22   Exhibit 2, do you see request number 1 and your

23   response?

24       A:  The second page, is there a number to that --

25       Q:  No, this is a document you submitted to us --

1

2      A:   Yeah --

3      Q:   It's the second page of Exhibit 2.

4      A:   Okay, I'm with you.

5      Q:   Do you see item number 1, list all bank

6  accounts, et cetera?

7      A:   My page number 2 starts with, "And the date it

8  was closed," and number 6, 7, 8, 9 and 10.

9      Q:   The second page of this exhibit, Mr. Etra, the

10  first page is a signature page of you, of your --

11      A:   I see, okay.

12      Q:   The second page is titled "Respondent's

13  Response to Benthos Master Fund Subpoena Duces Tecum"?

14      A:   Yes.

15      Q:   You see number 1?

16      A:   Yes.

17           THE COURT:   Speak into the microphone, Mr.

18  Etra.

19      A:   Yes, sorry, Your Honor.

20           THE COURT:   Please.

21      A:   Sorry.

22      Q:   In your response to request number 1 you

23  identified UniCredit Affiliate, correct?

24      A:   Yes.

25      Q:   Okay.  We had never asked you anything about

```
 1                            ETRA - DIRECT (By Mr. Popofsky)      13
 2   UniCredit Affiliate until you wrote that to us,
 3   correct?
 4        A:   Correct.
 5        Q:   Okay.  And you told us about an account at
 6   Sberbank, correct?
 7        A:   I'm sorry?
 8        Q:   You told us about an account at Sberbank,
 9   correct?
10        A:   I don't recollect, when did I tell you about
11   that?
12        Q:   Did we identify Seedbank to you and ask you
13   about it or did you first identify an account at
14   Sberbank to Benthos?
15        A:   I don't recollect, Mr. Popofsky.
16        Q:   You don't recollect whether you told us about
17   Sberbank before we knew about it and asked you about
18   it?
19        A:   I do not recollect, no.
20        Q:   Okay.  Please turn to Exhibit 3 in your
21   booklet.  It's docket number 86. I direct your
22   attention to page 5, please, and these pages are
23   numbered.
24        A:   Okay.
25        Q:   This is some sort of Sberbank document,
```

ETRA - DIRECT (By Mr. Popofsky)       14

1

2    correct?

3        A:   It says Sberbank on it, yes.

4        Q:   And you sent this to us, correct?

5        A:   That is correct. I sent it to you under the

6    context of the letter from the fiduciary who

7    identified that account.  So he was the source of that

8    identification.

9        Q:   And if I suggest to you that we knew nothing

10   about any connection between you and a Sberbank

11   account before this, do you have any reason to

12   disagree with that?

13       A:   I have no reason to agree or disagree with

14   that, the history of it was that this information came

15   in respect to what you asked me to provide as to those

16   two accounts and this was provided by the fiduciary

17   whose account this is, or was.

18       Q:   You sent this to us on November 19, 2021,

19   correct, that's the page before the Sberbank document,

20   you can see the date?

21       A:   Yes, as part of the explanation --

22       Q:   And we had never asked you --

23       A:   Of the European accounts.

24       Q:   (continuing) -- anything about Sberbank before

25   November 19th of 2021, have we?

1                    ETRA - DIRECT (By Mr. Popofsky)      15

2        A:   Mr. Popofsky, I've been trying to respond to

3   you comprehensively as best I could, and it was in

4   that context that I provided this information which

5   also referred to the UniCredit affiliate. I've been

6   trying to be responsive from the very beginning and

7   this is consistent with that.

8             THE COURT:  Where is the UniCredit affiliate

9   referred to in this exhibit?

10            MR. POPOFSKY:  It's not, Your Honor. I would

11   ask that Mr. Etra be directed to answer the last

12   question or I can repeat it.

13            THE COURT:  Repeat the question.

14        Q:   Isn't it true, Mr. Etra, that before you sent

15   us this Sberbank document on November 19, 2021, we had

16   never asked you a question about any Sberbank account

17   before that?

18        A:   Mr. Popofsky, I understood you asked me about

19   European accounts and I responded by the best I can to

20   provide that information.

21        Q:   That's not the question I'm asking you, sir,

22   I'm asking whether we had ever brought Sberbank to

23   your attention before you brought it to our attention

24   on this date?

25        A:   I do not recollect, Mr. Popofsky.

1

2    Q:  You don't recollect?

3    A:  No.  And, again, I've been trying to be

4  responsive as best I can and as comprehensively as I

5  can.

6         MR. POPOFSKY:  I'd move to strike that portion

7  of the response, Your Honor.

8         THE COURT:  I'm going to overrule that motion.

9  Keep asking him questions.

10    Q:  I'd ask you to turn to Exhibit 4 in the

11  booklet, please, Mr. Etra.  Do you see that document?

12    A:  Yes.

13    Q:  It's a report and recommendation from Judge

14  Parker to Judge Nathan, correct?

15    A:  Yes.

16    Q:  And on page 24 of that statement, Judge Parker

17  recommended that you be ordered to produce the full

18  set of monthly statements for the UniCredit account

19  and the full set of monthly statements for the account

20  for which a two page untranslated document was

21  previously provided, that's on page 24 and page 32.

22  Do you recall being ordered to produce those

23  statements?

24    A:  Yes, but I'm not sure that the sequence is

25  correct, I believe the material from the fiduciary

1                        ETRA - DIRECT (By Mr. Popofsky)        17

2    came after in response to that, not before.

3         Q:   And on May 16th of 2022, Judge Caproni adopted

4    those recommendations and also ordered -- and ordered

5    that those statements be produced, do you recall that?

6         A:   I do.

7         Q:   I'm sorry, I didn't hear you?

8         A:   I do.

9         Q:   Okay.  That's in Exhibit 5 at page 5.  On July

10   14, 2022, Judge Caproni ordered you again to produce

11   UniCredit and Sberbank statements, correct?

12        A:   Please refer me to where that is so I can --

13        Q:   Exhibit -- you don't recall that?

14        A:   I don't recall all the dates that you're --

15        Q:   Exhibit 6 --

16             THE COURT:  The Court can -- the Court can

17   take judicial notice of the different, of its orders.

18   I think the purpose of today's questioning should

19   focus on whether Mr. Etra has possession, custody and

20   control of these two bank accounts.

21        Q:   Okay, I understand, Your Honor.  Mr. Etra,

22   between August, 2020, and May, 2022, you flew to

23   Europe on at least nine separate trips, correct?

24        A:   I object to question, Mr. Popofsky.

25             THE COURT:  Please answer the question, Mr.

```
 1                    ETRA - DIRECT (By Mr. Popofsky)      18
 2   Etra.
 3        A:   I don't believe it was -- I did fly to Europe,
 4   I don't know if that account of trips is correct or
 5   not.
 6             MR. POPOFSKY:  I would offer Exhibit 7, Your
 7   Honor, which are bank statements that Mr. Etra
 8   produced to us as a result of Judge Caproni's order
 9   and incarceration of Mr. Etra.
10        Q:   You see Exhibit 7, these are your own bank
11   statements that you produced to us, correct, Mr. Etra?
12        A:   I've been consistent producing all that I
13   have, Mr. Popofsky.
14        Q:   Mr. Etra, could you look at, just take a quick
15   look at Exhibit 7 and confirm that these are your bank
16   statements that you produced to us?
17        A:   Looking at them for the first time now the
18   answer is I think yes.
19        Q:   And, Your Honor, I'm sure you don't want me to
20   go page by page through these, but Mr. Etra, in these
21   statements, these statements reveal that you went to
22   Europe in August and September of 2020, in November of
23   2020, in December of 2020 to January, 2021, in June
24   and July, 2021, in August/September, 2021, in
25   November, 2021, in April, 2022, and in May, 2022,
```

```
 1                     ETRA - DIRECT (By Mr. Popofsky)      19
 2  don't they?
 3       A:   Mr. Popofsky, you're asking me to say
 4  something that either is here or is not here and I
 5  haven't looked at them to ascertain, but the answer is
 6  I do travel to Europe, I have family there.
 7       Q:   And at least three of those European trips
 8  were before Covid vaccines were available, correct?
 9       A:   Covid --
10            THE COURT:   How are these questions relevant
11  to possession, custody and control of these two bank
12  accounts, can you move your questions to that topic,
13  please?
14            MR. POPOFSKY:   Yes, because the bank accounts
15  are in Europe, Your Honor --
16            THE COURT:   Okay.
17            MR. POPOFSKY:   And Mr. Etra is doing business
18  in Europe.
19            THE COURT:   Okay.
20            MR. POPOFSKY:   And he concealed, he concealed
21  the existence of these trips --
22       A:   He did not.
23            MR. POPOFSKY:   Mr. Etra, I'm speaking to the
24  Judge in response to her question.
25       A:   You're making an accusation.
```

ETRA - DIRECT (By Mr. Popofsky)      20

1

2          MR. POPOFSKY:  Mr. Etra --

3      A:   Which I object to.

4          THE COURT:  Mr. Etra, hang on a second, you'll

5  be able to make an argument, Mr. Etra --

6      A:   Okay, but I object to, instead of questioning

7  he's making accusations.

8          THE COURT:  Mr. Etra, please.

9      A:   Yes, I'm sorry, Your Honor.

10          THE COURT:  I'll allow you time after Mr.

11  Popofsky finishes his questioning.

12      A:    Okay, thank you, Your Honor.

13          MR. POPOFSKY:  I'll do it by way of a

14  question, Your Honor.

15          THE COURT:  Thank you.

16      Q:   Mr. Etra, you spent thousands of dollars on

17  those European trips but you didn't disclose the trips

18  or the spending to us until this past August after

19  Judge Caproni had incarcerated you for contempt of

20  court, isn't that right?

21      A:   No connection between the two, Mr. Popofsky.

22      Q:   That's not my question, Mr. Etra.  You spent

23  thousands of dollars on those trips and you concealed

24  them from us and the spending, the spending and the

25  trips you concealed from us until this past August

ETRA - DIRECT (By Mr. Popofsky)      21

1     after Judge Caproni incarcerated you --

2          A:   I did not, I, all my bank accounts were

3     disclosed when required. I did not conceal anything,

4     no.

5          Q:   You produced these Piermont Bank statements to

6     us before August of 2022, you say that under oath, Mr.

7     Etra?

8          A:   I produced that when required to produce it,

9     Mr. Popofsky. Your Honor, I object to the questioning

10    because it's about, not about the accounts that we're

11    talking about.

12               MR. POPOFSKY:  I'll move on, Your Honor --

13               THE COURT:  Please do, Mr. Popofsky.

14               MR. POPOFSKY:  We can deal with the issue of

15    perjury separately.

16         Q:   Mr. Etra, over the past two years, hundreds

17    and hundreds of thousands of dollars passed through

18    your attorney escrow account, correct?

19         A:   Passed through my --

20         Q:   Your attorney escrow accounts?

21         A:   Are we talking about the two bank accounts in

22    question or are we talking about other accounts which

23    are not subject to this hearing?  And I object to the

24    question.

```
 1                    ETRA - DIRECT (By Mr. Popofsky)    22
 2           THE COURT:  How is this relevant to the
 3    question of possession, custody and control of
 4    Sberbank and UniCredit?
 5           MR. POPOFSKY:  He -- Your Honor, Mr. Etra has
 6    sais pretty much that the UniBank and Sberbank
 7    accounts were used for escrow transactions for his
 8    clients in Europe.
 9           THE COURT:  Well you didn't ask him that
10    question, why don't you ask him that question, that hasn't
11    been established.
12           MR. POPOFSKY:  Well he's put that into
13    evidence already, Your Honor, he's put that in in
14    multiple documents to you and to Judge Caproni. So I
15    should be entitled to ask him about those escrow
16    agreements.
17           THE COURT:  Mr. Etra -- all right, let me ask
18    a few clarifying questions. Mr. Etra, you identified a
19    UniCredit affiliate as a bank account you possessed,
20    is that the official name of the bank, UniCredit
21    Affiliate or is there some other name?
22       A:   Your Honor, that and the other one was the
23    account of Magister Ellish (phonetic), I honestly
24    don't know what the official title of his account was,
25    but that's why I tried to the best of my ability to
```

```
 1                    ETRA - DIRECT (By Mr. Popofsky)      23
 2  disclose it rather than conceal it.
 3            THE COURT:  You identified UniCredit as a
 4  personal bank account in your responses in Exhibit 2.
 5  Is Uni, so my question is when you're referring to
 6  UniCredit or UniCredit affiliate, do you know what the
 7  specific name of the bank is?
 8       A:  I don't, Your Honor, and again, I didn't refer
 9  to it as my personal account, I was asked any accounts
10  that I had anywhere, so it was part of that disclosure
11  that I wanted to be fully disclosed because I thought
12  that was relevant in making sure that I was fully
13  disclosing.
14            THE COURT:  So is it your testimony, sir, that
15  you do not have a personal bank account with personal
16  funds in it in UniCredit or UniCredit affiliate?
17       A:  Yes, Your Honor.
18            THE COURT:  That is your testimony?
19       A:  Yes.
20            THE COURT:  Is it your testimony -- okay, do
21  you have a personal bank account at Sberbank?
22       A:  No, Your Honor.
23            THE COURT:  You do not?
24       A:  I do not.
25            THE COURT:  All right.  Do you utilize
```

```
 1                        ETRA - DIRECT (By Mr. Popofsky)      24
 2   Sberbank in connection with any clients of yours?
 3       A:   I've referred them to Magister Ellish who has
 4   that account.
 5            THE COURT:   You refer them to?
 6       A:   The gentleman whose accounts they are.  The
 7   gentleman who provided that information after a
 8   tremendous amount of my effort to get --
 9            THE COURT:   How do you know that he utilizes
10   Sberbank, or how do you know, how does that -- how do
11   you know about that bank?
12       A:   He has told me that those are the accounts
13   that he has available.
14            THE COURT:   And how do you, do you utilize
15   UniCredit affiliate in connection with your
16   professional work for any clients?
17       A:   I do not, again, it's only on referral to
18   Magister Ellish, I do not operate those accounts.
19            THE COURT:   Explain how you utilize UniCredit
20   with your clients?
21       A:   If a client has funds that they either receive
22   or need to disburse in Europe in particular in Euros,
23   I don't have any such account, and if they need
24   somebody to perform that function he is a person who I
25   knew did that and I referred that to him.
```

ETRA - DIRECT (By Mr. Popofsky)    25

1

2      THE COURT:  Do you have any kind of

3  relationship with that gentleman so that you pay him

4  for this service or do your clients pay him directly,

5  or something else?

6      A:  He charges directly for his service.

7      THE COURT:  Can you explain how you utilize

8  Sberbank with your clients?

9      A:  In the same way, Your Honor, he indicated he

10  had whichever accounts he did at that time, he had one

11  with Sberbank and one with the UniCredit affiliate and

12  he said those were the two that were available to

13  clients.

14      THE COURT:  Did you ever put any of your own

15  funds in a UniCredit account?

16      A:  No.

17      THE COURT:  Did you ever put any of your own

18  funds in a Sberbank account?

19      A:  No.

20      THE COURT:  Did you ever give any of your own

21  funds to this fiduciary in Europe to put into any

22  accounts he controlled?

23      A:  No.

24      THE COURT:  Did you put your personal funds in

25  any other European bank account other than the ones

1                    ETRA - DIRECT (By Mr. Popofsky)       26

2    we've been talking about?

3        A:   No.

4            THE COURT:  Did you utilize UniCredit for

5    your, in connection with your interactions with

6    Benthos?

7        A:   No.

8            THE COURT:  Or any money that Benthos gave

9    you?

10       A:   No.

11           THE COURT:  Did you utilize Sberbank in

12   connection with any money received from Benthos?

13       A:   No.

14           MR. POPOFSKY:  Your Honor, I'd like to --

15           THE COURT:  How -- do you have, what bank

16   account do you use when you go to Europe when you need

17   to access money?

18       A:   As Mr. Popofsky pointed out, I use my bank

19   accounts here and I charge any expenses against those.

20           THE COURT:  So your Piermont Bank account is

21   the bank account that you draw funds from when you're

22   in Europe?

23       A:   That was one and over the time it's been

24   several bank accounts, all of which statements were

25   made available to petition and, again, in the spirit

1

2    of disclosing all the payments and so on are there,

3    never concealed and always disclosed.

4          THE COURT:  And going to Exhibit 2, page 2,

5    request number 1, the request number 1 reads lists all

6    bank accounts, brokerage accounts, investment

7    accounts, checking accounts, savings accounts and all

8    other accounts whether in the United States or any other

9    country in which you, Mr. Etra, have or had an interest,

10   whether in your name, individually, jointly, in trust, as

11   custodian, as nominee, as a beneficiary, or in conjunction

12   with any other person or persons as of the date of the

13   subpoena and since August 1, 2018, do you see that

14   request?

15        A:  Yes.

16        THE COURT:  In response to that request you

17   identified, among other banks, UniCredit affiliate,

18   did you not?

19        A:  I did.

20        THE COURT:  Why did you identify UniCredit

21   affiliate in response to that request if you have no

22   personal interest in that account?

23        A:  In the interest of full disclosure because

24   there was nothing for me to conceal. It is not my

25   account but I did refer the clients to it and I wanted

```
 1                          ETRA - DIRECT (By Mr. Popofsky)        28

 2   to be compliant as best I could, as I have with all

 3   the other bank accounts.

 4         THE COURT:  Okay, Mr. Popofsky, it's your,

 5   back to your witness, you can continue to ask

 6   questions.

 7         MR. POPOFSKY:  Thank you, Your Honor, I'm

 8   going to ask him some questions about Mr. Ellish.

 9   But, Your Honor, I would like to just point out to you

10   in response to your, some of your questions, the issue

11   here is not, or not necessarily whether Mr. Etra has

12   personal funds at UniCredit or Sberbank, the order was

13   for him -- the multiple orders were for him to produce

14   those statements.  They might well be statements

15   relating to his clients, they might be escrow

16   accounts, they might be all sorts of types of things,

17   we don't know because he hasn't produced them. But the

18   issue is whether he could get them, not whether these

19   are personal funds.

20         THE COURT:  That is correct, and under the

21   standard in this circuit it's does he have the

22   practical ability to obtain documents from those

23   accounts.

24   CONTINUED DIRECT EXAMINATION BY

25   MR. POPOFSKY:
```

ETRA - DIRECT (By Mr. Popofsky)    29

1

2    Q:   Okay, on that subject, with respect to Mr.

3  Ellish, Mr. Etra, on August 2, 2022, three months ago,

4  you received a subpoena duces tecum in this matter, do

5  you recall that?

6    A:   You'd have to refer me to that subpoena, Mr.

7  Popofsky.

8    Q:   All right, do you recall being served with a

9  subpoena in court in Judge, outside of Judge Caproni's

10  courtroom in early August, do you recall that?

11    A:   I recall one time that your Mr. Bromberg,

12  while I was consulting with counsel, dropped some

13  papers on a bench next to me, if that was service,

14  yes.

15    Q:   All right, well Judge Caproni has ruled that

16  it was, but regardless, turn to Exhibit 12 in your

17  booklet, please, the first page, it has the title

18  "Subpoena Duces Tecum."  That is the subpoena you

19  received, correct?

20    A:   I can't verify, Mr. Popofsky, but I'm looking

21  at what you're showing me.

22    Q:   All right, when you're done looking at it, let

23  us know.

24    A:   I don't recollect, Mr. Popofsky, but, okay, I'm

25  with you.

ETRA - DIRECT (By Mr. Popofsky)      30

Q:  The pages are numbered in two different ways at the top and the bottom, if you look at the bottom number, please, in Exhibit 12, page 5 you'll see a heading that says "Documents Subpoenaed," could you turn to that page 5 at the bottom, please.  Do you have that page, Mr. Etra?

A:  I do.  I do, Mr. Popofsky, yes.

Q:  All right, request number 1 on that page, I'm going to read part of it, I'm going to skip over some words in the interest of brevity, but please look at request number 1, it sought all documents concerning communications since the date of the judgment sent or received by you concerning, among other things, petitioner's judgment enforcement efforts to or from any person or entity, whatsoever, including, but not limited to, Helmut Ellish, do you see that request number 1 Mr. Etra?

A:  It's page 5 -- oh, I was on page 4, sorry, Mr. Popofsky.  Yes, I see it.

Q:  All right, we'll come back to that in a minute.  Please turn to Exhibit 13 which was an information subpoena also served on you on August 2, 2022, do you see Exhibit 13, "Information Subpoena with Restraining Notice?"

1

2      A:   I do see it, yes.

3      Q:   If you turn to page -- I'm sorry, if you look

4  at the numbering at the top in this exhibit, page 6 of

5  8, "Questions in Connection with Information

6  Subpoena," could you please turn to page 6 of 8, the

7  number is at the top.

8      A:   Yes.

9      Q:   And you see information request number 1 which

10 asked for various items of information about any

11 legal, PayMaster or escrow related or other services

12 you've performed over the past five years, do you see

13 that?

14     A:   Your Honor, I'm objecting to this question

15 which is really going all over grounds that is really

16 not relevant to those two accounts asking --

17         THE COURT:  Yes, how is this relevant?

18         MR. POPOFSKY:  This relates directly to the

19 issue, Your Honor, because I'm going to establish what

20 the questions were and the fact that he produced no

21 documents responsive to --

22         THE COURT:  But how does --

23         MR. POPOFSKY:  Because --

24         THE COURT:  How does not producing documents

25 responsive go to possession, custody and control? His

```
 1                      ETRA - DIRECT (By Mr. Popofsky)      32
 2   position is he does not have possession, custody and
 3   control, if that is so then he wouldn't be able to
 4   produce any documents. So if you are trying to
 5   establish that you asked him to produce documents from
 6   these two bank accounts, that's clear from these
 7   exhibits.
 8              MR. POPOFSKY:  No, Your Honor, that's not what
 9   I'm asking. If you look at document request number 1
10   refers to communications between him and Mr. Ellish.
11   Mr. Etra has interposed Mr. Ellish here, he put in a
12   letter from Mr. Ellish, an unsworn hearsay letter from
13   Mr. Ellish.  He refers to that letter in repeated
14   communications to Your Honor and to Judge Caproni as
15   proving that he has no control over these accounts.
16   We have a subpoena, we had a subpoena outstanding
17   which asked him for his communications with Mr.
18   Ellish. Those communications would either answer the
19   question or bear very heavily on the question of
20   whether Mr. Etra has the practical control to obtain
21   those statements or not.  We served those subpoenas in
22   August, it is now November, and what I'm drawing out
23   through the questioning, but we don't really need the
24   questioning, I can make the points, Your Honor, if
25   you'd prefer, Mr. Etra has produced zero, zero
```

ETRA - DIRECT (By Mr. Popofsky)        33

1

2   documents responsive to those requests.  We do not

3   have a single email, text message or other

4   communication between Mr. Etra and Mr. Ellish other

5   than the one letter he has submitted. That letter,

6   Your Honor, did not drop down from heaven upon Mr.

7   Etra, he asked for it, he may have written it as far

8   as we know.

9           THE COURT:  Well why don't you ask him

10  questions about the circumstances of that, getting

11  that letter?

12          MR. POPOFSKY:  Because, Your Honor, I'm

13  entitled to bring out what I wish to bring out to

14  prove my inferences --

15          THE COURT:  Okay --

16          MR. POPOFSKY:  And it's up to him, he can

17  explain whatever he wants to explain, but I have a

18  subpoena and if he had responded to the subpoena we

19  would have the communications and the fact that he has

20  refused to respond to the subpoena I believe, without

21  anything else here I believe that enables you, in

22  fact, requires you to draw an inference that he has

23  control over these accounts, he could have obtained

24  the statements from Mr. Ellish, but he did not.

25          In addition, Your Honor, in your order of --

```
 1                          ETRA - DIRECT (By Mr. Popofsky)      34
 2   your order of August I believe 3rd, you specified a
 3   whole bunch of items that you suggested, it's docket
 4   number 188, Your Honor, and -- oh, no, I'm sorry, it's
 5   not docket 188, I apologize, it's docket 146 in which
 6   Your Honor wrote that specifically respondent shall
 7   bring witnesses, e.g. Mr. Helmut Ellish and clients, who
 8   can provide testimony regarding the accounts in question,
 9   including testimony as to the identity of any owners,
10   managers, fiduciaries and/or beneficiaries of the
11   accounts.  Respondent shall also bring documents.  Your
12   Honor didn't know that we had a subpoena out, but Your
13   Honor wrote, "Respondent shall also bring documents
14   regarding the accounts at issue, including documents
15   showing what type of accounts they are, who owns
16   and/or manages the accounts, the identify of any
17   individual or entity with a beneficial interest in the
18   account, documents appoint Ellish as fiduciary and any
19   client agreement between petition and the clients.
20   Respondent shall be prepared to authenticate any
21   documents provided, provide a certified English
22   translation," and Your Honor also gave him the
23   opportunity, to the extent you required us to show up in
24   person, "To the extent any witness resides abroad and
25   needs to testify via teleconference, the parties shall
```

```
 1                    ETRA - DIRECT (By Mr. Popofsky)       35
 2   inform the Court by letter and the Court will permit
 3   witnesses to testify remotely if needed."
 4            So Mr. Etra has had three months to come up with
 5   documents that Your Honor suggested he come up with,
 6   has had three months to bring Mr. Ellish into this
 7   courtroom to testify, himself, and to subject himself
 8   to cross examination. He has also had three months to
 9   produce documents responsive to a very, very specific
10   subpoena. And, Your Honor, I could do this through
11   questioning or not --
12            THE COURT:  Yes, do it through questioning.
13            MR. POPOFSKY:  He objected to the subpoena --
14            THE COURT:  Do it through questioning.
15            MR. POPOFSKY:  Okay.
16   CONTINUED DIRECT EXAMINATION BY
17   MR. POPOFSKY:
18       Q:   Mr. Etra, I believe you looked at, you looked
19   at the --
20       A:   Your Honor, can I respond to those comments?
21            THE COURT:  No. Not yet.
22       A:   Okay.
23       Q:   In Exhibit 13 on page 6 of 8, you saw the
24   question that asked you to discuss, to describe the
25   legal, PayMaster and escrow related services that you
```

ETRA - DIRECT (By Mr. Popofsky)    36

1    performed.  Now if you turn back to Exhibit 12,

2    please, and you look at request number 5, that's on

3    page 6, bottom numbered page 6 of Exhibit 12, request

4    number 5, saw all the documents concerning the

5    services referred to in item number 1 of the accompany

6    information subpoena.  In other words, all documents

7    concerning your escrow or PayMaster services.

8    A:  Mr. Popofsky, all of this information was

9    provided to you under the auspices of Judge Caproni, I

10    think you're going over the grounds that, we have

11    already responded to these --

12    Q:  Mr. Etra --

13    THE COURT:  Mr. Etra, you're, so is the

14    question did he provide any response to these?

15    A:  And he did.

16    MR. POPOFSKY:  Yes, I want to bring out one

17    other thing, Your Honor, before we get to that, yes.

18    Q:  Mr. Etra --

19    A:  I did, I did respond.

20    Q:  You asked me, you asked me for a 30 day

21    extension to respond to the subpoena --

22    A:  And I did --

23    Q:  Is that correct?

24    A:  Mr. Popofsky, you're neglecting the fact that

```
 1                    ETRA - DIRECT (By Mr. Popofsky)      37

 2   that --

 3          MR. POPOFSKY:  Your Honor, please direct the

 4   witness to answer the question.

 5          THE COURT:  Answer the question.  Answer the

 6   question, Mr. Etra --

 7      Q:  Mr. Etra, you asked me for a 30 day extension

 8   to respond to the subpoena, correct?

 9      A:  Yes, I did, and I utilized those days to

10   respond.

11      Q:  Mr. Etra, did you ask me for an extension?

12      A:  Yes, I did.

13      Q:  And I responded to you, correct, please turn

14   to Exhibit 14.

15      A:  In most cases --

16      Q:  Please turn to Exhibit 14, Mr. Etra.

17      A:  (continuing) -- you responded negatively to my

18   request.  Consistently.  So asking, yes, you never

19   responded, no.

20          MR. POPOFSKY:  Your Honor, please direct Mr.

21   Etra to just respond to the questions.

22          THE COURT:  Is the question -- what is the

23   question?

24      Q:  I want him to turn to Exhibit 14 --

25          THE COURT:  Okay, turn to Exhibit 14, Mr.
```

1                    ETRA - DIRECT (By Mr. Popofsky)      38

2   Etra.

3       A:  Okay, I'm with you.

4       Q:  All right, on the first page, the last bullet

5   point on that page is something I wrote to you on

6   August 18th.  I wrote to you, "We have a Court hearing

7   scheduled for October 6th, the subpoenaed material

8   and/or your refusal to provide it will be an important

9   part of the preparation for that hearing."  You saw

10  that, you saw that when I wrote it to you on August

11  18th, correct?

12      A:  You're -- you're making your own conclusions

13  --

14      Q:  Mr. Etra, all I'm asking you is did you read

15  those words that I wrote to you on August 18th?

16      A:  I did read your words --

17      Q:  Okay.

18      A:  And your assumptions which I objected to.

19      Q:  And on August 29th you asked Judge Caproni for

20  an extension of time to respond to the subpoenas,

21  correct?

22      A:  I did.

23      Q:  And she denied that, correct?

24      A:  She did.

25      Q:  Yes, at docket number 157 she wrote, "Denied,

```
 1                   ETRA - DIRECT (By Mr. Popofsky)      39
 2   contrary to his representations respondent has not
 3   been cooperative with petitioner and has not complied
 4   with its subpoenas."
 5        A:  Your Honor, counsel is asking questions that
 6   were before Judge Caproni, not here.
 7             THE COURT:  That's perfectly fine. He's, what
 8   he's trying to establish is did you --
 9        A:  Yes, I did respond.
10             THE COURT:  Did you get a, did you get a
11   denial of your request for --
12        A:  I did and then I --
13             MR. POPOFSKY:  I'll finish making my argument,
14   Your Honor.
15             THE COURT:  Please. Please, go ahead.
16        Q:  The next day, after Judge Caproni denied that,
17   the next day you filed two motions to quash the
18   subpoenas, correct?
19        A:  Judge Caproni had made that suggestion and we
20   complied with her suggestion.
21        Q:  Your Honor, those are at DKT 158 and 164, two
22   motions to quash.
23        A:  Correct.
24        Q:  Mr. Etra, Judge Caproni --
25        A:  Judge Caproni --
```

```
 1                      ETRA - DIRECT (By Mr. Popofsky)       40
 2       Q:   Mr. Etra --
 3       A:   Judge Caproni had made that suggestion.
 4       Q:   Mr. Etra, I'm asking the questions.
 5            THE COURT:   Hang on, Mr. Etra, let him --
 6       A:   Sorry, Your Honor.
 7            THE COURT:   Let him ask the question --
 8       Q:   Judge Caproni denied your motions to quash,
 9  correct?
10       A:   Not on that day, after we both filed responses
11  to her she made that decision --
12       Q:   That's Exhibit 16, Your Honor, docket number
13  174, page 13, Judge Caproni wrote --
14       A:   Your Honor, I think --
15       Q:   Judge Caproni wrote --
16            THE COURT:   The Court can take judicial notice
17  of what Judge Caproni ruled on the motion to quash.
18       Q:   Okay.  And then -- and then, Mr. Etra, we had
19  a hearing scheduled for October 6th, correct?
20       A:   Yes.
21       Q:   And you claimed to be sick so the Judge made
22  it a remote hearing and then you coughed so much that
23  the Judge adjourned the hearing, correct?
24       A:   No, Mr. Popofsky, you're again making your
25  conclusions, not asking a question.
```

```
 1                    ETRA - DIRECT (By Mr. Popofsky)      41
 2        Q:   Is it not true that the Judge adjourned the
 3   hearing because you were coughing too much?
 4        A:   It is also true that I was very sick that day
 5   --
 6        Q:   Okay.
 7        A:   And you continually deny and not recognize
 8   that, that's your choice, but as to whether I was sick
 9   or not, and don't --
10        Q:   I'm not asking whether you were sick, Mr. --
11        A:   I know, but you're saying that it was the
12   claim --
13        Q:   Mr. Etra --
14        A:   And I object to that.
15        Q:   Just answer the question.
16             THE COURT:   Okay.
17        A:   But I object to the question the way the
18   question --
19             THE COURT:   Your objection is noted but you
20   need to answer the question. So what is your question?
21        A:   What is your question?
22        Q:   The question was that we had a hearing
23   scheduled for October 6ᵗʰ and it did not go forward --
24             THE COURT:   The Court can take judicial notice
25   of that, this is not something that you have to
```

ETRA - DIRECT (By Mr. Popofsky)        42

1

2   establish through Mr. Etra's testimony.

3       Q:   Mr. Etra, a week after that in a brief that

4   Benthos submitted, we wrote, "The responses Mr. Etra

5   finally served on October 7th contained not a single

6   email or text exchange with Mr. Ellish and nothing

7   concerning any purported efforts by Mr. Etra to obtain

8   the statements he had been ordered to produce. Do you

9   recall reading that in a brief I submitted on October

10  13th?

11      A:   Mr. Popofsky, I have answered that many times

12  by saying I'd make every effort to make the contact

13  with Magister Ellish, you're going over again ground

14  that you know --

15      Q:   That's not the question, the question is do

16  you recall reading that statement, Mr. Etra?

17      A:   Again, Your Honor --

18          THE COURT:  Why is that the question?  Mr.

19  Etra, did you produce any email or text exchanges

20  between yourself and Mr. Ellish to Mr. Popofsky?

21      A:   I presented that --

22          THE COURT:  Yes or no?

23      A:   The answer was yes, that was the letter that I

24  received from him and I supplied to both him and Judge

25  Caproni.

1

2          THE COURT:  Is that the only --

3     A:   Yes.

4          THE COURT:  That you produced --

5     A:   Yes, Your Honor.

6          THE COURT:  So where there other

7  communications that you had with Mr. Ellish?

8     A:   There were not.

9          THE COURT:  Well how in the world did he know

10  to send you that email or send you that letter?

11    A:   For months and months and months I've been

12  calling him and saying the Court has asked for this

13  information, please provide it, please provide it.

14         THE COURT:  So you had a phone call --

15    A:   Phone call, yes --

16         THE COURT:  Voice phone calls.

17    A:   Voice phone calls --

18         THE COURT:  Did you have any communication

19  with Mr. Ellish by email?

20    A:   No, because --

21         THE COURT:  Did you have any communication

22  with Mr. Ellish by text message?

23    A:   No.

24         THE COURT:  Did you have any communication

25  with him through any app such as WhatsApp?

ETRA - DIRECT (By Mr. Popofsky)      44

1

2      A:   No.  No.

3           THE COURT:   The only mode of communication

4   you've had with Mr. Ellish has been phone calls?

5      A:   It's the only way to reach him and that's what

6   I've been doing for months and months in order to get

7   that letter.

8           THE COURT:   How did you get in touch with Mr.

9   Ellish in the first place, how do you know him?

10      A:   I was referred to him, I don't recollect by

11   whom.

12           THE COURT:   How long have you been dealing

13   with him?

14      A:   I think it dates back to 20 -- somewhere

15   around the 2016/2017 period, and, of course, for the

16   last three years there's been, there's been no

17   activity because of the pandemic.

18           THE COURT:   So how many interactions did you

19   have with Mr. Ellish regarding your clients?

20      A:   In that early period, I don't -- probably it

21   was somewhere in the less than five over that period

22   of time.

23      Q:   Over what period of time?

24      A:   The period of time that we had any

25   interaction. As I said, I haven't had any interaction

```
 1                    ETRA - DIRECT (By Mr. Popofsky)      45
 2  for several years now.
 3        Q:   You have not had any interaction with Mr.
 4  Ellish for several years now?
 5        A:   Correct.
 6        Q:   Then how did that letter appear in August of
 7  2022?
 8        A:   By sheer determination to comply with the
 9  subpoenas and comply with the orders, otherwise there
10  would be no reason to get it, a European fiduciary, he
11  couldn't understand why the Court would not just
12  accept the fact that he was a fiduciary, his clients
13  were private, and that I said you need to put it in
14  writing, you need to have something that's really
15  official, you need to cover the grounds that may be
16  asked of you which would include connection to
17  Benthos. He said he would do so, he never did until he
18  finally provided that letter.
19        Q:   So you had not communicated with him for
20  several years until you asked him for the letter?
21        A:   No, I was trying, again, since -- since this
22  matter began and since it was relevant I, in 2018,
23  I've been trying to do that whenever requested to
24  comply with it.
25        Q:   In 2018, what happened in 2018, Mr. Etra?
```

ETRA - DIRECT (By Mr. Popofsky)    46

1

2    A:   Well you started to begin this action, Mr.

3  Popofsky, that's what happened in 2018.

4    Q:   2018 was the underlying case that Benthos

5  brought against you for breaching your fiduciary duty,

6  Mr. Etra, the judgment was not obtained until August

7  of 2020, so why were you talking to Mr. Ellish about

8  obtaining bank statements in 2018, you're just making

9  stuff up, aren't you?

10    A:   I didn't say that, Mr. Popofsky, you asked me

11  when I was communicating with him, it wasn't on

12  Benthos at all, he had nothing to do with Benthos.

13    Q:   No, I believe you said a couple of minutes ago

14  that you were communicating with him in 2018 when this

15  matter began?

16    A:   I may have been, but I certainly was not

17  communicating on Benthos.

18    Q:   So how many times have you communicated with

19  Mr. Ellish in the last five years?

20    A:   I, I don't recollect how many but the only

21  communications were to try to get this information in

22  response to the request for it.

23    Q:   A few minutes ago in response to the Judge's

24  question you said you only communicated with him five

25  times, is that true?

```
 1                    ETRA - DIRECT (By Mr. Popofsky)      47
 2        A:   Mr. Popofsky, I told you, and Your Honor, I
 3   recollect trying to get this information from him,
 4   that's not an interaction, this is trying to get the
 5   information from him.
 6        Q:   How did he send the letter to you?
 7        A:   He sent it by email.
 8        Q:   By email, how did he have your email address?
 9        A:   Well that's not a secret, is it, Mr. Popofsky?
10        Q:   How did he have your email address?
11        A:   He had my email address from the first time we
12   made contact with each other.
13        Q:   But that first contact was not by email
14   according to your testimony, was it?
15        A:   Well we exchanged information and I suspect we
16   exchanged all information mail, email, telephone
17   number.
18        Q:   How did you give him your email address?
19        A:   As I say, the communications were by phone so
20   we exchanged that.
21        Q:   So you never sent Mr. Ellish a single email,
22   in the years you have known him you have never sent
23   him a single email, is that your testimony?
24        A:   No, my testimony is as given that --
25        Q:   No, answer this question, in all the years you
```

```
  1                        ETRA - DIRECT (By Mr. Popofsky)       48

  2   have known him is it your testimony that you have sent

  3   Mr. Ellish a single solitary email?

  4        A:   No, that is not my testimony.

  5        Q:   All right, then how many emails have you sent

  6   him?

  7        A:   I don't recollect how many.

  8        Q:   Why haven't you produced those?

  9        A:   All the emails that were from that earlier

 10   period, as you know, Mr. Popofsky, when my computer

 11   was wiped up, those included the ones that were wiped

 12   out.

 13        Q:   When was your computer wiped out?

 14        A:   As you -- you have that information --

 15        Q:   No, I'm asking you, when was your computer

 16   wiped out?

 17        A:   June of 2022.

 18        Q:   June of 2022, and when did you send the letter

 19   from Mr. Ellish, you sent it in August, 2022, correct?

 20        A:   I didn't send the letter, he sent the letter

 21   to me.

 22        Q:   You sent it to Judge Caproni in August of

 23   2022, correct?

 24        A:   That's correct.

 25        Q:   After your computer supposedly got wiped out,
```

```
 1                    ETRA - DIRECT (By Mr. Popofsky)       49
 2   correct?
 3        A:   The computer was wiped out and the dates of
 4   the letter, I received I shared it with Judge Caproni,
 5   as well as yourself.
 6        Q:   So you received it by email --
 7        A:   Yes.
 8        Q:   After you had the computer problem?
 9        A:   Yes.
10        Q:   Where is the email, why didn't you produce the
11   email?
12        A:   The email was produced and was sent to you and
13   Judge Caproni.
14        Q:   No, the letter was sent to us, where is the
15   covering email, there was no covering email, right?
16        A:   There was no covering email, the letter was
17   sent --
18        Q:   Mr. Etra, you use email on a regular basis,
19   correct?
20        A:   Mr. Popofsky --
21        Q:   Mr. Etra, you use email on a regular basis,
22   correct?
23        A:   Mr. Popofsky, these emails --
24        Q:   Please answer the question.
25        A:   I do.
```

ETRA - DIRECT (By Mr. Popofsky)    50

1

2    Q:  Yes, you have emailed me hundreds of times

3 over the last few years, correct?

4    A:  I wouldn't say hundreds of times but we

5 certainly did a lot, yes.

6    Q:  You emailed my clients dozens or hundreds of

7 times during the underlying transaction that gave rise

8 to this judgment, correct?

9    A:  I would not say hundreds of times, no.

10    Q:  Many times, correct?

11    A:  How many would you say is many?

12    Q:  How many times would you say you emailed my

13 clients during the months of the underlying

14 transaction?

15    A:  As necessary, I don't recollect how many.

16    Q:  Did you send them attachments?

17    A:  Sometimes yes, sometimes no.

18    Q:  Have you received attachments from people via

19 email?

20    A:  Sometimes yes, sometimes no.

21    Q:  So you know very well that when you receive an

22 attachment from somebody it comes in an email and you

23 can print out the email, correct?

24    A:  In this case it came exactly as it was

25 conveyed to Judge Caproni and yourself.

```
 1                      ETRA - DIRECT (By Mr. Popofsky)      51
 2      Q:   One more time, Mr. Etra, you sent the letter,
 3  you did not send the email --
 4      A:   The --
 5      Q:   So your testimony is that the email --
 6      A:   The letter --
 7      Q:   But you have no covering email for it and that
 8  was the only email Mr. Ellish has ever sent you in
 9  your life, is that your testimony?
10      A:   No.  No --
11           THE COURT:  Mr. Popofsky, that's not what he
12  said --
13      A:   That's not what I said.
14           THE COURT:  Stop mischaracterized what Mr.
15  Etra said.
16           MR. POPOFSKY:  I'm sorry, Your Honor, I
17  thought that was his testimony.
18      Q:   Then where are the emails Mr. Ellish sent you,
19  why did you not produce them?
20           THE COURT:  Mr. Popofsky, Mr. Popofsky, take
21  it down a notch, okay, this is --
22           MR. POPOFSKY:  Sure --
23           THE COURT:  There's no jury here, go slowly
24  and allow time for Mr. Etra to answer, please, okay,
25  this is getting a little too argumentative.
```

ETRA - DIRECT (By Mr. Popofsky)      52

1

2      Q:  Why did you not produce any emails between you

3  and Mr. Ellish in response to a subpoena that you

4  received months ago and were ordered to respond to

5  weeks ago?

6      A:  I produced all that I had because that was the

7  only email that I've received from him since the, the

8  subpoena, in response to the subpoena.

9      Q:  How many emails did you receive from Mr.

10 Ellish before the August 2, 2022, subpoena?

11     A:  Before my computer went down, I don't

12 recollect.

13     Q:  Roughly?

14     A:  I can't even estimate roughly.

15     Q:  You have no idea?

16     A:  No.

17     Q:  You do business with this gentleman on a

18 regular basis, don't you?

19     A:  He does business by telephone.

20     Q:  But you do business with him on a regular

21 basis, correct?

22     A:  I do not, no.

23     Q:  You don't.  And you have no idea how many

24 times you've interacted with him over the last few

25 years, is that your testimony?

ETRA - DIRECT (By Mr. Popofsky)    53

1

2        A:   That is my testimony.

3        Q:   Fine.  And any email that you may have sent to

4   him or received from him prior to August or June of

5   2022 is gone because you had a computer problem, is

6   that your testimony?

7        A:   I searched my computer to see whether anything

8   was left of it and the answer was no.

9        Q:   You didn't bring Mr. Ellish to testify today,

10  did you?

11       A:   I did not.

12       Q:   So we have no admissible evidence from Mr.

13  Ellish as to anything, correct?

14       A:   I believe you have the opportunity to, I've

15  tried to contact Mr. Ellish to tell him to cooperate

16  as much as possible and to be as responsive as he

17  could.

18       Q:   Did you do that by email or by phone?

19       A:   By phone.

20       Q:   Did you do that by email before your computer

21  problem?

22            THE COURT:  He just said it was by phone.

23       A:   By phone.

24       Q:   I know, but I want to make sure he understands

25  the time distinction, before your computer went down

```
 1                    ETRA - DIRECT (By Mr. Popofsky)      54
 2   were there emails between you and Mr. Ellish in which
 3   you asked him to cooperate and send statements?
 4        A:   That I don't recollect.
 5        Q:   You don't know if you did or didn't either
 6   way?
 7        A:   No.  My approach to him though was clearly by
 8   telephone, that's how I communicate with him.
 9        Q:   Well, Mr. Etra, you just said you communicate
10   with him by phone but you also acknowledge that you
11   sent him emails, you just say they're all gone,
12   correct?
13        A:   That's correct.
14             MR. POPOFSKY:  Your Honor, in the interest of
15   moving this along, anything else I have to say would
16   be by way of argument and --
17             THE COURT:  Okay, Mr. Etra, if you want to
18   provide an explanation for why you do not have, your
19   position is that you do not have possession, custody
20   and control over either of these two bank accounts, if
21   you'd like to provide an explanation of that you can
22   do so now under oath.
23             MR. ETRA:  Thanks, Your Honor.
24             THE COURT:  Speak into the microphone.
25             MR. ETRA:  Yes, thank you. I think those that
```

1                                  PROCEEDINGS                        55

2    have dealt with European fiduciaries understand that

3    they're very private and they've very zealous in their

4    relationship both with clients and with anybody that

5    interacts with them.  Magister Ellish was good enough

6    to say that he was available to clients to do things

7    that only he could do, recognizing that in Europe a

8    non-local rarely, if ever, has the opportunity to open

9    accounts and almost never has the opportunity to

10   fiduciary or escrow accounts if you're not licensed in

11   that jurisdiction and certainly if you are not a

12   citizen of that jurisdiction or, at minimum, a citizen

13   of the EU in the case of various European banks. So

14   there was at no time any opportunity for me to have

15   such accounts, let alone to have control over them.

16   And if they were not my accounts there was no basis

17   for me being able to obtain independently any

18   information like bank statements or correspondence or

19   anything of that kind.

20            So that, I think that's an acknowledged

21   situation and I think even in the US a non-account

22   holder is unable to obtain bank statements from an

23   account that's not the account holder. So here we have

24   a situation which is clearly accounts that were not

25   mine, that I had no funds in, that had nothing to do

1                        PROCEEDINGS                      56

2   with Benthos.  And to even explain that to Magister

3   Ellish that there was even a suggestion that I had

4   some personal control or that they were my accounts,

5   he found that completely, he couldn't understand it.

6   So I said, okay, if you can't understand it, please

7   put it as clearly as you can in a communication that I

8   could present to the Court.  And for many months he

9   just, you know, I guess he, again, couldn't understand

10  why that was even necessary, how we didn't understand

11  that it was an account that was no mine and I had no

12  rights to it, no opportunity to get any statements of

13  it, no control over it, but I said you have to put it

14  in black and white for the Court in response to this

15  subpoena and if there is any question of it, I

16  disclosed to Mr. Popofsky the contact details from

17  Magister Ellish so he could have contacted him, he

18  still can contact him, he can ask whatever questions

19  he wants, he can contact Sberbank if he wants, he can

20  contact the UniCredit affiliate if he wants. I'm not,

21  I've never hidden this information, I've never tried

22  to conceal the information.

23          As Mr. Popofsky, himself, pointed out, all the

24  charges for my account are on the bank statements

25  which he has, US accounts, he knows that I have family

1                              PROCEEDINGS                        57

2  in Europe and my trips are to be with them, and also

3  for therapy, the therapy that I get over there is

4  something that I can't get over here. And I also do

5  some public service activities over there that I also

6  do here.

7          So my travel, again, was never concealed, I

8  never tried to hide anything in that respect and have

9  no reason to, but in respect of the narrow issue

10 before this Court, it was a complete surprise to him

11 that his information was not accepted, that there was

12 any question, whatsoever, of somebody else having, you

13 know, any kind of ability to obtain information beyond

14 what he disclosed.

15         MR. POPOFSKY:  Your Honor, I object to the

16 double hearsay. Mr. Etra is staying what Mr. Ellish

17 told him.

18         THE COURT:  Okay, your objection is noted, go

19 ahead.

20         MR. ETRA:  Plus, those two accounts were

21 closed which is another factor, and as Mr. Popofsky

22 has seen, even with American bank accounts, if you try

23 to get bank statements, I've spent hundreds and

24 hundreds of hours to try to get from the bank in

25 response to all of Mr. Popofsky's subpoenas whatever

1                          PROCEEDINGS                          58

2   kind of information, duces tecum, whatever he throws

3   at me, with every single bank that I've ever dealt

4   with.  And at a certain point they say, no, because

5   those accounts are old, they're closed, they're dead,

6   there is nothing more to get of them, and these two

7   accounts fall in that category. So all of this is

8   talking about a period that ended I think in 2020 or

9   even earlier and, of course, had nothing, whatsoever,

10  to do with Benthos.

11          So I've tried as best I can and I've never

12  said to the Court or to Mr. Popofsky don't contact

13  Magister Ellish, you know, I'm hiding him. Contact him

14  if you wish, corroborate the fact that he is the

15  account holder. Corroborate that a non-account holder

16  has no basis of doing this. So this whole controversy

17  is I think a little exaggerated.  Mr. Popofsky does,

18  you know, continue to serve all these wonderful

19  subpoenas and restraining orders and everything but in

20  respect of this narrow issue of these two accounts,

21  there is just absolutely nothing more than I could

22  possible do, but if somebody else can do a better job

23  of it to get these bank statements which I think in

24  respect to the fiduciary he's entitled not to disclose

25  client activities that he does as fiduciary for his

1                              PROCEEDINGS                          59

2  clients, I don't think any of us would expect

3  otherwise from him.  But if anybody wants to contact

4  him, I'm not preventing it.

5           THE COURT:  Okay, thank you.  Do you have any

6  further questions for Mr. Etra?

7           MR. POPOFSKY:  No, I would like to make my

8  argument to Your Honor.

9           THE COURT:  All right, so, Mr. Etra, you can

10 step down and sit back at table and I'll hear

11 arguments. Go ahead, Mr. Popofsky.

12          MR. POPOFSKY:  Thanks, Your Honor.  This Court

13 set the standard in its order of August 3rd, does Mr.

14 Etra have, quote, "the right authority or practical

15 ability," emphasis by Your Honor on practical ability,

16 "to obtain the statements for the UniCredit and

17 Sberbank accounts," I respectfully submit that you

18 should conclude that he did for at least the following

19 reasons.

20          First, he's presented, other than his

21 testimony just now which I'll get to at the end, he

22 presented only a hearsay letter from someone

23 purportedly in Austria, a letter that Your Honor

24 previously found, quote, "to be an inadequate

25 production," that's docket number 146 note 1, also in

1                           PROCEEDINGS                           60

2    docket 95 at page 24 that letter was found to be,

3    quote, "insufficient."  He disregarded Your Honor's

4    directive or strong suggestion in docket number 146 as

5    to the types of documents and witnesses he could bring

6    today. I read that before, I won't read it again.

7            He was offered the opportunity to have Mr.

8    Ellish or anyone else testify remotely but he chose

9    not to avail himself of that opportunity despite

10   having had more than three months now to prepare.  He

11   was not willing to have Mr. Ellish or anyone else

12   state anything at all under oath, much less subject

13   themselves to cross examination. That by itself, Your

14   Honor, should give rise to a negative inference

15   sufficient to decide this.

16           Second, he failed to produce documents

17   responsive to our subpoena on this point. I read

18   document request number one before, I won't read it

19   again, but it's all documents concerning

20   communications about -- with Mr. Ellish, in

21   particular, named in particular. And then I

22   specifically told him that his responses and documents

23   were going to be used in this hearing, we still have

24   nothing.  As I said earlier, it's inconceivable that the

25   letter just appeared out of nowhere and Mr. Etra has his

1                          PROCEEDINGS                        61

2   story as to how it appeared.  Your Honor will I guess

3   have to decide whether that's credible.

4          The question of whether Mr. Etra tried to

5   obtain the statements, made a real effort to obtain

6   them, I don't believe he even testified that he made a

7   real effort, if he did testify to that I don't believe

8   it's credible. I don't believe we understand the

9   nature of the relationship between Mr. Etra and Mr.

10  Ellish. If these accounts were for his clients at his

11  request, pursuant to his escrow transactions, then I

12  don't see why he couldn't get the statements. And if there

13  was something confidential in them, that could have been

14  redacted and submitted to Your Honor in a redacted

15  fashion. I don't think, I believe you should conclude

16  that Mr. Etra does not really want to produce any of

17  those.

18         He made a deliberate choice over three months

19  not to give us any of these, any of this evidence.

20  Judge Caproni told Mr. Etra on July 13th, it's on the

21  transcript, monthly statements for UniCredit and

22  Sberbank have not been produced, nor have you

23  adequately produced something that would excuse you

24  from production. Judge Caproni made that statement on

25  July 13th.  So, Your Honor, nothing has changed since

1                            PROCEEDINGS                        62

2  them, you don't have any of the documents referred to,

3  you don't have Mr. Ellish under oath cross examined,

4  and you don't have any of Mr. Etra's communications

5  with him.  So he still has not adequately produced

6  something that would excuse him from production.

7           All of the relevant evidence is within Mr.

8  Etra's control, not Benthos' control. He has chosen to

9  stand on his word alone.  Given what he's chosen to

10 withhold and his adjudicated lack of credibility,

11 which I'll get to again, I submit you have enough to

12 rule against him.

13          There are also a host of other facts and

14 circumstances from which Your Honor can infer that he

15 had the practical ability to obtain the statements if

16 he wanted to do so.  First of all, he previously

17 admitted under oath having at least one European bank

18 account.  That testimony is in the record, he referred

19 to my bank, my account, you saw that.  He, himself,

20 identified these accounts to us as his. Again, we

21 found some accounts during our two years of judgment

22 enforcement, we found some accounts, we knew nothing

23 about UniCredit or Sberbank. He identified these

24 accounts to us as his, then a year and a half later

25 when it became inconvenient because, you know, he got

1                           PROCEEDINGS                          63

2    away with a lot of things over a year, a year and a

3    half, Judge Caproni finally cracked down on him.  Then

4    it became inconvenient, the UniCredit and Sberbank

5    became a problem, so now he says they're not mine.

6              Judge Caproni on July 13th on the transcript

7    in the record, she said, "You lined to me."  She said,

8    "His representation," referring to Mr. Etra, "His

9    representation on any fact means nothing to me because

10   he clearly will say whatever he thinks is convenient

11   at the time, including I have a European bank account,

12   I don't have a European bank account, bank account,

13   what bank account, not my bank account, it was a

14   fiduciary's bank account. So a representation from

15   Aaron Etra means nothing in this Court. Proof of some

16   of these things if they really are obtainable fine,

17   but it needs to be proof."  That's what Judge Caproni

18   said, Your Honor.

19             Hundreds and hundreds of thousands of dollars

20   flowed through his attorney escrow accounts in the

21   past two years, transactions involving many

22   international individuals and entities including

23   several in Europe, the UK, Portugal, a couple of other

24   European countries as well.  At least four European

25   countries.  He's doing, he's doing escrow business in

1                              PROCEEDINGS                          64

2  Europe clearly.

3           And it is relevant, Your Honor, I submit it is

4  relevant that he's traveled to Europe nine times over

5  two years, including three times unvaccinated claiming

6  to be ill. He must have been doing very important

7  business over there.  Two of those trips were right after

8  Your Honor recommended and then the District Judge

9  confirmed that he was ordered to produce the

10 statements, right after those orders he flew to

11 Europe. And, Your Honor, he concealed all of those

12 international trips and European escrow transactions.

13          All of those European escrow transactions he

14 concealed for two years. He went to great lengths to

15 conceal them.  He violated several successive Court Orders

16 from several different judges. He refused to tell us about

17 multiple bank accounts that he was using on a daily basis.

18 He withheld all of those statements until after Judge

19 Caproni threw him in jail to coerce some level of

20 compliance.

21          He sought to use an account at Sberbank, this is

22 my brief, Your Honor, we didn't get to that in the

23 questioning, he sought to use an account at Sberbank

24 in his underlying fraudulent business transaction with

25 my client, the one that gave rise to the judgment.

1                          PROCEEDINGS                          65

2   Sberbank is a Russian bank and he had claimed to Benthos

3   that the money he misappropriated from his attorney escrow

4   account was going to a Russian individual named Dimitri.

5   And we have, in the brief I submitted to you with the

6   exhibits to the brief I have an email during that

7   underlying transaction which he specifically referred to

8   using a Sberbank account with my clients.

9            And then, Your Honor, this also is in the

10  brief and I didn't go through it on the testimony now,

11  he so helpfully supplied us with a second copy of the

12  untranslated two page Sberbank statement previously

13  found insufficient with red retyping of words that

14  needed no retyping at all. He said he retyped them

15  for, quote, "clarity legibility purposes."  But

16  everything he retyped was quite clear and legible on

17  the document.  What he chose not to supply us with was

18  a red typing translation of the amount in the account.

19  We can't read that, it's not very legible, it's in a

20  foreign language, that he convenient chose not to

21  retype, not to tell us, he concealed that.

22           The Sberbank statement that he did supply,

23  whatever it is, it's very hard to tell what that

24  document is, but it clearly indicates some sort of

25  transferring of funds and it clearly has something to

1                           PROCEEDINGS                          66

2    do with him because he gave it to us voluntarily, it

3    bore a date on it that was only five days after the

4    late Judge Batts had ordered him to return $400,000 to

5    my client, money he had been -- money he was holding

6    in his escrow account and refusing to return. Judge

7    Batts threatened him with incarceration, she said pack

8    your toothbrush, five days after that something

9    happened with Sberbank where money was, where an

10   unidentified amount of money was transferred. So I

11   can't explain that, but he sure as heck hasn't

12   explained it.

13            So, Your Honor, against everything that I've

14   just recounted, what do you have, you have Mr. Etra's

15   say so, that's all you have.  If you were ruling on a

16   clean slate I respectfully submit that would not be

17   credible in light of everything but you are not ruling

18   on a clean slate. I'm not going to recite here all the

19   times he's been found to have lied and to have acted

20   dishonestly, including a prior instance where the New

21   York State Appellate Division affirmed that he had

22   misappropriated someone else's funds from his attorney

23   escrow account, not my client. He's done it twice,

24   he's been caught twice.

25            Your previously found Mr. Etra's testimony at

1                              PROCEEDINGS                        67

2    the last hearing you had a year or so ago to be not

3    credible.  Judge Caproni wrote a few weeks ago, "His

4    say so is of virtually no value," that's a quote.

5    Today, Your Honor, I respectfully submit that Mr. Etra

6    committed perjury on multiple occasions today. I think

7    if you read the transcript you'll see the inconsistent

8    testimony about his emails with Mr. Ellish. Mr. Etra

9    just says what comes to mind, what seems to be

10   appropriate in the moment, but he was all over the

11   place on whether he emailed Mr. Ellish or didn't email

12   Mr. Ellish. At the beginning he said he never emailed

13   him, it was all by phone and then when he started

14   realizing that that was not really credible, he

15   retreated to, oh, yeah, I had some emails with him but

16   my computer broke, they're all gone.

17          He also perjured himself, Your Honor, when he

18   said in response to a direct question that I repeated

19   for clarity, he said that he had produced all of those

20   Piermont Bank statements, the ones that showed the two

21   years of travel, the ones that showed all sorts of

22   violations of the restraining notice, the ones that

23   really get him in big trouble, including, not to this

24   subject but the subject of his credibility, including

25   showing him withdrawing personal funds from his

1                          PROCEEDINGS                    68

2  attorney escrow accounts. He produced all of those

3  only after he was incarcerated, but he specifically

4  denied today, he specifically said today under oath, he

5  said, I asked him did you, are you saying that you

6  produced these Piermont statements before you were

7  ordered, before you were incarcerated by Judge Caproni and

8  he said, yes, I produced them when they were required to

9  be produced. That's clearly not true, Your Honor, he

10 violated three orders of Judge Nathan requiring him to

11 produce all his bank statements. He then violated I

12 don't know how many more orders from Judge Caproni

13 requiring him to produce all his bank statements.  She

14 dragged him into Court which he tried to avoid and

15 when he was in court she told him that he was lying to

16 her and she threw him in jail and said you better, I'm

17 going to let you out this time and you better produce

18 some bank statements. Only after that did he produce

19 these Piermont statements and he sat here today in

20 front of Your Honor under oath and he testified that

21 he had produced the Piermont Bank statements when

22 required.  That is clearly a lie.

23         He also said, Your Honor, in his testimony

24 right at the end when you asked, gave him the

25 opportunity to speak, he said my travel was never

1                              PROCEEDINGS                        69

2   concealed.  That's perjury, Your Honor, he concealed it

3   for two years, we didn't get those statements until

4   August after he was incarcerated. Of course he

5   concealed it.  And the tie-in to this is two-fold,

6   Your Honor.  Number one, the tie-in is he was

7   concealing the European travel, that relates to the

8   European accounts. More broadly, the man lies at the

9   drop of a hat, Your Honor.  So, again, against all the

10  inferences, now admittedly, I don't have direct

11  evidence that he controls these accounts, it's not

12  within my control, but I rattled off for you I believe

13  two dozen reasons from which you should infer that he

14  does have control, and against that you have only his

15  word and his credibility is, therefore, key here.  His

16  credibility is critical.

17          He has zero credibility and, again, to

18  conclude, Your Honor, where is Mr. Ellish, where are

19  Mr. Etra's communications with him.

20          THE COURT:  Have you tried to reach out to Mr.

21  Ellish yourself?

22          MR. POPOFSKY:  No, Your Honor, in Austria, no.

23          THE COURT:  Why not?

24          MR. POPOFSKY:  I did not think it would be a

25  productive use of my client's money and effort. So I

1                        PROCEEDINGS                        70

2    believe, Your Honor, that you should infer that he has

3    the practical ability to obtain the bank statements.

4            THE COURT:  All right, Mr. Etra, I'm going to

5    allow you to speak from your seat there so I'll hear

6    from you next. And, Mr. Popofsky, you can take your

7    seat.

8            MR. ETRA:  I think we have to start with the

9    obvious, a person who is not the account holder has no

10   reason, basis or ability to obtain bank statements or

11   any information from a bank in which he is not the

12   account holder. I think that's the clear situation

13   here. I'm not the account holder, my reference to

14   those account were on behalf of referrals to clients

15   in respect of what they're doing, not anything more

16   and not anything less.

17           In respect of this question of dates, if Mr.

18   Popofsky would look at the statement that came from

19   Magister Ellish, it was a closing statement of 2020.

20   So those accounts have been closed for some time. I

21   think he is not making the effort to look at the

22   evidence, he's casting aspersions at me which I think

23   is irrelevant to this issue. I do react and object to

24   those.

25           He continues to refer to Judge Batts, at the

1                              PROCEEDINGS                          71

2   very first session in this matter when he and Mr.

3   Bromberg made the accusations, rather than the

4   decision of Judge Batts which is to reject every

5   accusation that they had made.  So it's a very

6   selective use of quotes and the same thing with all

7   the judges subsequent to that, to cast aspersions on

8   my credibility.

9           He has been trying to, through relentless

10  subpoenas and restraining actions, tried to obtain

11  something and, as Judge Batts, herself, said, he is

12  trying to obtain perfection which is unattainable in

13  light of my willingness to comply and do my best. And

14  I think that has been the case over hundreds of pages

15  of bank statements to all the judges involved.

16          He knows I think more about me than just about

17  anybody else at this point because I have not

18  concealed. My trips to Europe were not something that

19  I was broadcasting. I'm entitled to do travel, I'm

20  entitled to visit my family, I'm entitled to get

21  therapy. My ability to appear at court hearings have

22  been impacted by his actions. My health and my

23  financial condition has been effectively in a major

24  way ruined by his relentless action, to no benefit,

25  whatsoever, to his client because I don't have the

1                           PROCEEDINGS                    72

2   Benthos funds.

3            His connection to Sberbank is completely

4   incorrect.  He knows where the money from my escrow

5   account went, it did not go to Sberbank. He knows

6   exactly which banks they went to, none of them, none

7   of them were Sberbank.  The seller of the product is a

8   Russian, but Sberbank was not involved at all. So

9   that's a totally incorrect connection, as is any other

10  connection to that or UniCredit.

11           I have spent these four years trying to be

12  compliant, trying to be responsive, but perhaps more

13  important, trying to be helpful to his clients and

14  trying to raise at least some funds to deal with their

15  failed bank transaction of which I, again, truly had

16  no involvement with.  And his then reference to

17  another transaction which is total irrelevant to our

18  discussion here and the facts of which, again, do not

19  add up to loss of my credibility.  And it's, of

20  course, not the place to discuss that transaction here

21  and object vehemently to that being part of this

22  record.

23           So my credibility I think is truly not the

24  issue here, the issue is control and ownership of

25  these accounts. I think there's absolutely no basis as

1                          PROCEEDINGS                        73

2    you, yourself, asked, Your Honor, if he had any

3    question during these three months that he claimed

4    that I did nothing, he did nothing.  Yes, I said I've

5    done all I can in the same way I've said that with

6    other bank accounts, where the bank has been clear to

7    me, to the Court and to Mr. Popofsky that in respect

8    of dead accounts there's a limit to what they can

9    provide.  But that has not stopped me from asking them

10   time and time again for the information.

11          And the same thing here, I've tried to convey

12   to Magister Ellish that there is this inquiry, that he

13   does need to be responsive, he did, I believe his

14   best, certainly something, again, he found completely

15   extraordinary that it was necessary to do more than

16   say that this is a European fiduciary and his accounts

17   and accounts that are closed, and that I've done

18   everything that I can to be compliant, to obtain

19   these, I did not conceal anything.

20          The accounts and when they were disclosed, Mr.

21   Popofsky selectively twists the dates and the

22   compliance.  Again, Judge Batts was very angry at me

23   when she first heard Mr. Popofsky and Mr. Bromberg and

24   then she finally realized that a lot of what they

25   accused me of was not the case.  The same thing with

1                          PROCEEDINGS                        74

2   Judge Nathan and the same thing with Judge Caproni.

3   Yes, at one point she thought it was necessary to

4   incarcerate me for three hours, obviously that was not

5   the determining factor of what I did and did not

6   comply with.  Incarcerating me is not making me any

7   better and being compliant and providing the hundreds

8   and hundreds of pages and hundreds of hours that I've

9   spent to try to be compliant, again, in respect of

10  closed bank accounts that are of not true value to

11  Benthos.

12          THE COURT:  Mr. Etra, why, you stated that the

13  Sberbank document that was attached to Mr. Ellish's

14  letter was evidence of, it was a closing statement or

15  showing that an account had been closed.

16          MR. ETRA:  Yes, this --

17          THE COURT:  Do you know why that particular

18  Sberbank account was attached to Mr. Ellish's letter,

19  what does that, what does that account statement, how

20  are you in any way associated with that bank

21  statement?

22          MR. ETRA:  I said to him it's been accused,

23  I've been accused of it being my account, the two

24  accounts I've been accused of having as my accounts

25  are the UniCredit affiliate account and the Sberbank

1                            PROCEEDINGS                          75

2   account.  So I told him please provide whatever you

3   can in respect of those two, any bank statements, any

4   information, whatever you can, please, please supply

5   it, and he said this is the only thing I can, this was

6   the closing statement, the amount involved was what

7   was at the end when the account was closed, it was not

8   a transfer. The amount is I think fairly clear legibly

9   as to --

10              THE COURT:  But who, for whose benefit was

11  this particular account?

12              MR. ETRA:  It was purely his, it's his escrow

13  account, his fiduciary account, it was only --

14              THE COURT:  It's Mr. Ellish's escrow account?

15              MR. ETRA:  Yeah.

16              THE COURT:  At Sberbank --

17              MR. ETRA:  At Sberbank.

18              THE COURT:  That's closed?

19              MR. ETRA:  Yes.

20              THE COURT:  That's what you believe that is?

21              MR. ETRA:  That's what I believe it is, that's

22  the closing -- because one of the things I said, at

23  minimum please give me at least a closing statement

24  because in the other accounts that Mr. Popofsky's been

25  asking for he asked for closing statements. So I said

1

2    if you can't give the bank statements at least bring,

3    send the closing statements.  And this is what he

4    sent.

5             So I asked for him everything that I've been

6    asked in trying to be, to pass on to him the degree of

7    inquiry and what needs to be responsive to it and this

8    is, this is what he provided.

9             THE COURT:  When you had clients way back when

10   in, I think you said 2016 timeframe --

11            MR. ETRA:  Yeah.

12            THE COURT:  You said that you had maybe a

13   handful that wanted to do transactions in European

14   dollars, Euros, and you would refer them to Mr. Ellish and

15   they would then utilize his escrow account --

16            MR. ETRA:  Yes.

17            THE COURT:  Not yours because you didn't have

18   one --

19            MR. ETRA:  Correct.

20            THE COURT:  I believe that's what you said.  So

21   when the handful of clients did do that and did interact

22   with Mr. Ellish, did Mr. Ellish provide you with documents

23   or information about your clients' activities in his

24   escrow account?

25            MR. ETRA:  Normally not because it was his

1                          PROCEEDINGS                    77

2    interaction with the client. He might contact me if

3    there was a problem.  Also, Your Honor, in many of

4    these cases nothing transpired even after the referral

5    so there was nothing to communicate.

6              THE COURT:  How many of your clients, if you

7    know, the handful that you did refer to Mr. Ellish,

8    actually did utilize his services?

9              MR. ETRA:  I don't know that, Your Honor,

10   because I, only if some transaction happened that was

11   relevant to and for me would I hear about that and I only

12   can recollect, I can only recollect, well, one, one does

13   come to mind.

14             THE COURT:  And do you know, remember the name

15   of that client?

16             MR. ETRA:  No, I think it was T-A-S.

17             THE COURT:  And do you remember when that was,

18   what year?

19             MR. ETRA:  I think that was, again 215/216 --

20   2015/16, somewhere in that timeframe.

21             THE COURT:  Okay.  Mr. Popofsky, is there

22   anything else you want to say?

23             MR. POPOFSKY:  Yes, briefly, Your Honor, thank

24   you.  Credibility is important, Your Honor, because

25   there is no other admissible evidence that Mr. Etra

1                             PROCEEDINGS                        78

2    has presented, only his word.  Credibility is

3    important. As to Judge Batts, I would just ask you to

4    read Exhibit 11, it's short, it will take five

5    minutes, it will be entertaining reading. I implore

6    you to read Exhibit 11.  Judge Nathan, three Court

7    Orders, enough said. Judge Caproni put him in jail,

8    enough said. Your Honor knows what you've done.

9          He says I'm entitled to travel, well, number

10   one, he wasn't really entitled to travel because it

11   was in violation of the restraining notice and, number

12   two, he told Judge Nathan, he told Judge Nathan in the

13   middle of his travel, docket 54, page 2, that he was,

14   quote, "unable to purchase basic necessities," he

15   claimed to be impecunious, "unable to purchase basic

16   necessities."  He told her that right in the middle of

17   his multiple flights to Europe.  So credibility, Your

18   Honor.

19          Last point on that, I can't even say this

20   without laughing, Your Honor, he says he's tried to

21   help my client. He calls it a failed business

22   transaction. It's a failed business transaction in

23   which he was found to have breached his fiduciary duty

24   as a lawyer and sent $4.6 million to China.

25          As far as the emails, Your Honor, I guess you

1                              PROCEEDINGS                              79

2  can believe him or not believe him about the computer

3  and the emails and all the rest, and I went through it

4  before, I won't repeat it again but, you know, he

5  could get the emails from Mr. Ellish if he wanted. Mr.

6  Ellish has their emails, too.

7          In response to your questioning, you asked him

8  why Sberbank, why did Mr. Ellish send you the Sberbank

9  statement, he has no answer for that, Your Honor,

10  because this is the truth of what happened here.  He

11  identified some bank accounts back in response to

12  those early discovery requests, it turns out later

13  that he omitted two-thirds of his bank accounts. He,

14  he never has any interest in telling the truth, he

15  just has an interest in putting out whatever seems

16  sufficient at the moment.

17          We asked him for all his bank accounts and he

18  responded by rattling off a half dozen. He left out

19  another two dozen, you know, that came out over the

20  ensuing two years and after Judge Caproni incarcerated

21  him.  Among the half dozen that he identified at the

22  beginning, he threw in the name of UniCredit because

23  it's in Europe and he figured we could never get those

24  statements so he just threw it in, but he wouldn't

25  have identified it otherwise and the same thing for

1                          PROCEEDINGS                        80

2    Sberbank.  He sent us Sberbank, we didn't come up with

3    Sberbank. He sent us Sberbank, he has to have some, as

4    a practical matter has to have some control over this.

5           Do you really believe, the question for you,

6    Your Honor, I'm not asking you this now, the question

7    is do you really believe that he doesn't have

8    practical control and a relationship with Mr. Ellish

9    where he couldn't get these statements if he wanted

10   them.  Even if he had to redact theoretically, I'm not

11   conceding that but even if you had to redact some sort

12   of personal information, Judge Caproni ordered them to

13   produce all the escrow agreements with all his client

14   information, she didn't let him redact anything. But

15   do you really believe that he couldn't get these if he

16   wanted, do you really believe this story that he never

17   emailed Mr. Ellish but the emails he sent all

18   conveniently got destroyed and he's really tried very

19   hard to get the statements and he's just failed, do

20   you really believe he's telling you the truth? If you

21   do, Your Honor, then I lose.

22           Thank you.

23           THE COURT:  All right, anything further, Mr.

24   Etra?

25           MR. ETRA:  I think Mr. Popofsky said the

1                              PROCEEDINGS                        81

2    obvious if he said his client sent the money to China,

3    obviously it was not sent to Sberbank. So I think,

4    well, committing perjury or misstatements, there is

5    one very glaring one, and I think that's consistent,

6    unfortunately, with the way Mr. Popofsky presents

7    selectively facts from -- quotes from judges, facts that he

8    surmises and he assumes. I think in my case I've taken four

9    years that I've not avoided any of the questioning, I've not

10   concealed, obviously my life is something I'm entitled to some

11   privacy, to some life. Thanks to Mr. Popofsky, he knows

12   that I'm more than $100,000 in debt to my landlord

13   that I haven't paid, he knows that I have a credit

14   card obligation that's still open, he knows all of

15   these facts and he knows that the impact that this has

16   had on my health which I've submitted over the years

17   it's not something that he should be proud of.

18             And I'm, I think it's clear to Your Honor in

19   respect of the issue that's before the Court, the

20   opportunity to present, I've utilized whatever I can, if

21   Mr. Popofsky wants to contact Magister Ellish, he had

22   all this time to do. I can't force Magister Ellish to

23   come from Austria to our courts here to answer the

24   kinds of questions that should be obvious to anybody

25   that only one person who is the account holder has

1                            PROCEEDINGS                    82

2   control over an account, to ask him to come to answer

3   that question here as opposed to what he's already

4   answered seems totally unnecessary and way beyond the

5   reasonable level of dealing with this issue.

6          So I think that both as to the nature of what

7   we're dealing with which is control over two accounts

8   which, again, as Mr. Popofsky has said over and over

9   again, I've disclosed, I've not concealed. I've tried

10  to be compliant, I've tried to do this whether it's in

11  respect of this matter or before Judge Batts which, if

12  you read her decision rather than just transcript from

13  day one, and if you read and see, I think Your Honor

14  has, herself, seen the hundreds of pages of bank

15  statements, I've never had 2 dozen accounts. Mr.

16  Popofsky exaggerates everything, 9 trips, probably it

17  was 4 or 5 trips, 26 accounts at one time he charged

18  me for having and I think I had 5 or 6. So it's always

19  exaggeration to attack my credibility which should not

20  be an issue here, this is not a question of

21  credibility, this is a question of control over bank

22  accounts which it should be obvious the starting point

23  is only the account holder has them and I'm not the

24  account holder. And I think Magister Ellish said he

25  was and provided that.  If there is any further

1                          PROCEEDINGS                         83

2  questioning that Mr. Popofsky wants to make of Magister

3  Ellish, let him use the time to do that. I think, Your

4  Honor, in the meantime can rule that I've made every

5  effort to comply and I think the answer is obvious,

6  they're not my accounts, I can't produce anything

7  more, I've done everything I could to be compliant.

8          THE COURT:  Okay. All right, I've heard enough

9  --

10          MR. POPOFSKY:  Your Honor, on the allegation

11  that I committed perjury, please, Exhibit 8 is an

12  email that Mr. Etra received from Austin in the

13  underlying transaction where Mr. Austin said to him Citi

14  is a better option for him rather than Sberbank,

15  indicating Mr. Etra had submitted, had suggested Sberbank

16  --

17          THE COURT:  Okay, so we're getting a little off

18  topic but your record is made that you object to that

19  characterization.

20          MR. POPOFSKY:  And, Your Honor, just on Mr.

21  Ellish, it's not sufficient to say he doesn't have to

22  come in, in our courts we require testimony under

23  oath, not hearsay.

24          THE COURT:  I've heard -- I've heard enough,

25  thank you. I'll take this matter under advisement.

1                              PROCEEDINGS                          84

2              MR. POPOFSKY:  Thank you.

3              THE COURT:  We're adjourned.

4               (Whereupon the matter is adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                                                              85

 2

 3                    C E R T I F I C A T E

 4

 5        I, Carole Ludwig, certify that the foregoing

 6   transcript of proceedings in the case of Benthos Master

 7   Fund, Ltd. versus Etra, Docket #20cv3384 was prepared

 8   using digital transcription software and is a true and

 9   accurate record of the proceedings.

10

11

12

13   Signature    _____Carole Ludwig_____

14                    Carole Ludwig

15   Date: November 24, 2022

16

17

18

19

20

21

22

23

24

25
```