UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BENTHOS MASTER FUND, LTD.,

        Petitioner,

   - against -

AARON ETRA,

        Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 20-cv-03384 (VEC)

**REPLY DECLARATION OF
STEVEN R. POPOFSKY**

 I, **STEVEN R. POPOFSKY**, declare the following:

 1. I am affiliated with Kleinberg, Kaplan, Wolff & Cohen, P.C., counsel to Petitioner and judgment creditor Benthos Master Fund, Ltd.  I respectfully submit this reply declaration in further support of petitioner's motion to hold respondent in civil and criminal contempt of court, and to impose effective remedies not merely to coerce compliance, but also to prevent future non-compliance and punish past willful and egregious defiance of multiple court orders, subpoenas and restraining notices.

### Preliminary Statement

 2. To vindicate the rule of law and the federal court's authority, to give some measure of justice to Benthos, and to prevent the continued dissipation of funds to which the judgment creditor is entitled, this Court should grant all of the relief sought in the Notice of Motion.

 3. It is no longer enough for the Court to say, "This time we really mean it."  That was supposed to work on July 13th, after two years of agony and multiple court orders that were intentionally defied, and it was supposed to work on August 2nd.  If the Court does not act to

change the dynamic, we will all just be back here again; the Court will endlessly be supervising Mr. Etra's compliance; Benthos will endlessly be incurring legal fees; and Mr. Etra will have gotten away with his repeated and continuing two years of willful defiance, with impunity. At this juncture, he needs to be punished for his past transgressions – which cost Benthos many thousands of dollars, with the trips to Europe and the other spending (all deliberately concealed until he was briefly jailed last July) and the never-ending legal fees – and prevented (to the extent possible) from continuing his misconduct.

4.      Mr. Etra should be incarcerated for criminal (and civil) contempt; he should surrender his passport; he should be enjoined from continuing to violate the restraining notice (including but not limited to his airline travel); he should be ordered to forward his non-Social Security income to his judgment creditor; he should be ordered to comply with outstanding subpoenas on a going-forward basis; and his computer and phone should be forensically examined, at his expense, to finally (among other things) get to the bottom of why Aaron Etra – alone among American litigants – seems to be exempt from producing e-mails (and to investigate, also among other things, the very curious goings-on since June with the bank accounts he thought would never see the light of day).

5.      As always with Mr. Etra, it is difficult to know where to start, but those bank accounts are as good a place as any.

## Still-Concealed Recent Bank Accounts

6.      To recap only briefly, for two years Mr. Etra concealed the existence of the bank accounts through which he conducted most of his life and his spending, including the 9 international trips and much else (as well as concealing the IOLA accounts, through which millions of dollars have passed and which he certainly seems to have misused for personal purposes). Not only did he violate subpoenas and court orders in that regard, but he lied under

2

oath to the federal court, testifying in early 2022, as described by Judge Parker, "that he has only one open bank account: M&T bank account ending in x3443. Etra stated that all of his other accounts have been closed." (Moving Decl. para. 21, citing Ex. 9 at para. 33.[1]) He never has tried to defend or explain away that 24-month concealment, because he cannot do so.

7. He thought Benthos would never learn about his accounts with all the activity, so he could continue portraying himself as near-destitute and living a simple life. In December of 2020, for example, he told Judge Nathan that Benthos had rendered him so impecunious that he was "unable to . . . purchase basic necessities" (Ex. 15 at p. 2). That very month, he flew to Europe for an extended sojourn.)

8. But then, in July 2022, Judge Caproni herself, examining documents produced the night before a court hearing, discovered some unexplained transfers. Only after having been incarcerated for an afternoon did Mr. Etra finally produce statements for the bank accounts of interest, through June 2022. (See generally the moving declaration at paras. 11-21 and 16-20 in particular.)

9. This reply will not reiterate what those statements revealed. What is significant for purposes of addressing Mr. Etra's opposition here (Dkt. 235) is the issue of where he has banked since the end of June 2022.

10. Even though the initial 2020 subpoena required supplemental responses as time passed, on August 2, 2022, petitioner served Mr. Etra with a new subpoena expressly requiring monthly bank statements going forward. His motion to quash that subpoena was denied. On the court-ordered deadline of October 7, 2022, he failed to produce any bank statements subsequent

---

[1] Exhibit number references are to the exhibits that accompanied the moving declaration of Steven Popofsky (Dkt. 211). Additional exhibits accompanying this reply declaration will be numbered consecutively after the last exhibit previously numbered.

3

to the already-produced statements ending in June 2022.[2] Finally, on December 6th, he produced monthly statements from July through November 2022 for his Piermont account ending in 0362 (Dkt. 235-4).

11. To start with, on September 19, 2022, Mr. Etra had told this Court in writing that "all" his Piermont accounts were being closed by the bank (mistakenly blaming Benthos, although we had had no contact with the bank whatsoever). See Mr. Etra's letter, Exhibit 20, cited in the moving affirmation at para. 22:

> Piermont Bank, the bank which currently receives my social security checks because the M&T Bank account which received them prior to Piermont had been closed down after contact by Mr. Popofsky several years ago, called me on Friday. They said they were closing all my accounts at Piermont Bank without saying why. There was no other reason for the bank to have done this to me, other than for the same reason as what happened several years ago with M&T, Citibank and HSBC when they were contacted by Mr. Popofsky. His actions inevitably result in either freezing or closing accounts and/or his taking what little funds were in an account.

Just another lie to a federal judge.

12. In any event, 0362 is the (relatively) innocuous account he had produced just prior to the July 13th court appearance. It was Judge Caproni's close scrutiny of those statements that led to discovery of the other accounts, with all the inculpatory activity, summarized at paragraphs 16-20 of the moving declaration. The statements for those accounts – again, concealed for two years; concealed again in early July when only the 0362 account was produced; and finally disclosed only after Judge Caproni's discovery and Mr. Etra's brief

---

[2] He claims implausibly to be "still not certain" of what he himself produced on that date (Etra. Decl. para. 19). What is certain is that whatever his rush on October 7, he did not produce any current bank statements in the days thereafter. What is also certain is that after petitioner wrote to the Court on October 27 (Dkt. 202), unambiguously, that "Mr. Etra has quite deliberately refused to produce any bank statements for the period since June 30, 2022," Mr. Etra supplied no such bank statements. Nor did he do so on the initial due date of his opposition to this motion.

incarceration – are Piermont 2060, M&T 3441 (IOLA), and Piermont 2292 (IOLA) (Exs. 13, 17 and 18 respectively).

13. **As late as today, December 9, 2022, Mr. Etra still has not produced statements for those accounts since the end of June**.  The activity in the 0362 account produced was extraordinarily sparse.  Compare Mr. Etra's Dkt. 235-4 with the extensive activity in his Piermont non-IOLA account 2060 (Ex. 13), which is the account through which he conducted most of his day-to-day life – including the European travel and considerable other personal spending, as summarized in the moving declaration at paras. 16-17 – since at least 2020.  Even with a hearing approaching on December 14th, Mr. Etra continues concealing his recent bank activity, which is undoubtedly much more extensive than what he has produced.[3]

14. It simply cannot be sufficient for the Court merely to excoriate Mr. Etra orally on the 14th, and to order him yet again to produce the withheld statements, nor even to merely jail him until he does so (although that should be done as well).  (And it cannot be acceptable for him to finally produce the withheld statements after he receives these papers on the 9th and before the hearing on the 14th.  Not after five months of concealment on top of two years of prior concealment.)  We all have been down this road before, all too often.  <u>He needs to be punished, and prevented from the continued spending of Benthos's money that the withheld statements will undoubtedly reveal has continued, and will not stop absent judicial intervention</u>.

15. The 0362 statements, sparse as they are, do reveal some irregularities.  On October 24, 2022, he appears to have sent $1000 to American Express (Dkt. 235-4 at p. 9).  That

---

[3] The two missing Piermont accounts (2060 personal and 2292 IOLA) indisputably have remained active, as the 0362 September statement reveals that during that month, Mr. Etra received a transfer from the Piermont 2292 IOLA account and immediately sent that $4264 to his Piermont 2060 account (Dkt. 235-4 at p. 5).  If the M&T 3441 IOLA account has been closed, Mr. Etra has provided no evidence of that; nor has he stated under oath (or otherwise) that he opened or maintained no other bank accounts since June 30, 2022.

5

was not his only recent transfer to American Express (see Ex. 17, December 2021 and February 2022; Ex. 18, April 2022), but he has not disclosed any American Express account at all (notwithstanding various discovery requests and court orders, including Request No. 6 in the recent subpoena duces tecum (Ex. 6)).  He also made payments in October of 2022 to "Barclaycard US Creditcard" and "Applecard" – no such accounts have been disclosed.  But more concerningly, the five months of statements from the Piermont 0362 account (Dkt. 235-4) reveal deposits from Social Security in July, August and September of 2022, but not for October and November.  Into what account are his Social Security payments now going?

## Implausible Statements About His European Travels

16. It would not be surprising if the still-concealed recent bank statements contain evidence of yet more recent European travel.  On October 6, 2022 (two months ago), Mr. Etra wrote to Judge Parker that "My travels have been limited to either sources of therapy or [sic] where it is available" (Ex. 49 annexed hereto).  He made the same claim in his sworn testimony before Judge Parker on November 9, 2022, although it is implausible (to say the least) that whatever "therapy" he needs was so unavailable in the United States of America that he needed to fly to Europe nine times, during a global pandemic, including three trips while neither he nor anyone else was yet vaccinated.  And if he was getting "therapy" in Europe, why was the cost of that not reflected in anything that he has produced?

17. He now claims, for the first time, that his "humanitarian work . . . often requires travel, sponsored by the organizations he is serving" (Etra. Decl. para. 6); that he often "combine[s] the trips with medical procedures . . ." (id.); and that "he continues to maintain the same modest life style he has sustained for years. When he travels it is not to fly high or live the high life as Petitioner wants this Court to envision, but the travel is always curtailed

6

economically, often covered by the organizations he is working with and necessary to promote and maintain the communication and their programmatic requirements worldwide" (id. para. 19).[4]

18.     What "organizations"? He has not identified them, and has not produced any documents confirming this dubious assertion. If the "organizations" were "sponsor[ing]" and "cover[ing]" his expenses, why was he paying for plane tickets, and hotels, and meals, with no corresponding deposits for reimbursements? What were the trips for? He would have the Court believe they were not for business reasons (to deal with all his European escrow clients and likely to dupe more unsuspecting victims out of their money); not for personal reasons ("not . . . to live the high life"); and no longer "limited to . . . sources of therapy"; but rather for his "humanitarian work," "often" (but evidently not always) "covered by the organizations he is working with." Again, where is the documentation? What "humanitarian organizations" were "sponsoring" an unvaccinated 80-year-old to fly repeatedly to Europe during the height of the pandemic and global lockdowns?[5]

---

[4] Interestingly, he also writes that the travel "is no doubt exhausting" (id.). Notwithstanding his repeated requests that the Court give him a free lawyer, a reasonable inference from reading his declaration is that he is getting legal assistance.

[5] Mr. Etra devotes much space (anything to avoid actually addressing petitioner's specific showings) to touting his distinguished resume. It was precisely that deceptive resume that induced Benthos's young principals to repose trust and confidence in Mr. Etra such that they deposited $5 million in his escrow account, never dreaming that he would send it to Hong Kong and China without authorization. Mr. Etra's credibility is revealed not by his resume, but by (i) *Grasshoff v. Etra*, 135 A.D.3d 574 (1st Dept. 2016), where he previously was held to have converted escrowed funds which he "intentionally retransferred" without authorization and which "were never recovered" (similar to what he did here to Benthos, and probably did as well to other victims of which we are unaware); (ii) his choice of business partner in the underlying scheme against Benthos, convicted criminal Tracy Evans; (iii) his confederate in that scheme, counterparty Hugh Austin, who has a long trail of fraud lawsuits and judgments against him; (iv) his lies to the face of the late Judge Deborah Batts (Dkt. 24-21); and (v) the prior findings by Judges Parker and Caproni cited in para. 57 of the moving declaration. And his continued protestations of substantial compliance have been rejected time and time again by Judge Nathan and Judge Caproni.

19. Mr. Etra has been dissipating his judgment creditor's funds on his European jaunts (and his other personal expenses addressing in the moving papers), all in flagrant violation of not one but two restraining notices over the past two years. The only effective way to prevent him from continuing to do so is to grant the relief sought on this motion.

## Where Are the E-Mails?

20. Document Request No. 1 in the subpoena served on August 2, 2022 (Ex. 6), was all-encompassing and quite specific, and Mr. Etra's motion to quash was denied and he was required to comply with it:

> All documents concerning communications since the date of the Judgment (August 13, 2020) sent or received by You concerning (i) Your financial status, (ii) any attempts (by anyone) to obtain or provide funds from which to satisfy the Judgment (in whole or in part), (iii) any and all Court orders issued in this matter since August 13, 2020, and (iv) petitioner's or petitioner's counsel's judgment enforcement efforts, to or from any person or entity whatsoever (excluding communications with financial institutions seeking copies of statements), including but not limited to Mel Dussel, Helmut Allesch, Tracy Evans, Dmitri Kaslov (or any such person who has used that name), Minh Hoang Le (or any person who has used that name), and Koraljka Troselj.

He has produced virtually no communications in response. Not a single e-mail or text message. Zip. Zero. Nada. See the detailed discussion of this, which will not be repeated here, in paragraphs 32-42 of the moving declaration.

21. Mr. Etra wrote 13 pages in opposition to this motion, yet did not even address, much less refute, those 11 detailed paragraphs in the moving declaration. What more need be said? He should be punished for his ongoing willful defiance, and his computer – and his phone – should be made available for inspection as requested. It is inconceivable that no responsive documents exist, but he is not going to produce them voluntarily.

8

**The Convenient "Computer Breakdown"**

22. On June 21, 2022, the Court ordered Mr. Etra to produce certain documents, including Escrow Agreements he had long been withholding[6], by July 1st (Dkt. 113). On June 29th, Mr. Etra suffered a "computer breakdown" (Ex. 41 at para. 11). The Apple Service Report submitted by Mr. Etra to this Court (Dkt. 150-2) reported "Accidental damage/Liquid Damage." Now Mr. Etra writes that "the liquid damage issue never panned out" and Apple's "higher tech department never did say what the real cause was" (Etra Decl. paras. 25-26).

23. Regardless of what actually may have happened, the facts are that (i) after two years of willful defiance of subpoenas and court orders requiring production of documents, something happened to Mr. Etra's computer two days before he was due to produce documents; (ii) he invoked that "breakdown" over the summer (although he has not done so now) to explain non-production of responsive documents; and (iii) many documents he has been ordered to produce remain unproduced, after quite extensive efforts by Benthos and the Court to obtain production.

24. The Court need not find "suspicious activity" (Etra Decl. para. 25) – although that is surely a reasonable inference given the history and Mr. Etra's adjudicated lack of credibility (to say the least) – in order to conclude that temporarily taking Mr. Etra's computer and his phone (not at the same time) out of his custody is likely to help obtain at least some of the documents that were ordered to be produced but have not been produced – including, among other things, the 2020-2022 communications addressed above and all the missing Escrow Agreements addressed at paras. 53-56 of the moving declaration (and pages 5-7 of Dkt. 153 cited therein). Mr. Etra did not even try, in his opposition papers, to explain the whereabouts of the

---

[6] See the moving declaration at paras. 53-56 and pages 5-7 of Dkt. 153 cited therein.

9

many Escrow Agreements he resisted producing for so long, was ordered to produce, and has not produced. That is all the more reason a forensic examination of his devices is necessary, and an independent assessment of the cause of the June 29th "breakdown" is also more than appropriate under the circumstances.

### Mr. Etra's Determined Obfuscation
### Of His Escrow-Related Work

25. It is well-established that substantial monies have passed through Mr. Etra's escrow accounts. Benthos made the point to this Court repeatedly that he would not have been performing those services gratis – if indeed they were not scams entirely (see Ex. 40 at pp. 33-36 ("$5Billion USD"), discussed at para. 47 of the moving declaration) – and must have been getting compensated, but the compensation remained hidden. In September of this year, he admitted that he "took . . . fees" during the past "four years of this matter" (see Dkt. 170 and 172), and two weeks later he acknowledged "[unspecified] [c]lient payments earned and having been deposited . . ." (Dkt. 192-5 at No. 3).

26. But we still have not located or identified those fees, and on this motion he acts as though they did not exist, merely stating in passing that we "imply that somehow because Respondent has some clients with money that he should have money" (Etra. Decl. para. 22). That is not at all our contention. Rather, we contend that since he has been transferring for years hundreds of thousands, or millions (or billions) of dollars for his so-called clients – details he fought so hard for two years to withhold – surely he is receiving compensation for his services. Accordingly we posed some very pointed discovery requests on this subject; see, e.g., Ex. 7 at p. 6, Information Request No. 1:

> Identify (i) the name and full contact information (address, telephone, e-mail and otherwise) for every "client," or other individual or entity, for which You have performed any legal, "paymaster," escrow-related or other services from August 1, 2017 through the present; (ii) for each such individual or entity, the precise nature of the services

10

performed; (iii) for each such individual or entity, specifically what compensation You (or any affiliated person or entity, including but not limited to Koraljka Troselj) received for those services; (iv) where such compensation was paid to, in each instance separately (including names, addresses, account numbers, and Your responsible contact officers at each such institution); (v) all subsequent transfers of such compensation received; and (vi) the current whereabouts of all such compensation.

Mr. Etra's wholly inadequate response to that request was discussed at paragraphs 49-51 of the moving declaration and will not be further discussed here, except to note that his opposition did not even address (much less try to refute) any of that discussion, nor did he make even a pretense of responding, however belatedly, to the information request.

27. Similarly, Request No. 5 of the recent subpoena duces tecum (Ex. 6) sought "All documents, including but not limited to agreements and written communications, concerning the services referred to in [the above-quoted] item No. 1 of the accompanying Information Subpoena" (emphasis added) – i.e., documents and communications concerning the services for which Mr. Etra took monies into escrow. He has produced no such documents, nor has he even tried to explain the omission.

28. Again, while Mr. Etra surely should be ordered (yet again) to remedy these deficiencies, and coerced as necessary into doing so, that is simply not sufficient at this late stage.

### Mr. Etra Cannot Even Bestir Himself
### To Produce Recent Communications With His Landlords

29. While hardly among the most important of his many instances of willful non-compliance, Mr. Etra's treatment of communications with his landlords is a good example of his defiant attitude.

30. In response to a document subpoena for "All documents concerning communications since the date of the Judgment . . . sent or received by You to or from the Landlord . . . of your rental apartment" (Ex. 6 at No. 6), on the due date of October 7 Mr. Etra

11

produced only one solitary letter from his landlord. As discussed in paragraph 41 of the moving declaration, the landlord previously had produced a dozen such communications. After Mr. Etra's virtual non-production on October 7, petitioner's counsel again contacted the landlord, who provided still more (and recent) communications Mr. Etra had withheld.[7]

31.     Among those documents was an eviction notice the landlord had served on Mr. Etra on September 15, 2022 (Ex. 51), barely three weeks before his response to the subpoena was due. The landlord also pasted an e-mail Mr. Etra had sent to him a few days later in response, stating "It was not at all expected to find out on Friday that I was being served with a lease termination by you . . ." (Ex. 52). It is impossible to believe that on October 7th, Mr. Etra had forgotten about the eviction notice. He simply decided not to produce it, or his response to it, notwithstanding the subpoena and corresponding court order.[8]

32.     One other point relating to the landlord communications: In his e-mail responding to the eviction notice, Mr. Etra wrote that "I will be taken care of by my family through the Jewish holidays" (Ex. 52). Information Request No. 3 (Ex. 7) required him to "Identify any and all sources from which You receive funds that You use to pay Your current

---

[7] Putting aside the non-compliance, documents produced by the landlord demonstrated that Mr. Etra has (not surprisingly) not limited his lies to the federal judges and Benthos. After Judge Parker's hearing last February on our motion to hold Mr. Etra in contempt of court, he told his landlord that the "Judge took it under advisement" and when asked "what was taken under advisement?," he responded – falsely – "Judge needs to decide how my debts can be settled. . . . Funds for settlement and debts payment being raised in parallel and expect to be faster" (Ex. 50). He also complained, among other things, that the building's swimming pool [is] still far from useable."

[8] On December 6th, undoubtedly after the landlord advised him that we now had the eviction notice, Mr. Etra produced it (Dkt. 235-6). He produced nothing else from the landlord (including omitting his e-mail response quoted above), nor has he produced a single document exchanged with Regus Management, his office landlord (in response to subpoena duces tecum request No. 7 in Ex. 6), although his bank statements reflect sporadic rent payments to Regus and it is difficult to believe he has no rent statements from Regus and no communications regarding his rent payments or lack thereof.

12

monthly living expenses and/or any other non-recurring expenses," but he has not identified any such expenses paid on his behalf by his "family."

## Mr. Etra's Disingenuousness About His "Living Expenses"

33. The "current monthly living expenses" previously itemized by Mr. Etra (Ex. 23, item No. 2), in response to Information Request No. 2 (Ex. 7), were addressed briefly in the moving declaration at page 18 (para. 52). Now in opposition he inexplicably re-sends (Dkt. 235-2) an old Personal Financial Statement from 2020, prepared for purposes of this case, with an unsigned certification that the information therein was "true, accurate and complete." It is obvious that the 2020 statement was not "true, accurate and complete" at the time – it is belied by the bank statements he produced under coercion two years later, and is not consistent even with his Information Response at Ex. 23 – but the broader point is that <u>he is not entitled to be almost any of this money while under the restraining notice</u>.

34. It is unclear the extent to which Mr. Etra's "Current monthly living expenses" in Ex. 23 are intended to be aspirational: For example, he lists $4100/month for rent, but claims not to be paying rent; although he acknowledges that (as his bank statements revealed) "A few emergency back payments were made to his landlord" (Etra Decl. para. 24). He is living in a luxury apartment tower – the penthouse view of which he used to lure Benthos's principals into the underlying fraudulent transaction – and he is not permitted to pay $4000 per month in rent, "a few" times or otherwise, when those funds belong to his judgment creditor. Similarly, he lists "Credit Card Payments monthly: $750-1500 (to include arrear payments)" – what "Credit Card[s]?" He has produced no current credit card statements or bills (notwithstanding subpoena duces tecum request No. 3 (Ex. 6)), although, as noted in paragraph 15 above, he seems to

sporadically be paying American Express without identifying any such account; and, again, he has no right to be making those payments.

35. He also lists a monthly expense for an "office rental." He does not need a Regus office, and he is not entitled to spend that money. And he ludicrously claims only "$75-300" monthly for "transportation," notwithstanding the incessant flights to Europe. See also the other expenditures identified in paragraphs 16-20 of the moving declaration, all of which, to the extent they exceed his Social Security payments, are in violation of the restraining notice.

36. Putting aside that we still do not know where he is getting the money to make all these payments, he has not purported to identify under what authority he claims to be spending this money in the face of the two restraining notices served on him in 2020 and 2022. The bottom line is that Mr. Etra is determined to live his life as he sees fit, notwithstanding the restraining notices. He admitted as much to Judge Parker on November 9, 2022, when he testified – as recounted in the moving declaration at paras. 16 and 24, and not denied in opposition – that "I'm entitled to travel," without addressing his "right" to do so using his judgment creditor's money.

37. Benthos cannot recover the monies that were spent during the two years he was perjuriously hiding almost all of his expenditures, assuming (until his incarceration changed the equation) that his Piermont accounts would never come to light. But something needs to be done now – more than simply telling him in court to stop – that will (i) punish him for what he did, and (ii) prevent him from continuing to do it.

### 2017 Bank Statements and List of Accounts

38. The recent subpoenas were served on August 2, 2022, four months ago, and the Court denied the motion to quash on September 26, 2022 (Ex. 10), more than two months ago.

The subpoena duces tecum (Ex. 6 at Request No. 2, as limited by Ex. 24 at p. 5) required production of all bank statements during August-December 2017 (a year as to which Mr. Etra has repeatedly sought to conceal his finances (see, e.g., Ex. 35)). Mr. Etra writes that "Respondent has reached out to the various banks and so far has not secured any additional statements from the closed/old accounts" (Etra Decl. para. 21), but he provides no supporting documentation, reasonably leading one to wonder what efforts he has made in that regard, and when he made those supposed efforts.

39. He also does not tell us which accounts existed in 2017 (i.e., to which banks should he have directed his inquiries). And he was asked: Information subpoena Request No. 4 – to which, again, he was required to respond when the Court denied his motion to quash more than two months ago – required him to "List all bank accounts [etc.] in which You have (or had) an interest . . . since August 1, 2017" (Ex. 7). His response was merely, "The bank accounts for which I have an interest are attached" (Ex. 23), without producing or listing a single account for 2017. The documents he did attach were not complete, as discussed in para. 52 of the moving declaration, and in any event what was required was a "list," which he did not even attempt to provide.

40. All of this was complained about in the moving declaration (id.), but Mr. Etra just ignored this issue, too, in his opposition.

### A Concluding Note

41. In our moving papers, petitioner was not analogizing Mr. Etra's underlying conduct that gave rise to the judgment – breaching his fiduciary duty by misusing escrow funds – with the conduct that gave rise to the judgment against Steven Donziger (although in terms of impact on their victims, Chevron was much better able to withstand what Mr. Donziger did, and

15

was able to get it undone, while Mr. Etra almost ruined the lives of the recent college graduates whose investors' money he intentionally misdirected).

42. The point was, and is, that both judgment debtors willfully defied judgment-enforcement discovery and court orders over protracted periods of time, and that when lesser remedies fail repeatedly, the federal court has the power to grant all the relief sought in the Notice of Motion herein.  (See also CPLR 3225(b) (turnover order).)  While Mr. Etra (or whoever is ghost-writing his papers) pays lip service to the proposition that "asset(s) cannot be purposefully hidden or transferred and would be in violation of the enforcement of a restraining notice if this were done" (Etra. Decl. para. 18), he totally ignores that <u>that is precisely what he has done, for over two years</u>, not only with all of the spending – including but not limited to the European trips – but with the very intentional concealment (including through outright perjury, on top of defiance of multiple court orders) of the bank statements that would have revealed those violations; <u>and he is continuing to do it to this very day</u>.

43. For all of the reasons set forth in the moving papers and above, and because all of the courts' previous efforts have failed, Benthos respectfully requests that <u>all</u> of the relief sought on this motion now be granted.  Coercion, while still required, is not enough, and never will be enough, and Mr. Etra should also now be punished for his protracted and ongoing contempt and prevented from further violations of the restraining notice.

In accordance with 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 9, 2022

_____
Steven R. Popofsky