Exhibit 4

```
 1                    AARON ETRA, ESQ.
 2   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK
 3   ---------------------------------------------x
 4   BENTHOS MASTER FUND, LTD.,
 5                    Plaintiff,
 6            v.
 7   HUGH AUSTIN
     a/k/a EUGENE W. AUSTIN,
 8   JOHN AUSTIN, BRANDON AUSTIN,
     VALKYRIE GROUP LLC
 9   and VALHALLA VENTURE GROUP LLC,
10                    Defendants.
11   ---------------------------------------------x
     Index No. 151823/2019
12   ---------------------------------------------x
13                             April 12, 2019
                               9:36 a.m.
14
15
16
17            Deposition of AARON ETRA, ESQ., taken
18      by Plaintiff, pursuant to Subpoena Duces Tecum
19      and Ad Testificandum, dated February, 20, 2019,
20      at the offices of Kleinberg, Kaplan, Wolff &
21      Cohen, P.C., 551 Fifth Avenue, 18th Floor, New
22      York, New York, before Brandon Rainoff, a
23      Federal Certified Realtime Reporter and Notary
24      Public of the State of New York.
25
```

```
 1                    AARON ETRA, ESQ.

 2      A P P E A R A N C E S:

 3

 4      KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.

 5      Attorneys for Plaintiff

 6              551 Fifth Avenue

 7              18th Floor

 8              New York, New York  10176

 9              212.986.6000

10      BY:   JOSHUA K. BROMBERG, ESQ.

11              212.890.9895

12              jbromberg@kkwc.com

13              STEVEN R. POPOFSKY, ESQ.

14              212.880.9882

15              spopofsky@kkwc.com

16

17      AARON ETRA, ESQ.

18      Appearing Pro Se

19              445 Park Avenue

20              9th Floor

21              New York, New York  10022

22      BY:   AARON ETRA, ESQ.

23              aaron@etra.com

24

25
```

```
 1                    AARON ETRA, ESQ.

 2     ALSO PRESENT:

 3     JULIA HENRY, Kleinberg, Kaplan, Wolff & Cohen, P.C.

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     AARON ETRA, ESQ.

 2           I N D E X   O F   E X A M I N A T I O N

 3

 4

 5    Witness:

 6    Aaron Etra, Esq.

 7

 8

 9    Examination:

10    By Mr. Bromberg........................Page 11

11

12

13    Index of Exhibits......................Page 5

14

15

16    Discovery Requests

17    By Mr. Bromberg........................Page 144

18    any authorization by Valkyrie or any representative

19    of Valkyrie to the witness to send money based on

20    instructions provided to the witness by Mr. Kaslov,

21    Ms. Evans, or Mr. Le

22

23    By Mr. Bromberg........................Page 185

24    Any further correspondence with the Austins that the

25    witness has not provided
```

```
1                      AARON ETRA, ESQ.

2              I N D E X   O F   E X H I B I T S

3

4       Etra 1 ....................................14

5       Multipage document entitled: Subpoena Duces Tecum and

6       Ad Testificandum, dated February 20, 2019 (no Bates

7       Nos.)

8

9       Etra 2 ....................................18

10      Multipage e-mail chain, top e-mail From: Aaron Etra,

11      To: Joshua K. Bromberg and Steven Popofsky, Subject:

12      RE: Benthos Master Fund v. Austin, et al., Index No.

13      151823/2019 (Sup. Ct. N.Y. Cnty 2019), Sent: April 3,

14      2019 (no Bates Nos.)

15

16      Etra 3 ....................................21

17      Two-page document bearing heading: Aaron Etra (no

18      Bates Nos.)

19

20      Etra 4 ....................................23

21      Two-page document bearing heading: The Rowfant Club

22      (no Bates Nos.)

23

24

25
```

```
 1                    AARON ETRA, ESQ.

 2    Etra 5 .....................................25

 3    Multipage document entitled: Summons and Complaint,

 4    dated February 19, 2019 (no Bates Nos.)

 5

 6    Etra 6 .....................................27

 7    Document Bates stamped AE_00001 through AE(SUP)_545,

 8    three-page e-mail chain, top e-mail From: Tracy

 9    Evans, To: Aaron Etra, Subject: Fwd: Update, Sent:

10    November 22, 2018, with multipage attachments

11

12    Etra 7 .....................................43

13    Document Bates stamped TE-0001 through 953, five-page

14    document entitled: Benthos - Doos That Are Ready to

15    be Sent for Subpoena on 3/27/19, with UPS mailing

16    label cover page and multipage attachments

17

18    Etra 8 .....................................47

19    Document Bates stamped AS(SUP)_00546 through 556,

20    four-page document entitled: Documents produced by

21    Aaron Etra pursuant to Subpoena Duces Tecum, dated

22    February 20, 2019, in the Matter of Benthos Mater

23    Funds, Ltd., Plaintiff, against Hugh Austin, et al.,

24    Index No. 151823/2019, with multipage attachments

25
```

1                          AARON ETRA, ESQ.

2      Etra 9 ......................................66

3      Multipage document entitled: Private Deed of

4      Agreement for Bitcoin Asset Exchange/Transaction,

5      dated July 23, 2018 (no Bates Nos.)

6

7      Etra 10 .....................................67

8      Single-page e-mail From: Brandon Austin, To:

9      gerald@benthoscap.com and others, Subject: Benthos

10     Capital BTC Contract (Citibank Aaron Etra Deal),

11     Sent: July 31, 2018 (no Bates No.)

12

13     Etra 11 .....................................69

14     Multipage document entitled: BTC Agreement No.

15     CDKTEBPA073118BC, dated July 31, 2018 (no Bates Nos.)

16

17     Etra 12 .....................................91

18     Single-page e-mail From: Hugh Austin, To:

19     gerald@benthoscap.com, Subject: Latest Draft from

20     Aaron and Tracy, Sent: August 3, 2018 (no Bates No.)

21

22     Etra 13 .....................................92

23     Multipage document entitled: BTC Agreement:

24     Transaction Code No. CDKTEBPA080218SUB (no Bates

25     Nos.)

1                    AARON ETRA, ESQ.

2      Etra 14 ..................................107

3      Four-page e-mail chain, top e-mail From: Brandon

4      Austin, To: gerald@benthoscap.com and Brandon Austin,

5      Subject: Signed Docs, Sent: August 4, 2018 (no Bates

6      Nos.)

7

8      Etra 15 ..................................107

9      Multipage document entitled: BTC Agreement:

10     Transaction Code No. CDKTEBPA080218SUB (no Bates

11     Nos.)

12

13     Etra 16 ..................................107

14     Single-page document entitled: Client Information

15     Summary, with attachments

16

17     Etra 17 ..................................118

18     Multipage e-mail chain, top e-mail From: Brandon

19     Austin, To: Gerald Fong and others, Subject: Benthos

20     (Buyer) KYC AML, Sent: August 4, 2018 (no Bates Nos.)

21

22     Etra 18 ..................................130

23     Single-page document bearing passport copy of Minh

24     Hoang Le (no Bates No.)

25

```
1                    AARON ETRA, ESQ.

2    Etra 19 ....................................145

3    Two-page document entitled: Answer to Questions in

4    OSC Requested of Aaron Etra [Questions 1, 2, 3, 4 - 2

5    pages] (no Bates Nos.)

6

7    Etra 20 ....................................145

8    Four-page document bearing heading on first page:

9    Instructions to Aaron Etra, Esq., Escrow Agent, for

10   Transaction Codes: CDKTEBPA073118XXX and

11   CDKTEBPA073118SUB (no Bates Nos.)

12

13   Etra 21 ....................................145

14   Four-page document bearing heading on first page:

15   Completed Wire Detail (no Bates Nos.)

16

17   Etra 22 ....................................157

18   Three-page document entitled: China CITIC Bank

19   International Cross-border Banking (no Bates Nos.)

20

21   Etra 23 ....................................218

22   Single-page e-mail From: Gerald Fong, To: Tracy

23   Evans, Subject: Questions, Sent: August 29, 2018 (no

24   Bates No.)

25
```

```
1                    AARON ETRA, ESQ.

2    Etra 24 ...................................218

3    Single-page letter from Mark J. Hyland to Aaron Etra,

4    dated August 31, 2018 (no Bates No.)

5

6    Etra 25 ...................................278

7    Four-page document entitled: Judgment, dated October

8    30, 2014 (no Bates Nos.)

9

10   Etra 26 ...................................279

11   Single-page document entitled: Grasshoff v. Etra

12   Opinion, dated January 19, 2016 (no Bates No.)

13

14   Etra 27 ...................................285

15   Multipage document entitled: Complaint, dated March

16   1, 2019 (no Bates Nos.)

17

18

19

20

21

22

23

24

25
```

```
 1                    AARON ETRA, ESQ.

 2               *      *      *

 3            P R O C E E D I N G

 4            Friday, April 12, 2019

 5            New York, New York

 6                 9:36 a.m.

 7               *      *      *

 8   AARON ETRA,

 9            having been duly sworn, was examined and

10            testified as follows:

11   EXAMINATION

12   BY MR. BROMBERG:

13        Q.    Good morning, Mr. Etra.  Thank you for

14   being here with us.

15        A.    Good morning.

16        Q.    My name is Joshua Kolman Bromberg of

17   Kleinberg, Kaplan, Wolff & Cohen.  I represent

18   Benthos Master Fund in this action.

19            With me today is my colleague, Steven

20   Popofsky, also of the firm of Kleinberg, Kaplan,

21   and Julia Henry, a paralegal who is employed by

22   our firm.

23            Have you ever been deposed before, Mr.

24   Etra?

25        A.    Yes.
```

```
 1                    AARON ETRA, ESQ.

 2          Q.    In what proceeding were you deposed?

 3          A.    It was quite some time ago, so I don't

 4     have a clear recollection.

 5          Q.    Approximately how many years ago was

 6     it?

 7          A.    Oh, six or seven years ago.

 8          Q.    What kind of action was that

 9     deposition?

10          A.    I was a witness in that deposition.

11          Q.    Were you a party to the action?

12          A.    Not in that case, no.

13          Q.    Is that the only occasion on which you

14     have provided testimony?

15          A.    No.

16          Q.    On what other occasion have you

17     provided deposition testimony?

18          A.    In another action again.  In that

19     case, I was a party.

20          Q.    What was the name of that case?

21          A.    I don't recollect the exact name of

22     the case, but it was involving a Mr. Grasshoff.

23          Q.    You are an attorney, so I will assume

24     you are generally familiar with the process.

25     But just to be clear, if you could please let me
```

```
1                    AARON ETRA, ESQ.

2       finish the question when I am asking a question,

3       I will also endeavor to allow you to finish your

4       answers --

5          A.    Yes.

6          Q.    -- I would appreciate that.

7                If you need to take a break from time

8       to time, that's fine.  But I'll ask that you

9       please not do so while there is a question

10      pending.

11               So if I have asked a question, could

12      you please answer the question before you

13      request to take a break?

14         A.    Yes.

15         Q.    If you answer a question, I'm going to

16      assume that you understand the question.

17               Is that fair?

18         A.    Yes.

19         Q.    Are you under the influence of alcohol

20      or any drugs that would impair your ability to

21      testify today?

22         A.    No.

23               MR. BROMBERG:  Mark this 1, please.

24

25
```

```
 1                    AARON ETRA, ESQ.
 2                    (Exhibit Etra 1, Multipage document
 3         entitled: Subpoena Duces Tecum and Ad
 4         Testificandum, dated February 20, 2019 (no Bates
 5         Nos.), marked for identification)
 6    BY MR. BROMBERG:
 7         Q.    We are looking at a document that's
 8    been marked Exhibit 1, and it's a Subpoena Duces
 9    Tecum and Ad Testificandum to you, dated
10    February 20, 2019.
11                    Do you recognize this document?
12         A.    Yes.
13         Q.    Do you recall when you received this
14    document?
15         A.    No.
16         Q.    You are appearing today pursuant to
17    the subpoena, correct?
18         A.    I agreed to appear.
19         Q.    Now, you said you don't recall seeing
20    this document but you recognize it.
21                    Can you explain that?
22         A.    You asked me:  Do I recall when I
23    received it?, and I --
24         Q.    You don't recall receiving it?
25         A.    I don't recall when I received it, no.
```

```
1                      AARON ETRA, ESQ.

2          Q.    You don't recall whether you received

3    it by --

4          A.    When I received it.

5          Q.    How did you receive this document?

6          A.    My best recollection was I received a

7    mail copy of it.

8          Q.    At what location?

9          A.    I believe it was delivered to my

10   office address.

11         Q.    That's 445 Park Avenue --

12         A.    Yes.

13         Q.    -- 9th floor?

14         A.    Yes.

15         Q.    Is that a private office?

16         A.    No.

17         Q.    What type of office is that?

18         A.    It's a Regus office.

19         Q.    What is a Regus office?

20         A.    It's a shared office space, operated

21   by the Regus company.

22         Q.    Do you have a dedicated office there?

23               Or is it -- is it, like, a rotating

24   office that other lawyers would use?

25         A.    I do not have a dedicated office, no.
```

```
 1                    AARON ETRA, ESQ.

 2          Q.    Can you tell us a little bit about

 3      your background, sir?

 4          A.    Could you be more specific?

 5          Q.    What's your educational background?

 6          A.    At what level would you like me to

 7      start?

 8          Q.    Start from high school, if you please?

 9          A.    I went to high school, to the Horace

10      Mann school.

11                I went to college at Yale University.

12                I did a first law degree at Columbia

13      University, and a second law degree at NYU

14      University.

15          Q.    How many years have you been

16      practicing as an attorney?

17          A.    I was admitted in 1966.

18          Q.    Where is your current residence?

19          A.    I live at 240 East 47th Street in New

20      York City.

21          Q.    Is that an apartment?

22                Or a house?

23          A.    It's an apartment.

24          Q.    What apartment?

25          A.    12A.
```

```
 1                    AARON ETRA, ESQ.

 2         Q.    Did you previously live at 985 Fifth

 3    Avenue?

 4         A.    Yes, I did.

 5         Q.    What apartment did you reside at 985

 6    Fifth Avenue?

 7         A.    4B.

 8         Q.    Was that a rental?

 9               Or did you own that apartment?

10         A.    It was a rental apartment.

11         Q.    How much was the rent, if I may ask?

12         A.    I don't recollect.  The rent varied

13    over time.  I don't recollect the last rental

14    price.

15         Q.    And your current residence at 240 east

16    47th, Apartment 12A -- is that a rental?

17               Or do you own that apartment?

18         A.    It's a sub-tenancy.

19         Q.    Sub-tenancy.

20

21

22

23

24

25
```

```
 1                    AARON ETRA, ESQ.

 2                (Exhibit Etra 2, Multipage e-mail

 3      chain, top e-mail From: Aaron Etra, To: Joshua

 4      K. Bromberg and Steven Popofsky, Subject: RE:

 5      Benthos Master Fund v. Austin, et al., Index No.

 6      151823/2019 (Sup. Ct. N.Y. Cnty 2019), Sent:

 7      April 3, 2019 (no Bates Nos.), marked for

 8      identification)

 9                    MR. BROMBERG:  I have handed you a

10      document which has been marked Exhibit 2.  And

11      that's an e-mail chain between myself and you.

12      And it terminates in an e-mail from you to me,

13      dated Wednesday, April 3rd, 2019, at 10:50 a.m.

14      BY MR. BROMBERG:

15          Q.    Do you recognize this e-mail chain?

16                (Pause)

17          A.    I can't say if it's complete.

18                I do recognize some of the e-mails in

19      it, yes.

20          Q.    And the e-mail at the top is an e-mail

21      that you sent to me, correct?

22          A.    Correct.

23          Q.    And it was during the course of this

24      e-mail chain that you agreed to appear today on

25      April 12th, rather than the date set forth in
```

1                    AARON ETRA, ESQ.

2       the exhibit, correct?

3            A.    Yes.

4            Q.    Do you see at the top where it says,

5       on the third line of your e-mail:  You and your

6       colleagues seem only capable of making threats

7       and misconstruing the action of persons who have

8       been selflessly trying to assist your clients?

9            A.    Yes.

10           Q.    Can you tell us what you have done

11      recently to assist Benthos Master Fund in

12      recovering its $4.6 million?

13           A.    Being available to potentially

14      interested parties who might be able to deal

15      with the problem that had been developed in

16      consummating the arrangements with Benthos.

17           Q.    Can you elaborate on that?

18           A.    Yes.

19                 There are people who were interested

20      in purchasing bitcoins.  And to the best of my

21      knowledge and belief, the seller to whom Benthos

22      was connected had those bitcoins.  And those

23      bitcoins would be available for sale under

24      certain terms and conditions.

25                 And my effort -- to the extent that I

1                  AARON ETRA, ESQ.

2      can -- is to assist in trying to finalize those

3      arrangements for -- that had been desired by

4      Benthos and the parties with whom Benthos dealt.

5                  So the fact that there is still

6      interest in bitcoins, I have held myself

7      available to try to arrange for the consummation

8      of the originally-planned sale to Benthos.

9          Q.    Have you made any effort to effect the

10     return of Benthos' $4.6 million?

11         A.    Yes.

12         Q.    What were those efforts?

13         A.    I've conveyed through the

14     seller/owner's representative the desirability

15     of either returning the funds or in some way

16     arranging for the return of those monies to

17     Benthos, either by consummating the sale --

18     which would be the way that the seller has

19     indicated to us is the way to do it -- or any

20     other way that could result in Benthos receiving

21     the funds back.

22         Q.    You mentioned the seller/owner's

23     representative.

24                  Who is that person?

25         A.    That's Tracy Evans.

```
 1                    AARON ETRA, ESQ.

 2         Q.    Who does Ms. Evans represent?

 3         A.    She represents Dmitri Kaslov.

 4               (Exhibit Etra 3, Two-page document

 5       bearing heading: Aaron Etra (no Bates Nos.),

 6       marked for identification)

 7    BY MR. BROMBERG:

 8         Q.    Do you recognize the document that's

 9       been marked as Exhibit 3, sir?

10         A.    I do not.

11         Q.    I'm representing to you, sir, that

12       this is a webpage which is taken from United

13       Nations Association.  And you can see at the

14       bottom, there is a URL:

15       www.unasny.org/aaronetra@html.

16               Do you see that, sir?

17         A.    I do see it.

18         Q.    Are you the person who appears on this

19       webpage?

20         A.    It is my picture.  I didn't create the

21       page, but it's my picture.

22         Q.    What is the United Nations

23       Association?

24         A.    United Nations Association is a

25       voluntary organization of individual and
```

1                    AARON ETRA, ESQ.

2      organizational members that support the work of

3      the United Nations.  It's a not-for-profit

4      organization based primarily in Washington, D.C.

5                    But the United Nations Association,

6      Southern New York State division is the part of

7      it based in New York City.

8           Q.    Is the United Nations Association

9      officially affiliated with the United Nations?

10          A.    It's a so-called NGO --

11     non-governmental organization.

12          Q.    Do you see about halfway down in the

13     first paragraph where it says:  President & CEO,

14     INDEVA Corporation?

15          A.    Yes.

16          Q.    What is the INDEVA Corporation?

17          A.    INDEVA Corporation was a company

18     originally set up to do real estate development

19     and to provide consulting services in real

20     estate.

21          Q.    You say that it was.

22                Does INDEVA Corporation still exist?

23          A.    Yes.

24          Q.    Does INDEVA Corporation have assets?

25          A.    No.

1                    AARON ETRA, ESQ.

2          Q.     What business does INDEVA Corporation

3     currently carry on?

4          A.     Consulting.

5          Q.     What type of consulting?

6          A.     In real estate.

7          Q.     Do you have any income through the

8     INDEVA Corporation?

9          A.     I currently have had no income from

10    INDEVA Corporation, no.

11         Q.     For how long?

12         A.     To the best of my recollection, more

13    than 25 years.

14         Q.     Do you have a website sir?

15         A.     I do.

16         Q.     What is the address of that website?

17         A.     Etra.com.

18         Q.     What is the Rowfant Club?

19         A.     Rowfant Club?  I don't recollect any

20    knowledge of it.

21                MR. BROMBERG:  Can you mark this 4?

22                (Exhibit Etra 4, Two-page document

23    bearing heading: The Rowfant Club (no Bates

24    Nos.), marked for identification)

25

```
1                    AARON ETRA, ESQ.

2     BY MR. BROMBERG:

3          Q.    Do you recognize this document, sir?

4          A.    I do not.

5          Q.    Do you see at the bottom of the page

6     where it says:  Aaron.etra.com?

7          A.    Yes.  That is not any website of mine.

8          Q.    Didn't you previously testify that

9     your website is etra.com?

10         A.    Correct, but this is aaron.etra.com.

11    It's not the same thing.

12         Q.    Your domain name is etra.com, correct?

13         A.    The domain is etra.com, yes.

14         Q.    So it's your testimony as you sit here

15    today that you don't know what The Rowfant Club

16    is and this is not your website?

17         A.    Correct.

18         Q.    Have you made any recent changes to

19    your website?

20         A.    I have not.

21               My webmaster periodically does make

22    changes.  There are people who do hack in and he

23    needs to respond to it.

24               But I've not made any changes

25    personally.
```

```
 1                    AARON ETRA, ESQ.

 2         Q.    You say there are people who hack into

 3   your website?

 4         A.    There are people who hack into every

 5   website.

 6         Q.    Are there, in fact, people who have

 7   hacked into your website?

 8         A.    I have no direct knowledge of that.

 9         Q.    Do you have reason to think that

10   someone has hacked your website?

11         A.    I do.

12         Q.    What is that?

13         A.    Because that happens to just about

14   everybody that I know; and no reason why I would

15   be any less vulnerable than anyone else.

16         Q.    Can you think of any particular

17   individual who would want to hack your website?

18         A.    No.

19               (Exhibit Etra 5, Multipage document

20   entitled: Summons and Complaint, dated February

21   19, 2019 (no Bates Nos.), marked for

22   identification)

23               MR. BROMBERG:  I've handed you a

24   document now marked Exhibit 5.  And this is a

25   Summons and Complaint in the action Benthos
```

```
 1                    AARON ETRA, ESQ.

 2       Master Fund, Limited versus Hugh Austin, et al.

 3    BY MR. BROMBERG:

 4            Q.    Have you seen this document before?

 5            A.    I don't recollect seeing it.

 6            Q.    Do you know what this document is?

 7            A.    Only by looking what it says on its

 8       face.

 9            Q.    Did you discuss with anyone that you

10       intended to appear today to testify in this

11       proceeding?

12            A.    No.

13            Q.    Did you discuss it with Ms. Evans?

14            A.    I didn't discuss it.  She knows that I

15       was going to be deposed.

16            Q.    Did you discuss it with any person

17       other than Ms. Evans?

18            A.    No.

19            Q.    Did you discuss this with any member

20       of the Austin family?

21            A.    No.

22            Q.    Have you recently been in contact with

23       any member of the Austin family?

24                 When I say "the Austin family," I mean

25       Hugh Austin, Brandon Austin, John Austin, or any
```

```
 1                   AARON ETRA, ESQ.

 2      other related person that you know of.

 3           A.    Not recently, no.

 4           Q.    When was the last time you recall

 5      having any contact with any member of the Austin

 6      family?

 7           A.    The best of my recollection, it was

 8      sometime in February.

 9                   (Exhibit Etra 6, Document Bates

10      stamped AE_00001 through AE(SUP)_545, three-page

11      e-mail chain, top e-mail From: Tracy Evans, To:

12      Aaron Etra, Subject: Fwd: Update, Sent: November

13      22, 2018, with multipage attachments, marked for

14      identification)

15                   MR. BROMBERG:  Sir, you have been

16      handed a document that's been marked Exhibit 6.

17      BY MR. BROMBERG:

18           Q.    And you'll see that it has stamps at

19      the bottom, which we refer to as Bates stamps?

20           A.    Yes.

21           Q.    And those stamps begin AE_ 00001 and

22      they continue through AE (SUP) underscore 00545.

23                   Do you see that?

24           A.    I see the 0001 --

25                   (Pause)
```

```
 1                    AARON ETRA, ESQ.

 2         A.    -- yes, I see the last page is

 3    AE(SUP)_000545.

 4         Q.    These are the documents produced by

 5    your counsel in the federal court proceeding,

 6    correct?

 7         A.    I would have to examine them to be

 8    able to answer your question.

 9         Q.    Do you have any reason to believe that

10    these are not the documents produced by your

11    counsel?

12         A.    I have no reason to believe one way or

13    the other.  But if you say that that's what you

14    believe them to be, I accept your -- your

15    statement.

16         Q.    That is my representation to you, sir,

17    that these are documents --

18         A.    Okay.

19         Q.    -- produced by your counsel.

20               And when I say "AE" and a number, I

21    mean "AE" and the last two or three numbers in

22    that sequence.  And I'm going to omit the

23    underscore and zeros from now on.

24               Can we agree to that?

25         A.    You are going to omit --
```

```
1                  AARON ETRA, ESQ.

2         Q.   I'm just going to say "AE" and a

3    number I'm not going to say "underscore zero

4    zero" any more.

5         A.   Yes.

6         Q.   When you previously searched your

7    e-mails and produced documents to us, how did

8    you search your e-mails?

9         A.   I looked at my computer and tried to

10   find any relevant documents, any relevant

11   correspondence, any relevant material.

12        Q.   How did you determine which material

13   was relevant?

14        A.   I gave all that I found that were

15   relevant to what I was asked to provide.

16        Q.   When you searched for the e-mails on

17   your computer, were you searching on a webmail?

18             Were you using a web client?

19             Or were you using --

20        A.   No.

21        Q.   -- an e-mail application?

22        A.   I just looked in my e-mails.  I don't

23   have any of those tools.

24        Q.   And did you simply look at a list of

25   e-mails and pick e-mails out of that list?
```

```
 1                  AARON ETRA, ESQ.

 2            Or did you use search terms to find

 3    the e-mails?

 4       A.    I looked in respect of what I was

 5    asked to produce, and I looked for anything that

 6    was relevant to that request.

 7       Q.    Do you have a cellphone, sir?

 8       A.    Yes.

 9       Q.    In the course of searching for and

10    producing documents, did you look at your

11    cellphone?

12       A.    I don't retain anything on my

13    cellphone, so I didn't look at my cellphone.

14       Q.    Did you send and receive e-mails on

15    your cellphone?

16       A.    I don't use it for e-mails.  I use my

17    computer for e-mails.

18       Q.    What about text messages?

19            Do you send and receive text messages?

20       A.    Yes.

21       Q.    Did you search your phone for relevant

22    text messages?

23       A.    Yes.  I don't retain those messages on

24    my cellphone.

25       Q.    When you say that you don't retain
```

```
 1                    AARON ETRA, ESQ.

 2      them, what do you mean by that?

 3           A.    If I get them, I erase them and -- to

 4      leave space on my cellphone for going forward.

 5           Q.    It is your testimony, sir, that when

 6      you receive a text message after reading it, you

 7      immediately delete it?

 8           A.    No, I sometimes do not do it

 9      immediately.

10           Q.    How long is it before you delete your

11      test message?

12           A.    It would vary.

13           Q.    Can you tell me how you came to be

14      acquainted with Ms. Evans?

15           A.    Yes, an elderly lady who was

16      introduced to me indicated that she was

17      befriended by Ms. Evans.

18           Q.    Who was that other lady?

19           A.    Victoria Veronica, by name.

20           Q.    I'm sorry.

21                 Victoria? --

22           A.    Veronica.

23           Q.    Veronica -- what was her last name?

24           A.    Victoria.

25           Q.    Veronica Victoria?
```

```
 1                    AARON ETRA, ESQ.

 2        A.    Yes, to the best of my knowledge.

 3              It's a question of what her full and

 4    correct name is.

 5              She has since passed away.

 6        Q.    So Veronica Victoria introduced you to

 7    Ms. Evans?

 8        A.    Yes.

 9        Q.    Approximately when was that?

10        A.    Approximately eight years ago.

11        Q.    What was your relationship with Ms.

12    Victoria?

13        A.    I used to take her out to tea, if she

14    was physically able, once a week.

15        Q.    That was your only relationship with

16    Ms. Victoria -- you occasionally got tea with

17    her?

18        A.    And this was an occasion where she

19    would be able to talk to me and to have some

20    social activity.

21        Q.    So you were a friend to Ms. Victoria.

22              Were you employed by her in any

23    capacity?

24        A.    No.

25        Q.    Did you ever provide legal advice to
```

1                     AARON ETRA, ESQ.

2     Ms. Victoria?

3          A.    No.

4          Q.    Did you ever receive any money from

5     Ms. Victoria?

6          A.    No.

7          Q.    How is it that Ms. Victoria came to

8     introduce you to Ms. Evans?

9          A.    She indicated that Ms. Evans was the

10    last friend that she had in the world.

11         Q.    Did she tell you how she knew Ms.

12    Evans?

13         A.    She did.

14         Q.    What did she tell you about her

15    relationship with Ms. Evans?

16         A.    She said that Ms. Evans had been a

17    paralegal in a law firm that she had -- she had

18    known.

19         Q.    A paralegal at a law firm she had

20    worked with?

21               Or she had known of?

22         A.    I think she didn't work at that law

23    firm, but they were friendly to her.  They had

24    assisted her.

25         Q.    Do you recall the name of that firm?

```
 1                    AARON ETRA, ESQ.

 2         A.    I do not.

 3         Q.    And what, if you can tell us, was the

 4    relationship that Ms. Victoria had with Ms.

 5    Evans?

 6         A.    Ms. Evans was a true friend to her.

 7    She enabled her to shop.  She enabled her to

 8    essentially deal with the necessities of life

 9    that she, as an elderly, quite incapacitated,

10    person, could not.  And she did that for the --

11    right on through the last days of her life.

12         Q.    So Ms. Victoria introduced you to Ms.

13    Evans as her last friend in the world and

14    what -- strike that.

15                Why did you continue to have a

16    relationship with Ms. Evans following the death

17    of Ms. Victoria?

18         A.    I did not have a relationship with Ms.

19    Evans for some time thereafter.

20         Q.    Approximately when did Ms. Victoria

21    die?

22         A.    To the best of my recollection, it

23    would be three or four years ago.

24         Q.    And you didn't have any contact with

25    Ms. Evans from what time to what time?
```

```
1                    AARON ETRA, ESQ.

2        A.    Well, from then until the middle of

3    2018, or thereabouts -- best of my recollection,

4    sometime in 2018.

5        Q.    What were the circumstances under

6    which you reconnected with Ms. Evans in

7    mid-2018?

8        A.    She contacted me.

9        Q.    How did she contact you?

10       A.    By telephone.

11       Q.    What did she say on that occasion?

12       A.    She asked whether I was providing

13   paymaster services.

14       Q.    Do you recall approximately when this

15   phone call occurred?

16       A.    I do not.

17             I believe, though, it was sometime in

18   2018 -- early-to-middle 2018.

19       Q.    So Ms. Evans -- whom you had been

20   introduced to by Ms. Victoria four years

21   prior -- called you out of the blue and asked

22   you if you provided paymaster services.

23             Is that correct?

24       A.    I don't want to characterize "out of

25   the blue."  She called me.
```

```
1                    AARON ETRA, ESQ.

2        Q.    Were you expecting her call?

3        A.    I was -- no reason to expect the call.

4        Q.    And you hadn't heard from her in three

5    to four years, correct?

6        A.    To my recollection, no.

7              She may have called once or twice just

8    to say hello and check in, since we had really

9    done a lot of work together in the last days of

10   Victoria Veronica's life.

11       Q.    What work did you do in the last days

12   of Ms. Veronica's life?

13       A.    We were able to get her into hospitals

14   and rehabilitation facilities.  We visited her

15   as often as we could.  We tried to make her last

16   days as pleasant as possible.

17       Q.    Was Ms. Veronica a woman of means?

18       A.    No.

19       Q.    Do you know if she left any money or

20   other property to Ms. Evans?

21       A.    To my recollection, no.

22             But I have know way of knowing that

23   myself.

24             But to the best of my recollection,

25   no, because she had none to leave.
```

```
 1                    AARON ETRA, ESQ.

 2          Q.    What was the reason that you and Ms.

 3    Evans put in so much work for Ms. Victoria?

 4          A.    I think we really believed that she

 5    didn't have any people in the world to help her.

 6    And whatever we could do was something -- was

 7    worth doing on a humanitarian basis.

 8          Q.    That's kind of you.

 9          A.    Thank you.

10          Q.    So Ms. Evans called you and asked you

11    if you provide paymaster services.

12                And do you, in fact, provide paymaster

13    services?

14          A.    Yes.

15          Q.    What does it mean to provide paymaster

16    services?

17          A.    I'm asked to receive and distribute

18    funds to several parties on a transaction.

19          Q.    How is that different than acting as

20    an escrow agent?

21          A.    An escrow agent typically would

22    receive the funds prior to a transaction.

23                Paymaster would typically distribute

24    the proceeds from a transaction.

25                They are really two sides of the same
```

```
 1                    AARON ETRA, ESQ.

 2     function.

 3          Q.    When Ms. Evans asked if you provide

 4     paymaster services, what was your response?

 5          A.    I said:  Yes.

 6          Q.    Can you tell us more about that

 7     conversation?

 8          A.    She indicated that somebody with whom

 9     she had worked for a long time needed such

10     services.

11          Q.    Can you tell us more?

12          A.    She mentioned Dmitri Kaslov as that

13     person.

14          Q.    Who did she say is Dmitri Kaslov?

15          A.    She said that Dmitri Kaslov was

16     someone who was in the fuel oil trading business

17     and that she had worked with him for quite some

18     time.

19          Q.    Did she tell anything about the kind

20     of work she had done with Mr. Kaslov?

21          A.    No.

22          Q.    Did she give you any other information

23     about Mr. Kaslov?

24          A.    She did provide, at my request,

25     information about him -- basically -- basic data
```

```
1                    AARON ETRA, ESQ.

2    about him.

3         Q.    What basic data was that?

4         A.    Where he -- where he lived, what

5    country he was a national of, and that basic

6    information.

7         Q.    What services did Ms. Evans ask you to

8    provide for Mr. Kaslov?

9         A.    She indicated that Mr. Kaslov wanted

10   to sell certain of his assets, and that a

11   paymaster would be useful for that activity.

12        Q.    What assets, according to Ms. Evans,

13   was Mr. Kaslov looking to sell?

14        A.    She indicated that he had a supply of

15   bitcoins and he would like to sell some of them.

16        Q.    How many bitcoins did Ms. Evans say

17   that Mr. Kaslov was looking to sell?

18        A.    My recollection was she said that he

19   had a total of close to 900,000 of them.

20        Q.    What is the approximate market value

21   of 900,000 bitcoins, if you know?

22        A.    It varies by the second, so I can't

23   tell you.

24        Q.    Do you know the approximate price of

25   bitcoin?
```

                        AARON ETRA, ESQ.

1

2        A.    At the moment, I believe it's

3    somewhere between 5,000 and 6,000 for a bitcoin.

4    I haven't checked recently.

5        Q.    What is the approximate value of

6    900,000 -- 900 million bitcoins at --

7        A.    It's not 900 million.  It's 900,000.

8        Q.    -- 900,000 bitcoins.

9        A.    Again, you can't really fix an

10    approximate value, because it's a movable target

11    and the price varies with each transaction.

12              So any transaction impacts on the

13    price of a bitcoin.  If you want to multiply

14    9,000 by -- 900,000 by 5,000, you have that

15    approximate number.  But that's not a realistic

16    way to determine the price.

17        Q.    Well, if you do multiply 900,000 by

18    5,500, you get 4.950 billion?

19        A.    Yes.

20        Q.    So would it be fair to say that was

21    the approximate value of the bitcoins that Mr.

22    Kaslov purportedly had?

23        A.    Again, the price varies.  They have

24    been as low as between 2,000 and 3,000, and as

25    high as between 7,000 and 8,000.  So this -- you

1                    AARON ETRA, ESQ.

2        can't determine it except at the time that you

3        are looking to sell.

4                    And if you are selling, your sales, as

5        well, impact on the price.  And a large sale

6        could bring the price down.

7            Q.    So we can agree that Mr. Kaslov

8        purported to own many billions of dollars worth

9        of bitcoins, correct?

10           A.    That's your assessment.

11                 I indicated to you how people look at

12       it realistically.

13           Q.    I understand.

14                 Did Ms. Evans tell you how she came to

15       be acquainted with Mr. Kaslov?

16           A.    To the best of my recollection, she

17       just said that she had been working with him for

18       several years.  She didn't indicate how they

19       started.

20           Q.    She didn't tell you anything about how

21       she met Mr. Kaslov?

22           A.    She did not.  To the best of my

23       recollection, I don't remember her ever

24       saying -- telling me that.

25           Q.    Did she tell you whether she had ever

```
 1                  AARON ETRA, ESQ.

 2     met Mr. Kaslov?

 3          A.    To the best of my recollection, she

 4     did not tell me.

 5          Q.    Did you ever ask her?

 6          A.    No.

 7                (Pause)

 8          Q.    After Ms. Evans asked to you assist

 9     with selling Mr. Kaslov's bitcoins, did you

10     subsequently proceed with that?

11          A.    Yes.

12          Q.    And how did you go about finding a

13     buyer for Mr. Kaslov's bitcoins?

14          A.    I didn't find a buyer.

15                The first -- to the best of my

16     recollection, the buyers contacted both Ms.

17     Evans and me -- several of them -- and that's

18     how the process developed.

19                (Pause)

20          Q.    How did you come to meet Hugh Austin?

21          A.    He contacted me.

22          Q.    How did he contact you?

23          A.    By telephone.

24          Q.    Were you expecting his call?

25          A.    No.
```

```
 1                    AARON ETRA, ESQ.
 2        Q.    Had you heard of Hugh Austin before
 3   receiving his phone call?
 4        A.    No.
 5        Q.    When did Mr. Austin call you?
 6        A.    To the best of my recollection, it was
 7   sometime in the summer of 2018 -- I think June
 8   or July.
 9        Q.    Just to be clear, you hadn't had any
10   conversations with Ms. Evans about Mr. Austin or
11   any member of his family before receiving his
12   call?
13        A.    No.
14              (Exhibit Etra 7, Document Bates
15   stamped TE-0001 through 953, five-page document
16   entitled: Benthos - Doos That Are Ready to be
17   Sent for Subpoena on 3/27/19, with UPS mailing
18   label cover page and multipage attachments,
19   marked for identification)
20              MR. BROMBERG:  Sir, you have been
21   handed a document that's been marked Exhibit 7
22   and you'll see at the bottom it has Bates stamps
23   TE-0001 through TE-0952.
24              (Pause)
25
```

```
 1                    AARON ETRA, ESQ.

 2     BY MR. BROMBERG:

 3          Q.    These were documents that were

 4     produced by Ms. Evans in this proceeding.

 5                Do you see that, sir?

 6          A.    I see those references, yes.

 7          Q.    Can you please turn to TE-555?

 8                (Pause)

 9          Q.    And TE-555 contains an e-mail thread.

10                At the top of that thread is an e-mail

11     from Hugh Austin to Tracy Evans, with a cc to

12     Brandon Austin.  It's dated July 21, 2018, and

13     it has the subject line:  3000k BTC.

14                Do you see that, sir?

15                (Pause)

16          A.    I don't see the reference to 3000k.

17          Q.    Are you looking at 555, sir?

18          A.    I am.

19          Q.    Do you see at the top?

20          A.    Yes.

21          Q.    You see where it says

22     tracyEvans7111@gmail.com in the upper-right

23     corner?

24          A.    Yes.

25          Q.    Then on the left-hand side at the top,
```

```
 1                    AARON ETRA, ESQ.

 2      do you see where it says:  3000k --

 3           A.    -- BTC.  Yes, now I see it.

 4           Q.    And "BTC" stands for bitcoin, correct?

 5           A.    Yes.

 6           Q.    So 3000k would be how many bitcoins?

 7           A.    It would be 300,000.

 8           Q.    300,000?

 9                 Or 3 million bitcoins?

10           A.    300,000.

11           Q.    Three thousand K is 3,000, thousand,

12      correct?

13           A.    I think that -- it is.

14                 But again, I can't speak for the

15      sender of the message.

16                 But I think the sender would realize

17      that 3 million is an unrealistic number.

18                 But, again, you are right.  If purely

19      multiplying 3,000 by another thousand would be 3

20      million.  That's correct.

21           Q.    Do you see below that where Mr. Austin

22      writes to Ms. Evans:  Tracy, I wanted to see if

23      you are available tomorrow any time after 3:00

24      p.m. to jump on a call with Brandon and myself.

25      Please let me know if that works.
```

```
 1                    AARON ETRA, ESQ.

 2         A.    That's what it says, yes.

 3         Q.    Were you aware that Mr. Austin had

 4    sent this e-mail to Ms. Evans?

 5         A.    I have no recollection of it, no.

 6         Q.    Did Ms. Evans ever discuss this e-mail

 7    with you?

 8         A.    No.

 9         Q.    Do you have any recollection of the

10    approximate date that Mr. Austin called you?

11         A.    My recollection was sometime in the

12    July period.

13         Q.    Do you have any idea how Mr. Austin

14    would have known to e-mail Ms. Evans?

15         A.    I do not.

16         Q.    Do you have any idea why he e-mailed

17    Ms. Evans?

18         A.    No.

19         Q.    The e-mail address

20    tracyevans7111@gmail.com -- do you know if

21    that's Ms. Evans' only e-mail address?

22         A.    I don't know.

23         Q.    Do you know any other e-mail addresses

24    Ms. Evans uses?

25         A.    I recollect exchanges of e-mails with
```

```
 1                    AARON ETRA, ESQ.
 2        her at another number other than this one.  But
 3        I'm not -- I'm not -- that's just my
 4        recollection.
 5                    (Exhibit Etra 8, Document Bates
 6        stamped AS(SUP)_00546 through 556, four-page
 7        document entitled: Documents produced by Aaron
 8        Etra pursuant to Subpoena Duces Tecum, dated
 9        February 20, 2019, in the Matter of Benthos
10        Mater Funds, Ltd., Plaintiff, against Hugh
11        Austin, et al., Index No. 151823/2019, with
12        multipage attachments, marked for
13        identification)
14   BY MR. BROMBERG:
15        Q.    Do you recognize this document, sir?
16        A.    Yes, I do.
17        Q.    Can you read to me the first sentence
18        that appears at the top of Exhibit 8?
19        A.    Exhibit A?
20              Or this document?
21        Q.    Eight.
22        A.    Eight.  Sorry.
23              Documents produced by Aaron Etra
24        pursuant to subpoena duces tecum, dated February
25        20, 2019, in the matter of Benthos Master Funds,
```

```
1                    AARON ETRA, ESQ.

2      Limited, plaintiff, against Hugh Austin, a/k/a

3      Eugene W. Austin, John Austin, and Brandon

4      Austin, Valkyrie Group LLC and Valhalla Venture

5      Group LLC, Defendants, Index No. 1582 3/2019.

6           Q.    So these are, in fact, documents

7      produced by you in this action, correct?

8           A.    Yes.

9           Q.    Can we go back to Exhibit 7, and

10     please turn to TE-721?

11                (Pause)

12          Q.    Do you see TE-721?

13          A.    No -- oh, yes, I do see now.

14          Q.    Do you see here there is an e-mail at

15     the top from tracyevans7111@gmail.com to

16     bitcoin7111@gmail.com, Thursday, July 26, 2018?

17          A.    Yes.

18          Q.    See that, sir?

19          A.    Hm-hmm.

20          Q.    Do you know anything about the e-mail

21     address bitcoin7111@gmail.com?

22          A.    I have no recollection of it, no.

23          Q.    Two e-mails down from that, do you see

24     that there is an e-mail from Tracy Evans to

25     Dmitri Kaslov, dated Thursday, July 26, 2018?
```

```
1                    AARON ETRA, ESQ.

2         A.    Yes.

3         Q.    You see where she says:  See below

4    from father.  His daughter is back in the

5    hospital?

6         A.    I see that's what it says, yes.

7         Q.    Does "father" refer to Hugh Austin?

8         A.    I don't know.  I think you'd have to

9    ask Ms. Evans that.

10        Q.    Do you see where Ms. Evans writes in

11   the next sentence:  His daughter was the reason

12   they met with Aaron, spoke with me three weeks

13   ago and disappeared as she was very sick and

14   they were said they stopped all business to

15   focus on getting her well.  Now she is back in

16   hospital again?

17        A.    Yes.

18        Q.    Do you recall having a meeting with

19   Mr. Austin around that time?

20        A.    Yes.

21        Q.    And what were the circumstances of

22   that meeting?

23        A.    He invited me to his office downtown

24   in New York.

25        Q.    Is that a result of the phone call
```

```
1                    AARON ETRA, ESQ.

2        that he made to you?

3             A.    I believe it was, yes.

4             Q.    What did he say to you when he called

5        you that first time?

6             A.    That he would like to discuss his

7        activities in the bitcoin world.

8             Q.    Did he say how he got your number?

9             A.    I don't recollect his saying, no.

10            Q.    Did he say why he was contacting you?

11            A.    Well, because he wanted to have a

12       discussion about his activities in the bitcoin

13       world.

14            Q.    Can you be more specific?

15            A.    No.  That's what he said.

16            Q.    Did he say anything else on that phone

17       call?

18            A.    I have no recollection of it being

19       anything other than a very short phone call with

20       that being said.

21            Q.    So you agreed to take a meeting with

22       Mr. Austin?

23            A.    Yes.

24            Q.    Approximately when did that meeting

25       take place this?
```

```
 1                    AARON ETRA, ESQ.

 2          A.    Again, to the best of my recollection,

 3    it was in that July period.

 4          Q.    You met with Mr. Austin at his office?

 5          A.    Yes.

 6          Q.    You recall where that was?

 7          A.    To the best of my recollection, it was

 8    in a building in SoHo that was at one point the

 9    Trump hotel.  I don't know what it currently is

10    called, but it was on Spring Street in SoHo.

11          Q.    It was not an office building?

12          A.    It's a building that had various uses

13    in it.  People use it for offices.  It was a

14    hotel.  It was an apartment house -- a

15    variety -- a multi-use building.

16          Q.    In what part of that building did you

17    meet with Mr. Austin?

18          A.    I forget on which floor, but it was

19    several rooms in that building.

20          Q.    Were these rooms that Mr. Austin

21    owned?

22                Or had rented?

23          A.    I have no idea.

24          Q.    Was it upstairs?

25                Downstairs?
```

```
 1                    AARON ETRA, ESQ.

 2               In the basement?

 3               Where in the building was --

 4        A.    As I indicated, on one of the floors

 5    in the building, not in the basement, not on the

 6    ground floor, but one of the upper floors.

 7        Q.    Was it a single room?

 8        A.    It was separate rooms.

 9        Q.    Was it a hotel room?

10        A.    It was fitted out as a multi-use

11    space.

12        Q.    Did Mr. Austin represent to you that

13    this was his space?

14        A.    He represented that he was using the

15    space.

16        Q.    Was there anything in that space that

17    would indicate that it was used by Mr. Austin

18    regularly?

19        A.    It was what you would expect to find

20    in a space that would be used as an office.

21        Q.    There was a table?

22        A.    There were tables, yes.

23        Q.    There were chairs?

24        A.    There were chairs.

25        Q.    So you met with Mr. Austin on that
```

1                    AARON ETRA, ESQ.

2    occasion and spoke to him about what?

3         A.    About his interest in arranging for

4    the purchase and sale of bitcoins.

5         Q.    On that occasion, did he tell you how

6    he had gotten your number?

7         A.    I don't recollect.

8              (Pause)

9         Q.    So can you tell us, if you know, how

10   the Austins got in touch with Tracy Evans?

11        A.    I don't --

12        Q.    You don't know?

13        A.    I don't know.

14        Q.    And you don't know how they received

15   your number?

16        A.    No.

17        Q.    Is it merely a coincidence, sir, that

18   they contacted you and they contacted Ms. Evans

19   at approximately the same time in summer of

20   2018?

21        A.    I don't see any basis, no, for any

22   question about that.

23              (Pause)

24        Q.    Let's look at TE-723.

25              (Pause)

```
1                    AARON ETRA, ESQ.
2         Q.    Do you see midway down, there is an
3    e-mail from you to Hugh Austin?
4              Says:  Hugh, Thank you very much for
5    sharing the good news?
6         A.    Yes, I see it.
7         Q.    You say:  It is a shared pleasure to
8    know each other and to have the opportunity to
9    work together.
10        A.    Yes.
11        Q.    Then do you see, above that, you
12   forwarded that e-mail to Ms. Evans?
13        A.    Yes.
14        Q.    Why did you forward that e-mail to Ms.
15   Evans?
16        A.    To the best of my recollection, Hugh
17   Austin called me to tell me that his daughter
18   was no longer in danger; that she had been
19   hospitalized, but that she was recovering.  So I
20   wanted to share that information with Ms. Evans.
21        Q.    Why did you want to share that
22   information with Ms. Evans?
23        A.    Because good news about a person's
24   recovery is worth sharing.
25        Q.    Why -- what did Ms. Evans have to do
```

```
1                    AARON ETRA, ESQ.

2       with the Austins?

3            A.    I know that the Austins had been in

4       contact with her.

5            Q.    How did you know that?

6            A.    She told me.

7            Q.    Did she tell you how she got in

8       contact with the Austins?

9            A.    No.

10           Q.    Did she contact the Austins?

11                 Or was it the other way around?

12           A.    I don't know.  I don't remember.

13                 (Pause)

14           Q.    Let's look at TE-728.  That's part of

15      Exhibit 2 -- sorry -- Exhibit 7.

16                 (Pause)

17           A.    Which page, please?

18           Q.    Exhibit 7, page 728.

19                 (Pause)

20           Q.    Do you recognize this document, sir?

21           A.    Yes.

22           Q.    What is this document?

23           A.    I'm looking at the top line.  It says:

24      This BTC agreement.

25           Q.    And the BTC agreement is entered into
```

```
 1                    AARON ETRA, ESQ.

 2      as of 31st of July, 2018.

 3                    Is that what it said?

 4          A.    Correct.

 5          Q.    And who is the agreement between?

 6          A.    It states that it's between the

 7      seller, who is stated to be Dmitri Olegovich

 8      Kaslov, and a buyer, who is stated to be

 9      Valkyrie Group LLC.

10          Q.    This is a contract for the purchase of

11      300,000 bitcoins?

12          A.    That's what it says.  That's what it

13      seems to present, yes.

14          Q.    What is Valkyrie Group LLC?

15          A.    I believe it's an LLC.

16          Q.    Who owns Valkyrie Group LLC?

17          A.    I can't speak for Valkyrie Group LLC

18      as to who owns it.

19          Q.    Can you speculate as to who might own

20      it?

21          A.    I don't engage in speculation.

22          Q.    Were you a party to this contract?

23          A.    Yes.

24          Q.    In what capacity?

25          A.    As escrow agent in --
```

```
 1                    AARON ETRA, ESQ.

 2              (Pause)

 3         A.    -- to serve as escrow agent for this

 4    transaction.

 5         Q.    It your testimony as you sit here

 6    today that you have no knowledge of what

 7    Valkyrie Group LLC is, or who owns it?

 8         A.    It's not that I have no knowledge.

 9              They presented themselves as being

10    represented by Brandon Austin, who presented

11    himself as the authorized signatory.

12         Q.    So Mr. Austin contracted to purchase

13    300,000 bitcoins from Mr. Kaslov.

14              Is that a proper characterization of

15    what this contract is for?

16         A.    Yes.

17         Q.    What was your role in that

18    transaction?

19         A.    My role is as escrow agent.

20         Q.    What did that require you to do in the

21    context of this transaction?

22         A.    It required me to receive funds from

23    the purchaser and to follow instructions with

24    regard to disbursement of those funds.

25         Q.    How were the funds to be received from
```

1                    AARON ETRA, ESQ.

2      the purchaser, Valkyrie Group?

3           A.    They were to be transferred to one of

4      my accounts.

5           Q.    Then what was to happen?

6           A.    That I was to follow instructions as

7      to how to disburse it.

8           Q.    Where was the bitcoin to be received

9      from?

10          A.    The bitcoin was to be received from

11     Mr. Kaslov's supply of bitcoins.

12          Q.    Can you tell us what you know about

13     Mr. Kaslov's supply of bitcoins?

14          A.    He -- to the best of my knowledge, he

15     has the bitcoins in a storage facility.  He so

16     indicated that's where they were.

17          Q.    When did he indicate that, sir?

18          A.    To the best of my recollection, about

19     the time when this contract was being negotiated

20     and entered into.

21          Q.    Did Mr. Kaslov himself tell you there

22     were 300,000 bitcoins?

23          A.    He never said directly to me that

24     there were 300,000, but he agreed to the sale of

25     them.  To the best of my recollection, it was

1                      AARON ETRA, ESQ.

2     communications between him and Ms. Evans.

3          Q.    Have you ever spoken directly to Mr.

4     Kaslov?

5          A.    Yes, I have spoken to him, together

6     with Ms. Evans.

7          Q.    On how many occasions have you spoken

8     with Mr. Kaslov?

9          A.    Best of my recollection on this

10    matter, two, possibly three times.

11         Q.    Do you recall when those conversations

12    took place?

13         A.    Best of my recollection, they were in

14    the July-August period.

15         Q.    Before or after you entered into this

16    contract?

17         A.    Including -- there was one before --

18    perhaps one before, and the others after.

19         Q.    Did you ever speak to Mr. Kaslov in

20    connection with any other transaction?

21         A.    No.

22         Q.    So you have only spoken to him two or

23    three times in your life?

24         A.    To the best of my recollection, yes.

25         Q.    It was at some point in the

1                  AARON ETRA, ESQ.

2    July-August time period, 2018?

3         A.    Yes.

4         Q.    What can you tell you us about those

5    conversations with Mr. Kaslov?

6         A.    They were with respect to his

7    willingness to sell some of his bitcoins and the

8    arrangements necessary to do so.

9         Q.    How long have you been in the bitcoin

10   industry?

11        A.    I'm not in the bitcoin industry.

12        Q.    How many transactions for the sale or

13   purchase of bitcoin have you engaged in during

14   your career?

15        A.    I have engaged in none to date.

16        Q.    Well, this is a transaction for the

17   sale of bitcoin, is it not?

18        A.    Yes.

19        Q.    So you have engaged in at least one,

20   correct?

21        A.    Other than this one, yes.

22        Q.    Do you know what the term "POC" means?

23        A.    POC?

24        Q.    Yes.

25        A.    I don't think so.  POC?

```
1                    AARON ETRA, ESQ.

2          Q.    In the context of a bitcoin

3    transaction, have you ever heard the acronym

4    "POC" used before?

5          A.    What's the -- POC?

6          Q.    Proof of coin?

7          A.    Proof of coin?  I have heard "proof of

8    coin," but not as "POC."

9          Q.    Did you ever receive proof of coin

10   from Mr. Kaslov in any form?

11         A.    No.

12         Q.    Did you ever receive assurances of any

13   kind that Mr. Kaslov, in fact, had 300,000

14   bitcoins to sell?

15         A.    It was his assurance, and the

16   assurance of his transfer facilitator.

17         Q.    Who was the transfer facilitator?

18         A.    A gentleman by the name of Mr. Hoang.

19         Q.    Did you spell that?

20         A.    H-O-A-N-G.

21         Q.    What is a transfer facilitator?

22         A.    As he presented himself, to the best

23   of my recollection, he said he works with owners

24   of bitcoins to facilitate the purchase and sale

25   on behalf of such owner.
```

```
 1                    AARON ETRA, ESQ.

 2              (Pause)

 3      Q.     Let's go to Exhibit 7 at page TE-754.

 4              (Pause)

 5      Q.     At the top of this document, it says:

 6      Coordinator/Paymaster Agreement and Disbursement

 7      Instructions.

 8              Do you see that, sir?

 9      A.     I do.

10      Q.     Do you recognize this document?

11              (Pause)

12      A.     I don't believe I do, because -- I

13      don't believe I signed this agreement.

14      Q.     Do you have any reason to believe that

15      there is not in existence another version of

16      this agreement with your signature on it?

17      A.     I have no basis of knowing one way or

18      the other, but I certainly see that I did not

19      execute this agreement.

20      Q.     Can you tell us why this document was

21      not produced by you in the federal action?

22      A.     Probably because I didn't keep it

23      since I didn't execute it.

24              If it was created -- as I say, I don't

25      recollect seeing this agreement, so I couldn't
```

```
1                    AARON ETRA, ESQ.

2       produce it.  But you know, didn't even know it

3       existed.

4                    (Pause)

5            Q.    The bitcoin agreement between Valkyrie

6       Group and Dmitri Kaslov had an escrow agreement

7       annexed to it, correct?

8            A.    Yes.

9            Q.    Did you execute that escrow agreement?

10           A.    I did execute an escrow agreement,

11      yes.

12           Q.    Can you telling us why neither of

13      those agreements was produced by you in the

14      federal action?

15           A.    I believe I did produce that in the

16      federal action; or if I didn't -- I believe I

17      did.

18                   I think that's the basic agreement.

19      And I -- my recollection is it was produced

20      because it's part of that agreement.

21                   It may even be attached in your pages

22      here.  I'm not sure.  This is part and parcel of

23      the same agreement.  It's not a separate

24      agreement.

25                   (Pause)
```

```
1                   AARON ETRA, ESQ.

2         Q.    Let's go back to Exhibit 8.  This is

3    the document beginning with Bates stamp

4    AE(SUP)_00546.

5              (Pause)

6         Q.    Do you see where it says:  No. 1.

7    Please see attached Exhibit 1A and 1B?

8         A.    Yes.

9         Q.    Can you read the rest of that into the

10   record, please?

11        A.    Correspondence and other material has

12   already been submitted to the best of my

13   knowledge and belief to counsel for the

14   Plaintiff by my counsel, David Hammer, Esq., in

15   compliance with Plaintiff's counsel's prior

16   demands via subpoena or otherwise and included

17   in or attached to relevant Court Orders or

18   documents created by Plaintiff's counsel

19   themselves and/or in transcriptions of or

20   documents for, or included in prior Court

21   proceedings or has been or is being provided by

22   Tracy Evans -- in paren, in quotes --

23   ("Submitted Material").

24        Q.    Did you confer with Ms. Evans about

25   the materials she was intending to produce in
```

```
1                    AARON ETRA, ESQ.

2      response to her own subpoena?

3           A.     No.

4           Q.     Did you review the materials that Ms.

5      Evans intended to produce in response to her own

6      subpoena?

7           A.     I did not, no.

8           Q.     How is it, sir, you are able to make a

9      representation that your obligations under the

10     subpoena would be fulfilled by Ms. Evans?

11          A.     Because Ms. Evans is the repository

12     for most of the material in this transaction.

13          Q.     Is it your understanding, sir, that

14     when Ms. Evans produces materials, that relieves

15     you of your independent obligation to produce

16     them?

17          A.     No.  But I believe that she would

18     comply fully with producing all the material in

19     this matter that I don't have.

20          Q.     Did you do anything to ensure that Ms.

21     Evans, in fact, made a full and complete

22     production of everything?

23          A.     The one discussion I had with her was

24     that I indicated that I was complying fully and

25     that she should do the same.
```

```
1                    AARON ETRA, ESQ.

2         Q.     How is it, sir, that you intended to

3    comply fully when, in effect, you were expecting

4    Ms. Evans to fulfill your production obligations

5    for you?

6         A.     Well, I didn't -- I think I have

7    complied and fulfilled my obligations -- both in

8    the prior material submitted to you of

9    voluminous nature which you have here -- and in

10   this production.

11               (Exhibit Etra 9, Multipage document

12   entitled: Private Deed of Agreement for Bitcoin

13   Asset Exchange/Transaction, dated July 23, 2018

14   (no Bates Nos.), marked for identification)

15               MR. BROMBERG:  Exhibit 9 is what

16   appears to be a contract between True North

17   Brands LLC and Benthos Master Fund, Limited.

18   BY MR. BROMBERG:

19        Q.     Have you ever seen this document

20   before, sir?

21               (Pause)

22        A.     To the best of my knowledge, I have

23   not.

24        Q.     Do you know anything about True North

25   Brands LLC?
```

```
1                    AARON ETRA, ESQ.

2         A.    No recollection of True North Brands

3    LLC.

4         Q.    Have you ever heard the name Simon

5    John Gilbert Dalton?

6         A.    To the best of my knowledge, no.

7         Q.    You don't know anyone named Simon

8    Dalton?

9         A.    Not to the best of my recollection,

10   no.

11        Q.    Have you ever heard the name KRFB

12   Global Group LLC?

13        A.    To the best of my recollection, no.

14              (Pause)

15              MR. BROMBERG:  Let's mark this 10.

16              (Exhibit Etra 10, Single-page e-mail

17   From: Brandon Austin, To: gerald@benthoscap.com

18   and others, Subject: Benthos Capital BTC

19   Contract (Citibank Aaron Etra Deal), Sent: July

20   31, 2018 (no Bates No.), marked for

21   identification)

22              MR. BROMBERG:  Exhibit 10 is an e-mail

23   from Gerald Fong -- sorry -- it's an e-mail from

24   Brandon Austin to gerald@benthoscap.com, dated

25   Tuesday, July 31, 2018.
```

```
 1                      AARON ETRA, ESQ.

 2      BY MR. BROMBERG:

 3           Q.    And do you see at the top, there is a

 4      subject line that reads:  Benthos Capital BTC

 5      Contract (Citibank Aaron Etra Deal)?

 6                 Do you see that, sir?

 7           A.    Yes, I do.

 8           Q.    Do you see that this appears to be an

 9      e-mail attaching a contract?

10           A.    It seems to so state, yes.

11           Q.    Mr. Austin says to Gerald Fong:  As

12      per your conversation with Hugh, I have attached

13      a contract for the Citibank Aaron Etra deal.

14                 Do you see that, sir?

15           A.    I do.

16           Q.    What can you tell us about the

17      Citibank Aaron Etra deal?

18           A.    To the best of my knowledge and

19      belief, it's the transaction that was eventually

20      entered into by Benthos with Valkyrie.

21                 (Pause)

22           Q.    This is a transaction that the Austins

23      had proposed to you?

24           A.    Not proposed to me.

25                 The reference to "Citibank Aaron Etra"
```

```
 1                    AARON ETRA, ESQ.

 2      is my role as escrow agent.  It's the

 3      transaction that you referred to in prior

 4      questions.

 5                    (Pause)

 6                    MR. BROMBERG:  Let's mark this 11.

 7                    (Exhibit Etra 11, Multipage document

 8      entitled: BTC Agreement No. CDKTEBPA073118BC,

 9      dated July 31, 2018 (no Bates Nos.), marked for

10      identification)

11   BY MR. BROMBERG:

12           Q.    This is the document that was attached

13      to Mr. Austin's e-mail, correct?

14           A.    I have no idea, sir.

15           Q.    Do you have any reason to think that

16      this is not the document that was attached to

17      Mr. Austin's e-mail?

18           A.    I have no reason to know one way or

19      the other.

20                    It does look like a draft of an

21      agreement rather than an executed one.  And it

22      also doesn't have any names for seller or buyer,

23      so it looks clearly like a draft.

24           Q.    It appears to be a form contract for a

25      bitcoin transaction, correct?
```

```
 1                    AARON ETRA, ESQ.
 2        A.    I don't know if it's a form contract,
 3   but it does say it's a BTC agreement.
 4        Q.    If you turn towards the back of that
 5   document -- Exhibit 11 -- you go to the
 6   third-to-last page, do you see where it says:
 7   Aaron Etra, Attorney-At-Law?
 8        A.    Yes, I do.
 9        Q.    What is that information below that?
10        A.    It's headed:  Escrow Deposit
11   Coordinates.
12        Q.    This appears to be information for
13   your attorney escrow account.
14              Is that correct?
15        A.    It appears to be.  That's correct.
16        Q.    So would it be fair to say that this
17   form contract envisions you acting as escrow
18   agent?
19        A.    It would be fair to say that the draft
20   proposes my role as an escrow agent, yes.
21        Q.    Do you know who created this document?
22        A.    I do not.
23        Q.    When was the first time you saw a
24   draft of a contract between Valkyrie Group LLC
25   and Benthos Master Fund?
```

```
 1                    AARON ETRA, ESQ.

 2          A.    To the best of my recollection, it was

 3     during this period at the end of July.

 4          Q.    Who did you receive that draft

 5     contract from?

 6          A.    My recollection was it was from Ms.

 7     Evans.  It may have been from Ms. Evans and the

 8     Austins, but it would have been either one of

 9     those.

10          Q.    You don't recall one way or the other

11     whether the draft came from Ms. Evans or the

12     Austins?

13          A.    I do not.

14          Q.    Had you ever seen a contract purchase

15     of bitcoin before that?

16          A.    I don't recollect.

17          Q.    Do you recall what you did when you

18     saw that draft?

19          A.    Which draft?

20          Q.    The first draft of the contract

21     between Valkyrie Group LLC --

22          A.    Which first draft?

23          Q.    This agreement, sir.

24          A.    I don't recollect receiving this

25     agreement.
```

```
 1                    AARON ETRA, ESQ.

 2        Q.    Do you recall seeing later versions of

 3    the same agreement that's set forth in Exhibit

 4    11?

 5        A.    I believe there were several drafts

 6    before the final agreement was entered into,

 7    yes.

 8        Q.    What was the first occasion on which

 9    you recall seeing some version of this document?

10        A.    As I say, my best recollection is

11    sometime toward the end of July.

12              (Pause)

13        Q.    Do you recall ever receiving any draft

14    of the bitcoin agreement without the names of

15    the buyer and seller filled in?

16        A.    My recollection is that exchange of

17    drafts very often is without names.  And I may

18    have received -- I don't recollect.

19        Q.    Let's go to page 757 of Exhibit 7.

20              (Pause)

21        Q.    This appears to be an e-mail thread.

22              And do you see, about 2 inches down

23    the page, there is an e-mail from you to Ms.

24    Evans, dated Thursday, August 2nd, 2018?

25        A.    Yes.
```

```
1                    AARON ETRA, ESQ.

2          Q.    With the subject line:  FW:  BTC

3     Purchase?

4          A.    Hm-hmm.

5          Q.    Below that, it says:  Hi, Tracy, This

6     is another example of some of the communications

7     I am receiving connected in some fashion to the

8     Austins.

9                Do you see that, sir?

10         A.    Yes.

11         Q.    You then wrote to Ms. Evans:  I feel

12    we should do everything possible to make the

13    transactions with the Austins, while making sure

14    the documentation with whomever is their source

15    of their funds clearly reflecting that source,

16    knowing and agreeing to the arrangements with

17    Dmitri, including the escrow procedures.

18         A.    Yes.

19         Q.    What did you mean when you said to Ms.

20    Evans:  I feel we should do everything possible

21    to make the transactions with the Austins?

22         A.    To support on behalf of seller to be

23    able to enable him to complete his transaction

24    with a prospective buyer.

25         Q.    What was the Austins' interest in that
```

```
 1                    AARON ETRA, ESQ.

 2     transaction?

 3          A.    To the best of my knowledge and

 4     belief, it was to make the purchase that they

 5     eventually went to contract on.

 6          Q.    You said "the transactions with the

 7     Austins" -- transactions plural.

 8          A.    Yes.

 9          Q.    And which transactions were referring

10     to?

11          A.    The process is to have several layers

12     of the purchase.

13                For example, if Mr. Kaslov had 900,000

14     coins and the initial contract was for a lesser

15     number, you would have to have several

16     transactions to consummate the sale.

17          Q.    What other transactions were being

18     proposed besides the transaction with Benthos

19     Master Fund?

20          A.    There were those who -- to the best of

21     my knowledge, it is a time when there are

22     various people who had been contacting Ms. Evans

23     and myself -- and I believe the Austins as well.

24     So there was -- the nature is that people do

25     contact you.
```

                        AARON ETRA, ESQ.

1

2        Q.    So people began contacting you at some

3    point in 2018 about purchasing bitcoins?

4        A.    Yes.

5        Q.    How did those people know to contact

6    you about purchasing bitcoins?

7        A.    I can't answer the question for them.

8              My understanding is that the world is

9    small in respect of the availability of

10   cryptocurrencies.

11       Q.    Did any of these people tell you, if

12   you recall, how they received your contact

13   information?

14       A.    I don't recollect.

15       Q.    How many people contacted you about

16   the purchase of bitcoin?

17       A.    I don't recollect the number.

18       Q.    Do you see, below the e-mail that we

19   just discussed, another e-mail, dated Wednesday,

20   August 1st, 2018?

21             And it appears to be from a person

22   named Troy Davis to you?

23       A.    Yes.

24       Q.    And the name "Troy Davis" has been

25   partially redacted?

```
 1                    AARON ETRA, ESQ.

 2          A.    Yes.

 3          Q.    Who is Troy Davis?

 4          A.    I don't know.  He called me, as I

 5     recollect.

 6          Q.    How is Mr. Davis connected to the

 7     Austins?

 8          A.    I don't know.

 9          Q.    Do you see in the e-mail above that

10     where it says:  This is another example of some

11     of the communications I am receiving connected

12     in some fashion to the Austins?

13          A.    Yes.

14          Q.    It's your testimony as you sit here

15     today that you don't know how Mr. Davis is

16     connected to the Austins?

17          A.    That is correct.

18                The reference to what I was saying is

19     that the Austins were -- as I understood it --

20     were looking for people with whom they could

21     arrange the purchase; that they weren't using

22     their funds but they were looking for funds from

23     others.

24                So the reference here was to assist in

25     their being able to have access to the funds
```

```
 1                   AARON ETRA, ESQ.

 2     that they would need to make the purchase.

 3               (Pause)

 4          Q.    Do you see the e-mail below that where

 5     Mr. Davis writes:  I have also enclosed POFs

 6     from Citibank equivalent to approximately 4

 7     million USD?

 8          A.    Hm-hmm.

 9          Q.    If you would be willing to provide POC

10     for the aforementioned amount, the buyer is

11     willing to fly to NYC to expedite a transaction

12     to purchase any remaining BTC seller has

13     available.

14          A.    Hm-hmm.

15          Q.    Do you recall if you subsequently

16     provided POC to Mr. Davis?

17          A.    I have no recollection of doing so.

18          Q.    Do you have any recollection of ever

19     seeing POC for Mr. Kaslov's bitcoin?

20          A.    I have no recollection of seeing it,

21     no.

22          Q.    Below that, there is another e-mail.

23               And it says:  Hello, M. Etra.

24               Do you see that?

25          A.    I do.
```

```
 1                    AARON ETRA, ESQ.
 2         Q.    It says:  My name is -- and it's
 3    redacted -- from Montreal, Canada.
 4              Do you know what that name is that's
 5    been redacted?
 6         A.    I do not.
 7         Q.    It looks like it says Sammy or Summy.
 8              Does that ring a bell?
 9         A.    It doesn't -- doesn't ring a bell.
10         Q.    So you have no idea as you sit here
11    what name that is?
12         A.    No.
13         Q.    The next line -- it says:  I represent
14    a buyer directly.  I was told to contact you
15    via -- and that is also redacted -- from Hugh
16    and Brandon's office for a -- quote -- "urgent"
17    deal.
18              Do you know what that redacted name
19    is?
20         A.    No.
21         Q.    It looks like it's Michael someone.
22              Does that help you remember who it is?
23         A.    It does not.
24         Q.    Hugh and Brandon are Hugh and Brandon
25    Austin?
```

```
 1                      AARON ETRA, ESQ.
 2          A.    I would imagine so, although -- yes, I
 3     would imagine that's a fair estimate of that,
 4     yes.
 5          Q.    Do you know the names of any people
 6     who work for Hugh and Brandon Austin?
 7          A.    No.
 8          Q.    Have you ever met with any person who
 9     works for Hugh and Brandon Austin?
10          A.    Yes.
11          Q.    On what occasion?
12          A.    When I first visited their office,
13     there were other people in the office.
14          Q.    That was at the building that you said
15     used to be the Trump SoHo?
16          A.    Yes.
17          Q.    There were other people in the office
18     who you believe worked for Mr. Austin?
19          A.    Yes.
20          Q.    Did you interact with those people?
21          A.    Other than to say "hello," no.
22          Q.    Did Mr. Austin say to you that those
23     people worked for him?
24          A.    He said that they were part of the
25     team, as I recollect.
```

1                   AARON ETRA, ESQ.

2          Q.     Did Mr. Austin say what company those

3     people worked for?

4          A.     He did not, to my recollection.

5          Q.     How many of those people were there?

6          A.     Best of my recollection, there were

7     two -- two other persons.

8          Q.     Can you describe them?

9          A.     Male.

10         Q.     You don't recall their names?

11         A.     I do not.

12                (Pause)

13         Q.     If you turn to the next page --

14     TE-0759 in Exhibit 7 -- there is an e-mail from

15     Tracy Evans to Dmitri Kaslov, dated Thursday,

16     August 2nd, 2018.

17                And Ms. Evans writes:  This is also

18     from Aaron for a different buyer for father and

19     son, the Austins.

20                Have you heard Ms. Evans describe the

21     Austins as "father and son" before?

22         A.     I recollect her using that

23     terminology.

24         Q.     Do you know why Ms. Evans referred to

25     the Austins as "father and son"?

```
 1                   AARON ETRA, ESQ.

 2         A.    Probably because Hugh is the father of

 3    Brandon.

 4         Q.    Do you see below that where it says:

 5    In this one, you see the contract that the

 6    Austins are giving out has Aaron in it and with

 7    different procedures, so we can see why Aaron is

 8    upset?

 9         A.    Hm-hmm.

10         Q.    What does she mean by that?

11         A.    I think she means that some of these

12    prospective buyers were creating their own

13    documents and sending them to me -- and I think

14    to her, as well -- without consulting us before

15    sending, and just creating those documents

16    themselves.

17         Q.    Do you have any knowledge of that

18    occurring?

19         A.    I have no knowledge other than what

20    came to me.

21         Q.    Well, Ms. Evans says that you were

22    upset.

23         A.    Yes.

24         Q.    Were you, in fact, upset?

25         A.    Yes.
```

```
 1                    AARON ETRA, ESQ.

 2         Q.    Why were you upset?

 3         A.    Because that was not the procedure

 4    that was the one that was desired by the seller.

 5         Q.    So it was the fact that contracts were

 6    being circulated with different procedures that

 7    upset you?

 8         A.    Correct.

 9         Q.    Not the fact that contracts were being

10    circulated with your name on them --

11         A.    Both --

12         Q.    -- without your knowledge?

13         A.    -- both.

14         Q.    On how many occasions did that occur?

15         A.    I don't recollect the exact number.

16         Q.    Do you know how these people got your

17    name and contact information?

18         A.    I do not.

19         Q.    Do you care to guess?

20         A.    I don't care to guess, no.

21         Q.    You can't speculate as to how these

22    people would have gotten your name and contact

23    information and inserted your name and contact

24    information into a contract for the sale of

25    bitcoin?
```

```
 1                    AARON ETRA, ESQ.

 2         A.    No.  I don't want to engage in

 3    speculation.

 4               (Pause)

 5         Q.    Do you recall meeting with anyone from

 6    Benthos Master Fund?

 7         A.    Yes.

 8         Q.    Approximately when did that meeting

 9    take place?

10         A.    I believe in that same period of

11    July-August of 2018.

12         Q.    Would that meeting have been on August

13    3rd, 2018?

14         A.    It could have been, yes.

15         Q.    Do you recall who you met with on that

16    occasion?

17         A.    I recollect two or three people came

18    from Benthos.

19         Q.    No specific recollection whether it

20    was two or three people?

21         A.    I don't.  I recollect two of them by

22    name, but I'm not sure whether there was a

23    third.

24         Q.    Who are those two people that you met

25    with --
```

```
 1                      AARON ETRA, ESQ.

 2           A.    Gerald Fong and Mihir Deo.

 3           Q.    You met with both Gerald Fong

 4      and Mihir Deo --

 5           A.    Yes.

 6           Q.    -- on August 3rd?

 7           A.    Yes.

 8           Q.    Was there anyone else in attendance at

 9      that meeting?

10           A.    Yes.  As I say, I'm not sure if there

11      was another person from Benthos, and a person

12      that the Austins had sent to accompany them.

13           Q.    Do you recall the name of the person

14      that the Austins sent?

15           A.    I do not.

16           Q.    Was it Andrew?

17           A.    I honestly don't remember who it was.

18           Q.    Where did this meeting take place?

19           A.    It took place in the building that's

20      my residence.

21           Q.    That's the same building where you

22      currently reside?

23           A.    Yes.

24           Q.    That meeting took place in your

25      apartment?
```

1                          AARON ETRA, ESQ.

2          A.    No.

3          Q.    Where did the meeting take place?

4          A.    There is a lounge on the 43rd floor

5     which is where the meeting took place.

6          Q.    What was discussed at that meeting?

7          A.    Primarily, it was to meet each other

8     and to give -- my understanding -- was to give

9     the people from Benthos an opportunity to meet

10    me in-person and for me to do the same -- to

11    meet them.

12         Q.    Were any particulars of a bitcoin

13    transaction discussed at that meeting?

14         A.    My recollection is we discussed what

15    Benthos was considering with the Austins, yes.

16         Q.    Were any documents drafted or executed

17    at that meeting?

18         A.    No.

19         Q.    Was anyone present at that meeting to

20    speak for the seller in the transaction?

21                And what exactly were the mechanics of

22    the transaction that was being contemplated at

23    that meeting?

24         A.    The mechanics of the transaction is

25    what was eventually incorporated into the

```
1                    AARON ETRA, ESQ.

2       contract.

3            Q.    So the Austins were holding themselves

4       out as the ostensible seller at that meeting?

5            A.    They were not at that meeting, so they

6       didn't hold themselves out for anything.

7            Q.    You said they sent a representative --

8            A.    To accompany the Benthos group.  But

9       he didn't participate in the discussion.

10           Q.    Was Dmitri Kaslov discussed at that

11      meeting?

12           A.    I have no recollection of that being

13      discussed.

14           Q.    Do you recall anything else about that

15      meeting?

16           A.    No -- other than it was a pleasant

17      meeting and opportunity for people to meet.

18           Q.    Approximately how long did that

19      meeting last?

20           A.    Best of my recollection, it was about

21      one hour.

22           Q.    At the end of the meeting, had you

23      reached any kind of understanding with the other

24      persons there?

25           A.    No.  Not to the best of my knowledge.
```

1                    AARON ETRA, ESQ.

2         Q.    Do you recall at that time if there

3    was a draft contract already being drafted?

4         A.    Best of my recollection, there had

5    been Word drafts, and perhaps the -- yes,

6    certainly had been drafts exchanged.

7              (Pause)

8              THE WITNESS:  I will want to take a

9    break.  And, again, I am trying to cope with my

10   respiratory problems.

11             Do you have any idea on timing?

12             MR. BROMBERG:  Why don't we go another

13   10 minutes, then take a short break?

14             (Pause)

15   BY MR. BROMBERG:

16        Q.    Let's go to Exhibit 2 at page TE-25 --

17   sorry -- Exhibit 7.

18             (Pause)

19        A.    What page, please?

20        Q.    Page 25.

21             (Pause)

22        Q.    You see that e-mail from Tracy Evans

23   to you, dated 3 August 2018 at 16:52?

24        A.    Yes.

25        Q.    That's the same date that you met with

1                   AARON ETRA, ESQ.

2    Mr. Fong, correct?

3        A.    To the best of my knowledge and

4    recollection.

5        Q.    Do you recall receiving this e-mail

6    from Tracy Evans?

7        A.    No.  I don't actually see the -- any

8    substance to it, just --

9        Q.    You see that there was an attachment

10   to that e-mail?

11       A.    I don't see that there is an

12   attachment to that e-mail, no.

13       Q.    Do you see the e-mail from Tracy Evans

14   to you, dated 3 August 2018?

15       A.    Yeah, but I don't see any content to

16   it.

17       Q.    Below that, do you see where it says:

18   Bitcoin Purchase Sale Delivery (Final D)

19   (3)_AE.docx?

20       A.    Yeah.

21       Q.    That's an attachment, correct?

22       A.    I don't know.  I don't see it.

23             I see it's listed as that, but I don't

24   see where the attachment is.

25       Q.    Let's look at TE-27.  That's two pages

```
 1                    AARON ETRA, ESQ.

 2     later.

 3          A.     Okay.

 4          Q.     Do you recognize that document?

 5          A.     It looks like a draft.

 6          Q.     And if you go back to TE-25, below the

 7     e-mail from Ms. Evans to you is an e-mail from

 8     you to Brandon Austin, with a copy to Ms. Evans?

 9          A.     Okay.

10          Q.     Do you see that, sir?

11          A.     I do.

12          Q.     You write:  Brandon, Please use the

13     attached for completing the arrangements with

14     your buyer.

15          A.     Right.

16          Q.     What do you mean by that?

17          A.     My request to him was to utilize the

18     draft for finalizing arrangements with his

19     buyer, because, as we indicated, he was looking

20     to others to provide the funds for the purchase.

21          Q.     Do you know who the buyer was?

22          A.     That would have been up to the Austins

23     to do that -- to put that in.

24                 (Pause)

25          Q.     Do you have any other specific
```

```
1                    AARON ETRA, ESQ.

2       recollections about the drafting of this

3       contract?

4            A.    I do not.

5            Q.    How many drafts did this contract go

6       through before it became finalized?

7            A.    I don't recollect.

8            Q.    Did you make edits to this document?

9            A.    I made some comments along the way,

10      yes.

11           Q.    What was your role in the process of

12      negotiating this contract?

13           A.    To perform the role of escrow agent.

14           Q.    Did you have any other role in the

15      transaction?

16           A.    That was my role as escrow agent.

17           Q.    Purely as escrow agent.

18                 No other capacity?

19           A.    Yes.

20                 MR. BROMBERG:  You want to take a

21      short break?

22                 THE WITNESS:  Please.

23                 (Recess from 11:13 a.m. to 11:19 a.m.)

24      BY MR. BROMBERG:

25           Q.    You said that you participated in the
```

1                    AARON ETRA, ESQ.

2        drafting of this contract as escrow agent.

3                    Can you tell me more about what you

4        mean by that?

5            A.    The provisions relevant to the

6        function of the escrow agent was what my input

7        was on.

8            Q.    Did you actually do substantive

9        drafting work on those provisions?

10            A.    I gave input, yes.

11            Q.    Did you provide your input on any

12        provision of the contract other than the escrow

13        provision?

14            A.    No, I don't recollect.

15            Q.    What was your primary concern in

16        drafting those provisions?

17            A.    Facilitate the transaction.

18                    (Exhibit Etra 12, Single-page e-mail

19        From: Hugh Austin, To: gerald@benthoscap.com,

20        Subject: Latest Draft from Aaron and Tracy,

21        Sent: August 3, 2018 (no Bates No.), marked for

22        identification)

23

24

25

```
1              AARON ETRA, ESQ.

2              (Exhibit Etra 13, Multipage document

3       entitled: BTC Agreement: Transaction Code No.

4       CDKTEBPA080218SUB (no Bates Nos.), marked for

5       identification)

6              MR. BROMBERG:  Exhibit 12 is an e-mail

7       with the subject line:  Latest Draft from Aaron

8       and Tracy.  And it's from Hugh Austin to Gerald

9       Fong, dated August 3rd, 2018.

10   BY MR. BROMBERG:

11       Q.    Do you see where it says:  Hey,

12      Gerald, I spent the last hour making the final

13      edits with Aaron and Tracy?

14       A.    Yes.

15       Q.    Do you recall making edits to the

16      contract along with Mr. Austin and Ms. Evans?

17       A.    I don't recollect other than, as I

18      said, I have made inputs on the escrow

19      arrangements.

20       Q.    You only gave input as to the escrow

21      arrangements?

22       A.    I don't recollect what inputs I gave.

23              But I did the best I could to

24      facilitate the transaction in my role as escrow

25      agent.
```

1                    AARON ETRA, ESQ.

2          Q.    Do you see where Mr. Austin says:  I

3    believe we have accomplished what each party is

4    looking for?

5          A.    I see he says that, yes.

6          Q.    What were you looking for in

7    negotiating this contract?

8          A.    I'm not a party to the contract.

9          Q.    You are the escrow agent, correct?

10         A.    But I'm not a party to the contract.

11               I think he is referring to each party,

12   and I'm not a party to the contract.  I am the

13   escrow agent.

14         Q.    Let's look at Exhibit 13.

15               (Pause)

16         Q.    If you would, please, take a minute to

17   look through this document then look up when you

18   are done.

19               (Pause)

20         A.    Yes.

21         Q.    Go to page 7 of 16, paragraph 16.4,

22   subparagraph 2.

23               Do you see that the words:  The Seller

24   may pull out an amount of money from escrow in

25   order to secure the bitcoin from its

```
1                    AARON ETRA, ESQ.

2       bitcoin-backed instrument?

3            A.    Yes.

4            Q.    Do you know who inserted that phrase?

5            A.    I don't recollect, but I know it was

6       discussed because it's reflective of the

7       procedure that we were told was necessary --

8       that the seller indicated was necessary in order

9       to consummate the transaction.

10           Q.    You say that the seller told you it

11      was necessary?

12           A.    Yes.

13           Q.    Did you speak directly to Mr. Kaslov

14      about this?

15           A.    I don't recollect speaking to him or

16      whether it was communicated in some other

17      fashion.

18                 But he had made clear to -- again,

19      primarily to Ms. Evans -- that that was a

20      necessary requirement to the procedure.

21           Q.    It was necessary for money to be taken

22      out of the escrow --

23           A.    Yes.

24           Q.    -- in order to obtain the asset for

25      which that money was to be used?
```

```
1                    AARON ETRA, ESQ.

2         A.    To release the bitcoins.

3               As he explained to us, the procedure

4    was that the bitcoins had served as a collateral

5    for another of his -- of his investments.  And

6    in order to release the escrow -- release the

7    bitcoins from that situation, some funds would

8    have to replace it.  So some of the funds would

9    have to come from the escrow in order to

10   effectuate the release.

11        Q.    How many times have you acted as an

12   escrow agent in the course of your career?

13        A.    A goodly amount of times, yes.

14        Q.    Did this strike you as unusual -- that

15   the seller was permitted to take money out of

16   the escrow prior to providing the asset that was

17   being sold?

18        A.    I find each escrow is something that

19   needs to stand on its own, so there is no

20   one-size-fits-all escrow arrangement.

21        Q.    Did you have any concerns about the

22   nature of this arrangement in your capacity as

23   escrow agent?

24        A.    I wanted to make sure it was

25   understood on the part of the parties what the
```

```
 1                    AARON ETRA, ESQ.

 2      seller is indicating is required.

 3          Q.    What is a bitcoin-backed instrument?

 4          A.    It was an instrument owned by the

 5      seller that was collateralized by his bitcoins.

 6          Q.    What was the nature of that

 7      instrument?

 8          A.    It was his investment -- which he

 9      didn't share with me the exact nature of it.

10          Q.    So you don't know what this instrument

11      was?

12          A.    No.

13          Q.    You have never seen any documentation

14      of this instrument?

15          A.    Correct.

16          Q.    Have you ever heard of any other

17      bitcoin-backed instrument?

18          A.    It's not surprising to me that one

19      could use the bitcoins like any other asset to

20      collateralize the situation like that.

21          Q.    But you never saw any proof whatsoever

22      that this bitcoin-backed instrument actually

23      exists?

24          A.    Correct.

25          Q.    Nor did you see any proof whatsoever
```

1               AARON ETRA, ESQ.

2      that the underlying bitcoins exist?

3          A.    Yes.

4          Q.    Did this concern you at all?

5          A.    I relied on the seller having made

6      this commitment.  And if it was satisfactory to

7      the parties, that was up to them to do what they

8      required to be comfortable with it or not.

9          Q.    When you say you "relied on the

10     seller," who were you referring to?

11         A.    Dmitri Kaslov.

12         Q.    You previously testified that you only

13     spoke to Mr. Kaslov on three occasions and you

14     never met him, correct?

15         A.    Correct.

16         Q.    You never saw any proof that Mr.

17     Kaslov actually owned bitcoins, correct?

18         A.    Correct.

19         Q.    Why did you rely on Mr. Kaslov?

20         A.    Again, it was not for me to rely on

21     Mr. Kaslov.  It was up to the purchaser to so

22     do.

23              As I say, my role was not to take a

24     position on the part of the buyer or anybody

25     else in that regard.

```
1                    AARON ETRA, ESQ.

2         Q.    When you enter into an escrow

3    arrangement, do you do any due diligence on the

4    buyer and the seller in that arrangement?

5         A.    Yes.

6         Q.    Did you ever do any due diligence on

7    Mr. Kaslov?

8         A.    Yes.

9         Q.    What did that consist of?

10        A.    He provided his passport and his

11   completed form -- information summary form --

12   client information summary form.

13        Q.    Can you tell us why Mr. Kaslov's

14   passport was not produced to us in the federal

15   litigation?

16        A.    It was not produced to me.  So it

17   would be -- as I recollect, best of my

18   recollection, it was produced to Ms. Evans.

19        Q.    You just told us that as part of your

20   due diligence on Mr. Kaslov, he produced his

21   passport.

22        A.    Correct.

23        Q.    But you never saw that passport?

24        A.    Did I see his passport?  I believe she

25   showed me his passport, yes.
```

```
1                    AARON ETRA, ESQ.

2        Q.    When did Ms. Evans show you Mr.

3   Kaslov's passport?

4        A.    I don't recollect the exact dates.

5        Q.    That was in connection with the

6   300,000-bitcoin contract?

7        A.    Yes.

8        Q.    She showed you the passport in-person?

9        A.    No.

10       Q.    How did she show you the passport?

11       A.    As I recollect, it was what he had

12  provided her, which was a photograph of the

13  picture page of the passport.

14       Q.    What kind of photograph was it?

15             Was it a PDF?

16             Was it an actual --

17       A.    I don't --

18       Q.    -- photograph?

19       A.    -- I don't recollect the format of it.

20       Q.    You don't recall if it was a physical

21  or electronic document?

22       A.    I don't recollect, no.

23       Q.    You don't recall if she showed you a

24  printout?

25       A.    I don't recollect.
```

```
1                      AARON ETRA, ESQ.
2          Q.    You just remember that you saw Mr.
3     Kaslov's passport --
4          A.    Yes.
5          Q.    -- and it was in Ms. Evans'
6     possession.
7          A.    Yes.
8          Q.    Was it in-person that Ms. Evans showed
9     you the passport?
10         A.    I don't recollect how it was --
11    whether it was in-person or otherwise.
12         Q.    But you are certain that you saw Mr.
13    Kaslov's passport?
14         A.    That's my recollection.
15         Q.    What did Mr. Kaslov look like?
16         A.    He was a male.
17         Q.    Can you tell us his approximate age?
18         A.    I don't recollect his age.
19         Q.    Was the photograph of Mr. Kaslov in
20    color?
21               Or in black-and-white?
22         A.    I don't recollect whether it was in
23    color or black-and-white.
24         Q.    You don't recall if he was a very
25    young man or very old man?
```

```
 1                    AARON ETRA, ESQ.
 2          A.   My recollection was he was not a young
 3     man.
 4          Q.   Can you approximate his age?
 5          A.   No.
 6          Q.   Can you provide any other description
 7     of the picture of Mr. Kaslov that you saw?
 8          A.   No.
 9          Q.   But you are certain you saw a picture
10     of Mr. Kaslov?
11          A.   Yes.
12          Q.   What information was provided on the
13     summary information form?
14          A.   To the best of my recollection, it was
15     his name, his address -- basic information of
16     that kind.
17          Q.   Any information about the asset he was
18     purporting to sell?
19          A.   Not to the best of my recollection.
20          Q.   Any other financial information about
21     Mr. Kaslov?
22          A.   Not to the best of my recollection.
23          Q.   You didn't see a bank account?
24          A.   Not to the best of my recollection.
25          Q.   You didn't see an investment account?
```

```
 1                    AARON ETRA, ESQ.

 2        A.    Not to the best of my recollection.

 3        Q.    At all times, Ms. Evans was acting as

 4   an agent for Mr. Kaslov?

 5        A.    To the best of my understanding, yes.

 6        Q.    Do you recall anything else about --

 7   that Ms. Evans may have -- I'll withdraw that

 8   one.

 9              Do you recall anything else Ms. Evans

10   may have told you about Mr. Kaslov's assets?

11        A.    I don't recollect any.

12        Q.    Did Tracy ever explain to you why Mr.

13   Kaslov put so much trust in her?

14        A.    The only thing I recollect is that she

15   said the two of them had worked together for a

16   number of years.

17        Q.    Let's go back to Exhibit 13.

18              (Pause)

19        Q.    If you look at page 8, there is a

20   clause that says:  Guarantee.

21              (Pause)

22        Q.    See that, sir?

23        A.    Yes.

24        Q.    Did you have any involvement in the

25   drafting of that provision?
```

```
 1                     AARON ETRA, ESQ.

 2          A.   I don't recollect.

 3          Q.   What was the fee that you expected to

 4     receive from this transaction?

 5          A.   It would be a fee from the seller.

 6          Q.   How much was that fee?

 7          A.   My recollection is we never finalized

 8     it, but my basic fee is 1%.

 9          Q.   And 1% of $5 million is how much?

10          A.   Excuse me?

11          Q.   1% of $5 million is how much?

12          A.   My calculation is as good as yours on

13     that.

14          Q.   $50,000, correct?

15          A.   That's correct.

16               But my fee was payable by the seller,

17     not by any other party.

18          Q.   What was the work that you were

19     expected to do in exchange for that $50,000?

20          A.   Serve as the escrow agent.

21          Q.   What exactly did that entail under

22     this contract?

23          A.   It entailed what was in the contract.

24               (Pause)

25          Q.   Okay.  Let's go to Exhibit 7 at TE-64.
```

```
 1                    AARON ETRA, ESQ.

 2              (Pause)

 3      Q.    Do you see that this is an e-mail from

 4  John Austin to Tracy Evans, dated August 4,

 5  2018? --

 6      A.    Yes, I see it.

 7      Q.    -- with the subject line:  Seller

 8  Update?

 9      A.    Hm-hmm.

10      Q.    Do you see two lines down in that

11  e-mail, Mr. Austin says to Tracy -- withdrawn.

12              Who is John Austin?

13      A.    There is a gentleman by that name,

14  John Austin.

15      Q.    Is he related to Hugh Austin?

16      A.    I believe it's his son.

17      Q.    Do you recall how and when John Austin

18  became involved in this transaction?

19      A.    To the best of my recollection, it was

20  at the same period of time, end of July,

21  beginning August of 2018.

22      Q.    What was Mr. Austin's role -- John

23  Austin's role -- in the negotiation of this

24  transaction?

25      A.    To the best of my recollection, he was
```

1                    AARON ETRA, ESQ.

2      assisting the other two Austins in the

3      transaction.

4          Q.    As an agent for Valkyrie?

5          A.    He was just assisting in whatever

6      capacity was necessary -- in their opinion, was

7      necessary.

8          Q.    Do you see two lines down in the

9      e-mail to Ms. Evans, it says:  I told him --

10     referring to the buyer -- we went over the

11     agreement line-by-line and we are as close as we

12     will ever be.

13                Do you know who he is referring to?

14         A.    I do not.

15         Q.    He also says:  I the also told him you

16     and Aaron have been very fair and accommodating,

17     and if he wants this deal he needs to sign and

18     close posthaste.

19                Do you see that?

20         A.    I do.

21         Q.    When he says that "you and Aaron have

22     been very fair and accommodating," do you know

23     what he's describing?

24         A.    Well, I believe he's saying we both

25     have made ourselves available to assist the

```
1                   AARON ETRA, ESQ.

2    parties, and both in-person and any other way.

3         Q.    What accommodations did you make to

4    the buyer in this contract?

5         A.    Again, I can't assess what he meant by

6    that.

7               But I can say what I did, which is to

8    be available at all times by phone, by in-person

9    for that meeting that you referred to, and every

10   other way.

11        Q.    Was there any urgency for you in

12   consummating this transaction?

13        A.    No urgency on my part.  As I say, I

14   was not a party to it.  My role was as a

15   facilitator, and urgency is to be available to

16   them.

17        Q.    Was there any reason for the buyer to

18   think that, if you did not close posthaste, he

19   will not be able to transact with you as the

20   escrow agent?

21        A.    I have no idea what the buyer would

22   think.

23              The only thing that I can suggest is

24   any buyer wants to consummate a transaction,

25   especially in this case where the commodity was
```

1                    AARON ETRA, ESQ.

2        in demand.

3                    But I can't speak for the buyer.

4                    MR. BROMBERG:  Let's go to --

5                    (Pause)

6                    (Exhibit Etra 14, Four-page e-mail

7        chain, top e-mail From: Brandon Austin, To:

8        gerald@benthoscap.com and Brandon Austin,

9        Subject: Signed Docs, Sent: August 4, 2018 (no

10       Bates Nos.), marked for identification)

11                   (Exhibit Etra 15, Multipage document

12       entitled: BTC Agreement: Transaction Code No.

13       CDKTEBPA080218SUB (no Bates Nos.), marked for

14       identification)

15                   (Exhibit Etra 16, Single-page document

16       entitled: Client Information Summary, with

17       attachments, marked for identification)

18       BY MR. BROMBERG:

19           Q.    You see at the top of Exhibit 14,

20       there is an e-mail from Brandon Austin to

21       gerald@benthoscap.com.

22                   And he says:  Attached is the

23       requested KYC info as well as the executed

24       Agreement.

25                   Do you see that, sir?

```
1                    AARON ETRA, ESQ.

2        A.    I do.

3        Q.    And the attachment -- Exhibit 15 -- do

4    you recognize the document?

5              (Pause)

6        A.    I'm with you.

7        Q.    This is the executed bitcoin agreement

8    between Valkyrie LLC and Benthos Capital,

9    correct -- Benthos Master Fund, correct?

10       A.    It seems to be executed by them, but

11   not by me.

12       Q.    When Mr. Austin says in Exhibit 14

13   "attached is the requested KYC info," do you

14   know what he's referring to?

15       A.    I don't know what he was referring to.

16             It's basically -- "KYC" is "know your

17   client."

18             I don't know what specifically he was

19   referring to.

20       Q.    In your experience, what does KYC

21   information consist of?

22       A.    It's a very open-ended term.  It

23   depends what each person asks for in the way of

24   KYC.  There is no one-size-fits-all.

25       Q.    If you turn to Exhibit 16, the KYC
```

```
 1                   AARON ETRA, ESQ.

 2     document that Mr. Austin sent to Gerald Fong --

 3     at the top of that document, it says: Client

 4     Information Summary c/o Aaron Etra.

 5               Do you see that, sir?

 6        A.    I do.

 7        Q.    Do you know why it says:  C/o Aaron

 8     Etra?

 9        A.    I think because he used one of my

10     forms for it.

11        Q.    Do you recall giving him a form for

12     KYC info?

13        A.    Yes.

14        Q.    Is that a form that Mr. Austin

15     requested from you?

16        A.    I requested it of him.

17        Q.    So can you tell us about the

18     circumstances under which you requested KYC info

19     from Mr. Austin?

20        A.    Yes, part of the due diligence on that

21     party to the proposed contract.

22        Q.    So you asked Mr. Austin for KYC

23     info --

24        A.    Yes.

25        Q.    -- without being prompted?
```

```
 1                    AARON ETRA, ESQ.

 2          A.    Yes.

 3          Q.    And he subsequently asked Mr. Fong for

 4    KYC info?

 5          A.    I have no idea what he asked for.

 6          Q.    But he used this form?

 7          A.    Again, I have no idea whether this was

 8    the attachment to that e-mail.

 9          Q.    Do you have any reason to believe this

10    is not the attachment to that e-mail?

11          A.    No reason either way.

12                (Pause)

13          Q.    When you engage in a transaction, at

14    what stage of the transaction do you typically

15    exchange KYC info?

16          A.    If people want to engage my services.

17          Q.    So prior to signing any contract?

18          A.    At the time that they want to engage

19    my services, which is usually before -- well,

20    again, it varies.  The only operative time is

21    when they ask me to perform services for them.

22          Q.    Let's go to Exhibit 7 at 341.

23                (Pause)

24          Q.    Sorry, Exhibit 6 at 341.

25                (Pause)
```

1                   AARON ETRA, ESQ.

2        Q.    Do you see that this is an e-mail from

3   Tracy Evans to you, dated Saturday, August 4th?

4        A.    Yes.

5        Q.    And the subject line is:  Final

6   Contract Signed with Escrow Agent?

7        A.    Hm-hmm.

8        Q.    Is this the final version of the

9   contract?

10             (Pause)

11       A.    To the best of my recollection, it is.

12       Q.    Do you recall why Ms. Evans was

13   sending the contract to you on this occasion?

14       A.    She is the repository of the materials

15   in this transaction.  So that would be -- would

16   make sense.

17       Q.    When you say that "she is the

18   repository of the materials in this

19   transaction," what do you mean by that, sir?

20       A.    Things like that agreement -- she is

21   the person that has been functioning to receive

22   the materials, whether it's a contract or other

23   materials relevant to the transaction.  So she

24   would be the one who would have the final

25   executed copy of this agreement.

```
 1                    AARON ETRA, ESQ.

 2          Q.    On whose behalf is Ms. Evans serving

 3     that function in this transaction?

 4          A.    It has evolved in that direction.  She

 5     is obviously representing the seller, but she

 6     has functioned, I think, on behalf of everyone

 7     to perform those functions.

 8          Q.    So Ms. Evans has taken it upon herself

 9     to keep in her possession all the relevant

10     documents in this transaction?

11          A.    To the best of my knowledge and

12     belief, yes.

13          Q.    Did someone appoint her to that

14     position?

15                Or did she volunteer for that

16     position?

17          A.    No, I believe she volunteered.

18                As I say, my recollection was it

19     evolved in that direction.  There wasn't an

20     official appointment or recognition by either of

21     the parties.

22                (Pause)

23          Q.    Go to page 361 of Exhibit 6.

24                (Pause)

25          Q.    There is an e-mail from you to Brandon
```

```
 1                    AARON ETRA, ESQ.

 2    Austin, with a copy to Ms. Evans, with the

 3    subject line:  Signed Docs.

 4              And the second line down, you say:

 5    The agreement looks fine and I am prepared to

 6    sign it (most expeditiously by authorizing Tracy

 7    to affix my electronic signature and initials)

 8    when I receive the KYC from Benthos Master Fund,

 9    Ltd.; its corporate organizational documents and

10    good standing certificate, etc.

11              Do you see that, sir?

12         A.    I do.

13         Q.    Did you, in fact, sign the agreement?

14         A.    I don't recollect if I signed it or

15    whether I authorized Ms. Evans to do it on my

16    behalf.

17              (Pause)

18         Q.    Have you ever authorized Ms. Evans to

19    sign anything else on your behalf?

20         A.    I don't have a clear recollection of

21    it.  It would not be unusual to have that

22    happen.  I don't have a clear recollection.

23         Q.    In the next line down, you say:

24    Please also have Benthos advised from where its

25    funds in the amount of $5 million will be
```

```
1                    AARON ETRA, ESQ.

2     coming.

3         A.    Yes.

4         Q.    What do you mean by that?

5         A.    I'd like to know in advance from where

6     funds come into my escrow account to make sure

7     that that goes as smoothly as possible.  So

8     that's customary.

9         Q.    It appears from this e-mail that you

10    expected to receive KYC information from Benthos

11    before you signed the agreement.

12                Is that correct?

13        A.    Yes -- or at least contemporaneous

14    with it.

15        Q.    When you ask a party for KYC

16    information, what exactly are you trying to

17    determine?

18        A.    Each situation varies, so I want to

19    know my clients.  I want to know -- depending on

20    what the transaction is, it varies as to how

21    much is important to know.

22        Q.    So when you are entering into a

23    transaction with a person who purports to own

24    billions of dollars of bitcoins, what do you

25    need to know to get comfort with that?
```

1                    AARON ETRA, ESQ.

2          A.    In that case, the information was not

3    important as in respect of the funds.

4                My function was not to receive the

5    bitcoins.  It was to receive the funds.

6                So my KYC functioning was in respect

7    of the source of the funds.

8          Q.    So when you act as the escrow agent in

9    the transaction, you only do KYC as to the buyer

10   and not the seller?

11         A.    It's focused on what my role is.

12               If my role is to receive and disperse

13   the funds, my focus is on the funds.

14         Q.    And if your role is to receive and

15   disperse the funds on the instruction of the

16   seller, do you do any additional due diligence

17   on the seller?

18         A.    Yes.

19         Q.    What due diligence did you do in the

20   case of Valkyrie?

21         A.    Well, in the case of Valkyrie, I have

22   asked them for their corporate documents in the

23   same way I have asked Benthos for theirs.

24         Q.    What assurances do you get from having

25   received corporate documents?

```
 1                    AARON ETRA, ESQ.
 2         A.    The assurances of the organization of
 3    being in existence and being a valid body to
 4    engage on the transaction.
 5         Q.    Why did you not do that equivalent
 6    work in the transaction between Valkyrie and
 7    Dmitri Kaslov?
 8         A.    That's incorrect.
 9         Q.    So what bona fides were you shown in
10    the case of Dmitri Kaslov?
11         A.    I was shown his passport.  I was shown
12    his basic information, as I so indicated to you
13    earlier.
14         Q.    So you were shown information
15    sufficient to determine that a person named
16    Dmitri Kaslov exists?
17         A.    Correct.
18         Q.    And that's the only due diligence that
19    you believe you are required to do as escrow
20    agent?
21         A.    Well, I also received -- he executed
22    the contract.  And he had entered into a number
23    of communications through his agent.  So that
24    was -- as I say, my focus was on the source of
25    the funds, which was not Dmitri Kaslov.
```

                         AARON ETRA, ESQ.

1

2        Q.    During the entire time that you have

3   conducted business with persons including Mr.

4   Kaslov, Tracy Evans has always acted as Mr.

5   Kaslov's agent?

6        A.    Yes.

7        Q.    Have you ever seen any kind of written

8   agreement between Mr. Kaslov and Ms. Evans?

9        A.    I don't recollect having seen any, no.

10       Q.    Have you ever received an e-mail from

11  Mr. Kaslov saying:  Tracy Evans is authorized to

12  transact business on my behalf?

13       A.    He has sent e-mails in respect of this

14  transaction, yes.

15            (Pause)

16       Q.    Did Mr. Kaslov ever send you an e-mail

17  setting forth what Ms. Evans' authority is with

18  respect to him?

19       A.    Best of my recollection, he

20  communicated the role that she was to play.

21       Q.    What was that role?

22       A.    To act on his behalf in respect of his

23  transaction and to interact with Mr. Hoang.

24            (Pause)

25       Q.    When you say "to act on his behalf in

```
 1                      AARON ETRA, ESQ.

 2      respect of this transaction," that means to

 3      enter into the transaction on his behalf?

 4          A.    To the best of my understanding and

 5      recollection, yes.

 6          Q.    Mr. Kaslov placed enormous amount of

 7      trust in Ms. Evans, wouldn't you say?

 8          A.    It's not for me to judge.

 9                (Exhibit Etra 17, Multipage e-mail

10      chain, top e-mail From: Brandon Austin, To:

11      Gerald Fong and others, Subject: Benthos (Buyer)

12      KYC AML, Sent: August 4, 2018 (no Bates Nos.),

13      marked for identification)

14                MR. BROMBERG:  Exhibit 17 is an e-mail

15      from Brandon Austin to Gerald Fong and you.

16                THE WITNESS:  Yes.

17                MR. BROMBERG:  It has the subject

18      line:  Benthos (Buyer) KYC AML.

19                THE WITNESS:  Hm-hmm.

20      BY MR. BROMBERG:

21          Q.    What is:  KYC AML?

22          A.    KYC, as we discussed earlier, is:

23      Know your client.

24                AML is:  Anti-money laundering.

25          Q.    And what did you need from Benthos in
```

1                    AARON ETRA, ESQ.

2    the way of KYC AML?

3         A.    I have asked them for various

4    corporate documents and their authority

5    documents, which they provided.

6               (Pause)

7         Q.    If you go a few pages in -- page 4 of

8    9 -- there is an e-mail from you to Mr. Deo,

9    dated August 4 at 4:20 p.m.

10              And you write:  Hello, Mihir, Thank

11   you for this message and the attachments.

12        A.    Hm-hmm.

13        Q.    Please provide the Company resolution

14   authorizing Gerald to enter into this agreement

15   on its behalf.

16        A.    Hm-hmm.

17        Q.    So you required a written

18   authorization?

19        A.    Well, not necessarily written

20   authorization, but indication as to how he was

21   authorized.

22        Q.    Did you ever ask for that sort of

23   documentation from Ms. Evans with respect to Mr.

24   Kaslov?

25        A.    No.

1                    AARON ETRA, ESQ.

2          Q.    Why is that?

3          A.    My focus was on -- as I indicated

4    earlier -- on the source of the funds.  That was

5    my primary focus and that's how I functioned.

6               (Pause)

7          Q.    So what do you recall occurred after

8    the contract was fully executed?

9          A.    I'm sorry.  I don't understand the

10   question.

11         Q.    What happened after the contract in

12   this case was fully executed?

13         A.    In what respect?

14         Q.    Well, you previously told us that the

15   contract was executed on August 4, 2018.

16              What happened after that?

17         A.    Well, lots of things have happened.  I

18   don't think -- please be a bit more specific as

19   to your question.

20         Q.    What's the next thing you remember

21   after the contract was executed?

22         A.    Next thing I remember was I asked for

23   and received the funds from Benthos.

24         Q.    Do you recall anything else about

25   receiving the funds from Benthos?

```
 1                    AARON ETRA, ESQ.

 2        A.    We had exchanges of communications as

 3    to where the funds were coming from, and the

 4    funds did come, and I acknowledged receipt of

 5    them.

 6              (Pause)

 7        Q.    Let's look at AE-299.  That's Exhibit

 8    6.

 9              (Pause)

10        A.    You said 299?

11        Q.    Let's look at 298.

12              You see midway down on 298, there is

13    an e-mail from Tracy Evans to you, dated Sunday

14    August 5th, 2018, at 12:53 p.m.?

15              Do you see that, sir?

16        A.    I do.

17        Q.    And Ms. Evans writes:  I'm sending you

18    the banking for the Austin deal.

19        A.    Yes.

20        Q.    What does that mean?

21        A.    I believe that's the information

22    necessary for disbursement of the escrow for

23    that transaction.

24        Q.    Below that, she says:  It is the same

25    as the Ko deal.
```

```
 1                    AARON ETRA, ESQ.

 2          A.    Yes.

 3          Q.    Who or what is Ko?

 4          A.    I believe that -- again, it's my

 5   recollection then, she would have to give you

 6   the input on it -- but he was a prospective

 7   buyer at that same time.

 8          Q.    You say that he was a prospective

 9   buyer?

10          A.    Yes.

11          Q.    Why do you say that?

12          A.    Because he was a prospective buyer.

13          Q.    Was there a contract entered into

14   between Mr. Ko and another person?

15          A.    To my knowledge and recollection, no.

16          Q.    Do you recall why you received wire

17   instructions for the payment of money out of

18   your escrow account in respect of Mr. Ko?

19          A.    Yes, because that was the -- not --

20   Mr. Ko had nothing to do with the transaction.

21   There was no contract, no payment to Mr. Ko.

22          Q.    Mr. Ko is a person?

23          A.    I believe it refers to a person, yes.

24          Q.    So when Ms. Evans says "the banking is

25   the same as the Ko deal," what does she mean by
```

1                    AARON ETRA, ESQ.

2      that?

3           A.    I believe -- and again, you need to

4      ask her that -- she is referring to the

5      destination of the transfers, the same account

6      that had been proposed for this other

7      prospective buyer.

8           Q.    So the transfer of the buyer's funds

9      out of escrow to a certain account was proposed

10     in the Ko deal, but never actually effectuated?

11          A.    I don't remember what the provisions

12     of the Ko deal was.

13          Q.    Do you recall why the destination of

14     the transfer of funds out of your escrow account

15     was discussed in the context of the Ko deal?

16          A.    Yes, because the procedure for release

17     of the bitcoins would apply to any buyer.

18                (Pause)

19          Q.    If you go back to Exhibit 15, that's

20     the contract between Benthos Master Fund and

21     Valkyrie Group.  And this is before you had

22     signed it.

23          A.    This was a draft contract.

24          Q.    I think you'll agree that the executed

25     version of 15 is essentially the same as the one

```
 1                    AARON ETRA, ESQ.

 2    that you executed?

 3         A.    I can't do that without studying it at

 4    greater length.

 5         Q.    Well, you can go back to it in the --

 6         A.    -- it is not a question of my opinion

 7    on that.  One is the drafting, one is executed.

 8              (Pause)

 9         Q.    Do you see anywhere in the document

10    instructions for the payment of money out of the

11    escrow account?

12         A.    First of all, let us see if that is

13    the executed version of it.

14              (Pause)

15         Q.    You know what?  Instead, let's go to

16    Exhibit 6 at page 341 -- 342.

17              (Pause)

18         Q.    This is the final version of a

19    contract executed by you, correct?

20         A.    I believe it is.

21         Q.    Do you see anywhere in this contract

22    instructions for where the money is to be sent

23    when it leaves your escrow account?

24              (Pause)

25         A.    Yes, in section 16.4, sub 2, the last
```

```
1                    AARON ETRA, ESQ.

2    sentence.

3         Q.    It says:  The Seller may pull out an

4    amount of money from escrow in order to secure

5    the bitcoin from its bitcoin-backed instrument.

6         A.    Correct.  There is that.

7               And I believe in the escrow part -- so

8    there is that provision.

9               If you give me time, I will give you

10   additional references.

11              (Pause)

12        A.    On page 12 of 16 -- which is 353 --

13              (Pause)

14        A.    The Parties expressly and fully agree

15   of consent to the right of the Escrow Agent to

16   follow the sole instructions of the Seller,

17   provided the Seller is doing so with the intent

18   of securing the BTC for the buyer from its

19   BTC-backed, and that these instructions are with

20   respect to the application of funds representing

21   the Deposit once received from the Buyer, and

22   transferred as provided in the Agreement and

23   herein.

24        Q.    Does it say where the money is to be

25   sent?
```

1                    AARON ETRA, ESQ.

2         A.    On the instructions of the seller,

3    which is what the provision of 16.4 says.

4         Q.    Are there wire instructions contained

5    in this agreement, sir?

6         A.    No, nor would there be necessarily.

7         Q.    Is there a bank name?

8         A.    No --

9         Q.    Is there --

10        A.    -- nor would there --

11        Q.    -- an express --

12        A.    -- necessarily be --

13        Q.    -- code?

14        A.    -- no, none of that is in the

15   agreement, nor would it be --

16        Q.    Is there an account number?

17        A.    No, and nor is it to be expected to

18   find it there.

19        Q.    So I'll ask you again, sir:  When Ms.

20   Evans said to you in the e-mail at AE298, "it is

21   the same as the Ko deal," what was she referring

22   to?

23        A.    That was, of course, subsequent to the

24   execution of this agreement, I believe.

25        Q.    Which agreement?

```
1                    AARON ETRA, ESQ.

2              The Ko deal?

3        A.    No, this agreement that you are

4    referring to.

5        Q.    When Ms. Evans referred to the banking

6    being the same as the Ko deal, she was referring

7    to wire instructions, correct?

8        A.    That is correct.

9              What is the date of Ms. Evans' e-mail?

10       Q.    August 5th, 2018.

11       A.    And this agreement is August 2nd.

12             So my point to you is that was

13   subsequent to the execution of this agreement,

14   which would be the time for that information to

15   be conveyed.

16       Q.    My question to you, sir, is:  Why were

17   there wire instructions in the Ko deal if, in

18   fact, that document -- if, in fact, that

19   transaction was never consummated?

20       A.    There is no inconsistency -- the fact

21   that those were provided but never incorporated

22   into a signed contract .

23       Q.    Was there a contract in the Ko deal?

24       A.    Not to my recollection -- not an

25   executed contract, no.
```

```
 1                      AARON ETRA, ESQ.

 2          Q.    It was never executed?

 3          A.    No.

 4          Q.    But there were wire instructions

 5   discussed?

 6          A.    I don't recollect what that contract

 7   provided.

 8          Q.    Who was the seller in the Ko deal?

 9                It was also Mr. Kaslov?

10          A.    My recollection, it was Mr. Kaslov.

11          Q.    Were the Austins involved?

12          A.    I don't recollect if they were.

13          Q.    So there were wire instructions

14   circulated for the Ko deal, but it was never

15   consummated, and no money was ever sent?

16          A.    Correct.

17          Q.    Below that, on page 298 of Exhibit

18   6 --

19          A.    298?  Okay.

20          Q.    -- it says:  Hello, Tracy, Here is the

21   account.  Kindly ask Mr. Ko to wire the 9.8 and

22   I will give the equivalent in BTC.

23          A.    I think that was -- that was an

24   expectation.  I believe, again, I am only

25   looking at it here -- that would be the
```

```
 1                    AARON ETRA, ESQ.

 2      expectation of a deal being consummated with Mr.

 3      Ko, which it was not.

 4           Q.    So do you see midway down on page 299,

 5      it says:  Here is the signatory to the company

 6      account who is one of my associate.  Please

 7      kindly ask Mr. Ko to kindly with due respect go

 8      ahead and make the payment into the account and

 9      let me have slip.

10           A.    Yes.  I see.

11           Q.    It's your testimony as you sit here

12      today that this was all prospective?

13           A.    Yes.

14           Q.    And Mr. Ko never signed an agreement?

15           A.    Yes.

16           Q.    And never transferred any money to

17      the --

18           A.    My recollection is that that agreement

19      never went forward.

20                 And, again, Ms. Evans probably would

21      be the best source of that.

22                 But my recollection was that

23      nothing -- no funds were ever transferred.  The

24      deal never was consummated.

25           Q.    If you look above that, on page 299,
```

```
1                    AARON ETRA, ESQ.

2      there are wire instructions, correct?

3           A.    Yes, correct.

4           Q.    The bank name is China CITIC

5      International Limited?

6           A.    Hm-hmm, correct.

7           Q.    And the account name is:  HK

8      Zhixuan -- Z-H-I-X-U-A-N -- Trading Limited?

9           A.    Yes.

10          Q.    Prior to receiving this e-mail from

11     Tracy Evans, had you ever heard the name HK

12     Zhixuan Trading Limited?

13          A.    I don't remember the -- to my

14     knowledge, I never received those details.  My

15     recollection is I didn't receive those details

16     before.

17          Q.    Do you recall receiving this e-mail

18     from Ms. Evans?

19          A.    I don't recall receiving it, but it

20     looks like it was sent.

21                (Exhibit Etra 18, Single-page document

22     bearing passport copy of Minh Hoang Le (no Bates

23     No.), marked for identification)

24     BY MR. BROMBERG:

25          Q.    Do you see midway down on page 298 of
```

```
 1                    AARON ETRA, ESQ.
 2    Exhibit 6, Ms. Evans says --
 3                (Pause)
 4        A.    298 of Exhibit 6.  Okay.  Yes.
 5        Q.    Ms. Evans writes to you:  Also
 6    attached is passport.
 7                Do you recognize the document that I
 8    handed to you -- Exhibit 18?
 9        A.    It looks like a picture of a passport,
10    yes.
11        Q.    Do you recall receiving this document
12    from Ms. Evans?
13        A.    I believe I received it from Ms.
14    Evans.  I don't recollect, but I believe I did.
15        Q.    Whose passport is this?
16        A.    It's stated to be of Mr. Hoang Le --
17    Hoang Le.
18        Q.    When Ms. Evans says "I think you have
19    all this, but wanted to make sure," did you, in
20    fact, have this document already?
21        A.    I don't recollect if I did.
22        Q.    Do you recall the first time that you
23    saw this document?
24        A.    I don't recollect, no.
25        Q.    When you received wire instructions
```

```
 1                    AARON ETRA, ESQ.
 2      from Ms. Evans for this account at China CITIC
 3      International Limited, do you recall anything
 4      about that?
 5          A.   Well, in this case, it wasn't for me
 6      to transfer the funds.  It was for Mr. Ko, as I
 7      read this message.
 8          Q.   When Ms. Evans said "I'm sending you
 9      the banking for the Austin deal; they are
10      contained herein but also attached as a separate
11      attachment; it is the same as the Ko deal," what
12      did you understand that to mean?
13          A.   I understood that it was the same
14      account coordinates.
15          Q.   So these were, in fact, instructions
16      for the Austins' deal, correct?
17          A.    It could be for both transactions,
18      yes.
19          Q.    Are these the -- are these the actual
20      wire instructions upon which you relied in
21      sending Benthos' money to that account?
22          A.    I don't recollect if these were the
23      only ones, but I do believe those are the ones
24      that I followed in the Benthos transaction.
25                    (Pause)
```

1                     AARON ETRA, ESQ.

2          Q.    Did you have any concerns about these

3     instructions when you received them?

4          A.    I don't recollect any concerns.

5          Q.    Let's go to the previous page --

6     AE-297 of Exhibit 6.

7                THE WITNESS:  Just want to do one

8     thing before you do that, if I may.

9                (Pause)

10               THE WITNESS:  If it's helpful to you,

11    those coordinates are the same as in Exhibit 1A

12    of the material that I provided to you under

13    Exhibit 8.

14               MR. BROMBERG:  That is helpful, sir,

15    and we'll get to that.

16    BY MR. BROMBERG:

17         Q.    Right now, let's turn to AE-297 of

18    Exhibit 6.

19         A.    297.  Okay.

20               (Pause)

21         Q.    Midway down, there is an e-mail from

22    you to Ms. Evans, in which you say:  Tracy,

23    Sending funds to a HK account made sense when

24    the funds were coming from HK, and would then go

25    to Dubai.

```
 1                    AARON ETRA, ESQ.

 2               What did you mean by that?

 3        A.    My recollection was that, at some

 4   point, Ms. Evans, I think -- and again, you need

 5   to confer with her -- was advised by Mr. Kaslov

 6   that eventually the release procedure had to

 7   take place in Dubai.

 8               So that was why, as I say, it would

 9   make sense if the buyer's funds were coming from

10   Hong Kong and could go directly to Dubai.

11               Because instead of sending the funds

12   to my escrow account, the proposal was to have

13   the funds go to a Hong Kong account, rather than

14   to my escrow account.

15        Q.    Below that, you say:  Now that the

16   funds are coming from the U.S., does it not make

17   more sense for them to go to Dubai in one

18   transfer, rather than to Dubai in two steps,

19   especially with the time differentials back and

20   forth?  As well, sending the funds to an

21   individual in HK rather than to a firm in Dubai

22   seems unusual for this purposes.

23        A.    Yes.

24        Q.    Does that refresh your recollection as

25   to whether you had any concerns when you
```

                        AARON ETRA, ESQ.

1                       AARON ETRA, ESQ.

2    received these instructions?

3        A.    Well, again, the question of

4    concerns -- I tried to do my best to function in

5    a rational way, and this is part of it.

6              So I do communicate in this fashion

7    that I looked for an answer, which is what she

8    gave in the reply e-mail.

9              So, yes, I do try to do the best job I

10   can to make sure that the funds are dealt with

11   correctly.

12       Q.    I asked you whether you had any

13   concerns.

14             And you answered:  I tried to do the

15   best to function in a rational way.

16       A.    That's correct.  I mean, that's my

17   interpretation of acting in a way.

18             I don't know what your definition of a

19   "concern," is but it's acting in the way that I

20   need to function -- is my analysis.

21       Q.    So it's your testimony as you sit here

22   today that you don't recall having any concerns

23   about these wire instructions.

24       A.    It's not my testimony that I didn't

25   have any concerns.

1                    AARON ETRA, ESQ.

2            My testimony is that I acted in a way

3      that's appropriate for the function involved.

4            (Pause)

5      Q.    If you go above that to the top

6      e-mail, you write to Ms. Evans:  Tracy, Please

7      also appreciate that we have verbally and now in

8      the agreement stated that the funds would be

9      applied to assist in delivering the BTC and we

10     have told persons about Dubai and stabilizing an

11     instrument.

12            Do you see that, sir?

13     A.    I do.

14     Q.    Then you went on to write:  Sending

15     funds to a trading company in HK, albeit run by

16     a friend of Dmitri's, may not be viewed as

17     consistent with that effort and commitment.

18            What did you mean by that, sir?

19     A.    Well, again, I'm exercising what I

20     considered to be necessary in my function to

21     confirm that this is a most appropriate way to

22     fulfill the agreement the parties entered into.

23            This whole exchange is in that

24     spirit -- that I am trying to do my best to

25     ascertain that the funds that were given to me

                    AARON ETRA, ESQ.

1    in escrow, with the specific consent to have

2    them transferred to be used as part of the

3    release procedure, but to make sure that that --

4    those arrangements are the most appropriate and

5    correct in order to implement that agreement.

6            All of this exchange is exactly with

7    that in mind.

8            I mean, my functioning to try to make

9    sure that what the parties agreed to -- which

10   was the release of the funds for this purpose --

11   is done in a way that effectuates that result.

12   That's my whole purpose in acting as an escrow

13   agent.

14           And this exchange is exactly in that

15   spirit -- that I'm asking the seller's agent to

16   assure me that what I'm doing is what he wants

17   and what the parties agreed to.

18       Q.   When you say "the seller's agent," who

19   are you referring to?

20       A.   Ms. Evans.

21       Q.   Where in the contract, if you can show

22   me that -- strike that.

23       A.   As I showed you, those two provisions

24   in both the main contract and in the escrow

                    AARON ETRA, ESQ.

1    in escrow, with the specific consent to have

2    them transferred to be used as part of the

3    release procedure, but to make sure that that --

4    those arrangements are the most appropriate and

5    correct in order to implement that agreement.

6            All of this exchange is exactly with

7    that in mind.

8            I mean, my functioning to try to make

9    sure that what the parties agreed to -- which

10   was the release of the funds for this purpose --

11   is done in a way that effectuates that result.

12   That's my whole purpose in acting as an escrow

13   agent.

14           And this exchange is exactly in that

15   spirit -- that I'm asking the seller's agent to

16   assure me that what I'm doing is what he wants

17   and what the parties agreed to.

18       Q.   When you say "the seller's agent," who

19   are you referring to?

20       A.   Ms. Evans.

21       Q.   Where in the contract, if you can show

22   me that -- strike that.

23       A.   As I showed you, those two provisions

24   in both the main contract and in the escrow

```
 1                    AARON ETRA, ESQ.

 2     agreement provides exactly for what I did.

 3               And the parties knew it, and were told

 4     of it, and approved it.

 5               And you are only showing in this

 6     exchange that I, you know, acted really in the

 7     best interests of both parties to try to make

 8     sure that what they agreed to would be

 9     implemented as they agreed.

10          Q.   Well get to that, sir.

11               But continuing on with AE-297, you are

12     saying:  I'm concerned with the appearance as

13     well as the practicality of such transfer to

14     Hong Kong, and certainly about the consequences

15     of any delay and problems that arise at any

16     stage of the transaction.

17          A.   That's correct.

18               This is all part and parcel of acting

19     in the best possible way, and so on.  I read all

20     of this is very clearly my functioning in the

21     way that the parties would have wanted me to

22     function, and I did function.

23          Q.   What was the basis of your concern

24     about sending money to an individual in Hong

25     Kong?
```

```
1                    AARON ETRA, ESQ.
2        A.    I have concern -- again, it's a
3   question of defining "concern."
4              Part of my function is to make sure
5   that any transfer that I make is in accordance
6   with what the parties agreed and is a way to
7   implement it.
8              So that's an abiding -- if you call it
9   a concern, it's an abiding concern.
10             I don't call it a concern.  I call it
11  my function.
12       Q.    And it's your testimony as you sit
13  here today that Benthos Master Fund agreed that
14  you were to take instructions from Minh Hoang
15  Le?
16       A.    From the seller.
17             And if the seller's transfer storage
18  facilitator is Mr. Le, the answer is:  Yes.
19       Q.    Who is the seller from whom you were
20  supposed to take instructions?
21       A.    Dmitri Kaslov, recognizing that the
22  agreement that Benthos had is with Valkyrie.
23             Valkyrie had the agreement with Dmitri
24  Kaslov.
25             Benthos knew that.  It was very clear
```

```
 1                    AARON ETRA, ESQ.

 2      and -- to all concerned that Valkyrie --

 3      Valkyrie was not the owner of the assets; that

 4      Dmitri Kaslov was.

 5               The parties knew exactly what was

 6      going on.

 7          Q.   Can you show me, going to be to

 8      Exhibit 6 at page 343?

 9          A.   I showed you the two provisions in the

10      agreement that referred to it.

11               You want to do it again?

12          Q.   Let's go back to Exhibit 343 --

13      Exhibit 6 at page 343.

14               (Pause)

15          Q.   That is the agreement itself.

16               Isn't that correct, sir?

17          A.   This is the agreement.  That's

18      correct.

19          Q.   Can you show me where in this

20      agreement it says that you are to take wire

21      instructions from Dmitri Kaslov?

22          A.   It says:  The seller may pull out an

23      amount of money from escrow in 16.4, paragraph

24      2.

25               And then I showed you the other
```

1                    AARON ETRA, ESQ.

2       provision on page 12:  The escrow agent -- the

3       Parties expressly and fully agree and

4       irrevocable consent to the right of the Escrow

5       Agent to the sole instructions of the Seller,

6       provided the Seller is doing so with the

7       intention of securing the BTC for the Buyer from

8       its BTC-backed, and that these instruction are

9       with respect to the application of the funds

10      representing the Deposit, once received from the

11      Buyer and transferred as provided for in the

12      Agreement and herein.

13          Q.    Who is the seller under this contract?

14          A.    The seller under this contract -- the

15      immediate seller was Valkyrie.

16          Q.    You say:  The immediate seller.

17                Who was the seller under this

18      contract, sir?

19          A.    The two parties.  Valkyrie was listed

20      as the seller, and Benthos is listed as the

21      buyer.

22          Q.    Is Mr. Kaslov a party to this

23      contract?

24          A.    Mr. Kaslov is not a party to the

25      contract.

```
 1                    AARON ETRA, ESQ.

 2         Q.    Is Ms. Evans a party to this contract?

 3         A.    Ms. Evans is not a party to the

 4    contract.

 5         Q.    Is Mr. Le a party to the contract?

 6         A.    Mr. Hoang is not a party to the

 7    contract.

 8         Q.    Does it say anywhere in this contract

 9    that you are authorized to take wire

10    instructions from either Mr. Kaslov, Mr. Le, or

11    Ms. Evans?

12         A.    It was clearly understood by Benthos

13    and Valkyrie that the seller and the owner of

14    the assets of the bitcoins was Mr. Kaslov.

15              There was --

16         Q.    Not Valkyrie, as set forth in the

17    agreement itself?

18         A.    No question.  There is no doubt that

19    Benthos understood that Valkyrie didn't own the

20    -- or was not the seller for this purpose.  It

21    was clearly understood.  There was no question

22    about it --

23         Q.    So it's your testimony as you sit here

24    today, sir, that notwithstanding that the

25    document says you are to take instructions only
```

1                    AARON ETRA, ESQ.

2     from Valkyrie, it was Benthos' contemporaneous

3     understanding that you were permitted to take

4     instructions from someone else?

5          A.    And Valkyrie, in fact, not only

6     understood, and Benthos not only understood, but

7     they also authorized me to obviously implement

8     their contract with Kaslov.

9                    So it was not only Kaslov directly,

10    but Valkyrie as well.

11                   So if you -- if you -- I'm sure you

12    are going to deal with Valkyrie.  And I would

13    be -- it would be clear that they understood

14    pursuant to their contract that the instructions

15    were to come from Dmitri Kaslov --

16         Q.    So it's your testimony, sir, that you

17    received written authorization from Valkyrie

18    that you were permitted to take instructions

19    from Dmitri Kaslov?

20         A.    It's my testimony that Valkyrie so

21    authorized me to do that.

22         Q.    In writing?

23         A.    I don't know what my recollection --

24    whether it was in writing, but certainly

25    verbally and throughout the discussions of this

```
 1                    AARON ETRA, ESQ.

 2      transaction.

 3      --------------------------

        DISCOVERY REQUEST

 4      --------------------------

 5                    MR. BROMBERG:  If there was a

 6      authorization by Valkyrie or any representative

 7      of Valkyrie to you to send money based on

 8      instructions provided to you by Mr. Kaslov, Ms.

 9      Evans, or Mr. Le, we call for that document to

10      be produced.

11                    Do you understand, sir?

12                    MR. ETRA:  I hear you.

13                    I'm just saying to you that the

14      authorization was given.  And I will do my best

15      to ascertain -- in addition to verbally, which

16      there is no question it was given -- whether

17      there is any written reflection of it.

18                    But there is no question in any mind,

19      or on the part of the Benthos, that that

20      authorization was given.

21                    (Pause)

22      BY MR. BROMBERG:

23          Q.    Do you have any knowledge of a meeting

24      that the Austins subsequently had with Mr. Fong?

25          A.    I have no understanding or
```

```
 1                    AARON ETRA, ESQ.

 2      recollection, no.

 3                    (Exhibit Etra 19, Two-page document

 4      entitled: Answer to Questions in OSC Requested

 5      of Aaron Etra [Questions 1, 2, 3, 4 - 2 pages]

 6      (no Bates Nos.), marked for identification)

 7                    (Exhibit Etra 20, Four-page document

 8      bearing heading on first page: Instructions to

 9      Aaron Etra, Esq., Escrow Agent, for Transaction

10      Codes: CDKTEBPA073118XXX and CDKTEBPA073118SUB

11      (no Bates Nos.), marked for identification)

12                    (Exhibit Etra 21, Four-page document

13      bearing heading on first page: Completed Wire

14      Detail (no Bates Nos.), marked for

15      identification)

16      BY MR. BROMBERG:

17          Q.    So going to Exhibit 19 -- these are

18      answers to questions that you provided in the

19      federal action.

20                    Is that correct?

21          A.    I believe it is, yes.

22          Q.    If you go down to question 2, part

23      (b), it says:  $3 million was transferred on

24      August 7, 2018?

25          A.    Yes.
```

```
 1                    AARON ETRA, ESQ.

 2          Q.    Tell us what you recall about that

 3     transfer.

 4          A.    The transfer was made.

 5          Q.    Did you receive wire instructions in

 6     connection with that transfer?

 7          A.    My recollection is I received those

 8     instructions from Ms. Evans on behalf of Mr.

 9     Kaslov.

10          Q.    If we go to Exhibit No. 20, are these

11     the instructions that you received?

12          A.    I believe they are.

13          Q.    You said that you received them from

14     Ms. Evans on behalf of Mr. Kaslov?

15          A.    Yes.

16          Q.    Did you receive any wire instructions

17     directly from Valkyrie?

18          A.    Did I receive instructions -- wire

19     instructions?  No.

20          Q.    Can you tell us what you recall about

21     this document in Exhibit 20?

22          A.    I don't understand the question.

23          Q.    What do you remember about this

24     document?

25          A.    I have no recollection of the
```

1                   AARON ETRA, ESQ.

2       document.

3            Q.    Do you remember receiving this

4       document?

5            A.    I believe -- I don't know whether it

6       was this document, but I do remember receiving

7       wire instructions from Ms. Evans on behalf of

8       Mr. Kaslov, yes.

9            Q.    Have you ever seen this document

10      before you received the wire instructions?

11           A.    Before I received -- in other words,

12      did I see something about this before --

13           Q.    Do you know anything about the origin

14      of this document?

15           A.    I believe it was prepared -- again, I

16      received it from Ms. Evans.  That is as much as

17      I know.

18           Q.    Have you ever seen this document

19      before you received it from Ms. Evans?

20           A.    I did not, no, not to my recollection.

21                 (Pause)

22           Q.    Let's go to TE-87.  That's part of

23      Exhibit 7.

24                 (Pause)

25           A.    Sorry.  What page was it?

```
1                    AARON ETRA, ESQ.

2         Q.    Exhibit 7, at page TE- --

3               (Pause)

4         Q.    -- TE-87.

5               (Pause)

6         Q.    You see there is an e-mail from you to

7    Ms. Evans, dated 6 August 2018, with the subject

8    line:  Letter of Instructions?

9         A.    Hm-hmm.

10        Q.    Do you recall anything about this

11   e-mail?

12              (Pause)

13        A.    I don't recollect, but -- I don't

14   recollect the e-mail.

15        Q.    Can you tell us the purpose of your

16   sending this e-mail to Ms. Evans?

17        A.    Yes, so that she would be able to

18   provide on behalf of Dmitri, the owner,

19   appropriate wire instructions.

20        Q.    Below that where it says "please also

21   provide the CIS from Hong Kong," what does that

22   mean?

23        A.    That was in respect of Dmitri's

24   storage -- transfer storage facilitator, Mr.

25   Hoang.
```

1                    AARON ETRA, ESQ.

2          Q.    What does "CIS" stand for?

3          A.    Confidential information summary.

4          Q.    You refer to Mr. Hoang as storage

5    facilitator?

6          A.    Yes.

7          Q.    What do you understand a storage

8    facilitator to do?

9          A.    He works on behalf of the owners of

10   the assets to be able to facilitate the purchase

11   and sale of those assets, including their

12   storage, including their release, including

13   their delivery, including the payment for them.

14         Q.    We'll come back to that.

15               Let's move to TE-88, next page of

16   Exhibit 7.

17               There is an e-mail, subject line:

18   Draft, from Tracy Evans to you, dated August 6,

19   2018.

20         A.    Hm-hmm.

21         Q.    It has attached to it a document:

22   Instructions to Aaron Etra 080718.

23               Below that, there is an e-mail from

24   you to Ms. Evans, dated 6 August 2018 at 19:26.

25               You say:  Tracy, Please see the

1                   AARON ETRA, ESQ.

2    revised instructions letter attached.

3         A.    I think that was with a view to get

4    the final form of what you have given me as

5    Exhibit 20.

6         Q.    Does this refresh your recollection,

7    sir, as to whether you had seen that document

8    previously to having received it in final

9    executed form from Ms. Evans?

10        A.    Well, I guess my answer was not with

11   respect to drafts of it.

12              Drafts clearly would have been

13   exchanged.

14        Q.    So you did exchange drafts of this

15   document before Ms. Evans delivered it to you

16   with the signature on it?

17        A.    Yes.

18        Q.    And had you a hand in drafting that

19   document, correct?

20        A.    I had a hand in trying to get the

21   required -- the information that I needed on the

22   document, yes.

23        Q.    So you had a hand in crafting that

24   document, correct?

25        A.    I had a hand in as I say, in getting

```
1                    AARON ETRA, ESQ.

2      the information that I think I needed to

3      implement the instructions.

4           Q.    When you e-mailed Tracy "please see

5      the revised instructions letter attached," it

6      was you who had provided those revisions,

7      correct?

8           A.    I don't know which of the revisions I

9      provided, you know, on the original draft or

10     things.

11               But, yes, I did put input in, yes.

12          Q.    Is it usual in your experience for an

13     escrow agent in a transaction to have a hand in

14     drafting the wire instructions upon which he

15     relies on sending money out of his escrow

16     account?

17          A.    Yes, because he wants to make sure

18     that those instructions are complete.

19               Very, very often that happens.  I

20     wouldn't say invariably, but the answer is

21     clearly:  Yes.

22          Q.    On how many occasions have you drafted

23     the wire instructions out of your own IOLA

24     account?

25          A.    I have too many to count.
```

```
1                    AARON ETRA, ESQ.

2              It's not a question of drafting.  It's

3         a question of dealing with the fullness of the

4         instructions needed.  It's not a drafting

5         exercise as much as making sure the information

6         that I need is complete.

7              (Pause)

8              MR. BROMBERG:  Take a very short

9    break?

10             Then we will probably go a little

11   while longer, then we will take a lunch?

12             THE WITNESS:  What about timing

13   overall, because I do have a doctor's

14   appointment to get to.

15             MR. BROMBERG:  Why don't we take five

16   minutes?

17             MR. POPOFSKY:  What time is your

18   doctor's appointment?

19             THE WITNESS:  It was at 2:00 o'clock.

20   Doesn't look like I'm going to make it, will I?

21             MR. BROMBERG:  You are not likely to

22   make your doctor's appointment, sir.

23             I would suggest that you reschedule it

24   for another day on which you don't have a

25   deposition scheduled.
```

1              AARON ETRA, ESQ.

2              THE WITNESS:  Well, I think, you know,

3        should be limits to the deposition as well.

4              MR. BROMBERG:  The deposition is

5        limited to seven hours per the New York rules.

6              THE WITNESS:  Well, thanks very much.

7              MR. BROMBERG:  But of course, we

8        reserve the right to call we back if you haven't

9        provided the testimony -- if we haven't received

10       the testimony that you are required to give.

11             THE WITNESS:  Certainly overbearing.

12             (Pause)

13             MR. BROMBERG:  Let's take a very brief

14       break.

15             (Recess from 12:41 p.m. to 12:51 p.m.)

16  BY MR. BROMBERG:

17        Q.    So when we were last on the record, I

18       believe you testified that you took wire

19       instructions from Ms. Evans or -- from Ms.

20       Evans.  And that based on those wire

21       instructions, you sent $3 million of Benthos

22       Master Fund's money to an account in Hong Kong.

23             Correct?

24        A.    My testimony was that Ms. Evans, on

25       behalf of Dmitri Kaslov, delivered those wire

```
 1                    AARON ETRA, ESQ.

 2    instructions.  And those wire instructions were

 3    known to all the parties concerned, Valkyrie as

 4    well as Benthos.

 5        Q.    It's your testimony that these wire

 6    instructions set forth in Exhibit 20 were shown

 7    to Benthos?

 8        A.    I don't recollect who it was shown to,

 9    but -- whether it was shown to them before or

10    after it was sent.

11             But clearly it was conveyed to them

12    that those funds would be going out, yes.

13        Q.    It was conveyed to Benthos Master Fund

14    that their funds would be sent to an account in

15    Hong Kong in the name of HK Zhixuan Trading

16    Limited?

17        A.    I don't recollect the exact detail of

18    which the information was conveyed, but the

19    information was conveyed that the first transfer

20    of funds were to be made.

21        Q.    To be made where?

22        A.    Again, I don't recollect how much of

23    the detail was made.

24             But it was conveyed to them, and they

25    fully understood.  No problems were indicated.
```

1                    AARON ETRA, ESQ.

2         Q.    Who conveyed that information

3    to Benthos Master Fund?

4         A.    I believe they inquired both of me and

5    Ms. Evans.  I don't remember.

6              But I remember we were in daily

7    contact with Benthos -- both them calling Ms.

8    Evans and them calling me.

9         Q.    It's your testimony that you advised

10   Benthos Master Fund as to where its money had

11   been sent?

12        A.    My recollection and testimony is that

13   they were informed that the funds were going

14   out, yes.

15        Q.    Did you inform them where the funds

16   were going?

17        A.    I don't recollect what degree of

18   detail was given.

19        Q.    You just told them that their money

20   had been sent?

21        A.    I don't recollect the detail of

22   giving, but it was certainly conveyed that they

23   were sent.  And they understood and had no

24   problems with it.

25        Q.    So it's your testimony as you sit here

1                    AARON ETRA, ESQ.

2       today that you don't recall whether or not you

3       informed Benthos Master Fund that its funds had

4       been sent to an account in Hong Kong?

5           A.    Again, I don't remember the details of

6       whether it was the account in Hong Kong, or the

7       name of the account, or as much detail as was

8       conveyed.

9           Q.    Let's go back to Exhibit 20.

10               The bank is China CITIC International

11      Limited?

12          A.    Yes.

13          Q.    Do you know anything about that bank?

14          A.    I don't know anything other than my

15      understanding, to the best of my knowledge and

16      belief, is it's a major bank.

17          Q.    It is, in fact, a major bank in China,

18      as I understand it.

19          A.    That's my understanding.

20          Q.    You see below that, where it says:

21      Bank officer:  Zoe Lau & Joanne Lai?

22          A.    Hm-hmm.

23          Q.    You would expect those persons to be

24      responsible for receiving wire transfers at the

25      bank?

```
 1                    AARON ETRA, ESQ.

 2        A.    That would be those who are familiar

 3    with the account.  To the best of my

 4    understanding, that's what role they would play.

 5              (Exhibit Etra 22, Three-page document

 6    entitled: China CITIC Bank International

 7    Cross-border Banking (no Bates Nos.), marked for

 8    identification)

 9              MR. BROMBERG:  Exhibit 22 is a webpage

10    taken from the website of China CITIC Bank

11    International.

12    BY MR. BROMBERG:

13        Q.    Do you see that, sir?

14        A.    I do.

15        Q.    It lists the chairman and senior

16    executives.

17              Do you see that, sir?

18        A.    I do.

19        Q.    If you go to the bottom of the second

20    page, it lists a Ms. Zoe Lau?

21        A.    Yes.

22        Q.    It says that:  Ms. Lau joined the bank

23    in August, 2007, as Senior Vice President --

24        A.    Hm-hmm --

25        Q.    -- and Head of Wealth Management &
```

1              AARON ETRA, ESQ.

2    Strategic Planning.

3         A.    Hm-hmm.

4         Q.    And that:  Ms. Lau is currently a

5    Director of CEO Office of the Bank --

6         A.    Okay.

7         Q.    -- and is responsible for coordinating

8    various corporate initiatives and activities for

9    the Chief Executive Officer.

10        A.    Hm-hmm.

11        Q.    If you turn to the third page, you see

12   Ms. Joanne Lai?

13        A.    Hm-hmm.

14        Q.    And it says:  Ms. Lai joined the bank

15   in January, 2018, and Ms. Lai is currently the

16   Bank's Chief Compliance Officer?

17        A.    Hm-hmm yes.

18        Q.    Does it strike you as unusual, sir,

19   that two of the senior executives for the

20   corporation are listed as the bank officers on

21   this wire instruction?

22        A.    No, not necessarily.  Doesn't strike

23   me as unusual.

24        Q.    Why is that, sir?

25        A.    No reason to think it unusual.

```
 1                    AARON ETRA, ESQ.

 2        Q.    So you would expect virtually anyone

 3   to appear as a bank officer on a wire

 4   instruction?

 5        A.    I think I didn't say that.

 6        Q.    Why do you think that the banks' chief

 7   compliance officer would be listed as the bank

 8   officer on simple wire instructions?

 9        A.    It may be a major account with them.

10   It may be their procedure.  It may be the way

11   that they happen to set things up for

12   international transfers.

13              I have no idea as to how the bank

14   functions in that regard, but it doesn't strike

15   me as unusual.

16        Q.    Can you tell me anything about HK

17   Zhixuan Trading Limited?

18        A.    Only its -- the details of its name,

19   its address, its location -- basic information

20   about it as provided by Mr. Hoang.

21        Q.    Do you know what HK Zhixuan Trading

22   Limited does?

23        A.    Not specifically.  I would imagine

24   from its title, it's a trading company.

25              (Pause)
```

                    AARON ETRA, ESQ.

 1

 2          Q.    Did you ever discuss HK Zhixuan

 3    Trading Limited with Mr. Hoang -- or Mr. Le, I

 4    should say?

 5          A.    Hoang is actually his name.

 6          Q.    His name is Mr. Hoang?

 7          A.    Yeah.

 8                Discuss the company itself?  I don't

 9    recollect.

10          Q.    Mr. Hoang is a represented of HK

11    Zhixuan Trading Limited?

12          A.    My understanding is:  Yes.

13          Q.    Is HK Zhixuan Trading Limited the

14    storage facility?

15          A.    It was not presented as the storage

16    facility, but his company, as -- in his function

17    as facilitator.

18          Q.    I'm not sure I understand what you

19    mean when you say "his company in his function

20    as facilitator."

21          A.    As I believe I said earlier, he

22    functions on behalf of owners of assets,

23    bitcoins, and among them in arranging for their

24    purchase and sale.  So he represents and acts on

25    behalf of the owner.

1                    AARON ETRA, ESQ.

2         Q.    He does so through HK Zhixuan Trading

3    Limited?

4         A.    I believe so, yes, to my

5    understanding.

6         Q.    And you don't have any other

7    information about HK Zhixuan Trading Limited?

8         A.    I have the corporate information that

9    had been provided to Ms. Evans.

10               (Pause)

11        Q.    Why was $3 million transferred to HK

12   Zhixuan Trading Limited rather than the entire

13   $5 million?

14        A.    That was the initial request.  We were

15   following the request as to what was needed

16   when.

17        Q.    Did you ever inquire as to why only $3

18   million was sent?

19        A.    No.  We assumed that the -- that this

20   was in accordance with what they needed and when

21   they needed it.

22        Q.    Did there come a time when you

23   subsequently took instructions to send

24   $250,000 --

25        A.    Yes.

```
1                    AARON ETRA, ESQ.

2         Q.    -- to another company?

3         A.    Yes.

4         Q.    What was the reason for that transfer?

5         A.    To the best of my recollection, the

6    initial transfer -- there was some delay in its

7    arrival.  And they wanted to make sure that, in

8    fact, funds were being sent so that they could

9    begin their procedures.

10              And so the suggestion was made that

11   this smaller amount would be sent to another

12   account, just to prove that funds were received

13   and funds were being disbursed.

14        Q.    You said that they wanted to make sure

15   that, in fact, funds are being sent to they

16   could begin their procedures?

17        A.    Yes.

18        Q.    Who is the "they" in that sentence?

19        A.    That's the seller, as conveyed by Mr.

20   Hoang.

21        Q.    When you say "the seller," who are you

22   referring to?

23        A.    Dmitri Kaslov.

24        Q.    So Mr. Kaslov wanted to make sure that

25   funds were being sent?
```

```
1                     AARON ETRA, ESQ.

2          A.    Yes.

3          Q.    What funds and to where?

4          A.    Well, the funds necessary for him to

5     do his release procedure.

6          Q.    Was it explained to you why it was

7     necessary to transfer $250,000 to facilitate the

8     release procedure?

9          A.    Yes, because they had yet to receive

10    or recognize that they had received 3 million in

11    the first transfer.

12         Q.    Turn to the second page of Exhibit 20.

13               You also received these wire

14    instructions from Tracy Evans?

15         A.    Yes.

16         Q.    You sent $250,000 of Benthos Master

17    Fund's money to Citibank?

18         A.    To that account, yes.

19         Q.    That account.

20               Do you know anything about First City?

21         A.    I think that's an address.

22         Q.    Do you know why the account name was

23    First City?

24         A.    I think the account is -- I don't know

25    why they chose that officially, no.
```

 1                    AARON ETRA, ESQ.

 2        Q.    What about Invictus Agro Business

 3   Limited?

 4        A.    That was to be part of the special

 5   instructions.

 6        Q.    Do you know why that was to be part of

 7   the special instructions?

 8        A.    I think to be sure that it was

 9   correctly allocated.

10              And, again, was part of their

11   verification procedure.

12        Q.    Can you be more specific?

13        A.    Since there had been a problem and

14   delay in the 3 million transfer, they wanted to

15   be sure that this transfer was well received and

16   well and appropriately noted.  So they provided

17   both the beneficiary name and the special

18   instructions.

19              (Pause)

20        Q.    Did there come a time when the special

21   instructions were changed?

22        A.    Yes.

23        Q.    What was the reason for that change?

24        A.    They said that, in fact, it should be

25   a different special instructions in order to be

```
1                    AARON ETRA, ESQ.

2      appropriately noted.

3           Q.    Do you recall what change was made?

4           A.    I don't recollect exactly, but there

5      were several changes that needed to be made --

6      that they asked to be made.

7           Q.    Can we go to Exhibit 6 at 255?

8           A.    Yes.

9                 (Pause)

10          A.    Yes.

11          Q.    Do you see the e-mail from Mr. Kaslov

12     to Tracy Evans, dated Friday, August 10, 2018,

13     at 9:03 a.m.?

14          A.    Yes.

15          Q.    It says Tracy, Good morning.  Good

16     news.  They received in the account $2,999,985.

17          A.    Hm-hmm.

18          Q.    Is that the $3 million that was sent

19     to HK Zhixuan Trading Limited?

20          A.    I believe it is, yes.

21          Q.    He says:  They are working on

22     everything now.

23                What does that mean?

24          A.    That they are beginning their

25     procedures that they needed to implement to
```

```
1                    AARON ETRA, ESQ.

2      release the bitcoins.

3           Q.    Just that the 250K is not corrected

4      with the amendment.

5           A.    Right.

6           Q.    Does that refresh your recollection as

7      to what the amendment was?

8           A.    Again, as I indicated, there was

9      changes in the special instructions.

10          Q.    Did you discuss those changes with

11     Valkyrie?

12          A.    We kept them and Benthos updated as

13     to -- as the progress on the transfers.

14               (Pause)

15          Q.    Who is Taramati Deonarine?

16          A.    She was the Citibank branch manager at

17     one time of my Citibank branch.

18          Q.    Is she still the branch manager?

19          A.    No.

20          Q.    At what point did she cease to be the

21     branch manager?

22          A.    You'll have to ask Citibank.

23               (Pause)

24          Q.    Do you recall the name Perzky

25     Solutions?
```

1                    AARON ETRA, ESQ.

2          A.    Sounds a bit -- Perzky Solutions?

3                Can you show me where that's referred

4     to, please?

5          Q.    Let's look at Exhibit 7 at 572.

6                (Pause)

7          A.    Okay.  With you.

8          Q.    Do you see that there is an e-mail

9     from Mr. Kaslov to Tracy Evans that says:

10    Tracy, Please kindly send this to Aaron to

11    correct immediately?

12         A.    Yes.

13         Q.    Special instruction to Perzky

14    Solutions.

15         A.    Same thing.  They asked us to change

16    the special instruction several times.

17         Q.    Do you have any idea why the special

18    instruction was changed?

19         A.    No, other than to verify.  I think

20    it's a procedure that they use to verify

21    transfers.  That's the best of my knowledge and

22    belief.

23         Q.    Do you see on the second page at

24    573 --

25         A.    573.

```
1                    AARON ETRA, ESQ.

2         Q.    -- there is an e-mail from you to Ms.

3    Evans:  I have requested the change on the wire

4    in "special instructions" from Citibank.  They

5    will process that first one to a case which they

6    have opened.

7         A.    Yes.

8         Q.    So you did, in fact, request that

9    change?

10        A.    Yes.

11        Q.    And Citibank made that change?

12        A.    I believe they made all the changes

13   requested -- the question was the arrival of the

14   funds in all these cases.

15        Q.    The $200,000 -- $250,000 that was sent

16   to that Citibank account in the name First City,

17   was subsequently returned to you, correct?

18        A.    Right.

19        Q.    Can you tell us about the

20   circumstances of that money being returned?

21        A.    Yes.

22              They verified the 3 million had, in

23   fact, been received and that the 250,000 wasn't

24   really necessary because the original amount had

25   been confirmed as received.  And so they agreed
```

```
 1                   AARON ETRA, ESQ.

 2      to send the 250 back.

 3                   (Pause)

 4           Q.    Let's go to TE-113 in Exhibit 6.

 5           A.    Also in 6?

 6           Q.    Yes.  No, I'm sorry, 7.

 7           A.    Seven?  113?

 8           Q.    Yes.

 9           A.    Okay.

10                   (Pause)

11           Q.    Do you see an e-mail from Tracy Evans

12      to you saying:  The second amendment arrived but

13      the account was doing another transaction so

14      they need another amendment done immediately?

15           A.    That's the special instructions, yet

16      again.

17           Q.    The instructions were changed again,

18      correct?

19           A.    Yeah.

20           Q.    They were changed to Quinspec Limited?

21           A.    Yes.

22           Q.    Do you know why they were changed to

23      Quinspec Limited?

24           A.    No.  Again, I think these are all code

25      names of no particular consequence other than
```

```
 1                    AARON ETRA, ESQ.

 2    verify.

 3         Q.    Code names for what?

 4         A.    For verification, I would imagine.

 5               Again, we are not involved in choosing

 6    those names, or in any procedure other than

 7    complying with their requests to change the

 8    special instructions.

 9         Q.    You say:  Code names for verification.

10               What do you mean by that?

11         A.    To make sure that the funds that had

12    arrived were correctly allocated to where they

13    should have been.

14         Q.    When you say "where they should have

15    been," where they should be as the name and the

16    account number, correct?

17         A.    Not only to that extent.

18               Because they are -- again, I'm not the

19    banker involved in this regard -- but there are

20    situations where the account has subaccounts or

21    different applications of the funds and you need

22    to have the special -- the correct special

23    instructions.

24         Q.    So after the special instructions were

25    exchanged twice, the money went out, and that
```

```
 1                    AARON ETRA, ESQ.

 2    was returned to you, correct?

 3         A.    Right.

 4              (Pause)

 5         Q.    At this point in time after you had

 6    sent out $3 million of Benthos' money to HK

 7    Zhixuan Trading Limited, you were fairly

 8    confident they would receive a bitcoin in

 9    exchange for that money?

10         A.    No.  It became clear at that point in

11    time and to the disappointment of all concerned

12    is that it was insufficient to effectuate the

13    release because of the situation -- which again,

14    was advised to all the parties -- that because

15    of the way the contract and the timing of the

16    contract, the release price required additional

17    funds.

18         Q.    How did it become clear at that point

19    that the money sent out to insufficient to

20    effectuate the release?

21         A.    We were advised that by the owner of

22    the bitcoins.

23         Q.    The owner of the bitcoins being Dmitri

24    Kaslov?

25         A.    Yes.
```

1                     AARON ETRA, ESQ.

2          Q.     That was related to you directly by

3     Mr. Kaslov?

4          A.     As I recollect, it was via Ms. Evans.

5          Q.     Do you recall having conversations

6     with Ms. Evans about this?

7          A.     Yes.

8          Q.     What was the substance of those

9     conversations?

10         A.     The substance was we needed to have

11    additional funds in order to effectuate the

12    release because of the timing and the pricing.

13    And that was essentially the -- discussed with

14    her, with Benthos, with Valkyrie.

15         Q.     Let's go to page 99 of Exhibit 7.

16                (Pause)

17         Q.     TE-99.

18                There is an e-mail from you to Ms.

19    Evans, dated Saturday, 11 August 2016.

20         A.     You say 99?

21         Q.     Yes, TE-99.

22         A.     Okay.

23         Q.     You see that e-mail, sir?

24         A.     Hm-hmm.

25         Q.     You wrote to Ms. Tracy:  You and I

```
1                    AARON ETRA, ESQ.

2       really need to know what Dmitri can deliver in.

3       BTC, both the total and the timing?

4            A.    Hm-hmm.

5            Q.    What do you mean by that?

6            A.    In other words, that was, I think,

7       about the time we were told that the funds were

8       insufficient.

9                    And my request was to really have a

10      full understanding of what would be necessary to

11      deal with the problem as it developed.

12           Q.    At that time, what was your

13      understanding of what Dmitri can deliver in

14      bitcoin -- both the total and the timing?

15           A.    Well, he could deliver -- the

16      understanding was what he could deliver with the

17      funds that were provided to him.

18                   And that's why I asked for a clear

19      statement of what that would be.

20           Q.    When you said "we need to understand

21      how he is doing it, what are his constraints and

22      the parameters under which he needs to

23      accomplish this --

24           A.    Yes.

25           Q.    -- what did you mean by that?
```

1                    AARON ETRA, ESQ.

2          A.     In light of what had been presented to

3     us -- that the funds were insufficient because

4     the release price had been more than the 5

5     million that had been agreed with Benthos -- so

6     to -- even at that point, to try to come up with

7     the best way to resolve the situation and to

8     deal with it.

9          Q.     So at this point you find yourself

10    entirely at the mercy of Mr. Kaslov?

11         A.     Well, entirely at the mercy of the

12    system that was presented to us.

13         Q.     What else were you told about the

14    system?

15         A.     We were told that there needed to be a

16    certain amount released at any one time, and a

17    certain formula as to the percentage of the

18    price of those -- of the bitcoin at that time.

19         Q.     This is the storage facility system?

20         A.     Yes.

21         Q.     What is the storage facility?

22         A.     Storage facility is where the bitcoins

23    are stored.

24                In the case of Mr. Kaslov, we were

25    advised that it was a so-called cold storage

1                   AARON ETRA, ESQ.

2     system.  So the bitcoins are not immediately

3     available.

4                   But that's the description of the

5     storage facility.

6          Q.     It's a cold storage facility?

7          A.     Yes.

8          Q.     What is a cold storage facility?

9          A.     That the bitcoins are not immediately

10    available.

11         Q.     Is that a physical storage facility?

12         A.     Well, as we know bitcoins are not a

13    physical commodity.  It's a registry.

14         Q.     So what is meant by "cold storage"?

15         A.     It means you can't have immediate

16    access.  You have to go through procedures to

17    release the coins.

18         Q.     Why can you not have immediate access?

19         A.     That's not the nature of the cold

20    storage, as described to us.

21         Q.     So the cold storage facility is not a

22    physical storage facility?

23         A.     There is a physical storage facility

24    where, we are led to believe, the registry --

25    which is a group of machines, a group of storage

```
1                    AARON ETRA, ESQ.

2      machinery -- is located.

3           Q.    So there is a physical machine

4      somewhere that houses this cold storage

5      facility?

6           A.    So we were advised.

7           Q.    Who advised you of that?

8           A.    It was Mr. Kaslov and Mr. Hoang.

9           Q.    Where are those physical machines

10     located?

11          A.    The advice was that, in this case, it

12     was in Dubai.

13          Q.    Was it ever explained to you why it

14     was necessary for Benthos to transfer money to

15     Hong Kong in order to access bitcoins stored in

16     a storage facility in Dubai?

17          A.    Yes.  It was explained that that was

18     the instructions of the storage facility, which

19     preferred accounts in the Far East.

20          Q.    Why were accounts in the Far East

21     preferred?

22          A.    That you'd have to ascertain from the

23     persons who asked us to do that.

24          Q.    Do you know the name of the facility

25     in Dubai?
```

1                      AARON ETRA, ESQ.

2          A.    I do not, no.

3          Q.    Do you know the identity of any person

4    who has interacted with this facility in Dubai,

5    apart from Mr. Hoang?

6          A.    I do not.

7          Q.    Have you ever seen any evidence that

8    such a facility exists?

9          A.    What I have seen is the fact that

10   Dubai is one of the centers for the

11   cryptocurrency world.  That I have seen, yes.

12         Q.    Do you consider that evidence, sir --

13         A.    Yes.

14         Q.    -- that this specific facility is

15   located in Dubai?

16         A.    That there are facilities of this

17   nature in Dubai, yes.

18         Q.    Have you ever seen evidence that this

19   facility actually exists?

20         A.    I have not been to Dubai to look and

21   see if there is such a facility physically

22   there, no.

23         Q.    Have you ever seen a website for this

24   facility?

25         A.    I have seen websites for facilities in

1                    AARON ETRA, ESQ.

2      Dubai, yes.

3          Q.    Have you ever seen a website for the

4      facility on which Mr. Hoang purports to work?

5          A.    He --

6          Q.    I'll withdraw that, because it's

7      garbled.

8                Have you ever seen a website for the

9      storage facility for which Mr. Hoang purports to

10     work?

11         A.    He's advised us that he works for

12     several storage facilities, whose -- and there

13     are such websites.

14         Q.    Who are the names of those storage

15     facilities?

16         A.    One is blockchain.com.

17               One is coinbase.com.

18               And there are several others.

19         Q.    Have you ever seen any support for Mr.

20     Hoang's representation to you that he works for

21     blockchain.com or coinbase.com?

22         A.    His representation to us is he works

23     for Dmitri Kaslov.

24         Q.    So the storage facility is located at

25     blockchain.com or coinbase.com?

```
 1                    AARON ETRA, ESQ.

 2        A.    We were advised it's one of those

 3   Dubai-based facilities, yes.

 4        Q.    By Mr. Hoang?

 5        A.    Yes.

 6        Q.    And you have never seen any

 7   independent verification of this?

 8        A.    No.

 9        Q.    You are going entirely on Mr. Hoang's

10   say-so?

11        A.    And Mr. Kaslov, who referred us to Mr.

12   Hoang.

13        Q.    You've never met either of these

14   gentlemen?

15        A.    Correct.

16              (Pause)

17        Q.    Do you know if Ms. Evans has met

18   either of these gentlemen?

19        A.    I don't know.  She'll have to say so

20   herself.

21        Q.    Did you ever discuss it with her?

22        A.    No.

23        Q.    Did she ever tell you that she had met

24   them?

25        A.    She did not say that, no.
```

```
 1                    AARON ETRA, ESQ.

 2              (Pause)

 3       Q.    Let's go back to 8.

 4       A.    Eight?

 5       Q.    Exhibit 8.

 6              (Pause)

 7       Q.    Let's turn to the page AE-553 in

 8   Exhibit 8.

 9       A.    Is that large one or a small one?

10       Q.    That's the small one.

11              (Pause)

12       Q.    If you turn to page 553 --

13       A.    Okay.

14       Q.    -- this is a document that you

15   produced to us in connection with the subpoena,

16   correct?

17       A.    Yes.

18       Q.    It appears to be an engagement letter

19   between you and Valhalla Venture Group --

20       A.    Yes.

21       Q.    -- dated August 16, 2018.

22              Tell me about this document.

23       A.    They asked if I would render

24   professional services to them.

25              And I said I would, but on a
```

1                      AARON ETRA, ESQ.

2    completely separate basis.

3             And hence the creation and entering

4    into of this agreement, which was not fully

5    complied with, and I have not rendered any

6    professional services to.

7         Q.    What kind of professional services did

8    Valhalla Venture Group ask you to provide under

9    this agreement?

10        A.    They were interested in, basically,

11   advice on their business activities, as I

12   provided, I think, in connection with their

13   business activities.

14        Q.    It says:  The fee for this matter

15   shall require an initial non-refundable retainer

16   of $20,000?

17        A.    Yes.

18        Q.    Did you, in fact, receive $20,000?

19        A.    No.

20        Q.    Is that why you have not provided any

21   professional services under this agreement?

22        A.    One reason.

23             They have never asked for any

24   services.

25        Q.    Do you have an attorney-client

1                    AARON ETRA, ESQ.

2    relationship with Valhalla Venture Group?

3         A.    I don't consider that I do, no.

4         Q.    Do you have an attorney-client

5    relationship with any member of the Austin

6    family?

7         A.    I do not.

8         Q.    Have you withheld from us -- either in

9    connection with the subpoena or in connection

10   with the federal action -- any document on the

11   basis of attorney-client privilege?

12        A.    Not to the basis of my knowledge and

13   belief, no.

14        Q.    It's your testimony as you sit here

15   today that you have never provided any

16   professional services under this agreement

17   whatsoever?

18        A.    No, that's correct.

19        Q.    And this agreement is, as far as you

20   are concerned, no longer effective?

21        A.    Correct.

22        Q.    Or never was effective.

23              Which is it?

24        A.    It never was -- never was implemented.

25   Never paid the fee, and I never provided any

```
1                    AARON ETRA, ESQ.
2      services.
3           Q.    What kind of advice -- what advice
4      under business activities did you contemplate
5      giving in connection with this agreement?
6           A.    I believe they were interested in the
7      international side of their business activities,
8      which they would reveal to me and indicate what
9      they were interested in advice on -- which they
10     never did.
11          Q.    Did they ever say anything else about
12     the reasons they wanted advice on their business
13     activities?
14          A.    No.  Took it as a very normal request,
15     and just never was implemented.
16          Q.    Did they tell you why they never sent
17     you the $20,000 retainer --
18          A.    No --
19          Q.    -- to seek your advice?
20          A.    -- no.
21          Q.    Just never happened?
22          A.    Just never happened.
23          Q.    Did you ever ask them to follow up in
24     any way on it?
25          A.    Yes.  I periodically asked them, and
```

                        AARON ETRA, ESQ.

1

2    it never was fully paid.

3         Q.    Why did they say that they didn't?

4         A.    They gave various reasons -- of

5    timing, of other requirements, other

6    commitments.

7         Q.    Did they say what those other

8    requirements and other commitments were?

9         A.    They did not.

10        Q.    They just generally said they had

11   other requirements and other commitments that

12   prevented them from --

13        A.    Hm-hmm.

14        Q.    -- entering into this relationship

15   with you?

16        A.    The only part -- they said they had

17   sent it, or they will send it, or they are going

18   to send it.

19             But it never ways sent.

20             And again, they never consulted me on

21   their business activities.

22        Q.    Do you have anything in writing to or

23   from the Austins reflecting their inability to

24   pursue this relationship with you?

25        A.    I don't recollect if I have anything

1                    AARON ETRA, ESQ.

2       that wasn't provided to you.  I think I provided

3       all the correspondence with the Austins.

4       --------------------------

        DISCOVERY REQUEST

5       --------------------------

6                    MR. BROMBERG:  If there is any further

7       correspondence with the Austins that you have

8       not provided, we call for that to be produced.

9                    MR. ETRA:  Okay.

10                   (Pause)

11      BY MR. BROMBERG:

12           Q.     Let's go to Exhibit 6 at 239?

13           A.     That's one of the big ones, yes?

14           Q.     That's the smaller of the two --

15           A.     Smaller of big ones.  Okay.  The one

16      that's coming apart.  I'll try to preserve it.

17                   (Pause)

18           A.     239?

19           Q.     Yes, 239.

20                   There is an e-mail from Brandon Austin

21      to you, dated August 14, 2018.

22           A.     Okay.

23           Q.     And he writes:  Aaron, I have attached

24      the client edits to the agreement.

25           A.     Right.

1                    AARON ETRA, ESQ.

2          Q.    And the subject line is:  250 BTC

3     Buyer Contract Edits.

4          A.    Hm-hmm, right.

5          Q.    Do you know why this e-mail was not

6     produced to us in connection with the federal

7     action, or in connection with the subpoena?

8          A.    I don't know.  Certainly not

9     intentionally.

10         Q.    What is the contract that this e-mail

11    refers to?

12         A.    I believe -- my recollection is I

13    believe this is referring to what we were all

14    trying to do, once realized that the deficit of

15    funds.

16              The effort was to try to find a buyer

17    for 250 bitcoins since the amount of funds that

18    Benthos had provided was sufficient at that time

19    for 750, and the minimum was 1,000.

20              So we were looking for a buyer for the

21    difference between 750 and 1,000.

22         Q.    So it's your testimony, as of August

23    14, 2018, Benthos had already been advised that

24    the $3 million of its funds that were sent to

25    Hong Kong was not sufficient to consummate the

1                    AARON ETRA, ESQ.

2    transaction?

3          A.    They were further advised that the 5

4    million they provided was not sufficient.

5          Q.    If you turn to -- strike that.

6                Who was the buyer in this contract for

7    250 bitcoins?

8          A.    I have no recollection who it was.

9          Q.    You do recall there was a contract

10   contemplated for the purchase 250 bitcoins?

11         A.    My recollection there were several

12   prospective buyers for that 250 bitcoins, yes.

13         Q.    Looks like there was an actual

14   document exchanged.

15         A.    Could have been, could have been.

16         Q.    And you don't recall who the buyer

17   was?

18         A.    I don't recall who that -- this buyer

19   was, no.

20         Q.    But you were to act as escrow agent in

21   that transaction?

22         A.    Yes, yes.

23         Q.    Let's go to Exhibit 6 at 238, the

24   previous page.

25         A.    238, okay.

1                      AARON ETRA, ESQ.

2                 (Pause)

3        Q.    Can you walk us through this e-mail?

4        A.    Yeah -- that was my attempt to try to

5    get everybody to focus on the problem that had

6    arisen because the -- as I tried to explain

7    earlier -- the funds were insufficient to

8    effectuate the release of the price that the

9    bitcoins worth at the time of the Benthos

10   contract.

11            And the contract between Valkyrie and

12   Kaslov was submitted to the transfer storage

13   facility.

14            There just was insufficient amount --

15   the 5 million was insufficient.  And we were

16   advised by Benthos that they couldn't provide

17   any more funds.

18            So this was just to try to focus

19   everybody on the problem and to get everybody to

20   work together.  And I did that as the escrow

21   agent because, again, I'm not a party to it.

22            But in trying to help the parties,

23   this was an attempt to do that.

24            And I sent it to Benthos, to Gerald

25   Fong, and Mihir Deo, as well as the two Austins,

```
1                    AARON ETRA, ESQ.

2      and to Tracy as Dmitri's representative -- so

3      from my perspective as an escrow agent, to try

4      to get everybody to work together to resolve and

5      deal with the problem that we all recognized at

6      that point.

7          Q.    What does "nostra culpa" mean?

8          A.    We are all guilty.

9          Q.    Why do you believe Benthos bears some

10     responsibility for the fact that it's $3 million

11     was not sufficient?

12         A.    Because I think they believed that it

13     was.

14         Q.    Let me strike that.

15               Why do you believe Benthos bears some

16     responsibility for the fact that it's $5 million

17     were not sufficient?

18         A.    Because in one way of looking at the

19     transaction, a buyer who wants to consummate

20     this kind of a transaction should have the

21     ability to deal with situations like that, being

22     able to put more funds into the transaction.

23               They -- for obviously good reasons of

24     theirs -- can only -- could only do 5 million at

25     any one time.
```

1                AARON ETRA, ESQ.

2                They had submitted to us, for example,

3      a whole schedule of things that they could do.

4      But it was clear that one thing they couldn't do

5      is any more funds.

6                And they recognized that that was, you

7      know, an impediment to finalizing this.  So they

8      were fully appreciative of their role in --

9      in -- as part of the "nostra" that's involved in

10     this problem -- that Dmitri Kaslov has his

11     problem on the release; they have their

12     constraint on the amount of money per

13     transaction.

14                So everybody was involved with it.

15     And I think they recognized that.

16     Q.    So I understand you to be saying, sir,

17     that Benthos was partly responsible for the

18     failure of the transaction to be consummated

19     because they refused to put in any amount above

20     the $5 million that they contracted to provide?

21     A.    Not that they refused to, but they

22     were constrained in doing so.  It was a

23     constraint that -- that was their constraint.

24                Dmitri Kaslov's constraint was he

25     could only release based on the price of the

1                    AARON ETRA, ESQ.

2      contract as submitted.

3              So it's not a refusal.  It's the fact

4      that they -- they told us -- and we obviously

5      believed them -- that that was their constraint.

6              So each party -- and the reason why I

7      sent to it all -- to both parties was that --

8      that it was not pointing the finger at any one

9      of the parties, but saying:  Here is the

10     situation, let's try to work together to resolve

11     it.

12     Q.    When you said that Dmitri Kaslov's

13     constraint was that he could only release based

14     on the price of the contract as submitted --

15     A.    Yes.

16     Q.    -- what does that mean?

17     A.    In other words, at the time the

18     contract was submitted for the bitcoins, the

19     price of the bitcoins was 7,800.

20             And on his release procedure, he

21     needed 5,800-some-odd -- 5,850, I believe -- to

22     do it.  And the Benthos money was only 5

23     million.

24             So at an early point where we all

25     recognized the problem, we realized that it was

1                    AARON ETRA, ESQ.

2     $850,000 short.

3              Benthos couldn't provide that 850,

4     they said.  So the effort was made to find

5     others.

6              And that's where this 250,000 --

7     250,000 bitcoins come in to be able to generate

8     the money to release the full 1,000: 750 to

9     Benthos, 250 to a buyer.

10             As I say, this was my attempt as an

11    escrow agent and not a party to get the parties

12    to recognize what the problem was and to work

13    together to resolve it.

14             And I think people in good faith

15    really did, and have still working to do that.

16             I would never accused Benthos of

17    refusing.  I fully appreciate they had that

18    constraint.

19    Q.    It's your understanding that the price

20    of bitcoin at that time was $7,800 per bitcoin?

21    A.    When the contract was submitted to

22    the -- by Dmitri Kaslov to the transfer storage

23    facility, yes.

24    Q.    Let's go to TE-122.  That's part of

25    Exhibit 7.

                    AARON ETRA, ESQ.

1

2        A.     Exhibit 7?  That's the bigger one?

3        Q.     Yes.

4        A.     Which page?

5        Q.     Let's turn to page 122.

6               (Pause)

7        Q.     There is an e-mail from Tracy Evans to

8     Dmitri Kaslov, dated August 15, 2018 --

9        A.     Hm-hmm.

10       Q.     -- with the subject line:  Aaron and I

11    and Hugh are facing real trouble.

12              Do you see that, sir?

13       A.     I do.

14       Q.     All the way at the bottom, do you see

15    where it says:  The 7,800 number just won't work

16    Dmitri, and it comes out of nowhere.

17       A.     Well, I think what -- once she was

18    told that 7,800 number was the applicable

19    number, that was when it was recognized that

20    that -- the 5 million would work based on the

21    7,800 strike price.

22              Her comment "comes out of nowhere," I

23    think was just part of her reaction to -- said:

24    Oh, my God.

25              But, again, that's for her to say.

```
1                   AARON ETRA, ESQ.
2     I'm sorry.  I didn't mean to put words in her
3     mouth.
4                   But that does put the finger on the
5     problem that the release price was 7,800.  We
6     only had 5 million to work with, and we needed
7     5,850,000.
8                   (Pause)
9          Q.    You were informed by Mr. Kaslov that
10     he could only release 1,000 bitcoins at a time?
11         A.    Yes.
12         Q.    And it had to be 75% of the cost of
13     1,000 bitcoins?
14         A.    It had to be 75% of the price on which
15     the contract that he submitted was fixed at the
16     time that the contract was submitted, yes.
17         Q.    And did you ever receive any
18     independent documentation of the so-called
19     requirement of the storage facility system?
20         A.    Not to my recollection, no.
21         Q.    So Mr. Kaslov just said:  I want more
22     money?
23         A.    No.
24                   I didn't view it as "I want more
25     money," because the money, you know, is used for
```

```
 1                    AARON ETRA, ESQ.
 2   this purpose.  It's not put into his pocket.
 3        Q.   Mr. Kaslov said:  The system needs
 4   more money.
 5        A.   Yes.
 6        Q.   It's not my fault --
 7        A.   So, again, it is not a --
 8        Q.   -- I'm just a slave to the system.
 9        A.    No, it's not a question of fault or a
10   slave to the system.
11             It's just that, as he described it,
12   that was the nascent system.
13        Q.   You don't know what system this is?
14        A.    Well, as described to us, it's the
15   system under which removal from the cold storage
16   requires funds going in to effectuate.
17        Q.   As described to you by Mr. Kaslov?
18        A.   Yes, and Mr. Hoang.
19             (Pause)
20        Q.   And neither Mr. Kaslov nor Mr. Hoang
21   has ever provided to you any further information
22   about this system?
23        A.   Not anything more than -- than --
24   certainly not, to my knowledge, in written form.
25             We've tried to communicate with them
```

```
 1                   AARON ETRA, ESQ.
 2      on an ongoing basis.  And that's -- that's been
 3      the focus, to try to see whether anything can be
 4      done.
 5                   And again, I think Ms. Evans is the
 6      better person to describe it.
 7                   But there was one time where Mr. Hoang
 8      said that that he was going to the transfer
 9      storage facility to see whether, in fact, if we
10      used all the funds that we had available, he
11      could release enough to be able at least get the
12      procedure underway.
13                   And he went.
14                   As he explained to us, he had gone to
15      Dubai to look into that and tried to do it, and
16      unfortunately, was unsuccessful.
17      Q.   Did there come a time when you used
18      all the funds that were available to try to open
19      up the --
20      A.   The only funds I disbursed were the
21      funds pursuant to the instructions of Mr.
22      Kaslov, and no more, no less.
23                   (Pause)
24      Q.   Let's go to 234 in Exhibit 6.
25                   (Pause)
```

```
 1                    AARON ETRA, ESQ.

 2        Q.    Actually, let's go to 236 first.

 3        A.    236.

 4        Q.    So you have an e-mail from Dmitri

 5   Kaslov to Tracy Evans -- Exhibit 6 at 236.

 6              Are you there?

 7        A.    Yeah, I'm with you.

 8        Q.    You have an e-mail from Dmitri Kaslov

 9   to Ms. Evans it seems, dated August 16, 2018,

10   with the subject line:  Please help?

11        A.    Yes.

12        Q.    Mr. Kaslov says:  Hello, Tracy, Good

13   morning.  I just pleaded with the doctors for

14   five minutes to send this to you.

15              What doctors is he referring to?

16        A.    His doctors, I believe.

17        Q.    He says:  I'm just going into the

18   theater for an urgent operation.  I had a heart

19   failure this morning.  Due to finalizing issues

20   with Hong Kong on the amendments and the

21   agreement and the price, I have overstressed

22   myself and the doctors are all scared with my

23   developing condition.

24              What was Mr. Kaslov's condition?

25        A.    I believe it's a heart condition.
```

```
 1                   AARON ETRA, ESQ.

 2        Q.    What was that heart condition?

 3        A.    Again, only his doctors can tell us

 4   that.

 5              But he presented that he has had

 6   continuing heart problems.

 7        Q.    Did you ever see Mr. Kaslov's medical

 8   records?

 9        A.    No, I did not.

10        Q.    Did you ever speak to Mr. Kaslov about

11   his heart condition?

12        A.    No, I did not.

13        Q.    Did you ever see any proof that Mr.

14   Kaslov actually had a heart condition?

15        A.    No, I did not.

16        Q.    Do you believe that Mr. Kaslov has a

17   heart condition?

18        A.    I do.

19        Q.    He says:  The instrument on the BTC

20   can only allow the minimum of 1,000 BTC and

21   above.  The once the right figure of amount is

22   input into the system, the delivery date for the

23   BTC will be within 24 hours.

24              Is that the requirement of the system

25   that you are referring to?
```

```
1                    AARON ETRA, ESQ.

2        A.    And it goes on:  The transaction --

3   pending now.  We need to get the balance payment

4   in order to get this done.

5             Yes.

6        Q.    You later wrote to Ms. Evans:

7   Resolving this matter calls for healthy persons

8   to be able to get hard information and take

9   affirmative action in a timely fashion.

10       A.    Yes.

11       Q.    Then you went on to write:  At a

12  minimum, this means to me Dmitri should empower

13  you and me to fully represent him to get firm

14  delivery commitments and the correct price for

15  the remaining payment.

16            Did that, in fact, happen?

17       A.    No, it -- what happened was he

18  reinforced Ms. Evans' role and Mr. Hoang's role.

19            And he understands what my role is.

20            So I -- he essentially implemented

21  this to the extent that -- saying that Mr. Hoang

22  would be available to -- on his behalf.

23       Q.    Was Mr. Hoang available on his behalf?

24       A.    He's been available as, you know --

25  ideally?  You know, perhaps not.
```

1                    AARON ETRA, ESQ.

2              But he's been available, yes.

3         Q.    What has Mr. Hoang done to ensure the

4    delivery of the bitcoin or the return of

5    Benthos' money?

6         A.    Well, as I mentioned to you, he told

7    us he went to Dubai to try to see whether he

8    could work with the funds we had and found out

9    that it couldn't.

10             And then we have been -- Ms. Evans

11   particularly -- has been working with him to see

12   whether -- what arrangements from other buyers

13   might work to end this logjam.

14        Q.    How do you know that Mr. Hoang went to

15   Dubai?

16        A.    He told us that he went to Dubai.

17        Q.    Did he show you a plane ticket?

18        A.    We didn't ask for a plane ticket, and

19   he did not show us, no.

20        Q.    Did you believe he went to Dubai?

21        A.    I do.

22        Q.    He interacted with the storage

23   facility there?

24        A.    So he said.

25        Q.    But he was unsuccessful?

1                    AARON ETRA, ESQ.

2         A.    So he advised us.

3         Q.    Now let's go to 234.

4               (Pause)

5         Q.    Friday, August 17, 2018, you e-mailed

6    John Austin, Hugh Austin, Brandon Austin, and

7    Tracy Evans.  The subject line is:  New BTC

8    contract using Dmitri's BTC.

9               What does that refer to?

10        A.    The continuing effort to find buyers

11   to purchase bitcoins to be able to deal with the

12   Benthos situation and to go forward from there.

13        Q.    At this point, after you had sent $3

14   million of Benthos' money to Hong Kong, you are

15   talking about new bitcoin contracts using

16   Dmitri's bitcoin?

17        A.    Yes.

18        Q.    At that point, had you seen any proof

19   that those bitcoin existed?

20        A.    No further proof, no.

21        Q.    You wrote:  John, Lessons learned what

22   we are going through on this Benthos deal

23   include.

24               And you made reference to the 1,000

25   bitcoin minimum, correct?

                        AARON ETRA, ESQ.

1

2        A.    Correct.

3        Q.    Then you wrote:  All the language

4    about the seller being able to use the escrowed

5    fund and the escrow agent taking only

6    instructions from the seller needs to be as in

7    the Benthos contract.

8        A.    Yes.

9        Q.    Why did you write that?

10        A.    Because the release procedure applies

11    to all of Dmitri's bitcoins.

12        Q.    At this point, what assurances had you

13    received that the release procedure would

14    actually being successful?

15        A.    No further assurance.

16        Q.    When you write "Jamal is calling me

17    many times saying he cannot reach any Austin,"

18    who is Jamal?

19              (Pause)

20        A.    Jamal, I believe, was a prospective

21    buyer who had appeared.

22              I don't recollect the full name of

23    Jamal.

24        Q.    Do you recall anything else about

25    Jamal?

```
 1                    AARON ETRA, ESQ.

 2        A.    No.

 3              (Pause)

 4        Q.    When you say "I did not tell him that

 5   the contract format does not work," what did you

 6   mean by that?

 7        A.    Where are you looking at?

 8        Q.    This is further down, after you say:

 9   Jamal is calling me many times saying he cannot

10   reach any Austin.

11              I told him there is no problem in

12   doing so.  I DID NOT tell him that the contract

13   format does not work.

14        A.    Ah, that probably refers to the fact

15   that this Jamal may well have told the Austins

16   that the format of the -- the agreement for the

17   bitcoins in the format that he looked at didn't

18   work.

19              And I didn't say anything about it.

20              (Pause)

21        Q.    Let's go to AE-71.  That's Exhibit 6

22   at page 71.

23        A.    Seventy-one?

24        Q.    Yes.

25              (Pause)
```

1                    AARON ETRA, ESQ.

2          Q.    Do you recall receiving a phone call

3    from Gerald Fong on or about August 17, 2018?

4          A.    I recollect receiving calls from

5    Gerald Fong quite often during that period.

6          Q.    In your e-mail, you say:  Per your

7    request on the call, I confirm that two

8    transfers have been made to date, per

9    instructions, from the $5 million received in

10   escrow:  One of 3 million and one of 250,000,

11   leaving 1.75 million remaining.

12         A.    My recollection is Gerald asked me to

13   put that in writing to him.

14         Q.    Did you tell Gerald where the money

15   had been sent?

16         A.    Yes.

17         Q.    Did you put that in writing?

18         A.    No, he only asked for the amounts.

19         Q.    Why did you not tell Gerald where the

20   money had been sent?

21         A.    Because he only asked for the amounts.

22               (Pause)

23         Q.    Do you recall the circumstances under

24   which another $1.6 million of Benthos' money was

25   sent to HK Zhixuan Trading Limited?

```
 1                    AARON ETRA, ESQ.

 2        A.    I recollect receiving those

 3   instructions, yes.

 4        Q.    From whom did you receive those

 5   instructions?

 6        A.    From Ms. Evans on behalf of Dmitri

 7   Kaslov.

 8        Q.    You transferred $1.6 million of

 9   Benthos' money from your attorney escrow account

10   to an account in Hong Kong based on instructions

11   received from Ms. Evans on behalf of Mr. Kaslov?

12        A.    Yes.

13              (Pause)

14        Q.    Do you recall what happened

15   immediately after that $1.6 million was

16   transferred?

17        A.    I did --

18        Q.    Benthos received its bitcoins?

19        A.    No.

20        Q.    Why not?

21        A.    Because the funds were still

22   insufficient to implement the release.

23              I believe -- my recollection is I

24   believe at that point was when Mr. Hoang went to

25   Dubai to see whether the total of 4.6 would be
```

```
1                    AARON ETRA, ESQ.

2    sufficient instead of the 5,850,000.

3         Q.    So you previously stated that the $5

4    million was not sufficient to obtain release of

5    the bitcoin?

6         A.    Yes.

7         Q.    But another 1.6 million was sent,

8    short of 5 million?

9         A.    Yes.

10        Q.    And what reason did you have to think

11   that 4.6 million would be --

12        A.    We were advised by Mr. Hoang that he

13   would hope and try to use that amount of money

14   to effectuate the release.

15        Q.    Did Mr. Hoang say what would happen if

16   it didn't work?

17        A.    All he said was he would try to make

18   the work.

19        Q.    Were you concerned at all that it

20   might not work?

21        A.    Yes, because time was going and we

22   obviously wanted it to work.

23        Q.    Did you have any assurances that the

24   money would be returned if the $4.6 million did

25   not achieve release of the bitcoin?
```

1                    AARON ETRA, ESQ.

2       A.    The only assurance that was given was

3    the one given by Mr. Hoang -- that if the full

4    amount was provided and didn't effectuate the

5    release, the full amount would be refunded under

6    those circumstances.

7       Q.    Have you ever asked Mr. Hoang why the

8    money was not refunded?

9       A.    Well, as I said, the -- what he said

10   was "if the full amount was paid in" -- which it

11   has never been.  So that would be the basis on

12   which the money would be returned.

13      Q.    So the full amount of 5.875 needs to

14   be paid in?

15      A.    I think it was 5.850.

16      Q.    To get the money back?

17      A.    No, to either to release the bitcoins

18   or to get the money back if it didn't --

19      Q.    So in order to get money out of the

20   storage facility, you need to put more money

21   back in?

22            Is that your understanding?

23      A.    You needed to put the money that was

24   necessary from the beginning of the transaction

25   in order to effectuate the release, yes.

1                    AARON ETRA, ESQ.

2         Q.    How does money go into the storage

3    facility?

4              Does it have a bank account?

5         A.    The only bank accounts that we were

6    advised of was the accounts to which the funds

7    were sent.

8         Q.    So can you think of any reason that an

9    account at China CITIC International would

10   require $5.875 million to be transferred it in

11   order to take money out?

12        A.    The procedure that was explained to us

13   does make sense.

14        Q.    Have you ever seen that procedure

15   anywhere else?

16        A.    I have not been involved in any other

17   bitcoin transaction.

18        Q.    But it makes sense to you that there

19   would be a storage facility from which money

20   cannot be withdrawn until certain amount of

21   money has been placed in?

22        A.    Yes.

23        Q.    So Benthos' $4.6 million went out and

24   no bitcoins came in?

25        A.    Yes.

1                    AARON ETRA, ESQ.

2          Q.    What did you think at that point?

3          A.    Well, all along, as I expressed in

4    that e-mail that you referred to, my hope was

5    that the parties -- with whatever help anybody

6    could give them -- would be able to resolve the

7    situation to the satisfaction of all concerned.

8                 So my thought about it was to try to

9    do whatever part I could to help that.

10                But it was a situation that needed to

11   be resolved.

12         Q.    And the only solution was for somebody

13   to put another $1.25 million in?

14         A.    That was -- as it was explained to

15   us -- was the procedure that were involved.

16         Q.    That seemed normal to you?

17         A.    That seems understandable to me.

18         Q.    As we sit here, six months later, does

19   that still seem normal and understandable to

20   you?

21         A.    The procedure sounds normal and

22   understandable.  I feel --

23         Q.    Excuse me -- eight months later.

24         A.    I think each day is unfortunate, but

25   the procedures remain understandable.  I mean,

1              AARON ETRA, ESQ.

2    it doesn't make anybody happy, myself fully

3    included.

4        Q.    If Benthos were to put in another

5    $1.25 million today, do you think they would get

6    their bitcoins?

7        A.    I believe they would, to the best of

8    my knowledge and belief.

9        Q.    Let's go to Exhibit 7 at 435.

10             (Pause)

11        Q.    Hold on.  Let's to back.  Let's go to

12    431 first.

13        A.    431.  Okay.

14        Q.    This is Exhibit 7 at TE-431, an e-mail

15    from you, with the subject line:  FW:  BTC

16    Transaction Important Update.

17             E-mail from you to Tracy Evans, Gerald

18    Fong, Brandon Austin, Mihir Deo, Hugh Austin,

19    and John Austin on Friday, August 24th.

20             You write:  Dmitri enabled Tracy and

21    me to speak with the transfer storage

22    representative he named to discuss what might be

23    done to enable the delivery of bitcoin from

24    Dmitri's wallet to Brandon's wallet

25    notwithstanding the lack of available additional

1                    AARON ETRA, ESQ.

2    funds.

3         A.    Yes.

4              That referred to the discussion with

5    Mr. Hoang, which we have been talking about.

6         Q.    What do you recall about that

7    conversation with Mr. Hoang?

8         A.    What I recall is what I put in the

9    next paragraph -- was that he said he'd use his

10   best efforts to try to get it delivered with the

11   amount of funds that we currently had.

12             I mean, that's a very good description

13   of what we have been talking about -- that he

14   would try to go to Dubai and see whether the 4.6

15   that we had would be sufficient to start the

16   release of the funds.

17        Q.    Did he tell you why it would or would

18   not be sufficient?

19        A.    No.  He said he would go and try.  He

20   said he would use his best efforts to see if it

21   could be done.

22        Q.    What was your understanding of the

23   likelihood of Mr. Hoang successfully releasing

24   the bitcoins from the system with $4.6 million?

25        A.    I had no understanding or no

```
1                    AARON ETRA, ESQ.

2      estimation.  I think, like all concerned, I was

3      hopeful he might be able to effect wait that.

4          Q.    He said he would try and that gave you

5      some --

6          A.    He said he would try.

7          Q.    And so you sent $1.6 million

8      additional to Mr. Hoang?

9          A.    I believe that was significantly

10     after -- well, it was in conjunction -- about

11     the same time, if I remember --

12         Q.    Do you know if, in fact, Mr. Hoang

13     tried to obtain the bitcoin?

14         A.    He so indicated to us that he did go

15     to Dubai and he tried to do it.

16         Q.    What happened in Dubai?

17         A.    He said, unfortunately, they wouldn't

18     do it.

19         Q.    But he didn't send the money back?

20         A.    No.

21         Q.    And why is that?

22         A.    Well, because there was no basis of

23     sending the money back.  Based on what he and

24     Mr. Kaslov has always said to us, there is no

25     basis of sending the money back.
```

```
1                    AARON ETRA, ESQ.

2               The release procedures is the release

3    procedure.  You fulfill it, and they fulfill

4    their obligations, or they send the money back

5    at that point.

6         Q.    None of this strikes you as unusual?

7         A.    I think unusual -- I mean, I think

8    cryptocurrency is an unusual field.  So I think

9    the answer is:  Everything is unusual.  And it's

10   new ground.

11              But as you see in this e-mail and the

12   other one that we looked to -- the nostra culpa

13   one -- I tried to get everyone to focus as best

14   as possible and using whatever ability they had

15   to come up with a solution to this.

16              So, yes, I will agree it's unusual.

17              But I think the whole world of

18   cryptocurrency, so far as I could see, was very

19   unusual.

20        Q.    You believe as you sit here today that

21   everyone in this transaction was proceeding in

22   good faith?

23        A.    I do believe the good faith on the

24   part of all concerned.

25        Q.    Now let's go --
```

```
 1                    AARON ETRA, ESQ.

 2          A.    If I may just interject.

 3          Q.    Please.

 4          A.    One of the reasons for it is if it's

 5    not good faith, my experience is the people of

 6    bad faith would long have disappeared on these

 7    kinds of transactions -- way, way before the

 8    eight months, as Mr. Popofsky correctly pointed

 9    out, down the road, we would have seen the back

10    of them and it would be a totally different

11    situation.

12          Q.    Well, who are the persons that

13    received the money?

14          A.    Again, the money, as we were

15    explained, went to the transfer storage

16    facility.

17          Q.    Where can that be found?

18          A.    It's up to them to -- I mean, we know

19    the account that it went to.

20                And I don't know where they can be

21    found.

22          Q.    "The account that it went to" -- you

23    are referring to the account of HK Zhixuan

24    Trading Company at China CITIC International?

25          A.    The ones to which the funds were sent.
```

1                       AARON ETRA, ESQ.

2         Q.    Are you aware that, in or around

3    August, 2018, a request was made to dissolve HK

4    Zhixuan Trading Company?

5         A.    I was not aware, no.

6         Q.    Are you aware that in January, 2019,

7    HK Zhixuan Trading Limited was administratively

8    dissolved?

9         A.    No, I was not aware.

10        Q.    Does that strike you as unusual?

11        A.    I don't know about unusual.

12              Again, I think in respect of these

13    accounts, they are very often opened and closed

14    for security reasons, and the account holders

15    are done the same way.

16              I think people are extremely concerned

17    about security.

18              And my understanding is that the

19    opening and closing of both the account holders

20    and the accounts themselves does take place.

21        Q.    So you sent $4.6 million of Benthos

22    Master Fund's to HK Zhixuan Trading Company.

23              And that company was subsequently

24    dissolved.

25              And you don't see any problem with

```
1                    AARON ETRA, ESQ.

2      that?

3          A.    Again, I'm concerned about the funds.

4      I'm not concerned about the company.  I'm

5      concerned about Benthos' found.

6          Q.    Does the dissolution of the company

7      tell you anything about the likelihood of

8      Benthos receiving its funds back from that

9      company?

10         A.    No, because I think Benthos is looking

11     to receive the money back from where the

12     bitcoins are.  And that's -- that is the focus.

13     That's the focus of all of us.

14         Q.    You believe the bitcoins are in Dubai?

15         A.    Yes, best of my knowledge.

16         Q.    You don't know where Benthos' money

17     is?

18               Let's go to 435 in Exhibit 7.

19               (Pause)

20         A.    Yes, I'm with you.

21         Q.    This is the e-mail with the subject

22     line:  Legal Action Notice:  Benthos Guarantee

23     Clause --

24         A.    Yes.

25         Q.    -- from Gerald Fong to Hugh Austin,
```

```
 1                    AARON ETRA, ESQ.
 2      Brandon Austin, and you --
 3           A.    Yeah, yeah.
 4           Q.    -- and a copy to Bresler -- Daniel
 5      Bresler, and a bcc to Mihir Deo, dated August
 6      28, 2019.
 7                    Do you see that, sir?
 8           A.    I do.
 9           Q.    Do you recall receiving this e-mail?
10           A.    I do recall -- I believe so.  I don't
11      have clear recollection of it, though.
12           Q.    Well, what do you recall about
13      receiving this e-mail?
14           A.    No, again, I'm just looking at it now.
15                    (Pause)
16           A.    I'm with you.
17           Q.    What do you recall of this e-mail?
18           A.    I'm just looking at it now.  I have no
19      recollection otherwise.
20                    (Pause)
21                    MR. BROMBERG:  Mark this Exhibit 23.
22                    (Exhibit Etra 23, Single-page e-mail
23      From: Gerald Fong, To: Tracy Evans, Subject:
24      Questions, Sent: August 29, 2018 (no Bates No.),
25      marked for identification)
```

```
 1                    AARON ETRA, ESQ.

 2    BY MR. BROMBERG:

 3        Q.    This is an e-mail from Gerald Fong to

 4    Tracy Evans, dated August 29, with the subject

 5    line:  Questions?

 6        A.    Yeah.

 7        Q.    There is a series of questions from

 8    Mr. Fong to Ms. Evans?

 9        A.    Yeah.

10        Q.    Did you ever discuss this e-mail with

11    Ms. Evans?

12        A.    I have no recollection of discussing

13    it with her.

14        Q.    Can you think of any reason why Ms.

15    Evans did not respond to this e-mail?

16        A.    No idea why.

17              (Exhibit Etra 24, Single-page letter

18    from Mark J. Hyland to Aaron Etra, dated August

19    31, 2018 (no Bates No.), marked for

20    identification)

21    BY MR. BROMBERG:

22        Q.    Do you recall receiving this letter,

23    sir?

24        A.    I don't have a clear recollection of

25    it, but I do recollect receiving something from
```

1                    AARON ETRA, ESQ.

2        that law firm.

3        Q.    This is a letter from Mark Hyland of

4        Seward & Kissel LLP to you, dated August 21,

5        2018.

6              Do you have any specific recollection

7        of receiving this letter?

8        A.    I do recollect receiving something

9        from that law firm, yes.

10       Q.    What do you recall doing when you

11       received this letter?

12       A.    I don't have a clear recollection.

13             But I do believe -- whether it's in

14       response to Gerald's next call, or my call to

15       him, I asked him about it.

16             And I said:  This -- you know, what's

17       the basis for it?

18             And he said:  Well, you know, we have

19       to send out a lawyer's letter.

20             And this is what this is.

21       Q.    Do you see where the letter says:

22       Benthos demands that you immediately provide us

23       with all details concerning the release of the

24       Escrow Funds, including but not limited to all

25       banking and wire instructions, the identity,

```
1                    AARON ETRA, ESQ.

2       address, and bank account information of all

3       recipients of any portion of the Escrow Funds,

4       all communications between or among you,

5       Valkyrie Group LLC, Valhalla Venture Group LLC

6       Brandon Austin, and Hugh Austin, or any of their

7       affiliates or representatives concerning the

8       Contract or monies held in escrow?

9            A.    Yes.

10               But my recollection was part of my

11      discussion with Gerald was:  What should I do

12      about it?

13               And I said:  This seems to be a very

14      heavy-handed action at the time that we were all

15      working together to try to resolve the

16      situation.

17               My recollection was that we agreed.

18               He said "okay, I'll have him back off"

19      or "don't be overly concerned about it."

20           Q.    Mr. Fong told you he would tell his

21      lawyer to back off?

22           A.    He said he recognized this was not

23      consistent with us working together at that

24      point in time.

25           Q.    Did you provide Mr. Fong's lawyers
```

```
 1                    AARON ETRA, ESQ.

 2    with banking and wire instructions?

 3         A.    I provided nothing to Seward & Kissel.

 4         Q.    Why is that?

 5         A.    Because my understanding from Mr. Fong

 6    was that would not be necessary.

 7         Q.    You have in writing from Mr. Fong that

 8    you need not provide any of the information

 9    demanded by his lawyer?

10         A.    I do not.

11               (Pause)

12         Q.    Let's go to TE-625.  That's Exhibit 7

13    at 625?

14         A.    625?

15               (Pause)

16         Q.    That's a letter dated September 28,

17    2018, from my colleague, Steven Popofsky, to

18    Michael Hess.

19               Who is Michael Hess?

20         A.    Michael Hess is an attorney in New

21    York who has been a longtime friend of mine.

22         Q.    Why do you think Mr. Popofsky was

23    writing this letter to Mr. Hess?

24         A.    That's a question for Mr. Popofsky.

25         Q.    Was Mr. Hess representing you as your
```

```
1                        AARON ETRA, ESQ.

2      attorney?

3           A.    I had asked him to represent me, yes.

4           Q.    Was he, in fact, representing you?

5           A.    I think he said that he would.

6                 I believe he subsequently had a

7      conflict in the firm that he was with.

8           Q.    Did he tell you the nature of that

9      conflict?

10          A.    I think that some of the people in

11     that firm also represent some people who are

12     investors in Benthos.

13          Q.    But at the time, you held out Mr. Hess

14     as your attorney, did you not, sir?

15          A.    That's correct.

16          Q.    That is the reason that Mr. Popofsky

17     wrote to Mr. Hess an not to you, correct?

18          A.    Again, I can't speak for Mr. Popofsky.

19          Q.    Again, if you look at Mr. Popofsky's

20     letter to Mr. Hess --

21          A.    Yes.

22          Q.    -- it also sets forth a series of

23     questions, correct?

24          A.    Yes.

25          Q.    Can you read those to us?
```

1                    AARON ETRA, ESQ.

2              Let's start with No. 1.

3         A.    Of the 5 million deposited to our

4    client into Mr. Etra's escrow account pursuant

5    to the Escrow Agreement, how much, if any, is

6    Mr. Etra presently holding in escrow, and is he

7    willing to return those remaining funds to our

8    clients upon demand?

9              If Mr. Etra is holding money in escrow

10   and is not willing to return it to our client on

11   demand, is he willing to commit in writing not

12   to transfer any of that money without our

13   client's written consent (or a court order)?

14              Identify all transfers or

15   disbursements made to date from the 5 million

16   escrow of Mr. Etra, including at a minimum, the

17   recipients of each transfer, the amount

18   transferred on each occasion, the written

19   instructions upon which each transfer was made,

20   written confirmation of each transfer, the bank

21   account information, and wire transfer

22   information, if any, associated with each

23   transfer.

24        Q.    You did not respond to this letter,

25   did you?

1                    AARON ETRA, ESQ.

2         A.    I think it was addressed to Mr. Hess.

3         Q.    Did Mr. Hess give this letter to you?

4         A.    Trying to recollect if he did.

5               (Pause)

6         A.    I have no clear recollection.

7               I do recollect discussing with him

8    that all the information was known by Benthos --

9    any of the information --

10        Q.    I'm not asking you, sir, to tell me

11   the substance of your communications with Mr.

12   Hess.

13              I want to know if Mr. Hess showed you

14   this letter.

15        A.    I have no clear recollection of

16   whether he did or didn't.

17        Q.    Do you recall having seen this letter?

18        A.    I have no clear recollection of seeing

19   this letter.

20        Q.    It's your testimony as you sit here

21   today that, at the time this letter was sent to

22   Mr. Hess, he was or was not representing you as

23   your attorney?

24        A.    I believe he had agreed to represent

25   me as my attorney, yes.

1                   AARON ETRA, ESQ.

2          Q.    Can you think of any reason that Mr.

3     Hess would not have responded to this letter?

4          A.    I can't speak for him.

5          Q.    You would agree that he did not

6     respond to this letter?

7          A.    I don't know.  That's for Mr. Popofsky

8     to say.

9          Q.    Do you have reason to think Mr. Hess

10    provided a response to this letter and he just

11    didn't show it to you?

12         A.    I truly -- I don't understand -- I

13    have no recollection of what he did or didn't

14    do.

15         Q.    Did you ever commit to Benthos that

16    you would return its funds upon demand?

17         A.    No.

18         Q.    Did you ever commit in writing to

19    Benthos that you would not transfer any of that

20    money without their written consent?

21         A.    No.

22         Q.    Did you ever identify to Benthos all

23    transfers or disbursements that were made to

24    date from the $5 million escrowed with you?

25         A.    Yes.

```
1                    AARON ETRA, ESQ.

2          Q.    Including the recipients of those

3     transfers?

4          A.    Yes.

5          Q.    You identified HK Zhixuan Trading

6     Company?

7          A.    Yes.

8          Q.    On or about September 28, 2018?

9                Or prior to that?

10         A.    It would all have been prior to that

11    date.

12         Q.    You provided to Benthos the written

13    instructions upon which that transfer was

14    made --

15         A.    Again, I --

16         Q.    -- on or before September 28th?

17         A.    -- I don't recollect how much detail I

18    provided.

19               But I certainly provided to them the

20    basis of the transfer and the arrangements for

21    those transfers, yes.

22         Q.    But you did not provide the written

23    instruction.

24         A.    I don't know -- I don't recollect

25    whether I did or not.
```

1                    AARON ETRA, ESQ.

2                    (Pause)

3          Q.    Did you provide this information at

4     any point in the future, after September 28,

5     2018?

6          A.    I believe all the information I

7     provided to yourselves included that

8     information, yes.

9          Q.    What were the circumstances under

10    which you provided the wire instructions that

11    named HK Zhixuan Trading Company to Benthos or

12    to Benthos' counsel?

13         A.    I don't remember the first time I did

14    it, but I obviously have done it.

15         Q.    When was the first time that you

16    provided the wire instructions?

17         A.    I don't recollect.

18         Q.    What was the reason you provided the

19    wire instructions?

20         A.    I believe it was in response to a

21    request for it.

22         Q.    So you provided the wire instructions

23    to HK Zhixuan Trading Company to Benthos upon

24    their request?

25         A.    I don't recollect whether I provided

1                    AARON ETRA, ESQ.

2     those details, as I've already testified.

3          Q.     So you don't have any specific

4     recollection of whether you provided those wire

5     instructions to Benthos?

6          A.     Well, the wire instructions, I

7     provided.

8                  The details -- I don't recollect what

9     details were provided.

10                 But the fact of the wire transfer --

11         Q.     When you say, sir, that the wire

12    instructions were provided, but details were not

13    provided, what does that mean?

14                 You either provided the wire

15    instructions or you didn't, sir.

16         A.     I'm sorry.  You pointed to an e-mail

17    which indicates that I provided the information

18    on the amounts.

19                 And in many conversations with them, I

20    provided further details.

21                 So the answer is yes, I did.

22                 (Pause)

23         Q.     Let's go back to Exhibit 20.

24                 (Pause)

25         Q.     It this document, sir.

```
1                    AARON ETRA, ESQ.

2         A.    Okay.

3         Q.    Did you send this document to Benthos?

4               It's a simple yes-or-no question.

5         A.    I don't recollect if I did.

6         Q.    You don't recall if you ever sent this

7    document to Benthos --

8         A.    That's correct.

9         Q.    -- or to any agent of Benthos?

10        A.    I don't recollect whether I did or

11   not.

12        Q.    Do you recall sending any specific

13   document to Benthos?

14        A.    I think there have been written

15   communications with Benthos from July onward,

16   which have been produced to you gentlemen.

17        Q.    Let's go to Exhibit 6 at page 93.

18               (Pause)

19        A.    Exhibit 6 --

20        Q.    Exhibit 6 is the smaller of the two --

21        A.    It is smaller of the two large ones.

22   Okay, sorry.

23               (Pause)

24        A.    What page did you say?

25        Q.    Ninety-three, AE-93.
```

230

```
 1                    AARON ETRA, ESQ.

 2              (Pause)

 3      Q.    Do you recognize this document, sir?

 4      A.    It does look familiar.

 5      Q.    It's addressed to you and to Valkyrie

 6  Group --

 7      A.    Hm-hmm.

 8      Q.    -- from Gerald Fong of Benthos Master

 9  Fund.

10              And it's titled:  Notice of

11  Termination of Escrow?

12      A.    Hm-hmm.

13      Q.    Can you read to us, starting from the

14  middle of the second paragraph:  And accordingly

15  the transaction referred to?

16      A.    And accordingly the transaction

17  referred to in the Escrow Agreement and the BTC

18  Agreement was not consummated within the

19  required time.  Accordingly, the Deposit funds

20  need to be returned to the Buyer immediately,

21  and without disbursement of any fee to the

22  Escrow Agent from the Buyer.

23      Q.    Were Benthos' funds returned

24  immediately?

25      A.    No.
```

                    AARON ETRA, ESQ.

1

2          Q.     Why is that?

3          A.     As escrow agent, I followed the escrow

4     agreements and so on, which didn't provide for

5     termination or return of the funds within any

6     limit of time.

7                 I read this as not applicable to my

8     functioning in my obligations.

9          Q.     Did you request that Valkyrie return

10    the funds?

11         A.     I did not.

12                I assumed that this request was

13    directed to Valkyrie.  And that was not my role

14    to do any request to Valkyrie.

15         Q.     Let's go to page 91 of the same

16    exhibit.  That's two pages back.

17                (Pause)

18         Q.     That's a response to Mr. Popofsky's

19    e-mail, which attached the notice of termination

20    escrow.

21                Do you see that?

22         A.     Ninety-one is an e-mail from me to the

23    Austin, Tracy, etc. --

24         Q.     If you go down to the bottom of that

25    page, you see there is an e-mail from Steven

```
1                    AARON ETRA, ESQ.

2       Popofsky to you and others --

3       A.    Yes, I do.

4       Q.    -- dated October 12?

5       A.    Hm-hmm.

6       Q.    Below that, it says:  This firm

7   represents Benthos Master Fund, Limited.  Please

8   see the attached Notice of Termination of

9   Escrow.

10               Do you see that?

11               And the notice of termination of

12  escrow was the document you just discussed, set

13  forth at AE-93, correct, sir?

14      A.    That is correct.

15      Q.    And you replied to that e-mail.

16               And the persons that you replied to

17  were jaustin@valhallaventuregroup.com?

18               Is that John Austin?

19      A.    Yes.

20               That's not a reply to Mr. Popofsky.

21  That's an e-mail to the --

22      Q.    It's a forward.

23      A.    Well, it forwarded the e-mail.

24               But the e-mail is not addressed to Mr.

25  Popofsky.
```

1                    AARON ETRA, ESQ.

2          Q.     It was addressed to John Austin,

3    correct?

4          A.     It was -- looks like it's addressed to

5    John Austin, Brandon Austin, copied to Tracy

6    Evans, to Michael Hess, not to Mr. Popofsky.

7          Q.     Why did you copy Michael Hess?

8          A.     Because he was assisting me as -- in

9    representation.

10         Q.     You wrote:  John and Brandon, You have

11   received this material as well as me.  As the

12   other contracting party to the relevant

13   agreements with Benthos and the one whose

14   instructions on the escrow funds I am committed

15   to follow, please advise how you intend to deal

16   with this notice, specifically instructing me

17   with respect to the funds still on escrow

18   deposit.

19         A.     That's correct.

20                Because any action on my part would

21   have to come from them, not from Benthos.

22         Q.     What did the Austins instruct you to

23   do?

24         A.     To my knowledge, they didn't give me

25   any instruction to take any actions --

```
1                    AARON ETRA, ESQ.

2        Q.    Did they reply to this e-mail?

3        A.    I don't recollect if they did.

4        Q.    Did they acknowledge receipt of this

5   e-mail?

6        A.    I don't recollect if they acknowledged

7   receipt to it.

8        Q.    Why did you not copy Benthos on this

9   e-mail?

10       A.    Because I believed that I was in a

11  situation where Benthos was represented by

12  counsel.

13       Q.    Why did you not copy Benthos' counsel

14  on this e-mail?

15       A.    This was not meant to be a reply to

16  Benthos' counsel.

17       Q.    Was this meant to be a private e-mail

18  between you, and the Austins, and your

19  lawyer? --

20       A.    This was meant to be --

21       Q.    -- and Ms. Evans?

22       A.    -- to be communication to those

23  recipients, yes.

24       Q.    What did you do when you did not

25  receive a response from the Austins?
```

```
1                    AARON ETRA, ESQ.
2          A.    Well, essentially what I did was not
3     take any action in response to Mr. Popofsky's
4     communication.
5          Q.    So you did not return the $400,000?
6          A.    I did return the 400,000 -- not at
7     that time, but as you know, the 400,000 I did
8     return.
9          Q.    Why did you return the $400,000 at a
10    later time an not in response to this e-mail?
11         A.    Because at this time, we were all
12    working together to try to have a resolution,
13    for which that 400 may well have been an
14    important part.
15         Q.    When you say "we were all working
16    together to try to have a resolution," what do
17    you mean by that?
18         A.    In other words, right up until the
19    time of the court hearing that took place,
20    Gerald was communicating -- primarily with Ms.
21    Evans, but once in a while to me as well -- and
22    recognizing the efforts that were going along
23    and the need for having funds to do that.
24         Q.    You understand, sir, that the letter
25    set forth at page 93 demands the return of the
```

```
 1                    AARON ETRA, ESQ.

 2    deposit funds to the buyer immediately?

 3          A.    I see what the letter says, yes.

 4          Q.    What do you understand that to mean?

 5          A.    That's the claim that action should be

 6    taken.  That's what I take it to mean.

 7          Q.    But you did not take that action?

 8          A.    Correct.

 9          Q.    You did not return any money to

10    Benthos in response to this letter?

11          A.    Correct.

12          Q.    You didn't return Benthos' money until

13    more than a month later.

14                Is that correct?

15          A.    I returned the money when -- on what

16    date was this?  I think in one of our exhibits

17    we have that exact date.

18          Q.    I'll represent to you, sir, that it

19    was on November 15, 2018.

20                Does that sound right?

21          A.    It sounds right.

22          Q.    Why did you return $400,000 to Benthos

23    Master Fund on November 15, 2018?

24          A.    That was part of the court order to do

25    so.
```

1           AARON ETRA, ESQ.

2           Here it is.  You are correct, November

3      15.

4           (Pause)

5      Q.    Subsequent to the return of $400,000

6      of Benthos' money on November 15, 2018, what

7      efforts did you make to return the other

8      $4.6 million?

9      A.    The efforts I have been making is to

10     try to find a solution in the person of a buyer

11     for escrow -- for the bitcoins or some other way

12     of being able to release the funds that went to

13     the transfer storage facility.

14     Q.    What other way of releasing the funds

15     from the transfer storage facility have you

16     pursued?

17     A.    I have certainly presented through Ms.

18     Evans the desirability of if the -- if the owner

19     can free up funds in some other fashion, to

20     return the $4.6 million.

21     Q.    What do you mean when you say you:

22     Presented through Ms. Evans the desirability of

23     releasing the funds?

24     A.    Clearly, if the procedures of the

25     transfer storage facility need to be followed,

```
 1                    AARON ETRA, ESQ.

 2      we are trying in our way to do so.  And the

 3      seller might be able to try in his way to

 4      provide funds in order to effectuate that

 5      release.

 6           Q.    The procedures of a transfer storage

 7      facility that only Dmitri Kaslov and Minh Hoang

 8      Le know?

 9           A.    No.  It's known to all the parties

10      from the minute it was presented.  So it is --

11      that was disclosed.

12           Q.    As related to you by Mr. Kaslov and

13      Mr. Hoang?

14           A.    Yes.

15           Q.    For a storage facility that those two

16      gentlemen have exclusive control over?

17           A.    The storage facility that is involved.

18                 I don't know they have exclusive

19      control or not.  I have no way of knowing.

20           Q.    Did you ever demand the return of the

21      $4.6 million from Mr. Hoang?

22           A.    In my role as I understood, it was not

23      to make such a demand.

24           Q.    What is your role at this point?

25           A.    My role is to follow the procedures
```

1                    AARON ETRA, ESQ.

2       that I was engaged to do, and to do my best

3       efforts to help the parties resolve that

4       situation.

5            Q.    What do those procedures call for if

6       you send money out on the purported instructions

7       of the seller and no bitcoin is delivered to the

8       buyer?

9            A.    There was no provision for that.  And

10      there was no provision for termination of the

11      escrow.  There was no such provision in the

12      agreements.

13           Q.    So what do you understand your

14      obligation to be as regards Benthos Master Fund

15      under the agreement?

16           A.    To be available to assist in any way

17      from this point onward -- that -- not -- I don't

18      visualize myself as a party.  I don't represent

19      the parties.

20                 And all I can do is what I have tried

21      to do -- both in communications and in

22      efforts -- to come up with a way in being able

23      to resolve the situation.

24           Q.    So you have requested that -- strike

25      that.

```
1                    AARON ETRA, ESQ.

2               (Pause)

3       Q.    Can you tell us anything else about

4   your efforts to secure the release of the $4.6

5   million from the so-called storage facility?

6       A.    I don't think so.

7       Q.    Would it be fair to say that the

8   majority of those efforts were in pursuit of a

9   second buyer?

10      A.    It would be fair to say in pursuit of

11  a buyer to either deal with the remaining

12  bitcoins under the original contract, or some

13  other arrangement whereby funds to purchase

14  bitcoins could be -- could help to effectuate

15  the release and the money come back to Benthos.

16      Q.    Tell us more about those efforts.

17      A.    Well, again, there are people who do

18  contact looking for bitcoins, and they certainly

19  are in demand.

20           The challenge is to find a mechanism

21  that complies with the release procedure and can

22  effectuate the release and to return of the

23  funds.

24      Q.    Are people still contacting you about

25  purchasing bitcoins?
```

1                    AARON ETRA, ESQ.

2          A.    Periodically, yes.

3          Q.    What do you tell those people?

4          A.    I tell them that they would have to do

5     a procedure along the lines of what's necessary

6     to release bitcoins.

7          Q.    Why are people still contacting you

8     about purchasing bitcoins, if you know?

9          A.    I really don't know.  My feeling is

10    that as I mentioned earlier, that bitcoins are

11    in demand.

12         Q.    Are you known in the industry to be a

13    person who facilitates transactions in bitcoin?

14         A.    Not to facilitate bitcoin --

15    transactions in bitcoins, but as a person who

16    does, you know, function as an escrow agent.

17         Q.    Have you ever functioned as an escrow

18    agent in a successful transaction for the

19    purchase of bitcoin?

20         A.    No.

21               (Pause)

22         Q.    When was the last contact that you had

23    with the Austins?

24         A.    I don't recollect.  I believe it was

25    several weeks ago.

```
1                     AARON ETRA, ESQ.

2         Q.    What did you discuss with the Austins

3    several weeks ago?

4         A.    I think they just called to say hello.

5               And the discussion was:  Is there

6    anything they could do currently to resolve the

7    situation more than they had been doing up until

8    then?

9         Q.    What did you tell them?

10        A.    I urged them to do whatever they could

11   do.

12        Q.    Do you know of anything they have

13   done?

14        A.    I do not.

15        Q.    What have you done?

16        A.    What have I done?  In what respect?

17        Q.    What have you done in the last month

18   to procure the return of the $4.6 million?

19        A.    I have -- any inquiry that seemed at

20   all promising, I would try to direct toward this

21   objective.

22        Q.    Do you believe that you have any

23   affirmative obligation to continue to pursue the

24   return of that $4.6 million?

25        A.    I believe I have fulfilled all my
```

```
 1                    AARON ETRA, ESQ.

 2      obligations under the agreements.

 3                (Pause)

 4          Q.    How many draft contracts have been

 5      circulated regarding potential second buyers in

 6      this transaction?

 7          A.    I really have not been the one keeping

 8      track of it.  I think Ms. Evans is the one

 9      who -- you should ask and look to on that.

10          Q.    So you can't say as you sit here today

11      how many potential second buyers you have spoken

12      to or --

13          A.    I would estimate at least -- at least

14      five.

15          Q.    What are the names of those buyers?

16          A.    I don't want to disclose them because

17      they were negotiated -- presented to us in

18      confidence.

19          Q.    You understand that you are under

20      subpoena?

21          A.    I do.

22          Q.    And you understand that you are under

23      oath?

24          A.    I do.

25          Q.    Are you refusing to answer the
```

```
 1                    AARON ETRA, ESQ.

 2   question on the ground of confidentiality?

 3        A.    I am doing that under confidentiality,

 4   yes.

 5              (Pause)

 6        Q.    Let's go to 528 of Exhibit 7.

 7        A.    That's the big one?

 8        Q.    Yes.

 9        A.    528?

10        Q.    Yes.  528.

11              (Pause)

12        Q.    This is an e-mail from Tracy Evans to

13   Minh, dated November 21, 2018.

14              Do you see that?

15        A.    Yes, I do.

16        Q.    Do you see in the middle of the page

17   where it says:  Aaron received the contempt

18   motion papers by e-mail last night our time at

19   11:50 p.m.  Does that not seem serious to you?

20        A.    Hm-hmm.  Yes, I do.

21        Q.    Then below that, it says:  As I said,

22   Aaron sent them back the 400K and answered all

23   their questions, but did not have the proof that

24   the money arrived overseas, and that is a big

25   issue.
```

```
1                    AARON ETRA, ESQ.

2              Do you see that?

3       A.    I think that was in reference to that

4   first transfer of the 3 million which we didn't

5   have the proof of, yeah.

6       Q.    Did you ever see proof of where

7   Benthos' money actually went?

8       A.    Well, we did have confirmation that it

9   was received and that's why the 250,000 came

10  back.

11      Q.    Below that, it says:  If you can help

12  with proof of receipts for the 3 million and

13  1.6 million, that would help greatly and put

14  that matter to rest as the judge may not

15  understand wires, and think Aaron is in contempt

16  of court.

17      A.    Right.

18      Q.    Have you ever seen any proof or any

19  indication whatsoever in writing of where that

20  $4.6 million currently resides?

21      A.    The -- in writing, the communications

22  from, I think, both Dmitri and Mr. Hoang --

23  which I think I provided copies of what I

24  received, and I hope Ms. Evans would do the same

25  thing -- of confirmation of the wires as they
```

1                    AARON ETRA, ESQ.

2     were received.

3          Q.    Have you ever seen confirmation of the

4     money in its current location?

5          A.    Not any current information.

6          Q.    Have you ever seen a statement for a

7     Hong Kong or Dubai bank account?

8          A.    No.

9          Q.    Have you ever seen a screenshot of any

10    bank account?

11         A.    No.

12         Q.    Have you ever seen a screenshot of the

13    purported storage facility?

14         A.    No.

15         Q.    Storage system?

16         A.    No.

17         Q.    Do you have any idea where Benthos'

18    $4.6 million is?

19         A.    My last recollection of it was where I

20    transferred it to.

21         Q.    In August of 2018?

22         A.    Yes.

23               (Pause)

24         Q.    Have you asked where the money

25    resides?

```
 1                    AARON ETRA, ESQ.

 2        A.    As you see in this correspondence,

 3   I've asked for as much support on that issue as

 4   possible.

 5             And what you have been reading is

 6   consistent with that, not only in respect of

 7   Benthos, but in respect of a new buyer to give

 8   comfort that the funds, when transferred, are

 9   going and will achieve what they need to

10   achieve.

11             So I have continually pressed for

12   that.

13        Q.    Ever you asked Mr. Hoang for specific

14   information --

15        A.    Yes.

16        Q.    -- about where the money is?

17        A.    Yes.

18             And you see in this correspondence and

19   other correspondence that reflects exactly that.

20   I have asked.

21        Q.    And he has not provided it to you?

22        A.    He has provided as much as he's

23   provided.

24        Q.    What does that mean, sir?

25        A.    In other words, we see what his
```

1                    AARON ETRA, ESQ.

2     response is.  And so far, that's been all that's

3     been provided.

4          Q.    Has Mr. Hoang provided you with any

5     specific information about where Benthos' money

6     is?

7          A.    After the confirmation receipt of the

8     funds?  No.

9          Q.    Why do you think that is, sir?

10          A.    I can't -- no basis for me answering

11     your question.

12          Q.    You believe Mr. Hoang when he tells

13     you the money is trapped in a storage facility?

14          A.    I do believe that the system does work

15     that way.

16          Q.    Because Mr. Hoang tells you so?

17          A.    He and Mr. Kaslov.

18                (Pause)

19          Q.    You have an account at Citibank.

20                Is that correct?

21          A.    I had an account at Citibank, yes.

22          Q.    Do you still have an account at

23     Citibank?

24          A.    I do not.

25          Q.    Where do you bank, sir?

```
 1                    AARON ETRA, ESQ.

 2        A.    I bank in several banks.

 3        Q.    Do you have a European bank account?

 4        A.    Yes.

 5        Q.    At what bank is that account?

 6        A.    That bank is a bank in Europe.

 7        Q.    What bank is it?

 8        A.    That bank has nothing to do with this

 9   transaction.

10              (Pause)

11        Q.    Let's go to Exhibit 6 at 399.

12              (Pause)

13        A.    Okay.

14        Q.    This is an e-mail thread.  Begins with

15   an e-mail from you to Tracy Evans.  The subject

16   line:  Euros Paymaster Account.

17              Do you see that, sir?

18        A.    Yes, I do.

19        Q.    What is Euros Paymaster Account?

20        A.    It is an account in Euros currency.

21        Q.    Where is that account located?

22        A.    It's located in Europe and has not

23   been used for this transaction or any related

24   transaction.

25        Q.    Well, it appears to have been used in
```

1                   AARON ETRA, ESQ.

2      relation to this transaction somehow or it

3      wouldn't be in this book, would it, sir?

4           A.    No, this was offered as an option for

5      another buyer who wanted to pay money into not a

6      U.S. dollar account or to a U.S. account but

7      some account outside of the U.S. and not in U.S.

8      dollars.

9                   So it's a prospective for a buyer,

10     which was never transpired.

11          Q.    On page 398 going further up in the

12     e-mail chain, you say:  Please appreciate that

13     using that account would require immediate

14     payment of its 1% fee out of the amount

15     deposited, and a transfer will require at least

16     one day on deposit.

17          A.    Yes.

18          Q.    What did you mean by that?

19          A.    In other words, as I indicated on the

20     Benthos transaction, I was not compensated, have

21     not been compensated, and was not ever

22     contemplated to be compensated by Benthos.

23                  In respect of a subsequent buyer --

24     and especially if that European account was

25     needed -- my arrangements are such that I do

```
 1                    AARON ETRA, ESQ.
 2      need to be compensated with this 1%, and that
 3      the funds need to stay in at least one day
 4      before they are transferred out.
 5          Q.    Just to be clear, sir -- are you
 6      refusing to tell me the name of the European
 7      bank at which you hold an account?
 8          A.    I am not refusing.
 9                I am saying it has nothing to do with
10      this transaction and is not relevant.
11          Q.    That may be well be true, sir, but I
12      am asking you the name of the bank.
13                Are you going to answer the question?
14          A.    It is a confidential arrangement
15      between me and my bank.
16          Q.    The identity of the bank is a
17      confidential arrangement between you and the
18      bank?
19          A.    It is a confidential arrangement
20      because it has nothing to do with the
21      transaction, nothing to do with Benthos, nothing
22      to do with anything that we are discussing here.
23          Q.    In your estimation.
24          A.    In my conviction -- based on the facts
25      as I presented them.
```

1                    AARON ETRA, ESQ.

2          Q.    Ms. Evans' e-mail says:  Since their

3    bank is in Europe, why can't they use Aaron's

4    European account?

5          Do you see that, sir?

6          A.    I do.

7          Q.    And then it says:  One of the largest

8    banks in Europe -- see attached.

9          A.    Right.

10         Q.    Do you see that, sir?

11         A.    I do.

12         Q.    Can you tell me why the attachment to

13   this e-mail was not produced by you?

14         A.    Probably for the reason I've just

15   mentioned, as a confidential arrangement between

16   me, my bank, with respect to something that has

17   nothing to do with the Benthos transaction.

18         Q.    Is it your understanding, sir, that

19   you are not required to produce information that

20   you deem in your estimation to be confidential

21   in response to a lawfully-issued subpoena?

22         A.    I'm saying that, in respect of matters

23   to do with this transaction, this is not one of

24   them.

25         Q.    So is it your understanding, sir, that

```
1                    AARON ETRA, ESQ.

2       you are not required to produce information that

3       you deem irrelevant in response to a

4       lawfully-issued subpoena?

5            A.    It's not my deeming it irrelevant.

6                  The facts are that it has not anything

7       to do with the transaction or any of the

8       inquiries you are making.

9            Q.    And it's your understanding that you

10      are the one who can make that determination, and

11      determine unilaterally whether you produce

12      documents or do not produce documents?

13           A.    It's a fact.  It's not a question of

14      my determination.

15           Q.    It's a fact that has yet to be

16      determined, sir.

17           A.    Well, it's a fact that -- I'm giving

18      you the facts.

19                 (Pause)

20           Q.    Does the name Madzienka mean anything

21      to you?

22           A.    I'm sorry?  Where are you looking?

23           Q.    Madzienka?

24           A.    I don't know where you are looking.

25           Q.    Does that name mean anything to you?
```

1                       AARON ETRA, ESQ.

2          A.     You'll have to show me where it's

3     written out.

4          Q.     M-A-D-Z-I-E-N-K-A.

5          A.     Again, you have to show me where you

6     are looking so I can help you.

7          Q.     Let's look at page 487 on Exhibit 6.

8                 (Pause)

9          Q.     Go to the bottom of page 487.

10                (Pause)

11         A.     Bottom of 487?  Okay.

12         Q.     There is an e-mail from you to -- it

13    appears -- John Austin, where you say:  John,

14    Andrew is your guy.  I believe there were three

15    Benthos people:  Gerald, Mihir, and a third.  Or

16    were there only two?  Andrew would know.

17         A.     Okay.

18         Q.     Who is Andrew?

19         A.     I believe that was my thought as to

20    who that person who brought the Benthos people

21    on behalf of the Austins.

22         Q.     Do you recall why you sent this

23    e-mail?

24         A.     I don't, actually.  No, I really don't

25    recollect.

```
1                    AARON ETRA, ESQ.

2          Q.    Do you see that John Austin replied:

3     Not sure, I will ask?

4          A.    Okay.  Well, I guess that's makes two

5     of us that weren't sure.

6          Q.    You replied:  Thanks?

7          A.    Yeah, that's friendly on my part.

8          Q.    Then you forwarded that e-mail to

9     David Hammer.

10               Do you see that, sir?

11         A.    Yes.

12         Q.    Then Mr. Hammer subsequently forwarded

13    that e-mail to an a.madzienka@gmail.com.

14               Do you see that, sir?

15         A.    No.

16         Q.    That's at the top of the page.

17         A.    Which page?  489?

18         Q.    487.

19         A.    Okay.  487.

20               (Pause)

21         A.    I think that's the person who does, I

22    believe -- either his paralegal or his person

23    doing -- reproducing the documents, copying the

24    documents.

25               (Pause)
```

```
1                    AARON ETRA, ESQ.

2         A.    I'm not doing a good job in preserving

3    this exhibit.

4         Q.    That's all right.  We have other

5    copies.

6         A.    Okay.

7              MR. BROMBERG:  Can we take a

8    five-minute break?

9              (Recess from 2:52 p.m. to 3:04 p.m.)

10   BY MR. BROMBERG:

11        Q.    Who is Chris Yergensen?

12        A.    I believe Chris Yergensen, if my

13   memory is correct, is somebody who is a

14   potential second buyer, as you would describe

15   it.

16        Q.    Is Mr. Yergensen still a potential

17   second buyer?

18        A.    I don't believe so.

19              Again, you'll have to ask Ms. Evans,

20   but I haven't heard from him recently.

21        Q.    Do you recall why Mr. Yergensen did

22   not decide to buy bitcoin?

23        A.    No, I do not.  It's really impossible,

24   I think, for me or anybody else to put ourselves

25   in the mind of the potential buyer.
```

```
1                    AARON ETRA, ESQ.

2              (Pause)

3    Q.    Let's go to Exhibit 7 at page 904.

4    A.    That's the big one, right?

5              (Pause)

6    Q.    Do you recognize this document?

7    A.    Do I recognize this?  I don't

8    recognize it, but let me look at it.

9    Q.    It's dated December 11, 2018?

10   A.    Yeah.

11   Q.    It is addressed to:  Chris.

12         Do you see that, sir?

13   A.    I do.

14   Q.    It says:  It was a pleasure speaking

15   with you and John yesterday.

16         Does that refresh your recollection as

17   to --

18   A.    No, it doesn't -- as to who the John

19   is, yes; but who the Chris is, no.

20         (Pause)

21   Q.    Let's go back to page 900.

22   A.    900, okay.

23   Q.    That's an e-mail from

24   Chris Yergensen to you, dated December 10, 2018.

25         Do you see that, sir?
```

1                      AARON ETRA, ESQ.

2          A.    Yes, I do.

3          Q.    Can you read what Mr. Yergensen wrote

4     to you?

5          A.    I am looking for any documentation

6     that helps me understand the process of you

7     obtaining the BTC from the storage facility.  It

8     appears that in order for you to do so, my

9     client's fund must be transferred from your

10    escrow account to a settlement account which is

11    then used as a release of this BTC to you.  Any

12    documents between you and the storage facility

13    which my client can rely upon would be useful.

14         Q.    Did Mr. Yergensen ever receive such

15    documents?

16         A.    I don't recollect if he did.

17         Q.    But subsequent to that -- the next

18    day, in fact -- there was a letter from you to

19    someone named Chris setting forth certain

20    information as to your understanding of the

21    process by which bitcoins are released from

22    storage.

23                Is that correct?

24         A.    That is correct.

25                And as I indicated earlier, the effort

1                    AARON ETRA, ESQ.

2    has continued to try to find buyers who will be

3    able to work within the procedures.

4         Q.    Did you tell Mr. Yergensen that

5    another buyer had put $4.6 million into this

6    storage facility and no bitcoins had come out?

7         A.    I don't recollect discussing any prior

8    purchasers or potential purchasers with Mr.

9    Yergensen.

10        Q.    Did you discuss with any potential

11   buyer the fact that Benthos Master Fund had put

12   $4.6 million into this storage facility and no

13   bitcoins had come out?

14        A.    I do recollect certainly in the early

15   stages of the looking for a second buyer that

16   the reason for looking for a second buyer was it

17   was impossible to release the bitcoins from the

18   first buyer.

19        Q.    That wasn't responsive to my question,

20   sir.

21        A.    Well, the answer is:  Yes, as I've

22   described it.

23              So it was not Benthos.

24              It was discussed that a buyer had

25   contracted to buy bitcoins but insufficient

```
 1                    AARON ETRA, ESQ.

 2      funds were there to release them and therefore a

 3      new buyer was needed.

 4           Q.    You explained to these potential

 5      buyers that this first buyer had placed its

 6      money in, and had received no bitcoins?

 7           A.    Yes.

 8           Q.    What was the response to that, in your

 9      recollection?

10           A.    I didn't have any particular response

11      to that.

12                 The response was to the opportunity to

13      purchase that wasn't focused on any one aspect

14      of it.

15           Q.    Let's go to page 869 of the same

16      exhibit.

17                 (Pause)

18           Q.    That's an e-mail from you to Ms.

19      Evans.

20                 And the subject line is:  Demystifying

21      while protecting the process of contracting for

22      Dmitri's BTCore.

23                 Do you see that, sir?

24           A.    I do.

25           Q.    What is BTCore?
```

```
 1                    AARON ETRA, ESQ.

 2         A.    It's BTC -- so it meant for the

 3    bitcoins.

 4         Q.    Can you read to me the first paragraph

 5    of that e-mail?

 6         A.    Being unable to have direct procedure

 7    for exchanging money against delivery of BTC, we

 8    have found buyer resistance to a procedure which

 9    calls for funds to leave the control of the

10    Escrow Agent and going to a designated account

11    in Asia under the control of someone not in the

12    contractual relationship with the buyer or the

13    Escrow Agent and without a clear explanation of

14    what happens thereafter.  Under these

15    circumstances, including the inability of you

16    and me to ourselves know the full procedure,

17    being able to constructively guide buyers and

18    close transactions.

19              Then I list various things that would

20    be my suggestions.

21         Q.    Can you think of why buyers would be

22    reluctant to enter into such a procedure?

23         A.    Again, I can't put myself in the

24    position of the buyers.

25              Obviously, each buyer would love to
```

```
1                    AARON ETRA, ESQ.
2       have just a simple exchange.  And I believe that
3       this is not the only situation where simple
4       exchange is not possible, but this has its
5       obviously challenges.
6            Q.    Do you think that -- you mentioned:
7       Challenges.
8                  Do you think that this procedure
9       entails any risk to the buyer?
10           A.    I don't know of a single transaction
11      in cryptocurrency that doesn't involve risk.
12           Q.    How many transactions have you been
13      involved with involving cryptocurrencies?
14           A.    I have explained to you:  I have only
15      been involved in this transaction.
16           Q.    Do you consider yourselves an expert
17      in cryptocurrency?
18           A.    I do not.  I definitely do not.
19           Q.    You say:  It is under these
20      circumstances, including the inability of you
21      and me to ourselves know the full procedure.
22                 What do you mean by that?
23           A.    We have tried to get as much
24      information on all the questions that we have
25      gone over today and elsewhere in order to be
```

1                    AARON ETRA, ESQ.

2      able to give the utmost comfort, not only to

3      Benthos, but to any prospective buyer.

4           Q.    Do you perceive any problem with

5      soliciting a buyer to participate in a

6      transaction of which you do not fully

7      understand?

8           A.    First of all, I'm not soliciting any

9      buyer.

10               Secondly, the situation is fully

11     disclosed, as you see in the correspondence.

12               And the disclosure is something --

13     yes, I do take seriously that requirement.

14          Q.    You were seeking to act as an escrow

15     agent in these transactions, were you not?

16          A.    I wasn't seeking to act as an escrow

17     agent, except to be able to facilitate the

18     transaction that got us into the situation in

19     the first place.

20               I am not adverse to acting as an

21     escrow agent.

22               I am not soliciting that business.

23          Q.    You were involved in discussions with

24     various buyers of bitcoin involving procedures

25     very similar to those involved in the Benthos

```
 1                    AARON ETRA, ESQ.

 2    transaction, correct?

 3        A.    No, it is only the Benthos situation

 4    that I've discussed with buyers.

 5              In other words, it's only the

 6    arrangements for Dmitri Kaslov's bitcoins, of

 7    which Benthos is a part.

 8        Q.    When you wrote to Ms. Evans "the

 9    inability of you and me to ourselves know the

10    full procedure," you meant that you, in fact,

11    did not understand the procedures by which the

12    bitcoins were being released from storage

13    facility.

14              Is that correct, sir?

15        A.    No, the words speak for themselves.

16              "Fully understand" doesn't mean that I

17    didn't understand.

18              I didn't have all the particulars.

19              I was very clear on that language.

20        Q.    But you nevertheless were comfortable

21    acting as escrow agent in transactions involving

22    those procedures?

23        A.    I'm only comfortable if the parties

24    are comfortable.

25              My role is to do something with the
```

                         AARON ETRA, ESQ.

1     parties are comfortable.

2              I'm not a judge of that.

3              If they are comfortable, then I will

4     act on their behalf.

5          Q.    And what is your understanding of your

6     responsibility to the parties as escrow agent?

7          A.    My responsibilities are per agreements

8     that refer to what my responsibilities are.

9          Q.    Is your responsibility merely

10    contractual?

11         A.    It is primarily contractual.

12         Q.    You say:  Primarily contractual?

13         A.    Yes.

14         Q.    What other responsibility is there?

15         A.    Obviously, need to act in compliance

16    with laws and regulations.

17         Q.    The law states that you are a

18    fiduciary, doesn't it?

19         A.    The law refers to my role.  And my

20    role has been clearly stated in the contractual

21    arrangements.

22         Q.    So it's your understanding that you

23    are only obligation as an escrow agent is

24    contractual?

1                    AARON ETRA, ESQ.

2        A.    My understanding is that my primary

3    responsibility is to act pursuant to the

4    arrangements agreed between the party disclosed

5    to them, and in accordance with rules and

6    regular -- applicable laws and regulations.

7        Q.    That's the second time that you have

8    stated what you believe your primary

9    responsibility to be.

10            And my question to you was:  Is it

11    your understanding that your only obligation is

12    contractual?

13        A.    No.

14        Q.    What other obligation do you have that

15    is extra-contractual?

16        A.    Applicable laws and regulations.

17        Q.    And those applicable laws and

18    regulations state that you are fiduciary to both

19    sides of the transaction, do they not?

20        A.    I have no idea what you are referring

21    to.

22            And I have no basis of saying yes or

23    no as to your interpretation of the law.

24        Q.    You are a New York attorney, are you

25    not, sir?

```
 1                    AARON ETRA, ESQ.

 2        A.    If you cite me the statute and the

 3    case law, I would be happy to look at it with

 4    you.

 5              (Pause)

 6        Q.    Let's go to 920 of Exhibit 6.

 7        A.    Okay.

 8              (Pause)

 9        A.    Okay.  I'm with you.

10        Q.    This appears to be an e-mail from Minh

11    Hoang Lei to bitcoin7111@gmail.com, dated

12    December 26, 2018.

13              It says:  To Aaron Etra, Esq., as

14    Escrow Agent.

15              Do you see that, sir?

16        A.    Hm-hmm.

17        Q.    It says:  I am the storage facilitator

18    for Dmitri Kaslov, the owner of bitcoins held in

19    wallets in Dubai, UAE, and confirm the

20    following:  The name of the storage facility of

21    which the client's funds are being credited to

22    is a blockchain.com sub in Dubai.  The

23    designated bank account is linked to the storage

24    facility.

25              What does that mean?
```

```
1                    AARON ETRA, ESQ.

2         A.    In other words, the account to which

3    the funds are to be sent is linked to the

4    storage facility on whose behalf the funds are

5    being sent.

6         Q.    What account is that?

7         A.    It talks in terms of the one that is

8    to be designated, or is designated.  It doesn't

9    refer to any particular one.

10        Q.    Is that the bank account for HK

11   Zhixuan Trading Limited?

12        A.    Again, that would be up to Mr. Hoang

13   to indicate if that's designated -- the

14   designated one or not.

15              He's -- that's talking about procedure

16   rather than a specific account.

17        Q.    Do you recall whether you ever

18   received this e-mail from Ms. Evans?

19        A.    I don't recall.

20        Q.    Let's go to page 922.

21              If you go back one page -- I'm

22   sorry -- to 921 --

23        A.    921?  Okay.

24        Q.    -- there is an e-mail from you.  It's

25   not clear who that e-mail is to.  It's dated
```

```
1                    AARON ETRA, ESQ.

2      December 27, 2018, and the subject line is:  BTC

3      Attestation Letter.

4                    It says:  Brandon, Please find the

5      Attestation Letter attached.

6                    Do you recall sending this e-mail?

7           A.    I don't recall sending it.

8           Q.    There is an attachment to that, you

9      know, which is set forth on page 922.

10          A.    Okay.

11          Q.    It contains an attorney's attestation.

12                Do you see that, sir?

13          A.    I do.

14          Q.    Can you tell me this document is?

15          A.    It looks like it is a letter that

16     contains certain attestations.

17          Q.    What are you attesting to in this

18     letter, sir?

19          A.    What I am attesting to is what's

20     written in the letter.

21          Q.    So you are attesting to the fact that

22     the name of the storage facility of which the

23     client's funds are being credited to is a

24     blockchain.com sub in Dubai?

25          A.    As -- it's based on the attestation
```

```
 1                  AARON ETRA, ESQ.

 2     and affirmation of Mr. Hoang.  And that's his

 3     attestation that I refer to.

 4                  If you read the prior paragraph, it's

 5     the introduction to those items.

 6                  So I'm essentially conveying in that

 7     attestation what I have received from Mr. Hoang.

 8                  So it's not my -- it's not based on my

 9     knowledge and belief.  It's based on what I

10     received from Mr. Hoang.

11          Q.    You are attesting to this information,

12     are you not?

13          A.    I'm attesting to what I say in this,

14     which is information I received from him.

15          Q.    You say it's based on that

16     information?

17          A.    That's correct, yes.  That's the

18     only --

19          Q.    You are attesting to the truth of this

20     information?

21          A.    I am not.

22                  I am saying that this is what he has

23     said.

24          Q.    What was the purpose of this document?

25          A.    As I recollect -- and, again, I'm not
```

```
1                    AARON ETRA, ESQ.

2       totally clear -- that it was probably requested

3       by a prospective buyer.

4            Q.    Did you speak to Mr. Hoang about this

5       document?

6            A.    Well, it was based on what Mr. Hoang

7       had conveyed to Ms. Evans, which was transmitted

8       to me, which is what we were just looking at.

9            Q.    Did you do any due diligence to

10      confirm the truth of the things that Mr. Hoang

11      told you before you conveyed them to a third

12      party?

13           A.    No, because what I was conveying was

14      his information rather than anything else.

15           Q.    What was the purpose of conveying the

16      information through yourself, as opposed to him

17      simply conveying to that third party?

18           A.    I was asked to do this.

19           Q.    Why were you asked to do this?

20           A.    No doubt because the buyer had asked

21      for it.

22           Q.    If the information is coming from Mr.

23      Hoang and you are not attesting to the truth of

24      that information, then what is the purpose of

25      this letter?
```

```
1                    AARON ETRA, ESQ.

2         A.    The purpose is exactly as it stands.

3               It's to convey the information on

4    these items.  It's up to the person who received

5    it to determine whether they relied on it, don't

6    rely on it --

7         Q.    But the information is being conveyed

8    by a licensed attorney in good standing

9    authorized to practice law in the State of New

10   York since 1966?

11        A.    That is correct.

12              That has nothing to do with the

13   validity of what's being conveyed.

14        Q.    Not from a gentleman with a random

15   e-mail address?

16        A.    Well, what random e-mail address are

17   you referring to?

18        Q.    The address of Mr. Minh Hoang Le.

19        A.    That's not being conveyed as my

20   information.  It's his information, so please

21   don't misconstrue it.

22              (Pause)

23        Q.    Tell me about Insight Communications.

24        A.    Can you show me where that appears,

25   please?
```

```
 1                    AARON ETRA, ESQ.

 2         Q.    Does the name ring a bell to you?

 3         A.    Offhand, it does not.

 4         Q.    How about Giovanni?

 5         A.    Giovanni is a very common first name.

 6         Q.    So the name Giovanni means nothing to

 7    you?

 8         A.    I have come across many Giovanni's in

 9    my lifetime.

10         Q.    Let's look at 936.

11               (Pause)

12         Q.    There is an e-mail on 936.  This is

13    936 on Exhibit 7.

14               It's an e-mail from Tracy Evans to

15    Minh Hoang Le, dated March 3rd, 2019.

16               She writes:  Aaron said to tell you he

17    also has a serious buyer, Austin, the one he met

18    in Frankfurt, and they have funds and can go as

19    well.

20               Who is the serious buyer, Austin?

21         A.    This was somebody that actually was

22    referred.  That's his first name, Austin.

23         Q.    What's his last name?

24         A.    It's confidential.

25         Q.    Is it Yavorsky?
```

```
 1                      AARON ETRA, ESQ.

 2         A.     No --

 3                Well, it's confidential.

 4         Q.     Is it Yavorsky?

 5         A.     It's confidential.

 6                (Pause)

 7         Q.     You see later on in that e-mail, it

 8    says:  Below is the information I sent you when

 9    you had the hacking issue so I do not know if

10    you saw it.  It is for -- and the name is

11    redacted -- in Singapore through Giovanni, the

12    broker.

13                Do you see that, sir?

14         A.     This is from Ms. Evans to Mr. Hoang?

15         Q.     Yes.

16         A.     Enclosed the information I sent you

17    when you had the hacking issue so I don't know

18    when you saw it.

19                Okay.

20                Mr. Hoang told us his e-mail had been

21    hacked.

22         Q.     Do you see the reference to:

23    Giovanni?

24         A.     I put Giovanni on the phone with

25    Dmitri -- I do see that, yes.
```

1                   AARON ETRA, ESQ.

2          Q.    Does that refresh your recollection as

3     to who Giovanni is?

4          A.    No, it does not.

5                (Pause)

6          Q.    Who is Don James?

7          A.    I have never interacted with that

8     gentleman, but to the best of my knowledge it's

9     somebody that Ms. Evans and Dmitri Kaslov know,

10    but I do not.

11         Q.    What is Project Genesis?

12         A.    Best of my understanding and

13    recollection, it's an organization that Dmitri

14    Kaslov has a relationship with.

15         Q.    Do you know anything else about

16    Project Genesis?

17         A.    I do not.

18         Q.    How about Velantis?

19               Does that name ring a bell to you?

20         A.    Yes.

21         Q.    Tell me about Velantis.

22         A.    It's the name of a company.

23         Q.    What kind of business is that company

24    engaged in?

25         A.    I believe it's something in finance.

1                    AARON ETRA, ESQ.

2          Q.    You don't remember anything else about

3    Velantis?

4          A.    Well, my understanding is -- tell you

5    about the company.  It's a company involved in

6    finance.

7          Q.    Have you ever personally been involved

8    in any transaction or potential transaction

9    involving Velantis?

10         A.    Velantis was one of the prospective

11   second buyers.

12         Q.    Tell me more.

13         A.    That's all I know.

14               (Pause)

15         Q.    How many times have you served as an

16   escrow agent during your career?

17         A.    I can't really count that number.

18         Q.    More than 50 times?

19         A.    It may well have been more than 50

20   times.

21         Q.    Was it more than 100 times?

22         A.    My estimate, again, is purely an

23   estimate -- somewhere in that range.

24         Q.    Has there ever been any other instance

25   where you sent money out of your escrow account

```
 1                    AARON ETRA, ESQ.
 2       without proper authorization?
 3            A.    Not without -- no.
 4            Q.    Has anyone ever accused you of sending
 5       money out of your escrow account without
 6       authorization?
 7            A.    Yes.
 8            Q.    Was there a finding of a court of
 9       competent jurisdiction that you, in fact, did
10       that?
11            A.    There was a finding of a court of
12       competent jurisdiction about that situation
13       without impugning that I was guilty of sending
14       out without authorization.
15            Q.    Was there any finding of fact in that
16       case?
17            A.    There were many findings of fact in
18       that case.
19            Q.    What was the resolution of that case?
20            A.    The resolution of that case?  I have
21       to pay the person whose funds had been
22       apparently misused by the person who received
23       the funds and I was left with the responsibility
24       of reimbursing that person -- that individual.
25            Q.    You say the funds were apparently
```

```
1                      AARON ETRA, ESQ.

2       misused.

3               I'll ask you again, sir:  Was there a

4       finding of fact that the funds were misused?

5          A.   There was no finding of fact that the

6       funds were misused.

7               (Pause)

8          A.   The finding was that the gentleman

9       complained that he -- that his investment was

10      lost.

11         Q.   He sued you, did he not?

12         A.   He did.

13              (Pause)

14              MR. ETRA:  I object to including this

15      matter.  It has nothing to do with this matter.

16      I object to this line of questioning.

17              MR. BROMBERG:  Your objection is

18      noted, sir.

19              (Exhibit Etra 25, Four-page document

20      entitled: Judgment, dated October 30, 2014 (no

21      Bates Nos.), marked for identification)

22              MR. BROMBERG:  You have been handed a

23      document that's marked as Exhibit 25.

24      BY MR. BROMBERG:

25         Q.   What is that document?
```

1                    AARON ETRA, ESQ.

2          A.    I refuse to answer any questions in

3     respect of it.

4          Q.    It's a judgment, isn't it, sir?

5          A.    I refuse to answer any questions in

6     respect of it.

7                It is totally irrelevant to this

8     matter.

9          Q.    You testified, sir, there has never

10    been a finding of fact in any court that you

11    misused escrow funds.

12                Is that correct?

13         A.    I gave my testimony as I gave it, yes.

14                (Exhibit Etra 26, Single-page document

15    entitled: Grasshoff v. Etra Opinion, dated

16    January 19, 2016 (no Bates No.), marked for

17    identification)

18    BY MR. BROMBERG:

19         Q.    Exhibit 26 is an opinion of the

20    Supreme Court of the New York, Appellate

21    Division, First Department.

22                Can you read to me the second-to-last

23    paragraph of that opinion, sir?

24         A.    I refuse to answer any questions in

25    respect of this one.

1                    AARON ETRA, ESQ.

2          Q.    It says:  Plaintiff established his

3    prima facie entitlement to summary judgment on

4    his conversion claim by submitting deposition

5    testimony, financial transfer documents, and

6    correspondences showing that he transferred his

7    personal finds into an apparent escrow account

8    maintained by defendant, that defendant

9    intentionally retransferred those funds to a

10   different individual without plaintiff's

11   permission, and that the transfer effectively

12   deprived plaintiff of the funds, which were

13   never recovered.

14              This is Grasshoff v. Etra, 135 A.D. 3d

15   574.

16         A.    It has absolutely nothing to do with

17   this matter, totally irrelevant, and --

18         Q.    It's a remarkably similar fact

19   pattern, isn't it, Mr. Etra?

20         A.    It is not.  Totally different fact

21   pattern.

22         Q.    Why was Valkyrie the seller in this

23   transaction and not Dmitri Kaslov?

24         A.    That's a question for Valkyrie.

25              But my understanding was that they

```
1                    AARON ETRA, ESQ.

2      were entering into that arrangement so that they

3      could receive a portion of the discount that was

4      available on the transaction.

5           Q.    You did not provide the information

6      and documents requested by Seward & Kissel

7      because Mr. Fong told you you did not have to do

8      that.

9                 That was your testimony, correct?

10          A.    Correct.

11          Q.    Did Mr. Fong tell you that you did not

12     have to provide the information and documents

13     that were requested in Mr. Popofsky's letter to

14     Mr. Hess?

15          A.    That point -- I had no discussion with

16     Mr. Fong on that matter.

17          Q.    So you just don't recall either way

18     whether you got the September 28 letter?

19          A.    Correct.

20          Q.    Following the request from Seward &

21     Kissel on August 31 and from this firm on

22     September 28, you provided none of the

23     information or documents requested in those

24     letters until you were ordered to do so by a

25     federal judge under threat of incarceration.
```

```
 1                    AARON ETRA, ESQ.

 2              Isn't that correct?

 3      A.    I provided it in a time when I thought

 4  it was -- I did provide it at that point, yes.

 5              The answer is:  Yes.

 6      Q.    Does the name Symphony FS Limited

 7  sound familiar to you?

 8      A.    I believe so, yes.

 9      Q.    What is Symphony FS Limited?

10      A.    I believe it's a company.

11      Q.    How do you know that name?

12      A.    I have had communications on their

13  behalf.

14      Q.    When you say "on their behalf," do you

15  mean that you were representing Symphony FS

16  Limited?

17      A.    No.

18      Q.    So what do you mean by that statement?

19      A.    I received communications from an

20  attorney acting on their behalf.

21      Q.    About what?

22      A.    Asking for information.

23      Q.    About what?

24      A.    Again, that's nothing to do with this

25  matter.
```

```
1                    AARON ETRA, ESQ.

2        Q.     Was it about bitcoin?

3        A.     Was it about bitcoin?  Yes.

4        Q.     Was Symphony acting as a potential

5   second buyer?

6        A.     No.

7        Q.     So why were you receiving an inquiry

8   about bitcoin from Symphony?

9        A.     I believe that's nothing to do with

10  this matter and that's not -- not relevant to

11  this matter.

12       Q.     Are you aware that Symphony is

13  involved with litigation with Velantis?

14       A.     Yes.

15       Q.     And what do you understand that

16  litigation to be about?

17       A.     I believe it's about the bitcoin

18  matter.

19       Q.     A bitcoin matter.

20       A.     Yeah.

21       Q.     Can you tell me anything else?

22       A.     No.

23       Q.     So you don't know anything about the

24  substance of that litigation?

25       A.     I have not been involved in the
```

1                    AARON ETRA, ESQ.

2    substance of that litigation, no.

3         Q.    How do you know they are involved in

4    litigation?

5         A.    By the fact that the letter from their

6    lawyer so indicated.

7         Q.    Do you know anything about the

8    substance of the litigation between Symphony and

9    Velantis?

10        A.    I have no knowledge of the substance

11   of that litigation, no.

12        Q.    You have none currently?

13        A.    What's that?

14        Q.    Did you ever know anything about that

15   lawsuit?

16        A.    No.

17        Q.    How about GSR?

18              Does that mean anything to you?

19        A.    GSR?  Not as such.

20        Q.    You have never heard the name GSR?

21        A.    I don't know if I have or have not.

22              If you show me something that

23   references it, I'd be happy to comment on it.

24

25

```
 1                  AARON ETRA, ESQ.

 2             (Exhibit Etra 27, Multipage document

 3      entitled: Complaint, dated March 1, 2019 (no

 4      Bates Nos.), marked for identification)

 5   BY MR. BROMBERG:

 6         Q.    Does this refresh your recollection as

 7      to GSR?

 8         A.    No, does not.

 9         Q.    Have you ever seen this document

10      before?

11         A.    I have not.

12         Q.    This is a complaint in a civil federal

13      action.

14               Do you see that?

15         A.    I see that's what it says.

16         Q.    You see that the plaintiff is GSR

17      Markets Limited?

18         A.    I do.

19         Q.    Do you see that the defendants are

20      Diana McDonald, McDonald Law Group LLC doing

21      business as Law Offices of Diana McDonald, LLC,

22      Valkyrie Group, LLC, Hugh Austin, Brandon

23      Austin, and Wells Fargo Bank, N.A.?

24         A.    I know nothing about this, and I have

25      not been involved in anything with this.
```

```
1                    AARON ETRA, ESQ.

2        Q.    Well, let me tell you something about

3   this litigation, sir, if I may.

4        A.    Well, I think it's irrelevant to our

5   situation, so it's a bit of a waste of our

6   collective time.

7        Q.    Oh, how can you make that

8   determination without actually knowing the

9   substance of the allegations in the complaint,

10  sir?

11       A.    Because I have no basis of being

12  involved in it, and no basis of any connection

13  to it.  That's how.

14       Q.    Well, let me give you that basis, sir.

15             Is that okay?

16       A.    No, it's not okay.

17             You are abusing this process by

18  bringing something that's totally irrelevant and

19  I have nothing to do with.

20       Q.    So you don't think there is any

21  potential connection between this case and our

22  case?

23       A.    I'm saying that I have no knowledge of

24  it and no involvement in it.

25             So the answer is:  Yes, I do believe
```

```
 1                    AARON ETRA, ESQ.

 2    that there is no basis for this line of

 3    questioning.

 4        Q.    Let me tell you, sir, that the

 5    allegation in this action is that GSR Markets

 6    Limited contracted with Valkyrie Group, LLC to

 7    purchase a quantity of bitcoin.

 8            And GSR Markets Limited submitted

 9    money to an escrow agent by the name Diana

10    McDonald.

11            And that escrow agent sent a

12    substantial portion of that money overseas to

13    places and persons unknown, never to be seen or

14    heard from again.

15        A.    It has nothing to do with me.

16            Please, I think you are abusing the

17    process by even taking the time to discuss this.

18            It has nothing to do with me.  I know

19    nothing of it.  Not been involved in it.

20    Nothing to do with my role in the present

21    situation.

22        Q.    Well, the seller in this transaction,

23    sir, was Valkyrie?

24        A.    That's Valkyrie.  I am not Valkyrie.

25        Q.    So this is the second transaction,
```

```
 1                   AARON ETRA, ESQ.
 2    sir, where Valkyrie Group LLC was the seller of
 3    bitcoin --
 4         A.    I have no idea what --
 5         Q.    -- and money was disbursed by an
 6    escrow agent, and never seen again.
 7         A.    -- I'm sorry, Mr. Bromberg, this is a
 8    line of questioning that's nothing to do with
 9    me.
10               You are abusing my time by asking me
11    on something that I have told you I have nothing
12    to do with, no knowledge of, no connection to.
13               It is a total abuse of time.
14         Q.    Do you believe it's a mere
15    coincidence, sir --
16         A.    I have no --
17         Q.    -- that the same thing --
18         A.    -- basis --
19         Q.    -- that happened to Benthos Master
20    Fund happened --
21         A.    -- that you're making --
22         Q.    -- to GSR Markets Limited?
23         A.    -- your making your statements doesn't
24    make it, in any event, relevant or any more
25    applicable to taking my time to discuss this.
```

```
1                    AARON ETRA, ESQ.

2                Please do not.

3        Q.    What do you think happened in this

4    case, sir?

5        A.    Again, you are abusing my time.  I am

6    not -- I am not --

7        Q.    -- this case --

8        A.    -- I am not --

9        Q.    -- the case of Benthos Master Fund?

10       A.    I have given you the testimony of what

11   I did and what my involvement is.

12               And that's my testimony.

13       Q.    What do you think happened in this

14   case?

15       A.    I'm not giving you any conjecture as

16   to what I think.

17               I have just told you what I did and

18   what my responsibilities are.

19       Q.    It continues to be your testimony here

20   today that everyone involved in this transaction

21   between Benthos Master Fund and Valkyrie LLC was

22   acting in good faith and continues to be acting

23   in good faith?

24       A.    I described my role in it and my

25   belief that people were acting in good faith,
```

```
 1                    AARON ETRA, ESQ.

 2     yes.

 3          Q.    Why does Benthos not have its bitcoin

 4     or money back? --

 5          A.    I can't answer all the world's

 6     questions, including that one.

 7          Q.    Who is responsible for this?

 8          A.    The parties entered into the

 9     agreements that they entered into, and the

10     consequences were the consequences.

11          Q.    Has Benthos' money been stolen?

12          A.    I have no basis of determining one way

13     or the other.

14                My belief is it that it has not been

15     stolen, no.

16                Basis of --

17          Q.    What is the basis for your belief that

18     the money has not been stolen?

19          A.    The basis that the people involved

20     have been acting in good faith.

21          Q.    Based on what?

22          A.    Based on their affirmations, based on

23     their actions, based on the communications that

24     they have given.

25          Q.    What affirmation of the Austin family
```

```
 1                    AARON ETRA, ESQ.

 2      have you received that they were acting in good

 3      faith?

 4           A.    I'm talking about in some cases it's

 5      affirmation, some cases it's action.

 6                 The facts are as I have presented

 7      them, as far as my involvement.  That's all can

 8      I comment on.

 9                 I can't conjecture.  I can't give you

10      theories.

11                 I can only give what you I've done,

12      how I've lived up to my responsibilities.

13                 MR. BROMBERG:  All right.  Let's take

14      five minutes.  I think we are almost done.

15                 (Recess from 3:41 p.m. to 3:47 p.m.)

16      BY MR. BROMBERG:

17           Q.    What have you been told by the Austins

18      that makes you believe they are proceeding in

19      good faith?

20           A.    It's their action -- that they have

21      been also trying to find buyers since the

22      indication of the problem.  So it's really their

23      action rather than what they have told me.

24           Q.    When you say they are trying to find

25      buyers, do you mean they are trying to find
```

1                    AARON ETRA, ESQ.

2    buyers in the context of this transaction?

3         A.    Yes.

4              I know nothing about what other

5    transactions are involved.

6         Q.    What efforts have the Austins made in

7    the last three months to find buyers of Mr.

8    Kaslov's bitcoin?

9         A.    They preferred a number of potential

10   buyers.

11        Q.    How many?

12        A.    The best of my knowledge and belief,

13   three, four, I think -- certainly four.

14        Q.    And you communicated with them in

15   connection with those three or four potential

16   buyers of Mr. Kaslov's bitcoins?

17        A.    I don't know if I've communicated with

18   all of them.

19              And I don't know the full extent of

20   what they have done.

21        Q.    There was a call for all of those

22   communications to be produced.

23        A.    All of those ones that I have been

24   involved with were, I believe, either submitted

25   by me, or Ms. Evans has those.

1                    AARON ETRA, ESQ.

2          Q.    And it's based on those that you

3    believe the Austins are proceeding in good

4    faith?

5          A.    Yes.

6          Q.    What makes you believe that Minh Hoang

7    Le is proceeding in good faith?

8          A.    Based on his willingness to be in

9    communications, based on his action when he went

10   to Dubai, based on his continuing availability.

11         Q.    When was the last time you spoke to

12   Mr. Hoang?

13         A.    I haven't spoken to him for some time.

14               Ms. Evans has been the one primarily

15   speaking to him recently.

16         Q.    What assurance have you received from

17   Mr. Kaslov that he is proceeding in good faith?

18         A.    He has been in communications with Ms.

19   Evans.

20               (Pause)

21         Q.    Do you have any other suggested

22   solutions to how Benthos can retrieve its money?

23         A.    I do not.

24         Q.    If you were in Benthos' position, what

25   would you do?

```
 1                    AARON ETRA, ESQ.

 2         A.    I would do my utmost to work together

 3    with their counter-party and with the owner of

 4    the asset to see whether the collective wisdom

 5    can come up with another solution.

 6         Q.    It is your testimony, sir, that you

 7    have been selflessly being trying to assist

 8    Benthos to recovery its money?

 9         A.    Yes.

10         Q.    From August?

11         A.    Yes.

12         Q.    Through today?

13         A.    Yes.

14         Q.    And that you have done everything in

15    your power that you could possibly do to help

16    them retrieve their money?

17         A.    Yes.

18              (Pause)

19         Q.    Does the name Isaac Austin mean

20    anything to you?

21         A.    Isaac Austin?  No.

22              Again, can you help me as to where

23    it's reflected?

24         Q.    Doesn't sound familiar to you?

25         A.    Isaac Austin?  No.
```

```
 1                    AARON ETRA, ESQ.

 2          Q.    How about Amy Tran?

 3          A.    Yes.

 4          Q.    Yes.

 5                What can you talk about Amy Tran?

 6          A.    Amy Tran is a broker.

 7          Q.    Whom does Ms. Tran represent?

 8          A.    She represents, I'm sure, a fair

 9    number of people, but her objective is to

10    function as a broker.

11                (Pause)

12          Q.    Did you have the opportunity to

13    consult with counsel in connection with the

14    subpoena that you received?

15          A.    No.

16          Q.    You did not have the opportunity to

17    consult counsel?

18          A.    No.

19          Q.    Who deprived you of the opportunity to

20    consult counsel?

21          A.    Maybe I misunderstood your question.

22                I didn't consult with counsel.  It was

23    my decision.

24          Q.    You chose not to consult with counsel,

25    correct?
```

```
1                    AARON ETRA, ESQ.

2         A.    Yes.

3         Q.    You chose not to have counsel appear

4    with you today.

5              Is that correct?

6         A.    Yes, that is correct.

7              (Pause)

8         Q.    Does Ms. Evans know that you are

9    appearing here today?

10         A.    Yes.

11         Q.    When was the last time you spoke to

12   Ms. Evans?

13         A.    It was earlier this week.  I don't

14   recollect whether it was Monday or Tuesday --

15   earlier this week.

16         Q.    What did you talk about with Ms.

17   Evans?

18         A.    Whether she had any news, any new

19   developments, whether I had any news or new

20   developments.

21         Q.    Were there any news or new

22   developments?

23         A.    No, not this week, no.

24         Q.    How about last week?

25         A.    I don't think last week either.
```

1                    AARON ETRA, ESQ.

2        Q.    How about the week before that?

3        A.    I think it's been some time since

4    there has been -- I do get calls from, you know,

5    buyers or brokers who are looking to present

6    buyers.  So that's something that I share with

7    her, until they come forward with something more

8    serious.

9              (Pause)

10       Q.    Let's go back to Exhibit 6 at page

11   347.

12             (Pause)

13       Q.    I believe you previously testified,

14   sir, that you took instructions from Ms. Evans

15   as to where the money should be sent from your

16   escrow account?

17       A.    It was instructions from Mr. Kaslov

18   communicated by Ms. Evans.

19       Q.    You also recognize, sir, that the

20   language of the contract provides only that you

21   are to take instructions from Valkyrie, correct?

22       A.    It said "the seller," but it was

23   understood by Valkyrie and Benthos that the

24   seller -- the ultimate seller was Mr. Kaslov.

25       Q.    Can you read to us paragraph 15.1 of

                         AARON ETRA, ESQ.

 1        page 347?

 2        A.    This Agreement, together with all the

 3   schedules and -- exhibits hereto and therein and

 4   other certificates and other written instruments

 5   delivered in connection herewith from time to

 6   time and following the date hereof constitute

 7   and contain the entire agreement and

 8   understanding between all Parties with respect

 9   to the subject matter hereof and thereof and

10   supersedes any and all prior negotiations,

11   correspondence, agreements, understandings,

12   duties, or obligations between both Parties and

13   respecting the subject matter here of and

14   thereof.  This Agreement may be amended and

15   revised only by written agreement signed by both

16   Parties.  All communications and notices between

17   the Parties will be in writing or sent by E-mail

18   to the persons and addresses set forth below,

19   effective on confirmed dispatch, or to such

20   persons and E-mail addresses as are notified

21   pursuant hereto.

22        Q.    Is there any other testimony that you

23   wish to add?

24        A.    No.

```
 1                    AARON ETRA, ESQ.

 2               MR. BROMBERG:  I have no further

 3       questions at this time.

 4               But we reserve the right to call you

 5       back in the event that becomes appropriate for

 6       whatever reason.

 7               And we appreciate your appearing

 8       today.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    AARON ETRA, ESQ.

 2              THE WITNESS:  Thank you.  I

 3        appreciated the hospitality.  Thank you.

 4                     *     *     *

 5           E N D   O F   P R O C E E D I N G

 6              Time noted 3:57 p.m.

 7                     *     *     *

 8

 9

10

11        _____

                          AARON ETRA, ESQ.

12

13

14

15   Subscribed and sworn to before me

16   this_____day of_____, 2019.

17

18

19

     _____
20                 NOTARY PUBLIC

21

22

23   My Commission expires:

24

25
```

```
 1                    AARON ETRA, ESQ.

 2                      E R R A T A

 3   STATE OF NEW YORK

 4   COUNTY OF NEW YORK

 5        I wish to make the following changes, for the

 6   following reasons:

 7   PAGE LINE

 8   ____ ____    CHANGE: _____

 9                 REASON: _____

10   ____ ____    CHANGE: _____

11               REASON: _____

12   ____ ____    CHANGE: _____

13               REASON: _____

14   ____ ____    CHANGE: _____

15               REASON: _____

16   ____ ____    CHANGE: _____

17               REASON: _____

18   ____ ____    CHANGE: _____

19               REASON: _____

20   ____ ____    CHANGE: _____

21               REASON: _____

22

23

24            _____

                         AARON ETRA, ESQ.

25
```

1                       AARON ETRA, ESQ.

2                   C E R T I F I C A T E

3    STATE OF NEW YORK

4    COUNTY OF NEW YORK

5

6            I, BRANDON RAINOFF, a Federal Certified

7    Realtime Reporter and Notary Public within and for

8    the State of New York, do hereby certify:

9            That  AARON ETRA, ESQ., the witness

10   whose  deposition is hereinbefore set forth, was duly

11   sworn by me and that such deposition is a true record

12   of the testimony given by the witness.

13           I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage, and that I am in no way interested in the

16   outcome of this matter.

17           IN WITNESS WHEREOF, I have hereunto set

18   my hand this 12th day of April, 2019.

19

20

21    _____

        BRANDON R. RAINOFF, RMR, CRR, RPR, FCRR

22

23

24

25