USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _12/20/2022_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BENTHOS MASTER FUND, LTD.,

                              Petitioner,

              -against-

AARON ETRA,

                              Respondent.

---

20-CV-3384 (VEC)

ORDER AND OPINION

VALERIE CAPRONI, United States District Judge:

Benthos Master Fund, Ltd. ("Benthos") successfully petitioned this Court to confirm an arbitration award of more than $5 million against Aaron Etra ("Etra"), an attorney who released Petitioner's funds from escrow in violation of his contractual and fiduciary duties as the escrow agent for a purported cryptocurrency sale. Although Benthos began seeking discovery from Etra to facilitate its execution of the judgment over two years ago, Etra has repeatedly failed to produce documents and information about his finances and has persistently and flagrantly disregarded court orders enforcing Petitioner's subpoenas. Despite being served with a restraining notice pursuant to N.Y. C.P.L.R. § 5222 (the "Restraining Notice") two years ago, Etra has failed to make any payments toward Petitioner's judgment, while spending lavishly on airfare to Europe, luxury hotels, and restaurant meals. Benthos therefore moved the Court to hold Etra, who has consistently appeared *pro se*, in criminal or civil contempt. *See* Not. of Mot., Dkt. 209. At a hearing on December 14, 2022 (the "Contempt Hearing"), the Court GRANTED Petitioner's motion to hold Etra in civil contempt, DENIED without prejudice[1] Petitioner's

---

[1]       The Court denied Petitioner's motion for criminal contempt without prejudice. At present, the Court's priority is to obtain compliance with its orders, not to punish Etra. If Benthos continues to wish to see Etra punished, it can re-raise its motion to hold him in criminal contempt at an appropriate time.

motion to hold Etra in criminal contempt, and ordered Etra's remand until he complies with the Restraining Notice and with orders previously entered by this Court.[2]  *See* Contempt Hearing Tr. at 16–17; 33–48.

## BACKGROUND

Petitioner is a California investment firm, and Respondent is a New York attorney.  Pet., Dkt. 1, ¶¶ 1, 2.  Etra's scheme to defraud Petitioner is set forth in the Court's prior orders in this case.  *See* Orders, Dkts. 14, 174.   For the purposes of this opinion, the Court limits its discussion to Etra's history of failing to comply with Court orders and with the Restraining Notice.

On April 30, 2020, Benthos filed a petition in this Court to confirm its $5,254,561.12 arbitration award against Etra.[3]  *See generally* Pet., Dkt. 1.  Judge Nathan, who was then assigned to the case, confirmed the award and entered judgment (the "Judgment") against Etra on August 12, 2020.  *See* Order, Dkt. 14; Judgment, Dkt. 15.  On August 26, 2020, the Court allowed Benthos to begin enforcement proceedings.  *See* Order, Dkt. 21.

Pursuant to Federal Rule of Civil Procedure 69(a)(2) and N.Y. C.P.L.R. § 5224(a)(2), Benthos promptly served Etra with a subpoena *duces tecum* (the "First Document Subpoena")

---

[2]        Etra, who has been proceeding *pro se* for the majority of this case, is an attorney and a member of the Bar of the State of New York.  Accordingly, he is not entitled to the same allowances as a *pro se* litigant who does not have a legal education.  *See MacCartney v. O'Dell et al.*, No. 14-CV-3925 (NSR), 2016 WL 815279, at *2 (S.D.N.Y. Feb. 29, 2016) (noting that "licensed attorneys proceeding *pro se* need not be afforded" the same "liberal standard" as other *pro se* litigants) (quoting *Smith v. N.Y. Presbyterian Hosp.*, 254 F. App'x 68, 70 (2d Cir. 2007) (summary order)).

In light of Etra's *pro se* status and his continued assertions of poverty, the Court asked the New York Federal Defenders (the "Federal Defenders") to represent him on July 13, 2022, in the hope that an attorney could help impress upon Etra the necessity of abiding by the orders of this court.  *See* Minute Entry (July 13, 2022).  The Court once again appointed the Federal Defenders to represent Etra at a civil contempt hearing on August 2, 2022.  *See* Minute Entry (Aug. 2, 2022).  On December 14, 2022, when it appeared quite possible that he would be remanded upon a finding that he was in civil contempt, the Court appointed the Federal Defenders to represent him for limited purposes.  *See* Contempt Hearing Tr. at 7–8; Minute Entry (Dec. 14, 2022); Orders Dkts. 247, 258.

[3]        It is worth noting that Etra chose not to participate in the arbitration.  *See* Final Award, Dkt. 1-1, ¶ 53.

and a restraining notice with information subpoena (the "First Information Subpoena"[4]).  *See*
First Document Subpoena, Dkt. 211-4; First Information Subpoena, Dkt. 211-5.  The First
Document Subpoena directed Etra to produce fifty-nine categories of documents concerning his
finances covering the period from August 1, 2018 through "the present."[5]  First Document
Subpoena, Dkt. 211-4, ¶ N.   The subpoena sought, *inter alia*:

- "All documents concerning the nature, extent, and location" of all the assets Etra
  owned or controlled ("Item 1 of the First Document Subpoena");

- "All documents, including but not limited to all monthly statements . . .
  concerning any bank accounts, brokerage accounts, investment accounts,
  checking accounts, savings accounts, and all other accounts" in which Etra has or
  had an interest ("Item 3 of the First Document Subpoena");

- "All documents, including but not limited to all monthly statements . . .
  concerning any credit cards" in which Etra has or had an interest ("Item 4 of the
  First Document Subpoena");

- "All documents concerning any escrow agent agreements" entered into by Etra
  ("Item 32 of the First Document Subpoena");

- "All documents concerning how" Etra paid his monthly expenses ("Item 34 of
  the First Document Subpoena"); and

- "All documents concerning" Etra's "banking records," including credit
  applications and statements for "any checking, savings, money market, certificate

---

[4]      This opinion refers to the "Restraining Notice" when specifically referencing the restraining notice (as opposed to the information subpoena) served on August 27, 2020.

[5]      The First Document Subpoena was served on August 27, 2020.  First Document Subpoena, Dkt. 211-4, at 2; Popofsky Decl., Dkt. 211, ¶ 5.

of deposit, investments, bonds, retirement accounts, safety deposit boxes or any

other financial assets maintained with any banking or financial firm or institution

. . . ." ("Item 49 of the First Document Subpoena").

First Document Subpoena, Dkt. 211-4, ¶¶ 1, 3–4, 32, 34, 49.

The First Information Subpoena directed Etra to respond under oath to thirty-six

questions concerning his finances covering the period from August 1, 2018 through "the

present."[6]  First Information Subpoena, Dkt. 211-5, at 6.  The subpoena sought, *inter alia*:

- An identification of all bank accounts, brokerage accounts, investment accounts,

  checking accounts, savings accounts, and "all other accounts" in which Etra has

  or had an interest ("Item 1 of the First Information Subpoena");

- As to each disclosed account, "the exact name on the account, the date the

  account was opened, the account number, the names of the signatories on the

  account, and the amounts presently on deposit," plus further details if the account

  was closed and information about the last drawn check or wire ("Item 2 of the

  First Information Subpoena");

- All credit cards in which Etra has or had an interest ("Item 3 of the First

  Information Subpoena"); and

- As to each disclosed credit card, the exact name on the card, the date the credit

  card account was opened, the credit card number, the names of the signatories on

  the card, and the amount of the line of credit, plus further details if the account

  was closed and information about the last transaction ("Item 4 of the First

  Information Subpoena").

---

[6]      The First Information Subpoena was served on August 27, 2020.  First Information Subpoena, Dkt. 211-5, at 5; Popofsky Decl., Dkt. 211, ¶ 5.

*Id.* ¶¶ 1–4.

The Restraining Notice prohibited Etra from disposing of any property in which he has an interest, as well as all property coming into his possession after the Restraining Notice was issued, except as provided under New York law.  Restraining Notice, Dkt. 211-5, at 2–4.

Etra was required to respond or object to Petitioner's subpoenas by September 21, 2020. *See* First Document Subpoena, Dkt. 211-4, at 3; First Information Subpoena, Dkt. 211-5, at 3; Fed. R. Civ. P. 45(d)(2)(B).  Etra did not object to either subpoena, repeatedly requested extensions to respond, and eventually produced some documents and information to Benthos in September 2020.  *See* R&R, Dkt. 95, at 3; Popofsky Decl., Dkt. 24, ¶¶ 6–12; Etra Mem., Dkt. 28, ¶¶ 4–9.  Judge Nathan concluded that it was "clear" that Etra had not adequately responded to the subpoenas, *see* Order, Dkt. 33, and repeatedly ordered him to comply with Petitioner's requests, *see* Orders, Dkts. 39, 54, 59.

Although the parties appeared to have reached a settlement agreement on April 1, 2021, it was short lived: Etra failed to make any payment, thereby voiding the settlement.  *See* R&R, Dkt. 95, at 6.[7]

Magistrate Judge Parker recommended granting a subsequently-filed motion to hold Etra in contempt, *see id.*, and on May 16, 2022, the Court adopted Judge Parker's recommendation, *see* Order, Dkt. 108.  The Undersigned ordered that Etra would be fined $50 per day starting on June 21, 2022 if he failed to produce specific documents, including monthly statements and closing statements for specific accounts, proof of funds received from any closed accounts, and certain tax records.  *See id.* at 4–5.

---

[7]     On February 18, 2021, this case was referred to Magistrate Judge Parker for general pretrial supervision. Referral, Dkt. 62.  On September 30, 2021, Petitioner moved to hold Etra in civil contempt for his failure to produce documents notwithstanding three court orders requiring him to respond to Petitioner's First Document Subpoena and First Information Subpoena.  *See* Not. of Mot., Dkt. 81.

After Etra was granted another extension to comply with Petitioner's subpoenas, *see* Order, Dkt. 113, yet insisted on another extension, *see* Dkt. 114, the Court scheduled a hearing regarding whether he should be held in contempt, and ordered Etra to appear with the documents he had been ordered to produce, *see* Order, Dkt. 116.

Etra sent certain tax documents to Petitioner's counsel, *see* Dkts. 119–21, 125, but did not fully satisfy the Court's orders by the date of the hearing, which he failed to attend, *see* Order, Dkt. 126, at 1.

On July 7, 2022, the Court ordered Etra to show cause before the Court on July 13, 2022, why a warrant for his arrest should not be issued so that he could be imprisoned as a coercive sanction until he complied fully with the Court's orders. *Id.* The Court also ordered that Etra's $50 per-day fine would increase to $1000 effective the following day and would thereafter double every other day until Etra fully complied or was jailed. *Id.* at 4.

On July 10 and 11, 2022, Etra produced some of the information and documents that he had been ordered to produce, *see* Dkts. 127, 129, but failed and refused to provide other subpoenaed information and documents, *see* Dkt. 130. Etra falsely represented that he had "no other savings, money market, certificates of deposit, investments, retirement accounts, safety deposit boxes or financial assets" beyond the accounts he had provided to Petitioner's counsel. *See* Dkt. 129 at 98.[8]

The parties appeared before the Court on July 13, 2022. *See* Order, Dkt. 132. The Court found Etra in civil contempt for failing to produce documents as ordered and remanded him into

---

[8]     The falsity of Etra's representation was revealed by the very documents he produced. Among the documents he produced on July 10, 2022, were bank statements from an account at Piermont Bank that revealed his ownership of other accounts that had never been disclosed. *See* Order, Dkt. 132.

the custody of U.S. Marshals.  *Id.* at 1.  Later that day, the Court ordered Etra released from custody subject to his commitment to comply with a document production schedule.  *Id.*

On July 14, 2022, Etra was ordered to produce escrow agreements and monthly bank account statements and to file sworn statements certifying that the documents had been produced as required by July 15 and July 19, 2022.  *Id.* at 2–5.

On July 25, 2022, Benthos informed the Court of Etra's remaining deficiencies and violations of its Restraining Notice.  *See* Dkt. 136.  The Court ordered Etra to show cause at the next status conference why he should not be held in civil contempt and remanded in light of his continued violation of court orders.  *See* Order, Dkt. 137, at 13.  The Court also required Benthos to submit a spreadsheet reflecting the items Etra had been ordered to produce pursuant to the Court's July 14, 2022, order, the items Benthos had received, and the items Benthos did not receive but believed existed (the "July 2022 Spreadsheet").  *Id.*

In its July 2022 Spreadsheet, Benthos represented that: Etra had produced almost no escrow agreements even though bank statements Etra had produced reflected "dozens of transactions" in his attorney escrow accounts; Etra had failed to produce monthly bank statements for a slew of accounts; none of the bank statements produced by Etra reflected receipt of social security payments prior to the time they were deposited into a recently-disclosed Piermont Bank account; and Etra had not produced documents substantiating many account closures.  *See* July 2022 Spreadsheet, Dkt. 140-1.

In response, Etra stated that his purportedly privileged escrow arrangements expired after twelve months and that "no documents are retained."  Dkt. 141 at 3.  He also stated that he diligently submitted the bank records that he possessed, was still trying to find certain financial

records, and attached additional bank statements he identified as missing after reviewing the July 2022 spreadsheet. *Id.* at 3–15.

Following a status conference on August 2, 2022, the Court found Etra in contempt of its July 14, 2022, order. *See* Order, Dkt. 143. The Court ordered Etra to produce missing account documents by August 10, 2022, and either to produce the escrow agreements associated with certain named clients (whose identities had been derived from the bank account statements Etra had finally produced) by August 22, 2022,[9] or to move to quash the First Document Subpoena for those documents by August 19, 2022.[10] *See* Orders, Dkts. 143, 144. The Court also referred the question of whether Etra has custody or control over bank accounts at SberBank and Uni-Credit (and therefore whether failure to produce bank statements from these accounts violated the Court's July 14, 2022 Order) to Magistrate Judge Parker. *See* Referral, Dkt. 145.

On August 2, 2022, Benthos served Etra with another subpoena *duces tecum* (the "Second Document Subpoena")[11] and a second restraining notice with information subpoena (the "Second Information Subpoena"[12]). *See* Second Document Subpoena, Dkt. 211-6; Second Information Subpoena, Dkt. 211-7. The Second Document Subpoena directed Etra to produce nine categories of documents concerning his finances covering the period from August 1, 2017

---

[9]     The names of at least thirty-one of Etra's escrow clients were ascertained from the attorney escrow account documents Etra belatedly produced. *See* Order, Dkt. 144, at 3–4.

[10]    There has never been any explanation why, if Etra, a licensed attorney, actually believed these documents were privileged, he did not move to quash the subpoenas when they were first received in August 2020 or at any point along the calendar between then and August 2022. Nevertheless, because Etra asserted *ipse dixit* that the agreements were privileged, the Court afforded him the opportunity to support that claim with legal authority.

[11]    Benthos also issued a subpoena *duces tecum* seeking documents Etra had provided to Judge Parker *in camera* on May 11, 2021. *See* R&R, Dkt. 96, at 6. That subpoena is not material to the this opinion.

[12]    This opinion refers to the "Second Restraining Notice" when specifically referencing the restraining notice (as opposed to the information subpoena) served on August 2, 2022.

through the present and going forward (unless otherwise specified).[13]  *See* Second Document Subpoena, Dkt. 211-6, ¶¶ L, N.   The subpoena sought, *inter alia*:

- "All documents concerning communications since the date of the Judgment (August 13, 2020)" sent or received by Etra concerning his financial status, attempts to obtain or provide funds to satisfy the Judgment, Court orders issued in this matter, and Petitioner's or its counsel's judgment-enforcement efforts ("Item 1 of the Second Document Subpoena");

- "All documents . . . concerning any bank accounts, brokerage accounts, investment accounts, checking accounts, savings accounts, and all other accounts" in which Etra has or had an interest ("Item 2 of the Second Document Subpoena");

- "All documents . . . concerning any credit cards" in which Etra has or had an interest ("Item 3 of the Second Document Subpoena");

- "All documents concerning any escrow agreements" entered into by Etra after July 2022 ("Item 4 of the Second Document Subpoena"); and

- "All documents, including but not limited to agreements and written communications, concerning" Etra's legal, paymaster, escrow-related or other services ("Item 5 of the Second Document Subpoena").[14]

*Id.* ¶¶ 1–5.

---

[13]     The Second Document Subpoena was served on August 2, 2022.  *See* Second Document Subpoena, Dkt. 211-6, at 3; Popofsky Decl., Dkt. 211, ¶ 6.

[14]     The Second Document Subpoena cross-references Item 1 of the Second Information Subpoena.  *See* Second Information Subpoena, Dkt. 211-7, ¶ 1.

The Second Information Subpoena directed Etra to respond under oath to nine questions concerning his finances covering the period from August 1, 2017 through "the present."[15] Second Information Subpoena, Dkt. 211-7, at 6.  The subpoena sought, *inter alia*:

- The name and full contact information for every client for whom Etra performed "any legal, 'paymaster,' escrow-related, or other services," plus the nature of services performed, compensation Etra received for his services, where such compensation was paid, all subsequent transfers of the compensation, and the current whereabouts of the compensation ("Item 1 of the Second Information Subpoena");

- All bank accounts, brokerage accounts, investment accounts, savings accounts, and all other accounts in which Etra has or had an interest ("Item 4 of the Second Information Subpoena");

- As to each disclosed account, "the exact name on the account, the date the account was opened, the account number, the names of the signatories on the account, and the amounts presently on deposit," plus further details if the account was closed and information about the last drawn check or wire ("Item 5 of the Second Information Subpoena");

- All credit cards in which Etra has or had an interest ("Item 6 of the Second Information Subpoena"); and

- As to each disclosed credit card, the exact name on the card, the date the card the date the card was opened, the credit card number, the names of the signatories on

---

[15]     The Second Information Subpoena was served on August 2, 2022.  Second Information Subpoena, Dkt. 211-7, at 5; Popofsky Decl. 2, Dkt. 211, ¶ 6.

the card, and the amounts of the line of credit, plus further details if the account

was closed and information about the last transaction ("Item 7 of the Second

Information Subpoena").

*Id.* ¶¶ 1, 4–7.

The subpoenas required responses or objections by September 1, 2022. *See* Second

Document Subpoena, Dkt. 211-6, at 2; Second Information Subpoena, Dkt. 211-7, at 2; Fed. R.

Civ. P. 45(d)(2)(B).

On August 19, 2022, Etra moved to quash the First Document Subpoena to the extent it

required the production of escrow agreements. *See* Dkt. 149. On August 30, 2022, Etra

requested an extension of time to respond to the Second Document Subpoena and the Second

Information Subpoena, Dkt. 155, which the Court denied, Order, Dkt. 157. Two days later, Etra

moved to quash those subpoenas in their entirety or, at minimum, those portions requesting

"privileged information and related information . . . ." *See* Dkts. 158, 164. Etra also moved the

Court to find that the subpoenas were improperly served and to modify the date range covered.

*Id.* On September 20, 2022, Etra reiterated his views on settlement and admitted that he "took

modest fees" over the last "four years of this matter." Dkt. 170.

On September 26, 2022, the Court denied Etra's motions to quash and ordered him to

produce all escrow agreements that he had previously been ordered to produce by September 30,

2022,[16] and to fully respond to Petitioner's Second Document Subpoena and Second Information

Subpoena by October 7, 2022 (the "September 2022 Order"). *See* September 2022 Order, Dkt.

---

[16] Etra had previously been ordered to "be prepared to disclose all escrow agreements" in the event his motion to quash were denied. *See* Order, Dkt. 144.

174.[17]  Etra again made several extension requests, *see* Dkts. 175, 178, 179, 182, which the

Court denied after he failed even to make a partial production as a sign of good faith, *see* Orders,

Dkts. 177, 181, 184.

On October 27, 2022, Benthos moved, by letter, to hold Etra in contempt for failing to

comply with its subpoenas and restraining notices, notably by failing to produce current bank or

credit card statements that he had been ordered to produce.  *See* Dkt. 202.  The Court denied its

motion without prejudice, and required Benthos to file a proper motion supported by a

memorandum of law and, as appropriate, affidavits and exhibits, for any requested relief.  *See*

Order, Dkt. 203.  On October 28, 2022 (the "October 2022 Order"), the Court advised Etra that if

Petitioner's letter motion was accurate and he had indeed not provided any current banking or

credit card records, he should "rectify this non-compliance **immediately** by promptly producing

bank records post-dating June 30, 2022, and his American Express card records, both of which

have been subpoenaed."  October 2022 Order, Dkt. 206.

On November 9, 2022, Etra testified before Magistrate Judge Parker that he did not have

control over the UniCredit or SberBank accounts.  *See* Parker Hearing Tr., Dkt. 214, at 23–24.

Etra had testified several years before as part of a state court proceeding that, as of April 12,

2019, he had a bank account in Europe.  *See* Etra Deposition Tr., Dkt. 243-4, at 249–51.

On November 15, 2022, Benthos filed a proper motion to hold Etra in criminal or civil

contempt.  *See* Benthos Not. of Mot., Dkt. 209.  Benthos requested sanctions including Etra's

---

[17]      The Court noted in its order that Benthos had voluntarily withdrawn that portion of Item 2 of the Second
Document Subpoena requiring bank statements covering the period from August 1, 2018 to June 30, 2022; and
Items 5 and 7 of its Second Information Subpoena.  *See* September 2022 Order, Dkt. 174, at 15 n.12 (citing Benthos
Mem., Dkt. 161, at 5 & n.2).

Although not as artfully written as it could have been, in context, the Court understood that Benthos was
withdrawing portions of Item 2 of the Second Document Subpoena only as to bank accounts that had previously
been disclosed; it did not excuse Etra from producing all bank records from August 2017 to the present as to any
account not previously disclosed.

incarceration, the surrendering of Etra's passport, and a ban on Etra's international travel.  *Id.*
Benthos further requested that the Court require Etra to comply with its subpoenas, enjoin Etra
from violating its restraining notices, and that it order a forensic examination of Etra's computer
and cellphone, among other relief.  *Id.*  The Court set a hearing on the motion for December 14,
2022, *see* Order, Dkt. 212, granted Etra an extension to oppose the motion, *see* Order, Dkt. 232,
and requested supplementary spreadsheets from Benthos to better understand the extent of Etra's
alleged noncompliance, *see* Orders, Dkts. 218, 244.

 After determining that Etra risked incarceration for his contempt, the Court ordered Etra
to submit a financial affidavit if he wanted the Court to appoint counsel for him because he is
indigent.  *See* Order, Dkt. 247.  The Court also advised Etra that Amy Gallicchio from the Office
of the Federal Defenders of New York ("Counsel"), who had previously represented him on a
limited basis on July 13, 2022 and on August 2, 2022, would attend the hearing for the limited
purpose of representing him in this civil contempt proceeding if the Court found him to be
indigent.  *Id.*  Although the Court has grave doubts about the accuracy of Etra's representations
in his financial affidavit, which was filed under seal, on December 14, 2022, the Court appointed
Counsel to represent Etra.  *See* Contempt Hearing Tr. at 7–8; *Huber v. Marine Midland* Bank, 51
F.3d 5, 11 (2d Cir. 1995) (noting that the district court appointed counsel for a *pro se* lawyer
incarcerated for civil contempt given the "poor quality of [the contemnor's] courtroom
performance over the years").  In light of Petitioner's outstanding Judgment, which exceeds $5
million, it seems probable that Petitioner is technically insolvent (unless he secreted and still
possesses Benthos's funds that he improperly released from escrow).[18]

---

[18] The probability that Etra's debts exceed his assets does not undercut the Court's conclusion, based on the
evidence before it to date, that Etra has the ability to pay Petitioner $94,070.78 to cure his contempt.  That said, the
Court remains open to considering credible, admissible evidence that, in fact, Etra is unable to pay any part of the
Judgment.

After ascertaining that Etra had not produced the materials required by this Court's orders, the Court inquired whether reasonable efforts had been made.  Because of Etra's lackluster opposition to Petitioner's contempt motion, *see* Etra Decl. in Opp. to Mot., Dkt. 235, the Court had reminded him that he should bring any evidence he had to refute Petitioner's claim to court with him, *see* Orders, Dkts. 238, 250.  Etra brought neither supporting documents nor his computer to the Contempt Hearing.  *See* Contempt Hearing Tr. at 20–30, 50–51.  When Etra was asked about the efforts to gather the required documents and information, it became quickly clear that he had made no diligent efforts.  *Id.* at 9, 20–30, 50–51.  He had no documentary evidence that he had ever requested bank or credit card records.  *Id.* at 21.  As to records that should have been readily available to him on-line (like his current bank and credit card accounts), Etra asserted that he would produce the records later that day, that he had not realized the records were missing, or that he had made only oral requests to his bank for the records.  *Id.* at 20–30, 50–51.  In other words, Etra offered no evidence beyond his own say-so, which the Court is not required to credit given his documented pattern of making false statements during this case.  *See Huber*, 51 F.3d at 11 (noting that the district court "was entitled to consider [the contemnor's] refusal to produce documents in assessing the credibility of his oral representations" at a contempt hearing); *United States v. Bobart Travel Agency, Inc.*, 699 F.2d 618, 620 (2d Cir. 1983) (noting that the court may weigh the "credibility" of a party's assertions during contempt proceedings) (quoting *Maggio v. Zeitz*, 333 U.S. 56, 76 (1948)).

Because Etra did not make diligent efforts to produce outstanding documents and information, the Court held Etra in civil contempt and ordered his incarceration until (1) he produces all documents that he has previously been ordered to provide, as further specified below; and (2) he pays Petitioner $94,070.78, which represents the sum of all amounts known to

14

have been deposited into one of Etra's personal bank accounts from August 27, 2020 onward that were not obviously exempt from the Restraining Notice, as further discussed below.[19]  *See* Contempt Hearing Tr. at 33–35, 48.

## DISCUSSION

In order to find a party in contempt, the Court must find that "(1) the order the [alleged] contemnor failed to comply with is clear and unambiguous; (2) the proof of noncompliance is clear and convincing; and (3) the [alleged] contemnor has not diligently attempted to comply in a reasonable manner." *Grand v. Schwarz*, No. 15-CV-8779, 2018 WL 1583314, at *3 (S.D.N.Y. Mar. 27, 2018) (internal quotation marks and citations omitted).  The moving party bears the burden of proof to establish contempt by "clear and convincing evidence," which requires "a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation occurred." *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002) (internal quotation marks and citations omitted).

## I.      Etra is in Contempt of the September 2022 Order and the October 2022 Order

Etra is in contempt of the September 2022 Order and the October 2022 Order (the "September and October 2022 Orders"), among countless other orders issued by this Court over the past two years, because glaring deficiencies in Etra's document productions remain despite the many opportunities he has been given to cure them.

---

[19]      An additional $30,787 was withdrawn from Etra's various attorney trust accounts since the date of the Restraining Notice.  Those transactions, listed on a spreadsheet prepared by Benthos ("IOLA Suspicious Withdrawals Spreadsheet"), Dkt. 243-3, appear to have been for Etra's personal benefit (*e.g.*, cash withdrawals and transfers to his wife).  As discussed *infra*, note 37, Etra has separately been ordered to show cause why those sums should not be added to the sum of money he must remit to Benthos to purge his contempt.

### A.  Legal Standard

Federal Rule of Civil Procedure 69(a)(2) provides that "[i]n aid of" the execution of a judgment, "the judgment creditor . . . may obtain discovery from any person—including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(2).  New York civil procedure allows judgment-creditors to serve document subpoenas, *see Amaprop Ltd. v. Indiabulls Finc. Servs. Ltd.*, No. 10-CV-1853 (PGG) (JCF), 2012 WL 4801452, at *11 (S.D.N.Y. Oct. 5, 2012), as well as information subpoenas to obtain evidence relating to the judgment-debtor's assets and any other "matters relevant to the satisfaction of the judgment," *Giuliano v. N.B. Marble Granite*, No. 11-MC-00753 (JG) (VMS), 2014 WL 2805100, at *3 (E.D.N.Y. June 20, 2014); *see also* N.Y. C.P.L.R. §§ 5223–5224.

"[B]road post-judgment discovery in aid of execution is the norm in federal and New York state courts." *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012); *see also First City, Tex.-Hous., N.A. v. Rafidain Bank*, 281 F.3d 48, 54 (2d Cir. 2002); *Libaire v. Kaplan*, 760 F. Supp. 2d 288, 293 (E.D.N.Y. 2011) (Rule 69 "permits 'wide latitude in using the discovery devices provided by the Federal Rules in post-judgment proceedings.'" (quoting *Gibbons v. Smith*, No. 01-CV-1224 (LAP), 2010 WL 582354, at *3 (S.D.N.Y. Feb. 11, 2010))); *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, No. 88-CV-3039, 1993 WL 50528, at *1 (E.D.N.Y. Feb. 23, 1993) (a judgment-creditor "is entitled to a very thorough examination of a judgment debtor with respect to its assets" (internal quotation marks omitted)); *see also Amaprop Ltd.*, 2012 WL 4801452, at *12 (granting petitioner's motion to compel respondent to comply with its post-judgment subpoena under the N.Y. C.P.L.R. in part after its arbitration award was confirmed in federal court); *Universitas Educ., LLC v. Nova Grp., Inc.*, No. 11-CV-1590 (LTS)

(HBP), 2013 WL 57892, at *9 (S.D.N.Y. Jan. 4, 2013) (denying motions to quash petitioner's subpoenas, which it issued after its arbitration award was confirmed in federal court).

### B.  Etra's Noncompliance with the September and October 2022 Orders

The September and October 2022 Orders, as well as the multiple orders that preceded them, were clear and unambiguous.  *See Grand*, 2018 WL 1583314, at *3; *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) ("A clear and unambiguous order is one that leaves no uncertainty in the minds of those to whom it is addressed . . . .") (internal quotation marks and citation omitted).  The Court has issued several prior orders requiring Etra to produce financial information, bank statements, and escrow agreements that he has still failed to produce, *see, e.g.*, Orders, Dkts. 102, 126, 132, 184, and has held Etra in civil contempt three times for failing to comply with those orders, most recently on August 2, 2022, *see* Orders, Dkts. 108, 132, 143.  The September 2022 Order denied Etra's motions to quash Petitioner's Second Document Subpoena and Second Information Subpoena and, once again, ordered him to produce all escrow agreements that were called for by Petitioner's First Document Subpoena and that were encompassed within previous orders, as well as to fully respond to Petitioner's subpoenas.  *See* September 2022 Order, Dkt. 174, at 15–16.  The Court repeatedly denied Etra's requests for extensions to satisfy the September 2022 Order.  *See* Orders, Dkts. 177, 181, 184.  Moreover, because there was no conceivable difficulty in obtaining and producing current bank and credit card statements, the Court ordered Etra to produce such documents "**immediately**. . . ."  *See* October 2022 Order, Dkt. 206.  At no time and in response to none of those orders did Etra indicate that he did not understand what he was being required to produce.  Thus, there can be no dispute as to what he was ordered to provide in order to be in full compliance with the September and October 2022 Orders.

The Court finds that proof of noncompliance with the September and October 2022 Orders is clear and convincing, *see Safeco Ins. Co. v. M.E.S., Inc.*, No. 09-CV-3312 (PKC) (VMS), 2014 WL 12834210, at *18–19, 28 (E.D.N.Y. June 27, 2014) (finding clear and convincing evidence of noncompliance when a contemnor's partial document production "fell short" of all documents requested, even after the requesting party provided an "extremely detailed accounting of missing documents in previous productions"), *report and recommendation adopted*, 2017 WL 1194730, at *9 (Mar. 30, 2017), and that Etra has not made diligent efforts to comply with the Orders, *see Schmitz v. St. Regis Paper Co.*, 758 F. Supp. 922, 927 (S.D.N.Y. 1991) ("To determine reasonable diligence, courts examine the defendant's actions and consider whether they are based on a good faith and reasonable interpretation of the court order.").[20]

Although there are many deficiencies in Etra's document and information productions to date, Etra may purge his contempt by producing the following documents and information.[21]

### 1. Complete Accounting of Funds Received from Legal, Paymaster, Escrow-Related or Other Services from August 1, 2017 through the Present

Etra's bank records produced to date reflect that his IOLA accounts[22] received hundreds of thousands of dollars purportedly from clients between February 2019 and June 2022. *See,*

---

[20]    As noted above, Etra has presented no evidence that he has made any formal written — or even on-line — requests for account statements from his banks and credit card companies or that he has searched his on-line accounts or cloud storage for responsive materials. *See* Contempt Hearing Tr. at 9, 20–30, 50–51. Because many of the requested materials should be readily available to Etra, there is more than clear and convincing evidence that he has not used reasonable diligence to comply with this Court's orders.

[21]    This is not a complete list of outstanding items, but it reflects the items that appear to be most urgent to Petitioner's efforts to collect its Judgment. If Etra produces these items, the Court would consider a request that he be released from custody while he produces the balance of the items that he has been ordered to produce.

[22]    Etra has a practice of regularly opening and closing accounts, including IOLA accounts. The Court has seen evidence of at least three IOLA accounts in Etra's name that were active at some point during the period between February 2019 and June 2022. *See* Piermont -2292, Dkt. 211-18; M&T -3441, Dkt. 211-17; M&T -7045, Dkt. 192-21.

*e.g.*, M&T -3441, Dkt. 211-17, at 46 (Oct. 16, 2020) (reflecting a $26,000 transfer from Oceanix, Inc.); *id.* at 66 (Aug. 13, 2021–Aug. 18, 2021) (reflecting $223,200 in total transfers from Transfer Pass LLC); *id.* at 74 (Dec. 6, 2021) (reflecting a $100,000 transfer from George Michael Du Plooy).  Moreover, Etra's personal bank records reflect tens of thousands of dollars in "business internet transfer[s]" from his IOLA accounts between May 2020 and June 2022. *See, e.g.*, Piermont -2060, Dkt. 211-13, at 90 (Oct. 12, 2021) (reflecting a $10,000 transfer from his Piermont -2292 IOLA account); *id.* at 102 (Dec. 20, 2021) (reflecting a $1,000 transfer from his Piermont -2292 IOLA account); *id.* at 114 (Apr. 29, 2022) (reflecting a $5,000 transfer from his Piermont -2292 IOLA account).  Etra was required to produce an accounting of all funds received from "any legal, 'paymaster,' escrow-related, or other services" pursuant to Item 1 of the Second Information Subpoena and the September 2022 Order; his response listed only modest fees from three of his forty-one known clients.  *See* Etra Second Information Subpoena Response, Dkt. 211-23, at 2 (listing $136 in fees from Renato Corzo, $146.37 in fees from Goldfinger Enterprise, and $150 in fees from Charles Weinstein).

In order to purge his contempt, Etra must provide a complete accounting of all funds received from any legal, paymaster, escrow-related, or other services from August 1, 2017 through the present.

### 2.  Monthly Citibank -0873 Statements

Etra has produced monthly statements for his Citibank -0873 account for September through October 2017, December 2017, August through October 2018, and December 2018, *see* Citibank Account -0873, Dkts. 192-13, 235-5.  Item 2 of the Second Document Subpoena and the September 2022 Order required him to produce monthly statements for that account from August 1, 2017 through August 1, 2018.

In order to purge his contempt, Etra must produce monthly statements for his Citibank -0873 account for August and November 2017 and from January 2018 through July 2018.

### 3. European Bank Account Monthly Statements from August 1, 2017 Through the Present

On April 12, 2019, Etra testified, under oath, that he had a bank account in Europe.  *See* Etra Deposition Tr., Dkt. 243-4, at 249–51.  Etra has neither identified the bank in which he holds the account nor produced corresponding monthly statements as required by Items 1 and 3 of the First Document Subpoena, Item 2 of the Second Document Subpoena, Item 4 of the Second Information Subpoena, and the September and October 2022 Orders.

In order to purge his contempt of the September and October 2022 Orders, Etra must identify his European bank account(s) and produce monthly statements from August 1, 2017 through the present or through the date of closing.[23]  If the account was opened after August 1, 2017, Etra must provide proof of its opening, and if the account has been closed, Etra must provide proof of its closing.

### 4. Monthly Account Statements for an M&T Bank Account Into Which His Social Security Payments Are Purportedly Now Being Made

In his response to Benthos's motion for contempt, Etra produced current monthly statements from July 2022 through November 2022 for his Piermont -0362 account.  *See* Current Piermont -0362, Dkt. 235-4.  That account, which had been secreted from Benthos until July 11, 2022, was the account into which his social security payments were made for some period of

---

[23]     As discussed *supra* note 17, Benthos withdrew its request for certain bank documents covering the period August 1, 2018 through June 30, 2022.  The Court does not interpret that withdrawal to include records from accounts that Etra had not, as of that point, disclosed.

time since at least August 2021.  *See* Piermont -0362, Dkt. 129, at 49–68.[24]  The bank records he

produced in response to Benthos's motion for contempt showed that, as of October 2022, his

social security payments were no longer being deposited into that account.  *See* Current Piermont

-0362, Dkt. 235-4, at 9–16.  Etra represented at the Contempt Hearing that his social security

payments were now being deposited into an M&T account, *see* Contempt Hearing Tr. at 22–23,

51; he has neither identified the account nor produced corresponding monthly statements as

required by Item 1 of the First Document Subpoena, Item 2 of the Second Document Subpoena,

Item 4 of the Second Information Subpoena, and the September and October 2022 Orders.[25]

In order to purge his contempt, Etra must identify the M&T account into which his social

security payments have been made since October 2022 and, if this is a newly-opened or

previously undisclosed account, must produce monthly statements from the date the account was

opened (or August 2017, whichever is later) through the present.[26]  If this is an M&T account

that has previously been disclosed, then he can purge his contempt by producing account

statements covering the period August 1, 2017 through August 1, 2018 and July 1, 2022 to the

present.

---

[24]    Etra produced account records for his Piermont -0362 account on July 11, 2022, falsely stating that the
account had been opened in August 2021.  *See* Dkt. 129 at 48.  That statement was obviously false as the account
statement he produced for the month ending August 31, 2021, showed a beginning balance of $7,484.88.  *Id.* at 49.
Etra has never produced earlier records associated with this account and he has never identified the account into
which his social security payments were made prior to August 2021 despite multiple orders that he do so.  *See*
Orders, Dkts. 108, 126, 143.

[25]    It is conceivable that the M&T account into which Etra's social security is now being deposited is the M&T
account ending in 3441 that has previously been disclosed, *see* M&T -3441, Dkt. 211-17, but it is also conceivable
that this is an entirely new bank account that has never been disclosed.

[26]    Etra represented at the Contempt Hearing that the account was currently open.  *See* Contempt Hearing Tr.
at 22–23.  He provided no explanation why he did not produce account records associated with the account as he had
been ordered to do.

5.   **Piermont -2060, Piermont -2992, and M&T -3441 Monthly
Account Statements from July 2022 Through the Present**

Item 2 of the Second Document Subpoena and the September and October 2022 Orders

required Etra to produce current (*i.e.,* July 1, 2022 to the present) bank statements for his

Piermont -2060, Piermont -2292, and M&T -3441 accounts.  Etra failed to produce any account

statements for those accounts post-dating June 30, 2022.  *See* Piermont -2060, Dkt. 211-13, at

120, Piermont -2292, Dkt. 211-18, at 27, M&T -3441, Dkt. 211-17, at 88.

In order to purge his contempt, Etra must produce monthly statements from July 1, 2022

through the present or the account's closing date, if applicable, for his Piermont -2060, Piermont

-2292, and M&T -3441 accounts.  If any of those accounts has been closed, Etra must provide

proof of its closing.

6.   **American Express -4005, HSBC -0136, Apple -6423, Barclays, and
Barclays/Old Navy Credit Card Statements from August 1, 2017
through the Present**

In response to the Second Information Subpoena, Etra finally disclosed the existence of

five credit card accounts that were open at some point between August 1, 2017 and October 7,

2022: American Express -4005, HSBC -0136, Apple -6423, Barclays, and Barclays/Old Navy.

*See* Etra Second Information Subpoena Response, Dkt. 211-23, at 6.  Etra has not produced

monthly statements for any of these accounts even though he was required to produce such

statements pursuant to Item 4 of the First Document Subpoena, Item 3 of the Second Document

Subpoena, the September 2022 Order, and the October 2022 Order.

In order to purge his contempt, Etra must produce monthly statements from August 1,

2017 (or the card's inception if later) through the present (or the card's closing date, if

applicable), for his American Express -4005 card, HSBC -0136 card, Apple -6423 card, Barclays

card, and Barclays/Old Navy card.[27]  If the card was opened after August 1, 2017, Etra must

provide proof of its opening, and if the card has been closed, Etra must provide proof of its

closing.

### 7. Complete and Final Escrow Agreements for the 41 Clients of Etra's Escrow/Paymaster Business that Have Been Identified

Through an examination of the bank records Etra produced, Benthos has been able to

identify thirty-one entities and persons who were associated with deposits into one of Etra's

IOLA accounts.  In its August 2, 2022 Order, the Court ordered Etra to produce the escrow

agreements associated with those clients.  *See* Order, Dkt. 144.  From that list (the accuracy of

which Etra has never disputed), plus ten additional clients Etra identified that were not

previously known to the Court or Petitioner, Etra has produced only nineteen escrow agreements.

Not all of the nineteen agreements he has produced are complete or final.  *See* Etra Letter &

Escrow Agreements, Dkt. 182.  Etra was required to produce such agreements pursuant to Item

32 of the First Document Subpoena, Item 4 of the Second Document Subpoena, and by several

Court orders[28] including the September 2022 Order.

The Court acknowledges that Etra has asserted that documents were "lost" when

something happened to his Apple MacBook computer.  *See* Etra Letter, Dkt. 114; Etra

Affidavits, Dkts. 150, ¶ 11; 166 ¶¶ 8–12.  He has, however, provided no credible, admissible

---

[27]     If Etra has additional credit card accounts that he has not yet disclosed, account records for those accounts must also be produced.

[28]     *See, e.g.*, Orders, Dkts. 102, 126, 132, 184.

evidence of that fact.[29]  Nor has he provided credible, admissible evidence that any documents "lost" when his laptop was damaged were not available to him in the iCloud drive.[30]

In order to purge his contempt, Etra must produce complete, final, executed agreements with Day Law & Associates; Goldfinger Enterprise; Eric Valdes/BVL Dev. Page; Diza Marine Services and Survey; Ian Robert Stewart Jordan; Sue White; Laima Khan; Renato Corzo; Charles L. Weinstein; Fisher Enterprise; Oceanix Inc.; Steven Kavanagh; Novavis Medical; Pound International Sender; Alba Lucia Giraldo; Pass LLC; Desmond Hinds; Konrad Jan Banasiak; Tennessee Bar Foundation; George Michael Du Plooy; Timothy L. Sanford; Incept Holdings BVI Ltd.; Charles Nastasi; Puerta Del Pacifico; Harold Wright Peavy; John R. Watkins; Peavy & Co., Inc.; Valarie Baptiste Irrevocable Private Trust; and Razur 7711 LLC, or provide credible, admissible evidence that he does not have possession, custody or control of any agreement he does not produce.[31]

---

[29]    The Apple store service record Etra submitted in support of his assertion on July 1, 2022 that his computer was "left with Apple for extensive repairs" and "should be in their shop for about a week or so," Dkt. 114 at 1, said nothing of the sort.  The record Etra attached states that the "device ha[d] lines on the display," that the device had "no signs of physical damage," and that Apple could provide a display replacement at no cost that same day for estimated pick-up on June 29, 2022.  Dkt. 114 at 6.  Although the record states "[c]ustomer aware of data loss[,]" it does not state that Apple determined there had been a loss of data.  *Id.*

[30]    The Court's understanding is that documents on a MacBook may, by default, be saved to iCloud.

[31]     Etra has asserted, without offering any proof, that he lost some of these agreements when his computer broke.  As further discussed *infra*, Petitioner will be ordered to conduct a forensic examination of Etra's electronic devices to determine whether any of the documents Etra has been ordered to produce but has not produced are recoverable from the computer.  If Etra's story about damage to his MacBook computer is true, the Court urges him to search his iCloud account to ascertain whether any of the documents that were lost when his MacBook was damaged can be found there.

### 8. Financial and Judgment-Related Communications From August 13, 2020 Through December 14, 2022[32]

Item 1 of the Second Document Subpoena and the September 2022 Order require Etra to produce all documented communications since the Judgment date of August 13, 2020 concerning Etra's financial status, any attempts to obtain or provide funds to satisfy the Judgment, and Petitioner's or its counsel's enforcement efforts. To date, Etra has only produced Petitioner's subpoenas, *see* Dkt. 211-30, one letter from Melvin Dussel, *see* Dkt. 192-9, and one letter from Helmut Allesch, *see* Dkt. 211-32 at 7. Documents produced to Benthos by Etra's landlord indicate that Etra regularly communicates through e-mail and text messages regarding his financial situation, *see* Dkts. 242-2, 242-4, and Etra has communicated to the Court and Petitioner through e-mail, *see, e.g.*, Dkts. 20-2, 24-5, 49, 96, 253. Despite Etra stating repeatedly that he is attempting to raise money to satisfy at least part of Benthos's judgment, *see* Dkts. 107, 110, 117, 170, 173, he has produced no documents evidencing such efforts.

In order to purge his contempt, Etra must produce all communications regarding his financial status and his attempts to obtain or provide funds to satisfy the Judgment or provide credible, admissible evidence that such documents do not exist beyond the records referenced above. [33]

---

[32]     Item 1 of the Second Document Subpoena requires production of communications on a going-forward basis. To the extent there are responsive documents that are attorney-client privileged, Etra may withhold such documents, but he must also produce a privilege log listing the date and time of the communication, from whom the communication came, to whom the communication went, and a short description of the subject matter, as required by Paragraph H of the Second Document Subpoena.

[33]     While the Court believes it is highly likely that Etra possesses responsive documents that he has not produced, the Court also appreciates the difficulty of proving a negative if, in fact, there are none. In this case, however, assuming there are no paper files over which Etra has control and assuming there are no documents stored on his computer (as to which Benthos will gain access via the forensic examination, *see infra* Conclusion), one way that Etra might prove that there are no responsive communications would be for Etra to give access to his Gmail and other email accounts (Etra notified the Court that he uses the email address aaron@etra.com, *see* Dkt. 216) to a credible third party who would run logical searches designed to locate responsive communications. If those searches yield a null set, the credible third party's testimony could satisfy this requirement. Alternatively, Etra could give Benthos access to his email accounts for Benthos to run logical searches to locate responsive materials.

    **9.  Documents Concerning the Legal, Paymaster, Escrow-Related or Other Services Etra Provided from August 1, 2017 Through the Present**

Item 5 of the Second Document Subpoena and the September 2022 Order require Etra to produce all documents, including "written communications," concerning the legal, paymaster, escrow-related, or other services Etra has provided since August 1, 2017.  To date, Etra has only produced one letter from Helmut Allesch, *see* Dkt. 211-32 at 7, yet, as discussed above and as Etra himself has testified, *see* Parker Hearing Tr., Dkt. 214, at 47, he communicates about business matters, including his escrow and paymaster business, through e-mail and text messages.  Benthos also confirmed at the Contempt Hearing that leading up to the ill-fated transaction using Etra as the escrow agent, it regularly communicated with Etra via e-mail.  *See* Contempt Hearing Tr. at 15.

In order to purge his contempt, Etra must produce all such communications and other related documents from August 1, 2017 through the present or produce credible, admissible evidence that no such documents exist.

    **10. List of All Financial Accounts From August 1, 2017 Through August 2, 2022**

Item 4 of the Second Information Subpoena and the September 2022 Order require Etra to provide a list of all bank accounts, brokerage accounts, investment accounts, checking accounts, savings accounts, and all other accounts in which he has or had an interest from August 1, 2017 through August 2, 2022.  To date, Etra has made no effort to provide a list of such accounts.  *See* Etra Second Information Subpoena Response, Dkt. 211-23, at 5.  Although Benthos and the Court have managed to identify a number of accounts (largely due to inter-account transfers) it is by no means clear that all such accounts have been identified.  Most notably, Etra has not disclosed any brokerage accounts, other than a closed J.P.Morgan Chase &

Co. account. *See* Dkt. 128 at 71–83. While it is, of course, possible that Etra does not now and has not since August 2017 had a brokerage account, the Court is skeptical.

In order to purge his contempt, Etra must produce a list of all accounts in which he has had an interest at any point between August 1, 2017 and August 2, 2022.

### C. Etra's Noncompliance With the September and October 2022 Orders That Must Be Cured After Release to Avoid Re-Incarceration

Once Etra purges his contempt of the September and October 2022 Orders and is released from custody, he must promptly produce the following documents within thirty days of his release, or on a going forward basis on the first business day of every month, as specified below, until he satisfies the Judgment.

### 1. Monthly Account and Credit Card Statements

Items 2 and 3 of the Second Document Subpoena and the September 2022 Order require Etra to produce any monthly account and credit card statements on a going forward basis. Etra must produce such statements for all of his accounts on the first business day of every month following his release from custody.

### 2. Itemization of Currently Monthly Living Expenses

Item 2 of the Second Information Subpoena and the September 2022 Order require Etra to identify and itemize his monthly living expenses. Although Etra provided a short list of expenses, *see* Etra Second Information Subpoena Response, Dkt. 211-23, at 5, the list he provided did not reflect his extravagant spending on international travel, *see, e.g.*, Piermont - 2060, Dkt. 211-13, at 22 (Oct. 19, 2020) (spending $1,057 on United airfare), *id.* at 28 (Dec. 7, 2020) (spending $1,450 on Lufthansa airfare), *id.* at 46 (Mar. 10, 2021) (spending $1,505 on United airfare), luxury hotels, *see, e.g.*, *id.* at 16 (Sept. 1, 2020) (spending $2,462 at a Croatian hotel), *id.* at 79 (Aug. 31, 2021) (spending $2,003 at a Croatian hotel), *id.* at 82 (Sept. 7, 2021)

(spending $925 at a Croatian hotel), and what appear to be business expenses, *see, e.g.*, *id.* at 50 (Apr. 5, 2021) (spending $640 at RMG Regus, which provides co-working office space), *id.* at 71 (July 26, 2021) (spending $360 on a Verizon Wireless bill), *id.* at 96 (Nov. 8, 2021) (spending $447 at Reed Exhibitions), *id.* at 97 (Nov. 12, 2021) (spending $475 to purchase "Delaware Corp."). Etra must make a good faith effort to produce an accurate itemization of his current monthly living expenses within thirty days of his release.

In sum, Etra has flagrantly violated his legal obligations in this case for years, and is therefore held in civil contempt for disregarding the September and October 2022 Orders, two of many orders requiring him to produce documents and information he has been obligated to produce for some time.

## II.     Etra Is in Contempt of the Restraining Notice

Etra is also in contempt of the Restraining Notice because records from the few bank accounts that he has produced show that, since the date of the Restraining Notice, he collected thousands of dollars in fees and has failed to remit any of that income to Benthos.

### A.  Legal Standard

The Court may find a party in civil contempt for violating a restraining notice issued under New York law if it was "initiated by the judgment creditor as a means of executing a judgment entered in federal court." *Cordius Tr. v. Kummerfeld Assocs., Inc.*, 658 F. Supp. 2d 512, 518 (S.D.N.Y. 2009) (collecting cases); *see also* N.Y. C.P.L.R. § 5251; *Amtrust N. Am., Inc. v. Preferred Contractors Ins. Co.*, No. 16-MC-0340 (CM), 2016 WL 6208288, at *6 (S.D.N.Y. Oct. 18, 2016) (concluding that failure to comply with a restraining notice issued to enforce a judgment confirming an arbitration award would be "considered contempt of court" after concluding that a restraining notice was effective against the assets at issue). Before making a

finding of contempt, the Court must review the notice's "validity and compliance with the statutory notice requirements . . . ." *Cordius Trust*, 658 F. Supp. 2d at 518 (citation omitted).

Under New York law, a judgment creditor's counsel may issue a post-judgment restraining notice as an officer of the Court.  N.Y. C.P.L.R. § 5222(a).  Leave of court is required, however, to serve more than one restraining notice upon the same person with respect to the same judgment or order.  *Id.* § 5222(c).  Where the debtor is a natural person, as in this case, the judgment creditor must provide notice of potentially exempt funds and the procedure for retrieving such funds, as well as advise the debtor that he may wish to consult counsel.  *Id.* §§ 5222(d)–(e).  Such notice must be served on the debtor no later than four days after the restraining notice was served.  *Id.* § 5222(d).  Notice is effective against the debtor until the judgment or order is satisfied or vacated.  *Id.* § 5222(b); *see also Middleton v. Green Cycle Hous., Inc.*, No. 15-MC-0023, 2017 WL 715747, at *7 (S.D.N.Y. Feb. 23, 2017).

### B.  The Restraining Notice is Valid

The Restraining Notice that was served on Etra is valid and complied with all statutory notice requirements.  Petitioner issued the Restraining Notice to execute the August 13, 2020 federal Judgment against Etra.  *See* Judgment, Dkt. 15; Restraining Notice, Dkt. 211-5, at 2. Petitioner served the Restraining Notice on Etra on August 27, 2020.  *See* Restraining Notice, Dkt. 211-5, at 3; Popofsky Decl., Dkt. 211, ¶ 5.  Moreover, the Restraining Notice itself set forth potentially exempt funds and the procedure to recover such funds.  It also advised Etra that he may wish to consult counsel and that violation of the Restraining Notice would be punishable as contempt of Court.  *See* Restraining Notice, Dkt. 211-5, at 2–4.  The Court is therefore satisfied that it may hold Etra in contempt if he violated the Restraining Notice.[34]

---

[34]     The Court does not hold Etra in contempt for violating the Second Restraining Notice because Petitioner did not seek leave from the Court as required to serve a second restraining notice on the same person with respect to

### C.  Etra's Noncompliance with the Restraining Notice

The Restraining Notice was clear and unambiguous.  *See Grand*, 2018 WL 1583314, at

*3; *King*, 65 F.3d at 1058.  It states that Etra is forbidden from disposing of any property in

which he has an interest, as well as all property coming into his possession after the Restraining

Notice is issued, except as provided under New York law.  *See* Restraining Notice, Dkt. 211-5, at

2–4.  New York law exempts, among other categories of property, social security payments,

unemployment benefits, and ninety percent of the debtor's wages or salary earned in the sixty

days prior to the restraining notice.  *See* N.Y. C.P.L.R. § 5222(e).

Proof of noncompliance with the Restraining Notice is clear and convincing.  *See Grand*,

2018 WL 1583314, at *3; *Cordius Trust*, 658 F. Supp. 2d at 523–24 (concluding that defendants'

lavish spending after restraining notices came into effect "support[ed] a finding that [they]

[were] in contempt for violating valid restraining notices and generally failing to comply in good

faith with postjudgment procedures").  Apart from a few thousand dollars that Petitioner was

able to seize from one of Etra's bank accounts, *see* Benthos Mem., Dkt. 153, at 8, Etra has failed

to make any payments toward the Judgment, yet his own bank records prove that he has received

tens of thousands of dollars since the Restraining Notice was served.

### 1.  Receipt of Tens of Thousands of Unexplained Funds

Etra admitted that he received fees from clients after the Restraining Notice was issued

and used those fees for his own purposes.  *See* Dkt. 170.  Although Etra's commingling of

money in his IOLA accounts,[35] and the movement of money in and out of those accounts,

---

the same judgment.  *See* N.Y. C.P.L.R. § 5222.  The fact that the Second Restraining Notice is invalid does not, however, invalidate the Restraining Notice.  *See Cordius Trust*, 658 F. Supp. 2d at 518 (concluding that a second restraining notice's invalidity due to petitioner's failure to seek leave "d[id] not materially affect the responsibilities" triggered by "valid restraining orders" in the case).

[35]    Etra's known IOLA accounts are Piermont -2292, Dkt. 211-18, M&T -3441, Dkt. 211-17, and M&T -7045, Dkt. 192-21.

coupled with his failure to provide a full accounting of his business income, make it difficult to confirm the exact amounts of his post-Restraining Notice income, Etra's scattershot set of bank statements reflect significant transfers into his personal accounts that should have been but were not remitted to Benthos. *See, e.g.*, Piermont -2060, Dkt. 211-13, at 30 (Dec. 21, 2020) (reflecting a $25,000 transfer from "Nhat M. Nguyen"); *id.* at 65 (June 21, 2021) (reflecting a $10,000 transfer from Etra's Piermont -0362 account); *id.* at 90 (Oct. 12, 2021) (reflecting a $10,000 transfer from Etra's -2292 IOLA account).

Upon the Court's request, Petitioner submitted a spreadsheet (the "Deposit Spreadsheet") reflecting all known deposits from the date of the Judgment[36] exceeding $500 into Etra's personal accounts. *See* Deposit Spreadsheet, Dkt. 243-2. The Deposit Spreadsheet includes a total of $115,651.28 in deposits, of which $21,580.50 are social security payments and therefore exempt from the Restraining Notice. That leaves $94,070.78 in unexplained deposits, which Etra claimed he could not sufficiently "remember" to defend. Etra Decl. in Opp. to Mot., Dkt. 235, ¶ 22.[37]

### 2. Lavish Spending

Etra's noncompliance with the Restraining Notice is also evident based on records of his lavish spending habits, as already discussed. Etra had sufficient liquid assets to purchase airline tickets and to travel extensively in Europe while the Restraining Notice was in effect. *See* Popofsky Decl., Dkt. 211, ¶¶ 16–17; Piermont -2060, Dkt. 211-13, at 16, 22, 28, 46, 79, 82.

---

[36] The first entry on the spreadsheet is dated September 16, 2020. *See* Deposit Spreadsheet, Dkt. 243-2.

[37] Petitioner also submitted a spreadsheet reflecting withdrawals from Etra's IOLA accounts that were seemingly for Etra's own benefit. *See* IOLA Suspicious Withdrawals Spreadsheet, Dkt. 243-3. That spreadsheet reflects $30,787 in suspicious withdrawals while the Restraining Notice was in effect. By separate Order, Etra has been ordered to show cause why the Court should not find that $30,787 should be added to the $94,070.78 that he must pay in order to purge his contempt. *See* Order, Dkt. 259.

Although Etra has asserted that third parties paid for his international travel, *see* Etra Decl. in Opp. to Mot., Dkt. 235, ¶¶ 6, 19, he has provided no admissible evidence of that fact beyond his own say-so.  Given Etra's extensive misrepresentations to Petitioner and the Court throughout this case, the Court does not credit his statements.  *See Huber*, 51 F.3d at 11; *Bobart Travel Agency*, 699 F.2d at 620.  Etra's bank statements and own itemization of expenses reflect that he spent freely while in the United States, routinely paying for Uber rides, high-end haircuts, restaurant meals, and housekeeping service.  *See, e.g.*, Piermont -2060, Dkt. 211-13, at 6 (July 22, 2020) (spending $132 at a restaurant); *id.* at 64 (June 9, 2021) (spending $117 at a café); *id.* at 94 (Nov. 1, 2021) (spending $100 on a haircut); *id.* at 97 (Nov. 12, 2021) (spending $76 on an Uber ride); Etra Second Information Subpoena Response, Dkt. 211-23, at 5 (stating that he spends $500 a month on "[a]partment cleaning and laundry and dry cleaning").[38]

Given these flagrant violations, the Court concluded that Etra has not diligently attempted to comply with the Restraining Notice in a reasonable manner.  *See Grand*, 2018 WL 1583314, at *3; *Cordius Trust*, 658 F. Supp. 2d at 523–24.  Although Etra asserted in his opposition that that he "has had little or no assets to transfer during the course of this litigation," and that he could not "remember the details" of the tens of thousands of dollars in transactions that Petitioner flagged, Etra Decl. in Opp. to Mot., Dkt. 235, at 7, the Court does not credit these bare assertions given Etra's misrepresentations and refusal to produce substantiating account records to date.  *See Huber*, 51 F.3d at 11; *Bobart Travel Agency*, 699 F.2d at 620.

---

[38]     This only reflects spending that can be identified from the bank records he has produced.  The Court suspects that additional lavish spending may be reflected on one or more of the credit card accounts that Etra has contemptuously failed to produce.

In sum, Etra's receipt of tens of thousands of dollars in fees, plus his lavish spending habits, show that he has violated the Restraining Notice.  Etra is, therefore, in civil contempt for violating the Restraining Notice.

## III.   Etra Will Remain in Custody Until He Purges His Contempt

### A.  Legal Standard

Because Etra is in civil contempt of the September and October 2022 Orders and the Restraining Notice, the Court has "the inherent power to order coercive civil confinement," *Armstrong v. Guccione*, 470 F.3d 89, 102 (2d Cir. 2006), and the statutory power "to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority," 18 U.S.C. § 401(3).  Coercive civil contempt sanctions may be imposed "to secure future compliance with court orders and to compensate the party that has been wronged." *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 657 (2d Cir. 2004) (citation omitted).

In determining the proper measure of coercive sanctions, the Court must consider "(1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1353 (2d Cir. 1989) (citations omitted).  The ultimate consideration for the Court is whether the coercive sanction is reasonable in relation to the facts, which is a matter in the Court's discretion. *Id.* (citation omitted).  When determining whether to order payment as part of a contempt sanction, the Court must, in the first instance, "consider[] the initial appropriateness of a contempt sanction in light of the circumstances, including the contemnor's ability to pay." *Dole Fresh Fruit v. United Banana Co.*, 821 F.2d 106, 110 n.3 (2d

Cir. 1987).  When determining a contemnor's ability to pay, the court is entitled to consider his refusal to produce documents in assessing "the credibility of his oral representations."  *Huber*, 51 F.3d at 11.

"Arrest is an appropriate coercive sanction for civil contempt, so long as its purpose is not punitive but is instead to compel the contemnor to perform the required act."  *Bank of Credit & Com. Int'l (Overseas) Ltd. v. Tamraz*, No. 97-CV-4759, 2006 WL 1643202, at *3 (S.D.N.Y. June 13, 2006).  So is requiring the contemnor to surrender his passport, *see United States v. Donziger*, Nos. 19-CR-561 (LAP), 11-CV-691 (LAK), 2021 WL 3141893, at *63 n. 610 (S.D.N.Y. July 26, 2021) (citing *Herbstein v. Bruetman*, 241 F.3d 586, 589 (7th Cir. 2001))*; see also Middleton*, 2017 WL 715747, at *5 (noting that the court imposed a "temporary travel ban" on the debtor as a contempt sanction), and requiring a forensic examination of the contemnor's electronic devices, *see* Order, *Donziger*, No. 11-CV-691 (LAK), Dkt. 2108 (S.D.N.Y. Oct. 18, 2018).

## B.  Sanctions

In this case, almost six months ago, the Court began with the lesser coercive sanction of monetary penalties for Etra's failure to produce many of the same documents that remain unproduced today despite being encompassed by many orders, most recently by the September 2022 Order.  The Court adopted Magistrate Judge Parker's recommendation of a $50 fine per day, *see* Order, Dkt. 108, at 4, which came into effect on July 2, 2022, *see* Order, Dkt. 113, at 2, and later increased it to $1000 effective July 8, 2022, doubling every two days until Etra complied, *see* Order, Dkt. 126, at 4.  As of August 2, 2022, Etra owed $16,382,300 in fines, yet he has still not produced all of the documents he has been ordered to produce.  The Court has,

therefore, concluded that financial sanctions, including ever-increasing ones, will not compel Etra to comply.

After weighing the character and magnitude of the harm caused and threatened by Etra's continued noncompliance, the effectiveness of incarceration, as opposed to the multiple civil fines the Court has already imposed, Etra's dismal evidence of inability to pay, Etra's poor record of diligence in attempting to comply with this Court's Orders, the number of chances he was given to come into compliance, and the severity of the sanction, *see Terry*, 886 F.2d at 1353, the Court found that arrest was an appropriate coercive sanction in this case. *See* Contempt Hearing Tr. at 33, 48. The Court did so fully aware of the less-than-ideal conditions at MDC-Brooklyn, Etra's claim of numerous health maladies, the difficulties he will encounter in communicating with his banks and email providers from jail, and his age. *See id.* at 23, 31–32.

Etra will remain in custody until such time as (1) he produces the documents and information listed *supra* § I.B. that he has previously been ordered to provide and that are all readily obtainable; and (2) he pays Petitioner $94,070.78, which represents the sum of all amounts known to have been deposited into a personal bank account of Etra from August 27, 2020 onward that were not obviously exempt from the Restraining Notice.

In determining the financial sanction, the Court has concluded that Etra has a sufficient ability to pay, notwithstanding his purported destitution, in light of bank statements reflecting tens of thousands of dollars in unexplained transfers into Etra's personal accounts, Etra's lavish lifestyle, and Etra's refusal to produce a complete set of current banks statements. *See Huber*, 51 F.3d at 11; *cf. Schwarz v. ThinkStrategy Capital Mgmt. LLC*, No. 09-CV-9346 (PAE), 2015 WL 4040558, at * 21 (S.D.N.Y. July 1, 2015) (collecting cases and noting that courts in this District have "incarcerated defendants until they purged the contempt by paying the judgments against

them" after assessing a contemnor's credibility with respect to their ability to pay by considering testimony and documents).

Etra's obligation to pay the sum of $94,070.78 will be reduced if Etra (1) proves with credible, admissible evidence that any of the deposited items on the Deposit Spreadsheet (beyond social security payments, which have already been subtracted from the total) are exempt from the Restraining Notice pursuant to N.Y. C.P.L.R. § 5222(e) or (2) proves with credible, admissible evidence that he is financially unable to pay all or part of that sum. The sum will be increased if Petitioner provides credible, admissible evidence of additional funds that came into Etra's possession after the Restraining Notice was in place that were not paid to Petitioner. *Cf. United States v. Chusid*, 372 F.3d 113, 117 (2d Cir. 2004) (affirming the District Court's decision to incarcerate a contemnor pursuant to civil contempt until he "satisfie[d] his obligations to make restitution and pay the fine imposed by the [c]ourt" because the contemnor "engaged in an extended campaign of obfuscatory and even deceptive conduct in an attempt to avoid his restitution and fine obligations"); *Schwarz*, 2015 WL 4040558, at *20–21 (wherein the contemnor testified that he was destitute and had limited access to family funds, but his loan agreements and credit card statements revealed "numerous unnecessary and excessive expenditures" and the court ordered his incarceration until he purged the contempt by either (1) paying a required disgorgement to the SEC or (2) "providing documentation, including records [from his] bank accounts, that concretely and unambiguously establishe[d] his inability to pay any greater amount than the portion (if any) he eventually pa[id]").[39]

---

[39]      *See also SEC v. Durante*, No. 01-CV-9056 (DAB) (AJP), 2013 WL 6800226, at *14 (S.D.N.Y. Dec. 19, 2013) (wherein the court concluded that the contemnor "only offer[ed] a fanciful tale of unparalleled charity and generosity by 'friends,'" which in any event should have prompted him to pay off the judgment, "not live a life of luxury," and ordered his incarceration until he "ma[de] meaningful payments towards the disgorgement amount and provide[d] a current and accurate accounting of his income and assets").

## CONCLUSION

For all foregoing reasons, Petitioner's motion to hold Etra in civil contempt is GRANTED, and its motion to hold him in criminal contempt is DENIED without prejudice.  To purge his contempt and achieve release from custody, Etra must produce documents, information, and funds as set forth *supra* § III.B.

In addition, the Court ordered Etra at the Contempt Hearing to surrender his passport and computer to his attorney, prohibited him from traveling outside the United States until he satisfies the Judgment, and required him to comply with the Restraining Notice going forward. *See* Contempt Hearing Tr. at 34–35.  The Court is now also ordering Etra to surrender his cell telephone(s) to his attorney.  Benthos is authorized to conduct a forensic examination of Etra's electronic devices, as discussed further in a forthcoming order.

**Within thirty days of his release**, Etra must produce documents and information as set forth *supra* §§ I.C.1–2.  **On the first business day of every month after his release**, Etra must produce records as set forth *supra* § I.C.1 until he satisfies the Judgment.  **On the first business day of every month after his release**, Etra must transfer any non-exempt funds under the Restraining Notice to Benthos until he satisfies the Judgment.

The Clerk of Court is respectfully directed to terminate the open motion at Dkt. 209.  The Clerk of Court is further directed to mail a copy of this Order to Etra at Aaron Etra, Reg. No. 36170-510, MDC Brooklyn, P.O. Box 329002, Brooklyn, NY 11232, and to note the mailing on the public docket.

**SO ORDERED.**

Date:  December 20, 2022
        New York, New York

_____
        **VALERIE CAPRONI**
        **United States District Judge**