MCE7BENC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    BENTHOS MASTER FUND, LTD.,

4                    Plaintiff,

5              v.                          20 Civ. 3384 (VEC)

6    AARON ETRA,

7                    Defendant.
                                          Conference
8    ------------------------------x

9                                         New York, N.Y.
                                          December 14, 2022
10                                        11:05 a.m.

11   Before:

12                     HON. VALERIE E. CAPRONI ,

13                                        District Judge

14                          APPEARANCES

15   KLEINBERG KAPLAN WOLFF & COHEN
          Attorneys for Plaintiff
16   BY:  ALISA BENINTENDI
          STEVEN POPOFSKY
17
     FEDERAL DEFENDERS OF NEW YORK
18        Attorney for Plaintiff
     BY:  AMY GALLICCHIO
19
     Also Present:
20   Mihir Deo, Principal Petitioner
     Eleanor Taylor, Defense Assistant
21

22

23

24

25

MCE7BENC

1        (Case called)

2        MS. BENINTENDI:  Good morning, your Honor.  Alisa

3   Benintendi on behalf of petitioner.  With me is Steven

4   Popofsky, my colleague, who I would respectfully request that,

5   pursuant to your individual Rule 4(d), Mr. Popofsky be

6   permitted to speak with me in regard with this argument today.

7        THE COURT:  I'm sorry.  Say that again.

8        MS. BENINTENDI:  Pursuant to your individual, Rule

9   4(d), I'm requesting that Mr. Popofsky be permitted to speak in

10  connection with this argument today.

11       Oh, so two people are speaking?

12       MS. BENINTENDI:  Yes, please.

13       THE COURT:  Okay.  Fine.

14       MS. BENINTENDI:  And also with me is Mihir Deo, a

15  principal petitioner, and Eleanor Taylor, a legal assistant

16  with our firm.

17       THE COURT:  Okay.  Good morning, Ms. Benintendi

18  Mr. Popofsky, Mr. Deo, and Ms. Taylor.

19       MS. GALLICCHIO:  Good morning, your Honor.  Federal

20  Defenders by Ms. Gallicchio.

21       THE COURT:  Good morning, Ms. Gallicchio.

22       So your client isn't here.  Just to make it official,

23  I'm appointing you to represent Mr. Etra based on his financial

24  affidavit that he submitted.  I have, and I will repeat this

25  when he's here, grave concerns that this is accurate.  But

MCE7BENC

1    based on the financial affidavit, he is entitled to appointed

2    counsel.  There's some notable omissions that are clear.  For

3    instance, he has omitted to disclose the facts that he owes

4    Benthos $4.5 million.

5           MS. GALLICCHIO:  Right.  Okay.

6           So that alone I think makes him insolvent and

7    therefore entitled to appointed counsel.

8           MS. GALLICCHIO:  And just for clarification, your

9    Honor, for the purpose of representing him with respect to the

10   criminal contempt proceeding.

11          THE COURT:  Actually, it's a civil contempt proceeding

12   at this point.  But the law seems to be that if there's a

13   likelihood of incarceration as a course of sanction, he's

14   entitled to appointed counsel.

15          MS. GALLICCHIO:  Okay.

16          THE COURT:  And there is indeed that likelihood.

17          So we can't proceed without your client.  What was the

18   last thing you heard from him, Ms. Gallicchio?

19          MS. GALLICCHIO:  Your Honor, I did speak with him this

20   morning by phone.  He had every intention of coming.  That

21   was -- we said we would see each other in court.  I had a

22   couple e-mail exchanges with him, so I expect he's on his way.

23          THE COURT:  Okay.  So what we're going to do --

24   there's a little bit of work that I can do that really deals

25   with Benthos and the order to show cause against them.  And

MCE7BENC

1   we'll wait.  Everybody was supposed to be here probably for a

2   while anyway, so let's -- I'm going to ask you to give him

3   another call in a little while and find out where he is.

4            MS. GALLICCHIO:  Sure.

5            To the Benthos lawyers, I don't know who's going to

6   talk relative to the order to show cause.

7            MR. POPOFSKY:  I will do that, your Honor.

8            Okay.  Mr. Popofsky, let me explain why I wanted

9   things to be broken out individually.  Because what you have

10  done, the way this has been presented, has essentially shifted

11  to the Court to go on an Easter egg hunt to figure out exactly

12  what has and hasn't been produced.  I don't want to go on an

13  Easter egg hunt.  I've got better things to do with my time.

14  That was why I asked you to do it.

15           Now, based on your response, I hear you, but let me

16  make sure that I correctly understand you.

17           So for Item No. 3 for example, I understand the issue

18  with the Citibank account, account 0873.  And then under the

19  line of asterisks, you say, "Bank statements for any other

20  accounts (unknown to petitioner) that Mr. Etra has opened in

21  2017."

22           Does that mean that all of those bank accounts that

23  have been disclosed for periods of time in 2018 you were

24  confident that those accounts were not opened in 2017?

25           MR. POPOFSKY:  I would not say I'm confident they were

MCE7BENC

1    not open.  I am --

2              THE COURT:  So were you waiving any interest in them?

3              MR. POPOFSKY:  I do not know of any that were open in

4    2017.  The records that we have have accounts that were opened

5    in 2018 or 2019.  He produced long ago some statements from

6    2012 that supposedly were closed back then.  So in looking at

7    our records, I don't have anything that indicates to me that I

8    know of any statements that were open in 2017.

9              THE COURT:  So all the accounts that you had that

10   showed activity in 2018 started with a zero balance?

11             MR. POPOFSKY:  I don't know that I can stand here and

12   represent that.

13             THE COURT:  Well, that was --

14             MR. POPOFSKY:  What we --

15             THE COURT:  That was why this exercise was requested.

16             MR. POPOFSKY:  Then we are not claiming any interest,

17   yes, your Honor.

18             THE COURT:  You're waiving any interest?

19             MR. POPOFSKY:  Yes, in any of those other accounts,

20   yes.

21             THE COURT:  All right.  Everything else, I don't feel

22   like it's fair for me to ask you without Mr. Etra here,

23   particularly because Ms. Gallicchio is not particularly up on

24   all the facts.

25             So is there anything further you want to say?

MCE7BENC

1          MR. POPOFSKY:  On this, no, your Honor.

2          THE COURT:  Okay.  You can have a seat.

3          Okay.  So here's what I want to do.  I would like to

4     handle this today.  I feel like it's been kicking around for a

5     long time and I would like to resolve it today.  And if we

6     don't do it today for reasons having to do with too few court

7     reporters, we're going to have a very difficult time to

8     schedule for tomorrow or the next day.

9          So it's 11:15.  I'm hearing voices.

10          MS. GALLICCHIO:  Yes.

11          Do you want to pop out there and see if it's Mr. Etra.

12          MS. GALLICCHIO:  No, it's not.

13          THE COURT:  Okay.  So what I'd like you to do is

14     everybody stay in the courtroom, and let's give him another 15

15     or 20 minutes.  If he doesn't come by then, I'm going to enter

16     an order to show cause why he shouldn't be held in contempt for

17     failing to appear, and why I shouldn't issue a warrant for his

18     arrest.

19          So is there anything further that the petitioners want

20     to say on this point?

21          MS. BENINTENDI:  No, your Honor.

22          MS. GALLICCHIO:  No, your Honor.

23          Just with respect to scheduling, I don't know how long

24     the Court anticipates this hearing will go once it begins, but

25     I do have some afternoon obligations starting at 1 o'clock.

MCE7BENC

```
 1              THE COURT:  Okay.  I do, too.

 2              MS. GALLICCHIO:  Okay.

 3              So we may go in fits and spurts, or there may not be

 4    that much to do.  It's going to -- of all the people in this

 5    case, your client is the most verbose.

 6              MS. GALLICCHIO:  Right.

 7              THE COURT:  So --

 8              MS. GALLICCHIO:  Understood, yes.

 9              THE COURT:  Okay.  So if you could give him a call and

10    find out where he is, that would be helpful.  And just let

11    Angela know.  Otherwise, I'll be back up in the courtroom at

12    11:30 on my clock.

13              (Recess)

14              THE COURT:  Please be seated, everyone.

15              All right.  Mr. Etra, you have to get to court on

16    time.

17              MR. ETRA:  My apologies, your Honor.  I was coping

18    with my medical condition this morning.

19              THE COURT:  I don't want to hear it.  You have to get

20    to court on time whatever your medical conditions are.  You

21    know what they are.  You got to get to court on time.

22              MR. ETRA:  I'm sorry, your Honor.

23              THE COURT:  Okay.  As I indicated in your absence, I

24    have appointed Ms. Gallicchio.  Based on the financial

25    affidavit that you have submitted, you're entitled to appointed
```

MCE7BENC

| 1 | counsel.  I noted, and I will repeat, that I have some question |
|---|---|

about the accuracy of the financial affidavit.  And I note that

it failed to disclose that you owe Benthos $4.5 million.  So

with that, we're ready to proceed, I believe.

      I have a few questions, and then I'm going to turn it

over to the movant to argue your motion.  You do not want to

call any witnesses; is that correct?

      MS. BENINTENDI:  Correct.

      THE COURT:  Including Mr. Etra?

      MS. BENINTENDI:  Correct.

      THE COURT:  Okay.  Mr. Etra had sent me a letter

indicating that he wanted to call somebody --

      MR. ETRA:  Yes, your Honor.

      THE COURT:  -- as a witness.  Okay.  You got a lawyer

so your lawyer is talking for you.

      MR. ETRA:  I'm sorry.

      THE COURT:  Ms. Gallicchio, did you talk to Mr. Etra

about this witness that he wanted to call?

      MS. GALLICCHIO:  No.  Unfortunately, your Honor, I

have not had an opportunity.  This was, I guess, filed this

morning so I have not had an opportunity.  Honestly, I've not

had a very fulsome opportunity to speak with Mr. Etra about

this case.

      THE COURT:  Okay.  Would you like -- in the interest

of proceeding expeditiously, would you like for me to give you

MCE7BENC

1    at least 15 to 20 minutes to at least chat with him to get a

2    sense of exactly where we are, and I can give you a heads up

3    about some of my concerns are?

4             MS. GALLICCHIO:  Sure.

5             THE COURT:  Okay.  Let me say that my concerns include

6    whether Mr. Etra has made a good faith attempt to comply with

7    the court orders.  I have grave concerns that he has not.  I

8    also have pretty clear concerns -- or the evidence is

9    reasonably strong—in fact, it's overwhelming—that he violated

10   the restraining order.  That is, there was cash that came into

11   his possession that was not exempt that he spent, rather than

12   turning it over to Benthos as he was required to do under the

13   restraining order.  So those are the kind of the primary issues

14   in terms of what he has failed to produce.  The charts that

15   Benthos provided are -- provide a sense of what that is.

16            Essentially, he hasn't updated bank accounts, he's not

17   produced credit card accounts, he hasn't produced certain bank

18   accounts from 2017 that were called for from 2017 up to the

19   date of August 2018, which is when he has produced, and he

20   hasn't produced communications and escrow agreements, because

21   the escrow agreements might take some time.

22            Let me ask before I send them off to chat with each

23   other:  Can somebody from Benthos's side tell me what your

24   theory on -- what are you going to get from the escrow

25   agreements?  What is the end game of that?  How do you think

MCE7BENC

1    that's going to help you find money to satisfy your judgment?

2            MR. POPOFSKY:  Mr. Etra is doing business with at

3    least 41 entities and individuals that he has admitted doing

4    business with.

5            THE COURT:  I know.

6            MR. POPOFSKY:  And presumably, he's earning fees and

7    he's not doing that *pro bono*.  Presumably, he's earning fees

8    there.

9            THE COURT:  But these escrow agreements are old.

10           MR. POPOFSKY:  Well, some of them are old.  They're

11   not all necessarily old.  And I don't know what ongoing

12   business he's doing.  It relates to the fact that we have no

13   confidence that he's actually disclosing his current escrow

14   agreements.

15           THE COURT:  That I understand, but what -- look --

16           MR. POPOFSKY:  Given resource constraints.  But I

17   would like the ability to reach out to these people and try to

18   find out what he was doing for them, and what monies he was

19   earning from them, and what current business he might be doing

20   with them.  It might be a black hole, your Honor.  It might get

21   us nowhere.  But we are kind of at a dead end otherwise in are

22   terms of his business.  He's admitted he's taken fees.  He

23   wrote in one of his papers, I've taken fees over the last four

24   years.  Well, we served an information request that said, tell

25   us for each client how much you received, where it went, where

MCE7BENC

1   it is now; he didn't answer that.

2            THE COURT:  No.  I understand that.

3            MR. POPOFSKY:  So we don't know.  So that's why we

4   want the escrow agreements.  We're hoping to find out what's

5   been going on with the money.  And on the subject of the

6   restraining order, has he made thousands?  Tens of thousands?

7   Hundreds of thousands?

8            THE COURT:  So your theory is that there may be fees

9   from those escrow agreements that you'll be able to understand

10  by talking to the clients that are not reflected in the many

11  bank accounts that he's produced?

12           MR. POPOFSKY:  Yes, your Honor.

13           THE COURT:  Okay.  I understand that theory.

14           What about the communications with his landlord?  I

15  mean, it's clear that he's been lying to his landlord for as

16  long as he's been lying to you, but what do you expect to get

17  from that, from him disclosing his side of those same

18  conversations that you've gotten from the landlord?

19           MR. POPOFSKY:  Candidly, your Honor, the

20  communications with the landlord were more of an example of his

21  lack of good faith compliance than actually something that is

22  critical to us in terms of judgment enforce.  Originally, we

23  were interested in that because we were not sure whether he was

24  telling the truth that he was living in this luxury apartment

25  and not paying rent.  But it turns out that because of the

MCE7BENC

1    COVID eviction moratorium, he seems to have been living -- he

2    pays rent once in a while with my client's money, but only once

3    in a while.  So originally, we thought maybe he was paying rent

4    and not telling us about it.

5              THE COURT:  Got it.  Okay.

6              So, Ms. Gallicchio, that gives you a sense of what

7    we're all about.  The escrow agreements have been ordered for

8    months to be produced.

9              MS. GALLICCHIO:  Your Honor, am I correct that some

10   escrow agreements had been produced?

11             THE COURT:  A few.  A few were produced.  Some were

12   not complete.  Some weren't signed.  Bunches were just never

13   produced.

14             So you can put all of this under a giant umbrella.

15   The evidence that has been put in front of me is that Mr. Etra

16   has not made a good faith effort to comply with either the

17   information subpoena, the subpoena for documents, all of which

18   have been enforced by orders of this Court, and he has not

19   complied with the restraining order.  So there's money issues,

20   there's document issues, in broad brush.  Okay?

21             MS. GALLICCHIO:  Okay.

22             THE COURT:  So why don't we do this, because I would

23   like for this to be a productive morning:  It's 11:25.  I'm

24   going to give you a half hour.  And one of the questions, which

25   is what we broke on was, was -- Mr. Etra indicated in the

MCE7BENC

1   letter that he wanted to call a witness.  I don't have any

2   reason to believe that witness is present in the courtroom and

3   I would want some proffer of what possible relevance that

4   witness might have to this proceeding.

5          MS. GALLICCHIO:  Okay.

6          THE COURT:  Third, sort of the last thing I would want

7   to know, is whether Mr. Etra himself wants to testify.  Okay?

8          MS. GALLICCHIO:  Okay.

9          THE COURT:  So let's break until five until 12.

10         (Recess)

11         THE COURT:  Okay.  Please be seated, everyone.

12         Okay.  This is Benthos's motion.  Who is arguing from

13  Benthos?

14         MS. BENINTENDI:  I am, your Honor.

15         THE COURT:  Okay.

16         MS. BENINTENDI:  Your Honor, we are here today for two

17  broad reasons, as you identified earlier.

18         First, Mr. Etra has repeatedly, continually, and

19  flagrantly refused to comply with this Court's orders and with

20  the subpoenas and restraining orders in this matter.

21         Second, Mr. Etra's failure to comply has really

22  demonstrated to us clearly and convincingly that the

23  restraining orders have been violated throughout the past two

24  years, despite the fact that he was well aware of the existence

25  of these orders and has been continually reminded of their

MCE7BENC

1    existence by petitioner and by this Court.  The very few

2    documents that Mr. Etra has begrudgingly produced to us were

3    really only produced in response to a brief incarceration this

4    summer.  Even when he did produce documents, it was a scant

5    production.  And it was this Court that identified the fact

6    that he had still refused to produce bank statements for the

7    account through which he really conducts his day-to-day life.

8              Once we have been able to review the statements from

9    the Piermont account ending in 2060, we were very easily able

10   to determine that Mr. Etra has not been living as if he is

11   under a restraining order by any means.  He has flown to Europe

12   nine times.  While he's been in Europe, he's traveled

13   extensively.  He's had restaurant expenses, airline and hotel

14   travel expenses that really cannot be accounted for because he

15   has not identified the source of this income.  Mr. Etra

16   continually pretends that he does not have any funds to pay for

17   all of this travel, but until we saw the bank statements we

18   really could not have determined that he was living under these

19   conditions.

20             THE COURT:  Hold on one second.  Go ahead.

21             MS. BENINTENDI:  In addition to failing to produce

22   current bank statements, which is really very simple for

23   Mr. Etra to do -- this really requires a few clicks of a button

24   for Mr. Etra to give us his bank statements, and he's refusing

25   to do so.  It's impossible for me to understand and for

MCE7BENC

1    petitioner to understand why he cannot comply in good faith

2    with the subpoena that's requesting these banks statements.

3          In addition, as we pointed out earlier, there's a

4    complete dearth of any communications in any of Mr. Etra's

5    productions.  While they aren't as critical to our case, it

6    just demonstrates that he's not making a good faith attempt to

7    comply with these orders.

8          THE COURT:  Let me ask you something.  When Benthos

9    was negotiating the underlying deal that brings us here, were

10   those communications done with Mr. Etra via e-mail?

11         MR. POPOFSKY:  Yes, your Honor.

12         THE COURT:  And was that via the Gmail account?

13         MR. POPOFSKY:  Yes, your Honor.

14         THE COURT:  Okay.  So he has a track record of using

15   e-mail to communicate about his business.

16         MR. POPOFSKY:  There were many historical e-mails,

17   your Honor, many.

18         MS. BENINTENDI:  Yes, your Honor.

19         Mr. Etra has claimed in various instances that there

20   was some sort of damage to his computer.  To the extent --

21         THE COURT:  I recall.

22         MS. BENINTENDI:  -- that he is claiming that he can't

23   produce any communications because of any such damage, we have

24   two responses.

25         First, Gmail is recoverable from outside the physical

MCE7BENC

1    computer.  So even if there were damage, he can, and likely

2    can, obtain these e-mails in some other way, absent some sort

3    of destruction of the e-mails themselves.

4            THE COURT:  The e-mails don't live on the computer;

5    the e-mails live elsewhere?

6            MS. BENINTENDI:  Yes, your Honor.

7            That also doesn't extend to text messages.  We also

8    requested text messages.  To date, Mr. Etra has not told us

9    that he does not use text.  So as far as we know, he is

10   texting.

11           THE COURT:  Well, we know he does because he was

12   texting with his landlord, right?

13           MS. BENINTENDI:  Yes.  Exactly.  We don't know to the

14   extent to which he texts, but we do know he has these text

15   messages.  Those should be attainable as well.  And this is why

16   we've requested, in part, a forensic examination of his cell

17   phone and his computers in order to determine, on the one hand,

18   is he destroying this evidence?  Has there been spoliation?  Or

19   on the other hand, is there something that we can recover?  Is

20   this something that we can obtain in some other means?

21           But really, at heart for all of this, Mr. Etra should

22   be punished for what he has done so far.

23           THE COURT:  I didn't say this expressly to you, I said

24   it expressly to him.  I'm not considering criminal contempt at

25   this point.  You may want a pound of flesh.  I'm not going to

MCE7BENC

1    get involved in the psychology in all this.  My goal is for

2    Mr. Etra to produce the material that he's been required to

3    produce.  I'm not interested at this stage in the game in

4    punishing him.  So forget criminal contempt.

5        Your request for criminal contempt is denied without

6    prejudice.

7        MS. BENINTENDI:  Understood, your Honor.

8        With regard to coercing any further compliance from

9    Mr. Etra, however, there still would need to be some kind of

10   preventative measure.  There's no reason for us to believe that

11   Mr. Etra is going to -- even if he complies and produces some

12   current bank statements, there's no reason to believe he will

13   continue to do so, as he's required to under the subpoenas

14   under the court orders.  He has demonstrated a track record of

15   disregarding this Court's authority.

16       In order to vindicate this Court's authority, really,

17   there is some kind of preventative measure that needs to take

18   place.  What we have requested is incarceration for civil

19   contempt until he complies with the orders.  And we have

20   requested that he surrender his passport until he has complied.

21   As I mentioned earlier, he has traveled to Europe nine times.

22       THE COURT:  Understood.  I got the point.

23       MS. BENINTENDI:  Okay.  And really, if we were not to

24   do any kind of preventative measure, what would that say to

25   petitioner, but also to future judgment debtors, that this

MCE7BENC

1    Court's authority could be disregarded?

2            THE COURT:  I got that.

3            Okay.  Let me ask you a couple questions.

4            Has Benthos issued any subpoenas to try to get this

5    material?  I'm not saying you're required to, and this is not

6    in any way to suggest that Mr. Etra wasn't responsible for

7    providing the materials.  But has Benthos tried to engage in

8    some self-help by issuing subpoenas to get this material on

9    their own?

10           MR. POPOFSKY:  Well, we, had served restraining

11   notices on various banks historically that we knew of.

12           THE COURT:  Right.  But did you issue subpoenas to try

13   to get -- for example, subpoenaing Gmail, subpoenaing his

14   iCloud account, subpoenaing the bank account.

15           MR. POPOFSKY:  I believe -- I'm not sure if it was

16   this case or another case, honestly, your Honor, but we did --

17   we've learned that Gmail -- it's almost impossible to get

18   anything from Gmail.  They are very, very difficult.  So

19   whether it was this case history not this case, no.

20           THE COURT:  What about his credit card accounts, his

21   bank accounts?

22           MR. POPOFSKY:  Well, the bank account we went after.

23   I believe we served some subpoenas on banks long ago, two years

24   ago, but we're well past that now, your Honor.  And the truth

25   is, we have resource allocation issues.

MCE7BENC

1          THE COURT:  I understand.  Although, a subpoena, with

2     all due respect, does not take that much time or effort.

3          And has Benthos done anything to execute on the land

4     in North Carolina that Mr. Etra disclosed he owed?

5          MR. POPOFSKY:  No.  He was earning a few hundred

6     dollars from that.

7          THE COURT:  That's what he said.  Do you know that's

8     true?  For all you know, it could be incredibly valuable.

9          MR. POPOFSKY:  That's correct, your Honor.

10          THE COURT:  It may not be.  It may be nothing.  But

11     you're relying on him?

12          MR. POPOFSKY:  Point well taken, your Honor.  But the

13     answer to your question is no.

14          THE COURT:  I can't believe I'm making this point to

15     you.  You've been chasing him for three years.

16          MR. POPOFSKY:  We've made a determination that we did

17     not think the North Carolina pursuit was worthwhile.  Maybe

18     that was a mistake, maybe it wasn't a mistake.

19          THE COURT:  Okay.  All right.

20          MR. POPOFSKY:  We have spent -- your Honor, client has

21     spent a tremendous amount of resources.

22          THE COURT:  I know, I know.  Don't get me wrong.  I

23     fully understand the frustration of Benthos.

24          MR. POPOFSKY:  So, yes, there are other things we

25     could have done that we haven't done.

MCE7BENC

1           THE COURT:  Okay.  Anything further?

2           MS. BENINTENDI:  No.  Thank you, your Honor.

3           THE COURT:  All right.  Thank you.

4           Ms. Gallicchio.

5           MS. GALLICCHIO:  Well, your Honor, Mr. Etra continues

6    to maintain that he is making his best efforts.

7           THE COURT:  Okay.  So let me ask some -- I'll tell you

8    what, I'll give you five minutes to give me your pitch and then

9    let me ask you some pointed questions.

10          MS. GALLICCHIO:  Sure.

11          So understandably, this has gone on for a long time.

12   And understandably, the responses have, at times, been slow

13   with respect to Mr. Etra's response to requests from the Court,

14   but he does comply.  I understand that in looking at the

15   spreadsheet, as I looked at it this morning, it does appear

16   that we're talking about a limited subset of, in particular,

17   bank records here.  It appears that all the records from 2018

18   have been turned over.

19          THE COURT:  Records have been turned over for '18.

20   Whether it's all the records or not is a different question.

21          MS. GALLICCHIO:  All right.  Well, it doesn't appear

22   that there is a request for those in this spreadsheet, but that

23   they are remaining to be unproduced, as noted here.

24          I do see that bank statements from Piermont, as

25   request, were turned over by Mr. Etra, according to this

MCE7BENC

1    spreadsheet.

2            THE COURT:  No.  Some were, but not all.

3            MS. GALLICCHIO:  Some were.  I understand that might

4    be information -- and perhaps the plaintiff, if I'm wrong, can

5    correct me, that the M&T bank, 3441, and the Piermont 2292 are

6    closed accounts.  Mr. Etra has indicated he's made efforts by

7    communicating --

8            THE COURT:  Does he have any evidence whatsoever with

9    him or are we just relying on his word?

10           MS. GALLICCHIO:  He has not brought any documentary

11   evidence, your Honor.  He doesn't have any because he made

12   phone calls to the bank to request these --

13           THE COURT:  Well, that was irresponsible and not a

14   good faith effort.

15           MS. GALLICCHIO:  Well, your Honor, Mr. Etra, as he has

16   been continuing to do, will continue to make those efforts and

17   will provide to the plaintiff and to the Court the records as

18   he receives them.

19           THE COURT:  Okay.  So that's the pitch, that he's

20   trying?

21           MS. GALLICCHIO:  Yes, your Honor.  And he continues to

22   do try.

23           THE COURT:  All right.  Let me -- anything further on

24   that score?

25           MS. GALLICCHIO:  On that score, no.

MCE7BENC

 1                THE COURT:  All right.  Let me ask you some pointed

 2     questions then.

 3                MS. GALLICCHIO:  Okay.

 4                THE COURT:  According to the records that Mr. Etra

 5     produced, his Social Security checks stopped being deposited

 6     into the Piermont 0362 account in September.

 7                As of October, what bank account was the Social

 8     Security check being deposited into?

 9                MS. GALLICCHIO:  I'm sorry.  It stopped being

10     deposited into which account, your Honor?

11                THE COURT:  The Piermont 0326 account.

12                MS. GALLICCHIO:  Okay.

13                THE COURT:  So where is it now?

14                (Counsel confers with defendant)

15                MS. GALLICCHIO:  Mr. Etra believes it's been

16     redirected to M&T.

17                THE COURT:  So the M&T account isn't closed?  It's

18     receiving his Social Security check.

19                Mr. Etra, just to be aware, I'm not putting you on the

20     stand and putting you under oath because that would be a

21     perjury trap.  It was clear that you would lie.

22                So my question is into what account is your Social

23     Security check currently being deposited?  I do not believe in

24     a million years that you do not know the answer to that

25     question.

MCE7BENC

1          MS. GALLICCHIO:  Your Honor, there is an open M&T

2     account in which it's being deposited.  I don't have that

3     account number.

4          THE COURT:  Okay.  That's fine.

5          What good faith efforts has Mr. Etra made to get

6     current account records from the M&T account into which his

7     Social Security check is currently being deposited to produce,

8     as they were called for by the subpoena, and they were called

9     for by the order that I entered?

10          MS. GALLICCHIO:  If I could have a moment.

11          (Counsel confers with defendant)

12          MS. GALLICCHIO:  Your Honor, to date, he has not

13     retrieved the statement, but he will.  We can produce it today.

14          THE COURT:  He's going to produce it before he gets

15     out of jail is what's going to happen.

16          So we're going to go through the rest because there's

17     a long line where the answer is going to be exactly the same, I

18     suspect.

19          MS. GALLICCHIO:  Your Honor, I just -- obviously if

20     he's incarcerated, he's not going to be able to produce any of

21     these items.

22          THE COURT:  It's going to make it harder, but he can

23     give you power of attorney.  You'll be able to get the records.

24          Look, he knew this day was coming he has tried and

25     tried and tried to put off the inevitable.  He promised me when

MCE7BENC

1    you were last in front of me that he was going to comply with

2    all of these orders, and he did not.

3              So let me just keep going so you have a sense.

4    Because I think in fairness to you and in fairness to Mr. Etra,

5    he needs to understand why I am so frustrated and why I am

6    prepared to put him in jail until he complies.

7              So no effort was made to produce the M&T account, even

8    though it's an open account, he knew it was covered.

9              Mr. Etra testified in front of Magistrate Judge

10   Parker—this is at Docket No. 214 page 47—that Magistrate

11   Ellish sent him the letter that he presented to the Court

12   indicating that Magistrate Ellish, and not Mr. Etra, controlled

13   the UniCredit and Sberbank account, that that letter was sent

14   to Mr. Etra by e-mail.  That e-mail was clearly called for by

15   Item 5 of the Benthos subpoena, dated August 2, 2022, and by

16   the Court's order, dated September 26.

17             What effort did he make to retrieve and produce that

18   e-mail to Benthos?

19             (Counsel confers with defendant)

20             MS. GALLICCHIO:  Your Honor, he believes that he did

21   convey both the e-mail and the letter to the Court.

22             THE COURT:  He did not.

23             Okay.  What effort did Mr. Etra make to obtain current

24   statements from Piermont Bank for the account ending in 2060?

25   The item was clearly called for by the subpoena and it was

MCE7BENC

1  covered by the Court's order dated September 26.

2              MS. GALLICCHIO:  2060, your Honor?

3              THE COURT:  2060.

4              MS. GALLICCHIO:  Well, it does appear that, according

5  to the spreadsheet, he did provide bank statements for

6  Piermont -- oh, I'm sorry.  2060?

7              THE COURT:  2060.

8              MS. GALLICCHIO:  He provided for 0362.

9              THE COURT:  Correct.  That's how I know that his

10  Social Security check is no longer being deposited there.

11             MS. GALLICCHIO:  Okay.  It's closed, your Honor.

12             THE COURT:  No, no.  It was not closed as of June.  So

13  it was closed as some point.  He did not -- what effort did he

14  make to produce the bank statements that would show that it was

15  closed out?

16             MS. GALLICCHIO:  He's indicated that he has called the

17  bank and he has asked for that documents.

18             THE COURT:  So he has no evidence that he made a

19  reasonable effort on that.

20             What efforts did he make to obtain current statements

21  from the Piermont Bank for the IOLA account ending in it 2292?

22             MS. GALLICCHIO:  Your Honor, the same --

23             THE COURT:  The same thing.  Okay.

24             MS. GALLICCHIO:  Same thing.  He's called the bank and

25  he request -- that account is closed, and he has called the

MCE7BENC

1   bank for those records.

2               THE COURT:  Any evidence, any evidence that he can

3   give me?  No.  Other than his word.

4               MS. GALLICCHIO:  Correct.

5               THE COURT:  Okay.  What effort did he make to --

6   you've already said.

7           The M&T Bank account that he says his Social Security

8   check is going into, is that the M&T Bank account for an IOLA

9   account ending in 3441 or is this a different M&T account?

10              MS. GALLICCHIO:  I believe it's a different M&T

11  account.

12              THE COURT:  Okay.  What effort did he make to obtain

13  current statements from the M&T Bank for the IOLA account

14  ending in 3441?

15              MS. GALLICCHIO:  Again, your Honor, that is closed,

16  and he has requested that information from the bank.

17              THE COURT:  No evidence that he's requested that

18  information from the bank that he can present to me other than

19  his word?

20              MS. GALLICCHIO:  Correct.

21              THE COURT:  What efforts did he make to obtain

22  statements for August and November 2017 from Citibank for the

23  account ending 0873?

24              (Counsel confers with defendant)

25              MS. GALLICCHIO:  So, your Honor, he's delivered what

MCE7BENC

1    he has, as is reflected in the spreadsheet.  He delivered

2    certain of those statements.  He does not have the others.

3    Those accounts are closed, and he has no ability to obtain

4    them.

5              THE COURT:  What efforts has he made to obtain them?

6    Again, it's just an oral request to Citibank?

7              MS. GALLICCHIO:  Yes, your Honor.

8              THE COURT:  That is not a good faith effort.  That is

9    not even close to a good faith effort.

10             MS. GALLICCHIO:  Can I have a moment, your Honor?

11             (Counsel confers with defendant)

12             MS. GALLICCHIO:  He's also indicated, your Honor, he

13   didn't know that those were missing until it was on the

14   spreadsheet that was just recently filed.

15             THE COURT:  Well, he's the one who produced them.  So

16   had he gone through them, making a reasonable effort to comply,

17   he would have known.

18             Okay.  What effort has he made to obtain statements

19   since August 2017 or since the opening date for the European

20   bank account that he testified on August 12 -- excuse me, on

21   April 12, 2019 that he owned?

22             (Counsel confers with defendant)

23             MS. GALLICCHIO:  Well, your Honor, I understand that,

24   as he's indicated I think previously, it is not his account --

25             THE COURT:  Here's the problem.

MCE7BENC

1              MS. GALLICCHIO:  -- and has no control over it.

2              THE COURT:  Here's the thing.  What he testified is

3    that the Sberbank and the UniCredit bank that Benthos was

4    focused on were not his accounts and that Magistrate Ellish

5    controlled those accounts.  It is lost in the fog of history

6    why Benthos believed that those were the two bank accounts that

7    Mr. Etra controlled in Europe.  Mr. Etra testified twice in a

8    deposition that he owned a bank account in Europe.  He referred

9    to it as his account.  So there is an outstanding account in

10   Europe.

11             At this point, unlike in front of Magistrate Judge

12   Parker where Benthos had the burden of proof to show that he

13   controlled documentation for that account, now the burden is on

14   him.  He testified that he had a bank account in Europe.  He

15   repeated it twice during a deposition.  He's made no efforts to

16   obtain the records, because he's now saying, I guess, that that

17   wasn't true.

18             What efforts did he make -- I'm not going to go

19   through every credit card account that the record shows that he

20   owns, but suffice it to say there's an American Express

21   account, there's an Apple account, there's a credit card

22   account at Barclays, one at Barclays Old Navy, credit card

23   account from HSBC.

24             What effort did he make to obtain any of the credit

25   card statements from those accounts?

MCE7BENC

1           (Counsel confers with defendant)

2           MS. GALLICCHIO:  He didn't realize that there were any

3    missing, your Honor.

4           THE COURT:  He hasn't produced any.

5           MS. GALLICCHIO:  He's indicated that he has produced

6    some, your Honor.

7           THE COURT:  Well, does he have them with him?

8           (Counsel confers with defendant)

9           MS. GALLICCHIO:  All right.  He believes he produced

10   the American Express and the Barclays, your Honor.

11          THE COURT:  When?

12          MS. GALLICCHIO:  Just a moment, your Honor.

13          (Counsel confers with defendant)

14          MS. GALLICCHIO:  He has not produced them yet, your

15   Honor.

16          THE COURT:  I didn't think so.

17          Okay.  What effort did he make to gather e-mail and

18   written communications concerning the escrow services he

19   provided?

20          He clearly communicated with Benthos via e-mail, via

21   his Gmail account.  Whatever happened to the iMac -- I don't

22   believe it was destroyed, but whatever happened to it would not

23   have prevented him from getting -- as we all know, Gmail lives

24   on Gmail servers.  All he's got to do is go into his account

25   and he'll have access to them.

MCE7BENC

1          But did he make any effort to pull his Gmail

2    communications regarding his escrow business?

3          (Counsel confers with defendant)

4          MS. GALLICCHIO:  Your Honor, I don't have an answer to

5    that question.  He believes he made some effort, but I don't

6    have any information to provide to the Court.

7          THE COURT:  Okay.  I understand that.

8          Here's the thing.  I'm not going to continue with this

9    exercise because I think I've made the record that Mr. Etra has

10   not made a good faith effort to comply with the subpoenas.  He

11   has not -- specifically, when I denied Benthos's letter motion

12   for contempt, I denied it and I specifically called out and

13   told Mr. Etra that while I was denying this without prejudice

14   and Benthos could proceed with a real motion, that he needed to

15   immediately produce current bank accounts and credit card

16   statements.  So if there was a single thing that should have

17   been on his mind, it's those.  And he failed to do it.  He did

18   not make reasonable efforts to do it.

19         So in short -- would you like to make a final pitch?

20         MS. GALLICCHIO:  Yes, I would like to make a final

21   pitch, your Honor.

22         And also, with respect to -- the Court had asked me to

23   make a proffer with respect to the witness.

24         THE COURT:  Yes.  Thank you.

25         MS. GALLICCHIO:  Yes.  So I think what this speaks to

MCE7BENC

1    is good faith efforts.  I understand that Mr. Melvin Dussel,

2    who was the witness that is proposed for today, is a gentleman

3    who is working with Mr. Etra to make efforts to raise funds to

4    settle.  I understand that he has been in communication with

5    the plaintiff and there have been talks with respect to

6    settlement, and so I think that it speaks to a good faith

7    effort in general.

8              THE COURT:  I don't believe that at all.

9              MR. POPOFSKY:  Can I address that briefly, your Honor?

10             I have not heard from Mr. Dussel since the day before

11   the August 2 hearing when he told me that he would have six

12   figures that week and a million dollars in the ensuing weeks if

13   we adjourn the hearing schedule for the next day.  The hearing

14   was not adjourned.  I never heard anything from Mr. Dussel

15   since then.

16             MS. GALLICCHIO:  Okay.  I'm sorry.  Just last pitch,

17   your Honor, just with respect to what the Court is potentially

18   contemplating here, I'm going to make one last pitch effort for

19   the Court to give Mr. Etra one last opportunity to produce at

20   least the bank statements of his current account and his credit

21   card statements.  Give hi ma short period of time, just given a

22   variety of other things, including his health conditions, which

23   I'm sure the Court is well aware.

24             THE COURT:  I have no idea what his health conditions

25   are.  I've never gotten a letter from a doctor or anybody other

MCE7BENC

1    than Mr. Etra.

2              MS. GALLICCHIO:  I believe -- I'm not sure.  Correct

3    me if I'm wrong, but I believe I have seen a medical document

4    that may have been filed under seal.

5              THE COURT:  That he had an appointment.  I think we

6    had a medical document that said he had an appointment.

7              MS. GALLICCHIO:  Well, I will represent --

8              THE COURT:  And I may have something that said he had

9    high blood pressure.

10             MS. GALLICCHIO:  Yes.  I will represent, your Honor,

11   that he indicates that he has hypertension.

12             THE COURT:  Oh, he's told me all of that.  He's told

13   me all about his medical problems.

14             MS. GALLICCHIO:  Well, so I would also point that out,

15   I will make that apart of the record, your Honor, he does have

16   medical conditions certainly make him, I would argue,

17   incompatible with incarceration.  And that it's just not --

18             THE COURT:  You know, all those things also were

19   incompatible with him flying back and forth to Europe

20   repeatedly before there were COVID vaccines.  So the level of

21   his concern about his health only seems to come into play when

22   it's time to do something that the Court has required him to

23   do.

24             Okay.  I hear you.  I hear the argument about his

25   medical concerns.  I'm not moved by them, but I do hear them.

MCE7BENC

1          MS. GALLICCHIO:  So, again, my last pitch, your Honor,

2     is just to give him a limited opportunity rather than

3     incarcerating him today, which is going to make it incredibly

4     hard for him to comply with the Court's --

5          THE COURT:  It is.  And you really should have thought

6     about that in advance.

7          MR. POPOFSKY:  Your Honor, can I be heard?

8          THE COURT:  Sit down.  No.

9          All right.  The Court finds that the respondent, Aaron

10    Etra, is in contempt of the order issued by this court on

11    September 26, 2022, referred to as the September 26 order.  And

12    the restraining notice issued by Benthos on August 27, 2020,

13    I'll refer to that as the restraining notice.  Accordingly,

14    Mr. Etra is remanded into the custody of the U.S. Marshals as a

15    coercive sanction.

16          Listen to me, Mr. Etra, because you need to know what

17    you're going to need to do.

18          Mr. Etra is remanded into the custody of the U.S.

19    Marshals as a coercive sanction until (1) he produces all

20    documents that he has been previously ordered to provide and

21    (2) he pays petitioner $94,070.78, which represents the sum of

22    all amounts known to have been deposited into a personal bank

23    account of Mr. Etra from August 27, 2020 onward that were not

24    obviously exempt from the restraining notice.

25          The Court will explain further in a written order that

MCE7BENC

 1    the obligation to pay the sum of $94,070.78 will be reduced if

 2    Mr. Etra proves with credible, admissible evidence that any of

 3    the deposited items are exempt from the restraining notice

 4    pursuant to C.P.L.R. Section 5222(e), or proves with credible,

 5    admissible evidence that he is unable to pay some or all of

 6    that sum.  And the sum will be increased if petitioner provides

 7    credible, admissible evidence of additional funds that came

 8    into Mr. Etra's possession after the restraining notice was in

 9    place that have not been paid to the petitioner.

10          From this date forward, respondent must comply with

11    the restraining notice by transferring promptly on receipt any

12    funds that are not exempt to Benthos.  Further, Mr. Etra is

13    ordered on a going-forward basis to provide to petitioner

14    current bank and credit card statements on the first business

15    day of every month until he satisfies the Court's $4.6 million

16    judgment.

17          In addition, respondent must surrender his passport

18    and laptop to the Court.  I'm going to ask on that that they be

19    surrendered to the Federal Defenders as an initial matter,

20    because there is some --

21          Mr. Etra, listen to me.  I'm going to give you an

22    opportunity to talk to your attorney, but you need to listen to

23    me.

24          MR. ETRA:  Yes, your Honor.

25          THE COURT:  Okay.  Because there is some possibility

MCE7BENC

that the laptop computer may contain privileged information,

petitioner must, in consultation -- Benthos must, in

consultation with Ms. Gallicchio, not later than Friday

January 13, 2023, propose a protocol for having a forensic

examination performed by an independent forensic expert; having

a report reflect the contents of the computer produced to

Mr. Etra; having Mr. Etra review the report reflecting the

contents of the computer, and lodging any claims of privilege

over any particular contents; and then for the Court to

determine whether the purportedly privileged material is, in

fact, privileged.

Even after Mr. Etra purges his contempt and is

released from detention, he is prohibited from traveling abroad

until he satisfies the Benthos judgment.

The Court has informed respondent of his right to

counsel at this civil contempt proceeding and his right to

court-appointed counsel if he's indigent.  Because respondent

submitted a financial affidavit swearing that he is indigent,

the Court appointed a Federal Defender, Amy Gallicchio, to

represent him in this contempt proceeding.  The Court notes

that it has substantial doubt that the affidavit is entirely

accurate.  Nevertheless, because Benthos holds a $4.6 million

judgment against him, he is likely insolvent.  Accordingly, he

qualifies for appointed counsel.

Respondent has flagrantly violated the legal

MCE7BENC

1    obligations in this case for years.  Despite receiving myriads

2    of second and third chances from this Court, he has amassed

3    millions of dollars in fines, wasted valuable judicial

4    resources, and spent time in the custody of U.S. Marshals for

5    his recalcitrance.  The orders he is found to have violated

6    today are, therefore, part of a greater pattern of

7    noncompliance which the Court took into account when

8    determining what would work as a coercive sanction.

9           In order to find a party in contempt, the Court must

10   find that (1) the order not complied with is clear and

11   unambiguous; (2) proof of noncompliance is clear and

12   convincing; and (3) the alleged contemnor has not diligently

13   attempted to comply in a reasonable manner.  These elements

14   have all been met with respect to the September 26 order.

15          The September 26 order, as well as the multiple orders

16   that preceded it, were clear and unambiguous.  The Court has

17   issued several prior orders requiring Mr. Etra to produce bank

18   statements and escrow agreements that he has still failed to

19   produce, and has twice held Mr. Etra in civil contempt for

20   disregarding those orders, most recently on August 2, 2022.

21   *See* Docket 143.

22          On September 26, 2022, the Court denied Mr. Etra's

23   motions to quash Petitioner's August 2, 2022 document subpoena,

24   referred to as the "document subpoena," and August 2, 2022

25   information subpoena, which I'll refer to as the "information

MCE7BENC

subpoena," and once again ordered him to produce all escrow
agreements encompassed within previous orders, as well as to
fully respond to petitioner's subpoenas.  *See* Docket 174.  The
Court repeatedly denied respondent's requests for extensions to
satisfy the September 26 order.  *See* Dockets 181 and 184.

At no time, and in response to none of those orders,
and nor today, did Mr. Etra indicate that he did not understand
what he was being required to produce.  Thus, there can be no
dispute as to what he was ordered to provide in order to be in
full compliance with the September 26 order.

The Court finds that proof of noncompliance with the
September 26 order is clear and convincing.  Although the
written order that will follow today's hearing will provide an
exhaustive list of the material that has been ordered and not
produced, the Court will, for now, point out just a few items
that Mr. Etra has not produced despite valid orders that he do
so:

Mr. Etra testified under oath on April 12, 2019 that
he has a European bank account.  Specifically, he was deposed
in the case of *Benthos Master Fund Limited v. Austin, et al.*,
Index No. 151823/2019, a case that was pending in the Supreme
Court, New York County.  During his deposition, at page 249, he
was asked if he has a European bank account and he testified,
"Yes."  Several pages later, as he was being pressed on the
identity of the bank, he declined to reveal it, stating, "It is

MCE7BENC

1   a confidential arrangement between me and my bank."  Deposition

2   at 251.

3         Benthos assumed, for reasons now lost in the fog of

4   history, that Mr. Etra had an account at UniCredit and

5   Sberbank.  During the course of a hearing before Magistrate

6   Judge Parker to determine whether he had power to produce

7   records related to the accounts at UniCredit and Sberbank that

8   Benthos believes are his accounts, he testified unequivocally

9   on November 9, 2022 that the accounts at UniCredit and Sberbank

10  are not his accounts.  Thus, there remains sworn testimony that

11  he has a bank account in Europe, but he has never produced

12  account records associated with that account or accounts

13  despite those records being called for by the document subpoena

14  and being encompassed by the Court's September 26 order.

15        On September 26, 2022, Mr. Etra was ordered, in

16  essence, to produce an accounting of all funds received via his

17  escrow/paymaster business since August 1, 2017.  He has failed

18  to do that.

19        Mr. Etra was ordered on September 26 to produce escrow

20  agreements for 31 clients——and he has since confirmed that he

21  had at least 41 escrow clients since August 1, 2018——but he has

22  only produced 19 escrow agreements, and not all of what he

23  produced were complete agreements or final agreements.  *See*

24  Docket 182.  He has failed to produce admissible or credible

25  evidence that the agreements that he has not produced do not

MCE7BENC

1    exist.

2    Escrow agreements with or on behalf of the following

3    parties were incomplete or produced as draft agreements:

4    Day Law & Associates; Goldfinger Enterprise; Eric

5    Valdes/BVL Dev. Page; Diza Marine Services and Survey; Ian

6    Robert Stewart Jordan—the agreement produced was unsigned—Sue

7    White; Laima Khan.

8    Escrow agreements with or on behalf of the following

9    parties have not been produced at all:

10   Renato Corzo; Charles L. Weinstein; Fisher Enterprise;

11   Oceanix Inc.; Steven Kavanagh; Novavis Medical; Pound

12   International Sender; Alba Lucia Giraldo; Pass LLC.; Desmond

13   Hinds; Konrad Jan Banasiak; Tennessee Bar Foundation; George

14   Michael Du Plooy; Timothy L. Sanford; Incept Holdings BVI

15   Limited; Charles Nastasi; Puerta Del Pacifico; Harold Wright

16   Peavy; John R. Watkins; Peavy & Co.; Valarie Baptiste

17   Irrevocable Private Trust; and Razur 7711, LLC.

18   On September 26, 2022, Mr. Etra was ordered to produce

19   records from all bank accounts he held from August 1, 2017

20   through August 1, 2018.  He's failed to do so.

21   Notable missing bank statements are the account

22   statements for the Citibank account 0873 for August 2017,

23   November 2017, and January 2018 through July 2018.

24   I would note that Benthos has waived any requests for

25   other bank accounts that may well have been opened during that

MCE7BENC

1    period of time, that is the period of time from August 1, 2017

2    through August 1, 2018.

3         On September 26, 2022, and again on October 28, 2022,

4    Mr. Etra was ordered to produce records from all bank accounts

5    he held from June 30, 2022 to the present.  He's failed to do

6    so.

7         His known missing bank accounts from that period

8    include the Piermont ending 2060; Piermont IOLA ending 2292;

9    M&T ending 3441.  The account into which his Social Security

10   check has been deposited since October 1, 2022, we're told

11   today it was an M&T account.  The account number unknown to the

12   Court.

13        On September 26, 2022 and again on October 28, 2022,

14   Mr. Etra was ordered to produce all credit card records from

15   August 1, 2017 to the present.  He has failed to do so.

16        Missing credit card statements include an American

17   Express ending in 4005, and any other American Express cards he

18   might own.  All of these are from the period of August 1, 2017

19   to the present or from the inception of the account.  He's

20   given other inception dates but, again, I don't know whether I

21   can trust those dates.  So there's an American Express card

22   ending 4005; an HSBC card ending 0136; an Apple card ending

23   6423; Barclays account, I don't have a number on that; Barclays

24   Old Navy account, I don't have a number on that.

25        As noted previously, that is a non-exclusive list, but

MCE7BENC

1    it will give Mr. Etra some items he can begin working on

2    immediately while he waits for the Court's written order.

3        Finally, the Court finds that respondent has not

4    diligently attempted to comply with the order in a reasonable

5    manner.  And that, and that alone, Ms. Gallicchio, is why I am

6    not willing to give him another chance.  He knew this day was

7    coming.  He had been told this day was coming.  And it was

8    obvious from today's hearing that he made absolutely no effort

9    to comply with the various items that were clearly called for.

10        Although respondent produced some information and

11   documents in response to the September 26 order, a significant

12   portion of the documents respondent produced had been produced

13   before, and the production did not address the glaring

14   deficiencies this Court ordered him to cure, notably missing

15   bank records, credit card statements, and an accounting of all

16   fees received since August 1, 2017.  While it is conceivable

17   that records from several years ago might not be readily

18   available to Mr. Etra online, he has had more than adequate

19   time to make formal requests to his credit card providers and

20   banks to get copies of the old statements that he has been

21   required to produce.

22        I would just note, it's not like Mr. Etra is one of

23   the many types of clients the Federal Defenders frequently

24   represents who is unsophisticated.  Mr. Etra is a Columbia Law

25   School graduate.  He knows how to get records when he is

MCE7BENC

1   required to get records, and he well knows how to create a

2   document trail when he wants to.

3         I would note that for many, many of these records that

4   he hasn't produced, statements from the last 12 months would be

5   readily available online.  So all he has to do is go online and

6   print them out.

7         Mr. Etra has provided no admissible evidence that he

8   has made formal requests for old bank statements and credit

9   card statements.  The only evidence he has presented is his own

10  oral statements, that he's made oral requests for the records.

11  Given the ease of getting such records——this is by way of

12  example only——American Express records are available online

13  going back to 2017; with the caveat that it may take a couple

14  of days to get statements that go back beyond what is readily

15  available immediately online, but it's a couple of days.  It is

16  clear that Mr. Etra has not exercised reasonable diligence to

17  comply with the Court's orders.  His answers to my questions

18  today regarding his efforts to comply made it clear that he has

19  not acted diligently.

20        Before addressing sanctions for respondent's conduct,

21  I will address his obvious violations of the restraining order.

22  The Court may find a party in civil contempt for violating a

23  restraining notice issued under New York law if it was

24  "initiated by the judgment creditor as a means of executing a

25  judgment entered in federal court."  *Cordius Trust v.*

MCE7BENC

1    *Kummerfeld Associates, Inc.*, 658 F. Supp. 2d 512, 518 (S.D.N.Y.

2    2009) (collecting cases); *see also* C.P.L.R. Section 5251;

3    *Amtrust N. Am., Inc. v. Preferred Contractors Ins. Co.*, No.

4    16-MC-0340 (CM), 2016 WL 6208288, at page 6 (concluding that

5    failure to comply with a restraining notice issued to enforce a

6    judgment confirming an arbitration award would be "considered

7    contempt of court" after concluding that a restraining notice

8    was effective against the assets at issue).  Before making a

9    finding of contempt, the Court must review the notice's

10   "validity and compliance with the statutory notice

11   requirement," *Cordius Trust,* 658 F. Supp. 2d at 518.

12           Under New York law, a judgment creditor's counsel may

13   issue a post-judgment restraining notice as an officer of the

14   Court.  C.P.L.R. Section 5222(a).  Where the debtor is a

15   natural person, as in this case, the judgment creditor must

16   provide notice of potentially exempt funds and the procedure

17   for retrieving such funds, as well as advise the debtor that he

18   may wish to consult with counsel.  C.P.L.R. Section 5222(d) and

19   (e).  Such notice must be served on the debtor no later than

20   four days after the restraining notice was served.  C.P.L.R.

21   Section 5222(d).  Notice is effective against the debtor until

22   the judgment or order is satisfied or vacated.  CPLR Section

23   5222(b); *see also Middleton v. Green Cycle Housing, Inc.*, No.

24   15-MC-0023, 2017 WL 715747, at page 7.

25           The Court finds that the restraining notice served in

MCE7BENC

1    this case is valid and in compliance with statutory notice

2    requirements.  Petitioner issued the restraining notice to

3    execute the August 13, 2020 federal judgment against

4    respondent.  *See* Docket 15.  The restraining notice sets forth

5    potentially exempt funds and the procedure to recover such

6    funds.  It also advises respondent that he may wish to consult

7    counsel and that violation of the restraining notice is

8    punishable as contempt of Court.  *See* restraining notice,

9    Docket 211-5, at pages 2-4.  The Court is therefore satisfied

10   that it may hold respondent in contempt if he violated the

11   restraining notice.

12        The Court finds that the restraining notice was clear

13   and unambiguous.  It states that respondent is forbidden from

14   disposing of any property in which he has an interest, as well

15   as all property coming into his possession after the

16   restraining notice is issued, except as provided under New York

17   law, which exempts, among other categories of property, Social

18   Security payments, unemployment benefits, and ninety percent of

19   the debtor's wages or salary earned in the 60 days prior to the

20   restraining notice.  *See* C.P.L.R. Section 5222(e).

21        The Court finds that proof of noncompliance with the

22   restraining notice is clear and convincing.  Apart from a few

23   thousand dollars the petitioner was able to seize from one of

24   respondent's bank accounts, respondent has failed to make any

25   payments toward the judgment in this case, yet his bank records

MCE7BENC

1    and information he has produced to date show that respondent

2    received fees from clients after the restraining notice was

3    issued, but did not remit those fees to Benthos as required by

4    the restraining notice.  *See* Docket 170.  The receipt of fees

5    is confirmed through his bank accounts, even though Etra's

6    commingling of money in his IOLA account and the movement of

7    money in and out of those accounts, coupled with his failure to

8    provide a full accounting of income from that business, makes

9    it difficult to confirm the exact amounts of his

10   post-restraining order income.

11          Respondent had sufficient liquid assets to purchase

12   airline tickets and repeatedly to travel extensively in Europe

13   while the restraining notice was in effect.  Although Mr. Etra

14   has asserted that third parties paid for his international

15   travel, he has provided no admissible evidence of that fact

16   beyond his own say so.  For reasons that have been previously

17   discussed, the Court does not credit Mr. Etra's statements.

18          Respondent's bank accounts reflect that he spent

19   freely while in the United States, routinely paying for Uber

20   rides, high-end haircuts, restaurant meals, and housekeeping

21   service even while failing to pay rent on his apartment.

22          In short, the Court finds that respondent has not

23   diligently attempted to comply with the restraining notice in a

24   reasonable manner.  Respondent has failed to make any payments

25   toward the judgment despite earning income, and has, therefore,

MCE7BENC

1    flagrantly violated the restraining notice for years.

2    Because respondent is in civil contempt of both the

3    September 26 order and the restraining notice, the Court has

4    "the inherent power to order coercive civil confinement,"

5    *Armstrong v. Guccione,* 470 F.3d 89, 102 (2d Cir. 2006), and the

6    statutory power "to punish by fine or imprisonment, or both, at

7    its discretion, such contempt of its authority,"  18 U.S.C.

8    Section 401(3).  Coercive civil contempt sanctions may be

9    imposed "to secure future compliance with court orders and to

10   compensate the party that has been wronged."  *Paramedics*

11   *Electromedicina Comercial, Limited. v. GE Medicine Systems*

12   *Information Technologies., Inc.*, 369 F.3d 645, 657 (2d Cir.

13   2004).  In determining the proper measure of coercive

14   sanctions, the Court must consider "(1) the character and

15   magnitude of the harm threatened by the continued contumacy,

16   (2) the probable effectiveness of the sanction in bringing

17   about compliance, and (3) the contemnor's financial resources

18   and the consequent seriousness of the sanction's burden."  *New*

19   *York State National Organization for Women v. Terry*, 886 F.2d

20   1339, 1353 (2d Cir. 1989).  The ultimate consideration for the

21   Court is whether the coercive sanction is reasonable in

22   relation to the facts, which is a matter in the Court's

23   discretion.  "Arrest is an appropriate coercive sanction for

24   civil contempt, so long as its purpose is not punitive but is,

25   instead, to compel the contemnor to perform the required act."

MCE7BENC

1   *Bank of Credit & Commercial International (Overseas) Limited.*

2   *v. Tamraz,* 2006 WL 1643202, at page 3.  So is the surrendering

3   of a debtor's passport, *see United v. Donziger* 11-CV-691, 2021

4   WL 3141893, at page 63, note 610, citing *Herbstein v. Bruetman,*

5   241 F.3d 586, 589 (7th Cir. 2001); *see also Middleton v. Green*

6   *Cycle Housing, Inc.,* 2017 WL 715747, at page 5 (noting that the

7   Court imposed a "temporary travel ban" on the debtor as a

8   contempt sanction) and the forensic examination of a debtor's

9   electronic devices.  *See* the order of the *Donziger* case, Docket

10  2108.

11          In this case, in the middle of the summer, the Court

12  began with the lesser coercive sanction of monetary penalties

13  for respondent's failure to produce many of the same documents

14  that remain unproduced despite being encompassed by many

15  orders, most recently by the September 26 order.  The Court

16  adopted Magistrate Judge Parker's recommendation of a $50 fine

17  per day——*see* Docket 108 at 4——which came into effect on July 2,

18  2022——*see* Docket 113 at 2——and later increased it to $1000,

19  effective July 8, 2022, doubling every two days until

20  respondent complied——*see* Docket 126 at 4.  As of August 2,

21  2022, respondent owed $16,382,300 in fines, yet he has still

22  has not produced all of the documents he has been ordered to

23  produce.  The Court has, therefore, concluded that financial

24  sanctions, including ever-increasing ones, will not compel

25  respondent to comply.

MCE7BENC

1          After weighing the character and magnitude of the harm

2    caused and threatened by respondent's continued noncompliance;

3    the effectiveness of incarceration, as opposed to the multiple

4    civil fines the Court has already imposed, and the severity of

5    the sanction——*see Terry*, 886 F.2d at 1353——the Court finds that

6    arrest is an appropriate coercive sanction in this case.

7    Respondent is remanded to the custody of the U.S. Marshal until

8    such time as (1) he produces all documents that he has

9    previously been ordered to provide; and (2) he pays petitioner

10   $94,070.78, which represents the sum of all amounts known to

11   have been deposited into a personal bank accounts of Mr. Etra

12   from August 27, 2020 onward that were not obviously exempt from

13   the restraining notice.

14          The Court will explain further in a written order that

15   the obligation to pay the sum of $94,070.78 will be reduced if

16   Mr. Etra (a) proves with credible, admissible evidence that any

17   of the deposited items are exempt from the restraining notice

18   pursuant to C.P.L.R. Section 5222(e), or (b), proves with

19   credible, admissible evidence that he is financially unable to

20   pay all or part of that sum.  And the sum will be increased if

21   petitioner provides credible, admissible evidence of additional

22   funds that came into Mr. Etra's possession after the

23   restraining notice was in place that were not paid to

24   petitioner.

25          A written order will follow.

MCE7BENC

 1         Ms. Gallicchio.

 2         MS. GALLICCHIO:  Your Honor, I just -- I have one

 3    request, and that would be if the Court would allow Mr. Etra to

 4    surrender on the Court's order on Friday or on Monday.  I just

 5    think it would allow for me to retrieve and to obtain his

 6    computer and electronic devices and get the ability to access

 7    his accounts, etc., given that I believe that when he's

 8    admitted to the MDC he will be under quarantine for at least a

 9    week at which time I will not be permitted -- not even counsel

10    will be permitted to visit him.  So I would ask the Court, if

11    you would give us at least a couple days so that I can obtain

12    the computer and phone from him.

13         THE COURT:  So during the period of time -- Mr. Etra

14    was asking me repeatedly to adjourn his time to respond—not

15    that it mattered since he didn't respond anyway—because he

16    indicated that he was spending time with his family.  So I am

17    confident he has family in New York who can access his

18    apartment and access the items that he is required to turn

19    over.

20         In terms of a power of attorney, he's going to be held

21    downstairs at least until the end of the day so I would

22    recommend that you get a power of attorney so that you can get

23    access to his bank accounts.

24         Ms. Gallicchio, I appreciate you coming in at the last

25    minute.  This is not -- you have done everything in your power.

MCE7BENC

1    You had him promise me last time you met him that he would

2    comply with these orders.  This is entirely on Mr. Etra for not

3    doing what he was required to do, and what he knew he was

4    required to do, and what the people at the front desk had been

5    pestering him now for over a year to do.  So the time has

6    finally come that he's going to pay the piper, and he's going

7    to pay the piper until he produces the documents that he's

8    required to produce.

9              MR. ETRA:  Your Honor, may I say something?

10             THE COURT:  You may.  You've got an attorney.  I would

11   suggest you don't, but it's entirely up to you.

12             MS. GALLICCHIO:  Whatever it is he wants to say, he

13   can speak to the Court, your Honor.

14             THE COURT:  Of course.  Go ahead.

15             MR. ETRA:  Your Honor, I think the record shows that

16   in October I produced a large, large number of materials

17   subsequent to that September 26 motion.  And the proposal that

18   I made then is that I work with petitioner to fill in the

19   missing items.  Not everything was missing.  A tremendous

20   amount was delivered in two amounts to the Court and to

21   petitioner.  So I think my compliance has not been correctly

22   reflected.

23             THE COURT:  Are you trying to re-argue the notion that

24   you have not made reasonable efforts to comply?

25             MR. ETRA:  Correct.

MCE7BENC

1          THE COURT:  Mr. Etra, just one question to you.

2          MR. ETRA:  Yes.

3          THE COURT:  Where's the bank statements for the bank

4   account that you currently deposit your Social Security account

5   in?

6          MR. ETRA:  I will provide that.

7          THE COURT:  No, no, no.  It was due before and you

8   didn't produce it.  You made no effort to produce it.

9          MR. ETRA:  I --

10         THE COURT:  You tried to cover up your current banking

11  relationship.  And this happened the last time as well.

12         MR. ETRA:  Your Honor, I plead with you because I have

13  made that effort.  I will continue to --

14         THE COURT:  What did you do?  Tell me what you did do

15  produce your current bank account.

16         MR. ETRA:  I provided the information on the one

17  Piermont account that's open.

18         THE COURT:  That's not the bank account that you're

19  depositing your Social Security account in.

20         Mr. Etra, your request for re-hearing is denied.

21         MR. ETRA:  Your Honor --

22         MS. GALLICCHIO:  That's it.

23         THE COURT:  Thank you all.  And, again, thank you to

24  the Federal Defenders for stepping in.

25         (Adjourned)