

**Steven R. Popofsky**
*E-Mail: spopofsky@kkwc.com*
*Direct Dial: 212.880.9882*

January 31, 2023

**VIA ECF**
Hon. Valerie Caproni
United States District Court
40 Foley Square, Room 240
New York, NY 10007

Re:     **Benthos v. Etra, 20-CV-3384**

Dear Judge Caproni:

Benthos respectfully submits this response to the Federal Defenders' letter of January 24, 2023.

The conclusory assertion that the "Coercive Effect of Civil Confinement Has Been Achieved" (Dkt. 273 at 4) is a curious one, and unsupported by the actual facts (and absence of facts) in the application. To the contrary, (i) almost nothing of what the Court required Mr. Etra to provide "[i]n order to purge his contempt" (Dkt. 260 at 19-27) has been provided; (ii) no evidence has been presented of any efforts at all by Mr. Etra to provide even the information (and documents) within his control that do not require cooperation from financial institutions; (iii) he has not paid Benthos even one penny of the payment required as a condition of his release, although he has had funds available; and (iv) the limited material produced reveals additional recent misconduct by Mr. Etra in violation of his legal obligations.

No post-June 2022 statements from the infamous Piermont Bank 2060 account – the bank account through which Mr. Etra conducted most of his financial affairs (see Dkt. 211 at 4-5), and which he concealed from Benthos and the Court for so long – have been produced. Nor have any bank statements whatsoever been produced, other than those from the new Wells Fargo account that he evidently opened in September intending to conceal it, too, from Benthos and the Court.[1] But the only other thing produced – the last few months of statements from the American Express card Mr. Etra also had concealed for two years – reveals, incredibly, that from prison he paid more than $4,000 to American Express (Ex. 2 at p. 1, entries for January 7, 2023).

---

[1] That account (Ex. 1) shows almost no activity, other than Social Security deposits. It does reveal that he lied to the Court on December 14, 2022, when he stated that his recent Social Security payments had gone into an "M&T" account.



Hon. Valerie Caproni
January 31, 2022
Page 2

We have no knowledge of the source of those funds. Furthermore, that money should have been paid to Benthos, for several (obvious) reasons: First, Mr. Etra remains a judgment debtor, still under the restraining notice (as he well understands). Second, the Court ordered that one condition of his eventual release would be paying to Benthos at least \$94,070.78[2]; he is now requesting release while indisputably having had access to funds that he chose not to pay to Benthos. And third, the Court previously ordered that "On the first business day of every month after his release, Etra must transfer any non-exempt funds . . . to Benthos . . ." (Dkt. 260 at 37). While these funds were not transferred "after his release," he well understood that the Court did not contemplate that he would be paying available funds while incarcerated other than to his judgment creditor.[3]

Counsel's letter admits that Mr. Etra has communicated with Marc Sklar, his "agent pursuant to a Power of Attorney, . . . by email on a regular, often daily, basis and occasionally by phone in his efforts to assist Mr. Etra to purge his contempt" (Dkt. 273 at 2), and counsel's letter reflects that she too has been in regular contact with Mr. Etra. Nonetheless, literally nothing has been provided in even partial compliance with the following conditions for purging his contempt: He has not listed his "financial accounts," as required by Dkt. 260, § I.B.10 at pp. 26-27; he has not produced all (or any) of his "financial and judgment-related communications" as required (id. § I.B.8 at p. 25); he has not provided "a complete" (or any) "accounting of all funds received from any legal, paymaster, escrow-related, or other services" as required (id. § I.B.1 at pp. 18-19); he has not produced any additional "complete and final escrow agreements" as required (id. § I.B.7 at pp. 23-24); and he has not produced all (or any) of his "documents concerning [his] legal, paymaster, escrow-related or other services" as required (id., § I.B.9 at p. 26).

None of the unsupplied items in the preceding paragraph require a power of attorney or any responsiveness from any financial institution. Mr. Etra's laptop and phone are in counsel's possession; he allowed his agent "to access his apartment" and "retrieve an address book that contained usernames and passwords" (Dkt. 273 at 3); and the Court expressly authorized "Mr. Etra or his agent," in response to a specific request

---

[2] That figure was set in Dkt. 260, representing "the sum of all amounts known to have been deposited into a personal bank account of Etra from August 27, 2020 onward that were not obviously exempt from the Restraining Notice" (id. at 35). The Court later ordered Mr. Etra to show cause why the figure should not be increased by \$30,787, but Mr. Etra's adjourned deadline in that regard has not yet come.

[3] There is no evidence that those payments came from exempt funds.



Hon. Valerie Caproni
January 31, 2022
Page 3

from counsel, to "access the data on his cellphone or computer solely for the purpose of producing responsive data to Petitioner" (Dkt. 266 at 2). Nonetheless, the application does not even claim (much less demonstrate) that Mr. Etra has made any efforts at all to comply with any of the requirements set forth in the preceding paragraph.

Nor, of course, as admitted, has Mr. Etra provided any of these other multiple statements required as a condition of his release: Citbank 0873 statements, European bank account statements, Piermont 2060 and 2292 statements, M&T 3441 statements, HSBC 0136 statements, Apple 6423 statements, and Barclays and Old Navy statements (Dkt. 260 §§ I.B.2, 3, 5 and 6). The absence of any recent statements from the long-concealed Piermont accounts is particularly striking, as Mr. Etra is aware that both Benthos and the Court have been highly focused on those accounts (and on the M&T 3441 account) due to their extensive (and, again, long-concealed) activity. It is not clear why Mr. Sklar, with access to Mr. Etra's laptop and possession of his passwords, cannot simply print out recent bank statements (see again Dkt. 266 at 2), but to the extent his power of attorney is required, Dkt. 273-1 shows that no attempt was made to contact Piermont or M&T until around a month after the Court's order, shortly before the release application. The Court can infer that Mr. Etra wishes the Court to rule on the application before disclosure of his past several months of activity in the Piermont and M&T accounts, one of which previously contained the bulk of his activity and two others of which are IOLA accounts that previously revealed substantial attorney misconduct.

In that regard, the paltry production of the American Express statements (Ex. 2) reveals – in addition to the improper payments this month while incarcerated – a host of other violations of the restraining notice, including after Benthos applied to this Court for relief regarding Mr. Etra's "Ongoing, Willful and Egregious Violations of Restraining Notices" (Dkt. 202 at 2). The Court may wish to review the fourteen pages itself, but among other things, those statements reveal that Mr. Etra renewed his American Express card, at the hefty annual fee of $595, two days before his court appearance on the contempt motion (id., 12/12/22[4]); he made substantial other payments (including for his Regus business office and for house-cleaning services) after being incarcerated (id., first two pages); he paid almost $15,000 to American Express during September through early December 2022 (9/2/22, 10/21/22, 10/22/22, 11/4/22,[5] and 12/5/22); he traveled again to Europe (in August and September, spending $1456.27 on one hotel and $1200.11 on

---

[4] The pages of the statements as produced are unnumbered.
[5] Two payments were made to American Express on 11/4/22; one of them, for $1292, was made from exempt Social Security funds.



Hon. Valerie Caproni
January 31, 2022
Page 4

another hotel; and apparently in late October as well); he traveled also to Las Vegas (in October); he spent almost $1000 on something called "Alpine TVL & Cruise"; and he continued his lavish lifestyle in New York throughout, with multiple expensive Uber rides, nice restaurants, wine purchases, a hair salon and similar expenditures.

It is also worth noting that Mr. Etra's application refers to his having "missed . . . the bris and naming ceremony of his grandson" (Dkt. 273 at 5). Mr. Etra was asked in August of 2020 to provide "the names and addresses of any immediate family members, including . . . adult children" (Dkt. 211-5, Request No. 35). He never identified any child (see Dkt. 56-4), although he was ordered by Judge Nathan (Dkt. 59) to provide a complete response to that information request (and others). It is unknown, of course, whether Mr. Etra was telling the truth to his lawyer in claiming to have a new grandson, but he should be required, at long last, to provide a full response to Information Request No. 35.

Finally, counsel states without elaboration that "I understand that progress is being made by friends of Mr. Etra, including Mel Dussel, . . . to secure financial resources" (Dkt. 273 at 3). Mr. Dussel did indeed telephone the undersigned, and when we spoke on January 18, he asked whether he could pay some money to "get Aaron out of jail," and said he was "hoping" to have six figures "before the end of the week," but "if not" he was "fairly confident" he would have those funds "early next week." He also said that he expected to be able to settle the judgment within "maybe 60 days, with so much [payable] every two weeks." Not surprisingly, and consistent with past patterns, Mr. Dussel has not been heard from since, and no funds actually have been proffered (notwithstanding the recent payments to American Express, as well as the likely receipt of funds in recent months of which we are unaware because of the ongoing failure to produce bank statements and information). It is quite reasonable to infer that Messrs. Etra and Dussel are waiting to see if the Court will release Mr. Etra without his having to comply with the monetary condition the Court directed in Dkt. 260, as he has continued not to direct a single dollar of his assets to Benthos.[6]

Nothing in this latest application supports the contention that "Coercive measures are no longer necessary" (Dkt. 273 at 3). To the contrary, any close observer of Mr.

---

[6] He is receiving Social Security while incarcerated. While Benthos cannot seize those funds in judgment enforcement, nothing prevents him from applying those funds to pay down the amount ordered as a condition of his release. And it is clear from his payments to American Express that he has access to assets (undisclosed, as always) in addition to the Social Security income.



Hon. Valerie Caproni
January 31, 2022
Page 5


Etra's conduct over the past four years (and particularly the past two and a half years, and most especially the past several months) would most reasonably conclude that if the Court overlooks the multiple conditions it imposed on December 20, and releases Mr. Etra notwithstanding that virtually all of those conditions have not been complied with, he will be less incentivized than he is now to attempt to comply, and he will continue concealing financial information and will continue receiving funds, not paying them to Benthos and using them in violation of the restraining order and the Court's order.[7]

  As always, the principals of Benthos and its counsel thank the Court for its continued active supervision of this unfortunate matter.


       Respectfully yours,

       Steven R. Popofsky


cc: Amy Gallichio
   Aaron Etra (per Dkt. 263 n.2)

---

[7] Should the Court nonetheless deem it appropriate to release Mr. Etra – notwithstanding that he has provided Benthos with virtually no more knowledge now of his finances than was known the day he was incarcerated – it goes without saying that he should not be given back his passport.  In addition, Benthos would respectfully request that he be ordered not to travel outside of New York City, not to spend any non-exempt funds, to transfer any existing non-exempt funds to Benthos within two days of his release, to transfer any non-exempt funds received thereafter to Benthos immediately upon receipt, and to provide such other documentation and information, consistent with Dkt. 260, as the Court deems appropriate in its discretion given the existing circumstances.  But release in the face of the demonstrated lack of compliance with the conditions set forth in Dkt. 260 would not be consistent with fostering respect for court orders.