USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/05/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BENTHOS MASTER FUND, LTD.,

                               Petitioner,

              -against-

AARON ETRA,

                               Respondent.

---

20-CV-3384 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

Benthos Master Fund, Ltd. ("Benthos") successfully petitioned this Court to confirm an arbitration award of more than $5 million against Aaron Etra ("Etra"), an attorney who released Petitioner's funds from escrow in violation of his contractual and fiduciary duties as the escrow agent for a purported cryptocurrency sale. Although Benthos began seeking discovery from Etra to facilitate its collection of the judgment almost three years ago, Etra has repeatedly failed to produce documents and information about his finances, persistently and flagrantly disregarded court orders enforcing Petitioner's subpoenas, and failed to make any payments toward Petitioner's judgment while spending lavishly on himself.

On December 14, 2022, the Court held Etra in civil contempt and ordered his incarceration (the "Contempt Order") until he produces all documents that he has previously been ordered to provide, and until he pays Benthos $145,718.49. *See* Contempt Order, Dkt. 260.[1] The Court also granted Benthos's request to conduct a forensic examination of Etra's electronic devices. *Id.* at 37.

---

[1] This obligation represents the sum of all amounts known to have been deposited into a personal bank account of Etra from August 27, 2020 onward that were not obviously exempt from Petitioner's restraining notice; the Court increased this sum after previously-undisclosed bank records revealed further noncompliance with Petitioner's restraining notice. *See* Orders, Dkts. 259, 286. The obligation will be reduced if Etra demonstrates an inability to pay that sum or that any of the items that make up that sum are exempt from Petitioner's restraining

On March 28, 2023, Etra, in yet another delaying tactic, for the first time in the three years that this proceeding has been pending, asserted his Fifth Amendment privilege with respect to the act of production of all records that he has been ordered to produce and all records and information on his computer and cellphones.[2]  *See* Order, Dkt. 307.  On May 5, 2023, counsel[3] filed a memorandum in support of Etra's blanket assertion that he has a Fifth Amendment right not to produce any of the documents and information he has been ordered to provide.  *See* Etra Mem., Dkt. 330.  The Court construes his motion as one to exclude certain items from the scope of documents he must produce in order to purge his contempt.  On June 7, 2023, Etra filed a motion to expand the scope of his counsel's appointment to include the filing of a habeas corpus petition.  *See* Etra Mot., Dkt. 335.

For the following reasons, Etra's request to exclude from the scope of the Contempt Order the production of certain documents and information based on his Fifth Amendment privilege is GRANTED in part and DENIED in part, and Etra's request to expand the scope of his counsel's appointment is DENIED.

## BACKGROUND

Benthos is a California investment firm, and Etra is a New York attorney.  Pet., Dkt. 1, ¶¶ 1–2.  On August 4, 2018, Benthos agreed to pay $5 million for a quantity of Bitcoin.  *Id.* ¶ 5.

---

notice.  *See* Contempt Order, Dkt. 260, at 36; Order, Dkt. 286, at 2.  To date, Etra has made no effort to demonstrate either.

[2]     Etra also objected to paying any funds to cure his contempt on Fifth Amendment grounds; the Court previously overruled that objection.  *See* Order, Dkt. 307, at 3.  The act of producing funds in an amount equal to the amount Etra has clearly spent in violation of Petitioner's restraining notice would not be incriminating, given the fungible nature of money.  *See United States v. Merritt*, 988 F.2d 1298, 1312–13 (2d Cir. 1993) (concluding that the district court did not violate a defendant's Fifth Amendment rights by penalizing him for refusing to produce the proceeds of his crime in part because "[m]oney is fungible" and the defendant "could be expected to have access to [funds] from sources other than the crime").

[3]     Counsel was appointed under the Criminal Justice Act for the limited purposes of Etra's civil contempt and ancillary Fifth Amendment claim.  *See* Orders, Dkts. 258, 322.

Benthos wired $5 million to Etra, who served as the escrow agent for the transaction, pursuant to an escrow agreement. *Id.* Benthos never received any Bitcoin for its $5 million. *Id.* ¶ 6. After Etra refused to provide information about the party to whom he had released the funds, Benthos sought preliminary injunctive relief in aid of arbitration from this Court. *Id.* ¶ 7. Etra eventually returned $400,000 to Benthos and provided some information about the location of the balance of the funds after Judge Batts, the judge then-assigned to that matter, threatened to jail him. *Id.*

On April 30, 2020, Benthos filed a petition in this Court to confirm its $5,254,561.12 arbitration award against Etra.[4] *See generally* Pet., Dkt. 1. Judge Nathan, who was then assigned to the case, confirmed the award and entered judgment (the "Judgment") against Etra on August 12, 2020. *See* Order, Dkt. 14; Judgment, Dkt. 15. On August 26, 2020, the Court allowed Benthos to begin enforcement proceedings. *See* Order, Dkt. 21.

Pursuant to Federal Rule of Civil Procedure 69(a)(2) and N.Y. C.P.L.R. § 5224(a)(2), Benthos promptly served Etra with a subpoena *duces tecum* (the "First Document Subpoena") and a restraining notice with information subpoena (the "First Information Subpoena"). *See* First Document Subpoena, Dkt. 211-4; First Information Subpoena, Dkt. 211-5. The First Document Subpoena directed Etra to produce fifty-nine categories of documents concerning his finances covering the period from August 1, 2018 through August 27, 2020. *See* First Document Subpoena ¶ N. The First Information Subpoena directed Etra to respond under oath to thirty-six questions concerning his finances covering the period from August 1, 2018 through August 27, 2020. *See* First Information Subpoena at 6.

Etra was required to respond or object to Petitioner's subpoenas by September 21, 2020. *See* First Document Subpoena at 3; First Information Subpoena at 3; Fed. R. Civ. P. 45(d)(2)(B).

---

[4]     Etra chose not to participate in the arbitration. *See* Final Award, Dkt. 1-1, ¶ 53.

Etra did not object to either subpoena, repeatedly requested extensions to respond, and eventually produced a limited number of documents and some information to Benthos in September 2020. *See* R&R, Dkt. 95, at 3; Popofsky Decl., Dkt. 24, ¶¶ 6–12; Etra Mem., Dkt. 28, ¶¶ 4–9. Judge Nathan, concluding that it was "clear" that Etra had not adequately responded to the subpoenas, *see* Order, Dkt. 33, repeatedly ordered him to comply with Petitioner's requests, *see* Orders, Dkts. 39, 54, 59.

Although the parties appeared to have reached a settlement on April 1, 2021, it was short lived: Etra failed to make any payment, thereby voiding the settlement. *See* R&R, Dkt. 95, at 6.

Magistrate Judge Parker recommended granting a subsequently-filed motion to hold Etra in contempt,[5] *see id*. at 34, and on May 16, 2022, the Court adopted Judge Parker's recommendation, *see* Order, Dkt. 108. Judge Parker also suggested that the Court refer this matter to the U.S. Attorney's Office for the Southern District of New York for investigation regarding Etra's theft of $5 million and failure to produce information regarding the location of the bulk of those funds. *See* R&R, Dkt. 95, at 34. The Undersigned did not adopt that suggestion but reserved the right to file a complaint with the U.S. Attorney's Office or other appropriate authorities. *See* Order, Dkt. 108, at 6. The Court has since suggested to the U.S. Attorney's Office that it might wish to investigate the matter.[6]

After Etra was granted another extension to comply with Petitioner's subpoenas, *see* Order, Dkt. 113, and after he insisted on yet another extension, *see* Dkt. 114, the Court scheduled

---

[5]     On February 18, 2021, this case was referred to Magistrate Judge Parker for general pretrial supervision. *See* Referral Order, Dkt. 62. On September 30, 2021, Petitioner moved to hold Etra in civil contempt for his failure to produce documents notwithstanding three court orders requiring him to respond to Petitioner's First Document Subpoena and First Information Subpoena. *See* Dkt. 81.

[6]     It is unknown whether an investigation was, in fact, opened and, if it was, whether it remains an on-going investigation.

a hearing regarding whether he should be held in contempt, and ordered Etra to appear with the documents he had been ordered to produce, *see* Order, Dkt. 116.

Etra sent certain tax documents to Petitioner's counsel, *see* Dkts. 119–21, 125, but did not fully satisfy the Court's orders by the date of the hearing, which he failed to attend, *see* Order, Dkt. 126.

On July 7, 2022, the Court ordered Etra to show cause before the Court on July 13, 2022, why a warrant for his arrest should not be issued so that he could be imprisoned as a coercive sanction until he complied fully with the Court's orders. *Id.*

On July 10 and 11, 2022, Etra produced some of the information and documents that he had been ordered to produce, *see* Dkts. 127, 129, but failed and refused to provide other subpoenaed information and documents, *see* Dkt. 130. Etra falsely represented, though not under oath, that he had "no other savings, money market, certificates of deposit, investments, retirement accounts, safety deposit boxes or financial assets" beyond the accounts associated with the records he had provided to Petitioner's counsel. *See* Dkt. 129 at 98.[7]

The parties appeared before the Court on July 13, 2022. *See* Order, Dkt. 132. The Court found Etra in civil contempt for failing to produce documents as ordered and remanded him into the custody of U.S. Marshals. *Id.* at 1. Later that day, the Court ordered Etra released from custody subject to his commitment to comply with a document production schedule. *Id.*

On July 14, 2022, Etra was ordered to produce escrow agreements and monthly bank account statements and to file sworn statements certifying that the documents had been produced as required by July 15 and July 19, 2022. *Id.* at 2–5.

---

[7] The falsity of Etra's representation was revealed in the very documents he produced. Among the documents he produced on July 10, 2022, were bank statements from an account at Piermont Bank that revealed his ownership of other accounts at Piermont Bank that he had never disclosed. *See* Order, Dkt. 132.

On July 25, 2022, Benthos informed the Court of Etra's remaining deficiencies and violations of its restraining notice, which requires Etra to use any income, other than certain exempt payments such as social security benefits, to satisfy Petitioner's judgment. *See* Dkt. 136. The Court ordered Etra to show cause at the next status conference why he should not be held in civil contempt and remanded in light of his continued violation of court orders. *See* Order, Dkt. 137, at 13. The Court also required Benthos to submit a spreadsheet reflecting the items Etra had been ordered to produce pursuant to the Court's July 14, 2022 Order, the items Benthos had received, and the items Benthos had not received but believes exist (the "July 2022 Spreadsheet"). *Id.*

In its July 2022 Spreadsheet, Benthos represented that: Etra had produced almost no escrow agreements even though bank statements Etra had produced reflected "dozens of transactions" in his attorney escrow accounts; Etra had failed to produce monthly bank statements for a slew of accounts; none of the bank statements produced by Etra reflected receipt of social security payments in the months prior to them being deposited into a belatedly-disclosed account at Piermont Bank; and Etra had not produced documents substantiating many account closures. *See* July 2022 Spreadsheet, Dkt. 140-1.

In response, Etra stated, though again not under oath, that his purportedly privileged escrow arrangements expired after twelve months and that "no documents are retained." Dkt. 141 at 3. He also stated that he diligently submitted the bank records that he possessed, was still trying to find certain financial records, and attached additional bank statements he identified as missing after reviewing the July 2022 spreadsheet. *Id.* at 3–15.[8]

---

[8]     Etra's unsworn response asserts that he had previously "submitted a sworn statement, under the penalty of perjury" that he produced certain documents, but no sworn statement is attached to the response, and the Court is not otherwise aware of such a filing. *See* Dkt. 141 ¶¶ 4, 17.

Following a status conference on August 2, 2022, the Court found Etra in contempt of its July 14, 2022 Order. *See* Order, Dkt. 143. The Court ordered Etra to produce missing account documents by August 10, 2022, and either to produce the escrow agreements associated with certain named clients (whose identities had been derived from the bank account statements Etra had finally produced) by August 22, 2022, or to move to quash the First Document Subpoena for those documents by August 19, 2022.[9] *See* Orders, Dkts. 143, 144. The Court also referred the question of whether Etra has custody or control over bank accounts at SberBank and UniCredit (and therefore whether failure to produce bank statements from these accounts violated the Court's July 14, 2022 order) to Magistrate Judge Parker. *See* Referral, Dkt. 145.

On August 2, 2022, Benthos served Etra with another subpoena *duces tecum* (the "Second Document Subpoena") and a second restraining notice with information subpoena (the "Second Information Subpoena"). *See* Second Document Subpoena, Dkt. 211-6; Second Information Subpoena, Dkt. 211-7. The Second Document Subpoena directed Etra to produce nine categories of documents concerning his finances covering the period from August 1, 2017 through August 2, 2022 and going forward (unless otherwise specified). *See* Second Document Subpoena ¶¶ L, N. The Second Information Subpoena directed Etra to respond under oath to nine questions concerning his finances covering the period from August 1, 2017 through August 2, 2022. *See* Second Information Subpoena at 6. The subpoenas required responses or objections by September 1, 2022. *See* Second Document Subpoena at 2; Second Information Subpoena at 2; Fed. R. Civ. P. 45(d)(2)(B).

---

[9]   There has never been any explanation why Etra, a licensed attorney, did not move to quash the subpoenas when they were first received in August 2020 or at any point along the calendar between then and August 2022 if he actually believed the documents were privileged. Nevertheless, because Etra asserted *ipse dixit* that the agreements were privileged, the Court afforded him the opportunity to support that claim with legal authority even though it appeared as though it was simply part of Etra's continuing effort to delay the proceedings.

On August 19, 2022, Etra moved to quash the First Document Subpoena to the extent it required the production of escrow agreements.  *See* Dkt. 149.  In support of his motion, Etra asserted "under the penalty of perjury" that he had "fully complied as is possible" with the Court's July 7, 2022 Order requiring responses to Petitioner's requests, apart from certain bank records that "may not exist" and which he promised to produce "when and if" the records could be obtained.  Etra Decl., Dkt. 150, ¶ 3.  Etra also asserted that he complied with part of the Court's August 2, 2022 Order requiring the production of escrow agreements and that his escrow clients are "irrelevant" non-parties who have "nothing to do with Benthos or anyone connected in any way to Benthos"; according to Etra, any escrow agreement is "void and deleted" after a year.  *Id.* ¶¶ 3, 9.[10]  On August 30, 2022, Etra requested an extension of time to respond to the Second Document Subpoena and the Second Information Subpoena, Dkt. 155, which the Court denied, Order, Dkt. 157.  Two days later, Etra moved to quash those subpoenas in their entirety or, at minimum, those portions requesting "privileged information and related information . . . ." *See* Dkts. 158, 164.   In support of his motion, Etra asserted "under the penalty of perjury" that unspecified bank records he produced "were not identical or complete down to the last statement" because unspecified financial institutions "had closed or changed their methods to obtain old or closed account information . . . ."  Etra Decl., Dkt. 159, ¶¶ 1, 13.[11]  On September

---

[10]      Etra also asserted that he was only able to produce two escrow agreements because of a computer breakdown on June 29, 2022.  *See* Etra Decl., Dkt. 150, ¶ 11.  Etra reiterated that data on his computer had been lost due to technical issues, not spoliation, in another submission "under the penalty of perjury" in support of his motion. *See* Etra Decl., Dkt. 166.  Notwithstanding these statements, Etra eventually produced nineteen escrow agreements. *See* Etra Letter & Escrow Agreements, Dkt. 182.

[11]      In another declaration "under the penalty of perjury" in support of his motion to quash, Etra asserted that he had produced "[e]lements" of the items Petitioner requested and that he would "continually provide updated information."  Etra Decl., Dkt. 165, ¶ 13.  Etra also represented that his friend Melvin Dussel had been "actively working on assembling" settlement funds and was "determined" to raise the funds as soon as possible despite "some unforeseen delays . . . ."  *Id.* ¶ 20.

20, 2022, Etra admitted that he "took modest fees" over the last "four years of this matter." Dkt. 170.

On September 26, 2022, the Court denied Etra's motions to quash and ordered him to produce all escrow agreements that he had previously been ordered to produce by September 30, 2022,[12] and to respond fully to Petitioner's Second Document Subpoena and Second Information Subpoena by October 7, 2022. *See* Order, Dkt. 174. Etra again made several extension requests, *see* Dkts. 175, 178, 179, 182, which the Court denied after he failed even to make a partial production as a sign that he was making a good faith effort to comply, *see* Orders, Dkts. 177, 181, 184.

On October 27, 2022, Benthos moved, by letter, to hold Etra in contempt for failing to comply with its subpoenas and restraining notices, notably by failing to produce current bank or credit card statements that he had been ordered to produce. *See* Dkt. 202. The Court denied its motion without prejudice, and required Benthos to file a proper motion supported by a memorandum of law and, as appropriate, affidavits and exhibits, for any requested relief. *See* Order, Dkt. 203. On October 28, 2022, the Court advised Etra that if Petitioner's letter motion were accurate and he had indeed not provided any current banking or credit card records, he should "rectify this non-compliance **immediately** by promptly producing bank records post-dating June 30, 2022, and his American Express card records, both of which have been subpoenaed." Order, Dkt. 206.

On November 9, 2022, Etra testified under oath before Magistrate Judge Parker that he did not have control over European bank accounts at UniCredit and SberBank. *See* Parker

---

[12] Etra had previously been ordered to "be prepared to disclose all escrow agreements" in the event his motion to quash were denied. *See* Order, Dkt. 144.

9

Hearing Tr., Dkt. 214, at 23–24.  Etra had testified several years before as part of a state court proceeding that, as of April 12, 2019, he had a bank account in Europe.  *See* Etra Deposition Tr., Dkt. 243-4, at 249–51.[13]

On November 15, 2022, Benthos filed a proper motion to hold Etra in criminal or civil contempt.  *See* Not. of Mot., Dkt. 209.  Benthos requested sanctions including Etra's incarceration, the surrendering of Etra's passport, and a ban on Etra's international travel.  *Id.* Benthos further requested that the Court require Etra to comply with its subpoenas, enjoin Etra from violating its restraining notices, and that it order a forensic examination of Etra's computer and cellphone, among other relief.  *Id.*  The Court set a hearing on the motion for December 14, 2022, *see* Order, Dkt. 212, granted Etra an extension to oppose the motion, *see* Order, Dkt. 232, and requested supplementary spreadsheets from Benthos to better understand the extent of Etra's alleged noncompliance, *see* Orders, Dkts. 218, 244.

After determining that Etra risked incarceration for his contempt, the Court ordered Etra to submit a financial affidavit demonstrating that he is indigent if he wanted the Court to appoint counsel for him.  *See* Order, Dkt. 247.  The Court also advised Etra that counsel who had previously represented him on a limited basis on July 13, 2022 and on August 2, 2022, would attend the hearing for the limited purpose of representing him in this civil contempt proceeding if the Court found him to be indigent.  *Id.*  Although the Court has grave doubts about the accuracy of Etra's representations in his financial affidavit, which was filed under seal, on December 14,

---

[13]     For reasons somewhat lost in the fog of history, Benthos concluded that the account Etra admitted having in Europe must have been connected to accounts associated with Etra at SberBank and UniCredit.

2022, the Court appointed counsel to represent Etra for the limited purpose of handling the contempt motion. *See* Contempt Hearing Tr., Dkt. 261, at 7–8.[14]

After ascertaining that Etra had not produced the materials required by this Court's orders, the Court inquired whether reasonable efforts had been made. Because of Etra's lackluster opposition to Petitioner's contempt motion, *see* Etra Decl., Dkt. 235,[15] the Court had reminded him that he should bring any evidence he had to refute Petitioner's claim that he was in contempt to Court, *see* Orders, Dkts. 238, 250. Etra brought neither supporting documents nor his computer to the Contempt Hearing. *See* Contempt Hearing Tr., Dkt. 261, at 20–30, 50–51. It became quickly apparent that he had made no effort to comply, let alone diligent efforts. *Id.* at 9, 20–30, 50–51. He had no documentary evidence that he had ever requested bank or credit card records from his bank or credit card issuers. *Id.* at 21. As to records that should have been readily available to him online (like his current bank and credit card accounts), Etra asserted that he would produce the records later that day, that he had not realized the records were missing, or that he had made only oral requests to his bank for the records. *Id.* at 20–30, 50–51. In other words, Etra offered no evidence beyond his own say-so, which the Court did not credit given his documented pattern of making false statements to the Court, of a diligent effort to comply.

---

[14]    The Court appointed counsel notwithstanding its doubts as to the accuracy of Etra's financial affidavit because Etra is likely insolvent in light of the Judgment. *See* Contempt Order at 13. The probability that Etra's debts exceed his assets does not undercut the Court's conclusion, based on the evidence before it to date, that Etra has the ability to pay Petitioner $145,718.49 to cure his contempt relative to violations of Petitioner's restraining notice. That said, the Court remains open to considering credible, admissible evidence that, in fact, Etra is unable to pay any part of the Judgment.

[15]    Etra asserted "under the penalty of perjury" that he "[could] not claim to be perfect in his responses" to Petitioner's subpoenas and that he had struggled to comply without the assistance of counsel. *See* Etra Decl., Dkt. 235, ¶¶ 7–8. Etra also broadly asserted that unspecified "banks . . . were unable to produce some material," *id.* ¶ 8, that he produced "what he could find on his computer at the time or was able to get from banks," *id.* ¶ 20, that he was producing "updated" bank statements, *id.*, that he was in the process of requesting further bank statements, *id.* ¶ 21, and that he "[could] not remember the details" of past financial transactions "well enough" to provide them to Benthos, *id.* ¶ 22.

Because Etra had not made diligent efforts to produce outstanding documents and information, the Court held Etra in civil contempt and ordered his incarceration until (1) he produces all documents that he has previously been ordered to provide, as further specified below; and (2) he pays Petitioner $145,718.49,[16] which represents the sum of all amounts known to have been deposited into one of Etra's personal bank accounts from August 27, 2020 onward that were not obviously exempt from Petitioner's restraining notice and that should, therefore, have been paid to Benthos.  *See* Contempt Hearing Tr. at 33–35, 48.

The Contempt Order specified the following documents or information that Etra must produce in order to purge his contempt:

> (1) a complete accounting of funds received from legal, paymaster, escrow-related or other services from August 1, 2017 through the present;

> (2) monthly -0873 Citibank statements for August and November 2017 and from January 2018 through July 2018;

> (3) monthly account statements from August 1, 2017 through the present for his European bank account(s);

> (4) monthly account statements for an M&T Bank account into which Etra's social security payments are purportedly now being made from the date the account was opened (or August 2017, whichever is later) through the present or the account's closing date;

> (5) monthly account statements from July 1, 2022 through the present or the account's closing date, if applicable, for his Piermont -2060, Piermont -2292, and M&T -3441 accounts (plus proof of closing, if applicable);

---

[16]     The Court originally required Etra to pay $94,070.78, but increased that amount after Etra produced financial records reflecting further, non-exempt amount that were not paid to Benthos.  *See* Orders, Dkts. 284, 286.

(6) monthly statements from August 1, 2017 (or the card's inception if later) through the present (or the card's closing date, if applicable), for his American Express -4005, HSBC -0136, Apple -6423, Barclays, and Barclays/Old Navy credit cards (plus proof of opening or closing, if applicable);

(7) complete and final escrow agreements for the 41 clients of Etra's escrow/paymaster business that have been identified;

(8) financial and judgment-related communications from August 13, 2020 through December 14, 2022;

(9) documents concerning the legal, paymaster, escrow-related or other services Etra provided from August 1, 2017 through the present; and

(10) a list of all of Etra's financial accounts from August 1, 2017 through August 2, 2022.[17]  *See* Contempt Order, Dkt. 260, at 18–27.

## DISCUSSION

## I.    **Legal Standard**

The Fifth Amendment privilege against compelled self-incrimination "can be asserted in any proceeding, civil or criminal," and protects against "any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used."  *Kastigar v. United States*, 406 U.S. 441, 444–45 (1972) (internal citations omitted).  The privilege "has consistently been accorded a liberal construction."  *Miranda v. Arizona*, 384 U.S. 436, 461 (1966) (citations omitted).

---

[17]     The Court also required Etra to produce monthly account and credit card statements on a going forward basis after his release from custody and an itemization of current monthly living expenses to avoid re-incarceration. *See* Contempt Order, Dkt. 260, at 27–28.

As a general matter, a party seeking to invoke the Fifth Amendment privilege against compelled self-incrimination to avoid answering questions or to avoid producing documents must do so "in a timely fashion." *Roberts v. United States*, 445 U.S. 552, 559 (1980) (citations omitted); *see also Cohen v. Altman*, No. 19-CV-274 (TJM), 2022 WL 370948, at *4 (N.D.N.Y. Feb. 8, 2022). Courts have wide discretion, however, to conclude that the Fifth Amendment privilege has not been waived. *See In re DG Acquisition Corp.*, 151 F.3d 75, 80–82 (2d Cir. 1998).

Because invoking the Fifth Amendment privilege "is an effective way to hinder discovery and provides a convenient method for obstructing a proceeding, trial courts must be especially alert to the danger that the litigant might have invoked the privilege primarily to abuse, manipulate or gain an unfair strategic advantage over opposing parties." *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, NY*, 55 F.3d 78, 84-85 (2d Cir. 1995).

If a party "testifies voluntarily, and therefore controls the extent of disclosure, '[t]he privilege is waived for the matters to which the witness testifies, and the scope of the waiver is determined by the scope of relevant cross-examination.'" *OSRecovery, Inc. v. One Groupe Intern., Inc.*, 262 F. Supp. 2d 302, 307–08 (S.D.N.Y. 2003) (quoting *Mitchell v. United States*, 526 U.S. 314, 321 (1999)); *see also United States v. St. Pierre*, 132 F.2d 837, 840 (2d Cir. 1942) ("[A]fter a witness has confessed all the elements of the crime, he may not withhold the details[.]"). If incriminating facts have already been "freely" provided, the Fifth Amendment privilege cannot be invoked to avoid disclosing related details; courts must consider whether testimony "present[s] a reasonable danger of further incrimination in light of all the

circumstances, including any previous disclosures." *Rogers v. United States*, 340 U.S. 367, 373–74 (1951).

The party invoking the privilege has the burden of establishing that it applies, and the Court must determine whether it applies based on "all of the circumstances of the case." *Huber v. Arck Credit Co., LLC*, No. 12-CV-8175 (JMF), 2016 WL 482955, at *6 (S.D.N.Y. Feb. 5, 2016) (internal quotation marks and citation omitted); *see also Camelot Group, Ltd. v. W.A. Krueger Co.*, 486 F. Supp. 1221, 1225 (S.D.N.Y. 1980) ("While the privilege is to be accorded liberal application, the court may order a witness to answer if it clearly appears he is . . . advancing his claim as a subterfuge.  Moreover, the burden of establishing a foundation for the assertion of privilege lies with the party making it." (internal citations omitted)).

To qualify for the Fifth Amendment privilege, a communication must be (1) testimonial; (2) incriminating; and (3) compelled.  *See United States v. Hubbell*, 530 U.S. 27, 34–38 (2000).

A party's "blanket assertion" of the Fifth Amendment privilege against compelled self-incrimination is insufficient for the privilege to apply because courts must conduct a "particularized inquiry" to determine whether a party's Fifth Amendment assertion is "founded on a reasonable fear of prosecution. . . ." *SEC v. Pence*, 323 F.R.D. 179, 188 (S.D.N.Y. 2017) (quoting *United States v. Bowe*, 698 F.2d 560, 566 (2d Cir. 1983)); *see also N.Y. ex rel. Khurana v. Spherion Corp.*, 511 F. Supp. 3d 455, 463–64 (S.D.N.Y. 2021).

To be testimonial, a communication "must itself, explicitly or implicitly, relate a factual assertion or disclose information." *Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 189 (2004) (quoting *Doe v. United States*, 487 U.S. 201, 210 (1988)).  Although the privilege generally does not apply to documents prepared by third parties, *United States v. Nobles*, 422 U.S. 225, 234 (1975), or to documents voluntarily prepared before they were demanded, *see*

*Fisher v. United States*, 425 U.S. 391, 409–10 & n.11 (1976), the act of producing evidence in response to a subpoena "has communicative aspects of its own, wholly aside from the contents of the papers produced," *id.* at 410 (explaining that whether an act of production is testimonial depends on "the facts and circumstances of particular cases or classes thereof").  The act of producing documents may, therefore, yield testimony establishing "the existence, authenticity, and custody of items that are produced."  *Hubbell*, 530 U.S. at 41.

To be incriminating, a communication must "support a conviction under a federal criminal statute" or "furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime."  *Hoffman v. United States*, 341 U.S. 479, 486 (1951).  If the incriminatory nature of testimony is "not readily apparent," the witness "must endeavor to explain how his answer will be incriminatory."  *United States v. Edgerton*, 734 F.2d 913, 919 (2d Cir. 1984) (citations omitted).  The Fifth Amendment privilege protects only against "real dangers, not remote and speculative possibilities."  *Zicarelli v. N.J. State Comm'n of Investigation*, 406 U.S. 472, 478 (1972) (citations omitted).  A witness's "say-so does not itself establish the hazard of incrimination."  *Hoffman*, 341 U.S. at 486.  Although a party is "not required to *prove* that an answer will be incriminating 'in the sense in which a claim is usually required to be established in court,'" he must nevertheless "demonstrate that the question and the context in which it was posed somehow present a possibility of incrimination."  *N.Y. State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1356 (2d Cir. 1989) (quoting *Hoffman*, 341 U.S. at 486).  When assessing the validity of a Fifth Amendment privilege claim, the Court must "be governed as much by . . . personal perceptions of the peculiarities of the case as by the facts actually in evidence."  *Hoffman*, 341 U.S. at 487 (internal quotation marks and citation omitted); *see also United States v. Stewart*, 907 F.3d 677, 684 (2d Cir. 2018).  Once a court determines that the requested

communication "would tend to incriminate the witness, it should not attempt to speculate whether the witness will in fact be prosecuted." *Edgerton*, 734 F.2d at 921 (internal quotation marks and citation omitted).[18]

To be compelled, a communication cannot be "voluntarily" provided. *Garner v. United States*, 424 U.S. 648, 654–55 (1976) (quoting *United States v. Monia*, 317 U.S. 424, 427 (1943)). A party seeking the Fifth Amendment's protection must therefore "claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment." *Id.* (quoting *Monia*, 317 U.S. at 427).

## II.   Application

Etra asserts that the act of producing all ten categories of documents the Court ordered him to produce to purge his contempt would violate his Fifth Amendment rights. *See* Etra Mem. at 11–13. Etra also asserts that the act of identifying his electronic devices for production, and the act of producing information via his electronic devices, would violate his Fifth Amendment rights. *Id.* at 13.

Etra maintains that these acts of production pose a risk of self-incrimination because Benthos and the Court have said that Etra's conduct in the underlying transaction at issue — Etra's unauthorized transfer of Benthos's $5 million in connection with a 2018 Bitcoin transaction — was or may have been criminal. *Id.* at 9–11. Etra also asserts that he may be at risk of prosecution for perjury under 18 U.S.C. § 1621, false statements under 18 U.S.C. § 1001, and the destruction of evidence under 18 U.S.C. § 1519. *Id.* at 13.

---

[18]     District courts have discretion to review *in camera ex parte* submissions made in support of a party's assertion of his Fifth Amendment right not to produce materials and to hold *in camera ex parte* hearings to assess the merits of a party's assertion that the Fifth Amendment protects him from being required to produce information or materials. *See Estate of Fisher v. C.I.R.*, 905 F.2d 645, 648–51 (2d Cir. 1990); *AAOT Foreign Econ. Ass'n (VO) Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, No. 96-CV-9056 (JGK), 1999 WL 970402, at *8–9 (S.D.N.Y. Oct. 25, 1999).

The Court first addresses the scope of potentially incriminating conduct that Etra has established.  It then considers each act of production in turn.

### A.  Etra Has Established That He May Be at Risk of Criminal Prosecution for His Conduct in Connection with the 2018 Bitcoin Transaction and for His Testimony Regarding His Lack of Control Over Accounts at UniCredit or SberBank

Etra has established that any testimonial communications that would link him to the theft of Petitioner's $5 million in 2018 — whether as a knowing co-conspirator or as a pawn in someone else's criminal enterprise — are sufficiently self-incriminating for the Fifth Amendment privilege to attach.  Judge Parker recommended referring this matter to the U.S. Attorney's Office precisely because Etra's failure to produce information showing the location to which the vast majority of Petitioner's funds were transferred gave rise to a "perceived criminal violation," R&R, Dkt. 95, at 34 (internal quotation marks and citation omitted), and the Court has since suggested to the U.S. Attorney's Office that it might want to investigate this matter. Testimonial communications linking Etra to the disposition of Benthos's funds in 2018 would, therefore, undoubtedly "furnish a link in the chain of evidence needed" to prosecute Etra for a federal crime such as wire fraud.  *Hoffman*, 341 U.S. at 486.  Any destruction of evidence in connection with that crime might also put Etra at risk of prosecution.  *See* 18 U.S.C. § 1519. Because Etra failed to raise his Fifth Amendment privilege until well past the eleventh hour, the Court could easily hold that Etra waived his Fifth Amendment privilege.  Nevertheless, given its constitutional magnitude and Etra's mostly *pro se* status throughout this case, the Court declines to conclude that Etra categorically waived the privilege.  *See In re DG Acquisition Corp.*, 151 F.3d at 81–82.

The Court considers it significant, however, that Etra has waited this long to invoke his Fifth Amendment privilege given his history of defying Court orders, needlessly delaying

proceedings, and misrepresenting facts to the Court.  The Court takes Etra's obstructionist

conduct into account when considering the extent to which Etra's invocation reflects a true, good

faith belief that the material may incriminate him.  *See Camelot Grp., Ltd.*, 486 F. Supp. at 1225–

30 (explaining that a court may order a witness to answer a question despite the witness's

invocation of the Fifth Amendment privilege if "it clearly appears he is mistaken as to the

justification for the privilege or is advancing his claim as a subterfuge" and concluding that

witnesses had not sustained their burdens to invoke the privilege by submitting "unusually

sketchy and dated" information); *cf. Certain Real Prop. & Premises*, 55 F.3d at 84–85 (warning

against use of the Fifth Amendment privilege as a "convenient method for obstructing a

proceeding").

        The Court is also not persuaded that Etra has established a risk of criminal prosecution so

overwhelming that producing any of the documents or information at issue would violate the

privilege.  Etra asserts that producing the documents necessary to purge his contempt may lead to

perjury charges because he submitted a sealed financial affidavit to the Court in support of his

application for Court-appointed counsel that may be false.  Etra Mem. at 13; Etra Reply, Dkt.

334, at 10.  Etra has already voluntarily disclosed facts in this case, however, that contradict the

affidavit.  For example, although the December 13, 2022 affidavit states that Etra has less than

$125,000 in debts, it is undisputed that Etra has owed Benthos close to $5 million since August

2020.  The affidavit also states that Etra does not have a job and therefore does not earn any

monthly fees, yet Etra asserted in response to the Second Information Subpoena on October 7,

2022 that he paid his monthly expenses in part through "[c]lient payments," which he identified,

and which are reflected in the account statements he has produced previously.[19]  *See Etra Second*

---

[19]        Etra indicated in the affidavit that he does have cash or money in a checking account but did not disclose
approximately how much money or cash is in his account(s).

Information Subpoena Response, Dkt. 211-23, at 4; Piermont -2060, Dkt. 211-13; *see also* Etra Letter, Dkt. 170 (stating that he "took modest fees" over the "last four years of this matter"). Having chosen to submit an affidavit to the Court at a time when the record contradicted its contents, Etra cannot now refuse to produce information that would merely compound his existing misrepresentations. *See Rogers*, 340 U.S. at 373–75; *United States v. Fortin*, 685 F.2d 1297, 1298 (11th Cir. 1982) (concluding in dicta that if a party's "prior inconsistent sworn statements [are] already sufficiently incriminating as to the crime of perjury," then the party's "right to not further discuss the matter" under the Fifth Amendment is waived).

Etra also asserts, in an entirely conclusory fashion, that producing records necessary to purge his contempt would contradict his previous representations in "numerous filings and court appearances" that he lacks control over the documents or that responsive documents do not exist. Etra Mem. at 13. Etra does not identify specific statements to that effect, let alone statements made under oath, which could put him at risk of perjury. Moreover, Etra has already produced account documents that reveal his control over relevant accounts; those disclosures informed the Court's Contempt Order. Etra's current "blanket assertion" that he cannot produce related records for fear of perjury is, therefore, not sufficiently particularized to trigger Fifth Amendment protections. *Cf. United States v. Bowe*, 698 F.2d 560, 566 (2d Cir. 1983) (concluding that a witness improperly invoked her Fifth Amendment privilege at trial because it was "not at all clear" that the witness's answers to certain questions "would reasonably implicate [her] in criminal activity").[20]

---

[20] Any inconsistent statements in unsworn papers could not form the basis for prosecution for false statements under 18 U.S.C. § 1001 because that statute does not apply to statements made to courts during judicial proceedings. *See Hubbard v. United States*, 514 U.S. 695, 697, 715 (1995) (reversing a false statements conviction based on a defendant's "unsworn, written responses filed with the Bankruptcy Court"); 18 U.S.C. § 1001(b) (specifying that the statute does not apply to "a party to a judicial proceeding . . . for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding").

The Court nevertheless addresses one of Etra's sworn statements that was brought to the Court's attention: his assertion to Magistrate Judge Parker, under oath, that he did not have control over foreign accounts at UniCredit or SberBank.  *See* Parker Hearing Tr., Dkt. 214, at 23–24.  Because Etra's production of UniCredit or SberBank account documents could incriminate him for perjury because it would demonstrate that he, in fact, has some control over accounts at those banks, the Court finds that Etra may validly invoke his Fifth Amendment privilege with respect to the act of producing such documents, as further discussed *infra*.[21]  *See United States v. Allmon*, 594 F. 3d 981, 986–87 (8th Cir. 2010) (explaining that a witness may invoke the Fifth Amendment privilege and refuse to testify in a later proceeding if truthful testimony in that later proceeding will reveal perjury that occurred in a past proceeding (citing *In re Grand Jury Subpoena*, 739 F.2d 1354, 1360 (8th Cir. 1984)); *United States v. Vavages*, 151

---

Although Etra was required to respond to Petitioner's information subpoenas under oath, to the Court's knowledge, he did not do so.  *See* Etra Financial Statement, Dkt. 28 at 22 (merely certifying that information was "true, accurate, and complete" to "the best of [his] knowledge"); Second Information Subpoena Response, Dkt. 211-23 (providing no certification at all); *see also* 18 U.S.C. § 1621(2) (cross-referencing 28 U.S.C. § 1746, which provides specific language necessary to make a written statement under oath); *In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 488 (2d Cir. 2013) (holding that 28 U.S.C. § 1746 "requires that a certification of the truth of a matter be expressly made under penalty of perjury" for the statute to apply because "[i]nclusion of the language 'under penalty of perjury' is an integral requirement of the statute").

The Court determined through its independent review of the docket, *see supra* Background, that Etra did submit certain filings to the Court "under the penalty of perjury."  *See* Etra Decls., Dkts. 150, 159, 165, 166, 235.  Etra's assertions in those filings either are not relevant to Etra's control over accounts or documents, *see, e.g.* Dkt. 159 (primarily discussing the means by which Petitioner's subpoenas were served, the subpoenas' breadth, and the stressfulness of enforcement proceedings), Dkt. 165 (same), were already contradicted by Etra's other voluntary assertions in this case, *compare* Dkts. 150 & 166 (asserting that Etra could only produce two escrow agreements because of computer issues and because escrow agreements are deleted after one year) *with* Dkt. 182 (subsequently producing nineteen escrow agreements, some of which were executed more than one year prior to their production), or are not inconsistent with Etra's production of further responsive documents, *see* Dkt. 235 (asserting that Etra "[could] not claim to be perfect in his responses" to Petitioner's subpoenas and that he was in the process of requesting further bank statements).  The Court is, therefore, not aware of any statements Etra has made under oath that would present a reasonable danger that compliance with the existing Court Orders would pose a risk of incriminating him for perjury or false statements.  *See Rogers v. United States*, 340 U.S. 367, 373–74 (1951).

[21]     As noted above, Etra previously testified in a separate state court proceeding that, as of April 12, 2019, he had a bank account in Europe.  *See* Etra Deposition Tr., Dkt. 243-4, at 249–51.  Etra did not testify, however, that his European bank account was at UniCredit or SberBank.  As further discussed *infra*, producing European bank records for accounts at banks other than UniCredit or SberBank would, therefore, not tend to incriminate him for perjury.

F.3d 1185, 1192 n. 3 (9th Cir. 1998) (noting that "[f]ear of a perjury prosecution can typically form a valid basis for invoking the Fifth Amendment only where the risk of prosecution is for perjury in the witness's past testimony" (citation omitted)).

Finally, Etra maintains for the first time in his reply brief that producing the documents at issue risks triggering a criminal contempt charge.  *See* Etra Reply at 7–8.  Criminal contempt punishes "retrospectively for a completed act of disobedience, such that a contemnor cannot avoid or abbreviate the confinement through later compliance."  *United States v. Donziger*, 38 F.4th 290, 305 (2d Cir. 2022).  Additional, as yet undisclosed, evidence that Etra has not been complying with Court orders could, therefore, contribute to prosecution for criminal contempt. Etra has again not established, however, how revealing that he has failed to produce certain records required by previous Court orders would meaningfully enhance the risk of prosecution already posed by his yearslong noncompliance, established in part by the documents and information he has already voluntarily produced.  *See Rogers*, 340 U.S. at 373.  If the Court were to adopt Etra's theory, any party found in civil contempt for failure to produce records could avoid compliance under the aegis of the Fifth Amendment by simply raising the possibility that complying with the Court's Contempt Order would reveal even more noncompliance.  Such a rule would defeat the purpose of civil contempt.

**B.  Etra May Refuse to Produce Limited Categories of Documents or Information Encompassed by the Contempt Order**

With this scope of relevant criminal prosecution in mind, the Court assesses the productions Etra is refusing to make.  The Court concludes that Etra may refuse to produce certain documents or information encompassed by the Contempt Order.  Etra is not excused, however, from complying with the forensic examination of his electronic devices, from producing the balance of the documents, or from paying Benthos $145,718.49.

22

1.   **Accounting of Funds Received from Legal, Paymaster, Escrow-related or Other Services from August 1, 2017 through the Present**

Etra refuses to produce an accounting of funds received from legal, paymaster, escrow-related or other services because producing such an accounting would require Etra to perform "the testimonial act of identifying all known accounts and transactions, acknowledging control over the accounts and documents, as well as verifying [the] authenticity of the documents."  Etra Mem. at 11.  Although the Court agrees that providing such an accounting would require Etra to perform a testimonial act, the Court is not persuaded that Etra can refuse to provide all information responsive to this information request because he has not made a sufficient showing that disclosure would enhance his risk of prosecution.

The risk of criminal prosecution posed by a request for an accounting of funds is "not readily apparent," yet Etra has not "endeavor[ed] to explain" how his answers would be incriminatory.  *Edgerton*, 734 F.2d at 919.[22]  Although an accounting of the fees Etra received around the time Petitioner's funds were stolen in 2018 could contribute to his criminal prosecution if, say, Etra received compensation from co-conspirators for facilitating the theft, or if Etra himself pocketed Benthos's funds, Etra has not identified any other specific clients or transactions that could put him at risk of prosecution.  *See Camelot Grp., Ltd.*, 486 F. Supp. at 1225–28 (concluding that witnesses had not sustained their burdens to invoke the Fifth Amendment privilege given the "singular lack of specificity and the remote linkages" upon

---

[22]     Although the Court signaled its willingness to consider records submitted *in camera* and to hold *an ex parte* evidentiary hearing, *see* Order, Dkt. 307, Etra did not submit any documents or issues for the Court's *in camera* review or request an *ex parte* evidentiary hearing.

which the privilege's invocation was predicated; to sustain the privilege "would [have] require[d] th[e] Court to engage in guesswork").[23]

Accordingly, Etra's motion to preclude from the scope of documents he must produce in order to purge his contempt an accounting of funds received from legal, paymaster, escrow-related or other services from August 1, 2017 to the present is denied. That denial is without prejudice to Etra making a particularized showing, *in camera*, of risks associated with particular responsive information.

### 2. Monthly -0873 Citibank Statements for August and November 2017 and from January 2018 through July 2018

Etra refuses to produce monthly Citibank statements for his account ending in -0873 because he would purportedly have to contradict his previous representations in "numerous filings and court appearances" that he lacks control over the documents or that responsive documents do not exist and because producing the bank records would admit to their authenticity. Etra Mem. at 12–13.

As discussed *supra*, Etra has not identified any statements to the Court, let alone statements under oath, regarding his lack of control over relevant account statements. To the contrary, Etra has already voluntarily produced monthly statements for this very account. *See* Citibank Account -0873, Dkts. 192-13, 235-5. Moreover, even assuming that Etra had adequately established a distinct risk of prosecution from the act of producing these bank records, the Court is satisfied that production of the records is not a testimonial act because the records could be authenticated without Etra's testimony. *See United States v. Fridman*, 974 F.3d

---

[23]     On April 27, 2023, Petitioner alerted the Court that a lawsuit had been filed by Berkley Equity, Ltd. against Etra in state court alleging that Etra wrongfully refused to return $1,000,000 that he was holding in escrow in connection with a transaction to purchase nitrile examination gloves. *See* Letter, Dkt. 329; Compl., Dkt. 329-1. Etra has not addressed these allegations, which, to the Court's knowledge, have not been substantiated. The Court therefore does not consider these allegations probative of possible incrimination.

163, 178–80 (2d Cir. 2020) (concluding that a defendant could not rely on the Fifth Amendment to avoid producing bank statements because the Government "knew the accounts existed and requested only customary account documents," which could be authenticated through "the testimony of third parties familiar with records, by comparisons to other bank records it already possesses, or by comparisons to similar bank documents"); *In re Grand Jury Subpoena Duces Tecum Dated Nov. 13, 1984*, 616 F. Supp. 1159, 1162 (E.D.N.Y. 1985) (concluding that the petitioner's production of bank statements in response to a subpoena would not "constitute authentication implicating the Fifth Amendment" because the Government could "authenticate them through the testimony of bank personnel without relying upon any testimonial act petitioner may perform by producing the statements").

Accordingly, Etra's motion to preclude from the scope of the documents he must produce in order to purge his contempt monthly Citibank statements for his account ending in -0873 for August and November 2017 and from January 2018 through July 2018 is denied.

### 3. European Bank Account Statements from August 1, 2017 through the Present

Etra refuses to produce European bank account statements from August 1, 2017 through the present because he would purportedly have to perform the testimonial act of identifying the accounts and acknowledging control over them, producing European bank records would contradict previous representations that he lacks control over the documents or that responsive documents do not exist, and because producing the bank records would admit to their authenticity. Etra Mem. at 11–13. Because Etra testified under oath that he does not have control over European account records at SberBank or UniCredit, the Court concludes that Etra may refuse to produce any such account records to avoid incriminating himself for perjury. *See Allmon*, 594 F.3d at 986–87; *Vavages*, 151 F.3d at 1192 n.3.

Etra must, however, produce records for any other European bank accounts he controls because, although it is likely a testimonial act given that he has never disclosed the bank in which any European account is held, he has not explained how such records would be incriminating.  *See Edgerton*, 734 F.2d at 919; *Zicarelli*, 406 U.S. at 478; *Terry*, 886 F.2d at 1356–57 (concluding that the trial court properly held that the defendant could not refuse to answer questions "in a civil context in connection with plaintiffs' motion for civil contempt" because he merely asserted that the Fifth Amendment's application "require[d] no explanation"); *United States v. Kirksey*, 631 F. Supp. 165, 169 (S.D.N.Y. 1986) (concluding that the defendant failed adequately to invoke his Fifth Amendment privilege to avoid producing documents in response to an IRS summons because he made "no showing that the summoned documents present[ed] a risk of self-incrimination" and only invoked the privilege belatedly after "repeatedly" asserting that the records were not incriminating).[24]

It is conceivable, of course, that Etra deposited the funds taken from Benthos into a European bank account and that, for that reason, disclosing that bank account would tend to incriminate him by drawing a direct line between funds wrongfully transferred out of escrow and an account under Etra's control.  *Cf. United States v. Greenfield*, 831 F.3d 106, 125–27 (2d Cir.

---

[24]    The cases Etra cites in favor of invoking the Fifth Amendment privilege to avoid producing documents in response to judgment-enforcement subpoenas are readily distinguishable.  *See Levitt v. Brooks*, No. 11-CV-1088 (JS) (AKT), 2013 WL 1346257, at *3–4 (E.D.N.Y. Mar. 29, 2013) (concluding that a debtor did not need to disclose bank accounts over which he had control because prosecutors could use this information to inform his disputed criminal forfeiture obligations in an ongoing criminal action); *SEC v. Mut. Benefits Corp.*, No. 04-CV-60573 (AMS), 2008 WL 239167, at *2 (S.D. Fla. Jan. 28, 2008) (wherein it was "undisputed" that the debtor properly invoked his Fifth Amendment privilege and the parties did not brief the incrimination at issue, *see* Briefs, No. 04-CV-60573, Docket Nos. 1994, 1998 (S.D. Fla.)); *In re Adelphia Commcn's Corp.*, No. 02-CV-41729 (JL), 2004 WL 2186582, at *9 (S.D.N.Y. Sept. 27, 2004) (defendants were charged with fraud and self-dealing; the decision did not decide the merits of a disputed Fifth Amendment claim); *AAOT Foreign Economic Ass'n v. Int'l Development Trade Services, Inc.*, No. 09-CV-9056 (JGK), 1999 U.S. Dist. LEXIS 16617, at *16, 26–28 (S.D.N.Y. Oct. 21, 1999) (parties asserting their Fifth Amendment privilege submitted a supporting affirmation *in camera* and the questions they refused to answer expressly targeted the parties' involvement in foreign bribery that was subject to an ongoing criminal investigation).

2016) (concluding that the Government failed to establish that possibly incriminating foreign bank account statements existed, remained in the defendant's control, and were authentic, and therefore vacating an order enforcing an IRS summons).  As noted previously, *see supra* note 22, the Court invited Etra to make an *in camera* submission if necessary to enlighten the Court on the incriminating nature of particular material he has been ordered to produce.  Because it would have been incredibly easy for Etra to have explained that he deposited the ill-gotten gains into his European bank account, the Court has to conclude that the absence of such an explanation means Etra does not have a legitimate Fifth Amendment privilege that protects materials associated with his European bank account(s).

Accordingly, Etra's motion to preclude from the scope of documents he must produce in order to purge his contempt records associated with European bank accounts under his control (other than accounts at Sberbank and UniCredit) for the period from August 1, 2017 onward is denied.  That denial is without prejudice to Etra making a particularized showing, *in camera*, of risks associated with disclosing control over responsive accounts.

### 4.   Monthly Account Statements for an M&T Bank Account Into Which Etra's Social Security Checks Are Purportedly Now Being Deposited from the Date the Account was Opened (or August 2017, Whichever is Later) Through the Present

Etra refuses to produce account statements for the M&T bank account into which his Social Security checks are purportedly now being deposited because, he asserts, production would be a testimonial act identifying the account, production would contradict previous representations that he lacks control over the documents or that responsive documents do not exist, and because producing the bank records would admit to their authenticity.  Etra Mem. at 11–13.

As discussed *supra*, Etra has not identified any statements to the Court, let alone statements under oath, regarding his lack of control over relevant account statements.  To the contrary, Etra represented to the Court that he had control over relevant account statements but was merely delayed in producing them.  *See* Contempt Hearing Tr., Dkt. 261, at 22–23.

There are at least two other problems with Etra's position.  First, production of the M&T statements is not a testimonial act because Etra has already disclosed the existence of an account at M&T that was open as of late 2022; to the extent there is incriminating information in the account, the cat is out of the bag that the account exists.[25]  Second, if Etra had not yet disclosed the existence of the M&T account, conceding its existence could conceivably lead to the discovery of incriminating evidence if ill-gotten gains were deposited into the M&T account.  As with the European bank accounts, however, it would have been easy enough for Etra to tell the Court, *in camera*, that Benthos's funds were deposited into the M&T account into which his Social Security checks are currently being deposited.  Etra's failure to do so leaves the Court with no basis on which to conclude that conceding control over another account would tend to incriminate him.  Thus, the production of these account statements would not be a testimonial act, and there is no basis to conclude that their production would be incriminating.

Accordingly, Etra's motion to exclude from the scope of documents he must produce in order to purge his contempt bank statements for the M&T account into which his Social Security checks are purportedly now being deposited from August 1, 2017 onward is denied.

---

[25]     While it is true that the account number has not been disclosed, that information could easily be obtained via subpoena to M&T.

     **5.**   **Monthly Account Statements from July 1, 2022 Through the Present or the Account's Closing Date, if Applicable, for Etra's Piermont -2060, Piermont -2292, and M&T -3441 Accounts**

Etra refuses to produce monthly statements for his Piermont -2060, Piermont -2292, and M&T -3441 accounts because he purportedly would have to contradict his previous representations in "numerous filings and court appearances" that he lacks control over the documents or that responsive documents do not exist and because producing the bank records would admit to their authenticity.  Etra Mem. at 12–13.

As discussed *supra*, Etra has not identified any statements to the Court, let alone statements under oath, regarding his lack of control over relevant account statements.  To the contrary, Etra has already voluntarily produced some monthly statements for these accounts.  *See* Piermont -2060, Dkt. 211-13; Piermont -2292, Dkt. 211-18; M&T -3441, Dkt. 211-17.  Thus, the production of these account statements would not be a testimonial act, and there is no basis to conclude that their production would be incriminating.

Accordingly, Etra's motion to preclude from the scope of documents he must produce in order to purge his contempt monthly account statements from July 1, 2022 onward for his Piermont -2060, Piermont -2292, and M&T -3441 accounts is denied.

     **6.**   **Monthly Account Statements from August 1, 2017 Through the Present for Etra's American Express -4005, HSBC -0136, Apple -6423, Barclays, and Barclays/Old Navy Credit Cards**

Etra refuses to produce monthly statements for his American Express -4005, HSBC -0136, Apple -6423, Barclays, and Barclays/Old Navy credit cards because he would purportedly have to contradict his previous representations in "numerous filings and court appearances" that he lacks control over the documents or that responsive documents do not exist and because producing the credit card records would admit to their authenticity.  Etra Mem. at 12–13.

As discussed *supra*, Etra has not identified any statements to the Court, let alone statements under oath, regarding his lack of control over relevant account statements. To the contrary, Etra has already voluntarily disclosed his control over these credit card accounts and the dates on which he opened the accounts and has produced some account statements associated with the American Express account. *See* Etra Second Information Subpoena Response, Dkt. 211-23, at 4–5. Thus, the production of these account statements would not be a testimonial act, and there is no basis to conclude that their production would be incriminating.

Accordingly, Etra's motion to preclude from the scope of documents he must produce in order to purge his contempt produce monthly statements from August 1, 2017 through the present for his American Express -4005, HSBC -0136, Apple -6423, Barclays, and Barclays/Old Navy credit cards is denied.

### 7.   Complete and Final Escrow Agreements for the 41 Clients of Etra's Escrow/Paymaster Business That Have Been Identified

Etra refuses to produce escrow agreements for the 41 clients that have been identified because he would purportedly have to contradict his previous representations in "numerous filings and court appearances" that he lacks control over the documents or that responsive documents do not exist and because producing the escrow agreements would admit to their authenticity. Etra Mem. at 12–13.

As discussed *supra*, Etra has not identified any statements to the Court, let alone statements under oath, regarding his lack of control over relevant escrow agreements. Although Etra has represented under oath that escrow agreements were destroyed, he has already produced records contradicting that assertion, *see* Dkt. 182, and has not adequately identified any other risk of criminal prosecution from a possible misstatement. Etra has also not explained why acknowledging control over escrow agreements with other clients could yield evidence of

criminal activity.[26]  Thus, the production of these account statements would not be a testimonial

act, and there is no basis to conclude that their production would be incriminating.

Accordingly, Etra's motion to exclude from the scope of documents he must produce in

order to purge his contempt complete and final escrow agreements for the 41 clients of his

escrow/paymaster business that have been identified is denied.

### 8.  Financial and Judgment-Related Communications from August 13, 2020 Through December 14, 2022

Etra refuses to produce financial and Judgment-related communications from August 13,

2020 through December 14, 2022 because such communications could "provide information

relating back to the underlying financial transaction and serve as a link in the chain of evidence."

Etra Mem. at 12.  Etra also asserts that such communications could identify co-conspirators for

the Government to investigate.  *Id.*

Unlike virtually all of the other materials Etra is in contempt for failing to produce,

compliance with this portion of the Court Order would be testimonial because the production of

documents would reflect Etra's "testimony" that the correspondence is about the Judgment or his

finances.  Moreover, it is conceivable that certain communications regarding Etra's finances or

the Judgment could serve as a link in the chain of evidence leading to a fraud charge against Etra

because such communications could involve or tread dangerously close to the theft of

Petitioner's funds that gave rise to the Judgment.  That possibility does not, however, allow Etra

to withhold all communications regarding the Judgment and his finances.  Etra's failure to

include any *in camera* submissions substantiating the risk of prosecution posed by producing

these communications, Etra's prior representations that his friend Melvin Dussel is attempting to

---

[26]     At Etra's December 14, 2022 contempt hearing, Benthos explained that it seeks Etra's escrow agreements with past clients so that it can approach these clients to determine the extent to which Etra has earned or is still earning fees from them.  *See* Contempt Hearing Tr., Dkt. 261, at 10–11.

raise funds to help Etra satisfy the Judgment, coupled with his belated invocation of the privilege, reeks of obstructionism. *See Certain Real Prop. & Premises*, 55 F.3d at 84–85 (warning against use of the Fifth Amendment privilege as a "convenient method for obstructing a proceeding"); *Camelot Grp., Ltd.*, 486 F. Supp. at 1225–28 (explaining that a court may order a witness to answer a question despite the witness's invocation of the Fifth Amendment privilege if "it clearly appears he is mistaken as to the justification for the privilege or is advancing his claim as a subterfuge"). To the extent there are particular communications that would tend to incriminate Etra, he may make a separate, *in camera*, particularized objection to producing those particular communications.[27]

Accordingly, Etra's motion to exclude from the scope of the documents he must produce in order to purge his contempt communications regarding his finances and regarding the Judgment from August 13, 2020 through December 14, 2022 is denied. That denial is without prejudice to Etra making a particularized showing, *in camera*, that certain responsive communications would tend to incriminate him.

### 9. Documents Concerning the Legal, Paymaster, Escrow-related or Other Services Etra Provided from August 1, 2017 Through the Present

Etra refuses to produce documents concerning the legal, paymaster, escrow-related or other services that he provided from August 1, 2017 through the present because such communications would include all communications related to the underlying theft of Petitioner's funds. Etra Mem. at 12.

---

[27]     Benthos is again reminded that it can, to the extent it believes these communications are critical to its efforts to collect its Judgment, engage in self-help by serving subpoenas on Google for Etra's email. Given Etra's failure to respond to the Court's order to show cause why he should not be required to reimburse Benthos for any costs associated with such a subpoena, *see* Order, Dkt. 307, if Benthos decides to pursue this track, the Court would look favorably on a motion to require Etra to reimburse Benthos for any associated costs.

Compliance with this portion of the Court Order would be testimonial because the production of documents would reflect Etra's "testimony" that the documents concern Etra's professional services.  Although documents concerning the services Etra provided to Benthos could lead to incriminating evidence if, say, the documents include communications regarding the theft of Petitioner's funds, Etra has not made any *in camera* showing to that effect.  It is especially unclear why documents concerning transactions with clients other than Benthos would risk incriminating Etra.  *See Certain Real Prop. & Premises*, 55 F.3d at 84–85; *Camelot Grp., Ltd.*, 486 F. Supp. at 1225–28.[28]   Thus, the production of these documents would be a testimonial act, but there is no basis to conclude that their production would be incriminating.

Accordingly, Etra's motion to exclude from the scope of the documents he must produce in order to purge his contempt documents concerning his legal, paymaster, escrow-related or other services from August 1, 2017 through the present is denied.  That denial is without prejudice to Etra making a particularized showing, *in camera*, that certain responsive communications would tend to incriminate him.

### 10. A list of all of Etra's Financial Accounts from August 1, 2017 Through August 2, 2022

Etra refuses to produce a list of all of his financial accounts from August 1, 2017 through August 2, 2022 because such an accounting would purportedly require Etra to perform the testimonial act of identifying responsive documents and because it would require Etra to contradict previous representations.  Etra Mem. at 11–13.

---

[28]      The allegations in *Berkley Equity, Ltd. v. Etra*, No. 654403/2022 (N.Y. Sup. Ct. Nov. 17, 2022) and Etra's wrongful transfer of Benthos's funds suggest that Etra's escrow and paymaster businesses may have not ben entirely on the up-and-up.  Nevertheless, given the known scope of Etra's business, the Court has no basis to conclude that it was entirely illegitimate.  Indeed, if there were substantial other fraud associated with his business, one would expect that Benthos and Berkley Equity, Ltd. would not be the only former clients pursing Etra.

Compliance with this portion of the Court Order would be testimonial because producing a list would require Etra to testify as to his financial accounts.  The Court also agrees that, to the extent Etra has not already disclosed an account, a list of accounts controlled by him surrounding the 2018 theft of Petitioner's funds could lead to incriminating evidence if there are previously-undisclosed accounts on the list and the heretofore-undisclosed accounts were used as part of the scheme to steal Benthos's funds.  But the Court has no way of concluding that all heretofore-undisclosed accounts fall into that category.  *See Camelot Grp., Ltd.*, 486 F. Supp. at 1225–28.  Thus, the production of this list would be a testimonial act, but there is no basis to conclude that the list's production would be incriminating.

Accordingly, Etra's motion to exclude from the scope of the documents he must produce in order to purge his contempt a complete list of all accounts under Etra's control from August 1, 2017, through August 2, 2022, is denied.  That denial is without prejudice to Etra making a particularized showing, *in camera*, as to certain accounts whose disclosure might tend to incriminate him.

### C.  Etra's Belated Invocation of His Fifth Amendment Privilege Does Not Prevent the Court from Ordering a Forensic Examination of His Electronic Devices

Etra asserts that the act of producing information via his electronic devices would violate his Fifth Amendment rights because it would demonstrate his possession and control of the information on his devices.  *See* Etra Mem. at 13.  Etra also maintains that even though he has already surrendered his devices to his attorney, he may still invoke his Fifth Amendment privilege because the items are protected by the attorney-client privilege.  *See* Etra Reply at 4–5.  That argument fails because Etra has not established that he produced the devices to counsel for the purpose of obtaining any legal advice.  Instead, Etra voluntarily produced the devices in response to the Court's Contempt Order and thereby impliedly authenticated their contents.

The Fifth Amendment generally does not protect against "the compelled disclosure of [a party's] private information by his attorneys." *Matter of Grand Jury Subpoena Dated Oct. 22, 1991, & Nov. 1, 1991*, 959 F.2d 1158, 1163 (2d Cir. 1992) (citing *Fisher*, 425 U.S. at 401–02 and *Couch v. United States*, 409 U.S. 322, 328 (1973)). If a client transferred preexisting documents to his attorney "for the purpose of obtaining legal advice," however, and the client claims attorney-client privilege, "the attorney may refuse to produce the documents if the client, had he retained possession of them, would have had a Fifth Amendment privilege to refuse production." *Id.* (citing *Fisher*, 425 U.S. at 404–05).

There is no dispute that Etra has already identified his electronic devices and produced them to counsel. *See* Order, Dkt. 327; Counsel Letter, Dkt. 328. The Court also concludes that, if the electronic devices were still in Etra's possession, he could refuse to produce them on Fifth Amendment grounds if he demonstrated some risk that the devices contain incriminating information. Producing the devices would be a testimonial act because it would admit control over them and authenticate their contents, and Benthos has not demonstrated that the contents of Etra's devices could be authenticated independently. *See SEC v. Forster*, 147 F. Supp. 3d 223, 229–30 (S.D.N.Y. 2015) (rejecting the SEC's argument that it could independently authenticate text messages on the defendant's phone by obtaining copies of the same communications from someone else and therefore denying the SEC's motion to compel compliance with its subpoena); *cf. In re Boucher*, No. 2:06-MJ-21 (WKS), 2009 WL 424718, at *3–4 (D. Vt. Feb. 19, 2009) (denying a defendant's motion to quash a subpoena requiring him to produce an unencrypted version of his computer's drive in part because the Government "submitted that it [could] link [the defendant] with the files on his computer without making use of his production" of the drive

and the Government asserted that it "[would] not use his act of production as evidence of authentication").

The key issue here is whether Etra may still invoke his Fifth Amendment privilege to preclude examination of his devices even though he already produced his devices to counsel. Etra urges the Court to conclude that his Fifth Amendment right still attaches because his devices "are communications made solely to counsel at the direction of the court." Etra Reply at 5. Etra has not established, however, that he delivered his devices to counsel "for the purpose of obtaining legal advice." *Matter of Grand Jury Subpoena Dated Oct. 22, 1991, & Nov. 1, 1991*, 959 F.2d at 1163. A party's decision to "hand[] his . . . electronic devices to his counsel personally" does not render the devices' contents privileged. *United States v. Correia*, 468 F. Supp. 3d 618, 622–23 (S.D.N.Y. 2020) (concluding that a package containing defendant's computer and smartphone was not shielded by the attorney-client privilege merely because the defendant had sent the package to his counsel because "[t]here was no letter or other document [in the package containing the devices] that discussed even in vague terms the legal advice being sought" and "nothing in the package revealed any communications between [the defendant] and his counsel"). Moreover, counsel's representation, well before Etra's belated assertion of his Fifth Amendment privilege, that he has custody of Etra's devices implicitly authenticated their contents. *See United States v. Hatfield*, No. 06-CR-0550 (JS), 2010 WL 1423103, at *2 (E.D.N.Y. Apr. 7, 2010) (concluding that a defendant could not refuse to produce metadata to the Government by invoking the act-of-production doctrine in part because he had already "implicit[ly] authentic[ated]" the metadata; before the defendant invoked the privilege, his

attorney represented in court that the defense team possessed it and that it was the defendant's "private information").[29]

> For all of those reasons, the forensic examination of Etra's devices will proceed.

### III.   The Court Declines to Expand the Scope of Counsel's Representation to Include Habeas Relief

> As a general matter, an indigent contemnor who risks incarceration has a right to Court-appointed counsel only "insofar as the [civil] contempt hearing [is] concerned." *United States v. Bobart Travel Agency, Inc.*, 699 F.2d 618, 620–21 (2d Cir. 1983); *see also Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 26–27 (1981) (holding that an indigent litigant "has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty"). Despite the Court's grave concerns regarding the accuracy of Etra's financial affidavit in support of his purported indigency, the Court appointed counsel to represent Etra for this limited purpose. *See* Orders, Dkts. 258, 322. A few months later, the Second Circuit appointed Etra counsel with respect to his appeal of the Contempt Order. *See* Order, Dkt. 293.

> Contemnors who are incarcerated for civil contempt typically bring habeas petitions on the grounds that their confinement violates the Constitution or laws or treaties of the United States. *See Armstrong v. Guccione*, 470 F.3d 89, 96–97 (2d Cir. 2006).

> Etra has not asserted any grounds upon which he might have a valid habeas claim, and he has already been appointed appellate counsel to challenge his incarceration for civil contempt.

---

[29] Etra asserts that the Court "has recognized that [Fifth Amendment] protections still exist and have not been waived" by requiring a protocol "to protect any attorney-client privilege between [Etra] and his clients." Etra Reply at 5. Etra's argument is illogical. The protocol to protect attorney-client privileged material on the devices will be used to protect attorney-client communications between Etra and his clients; nothing about that protocol is designed to protect materials that may be incriminating as to Etra but that are not attorney-client privileged as between him and a former client.

The Court, therefore, denies his request to expand the scope of his appointed counsel's representation to include filing a habeas corpus petition.

## CONCLUSION

For the foregoing reasons, Etra's motion to exclude from the scope of materials he must produce in order to purge his contempt based on his Fifth Amendment privilege is GRANTED in part and DENIED in part, and Etra's request to expand the scope of his counsel's appointment is DENIED. The Clerk of Court is respectfully directed to close any open motions at Docket Entries 330 and 335.

The Contempt Order is modified such that Etra must only produce the following documents or information (in addition to the funds discussed *supra*) in order to purge his contempt: (1) an accounting of funds received from legal, paymaster, escrow-related or other services from August 1, 2017 to the present, without prejudice to Etra making a particularized showing, *in camera*, of risks associated with particular responsive information; (2) monthly Citibank statements for Etra's account ending in -0873 for August and November 2017 and from January 2018 through July 2018; (3) bank statements for European accounts he controls at banks other than SberBank or UniCredit for the period from August 1, 2017 onward, without prejudice to Etra making a particularized showing, *in camera*, of risks associated with disclosing control over a particular account; (4) bank statements for the M&T account into which Etra's Social Security checks are purportedly now being made from August 1, 2017 onward; (5) monthly account statements from July 1, 2022 onward for Etra's Piermont -2060, Piermont -2292, and M&T -3441 accounts; (6) monthly statements from August 1, 2017 through the present for Etra's American Express -4005, HSBC -0136, Apple -6423, Barclays, and Barclays/Old Navy credit cards; (7) complete and final escrow agreements for the 41 clients of Etra's escrow/paymaster

business that have been identified; (8) communications regarding Etra's finances and the

Judgment from August 13, 2020 through December 14, 2022, without prejudice to Etra making a

particularized showing, *in camera*, that certain responsive communications would tend to

incriminate him; (9) documents concerning Etra's legal, paymaster, escrow-related or other

services from August 1, 2017 through the present, without prejudice to Etra making a

particularized showing, *in camera*, that certain responsive communications would tend to

incriminate him; and (10) a list of financial accounts from August 1, 2017 through August 2,

2022, without prejudice to Etra making a particularized showing, *in camera*, that disclosing any

such account will disclose additional, unrelated criminal conduct.

   The parties and Petitioner's forensic expert must appear for a status conference to discuss

the forensic examination of Etra's devices on **Wednesday, July 12, 2023 at 2:30 P.M.** in

Courtroom **443** of the Thurgood Marshall Courthouse, 40 Foley Square, New York, NY 10007.

The Court will email Petitioner's forensic expert several days before the conference to enable the

expert's remote appearance.


**SO ORDERED.**

**Date:  July 5, 2023**
   **New York, New York**        **VALERIE CAPRONI**
                  **United States District Judge**