N8t2BenC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   BENTHOS MASTER FUND, LTD.,

 4                   Petitioner,            New York, N.Y.

 5           v.                             20 Civ. 3384 (VEC)

 6   AARON ETRA,

 7                   Respondent.

 8   ------------------------------x        Conference

 9                                          August 29, 2023
                                            11:00 a.m.
10   Before:

11                   HON. VALERIE E. CAPRONI,

12                                          District Judge

13

14                       APPEARANCES

15

16   KLEINBERG KAPLAN WOLFF & COHEN, P.C.
          Attorneys for Petitioner
17   BY:  ALISA BENINTENDI

18

19   AARON ETRA,
          Pro Se Respondent

20

21   DANIEL A. McGUINNESS
          Attorney for Respondent (For Limited Purposes)

22

23   Also Present:

24   Marc Sklar

25
```

N8t2BenC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your

3     appearance for the record.

4          MS. BENINTENDI:  Good morning, your Honor.  Alisa

5     Benintendi for the petitioner Benthos.

6          THE COURT:  Good morning, Ms. Benintendi.

7          MR. McGUINNESS:  Good morning, your Honor.  For

8     Mr. Etra for limited purposes, Daniel McGuinness.

9          THE COURT:  Good morning, Mr. McGuinness.  Good

10    morning, Mr. Etra.

11         MR. ETRA:  Good morning, your Honor.

12         THE COURT:  Please be seated.

13         Okay.  Let's start with the issue of the forensic

14    protocol because that's really the issue at hand.  Mr. Etra was

15    long ago required to provide to his lawyer, Mr. McGuinness, a

16    list of all of his accounts and user names and passwords so

17    that the forensic guys can do their things.  Has that been

18    done?  Do you have a list, Mr. McGuinness, of all of Mr. Etra's

19    accounts and passwords?

20         MR. McGUINNESS:  No, I do not, your Honor.

21         THE COURT:  Okay.  Has that ever been produced,

22    Mr. Etra?

23         MR. ETRA:  When that was requested of me, I indicated

24    to my power of attorney where he might find those passwords

25    because I, of course, don't have anything in -- where I am on

N8t2BenC

1    that information.

2                THE COURT:  Okay.

3                MR. ETRA:  So I did ask him to --

4                THE COURT:  And did he obtain them?

5                MR. ETRA:  I think you probably should ask him that,

6    your Honor.

7                THE COURT:  I'm asking you.

8                MR. ETRA:  Again, I told him where it was and I

9    don't -- I can't answer for him.  But he has full access to it.

10   There is no nondisclosure.  There is no hiding information.

11   Whatever exists, to my knowledge, is where I thought it was in

12   April of last year's calendar.

13               THE COURT:  Mr. Sklar, do you have a list of passwords

14   and accounts?

15               MR. SKLAR:   I have his book of, among many things in

16   the book, passwords which are hieroglyphics to me.  I'm

17   perfectly happy to -- I think I would need his assistance to

18   kind of like really redirect it in any kind of a reasonable

19   way.

20               THE COURT:  Okay.  So here's the thing.  Mr. Kelley,

21   am I correct that you are going to need -- are the accounts on

22   your computer password protected, Mr. Etra?

23               MR. ETRA:  I believe -- again, I don't know account by

24   account, your Honor, but the ones I have received the password

25   from, I have that password.  I believe most of them do require

N8t2BenC

1    a password.

2              THE COURT:  What do you mean most of them require a

3    password?  Most of what require a password?

4              MR. ETRA:  What you have asked access to.  I think it

5    is less so on my computer and more so to apps on my telephone.

6    I don't have all that many of what I think you are looking for,

7    your Honor.

8              THE COURT:  Mr. Etra, are accounts files on your

9    laptop?  Did you password protect --

10             MR. ETRA:  No.

11             THE COURT:  -- separate and apart from the password to

12   get into the laptop?

13             MR. ETRA:  No, your Honor, I did not.

14             THE COURT:  There presumably is a password to get into

15   the laptop.

16             MR. ETRA:  Yes, your Honor.

17             THE COURT:  Do you know that password?

18             MR. ETRA:  Offhand, I believe it is in the book, in

19   the book that Mr. Sklar has referred to.

20             THE COURT:  Okay.  So Mr. Sklar -- Mr. Etra, this is

21   your obligation, not Mr. Sklar.  I can't order Mr. Sklar to do

22   anything.  You need to have a complete translated set of your

23   passwords and accounts, so user names and passwords, and they

24   need to be provided to Mr. McGuinness by Friday.

25             MR. ETRA:  Your Honor, at what point can we discuss my

N8t2BenC

1    question as to who the forensic expert should be and whether

2    they should not be in this district?

3         THE COURT:  You want to be heard on that point?  Go

4    ahead.

5         MR. ETRA:  I believe that there are many very

6    qualified forensic experts in this district, and I think it is

7    a bad idea and I object to having equipment sent outside the

8    district which takes it out of both your control and

9    supervision and --

10        THE COURT:  Why does it take it out of my control and

11   supervision?

12        MR. ETRA:  Because it's in a different district, your

13   Honor.

14        THE COURT:  Yeah, but why -- trust me, if there is an

15   order that applies to the laptop, Mr. Kelley will comply with

16   it or I will send the marshals out to arrest him in Ohio or

17   wherever he is.

18        MR. ETRA:  And also there is the risk of shipment back

19   and forth, there is the risk of type involved in that, and I

20   think it is clearly in everybody's interest to have that done

21   much closer to home.

22        THE COURT:  Mr. Etra, this is just another way of

23   delaying things --

24        MR. ETRA:  No.

25        THE COURT:  -- so your objection --

N8t2BenC

1          MR. ETRA:  No.  I would ask for it to be done

2     immediately.

3          THE COURT:  Your objection is overruled.  Anything

4     else you want to say about --

5          MR. ETRA:  Can I --

6          THE COURT:  -- who the expert is?

7          MR. ETRA:  May I respectfully appeal on that, your

8     Honor?

9          THE COURT:  That's between and you the 17th floor.

10    I'm not going to stay the examination for you to appeal.  If

11    you think you've got an appeal, pay the fee and appeal.

12         MR. ETRA:  Yes, your Honor.

13         THE COURT:  Okay.  Any other objections to Mr. Kelley

14    as the forensic expert?

15         MR. ETRA:  I know nothing of Mr. Kelley.  I would

16    appreciate some information about him.

17         THE COURT:  What do you want to know?

18         MR. ETRA:  I want to know his qualifications, his

19    experience, the commitments that he is making in respect of his

20    work, the fact that each person in his employ has committed to

21    not commingle, to keep confidential the items that I, to the

22    best of my knowledge, put down in my communication to you, your

23    Honor, and I would appreciate that being done before proceeding

24    with the work.  I mean, it is something that I think is owed to

25    the work to have that commitment by each person who is in his

N8t2BenC

1    employ who is going to deal with this matter, if it is him or

2    it is his employees or whoever it is.

3            And again, I know nothing of him.  I don't know if he

4    is a company, if he is an individual.  There was no indication

5    that it's a company.  It was just a name, I think Vestige

6    something, Vestige Digital Investigations, or something.  It

7    didn't say Inc. or Corp. or LLC or anything of that kind, which

8    seems to suggest it is a sole proprietorship.  Whatever it is,

9    I would appreciate knowing about it, their experience, how they

10   intend to do this work, and again, the commitments on the part

11   of each and every one of the people who will deal with it to

12   these commitments to that work.

13           THE COURT:  Commitments?  I'm sorry, what commitment

14   do you want?

15           MR. ETRA:  Not to commingle, not to disclose --

16           THE COURT:  Hang on a second.  Your material is not

17   going to be commingled.

18           MR. ETRA:  Your Honor, I would appreciate that being

19   in writing.

20           THE COURT:  It is.  It is in the protocol.

21           MR. ETRA:  I don't think that each person who is doing

22   it has signed anything personally.  Again, I'm not --

23           THE COURT:  Okay.  I'm not going to require that.

24           MR. ETRA:  Not knowing if it's a company, your Honor,

25   if it's just him, then just him.  If there are other people, I

N8t2BenC

1   would appreciate it from each and every one of them.

2           THE COURT:  I'm not going to require that.

3           MR. ETRA:  May I respectfully appeal from that, your

4   Honor?

5           THE COURT:  Again, it's the same answer as before.

6           MR. ETRA:  Can I understand why you have objections to

7   my requiring that personal commitment on the person dealing

8   with confidential and very -- things that deserve protection,

9   your Honor?  Is that something that you don't support?

10          THE COURT:  There will be an order that will require

11  the material to be maintained in confidence.

12          MR. ETRA:  And not commingled and not --

13          THE COURT:  It's not going to be commingled.  They are

14  going to mirror the laptop.

15          Mr. Kelley, is there any way that the materials from

16  his laptop are going to be commingled with other materials from

17  your company?

18          MR. KELLEY:  No, your Honor.

19          THE COURT:  Okay.

20          And Ms. Benintendi, what can you tell Mr. Etra about

21  Mr. Kelley's company?

22          MS. BENINTENDI:  I would ask if Mr. Kelley could just

23  opine as to any other employees, but it's not just Mr. Kelley

24  from my understanding.

25          THE COURT:  How big is your company, Mr. Kelley?

N8t2BenC

```
 1              MR. KELLEY:  We are 20 individuals, your Honor.

 2              THE COURT:  I'm sorry, three individuals?

 3              MR. KELLEY:  20, your Honor, two zero.

 4              THE COURT:  And what is your expertise?  Why are you

 5     capable of doing this.

 6              MR. KELLEY:  Certainly, your Honor.

 7              My background is in computer engineering, that would

 8     be a bachelor of science degree in computer engineering.  I

 9     have been doing digital forensic work since 2001.  I hold

10     multiple certifications in the digital forensic industry.  I

11     have testified in multiple venues, both federal and state

12     courts, as a digital forensic expert.

13              THE COURT:  Mr. Etra, do you have any questions for

14     Mr. Kelley?

15              MR. ETRA:  If he would give me some further details on

16     his education and his qualification, I would appreciate it,

17     your Honor.

18              THE COURT:  You've got to ask a specific question.

19     What precisely do you want to know?

20              MR. ETRA:  I believe I have conveyed that --

21              THE COURT:  No.  That is not a question.  What is your

22     question?  Do you want to know where he went to school?

23              MR. ETRA:  I would like his education.  I would

24     like --

25              THE COURT:  Hang on.  Where did you go to school?
```

N8t2BenC

1    Where did you go to college?

2            MR. KELLEY:  Case Western University in Ohio.

3            MR. ETRA:  And any graduate degrees, Mr. Kelley?

4            MR. KELLEY:  A bachelor of science, not a masters, a

5    bachelor of science.

6            MR. SKLAR:  Just one undergraduate degree.

7            MR. KELLEY:  Yes.

8            MR. ETRA:  And your other 22 employees, are they

9    all --

10            MR. KELLEY:  Various degrees.

11            MR. ETRA:  I see.  And none of them have graduate

12    degrees?

13            MR. KELLEY:  Yes.  My business partner has an MBA and

14    I believe another member of my staff has a masters.  I don't

15    have their degrees all memorized.

16            MR. ETRA:  Okay.  Would it be possible to have that in

17    writing?

18            THE COURT:  I'm not going to order that.

19            MR. ETRA:  Would it be possible to have the

20    qualifications to which you referred to, either experience or

21    memberships of groups dealing with this matter?  That would be

22    appreciated also in writing.

23            THE COURT:  Okay.  I'm not going to order that,

24    Mr. Etra.

25            MR. ETRA:  So we have nothing in writing from

N8t2BenC

1    Mr. Kelley or his associates.

2            THE COURT:  We have Mr. Kelley stating on the record

3    what his background is and his firm and he has been accepted as

4    an expert in forensic examinations -- how many times?

5            MR. KELLEY:  As a whole in the company, approximately

6    100 times, your Honor.

7            MR. ETRA:  Are there any references, your Honor, that

8    we can have access to?

9            THE COURT:  Like what?  What do you want to know?

10            MR. ETRA:  From other people that vouch for their

11    expertise and vouch for their work that they have done.

12            THE COURT:  Do you have a professional reference?

13            MR. KELLEY:  I can provide references, your Honor.

14            THE COURT:  Okay.  I'm not going to delay this,

15    Mr. Etra, for you to --

16            MR. ETRA:  I'm not looking to delay, your Honor.  I'm

17    just looking for verification and corroboration.  That's why I

18    conveyed that to you.  I think there is no delay involved in

19    anything that I have asked for.

20            THE COURT:  Okay.  Do you have any other questions for

21    Mr. Kelley, or can I proceed so that we can get this show on

22    the road?

23            MR. ETRA:  Is this the time to discuss the timelines

24    or the way of conveying the information?

25            THE COURT:  We will get there in a second.

N8t2BenC

1          MR. ETRA:  Okay.

2          THE COURT:  You interrupted me, but I just want to

3    make sure that you understand that all of the passwords and all

4    of the user names for your accounts need to be translated so

5    Mr. Sklar understands what he's got, and those need to be

6    provided to Mr. McGuinness by Friday, close of business.

7          MR. ETRA:  Your Honor, this highlights the problem of

8    communications that I and Mr. Sklar have.  I have no access on

9    a regular basis to telephone.  I have no access on a regular

10   basis to computers where I am incarcerated.  So being able to

11   do what you request, which is obviously a valid request, if I

12   was with him and could work with him, in this situation where I

13   am completely unable to communicate, as I have tried to convey

14   to your Honor time and time again, the situation is only

15   getting worse.

16         THE COURT:  Mr. Etra, today is Tuesday.  You have to

17   do this by Friday.  So that means you are going to need to have

18   Mr. Sklar come visit you with the book so that you can

19   translate it for him.

20         MR. ETRA:  He cannot gain admission by Friday, your

21   Honor.

22         MR. McGUINNESS:  Your Honor, I can speak to this issue

23   of Mr. Sklar visiting.

24         Mr. Sklar has had difficulty visiting the facility.  I

25   have been trying to help him as I can.  I wanted to fully

N8t2BenC

1    exhaust the issue with the facility before I brought it to your

2    Honor, but we are getting very close to needing court

3    intervention.

4            THE COURT:  Well, what's the problem?

5            MR. McGUINNESS:  Your Honor, Mr. Sklar initially put

6    in a visitor application in June.  It was not processed.  It

7    was rejected out of hand because he wasn't family, apparently.

8    I was told to put in an application to have him basically

9    admitted into the facility as paralegal or private investigator

10   because of course he would have to bring documents and review

11   them with Mr. Etra.

12           The problem is he is not working for any attorney.  He

13   is not in my employ, certainly.  He is technically working for

14   Mr. Etra working *pro se*.  I think that's -- that would be a

15   problem.  I have been following up, following up, but this has

16   played out over the last approximately two months.  The most

17   recent thing is that that application for the background check,

18   which Mr. Sklar is expected to clear, is ongoing now and as

19   that process ends, I think that's expected to end the week

20   after next, I may very likely be coming to the Court.  But as

21   of now, Mr. Sklar cannot get into the facility.

22           THE COURT:  Okay.  Well, that should have been brought

23   to my attention, Mr. Etra, a long time ago.  So Friday doesn't

24   seem realistic unless you know some of these -- to the extent

25   you know any of them that would expedite things, but you are

N8t2BenC

```
 1    not interested in expediting it, so that's fine.

 2              I will raise this with the MDC as well and attempt to

 3    get Mr. Sklar expedited so that he can enter and so that he can

 4    bring paperwork in.

 5              MR. McGUINNESS:  To the extent it helps, your Honor, I

 6    have spoken to staff attorney John Wallace who has been

 7    helpful.

 8              THE COURT:  Okay.  John Wallace?

 9              MR. McGUINNESS:  Yes, your Honor.

10              THE COURT:  So you think the earliest that's going to

11    be cleared is in two weeks, is that right?

12              MR. McGUINNESS:  I believe that's correct.  It may be

13    sooner.  I will certainly advise the Court, if you would like

14    me to.

15              THE COURT:  Okay.  So the passwords and user names,

16    then, are due September 15.

17              Mr. Etra, how is your computer organized?

18              MR. ETRA:  I'm sorry, your Honor.  I don't understand

19    the question.

20              THE COURT:  How do you -- how are files on it

21    organized?  What's on the laptop?  For example, are all the

22    escrow agreements organized by client, are they organized by

23    year?  How do you have files on your computer?

24              MR. ETRA:  It depends on -- if you refer to the escrow

25    agreements, if and when they are executed and enforced, I enter
```

N8t2BenC

1    them on to the computer.  Yes, your Honor.  That's how I deal

2    with those.

3              THE COURT:  Are they organized by client?

4              MR. ETRA:  Yes.

5              THE COURT:  By year?

6              MR. ETRA:  No.

7              THE COURT:  Just by client.

8              MR. ETRA:  As you recollect, your Honor, all of them

9    are only a 12-month duration.

10             THE COURT:  Mr. Etra, recognize I don't know if that's

11   true or not.

12             MR. ETRA:  Your Honor, I believe you have copies of

13   the agreements, so you can check and corroborate that.

14             THE COURT:  I'm not sure that I ever got a complete

15   copy of any escrow agreement, but maybe I did.  It was a long

16   time ago.

17             MR. ETRA:  I think you did, your Honor.  If any that

18   were on my computer, I think they were all furnished to

19   Mr. Popofsky and to your Honor, and they are all 12-month

20   agreements.

21             THE COURT:  Mr. Kelley, my next question is to you.  I

22   had asked at one point for Benthos to provide me an example of

23   what the report is going to look like, and what they gave me

24   didn't really answer the bell because it was more like a

25   narrative explanation of what a forensic examiner had found.  I

N8t2BenC

1    am more interested in understanding what is the thing that you

2    are going to be able to give to Mr. Etra so Mr. Etra can assert

3    that particular items on the computer are privileged, which

4    would be the items that then would not be produced to Benthos.

5    What is that report going to look like?  Is it going to be a

6    paper report?  Is it going to be an electronic report?  What's

7    it going to look like?

8         MR. KELLEY:  The most efficient manner, your Honor, is

9    to provided as an Excel spreadsheet, where basically each row

10   will list the name of a file, the location where the file

11   exists, the various dates associated with the file.  There will

12   be a unique identifier that we can use to track things through

13   the process, and then there will be a column where he will be

14   able to identify whether or not the file is to be marked

15   privileged or not.  So an efficient way of doing this is

16   through an Excel spreadsheet and provide it in that fashion.

17        THE COURT:  So, for example, if the name of the file

18   is ABC Company, the Excel spreadsheet will show ABC Company and

19   then what will it show?  What else will it --

20        MR. KELLEY:  Then it will show -- then it will show

21   the create date of the file, the last written date of the file,

22   the last access date of the file, the size of the file.  It

23   will give some information on what type of file it is.  Is it a

24   Word document?  Is it a PDF file?  Is it a spreadsheet?  And

25   then it will have where the file is located on the computer.

N8t2BenC

1    So is it under the My Documents folder?  Is it under the

2    Desktop?  Is it in a subfolder underneath that?  So basically

3    any kind of metadata we were able to derive about the file will

4    be in that spreadsheet so that, without transmitting the

5    content of the files, people can make educated decisions as to

6    whether or not the file should be marked as privileged or not.

7         THE COURT:  Mr. Etra, do you understand what

8    Mr. Kelley just said in terms of what you are going to receive

9    by way of an Excel spreadsheet?

10        MR. ETRA:  Yes, your Honor.  But I would appreciate,

11   considering the difficulty of my viewing things on a computer

12   screen, if he could give me a printed copy of his Excel

13   spreadsheets.

14        THE COURT:  So here's the thing about Excel

15   spreadsheets.  The more data that you have on them, the smaller

16   the print.  One question I would have for you, Mr. Etra, is you

17   just heard that part of what he is going to produce for you or

18   produce in the Excel spreadsheet is all of the metadata.  So

19   where is the file on the computer?  When was it accessed?  When

20   was it created, etc.  Do you want that data?  Do you need that

21   data to make your cut of whether the file is likely privileged?

22   Because if you do, what you are going to get is very small font

23   on your Excel spreadsheet.  If you don't need that data then

24   it's going to be bigger, or it can be bigger.

25        Is that a fair statement, Mr. Kelley?

N8t2BenC

1          MR. KELLEY:  Yes, your Honor.  We can do things to try

2     to make the font as large as possible.  We could use legal

3     sized paper, do it in landscape.  We could even have -- you

4     know, for example, the most difficult piece would be getting

5     the full path to the file on there, but we could have it be in

6     multiple lines.  I have done things similar.

7          You are right.  Producing it as paper isn't optimal,

8     but if -- we can produce it in both fashions, if necessary.

9          THE COURT:  So do you want the metadata?  Do you not

10    need the metadata, Mr. Etra?

11         MR. ETRA:  Yes, it would be appreciated, your Honor.

12         THE COURT:  Okay, fine.  So then that's what will be

13    produced to you.  You have asserted that five days is not long

14    enough to make your privilege assertions.  Before I get to you

15    on that --

16         MR. ETRA:  First of all --

17         THE COURT:  Let me ask -- hang on a second.

18         MR. ETRA:  I'm sorry.

19         THE COURT:  -- Ms. Benintendi, is Benthos in a

20    position to prioritize what you are most interested in from the

21    phone and the computer?

22         MS. BENINTENDI:  Prioritize as in the categories of

23    documents that we are most interested in?

24         THE COURT:  Yes.

25         MS. BENINTENDI:  We are most interested, I would say,

N8t2BenC

1    in the communications that Mr. Etra has not produced yet.

2    That's honestly one of the priorities that we have in this

3    entire forensic examination.  So I don't know if those are

4    necessarily stored on Mr. Etra's computer or phone or if they

5    are in Web-based accounts of some sort, which is something that

6    we are hoping to figure out in the course of this.  So it's a

7    bit difficult as far as what Mr. Kelley is going to do, you

8    know, in printing things out, to explain exactly how that would

9    be prioritized.  But it would be communications, any of the

10   bank statements that we don't already have that may have been

11   saved on his computer.  Those would be our top priorities I

12   would say, and then the remaining documents are still, of

13   course, priorities, but less so.

14          THE COURT:  Got it.  Okay.

15          So, Mr. Etra, how long do you think you are going to

16   need to make at least some privilege calls?  I'm prepared to do

17   this in waves rather than waiting for you to get through -- I

18   have no idea how many documents are on the laptop.  So I don't

19   know if we are talking about a large project or a small

20   project.

21          MR. ETRA:  Your Honor, would it make sense if we do it

22   in waves for Mr. Kelley to give us the number and then how it

23   can be divided into waves and do our timing as a result of that

24   information?

25          THE COURT:  Fine.  Why don't we do that.  So after the

N8t2BenC

1    report is produced and after you have examined it, then we can

2    meet again and you can tell me what you are going to need.

3            MR. ETRA:  Okay.

4            THE COURT:  Ms. Benintendi, the way the protocol is

5    currently written, as I read it, it looks like paragraph 9

6    deals with spoliation, and it looks like that's on an

7    as-requested basis.  Is that -- so Benthos hasn't made a

8    decision as to whether or not you want them to examine the

9    laptop for spoliation?

10           MS. BENINTENDI:  We are interested in figuring out if

11   Mr. Etra has been committing any spoliation; however, it's less

12   of a priority at this point, especially if we try to determine

13   exactly how expensive the entire exercise will be.  Of course

14   we would want to know ideally, but it's been deprioritized in

15   this version just in the sense that we first want to at least

16   see what we can before we figure out if things have been

17   deleted and assess that later.

18           THE COURT:  Okay.  So, Mr. Kelley, in the prior -- the

19   forensic expert had something in their protocol dealing with

20   images.  On an Excel spreadsheet it's not going to matter

21   because there are not going to be any images on it.  So maybe

22   that's the answer.  But there will be a forensic copy made and

23   given over to the defense, is that correct?

24           MR. KELLEY:  Yes.  We can provide a full forensic

25   image of the hard drive over to the defense, yes, if that's

N8t2BenC

1    needed.

2         THE COURT:  And will your report reflect whether

3    anything that's on that forensic image are images and, in

4    particular, because of it in -- the possibility, which is

5    possible, but not likely, that Mr. McGuinness, the attorney, is

6    dealing with the contents of the computer, the one thing that

7    cannot go into a prison is pornography.  I have no idea whether

8    Mr. Etra has pornography on his computer or not, but on the off

9    chance that he does, how would that be marked?

10        MR. KELLEY:  We can look to exclude any pictures that

11   have skin tone, have an excessive amount of skin tone.  That is

12   kind of an automated process.  Of course you would get

13   something like -- if it's just someone's head shot, that would

14   have an excessive amount of skin tone, but it would not be

15   pornography, but it kind of makes it easier to go through it

16   all in an automated fashion and eliminate pictures with an

17   excessive amount of skin tone.

18        THE COURT:  So that would be eliminated from what?

19        MR. KELLEY:  It would be eliminated from the forensic

20   image that we provide over to the defense counsel.

21        THE COURT:  Mr. Etra, do you understand the problem?

22        MR. ETRA:  I do, your Honor.

23        THE COURT:  Do you want to be heard?  Do you

24   understand what Mr. Kelley is saying, the way that he can deal

25   with this issue.

N8t2BenC

1           MR. ETRA:  Yes, your Honor.

2           THE COURT:  Do you have any objection?

3           MR. ETRA:  No.

4           THE COURT:  Fine.  That will be done.  I'm going to

5   request that you do that, Mr. Kelley.  So the forensic image

6   that Mr. McGuinness will receive will not include photographs

7   with, quote, excessive skin tone.

8           Okay.  So nothing can happen until September 15 or at

9   whichever time, Mr. Etra, you and Mr. Sklar work out so that

10  you can give him names and passwords.

11          Am I correct, Mr. Kelley, that there is really not

12  much you can do with the computer until you get the password to

13  get into the computer?

14          MR. KELLEY:  So, actually, your Honor, if the computer

15  is not encrypted, there is no need for us to have the password

16  for it.  We should be able to make a forensic image of the hard

17  drive.  There are various situations where it may not be

18  possible, but for the most part, unless the hard drive is

19  encrypted, we would not need a password for the hard drive

20  itself.

21          Now, to the extent that there are other accounts, as

22  plaintiff's counsel brought up, as far as, like, other e-mail

23  accounts and financial accounts, where the data isn't saved on

24  the computer but is, instead, in the cloud, those will require

25  passwords at that point in time.

N8t2BenC

1          But as far as the computer is concerned, if it is not

2     encrypted, we should not need the password, barring some

3     unexpected situation.  And I am assuming this is a Windows PC

4     versus a Mac.  Now, if it is a Mac, then a password would be

5     required.

6          THE COURT:  Is it a Windows PC or a Mac?

7          MR. ETRA:  It is a Mac, your Honor.

8          THE COURT:  It is a Mac.

9          MR. KELLEY:  So if it is a Mac, there is a good

10    likelihood we would need a password, your Honor.  We will not

11    know that until we receive it and start going through that

12    process.

13         THE COURT:  Okay.  And what about the phone?  Same

14    with the phone?  I presume you are going to need the password

15    to get into the phone.

16         MR. KELLEY:  Yes, your Honor, the PIN for the phone.

17         THE COURT:  Do you have your PIN?  Do you know your

18    PIN, Mr. Etra.

19         MR. ETRA:  I don't know it offhand, your Honor.

20         THE COURT:  Seems unlikely, but that's what you are

21    saying, so so be it.  Again, Mr. Etra, you are sitting in jail

22    while all this is taking place, so to the extent you can do any

23    of this faster so that we can get into the computer faster,

24    that is in your interest.  Because what your lawyer is arguing

25    is that you shouldn't remain in prison because everything

N8t2BenC

1    that's not been produced yet is going to be produced as part of

2    the forensic examination of your computer.  I know that that

3    information got to Mr. McGuinness from you, and I don't have a

4    lot of confidence that that's true without actually seeing.

5            So the ball is in your court.  If you don't know any

6    of your passwords, that's fine.  We will wait.  You are ordered

7    to produce them on September 15.  If you produce them sooner

8    than that, then we will be in a position for the computer to be

9    delivered to Benthos and Benthos to deliver the computer to

10   Mr. Kelley so Mr. Kelley can get going on his examination.

11           Once you get the computer and the password,

12   Mr. Kelley, about how long is it going to take you?  I take it

13   it depends in part on how much stuff is on the computer.

14           MR. KELLEY:  Yes, your Honor.  I would venture we

15   could get it done in two weeks, if not sooner.

16           THE COURT:  Okay.  What I am going to order, then, is

17   that Benthos be in touch with you and give us an update.

18   Sometime I guess around October 1 would seem to be the point

19   that makes sense.

20           Mr. McGuinness, you have the computer and the phone,

21   right?

22           MR. McGUINNESS:  Yes, your Honor.

23           THE COURT:  Is there anything else we need to talk

24   about relative to the forensic examination from your

25   perspective, Ms. Benintendi?

N8t2BenC

1            MS. BENINTENDI:  The only thing that we would want to

2    urge the Court is we want to reiterate our request that

3    Mr. Etra be ordered to defray some of the costs of the forensic

4    examination.  The only reason we are here is because of

5    Mr. Etra's continued refusal to produce almost anything that we

6    have been asking for other than the recent efforts with the

7    bank statements.  This exam would not be necessary if he were

8    just complying with the Court orders.

9            And he did comply with paying the $2,000 the last time

10    the Court ordered in connection with denying him the ability to

11    assert privilege if it were not so ordered, so there is an

12    incentive at this point.  It seems to have worked the last

13    time.  And it seems pretty clear at this point that he is

14    hiding some responsive documents.  There have to be some

15    communications regarding his finances.  We know that the Court

16    said that if there was an indication that he was hiding

17    something, potentially there could be an additional

18    contribution to the forensic examination.  So we are just

19    reiterating that request.

20            THE COURT:  Okay.

21            Mr. Kelley, anything further that we need to discuss

22    relative to your forensic examination?

23            MR. KELLEY:  Not that I could think of, your Honor.

24            THE COURT:  Mr. Etra, do you have any questions or

25    anything you want to say about this?

N8t2BenC

1            MR. ETRA:  No.  Thank you, your Honor.

2            THE COURT:  Okay.  So, Mr. Kelley, we are going to let

3     you drop off now because there is no reason for you to stay on

4     the other issues that I have to discuss with Mr. Etra.

5            MR. KELLEY:  Thank you, your Honor.

6            THE COURT:  Thank you.

7            (Mr. Kelly not present)

8            THE COURT:  Mr. McGuinness, you have requested that I

9     reconsider maintaining Mr. Etra in prison because he has not

10    fully complied with the orders.  Do you want to be heard on

11    that?

12           MR. McGUINNESS:  Yes, your Honor, just briefly.  I

13    mean, it is all in the record and all in my submissions, your

14    Honor——his age, his ill health, the conditions at the MDC, I

15    know the last of which you are very well aware of, your Honor.

16           This case is about money and, frankly, your Honor, I'm

17    at a loss to prove that he doesn't have it anymore, and I would

18    appreciate any guidance or direction from the Court as to how

19    to proceed and how to advise my client.

20           He's produced all of the bank records that have been

21    requested.  He has shown his financial status.  This

22    contribution to the forensics examiner, that's in there.  You

23    can see that.  That was some of the last dollars he had.

24           Mr. Sklar is here and available to offer his opinions.

25    He's had power of attorney for several months.

N8t2BenC

1          Mr. Etra is on the verge of eviction.  He lost his

2     phone number recently because he couldn't pay his phone bill,

3     lost his healthcare.  He is destitute by all apparent measures.

4     I understand that he was visiting his wife in Europe when he

5     was released, and that is something that costs money, but --

6          THE COURT:  But here's the thing, Mr. McGuinness, and

7     this is the problem that I have with Mr. Etra.  He was pleading

8     poverty when he was out.  He kept telling me he had no money,

9     he had no money, can't pay, can't pay, can't pay.  So I don't

10    know if -- and this is the problem.  I don't know whether

11    Mr. Etra really doesn't have any money or if he has money in an

12    account that we don't know about because it's never -- there is

13    no direct movement from one of the accounts that we do know

14    about into an account we don't know about.

15         What I do know is that when we were dealing with this,

16    every production of documents revealed more information that

17    Mr. Etra had not disclosed.  And what he clearly was doing was

18    spending money that he knew was subject to a restraining order

19    and was supposed to be paid to Benthos.

20         MR. McGUINNESS:  Yes, your Honor.  Three things.

21         First of all, the money he was spending, there was

22    income that can be seen from additional escrow.

23         THE COURT:  But there was a restraining order.  It was

24    due to Benthos.

25         MR. McGUINNESS:  Understood, your Honor.  But the

N8t2BenC

1    difference is he wasn't extracting money from some hidden

2    account.  It wasn't coming from some unknown place.  You can

3    see him earning the money.  Obviously he's not been earning

4    money.  He's been incarcerated.

5        The second thing is, he has now given all of the

6    documents that were asked for.  And I'm sure your Honor saw the

7    requests.  They were incredibly inclusive language, any and all

8    accounts, not just the one that is have been listed, give me

9    everything I've ever had with this bank, it's urgent.  He got

10   it and he turned it over, and there has been no indication,

11   hey, where's this money coming from, here's a new bank account.

12   There is been none of that, your Honor.  So there is

13   speculation that there is money somewhere, but there really

14   isn't any factual basis for that, your Honor.

15       And third, again, I understand your Honor or

16   petitioner may think there is money somewhere else, but he's in

17   the position of proving the negative now, and I don't know how

18   else he can go about showing that he doesn't have money than

19   showing all of his account statements, all of his debts.

20       And certainly while he was out, although he was

21   spending money, he was living well beyond his means, which is

22   not uncommon in Manhattan, and it's caught up with him, your

23   Honor, and now he is destitute.  It is what all the paperwork

24   that I have seen shows me.

25       So while we could speculate that there is other money

N8t2BenC

1    somewhere, that factual basis isn't there.  Again, your Honor,

2    I'm asking guidance how to advise my Court to demonstrate he

3    doesn't have money beyond what he's done.

4              THE COURT:  So I would put money in one bucket that he

5    hasn't produced.  The other is, as Ms. Benintendi just pointed

6    out, the whole issue of communications about finances is

7    totally within his control and none have been produced.

8              MR. McGUINNESS:  Yes, your Honor.  Mr. Etra has told

9    me that his incarceration and his eyesight have prevented him

10   from really getting those documents.

11             THE COURT:  Let me just say I have examined the

12   records that he provided you and you provided me.  What they

13   show is that he has problems with distance vision.  There is no

14   indication in the record that he has anything else.  Now, I'm

15   not a doctor.  I'm certainly not an eye doctor.  I did the best

16   I could reading the records.  The records say he is extremely

17   myopic.  I looked that up.  That says he has difficulty seeing

18   things at a distance.

19             But his eyesight is not the problem.  He's got a

20   friend who has his power of attorney.  All he's got to do is

21   say go into my Gmail account, go into my Mac account and get

22   the e-mails.  He hasn't done that.

23             MR. McGUINNESS:  Your Honor, I would say to the extent

24   he hasn't done some of the Court's order, he's done a vast

25   majority of it, and he's shown that he doesn't have money.  And

N8t2BenC

1    your Honor, I am just pleading with the Court that that is

2    enough not to absolve him of additional responsibilities, but

3    just to get him out of the dire incarceration he is in, your

4    Honor.  Home confinement would be a tremendous --

5            THE COURT:  He doesn't have a home, according to you.

6            MR. McGUINNESS:  He is not evicted yet, Judge.  He is

7    not evicted yet.  He is undergoing proceedings.

8            THE COURT:  Well, do you really think his landlord is

9    going to let him back in when he owes him, according to the

10   records you have shown me, tens of thousands of dollars.

11           MR. McGUINNESS:  He is legally allowed to be there,

12   and when he is evicted, he will have to find another housing

13   situation, but that alone, your Honor, I would say shouldn't

14   land him in the MDC.

15           THE COURT:  No, it doesn't.  He is not in the MDC

16   because he doesn't -- it's not clear that he has a house to go

17   to.  He is in the MDC because he has the ability to produce

18   what he's been ordered to produce and he hasn't done it.

19           MR. McGUINNESS:  In light of the substantial

20   good-faith efforts he's made, your Honor, and the showing that

21   he doesn't have additional funds, I'm just asking that he be

22   put under some less onerous, less harmful to his health

23   conditions.

24           THE COURT:  He looks -- I have to say, he looks better

25   now than he did when he went in in December.

N8t2BenC

1              MR. ETRA:  Your Honor --

2              THE COURT:  Hang on a second.

3         I have not gone through, because we didn't actually

4    get all of the bank records and, frankly, it's not my job to do

5    a forensic examination of Mr. Etra's bank accounts.  Do any of

6    the IOLA accounts have positive balances?

7              MR. McGUINNESS:  Your Honor, there are two.  One your

8    Honor identified has approximately $2,000, which is, I

9    understand from Mr. Etra, client funds.  He can't immediately

10   recall which client without reviewing the escrow records.  But

11   certainly that's not going to satisfy a judgment.  And then the

12   other, your Honor, is this other issue.  I believe it is

13   *Motherland v. Berkeley*.  There is another case.  That is client

14   money that is under litigation in New York County.  I believe

15   it is being heard or was just heard last week.  That is going

16   to be released and fully zeroed out, that IOLA account.

17             THE COURT:  And Benthos has no objection?  Benthos

18   concedes that that is not his money, is that correct?

19             MS. BENINTENDI:  Based on what we are being told by

20   Mr. Etra.  If that's another client's money, then we do not

21   object to it being --

22             THE COURT:  Have you been in communication with the

23   lawyer for that client or are you just taking Mr. Etra's word

24   for things?

25             MS. BENINTENDI:  No, your Honor.

N8t2BenC

1          THE COURT:  I don't understand why you would take

2     Mr. Etra's word for anything.

3          MS. BENINTENDI:  We do not take his word for anything.

4     If that -- we believe that that amount was subject to a Court

5     order, and if it is, we are not objecting to a separate court

6     order.

7          THE COURT:  All right.  The other IOLA account that

8     has money in it, you are going to have to show me records that

9     prove that that is client funds and not his funds.  And the

10    notion -- I understand you just told me what Mr. Etra told you.

11    The idea that he doesn't commingle funds is ridiculous.  We can

12    see it in the records where he is paying personal expenses from

13    his IOLA account.  So he may not view that as commingling.  I

14    do.

15         MR. McGUINNESS:  Just to close the loop on the other

16    account with substantial funds on it, that is another account,

17    that is frozen and subject to litigation.  Mr. Etra could not

18    touch that if he wanted to.

19         THE COURT:  Correct.  So that one is not of interest.

20    He's got $2,000.  We want to see proof that that is in fact

21    client funds and not his funds.  Because while it's not a lot

22    of money, Ms. Benintendi has apparently decided that they are

23    going to try to collect their $5 million judgment dollar by

24    dollar.

25         So bottom line, Mr. McGuinness, putting side the

N8t2BenC

```
 1    money, there are still documents and records that Mr. Etra has
 2    not produced that he has the ability to produce.  So he can
 3    either produce them or he can continue to sit in MDC.  And we
 4    may get them -- it may be that the forensic examination will
 5    cough up all of those records, and therefore they will be had,
 6    in which case it becomes a moot point.  But he knows what's on
 7    his computer.  I don't.  I don't know what's going to come out
 8    of the forensic exam, whether that's going to provide the --
 9    any communications.  My recollection is—correct me if I am
10    wrong, Ms. Benintendi—he has not produced a single
11    communication relative to his financial condition or --
12              MS. BENINTENDI:  Correct.
13              THE COURT:  -- relative to the efforts that he was
14    allegedly making to collect money to pay off -- to pay the
15    settlement with Benthos, let alone the full judgment.
16              MS. BENINTENDI:  That is correct, your Honor.
17              THE COURT:  Okay.  So not a single communication.
18              MS. BENINTENDI:  Correct.
19              MR. ETRA:  Your Honor, may I speak to that?
20              THE COURT:  You may.
21              MR. ETRA:  The one communication that has been in the
22    hands of Mr. Popofsky and team and the Court is the one
23    communication on that.  That's from Mel Dussel, who was the
24    person who is leaving, but I hope will be a realized settlement
25    effort and to raise funds.  So that is not true there is no
```

N8t2BenC

1    communications.  That communication was given several years ago

2    when the first attempt to reach a settlement took place.

3    That's the only communication, and that's the communication

4    that's been on the record.  So that's not been held back in any

5    way.

6         THE COURT:  That letter, the letter from -- it was a

7    letter or e-mail from --

8         MR. ETRA:  It's a letter from Mr. Mel Dussel to the

9    Court indicating that they are making efforts to pay the

10   settlement which was agreed and it has been agreed.  And the

11   one bright spot in this matter is that we believe that that

12   settlement, raising the funds for that settlement, is

13   proceeding actively, not as actively as it could have if I were

14   out to assist it.

15        THE COURT:  What's being done?

16        MR. ETRA:  It's raising the $1,000,750, your Honor.

17        THE COURT:  How?  What is being done?

18        MR. ETRA:  Mel Dussel is in charge of it.  He is doing

19   it. I --

20        THE COURT:  How do you know this is underway?

21        MR. ETRA:  I know it is underway.  It is something

22   that has --

23        THE COURT:  How do you know it is under way, Mr. Etra?

24        MR. ETRA:  I get that information not in any

25   communications to me, but I think it's been communicated to my

N8t2BenC

1  POA.

2          THE COURT:  So Mr. Sklar has told you that money is

3  being collected?

4          MR. ETRA:  Yes.

5          THE COURT:  And he's done that by phone, right?

6          MR. ETRA:  Yes.

7          THE COURT:  So if your telephone records were pulled

8  from the MDC --

9          MR. ETRA:  Yes.

10          THE COURT:  -- benthos would know --

11          MR. ETRA:  Yes.

12          THE COURT:  -- what efforts are being made to collect

13  the money.

14          MR. ETRA:  Yes.

15          THE COURT:  Okay.

16          MR. ETRA:  The other point, your Honor, in respect of

17  my medical situation, I believe the New York Eye and Ear has

18  the diagnosis of glaucoma and macular degeneration.  It's not

19  myopia or long-distance eyesight.  I am losing my sight.  I

20  have lost my sight in my left eye significantly, and it may be

21  translating to my right eye.  So this is not a myopia or

22  long-distance problem.  It's a loss of eyesight problem.

23          As well, I am not getting to the hospital in time for

24  the appointments, which they are very unhappy about.  I am also

25  having delivery problems with the eyedrops which need to treat

N8t2BenC

1    it.

2          In respect of other aspects of my health, the medical

3    director of the facility continually tells me that I am not in

4    a position to receive things that I should be receiving, such

5    as, blood testing and -- because of my low white blood cell

6    count, skin tracing in respect of the melanomas, medical

7    podiatry.  So it's not something that I am just sitting and not

8    dealing with major, major life-threatening conditions.

9          THE COURT:  All of which would argue in favor of you

10   moving quickly with things that you need to produce.

11         MR. ETRA:  As Mr. McGuinness has indicated, I have

12   made every effort.  My POA has made every effort.  So the good

13   faith that you required, the evidence, the documentary evidence

14   that you have required have been provided.

15         There seems to be no realistic reason to keep me

16   incarcerated, because I cannot help -- you mentioned, in

17   respect of the forensic report, if I were out and Mr. Sklar

18   could sit with me outside of jail, this could be done far more

19   quickly.  So we are actually counterproductive in keeping me

20   incarcerated from a compliance point of view.

21         We are also putting me at life-threatening risk every

22   day.  You may know Brooklyn MDC, but you do not know the

23   current thing, situation there.  I invite you to check that

24   more closely as to the fact of how much we are locked down, how

25   much the situation has become more and more difficult.

N8t2BenC

```
 1              One warden has left.  The next warden who has just

 2     arrived is only there a couple of months and says that he can

 3     do nothing.

 4              To keep an 82-year-old person in a life-threatening

 5     position in respect of already doing the compliance that I have

 6     done, and Mr. McGuinness has helped tremendously on and

 7     Mr. Sklar has voluntarily tremendously helped on, it seems to

 8     me is something that raises tremendous questions as to -- and

 9     as far as whether I am hiding money, I wouldn't spend eight

10     months in jail if I had money to myself buy the settlement.

11     That completely doesn't make sense.

12              So I'm saying both due to compliance and to save my

13     life, I should be released long since.  Again, it just doesn't

14     seem to help either Benthos certainly, because Benthos, I

15     think, by this time realizes that the funds are not going to

16     come from me, because I have none, as Mr. McGuinness has

17     indicated, but will come in a settlement which Mr. Popofsky has

18     been dealing with Mr. Dussel on.

19              So both in respect of accelerating that effort, which

20     I could help on if I were out and I cannot if I'm in, and the

21     compliance that your Honor has requested, I can do far better

22     out than in.  So there is no real reason for keeping me beyond

23     these eight and a half months that I have been incarcerated,

24     which completely astounds my fellow inmates and the institution

25     where I am in, where I am the only civil person in a criminal
```

N8t2BenC

1    facility, and can do nothing in respect of dealing with

2    matters.

3         I just, to give you an example, speaking to a fellow

4    inmate who hasn't been able to deal with their discovery for

5    two months there, and they have no eyesight problem.  With my

6    eyesight problem, I couldn't deal with it even if we were

7    permitted to deal with it.

8         So I respectfully request, your Honor, to consider

9    these factors when you leave me incarcerated where I cannot

10   help on compliance as I should, and where my life is literally

11   threatened, whether it is by loss of eyesight, whether it is

12   leukemia, from which my mother died, and the condition that I

13   have with my blood cells, or melanomas which I have on my skin.

14   So there is great risk to me, and I'm sure your Honor would not

15   want that to deteriorate further.

16        So Mr. McGuinness had made the suggestion of home

17   confinement.  I hope that the settlement will happen even

18   before that, before any of the dates that we have been talking

19   about today.  I sincerely hope so.  I would love to be able to

20   work more actively on it outside, which I cannot do inside.

21        So I really respectfully request your Honor to

22   consider those factors when you still keep me incarcerated

23   after all the efforts that have been made to comply and the

24   desire on my part and my POA's part to fully comply with those

25   valid requests, and those requests and the procedures.

N8t2BenC

1      So please, your Honor, please consider that, rather

2  than just let me be unproductive in Brooklyn MDC.

3      THE COURT:  I have considered all of that.  Your

4  request for release is denied.

5      Mr. Etra said that Mr. Dussel and Mr. Popofsky are in

6  contact over the settlement.  Is that -- have you heard that,

7  Ms. Benintendi?

8      MS. BENINTENDI:  My understanding is Mr. Popofsky has

9  not heard from Mr. Dussel in many months, that the settlement

10  is essentially at a standstill.

11      THE COURT:  Okay.

12      Mr. McGuinness.

13      MR. McGUINNESS:  On a separate issue, your Honor, I

14  would just ask the Court for some clarification on the

15  privilege issue, which the Court ruled on.  My understanding is

16  that Mr. Etra is permitted to identify specific communications

17  or documents and submit them to the Court *ex parte* under seal

18  for a ruling.  And your Honor, I just wanted clarity if there

19  is any sort of immunity that is attaching to that or if he is

20  making himself vulnerable by seeking to assert his Fifth

21  Amendment?

22      THE COURT:  I thought we had already dealt with the

23  Fifth Amendment privilege on this.  These are preexisting

24  documents.

25      MR. McGUINNESS:  Yes, your Honor, but you said --

N8t2BenC

1          THE COURT:  He is entitled -- to the extent he was

2     really operating as an attorney and there are really privileged

3     materials on the laptop, those are legitimately privileged and

4     they will not be produced to Benthos.  I'm not sure there is

5     going to be much of that, but maybe there will be.

6          MR. McGUINNESS:  As to the testimonial aspects that he

7     would be asserting the Fifth Amendment, though, my

8     understanding is that he has to give them to the Court to rule

9     if he can assert his Fifth Amendment rights, but I just want to

10     be clear that he is under no immunity there.

11          THE COURT:  He is not.

12          MR. McGUINNESS:  He is putting himself at risk when he

13     does that.

14          THE COURT:  Well, I mean, in the same way that anybody

15     who has materials that are subject to a subpoena or a court

16     order are at risk.  But this is not -- I am pretty sure we went

17     through all of this.  I feel like there was a very lengthy

18     opinion on what is privileged and what he can assert active

19     production to and what he cannot.  If there is a disagreement

20     on that, again, he can take an appeal.

21          MR. McGUINNESS:  Okay.  Thank you.

22          THE COURT:  Okay?  I don't know what other advice to

23     give you on that.

24          MR. McGUINNESS:  No, your Honor.  That is the

25     clarification I was looking for.  Thank you.

N8t2BenC

1          THE COURT:  Anything further from Benthos?

2          MS. BENINTENDI:  No, your Honor.

3          THE COURT:  Anything further from you, Mr. Etra?

4          MR. ETRA:  No, thank you, your Honor.

5          Again, I'm sorry to hear your denial of my release at

6      this point in time.  I understand that you had indicated the

7      last time, and I believe you still have that opinion, that if

8      the parties do reach the settlement──and I think the

9      communications between Mr. Dussel and Mr. Popofsky are much

10     more recent than has been just indicated──if they reach their

11     settlement, that will deal with what we are about.

12         THE COURT:  If they reach a settlement and money

13     passes and it clears, that would be what is going to lead

14     Benthos to say, We want to dismiss this, not Dussel's telling

15     Popofsky, We have got a deal.  Ya'll did that before, remember?

16     You shook hands on a deal, and then you didn't deliver.

17         Mr. McGuinness.

18         MR. McGUINNESS:  Subject to the approval of the

19     marshals, would your Honor allow myself to meet with Mr. Etra

20     and Mr. Sklar either in the courtroom or the witness room after

21     this proceeding?

22         THE COURT:  How about over in the marshals area?

23         THE MARSHAL:  That's usually the best procedure, the

24     usual procedure.

25         MR. McGUINNESS:  I don't know if Mr. Sklar would be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N8t2BenC

1    permitted to come in.

2              THE MARSHAL:  I would have to find out, ma'am.

3              THE COURT:  I'm ordering you to allow Mr. Sklar to

4    come in.  Okay?

5              THE MARSHAL:  Yes, ma'am.

6              THE COURT:  Do you need it in writing?

7              THE MARSHAL:  I'm sure we can make it work.  I will

8    call your deputy if --

9              THE COURT:  You've got a witness between the two of

10   you.

11             THE MARSHAL:  Yes, ma'am.  We will make it happen.

12             THE COURT:  All right.  Thank you all.

13             MR. McGUINNESS:  Thank you.

14             MR. ETRA:  Thank you.

15                              oOo

16

17

18

19

20

21

22

23

24

25