UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
BENTHOS MASTER FUND, LTD.,                    :

               Petitioner,               :

 -against-                                                 :                    20 Civ. 3384 (VEC)

AARON ETRA,                                              :

               Respondent,              :
-------------------------------------------------------------x

**Motion for Release From Custody**

Daniel McGuinness
Law Office of Daniel A. McGuiness, P.C.
353 Lexington Ave, Suite 900
New York, NY 10016
(646) 360-0436

Benjamin Silverman
Law Office of Benjamin Silverman
224 West 30th Street, Suite 302
New York, NY 10001
(212) 203-8074

*Attorneys for Aaron Etra*

## Table of Contents

Page

PRELIMINARY STATEMENT.................................................................................................... 1

PROCEDURAL BACKGROUND ............................................................................................... 2

APPLICABLE LAW .................................................................................................................... 8

    A.   Civil contempt orders must be coercive, not punitive. ...................................................... 8

    B.   Fifth Amendment Act of Production Privilege .................................................................. 9

ARGUMENT ............................................................................................................................... 10

    A.   It is readily apparent why Etra fears that responding to the remaining interrogatories could incriminate him. .........................................................................................................11

        1.   A list of all of his financial accounts from August 1, 2017 through August 2, 2022.... 14

        2.   Communications regarding his finances and Petitioner's judgment from August 13, 2020, through December 14, 2022 ................................................................................... 16

        3.   Complete and final escrow agreements for the 41 clients that have been identified "or credible, admissible evidence that he does have possession" of them ................................. 17

        4.   (A) An accounting of all funds he received from legal, paymaster, escrow-related and other services from August 1, 2017, to the present and (B) documents concerning his legal, paymaster, escrow-related or other services from August 1, 2017, through the present........ 19

    B.   Etra cannot be compelled to provide incriminating *in camera* testimony. ...................... 21

    C.   Etra cannot pay a fine. ..................................................................................................... 22

    D.   Incarceration is not coercing Etra. ................................................................................... 24

    E.   Etra asserts the Fifth Amendment as to the Aegis Capital document. ............................. 25

    F.   Etra's Children.. ............................................................................................................... 25

    G.   Etra's Health..................................................................................................................... 25

CONCLUSION............................................................................................................................ 27

Aaron Etra, by and through his undersigned counsel, submits this motion for his release from indefinite confinement at the MDC Brooklyn because the incarceratory sanction is no longer coercive.

## PRELIMINARY STATEMENT

Aaron Etra is indefinitely detained at MDC Brooklyn until he (1) complies with five outstanding interrogatories and discovery demands that all require testimonial responses (*see* Dkt. 371 at 2) and (2) pays a $145,718.49 fine (*see* Dkt. 372). He cannot comply with the discovery demands and interrogatories because he validly invokes his Fifth Amendment right to remain silent for readily apparent reasons discussed below. And he cannot pay the fine because he does not have money – a fact that the Court appears to acknowledge by noting that Etra has been evicted (8/29/23 Tr. at 30) and has a tax lien exceeding $130,000 (Dkt. 357-5).

Since he was put in jail on December 14, 2022, Etra has been successfully coerced to produce specifically identified documents whose existence was a foregone conclusion, as well as all other bank records gathered with help from his attorney in fact, Marc Sklar. *See* Dkts. 347, 348, 358. **That compliance occurred one-half year ago**; Etra signed letters to the banks in May 2023 and to the credit card companies in June 2023. *See, e.g.*, Dkts. 347-2, 347-7. Since that time, which was early this past summer, he has not been able to take any additional steps to comply with the contempt orders (Dkts. 260, 337, 371, 372) because he cannot be compelled to pay money he does not have or to perform incriminating testimonial acts. His compliance with other orders – for which compliance

is not required to purge his contempt and gain release from jail – does not demonstrate ability or willingness to respond to the five outstanding interrogatories the Court orders him to answer to purge his contempt, all of which require testimony that may incriminate him.

At last Thursday's conference, counsel for Benthos Master Fund Ltd. (Benthos) stated that Benthos would settle this civil lawsuit for an "embarrassingly small" amount. Thus, if Etra had any money, this entire lawsuit would be over. He does not. He only has testimony that he cannot be coerced to provide. Benthos has his laptop and other devices, but Etra cannot be detained to coerce him to curate those materials when he has readily apparent reasons to believe that doing so would incriminate him. The sanctions have lost coercive effect and he must be released.

## PROCEDURAL BACKGROUND

We recognize that the Court is familiar with the facts of this case and therefore only highlight certain important elements in the chronology.

1.      Aaron Etra was *pro se* until the day he entered in the MDC almost one year ago on December 14, 2020. Prior to that date, the Federal Defenders had twice been appointed to represent him briefly at court conferences, including one day when he was detained for several hours in the Marshal's custody at the courthouse; but the limited appointments were not continuous until after Etra entered the MDC. For most of the time that this case was pending – from April 2020 through December 2022 – Aaron Etra proceeded *pro se*.

2.      On December 20, 2022, six days after Etra was sent to the MDC, the Court issued an order listing interrogatories and documents demands that he must address to purge his contempt, in addition to paying the fine now assessed at $145,718.49. Dkt. 260 at 18-26; Dkt. 372.

3.      Not long after Federal Defenders were relieved by the Second Circuit based on an undisclosed conflict,[1] Etra asserted the Fifth Amendment. *See* 3/28/23 Tr. at 3-4. When he asserted the privilege, Etra sat alone at counsel's table with his standby CJA counsel sitting in the courtroom's gallery. *See* 11/30/23 Tr. at 49. Briefing was delayed because the first CJA counsel appointed by this Court moved to withdraw. Mr. McGuinness then briefed the motion, Dkt. 330, which the Court decided on July 5, 2023, Dkt. 337. The July 5 Order reiterates ten interrogatories and document demands for Etra to address to purge his contempt. *See id.* at 24-34.

4.      Within weeks after the Court's July 5 ruling, Etra promptly complied with the non-testimonial portions of December 20 and July 5 Orders – meaning he complied with fully one half of the discovery demands listed in the Court's December 20 and July 5 Orders. *See* Dkts. 347, 348, 357. Mr. McGuinness and Mr. Sklar obtained and produced all the documents that were specifically identified in the Court's Orders – whose existence was therefore a foregone conclusion – and provided them to Benthos and the

---

[1] The Federal Defenders simultaneously moved to be relieved both before this Court and the Court of Appeals. *See Benthos v. Etra*, 23-19 (2d Cir. Mar. 9, 2023), DE 59, 60.

Court. *See id.* They also produced other bank records that were not specifically identified. *Id.*

Notably, all those materials submitted in late July and early August were gathered over the prior two months. Etra signed the letters written to his bank requesting that they release his records in May 2023. *E.g.*, Dkt. 347-2. He signed the letters written to his credit card companies in June 2023. *E.g.*, Dkt. 347-7. These were the most recent actions that he took to comply with the Court's orders, and they occurred approximately one-half year ago. We do not here dispute that incarceration may have motivated Etra to take those steps. But by the time that this motion is fully briefed, nearly six months will have passed since he wrote those letters. *See generally* Dkt. 347 (attaching all letters to banks and credit card companies). He has not been coerced to take any additional steps necessary to purge his contempt for nearly six months now – and maybe more than six months by the time this motion is decided – which is about half the time that he has been in jail.

5.    After Etra produced the documents whose existence was a foregone conclusion and complied with the non-testimonial discovery demands in the Court's December 20 and July 5 Orders, he moved again to be released from prison on July 29, 2023. Dkt. 345. He cited his compliance and argued that he has a Fifth Amendment right not to answer the testimonial interrogatories. *Id.* at 2-7. He also implored that he cannot pay the fine. *Id.* at 5-6. The Court denied his motion both orally and in written orders on August 29, 2023. Dkts. 371, 372.

The first written August 29 Order confirmed the five outstanding interrogatories that Etra must address to purge his contempt. *See* Dkt. 371 at 2. Those outstanding

4

interrogatories would trace the money that Benthos and the Court believe Etra stole by requiring him to use the contents of his mind to identify and produce:

1. A list of all his financial accounts from August 1, 2017 through August 2, 2022;

2. Communications regarding his finances and Benthos' judgment from August 13, 2020, through December 14, 2022;

3. An accounting of all funds he received from legal, paymaster, escrow-related and other services from August 1, 2017, to the present;

4. Documents concerning his legal, paymaster, escrow-related or other services from August 1, 2017, through the present; and

5. Complete and final escrow agreements for the 41 clients that have been identified.

*Id.* Thus, accepting *arguendo* the premise that Etra stole Benthos' money – which the Court believes[2] but which Etra vehemently denies – the remaining interrogatories would roadmap a money laundering prosecution by tracing the stolen asset's movements.

The second August 29 Order addressed the fine Etra must pay to purge his contempt, opining that "one way that Etra could provide evidence (beyond his own say-so) of inability to pay $145,718.49 to cure his contempt would be for him to produce credit reports from Experian, TransUnion, and Equifax reflecting his past and current accounts so Petitioner and the Court can confirm that he has, in fact, produced records from all of the financial institutions in which he holds or held funds." Dkt. 372 at 2. Last week, he provided his credit report to Benthos and the Court. 11/30/23 Tr. at 52-53.

---

[2] At the July 13, 2022 conference, the Court stated that Etra is a "grifter" and told Benthos' counsel, "He stole your money and he's not giving it back." Dkt. 148 (7/13/22 Tr.) at 8-9.

Last months, the Court repeated to Etra that he stole money "whether it was out of escrow or not." 11/16/23 Tr. at 41

5.      Etra filed a notice of appeal on September 18, 2023, resulting in Second

Circuit docket number 23-1826 (the Contempt Appeal), because he could not further

comply with the Court's Order: he does not have money to pay the fine and he cannot be

compelled to incriminate himself.[3] Counsel filed a motion in the Second Circuit to

resolve the Contempt Appeal within 30 days under 28 U.S.C. § 1826(b), which the

Second Circuit effectively denied. *See* Motion Affidavit, *Benthos v. Etra*, 23-1826 (2d

Cir. Oct. 9, 2023), DE[4] 26-2; *id.*, DE 39 (order "granting" motion without providing

requested relief).

Benthos stated that it would not participate in the Contempt Appeal: it did not

submit a brief or appear at oral argument to defend the Court's civil contempt Orders.

Benthos has ridiculed Etra's claim that he did not participate in the underlying arbitration

because he was "financially unable," implying that Etra did not participate because he did

not have a defense. But Benthos then claimed that it was financially unable to defend the

incarceratory contempt sanction before the Second Circuit, *see id.* DE 49, even while it

undertakes expensive forensic work on Etra's laptop. Last week, Benthos' counsel raised

his voice repeatedly at the status conference, appearing to try to preempt discussion of the

Fifth Amendment issues that Benthos declined to address in response to our Second

---

[3] When he was still *pro se*, Etra commenced several appeals that the undersigned
voluntarily withdrew, with Etra's consent, shortly after appointment by the Second
Circuit because they were improvidently commenced by a *pro se* party.

[4] "DE" refers to docket entries on Etra's Contempt Appeal, No. 23-1826 in the
Second Circuit, while "Dkt." refer to entries on this Court's docket sheet.

Circuit brief, and which now fall back to this Court to consider again on remand with this motion.

In short, after forcefully seeking an extraordinary sanction in this Court – indefinite incarceration of an octogenarian adversary – Benthos told the Court of Appeals that it would not defend the Court's ruling. *Id.*, DE 49. While Aaron Etra sat in jail pending the appeal that Benthos did not contest, counsel again moved for his release (*id.*, DE 51), and the Second Circuit then scheduled oral argument on less than 24 hours' notice.

It goes without saying that if Benthos believed that continued incarceration would coerce Etra, it would have invested resources to defend that sanction before the Court of Appeals.

6.      The Court of Appeals resolved the Contempt Appeal by bottom line, non-precedential ruling one business day after argument, *id.*, DE 74. Notably, Etra's application to be released pending appeal was "denied without prejudice to his moving for release in the district court as part of the proceedings on remand." *Id.*

The remand order instructed the Court to "proceed as expeditiously as possible and . . . within seven business days hereof, hold a hearing to consider" whether the incarceratory sanction continues to be coercive. *Id.*

7.      Simultaneous to this contempt litigation, Etra has complied with certain other orders concerning the forensic search of his devices and online accounts; and no incarceration has been necessary to coerce this compliance. *See* Dkt. 417 at 2. As a result, Benthos now has all relevant information in Etra's possession, custody, or control (*see*

7

11/16/23 Tr. at 23), and what is left is the Court's requirement that Etra curate these documents, *i.e.*, that he engage in testimonial acts by using the contents of his mind to identify and organize the files.

## APPLICABLE LAW

Two bodies of law are relevant to this motion – the law concerning civil contempt sanctions and their limits, and case law concerning the Fifth Amendment. Each are addressed in turn below.

### A. Civil contempt orders must be coercive, not punitive.

"[A] sanction imposed on a party held in civil contempt generally may serve either or both of two purposes: to coerce the contemnor into complying in the future with the court's order, or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.*, 673 F.2d 53, 56-57 (2d Cir. 1982). Civil contempt sanctions may be coercive or compensatory, or both, but they "may not be imposed as a purely punitive measure." *Paramedics Electromedicina Com., Ltda v. GE Med. Sys.*, 369 F.3d 645, 657 (2d Cir. 2004).[5]

"The primary purpose of the imposition of a sanction for civil contempt is to coerce the contemnor into future compliance and to remedy past non-compliance, rather

---

[5] Criminal contempt sanctions, by contrast, "are intended to punish a contemnor or to vindicate a court's authority." *In re Stockbridge Funding Corp.*, 158 B.R. 914, 917 (S.D.N.Y. 1993). The district court denied without prejudice Benthos' motion to hold Etra in criminal contempt. S.A. 1.

than to punish him." *Matter of Dickinson*, 763 F.2d 84, 87 (2d Cir. 1985) (citing *Shillitani v. United States*, 384 U.S. 364, 370 (1966)). Since "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed," *Jackson v. Indiana*, 406 U.S. 715, 738 (1972), once a contemnor establishes that there is no "substantial likelihood" that continued confinement would accomplish its coercive purpose, the confinement becomes punitive in nature, at which point due process requires its termination. *Soobzokov v. CBS, Inc.*, 642 F.2d 28, 31 (2d Cir. 1981).

Thus, "[t]he paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command such as an order to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance." *Bagwell*, 512 U.S. at 828 (citation and quotation marks omitted). The phrase "indefinitely until he complies," however, is not as absolute as the use of the term "indefinitely" might suggest. A contemnor can, for example, secure his freedom, without complying, if he demonstrates that there is "**no willful disobedience but only an incapacity to comply**." *Maggio*, 333 U.S. at 74 (emphasis added).

### B. Fifth Amendment Act of Production Privilege

The Court has already set forth the law concerning Fifth Amendment privilege in its July 5 Order (Dkt. 337) and we therefore highlight only the most critical points. The Fifth Amendment provides that "[n]o person . . . shall be [c]ompelled in any criminal case to be a [w]itness against himself." U.S. Const. Amend. V. It should be given liberal

9

construction in favor of the right it was intended to secure. *See Hoffman v. United* States, 341 U.S. 479, 486 (1951). The privilege is available to the innocent the same as the guilty. *Ohio v. Reiner*, 532 U.S. 17, 21 (2001).

An act or communication qualifies for the Fifth Amendment privilege if it is (1) testimonial; (2) incriminating; and (3) compelled. *United States v. Hubbell*, 530 U.S. 27, 34-38 (2000). While no privilege can be asserted over a document whose existence at a subpoenaed location is a "foregone conclusion," if the subpoenaed party is forced to use the "contents of his own mind" to identify the existence of the document, then the act of production may be testimonial. *Hubbell*, 530 U.S. at 43. The privilege may be invoked when reasons for doing so are "readily apparent" even if the chance of prosecution is only "**slight**." *United States v. Miranti*, 253 F.2d 135, 139 (2d Cir. 1958) (emphasis added); *see also United States v. Edgerton*, 734 F.2d 913, 919 (2d Cir. 1984). "To sustain the privilege, it need only be evidence from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman*, 341 U.S. at 486.

## ARGUMENT

The indefinite civil confinement sanction imposed on Aaron Etra on December 14, 2022, is no longer coercive because Etra – at this point – evinces "no willful disobedience[,] but only an incapacity to comply." *Maggio*, 333 U.S. at 74. He cannot be compelled to testify against himself and therefore cannot answer the remaining five

interrogatories listed in the August 29 Order at Dkt. 371. And he has demonstrated that he has no money to pay the fine. That is why he has not been able to comply with any of the interrogatories and monetary obligations in the Court's August 29, 2023 Orders (Dkts. 371, 372) and he has not been able to comply with any of the remaining requirements to purge his contempt since he requested documents from his banks and credit card companies in May and June 2023 (*see* Dkt. 347), leading Mr. Sklar to make the most recent, and final, relevant production four months ago on August 8, 2023 (Dkt. 357).

### A.    It is readily apparent why Etra fears that responding to the remaining interrogatories could incriminate him.

On the facts and circumstances in this case, it is readily apparent why there is at least a "slight" possibility that the compelled testimony could be a "link in the chain" to prosecute Etra for crimes. *Miranti*, 253 F.2d at 139. Indeed, as we argued in court last Thursday, it would be irresponsible for counsel to let Etra do anything other than remain silent concerning the outstanding five interrogatories.

First, Benthos has argued for years that Etra is a criminal who stole money he held for it in escrow, and that he is trying to hide it by refusing to respond to discovery. In a letter filed on ECF, Benthos wrote that Etra was "**an integral part of the criminal conspiracy**" who may be "**indicted and eventually jailed**." Dkt. 24-9 at 2 (emphasis added). Benthos later wrote to the Court that Etra is "**likely a career criminal**." Dkt. 309 (emphasis added). This language goes beyond posturing: we understand that Benthos – the adversary who propounded the initial discovery requests to trace our client's assets –

believes that our client stole those assets and should go to jail for it. Etra therefore understands that the testimony he is being compelled to provide would, through Benthos' eyes, be evidence of criminal wrongdoing.

Second, the Court apparently agrees with Benthos that Etra is a criminal. In July 2022, the Court told Benthos' counsel on the record that Etra is "**a grifter**" who "**stole your money and he's not giving it back**." Dkt. 148 at 8 (emphasis added). More recently, it told Mr. Etra, "one of the obligations of lawyers is not to steal from escrow." 11/16/23 Tr. at 41. Mr. Etra responded, "I have not stolen from escrow . . . ." and the Court then revised its statement: "[w]hether it was out of escrow or not." *Id.* Moving stolen funds is punishable under 18 U.S.C. §§ 1956, 1957.

As a result, the Court referred Etra to the U.S. Attorney's Office, advising federal prosecutors that they "might want to look into" Etra. Dkt. 337 at 4. In total, three federal judges assessing the Benthos transaction and Etra's responses to discovery requests in this case have stated either that Etra is a criminal or that he should be criminally investigated. In March 2022, Magistrate Judge Parker recommended referring Etra to the U.S. Attorney's Office. Dkt. 95 at 34. Two years before that, the Honorable Deborah A. Batts advised Etra to "pack your toothbrush." Dkt. 214 at 66. And this Court has referred him to the Southern District of New York's United States Attorney's at least as of July 5, 2023. Dkt. 337 at 4. That three federal judges have stated on the record that Etra either is a criminal or should be investigated by criminal authorities – for conduct related either to the Benthos transaction or his response to Benthos' discovery demands attempting to trace the missing money – further supports Etra's readily apparent reasons for remaining

silent.

Third, the Court has opined extensively that Etra is a perjurer and a liar, Dkt. 280 at 3, and wrote that he falsely represented things as a pattern, *id.* at 14 (stating that Etra has "a documented patter of making false statements to the Court"); *see also* Dkt. 337 at 11. Indeed, the Court feels so strongly that Etra is a liar and a perjurer that, at last Thursday's conference when counsel made a *pro forma* denial that our client is a perjurer, the Court was moved to interject and state, "I caught Mr. Etra in multiple baldfaced lies." 11/30/23 Tr. at 47-48. **There is only one course that counsel can advise a man in Etra's position who is accused of stealing millions of dollars, laundering it, and then serially lying to a judge: stop talking and remain silent.**

Fourth, at the November 30, 2023 conference, Benthos raised a document it says it found on Etra's laptop that looks like an application submitted by Etra to Aegis Capital Corp. claiming a $500,000 liquid net worth. *See* 11/30/23 Tr. at 14. The Court stated that if there was or is an account at Aegis Capital Corp., then "there is no question in my mind I am going to ask the U.S. Attorney's Office to bring criminal contempt charges against Mr. Etra." *Id.* The Court added, "He either was telling them the truth that he has a net worth of $1.2 million and a liquid net worth of $500,000, or he lied repeatedly to me about where his money was. **So one of them is a lie.**" *Id.* (emphasis added). In other words, the very existence of this document is incriminating; its existence was not previously known, much less a foregone conclusion; and asking Etra to use the contents of his mind to identify either this document or others like it would coerce a self-incriminating testimonial act.

Fifth, the Court has speculated that Etra hides money – presumably referring to the money it believes Etra stole from Benthos. On November 16, 2023, the Court opined that it "always assumed that there was a reason why [Etra] was resisting complying with those orders to turnover communications about his finances and the collection of the judgment. Being a suspicious sort, I assume the reason is that he was being resistant was because there were other pools of money somewhere that he was trying to protect, but I don't know." *Id.* at 27-28. **Tracing stolen funds would reveal violations of § 1956 and § 1957 each time the money was transferred.**

A closer examination of the five categories of information that the Court compels Etra to address with testimonial responses to purge his contempt buttresses the conclusion that Etra has every reason to fear that the compelled testimony could be incriminating.

### 1.    A list of all of his financial accounts from August 1, 2017 through August 2, 2022[6]

This interrogatory would trace Etra's assets – including the $5 million that Benthos and the Court believe he stole. Moving stolen assets is criminally punishable under 18 U.S.C. § 1957, and under some circumstances under 18 U.S.C. § 1956(a)(1). It is therefore readily apparent why Etra's response to this interrogatory could create at least a "slight" possibility of contributing a "link in the chain of evidence" to build a criminal case against him. *Miranti*, 253 F.2d at 139; *Hoffman*, 341 U.S. at 486-87.

---

[6] Dkt. 260 at 26-27; Dkt. 337 at 33-34; Dkt. 371 at 2.

The Court's comments at the November 30, 2023 status conference illustrated another important reason why identifying these documents could incriminate Etra. Benthos raised one application to Aegis Capital Corp., and the Court stated that the document indicated one way or another that Etra is guilty of a crime: he either lied to the Court about his assets, in which case the Court stated "there is no question in my mind I am going to ask the U.S. Attorney's Office to bring criminal contempt charges," or he lied to Aegis, committing bank fraud and wire fraud, among other crimes prosecutable in both federal and state courts. *See* 11/30/23 Tr. at 14. This colloquy vividly illustrates why Etra has not and cannot comply with the interrogatory for him to identify "all of his financial accounts." Doing so, based on the Court's view of Etra and his activities, very well could provide links in the chain of evidence to indict him – or even cornerstones for prosecutions. His reasons for remaining silent are readily apparent.

The Court's July 5 Order acknowledges that "a list of accounts controlled by [Etra] surrounding **the** 2018 theft of Petitioner's funds could lead to incriminating evidence if the heretofore-undisclosed accounts were used as part **the** scheme to steal Benthos' funds." Dkt. 337 at 34 (emphasis added). Last Thursday, by raising the Aegis document, Benthos appeared to argue that there were in fact undisclosed accounts, and the Court and Benthos believe that Etra stole over $4 million. He is not required explicitly to admit guilt of a crime – either *in camera* or otherwise – before he can remain silent.[7]

---

[7] For the avoidance of doubt, Etra continues to vehemently deny wrongdoing. A man like Etra who is caught in "ambiguous circumstances" may invoke the Fifth

The Court acknowledged that "[c]ompliance with this portion of the Court Order would be testimonial," as Etra must himself identify the financial accounts if they are not already known. Dkt. 337 at 33-34. It thus therefore compelling incriminating testimony.

### 2.    Communications regarding his finances and Petitioner's judgment from August 13, 2020, through December 14, 2022[8]

The Court next requires Etra to use the "contents of his mind," *Hubbell* 530 U.S. at 43, to identify and produce communications regarding his finances and Benthos' judgment against him. As to the former, it is readily apparent why Etra fears his answers could incriminate him for the same reasons discussed under the previous subheading: until November 30, 2023, he was being asked to identify the Aegis Corp. document that the Court views as incriminating one way or another. Others like it would be revealed if Etra used the contents of his mind to identify all "communications about his finances." There is circumstantial evidence in the record that he continues to be required to identify other financial documents, like the Aegis document, and related communications that would pose similar risks to him as the Aegis document does.

As to the latter requirement – communications about Benthos' judgment – the only relevant reason why Benthos might require Etra to produce those communications is if it believes Etra fraudulently conveyed, laundered, or otherwise took improper steps to

---

Amendment even when innocent of criminal wrongdoing. *Ohio v. Reiner*, 532 U.S. 17, 21 (2001).

[8] Dkt. 260 at 25; Dkt. 337 at 31-32; Dkt. 371 at 2.

evade that judgment by transferring money, including the money that Benthos and the Court believe Etra stole. Given the underlying allegations of criminal conduct – which the Court has accepted as true, as indicated by its multiple statements on the record accusing Etra of stealing – as well as the federal money laundering statutes, it is readily apparent why Etra believes that it would be incriminating to identify those documents about which Benthos, the Court, and the U.S. Attorney's Office do not already know.

The Court has again acknowledged that the responses it compels Etra to provide to this discovery demand to purge his contempt "would be testimonial." Dkt. 337 at 31-32. Because it is readily apparent why Etra believes this compelled testimony would incriminate him, he must be permitted to remain silent.

### 3. Complete and final escrow agreements for the 41 clients that have been identified "or credible, admissible evidence that he does have possession" of them.[9]

Similar concerns apply to the escrow agreements for 41 identified clients. First, Etra already told the Court that these escrow agreements were "destroyed," Dkt. 337 at 31-32, and the Court disbelieved that testimony, *id.* at 31. As a result, the Court requires that Etra provide "credible, admissible evidence of that fact," *i.e.*, testimony about the substance of what the Court believes were false sworn statements. Dkt. 260 at 23-24. Thus, the act of producing any escrow agreements that Etra swore did not exist in his possession would be testimonial in nature, as would of course the testimony he would

---

[9] Dkt. 260 at 23-24; Dkt. 337 at 30-31; Dkt. 371 at 2.

have to provide to establish that they were "destroyed" – as he previously swore in testimony that the Court has explicitly accused him of fabricating, Dkt. 337 at 30-31.

It could not be more apparent why this compelled testimony could incriminate Etra. Even a grand jury investigation cannot go this far to compel a target. The Court thinks Etra lied to it, but requires him to testify to either admit that he lied in sworn statements or to dig his hole deeper by doubling down on the lie. At this point, he has a right to stop talking and remain silent.

The Court opined in the July 5 Order that it is already evidentiarily established that Etra lied about destroying or losing the escrow agreements. Dkt. 337 at 30-31. But assuming *arguendo* that Etra is proved to have made false, sworn statements and engaged in conduct that might lead to criminal contempt charges, he cannot then be compelled to create more evidence to convict him of those crimes through his own testimony. There is no principle or precedent holding that the Fifth Amendment is waived when there is already pre-existing, overwhelming evidence of the criminal conduct. Even when it is proved that someone has committed a crime – and Etra denies that he has – it is still improper to compel that person to create more evidence through their own testimony.

Based on its own independent investigation, counsel is aware of substantial other reasons why producing these escrow agreements could incriminate Etra; and we further note that Benthos describes him as "likely a career criminal" and "an integral part of the criminal conspiracy," Dkt. 24-9 at 2; Dkt. 309. But his reasons for remaining silent are already readily apparent based on what we have described and nothing more need be acknowledged or disclosed.

18

4.    **(A) An accounting of all funds he received from legal, paymaster, escrow-related and other services from August 1, 2017, to the present and (B) documents concerning his legal, paymaster, escrow-related or other services from August 1, 2017, through the present.**[10]

The testimonial accounting of Etra's professional income would identify accounts and payments that would, in turn, reveal other accounts and financial documents (like the Aegis document) that cannot easily be explained (from Etra's perspective), or cannot be explained innocently (from Benthos' and possibly others' perspectives).

In addition, a purpose of these two separate interrogatories is to determine whether Etra has had income in recent years to support his spending; an absence of other income would be circumstantial evidence that he supported himself with money that he stole from Benthos. Benthos has emphasized Etra's American Express credit card statements, which it argues reveal lavish spending, a characterization that the Court has concurred in. *See* Dkt. 280 at 3. In this context, it is readily apparent how his responses could be incriminating – as viewed through the lens of the referral that the Court made to the U.S. Attorney's Office suggesting that they "look into" whether Etra stole $5 million from Benthos. *Hoffman*, 341 U.S. at 486-87 ("To sustain the privilege, it need only be evidence from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or explanation of why it cannot be answered might be dangerous because injurious disclosure could result.").

Further, as described above, the Court has accused Etra of lying in sworn statements when he said that he no longer has certain escrow agreements. Testimony in

_____

[10] Dkt. 260 at 23, 26; Dkt. 337 at 32-33; Dkt. 371 at 2.

response to this interrogatory outlining the exact number of clients with whom Etra has escrow agreements could contribute to a perjury indictment.

Finally, counsel is aware of other meaningful reasons why Etra has good faith reasons to assert the Fifth Amendment as to this interrogatory; but the reasons already provided are clear on their face and readily apparent reasons to remain silent. An inventory – or roadmap – of criminal exposure is not required, either *in camera* or via attorney proffer, before a target is permitted to remain silent.

The Court has again acknowledged that Etra's response to its demand for "documents concerning the legal, paymaster, escrow-related or other services Etra provided" would be "a testimonial act" – that is, compelled testimony. Dkt. 337 at 32-34. And an "accounting" is clearly a testimonial act as well. He must be permitted to remain silent.

***

As to each of these five categories of interrogatories and discovery demands, which all require testimonial responses, Etra has readily apparent reasons to invoke the Fifth Amendment. Etra cannot be compelled to say anything further after invoking his Fifth Amendment privilege under these circumstances. The Court has already ordered a complete forensic search of Etra's laptop and "online" accounts. Anything else it seeks is information from the contents of Etra's own mind that he cannot answer.

20

**B.  Etra cannot be compelled to provide incriminating *in camera* testimony.**

Etra should not be required to provide testimony – *in camera* or otherwise –

because his reasons for asserting the Fifth Amendment are clear on their face. The Second

Circuit has permitted *in camera* review only when the reason why the privilege was

invoked was not "clear on its face" or "readily apparent." *Edgerton*, 734 F.3d at 919;

*Estate of Fisher v. C.I.R.*, 905 F.2d 645, 650 (2d Cir. 1990). Based on "the implication of

the question, in the setting in which it is asked," *Edgerton*, 734 F.3d at 919, including in

an enforcement proceeding where everyone has accused Etra of committing perjury and

hiding stolen money; in which the specter of criminal contempt has been raised multiple

times; and where Etra has been referred to on the record as a "career criminal," a

"grifter," an "integral part of the criminal conspiracy," and a "bald face" liar; it is clear

why he believes further disclosing financial accounts, communications reflecting those

accounts, escrow agreements the Court thinks he lied in sworn statements about

destroying, and documents concerning Benthos' judgment could all "furnish a link in the

chain of evidence needed to prosecute the claimant for a federal crime." *Hoffman*, 341

U.S. at 486-87.

Etra is referred to the U.S. Attorney's Office and quite possibly the subject or

target of one or more grand jury investigations. Three federal judges, after reviewing

Etra's conduct in relation to Benthos, have either characterized him as a criminal or

recommended that law enforcement investigate him. He does not need to testify – *in

camera* or otherwise – as a prerequisite to remaining silent. Nor does his counsel need to

roadmap his exposure, on or off the record, when it is already readily apparent that the

answers to the interrogatories and discovery demands he is compelled to provide all pertain to tracing money that the Court believes Etra stole and laundered.

### C. Etra cannot pay a fine.

Etra has done everything he reasonably can – short of testifying against himself – to prove the negative and show that he cannot pay a fine. Etra is 82 years old, and the evidence of his penury is substantial. At the August 29, 2023 conference, the Court suggested that Etra will be homeless if he is released because he is so behind on his rent. 8/29/23 Tr. at 30. Etra owes over $130,000 to the IRS. Dkt. 357 ¶ 8 & Ex. E. The Court may take judicial notice of the legislative fact that Social Security checks generally are not mailed to people who are incarcerated.[11] Etra has provided the Court with copious bank statements illustrating that he lacks funds to pay. *See* Dkts. 347, 348, 357.

Three months ago, the Court ruled that Etra may demonstrate inability to pay the fine by providing credit reports, which would confirm whether he has already disclosed all his bank accounts. Dkt. 372 at 2. He has now done so. 11/30/23 Tr. at 52-53.

If Benthos can subpoena bank records, then it should do so. If a grand jury wants to do that, then it may or may not be able to do so as well. If the Court wants a criminal case established against Etra, then it should defer to the U.S. Attorney's Office and a properly empaneled grand jury. But keeping him in jail any longer over the fine is akin to

---

[11] https://faq.ssa.gov/en US/Topic/article/KA02549#:~:text=Can%20prisoners %20get%20Social%20Security,Security%20Income%20(SSI)%20payments%3F&text=B oth%20programs%20prohibit%20payments%20to,due%20to%20a%20criminal%20convi ction.

a debtor's prison; the Court cannot force him to pay what he does not have. And he has satisfied what the Court required in its August 29 Order (Dkt. 372) for him to demonstrate inability to pay.

Notably, Benthos does not contend that Etra has its money at his disposal in the United States. It rather argues that he transferred the money through Hong Kong and China to parts unknown, 11/30/23 Tr. at 6, and that he was part of a "conspiracy," Dkt. 24-9 at 2. Benthos' counsel does not appear familiar with criminal conspiracies; suffice it to say, if there were a conspiracy, which Etra adamantly denies, Etra would not then have all the money that Benthos placed in the escrow account. Benthos' theory appears to be that it can hold Etra as a hostage so that other people come up with money from overseas, which it describes as "Etra's" money. To try to coerce a settlement, it wrote to Etra that, "We understand that only when what you and your wife have sought to conceal is about to be revealed, and/or **only when you are on the verge of a longer period of incarceration, will [your colleague] come up with your money from overseas**." Dkt. 175-1. That was written in September 2022. *Id.* Etra has since endured that longer period of incarceration, and no money has been forthcoming. It is not coming. If anyone does have access to money somewhere, they obviously do not care about leaving Aaron Etra to die in jail. Keeping him in the MDC will not produce money for Benthos.

Benthos now knows that there is no money that will be paid to get Etra out of jail. That is why it did not defend the incarceratory sanction before the Second Circuit and instead focuses its resources on reviewing his laptop and devices. We do not have debtors' prisons in the United States and Etra cannot be detained to coerce him to pay

money that he does not have.

### D. Incarceration is not coercing Etra.

For the reasons above, the incarceratory sanction is not coercive now.

In an order dated November 30, 2023, the Court suggested that the sanctions are coercive because, in recent months, Etra "has apparently complied with the Court's orders regarding the forensic examination of his electronic devices, providing passwords and account information . . . ." Dkt. 417. These facts prove just the opposite point: Etra is not coerced by incarceration to comply with the forensic searches of his devices, yet he complies nonetheless.

Moreover, the question here is not whether Etra is complying with the search of his laptop and online accounts, which he is, but instead whether the incarceration is coercing him to comply with the five outstanding testimonial interrogatories and to pay the fine that he cannot afford to pay – *i.e.*, the requirements the Court imposed to purge his contempt. *See* Dkts. 260, 337, 371, 372. Etra's compliance with the Court's forensic search orders is laudatory and appropriate; it proves he does not need to be kept in jail to coerce compliance with routine discovery at this point; but it does not show that keeping him in jail will coerce him to testify against himself or pay money that he does not have, as he must to purge his contempt under the Orders at dockets 260, 337, and 371.

Indeed, Benthos has stated that it will settle this action – necessarily leading to Etra's release from prison – for an "embarrassingly small amount of money." 11/30/23 Tr. at 70. If he had the money, he could get out of more than just the fine. This is strong

evidence that he does not have the money to pay.

Thus, when Etra has said that he does not want to delay, as the Court's November 30 Order notes, he means that he wants to comply with the forensic laptop order, and to provide the password for his Gmail account and other online accounts, which he has done. He has never said that he wants to comply with the remaining testimonial interrogatories or that he can pay the fine. Those are the actions he needs to take to purge his contempt (Dkt. 371 at 2; Dkt. 372 at 2); he cannot be coerced to comply with those orders, nor should he be.

**E.  Etra asserts the Fifth Amendment as to the Aegis Capital document.**

For the reasons stated above, Etra asserts the Fifth Amendment concerning the Aegis Capital document produced by Benthos in Court on November 30. The Court indicated that the document incriminates Etra no matter how he explains it. 11/30/23 Tr. at 17.

**F.  Etra's Children.**

Aaron Etra acknowledges his third child, whose name was stated by Benthos at the last conference. Mr. Etra was never the custodial parent of this child, and has not seen this child in at least two years. He does not presently have contact information for this child, but will obtain it and disclose it.

**G.  Etra's Health**

We would be remiss if we did not raise again our concerns about Aaron Etra's frailty and his generally poor health. As officers of the Court, one of the undersigned can

attest that when I was substituted for the Federal Defenders, I was told that MDC personnel had called the Federal Defenders to urge them to file a "compassionate release" motion on Etra's behalf or any other application for bail or release; the MDC personnel stated, in substance, that "Etra does not belong here." That kind of phone call from BOP personnel is remarkable and all but unheard of, and it illustrates how much older and frailer Aaron Etra is than other prisoners. Older prisoners – those who do not receive some form of sentence reduction – often end up in federal medical facilities. Aaron Etra lives in an MDC cell that is bathroom that he shares with a randomly assigned younger man. Over the holidays, he is locked into that bathroom for days at a time with food pushed through a slat and trays piling up on the floor. The shared bathroom is cold. If Aaron gets infected while on lockdown for days in that cold, shared bathroom, as a weak and fail elder, he will be in serious jeopardy. Keeping him in jail is dangerous.

Given his health profile, the time he has spent in jail is especially punishing; and that means that the past six months during which he has not been coerced to do anything additional that is required to purge his contempt – *i.e.*, to respond to the five interrogatories or to pay the fine – have been a particularly long and painful period. They have not coerced him to do what he cannot do.

26

## CONCLUSION

For the foregoing reasons, the incarceratory sanction is no longer coercive and

Aaron Etra should be released from custody immediately.


Dated: New York, New York
     December 4, 2023            Respectfully submitted,

                                   /s/ Benjamin Silverman
                                   Daniel McGuinness
                                   Benjamin Silverman
                                   *Attorneys for Aaron Etra*