NBG4BENC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    -------------------------------x

3    BENTHOS MASTER FUND, LTD,

4                    Petitioner,

5             v.                              20 Civ. 3384 (VEC)

6    AARON ETRA,
                                             Conference
7
                    Respondent.
8
     -------------------------------x
9                                            New York, N.Y.
                                             November 16, 2023
10                                           11:05 a.m.

11   Before:

12                      HON. VALERIE E. CAPRONI,

13                                           District Judge

14                           APPEARANCES

15   KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
          Attorneys for Petitioner
16   BY:  STEVEN POPOFSKY

17
     AARON ETRA, Respondent Pro Se
18

19
     ALSO PRESENT:   Daniel McGuinness, Attorney for petitioner for
20                   limited purposes of civil contempt
                     Eleanor Taylor, Legal Assistant
21

22

23

24

25

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

NBG4BENC

```
1           (Case called)

2           MR. POPOFSKY:  Good morning, your Honor.  Steven

3   Popofsky, Kleinberg, Kaplan, Wolff & Cohen, P.C. for

4   petitioner, Benthos.  With me is my legal assistant,

5   Ms. Taylor.

6           THE COURT:  Good morning, Mr. Popofsky, and

7   Ms. Taylor.

8           MR. McGUINNESS:  For limited purposes, Daniel

9   McGuinness and Mr. Etra is seated to my right.  Good morning,

10  your Honor.

11          THE COURT:  Good morning, Mr. McGuinness, good morning

12  Mr. Etra.  You need to pull the microphone down so it's in

13  front of you, please.

14          OK.  We are here because the issue of the data that's

15  on the electronic devices that have now been handed off to the

16  expert are voluminous and they are kind of too voluminous to

17  deal with in paper copy.  First, Mr. McGuinness let me say do

18  not make any further copies unless Mr. Etra wants to pay for

19  it.  I cannot justify using CJA fund for this purpose.  Let's

20  go from there.

21          It seemed to me the letter that came in from Benthos a

22  couple days ago was an imminently reasonable proposal for how

23  to deal with this.

24          Mr. Etra, do you want to be heard on this?

25          MR. ETRA:  Your Honor, first of all, I'm under pain
```

NBG4BENC

and pressure when I'm out for this length of time, since

5:00 a.m. I'm under strict orders to limit my exposure to

light, and I'm having real problems in focusing on any medium

including print. That's my best hope for that. I'm advised

definitely not to look at things electronic, if at all

possible, and if I need to a very, very limited time. So I

have to function -- I've lost just about all my sight in my

left eye. If the intention is to completely blind me in both

eyes that's what is resuming if I'm kept in MDC because the

only light there is very harsh lights. It's the same light in

cells, same light in common areas. There is no place where I

could have soft light what has been recommended I could have

the best chance of focusing, which is why I've consistently

implored that I'm given that opportunity to be in a place out

of that facility, outside of those harsh lights.

I'm not trying to avoid. I'm not trying to delay. I

appreciate copies being made, which is again the only medium

that I really have a chance of focusing on in limited times and

limited quantities. I'm perfectly prepared to do that. I

haven't seen Mr. Popofsky -- Mr. McGuinness was good enough to

send to me. It came just when I came back from New York Eye

and Ear. I was cautioned to stay out of the lights since I've

been out several hours. So I haven't seen it, and I haven't

seen the exhibits, and I haven't focused on it.

My functioning is limited. Again, I implore your

NBG4BENC

1    Honor to let me be in a position where I can do compliance,

2    where I can work on settlement.  I can't do that from MDC.

3    Keeping me incarcerated is of no value to compliance, no value

4    to settlement, but a great, great danger to me.

5           Again, if you are asking me to lose the sight in both

6    eyes, if you are asking me to avoid anything dealing with other

7    aspects of my life whether it's my skin cancer, whether it's

8    blood cancer, that's something that needs to be kept in

9    consideration.

10          Especially since the objective is shared.  I'm not

11   trying to avoid the objective, but I'm trying to do what your

12   Honor appreciates is the only way out of this.  I'm clearly not

13   the source of anything that's of value to Benthos except to

14   help on the settlement.  I can't do that.  I can't do the

15   compliance you are asking me to do under the conditions at the

16   MDC.  They recognize that, medical services recognizes that,

17   New York Eye and Ear recognize that.  The only people who don't

18   seem to recognize that are in this room.

19          Mr. Popofsky, from 2018 has -- I don't know where he

20   gets the idea that incarceration is something that's

21   appropriate for an 80-year-old person, and maybe he wants to

22   have my blood on his hands.  But I can't afford to lose totally

23   my sight.  I have these skin cancers that haven't been looked

24   at since December of last year.  I have my blood that hasn't

25   been point taken to a hematologist since then.

NBG4BENC

```
1          THE COURT:  I think you are scheduled.

2          MR. ETRA:  Those are the conditions.  I wish the

3   conditions were different.  I don't want to suffer.  Maybe he

4   would like me to suffer.  Maybe he would like to suffer

5   himself.  Maybe he would like to spend a day in the Unit K83 at

6   MDC and understand it.  I think your Honor knows more about it

7   because your Honor gets the reports about our endless

8   lockdowns.  And that affects me because 11 people help me to

9   take eye drops.  When we are locked down none of them can get

10  into my cell except once in a while some orderlies are let in.

11         I'm waking up now at 5:00 a.m. I have nobody to give

12  me eye drops.  That's why my eyes are red now.  I can't even

13  focus on these things.  I would want to, but help me, please.

14  Help me do the compliance you are wanting me to do.  Help me do

15  the settlement effort that I should do and have been trying to

16  do since 2018.

17         That's the situation.  I'm not delaying.  I'm not

18  exaggerating.  When I sent you the message the other day this

19  is after I came back from New York Eye and Ear.  They cautioned

20  me to stay out of the harsh lights.  The condition that I

21  developed, macular degeneration, started here at MDC.  I didn't

22  have it when I went in.  You run the risk of losing eyesight.

23  You run the risk of not being treated for skin cancer, blood

24  cancer.

25         I implore your Honor and Mr. Popofsky as well.
```

NBG4BENC

1    Surely, he may cry for incarceration, but he can't want to not

2    only economically ruin a person but physically ruin a person or

3    take him, God forbid, to the end of his life.  And these are

4    the conditions that are here.

5            To say nothing of being deprived of family and friends

6    for 11 months now, it will be 12 months on December 14.  I

7    mean, this can't be the way the American justice system works.

8    Again, my jailers are the more respectful ones, people help me

9    with eye drops.  People understand when I can't walk upstairs.

10   People understand when I cry out for consultations on my

11   hematology and dermatology but don't supply it.  They say this

12   is the way things are.  We give you a six-month window, maybe

13   we can fit you in for a consultation.  In that period of time

14   people develop cancer.  People die from it.  I mean, I

15   certainly don't want to be a statistic.  And I don't want to be

16   blood on somebody else's hands.  Those are the conditions.  I'm

17   not exaggerating.  I'm not delaying.  You see me as I am.

18           So that's the condition.  I would love to be able to

19   give you hard answers to hard questions, how many pages can I

20   read?  And what does that accomplish for Benthos?  They know as

21   well as anybody that I never took any money from Benthos.  That

22   I never had $5 million in my possession.  That my life has been

23   dedicated to public service 57 years since I started in

24   practice.

25           THE COURT:  Mr. Etra, you've gotten way off track, and

NBG4BENC

1    I let you vent.  But now let me explain to you what Benthos is

2    proposing.

3         What Benthos is proposing in lieu of trying

4    essentially to boil the ocean, what they have proposed is to

5    look at a much smaller subsection of the digital data that they

6    currently have starting with your laptop putting the phone on

7    hold for now.  Correct me if I'm wrong on any of this,

8    Mr. Popofsky.  This is how I read your proposal.

9         When I read that proposal that to me makes immanent

10   sense in part because, based on the work that the expert has

11   done, we know that you have email on your laptop that's

12   available on your laptop from a little under 2,000 unique

13   addresses.  So the issue would be and the only reason we are

14   doing any of this, Mr. Etra is because you suggested, and I've

15   gone along with your suggestion, you could cut this short if

16   you say that what Mr. Popofsky believes, which is you never

17   functioned as a lawyer and therefore none of the stuff on your

18   laptop is privileged.  I see you shaking your head.

19         MR. ETRA:  That is not true.  I've functioned as an

20   attorney.

21         THE COURT:  I'm not going to argue about it.  You

22   represented you are an attorney.  I have set into place

23   procedures that would allow to you assert a claim of privilege

24   over materials that could be privileged so we have a way to

25   litigate in a way that gets done.  A casual review, and this is

NBG4BENC

1    just a casual review of the list of unique addresses reveals

2    many that cannot possibly be privileged.

3            So Mr. Etra, the issue is do you concur with me that

4    emails between you and banks cannot possibly be privileged?

5            MR. ETRA:  Again, I need to think about it before

6    answering that.

7            THE COURT:  Think quickly.  Did you ever represent a

8    bank?

9            MR. ETRA:  It's in respect for things I was doing for

10   people at that bank.  So it's not a question of me and the

11   banks.  It's what those funds in the banks were from or for.

12   And then maybe --

13           THE COURT:  But communication with the bank could to

14   the be privileged.

15           MR. ETRA:  About a person whose funds they are, not my

16   funds, it would be privileged because it's on behalf of my

17   client in communicating with the banks.  So I would think,

18   again, I'm just speaking off the top of my head, and I would

19   have to study that question that there would be a claim of

20   privilege, yes.

21           THE COURT:  Here's the thing, Mr. Etra, the more

22   things you say you are going to have to study, you are just

23   prolonging your time in prison.  You have essentially said I

24   know I haven't complied with the order because there are all

25   kinds of things I've been ordered to provide that I haven't

NBG4BENC

1    provided, but all that you will get when you get my materials

2    on the laptop.  Now, I don't know if that's true or not, but

3    fine, you made that representation so we are trying to proceed

4    on that path.  So if you raise spurious objections to turning

5    over materials, that's fine.  I'm going to allow you to say

6    your communications with banks could be privileged, and

7    therefore they will not be turned over as a group.  But just so

8    you understand, don't come whining to me about the fact that

9    you are sitting in MDC because this is your choice.  You failed

10   to comply when I warned you repeatedly that if you did not

11   comply with the orders you were risking contempt and

12   incarceration.

13            But let's move on.  How about credit card companies,

14   any possibility did you ever represent a credit card company?

15            MR. ETRA:  Again, your Honor, I will admit that I

16   didn't represent credit cards companies.  But I deal -- and my

17   feeling is that my efforts with banks, credit card companies,

18   and others on behalf of clients is covered by privilege.

19            THE COURT:  It's not though.  How is it going to be

20   privileged?  It's with a third party.

21            MR. ETRA:  It was on behalf of my client.  I mean,

22   surely attorneys do work on behalf their clients with banks and

23   credit card companies.

24            THE COURT:  Yeah, but it's not privileged.

25            MR. ETRA:  Again, I'm not prejudging your decision,

NBG4BENC

```
1   your Honor, I cannot do that, nor would I.  Whatever else you

2   say about me, I don't try to do what you do so well as a judge.

3   I'm just trying for me to explain to you how I function.

4         As far as being spurious or as far as alleging that

5   I'm not trying to comply that I think, with all due respect, is

6   not the case.  I'm trying to get you to appreciate how I

7   function.  What you judge on that is, of course, up to you.

8   That is my initial reaction to your question.

9         THE COURT:  Mr. Etra, give me an example in the last

10  ten years where you have communicated with a credit card

11  company on behalf of a client in a way that would be

12  privileged.

13        MR. ETRA:  If they were using either my service, my

14  credit card or their credit card in respect of a transaction

15  that I was advising them on.

16        THE COURT:  But why would your communication with the

17  credit card company then be privileged?

18        MR. ETRA:  Because I'm functioning not on my behalf

19  but on the behalf of my client.

20        THE COURT:  But that's not what privilege is.

21        MR. ETRA:  Your Honor, I'm not judging.  I'm just

22  trying to explain what my thinking is in respect of it.  And

23  again, I'm not trying to do something that I'm not capable of.

24  I'm just trying to explain myself to respond to your very valid

25  question.
```

NBG4BENC

1          THE COURT:  Your example would not be privilege and

2      therefore communications with credit card companies could be

3      disclosed.

4          How about retail establishments like Bed Bath & Beyond

5      or Old Navy?

6          MR. ETRA:  Again, my functions as an attorney include

7      actions across a wide range of activities of my clients and

8      whether those are the ones that are referred to I would have to

9      study and say.  I will do my best to indicate what it was in

10      reference to.  It's up to your Honor to decide whether that is

11      privileged or not privileged.

12          THE COURT:  Did you ever represent a retail

13      establishment?

14          MR. ETRA:  Yes.

15          THE COURT:  What?

16          MR. ETRA:  I represented some restaurants.  I

17      represented some stores that sell electronic equipment, both

18      manufacturers and sellers of garments.  So the answer is yes.

19          THE COURT:  Did you ever represent Bloomingdale's?

20          MR. ETRA:  Did I represent -- no.

21          THE COURT:  When did you represent restaurants,

22      electronics, and garments?

23          MR. ETRA:  I don't remember the exact dates.

24          THE COURT:  What are you interested in in terms of a

25      date range, Mr. Popofsky?

NBG4BENC

```
 1              MR. POPOFSKY:  Well, whatever is on the laptop, your

 2     Honor.

 3              THE COURT:  You are not prepared to limit --

 4              MR. POPOFSKY:  It doesn't go back that far because

 5     apparently he either switched laptops or things were lost.

 6              Your Honor, what you are getting at, I made a list of

 7     just a handful of email addresses that I would ask you to

 8     address today.

 9              THE COURT:  OK.

10              MR. POPOFSKY:  Along the lines of what you are doing

11     but more targeted, I think.  There are three individuals, the

12     names of which you should be familiar with.  Tracie Evans who

13     is the individual -- Mr. Etra's partner in the underlying scam

14     that --

15              THE COURT:  What's the email addresses.

16              MR. POPOFSKY:  TracieEvans@gmail.com.  There's Mr.

17              THE COURT:  What's the email address?

18              MR. POPOFSKY:  There are three email addresses

19     associated with him.  I could get those for you.

20              THE COURT:  Go ahead.

21              MR. POPOFSKY:  Helmut.Allesch@gmx.de.

22              The second one is helmut@allesch.at.  And

23     office@allesch.at.  I believe you are familiar with him.

24              THE COURT:  Tell me who he is again.

25              MR. POPOFSKY:  He is the individual -- when we were
```

NBG4BENC

1     seeking European accounts Mr. Etra popped up with a letter for

2     Mr. Allesch that descended from heaven had no email associated

3     with it.  He claimed he never emailed with Mr. Allesch.  He

4     produced nothing.  Turns out the email that led to that letter

5     does not exist.  It must have been deleted by Mr. Etra long,

6     long ago.  But in any event, there are a couple dozen emails

7     with Mr. Allesch.  Including one, two days after he generated

8     that letter.  The subject line is urgent.  So that's

9     Mr. Allesch.

10              The third person is Mr. Dussel.

11              THE COURT:  He the one coming up with the million

12    dollars?

13              MR. POPOFSKY:  Yes.  And, your Honor, on that subject

14    because Mr. Etra mentioned settlement.  On October 4,

15    Mr. Dussel texted me that, "even today signed docs that if

16    approved will have funds that I can send within a couple of

17    weeks."  That was October 4, obviously, nothing since then.

18              Mr. Dussel's email address is mel@dusselgroup.com.

19              And then there are four kinds of entity emails that we

20    picked out of a hat trying to just limit that we think are

21    relevant.  One is service@PayPal.com.  Mr. Etra seems to have a

22    whole bunch of PayPal accounts that have not been disclosed, it

23    appears that way.

24              The second is help@tryairwallet.com.  It appears to be

25    a cryptocurrency account.  There are a couple dozen emails with

NBG4BENC

1    them.

2            Another apparent crypto wallet address is

3    giorgi@reignfi.com.

4            THE COURT:  Let me repeat that, giorgi@reignfi.com?

5            MR. POPOFSKY:  Yes, your Honor.

6            Last one for these purposes, paulsims2@aol.com.  There

7    are some references to a UK account.

8            THE COURT:  The number 2?

9            MR. POPOFSKY:  The number 2, yes, at AOL.

10           These are not at all to say these are more important

11   than others or that there aren't dozens or hundreds of others

12   that are of equal importance but in after effort to get access

13   to something now, I just throw out that half dozen for your

14   Honor, if we could get a ruling on that.

15           THE COURT:  I appreciate that, and I was going to come

16   to that.  Just so you understand what I was going through with

17   him, I was trying to get certain addresses of the 1700, which

18   was a lot that, that we could just pull out, give you those

19   emails, I don't think there is going to be anything in there of

20   interest to you or to Mr. Etra, but it would reduce the list of

21   1700 down to a more manageable list of accounts for him to look

22   at.  This is sort of a slightly different which is we want an

23   explanation on these first for could they possibly be

24   privileged.

25           MR. POPOFSKY:  Right.  As, your Honor, points out we

NBG4BENC

1    are being whipsawed.  He is asserting privilege where he

2    probably doesn't have a privilege.  But I understand you are

3    letting him do that.  At the same time he is saying I can't

4    assert privilege.  I need endless time.  I need endless

5    restrictions.  We are well past the stage where Mr. Etra is

6    saying things and us proving that they are lies and your Honor

7    chastising him.  We just want to see the documents as quickly

8    as we can.  And I'm with you whatever --

9            THE COURT:  This is your first group?

10           MR. POPOFSKY:  Yes.  But I also think Exhibit A is

11   only 20 pages.  It's not that long.  And while I do appreciate

12   your effort to shorten it, and I'm OK with that if that's what

13   you think is best, I was thinking other than these seven, I was

14   thinking that if you just give Mr. Etra a couple of weeks to go

15   through these 20 pages and assert what he claims are

16   privileged, and that will knock down a whole bunch and then we

17   can litigate the rest of them as to the emails.  That way we

18   would get a half dozen now, we'd get a few more very soon, and

19   then whatever he litigates, we could litigate that on a tight

20   schedule.

21           He produced escrow agreements long ago.  It's clear

22   from the document list, there were many more escrow agreements.

23   The escrow agreements, they say, Etra as paymaster.  It's clear

24   in those agreements that he is not acting as a lawyer.  He can

25   call them clients, but it's clear he was not providing legal

NBG4BENC

1   services.  We just need to get to the briefing, which I don't

2   think will take very long.  Like almost everything else in this

3   case, he is going to assert anything at all to slow it down.

4   As I've mentioned he is not constrained by Rule 11.  He can say

5   whatever he wants.  We just need to reach that point, your

6   Honor.  The faster we can do -- 20 pages in terms of emails

7   before we get to documents, 20 pages is quite reasonable for

8   him to review.  Mr. Sklar could sit with him and go through

9   that list, there are many ways.  He reads my letters.  He could

10   read 20 pages.

11          One thing, off topic, I did not submit yesterday the

12   monthly letter stating nothing had been received in the last 30

13   days because I was here.

14          THE COURT:  Nothing has been received.

15          MR. POPOFSKY:  Right.

16          THE COURT:  How about colleges and universities,

17   Mr. Etra, anything with a .edu account?

18          MR. ETRA:  I've rendered services to two universities

19   that I've been on the board of governors.

20          THE COURT:  Being on the board of governors does not

21   make you attorney for them.

22          MR. ETRA:  I understand that.  I've also been asked to

23   render legal services for them.

24          THE COURT:  In the last five years?

25          MR. ETRA:  Yes.

NBG4BENC

1          THE COURT:  Mr. Etra, could you stand up, please.

2          Angela, could you swear him in.

3          (Defendant sworn)

4          THE COURT:  Please be seated.

5          Mr. Etra, you are now under oath.  That means if you

6     lie to me, it's perjury, not to mention making a false

7     statement in a material matter.

8          You have just said within the last five years you were

9     an attorney to a college or university, so which one?

10          MR. ETRA:  Your Honor, what I said to you is --

11          THE COURT:  Which one?

12          MR. ETRA:  Your Honor, I said to you that I rendered

13     service which I believe were legal services.

14          THE COURT:  I asked you were you representing them as

15     an attorney.  Are you now backing off that?

16          MR. ETRA:  I'm not backing off.

17          THE COURT:  What university or college?

18          MR. ETRA:  I've done that to Technion Academy in

19     Israel.

20          THE COURT:  Have you done any legal work for any

21     university or college in the United States?

22          MR. ETRA:  I would have to think about that question

23     before I answer because I also --

24          THE COURT:  Think, Mr. Etra.  In the last five years,

25     have you represented a college or university in the United

NBG4BENC

1    States?

2            MR. ETRA:  Your Honor, I really need time to think

3    about that question.  Because I've done work as a person

4    involved in not for profits and NGOs for colleges and

5    universities in the U.S.  So I really need to think before I

6    answer that question that you asked me to do under oath.  I

7    can't do it just on this -- you got to give me time to think

8    about that and before I answer that question fully.

9            THE COURT:  Mr. Etra, fine.  My goal was to narrow the

10   number of email addresses you needed to review because you are

11   obviously willing to just bold-face lie to me.  We are not

12   going to do that.  So I'm going to set a deadline, and the

13   order will provide to the extent there is no supported

14   objection on the ground of privilege by the date, then

15   everything gets turned over.

16           You are making your bed.  I told you this when we

17   first met.  You are continuing it.  So don't tell me that

18   Mr. Popofsky has blood on his hand, or I have blood on my

19   hands.  This is your doing, Mr. Etra.  The one thing that I

20   will not accept any argument from you on is why any.gov account

21   other than Ms. Gallicchio is privileged.  Do you agree that

22   those materials are not privileged?

23           MR. ETRA:  Your Honor, again, I'm not an expert on

24   privilege.  So please I'm not trying to avoid your questions.

25   But I'm also not trying to take a responsibility from

NBG4BENC

1    determining privilege or not privilege.  I'm trying to

2    cooperate, please understand that.

3             THE COURT:  No, you're not.

4             MR. ETRA:  Your Honor, I've worked with institutions,

5    I worked with universities all of my professional life.  You

6    seem time to think that this is something that I'm trying to

7    avoid.  I'm trying to explain to you and Mr. Popofsky that not

8    for profits, NGOs including universities and schools and so on

9    have been a part of my life, and they periodically asked me to

10   give them advice on things.  Now --

11            THE COURT:  Legal advice, but you can't name one

12   university, not one, that's in the United States.

13            MR. ETRA:  Horace Mann School.

14            THE COURT:  Who at Horace Mann School has asked you

15   for legal advice?

16            MR. ETRA:  Your Honor, you are asking me on the spot

17   to give you answers.

18            THE COURT:  Yes.

19            MR. ETRA:  I'm not in a position to do this.  Again,

20   that's you are really unfair to me because I'm saying to you if

21   you asked me that question, give me time to answer it instead

22   of trying to do it today.  I've been involved with -- I went to

23   Columbia.  I went to NYU.  I've been on the Center of

24   International Affairs for one.  I've been on the journal for

25   various institutions for Columbia Law School.  They've asked me

NBG4BENC

```
 1   for help on various questions.  I'm trying to fully answer your
 2   question.  Please, give me time to do that.
 3           THE COURT:  You are not trying to fully.  You are
 4   going to have all the time in the world, but the .gov accounts
 5   are going to be turned over.
 6           Stop.  Mr. Etra, here is the thing, when I talk you
 7   cannot talk over me.
 8           MR. ETRA:  I'm sorry, your Honor.  I respect --
 9           THE COURT:  So the .gov accounts other than
10   Ms. Gallicchio's account can be turned over.
11           Everything else, again, Mr. Etra, I was making --
12   Mr. McGuinness, you are sitting here, maybe you can explain to
13   him.  I was trying to reduce the burden on him.  But if is he
14   not going to cooperate, which he is he not, despite him saying
15   he is, there is nothing I can do about this.  So I'm going to
16   set a deadline.  If he doesn't respond during that period of
17   time, then they are going to be turned over.  We will turn them
18   over with a clawback.  So essentially Benthos will be required
19   if any of this looks like it might be privileged, they are
20   going to have to immediately segregate it and call it to my
21   attention.  That's the best I can do.
22           MR. McGUINNESS:  I will certainly continue that
23   conversation, your Honor.
24           There's a matter I wanted to clarify for the benefit
25   of the parties and myself on the scope of my representation on
```

NBG4BENC

1    this issue, your Honor.  Your Honor has made certain comments,

2    and I don't want to misrepresent them, that he will be at the

3    MDC longer because of this process.  But just to be clear, it

4    is my belief that he is not being incarcerated because of this

5    forensic review, and it does not implicate incarceration

6    issues.  I just want to clarify that.

7        THE COURT:  Here is why the two get linked.  He or you

8    on his behalf, argued that with the belated production of

9    letters from credit card companies and account records from

10   credit card companies and banks, there was a representation

11   that says everything else that he has been ordered to provide

12   is on the laptop in the phone.  And you now have those, so

13   we've done everything.  You don't know if that representation

14   is true, and I don't either.  What I know is that there are

15   categories of material that he has been order to produce, and

16   let me just use sort of a really short one and one that is sort

17   of easy to understand, he was ordered to produce any

18   communications about his financial condition or about efforts

19   to obtain money to satisfy the judgment.  He said he had none.

20   And yet, he appears to be communicating via email with the

21   person who allegedly is getting the money for him.  So there

22   are communications via email with that person that have never

23   been produced.  That's why they get linked.

24       MR. McGUINNESS:  Your Honor, maybe I wasn't clear in

25   my briefing, the argument wasn't necessarily that they will get

NBG4BENC

1    what they want or that the categories will be satisfied with

2    this production it's that's what there is, his devices.

3    Regardless of what is on those devices, they have them.  That's

4    all that there is.  They have the universe of information now,

5    and it's a question of whether it's responsive or not, it

6    doesn't change whether it's in his possession.

7                THE COURT:  So there are responsive documents that he

8    has the ability to obtain now, independent of the laptop,

9    independent of the telephone, that he has never produced.  He

10   had a gmail account.  Go to Google, download all of his emails

11   that are with the people that are responsive.  He has not done

12   that.  He was asked to do that months ago.  So there will be at

13   least some of those emails are going to be on his computer.

14   Whether that gives rise to the ability of Benthos to serve a

15   subpoena on Google to get others or for them to make the

16   presentation which is there are obviously other emails in his

17   gmail account that he has not disclosed.  So he is still in

18   contempt.

19                MR. McGUINNESS:  But they have all of the emails in

20   that example gmail account.

21                THE COURT:  They have all of the emails that are on

22   the laptop.

23                MR. POPOFSKY:  And we don't have them.

24                THE COURT:  And they don't have them yet.

25                MR. McGUINNESS:  He provided passwords, all of his log

NBG4BENC

1   in information for all accounts.  They have all that

2   information.

3           THE COURT:  He is now agreeing that they can look at

4   anything on the laptop?  The whole reason we are here,

5   Mr. McGuinness is because of Mr. Etra's, what I suspect is a

6   spurious claim that he represented people.  And therefore is

7   there is attorney-client privilege material on the laptop.  If

8   he wants to agree that all of that material can be reviewed by

9   Benthos subject to the same provision that I would put in

10  anyway, which is kind of an immediate clawback, that's great.

11  That will really expedite things.

12          MR. McGUINNESS:  Your Honor, that's my central issue

13  here.  My question is whether he is being held pending this

14  attorney-client privilege review or whether it's something

15  else.

16          THE COURT:  He is being held because he is still in

17  contempt.  He still has not produced communications relative --

18  I mean, I could go through the order and give you chapter and

19  verse what he hasn't produced.  But suffice it to say there are

20  items that have still not been produced.

21          MR. McGUINNESS:  They are in their possession as much

22  as they are --

23          THE COURT:  Maybe.

24          MR. McGUINNESS:  But where else could they be --

25          THE COURT:  On gmail.

NBG4BENC

1          MR. McGUINNESS:  They have access to gmail that gmail

2     account.

3          THE COURT:  Are you giving them access to break into

4     his gmail account and download anything on the account?

5          MR. McGUINNESS:  All that is at issue there is the

6     attorney-client review, to my understanding.

7          THE COURT:  So what are you proposing?

8          MR. McGUINNESS:  I'm just trying to clarify that under

9     that review, I believe he is being held subject to this

10    attorney-client review.

11         THE COURT:  No.  He is being held because he has not

12    produced documents that he was ordered to produce.

13         Look, you were the one that brought these two issues

14    together.  Mr. McGuinness, the Court appreciates your

15    representation of Mr. Etra.  Let me be clear about that.  They

16    came together because Mr. Etra has asserted that anything else

17    that's covered by the order is on the laptop.  I don't know if

18    that's true or not.  I have zero -- if there's the ability to

19    say minus -- I have zero confidence in the truth of anything

20    that Aaron Etra says to me because he lied repeatedly.  So he

21    says this all on the laptop.  I don't know if that's true or

22    not.  I'm pretty sure it's not.  If he is saying he is fine

23    with Benthos using his user name and password to go into his

24    Google account and to pull out any gmail communication they

25    want, that's fine.  Tell me that.  That will simplify people's

NBG4BENC

1    lives.  I don't think that's what Mr. Etra is saying.

2              MR. McGUINNESS:  Well --

3              THE COURT:  Therefore, just to complete the thought,

4    therefore there continued to be materials that are not

5    privileged and that are within Mr. Etra's ability to obtain

6    that have not been produced and therefore he has not purged his

7    contempt, and therefore he remains in jail as a coercive

8    sanction to get him to comply.  He is saying once you see

9    what's on the laptop everything will be clear.  That's fine.

10   Maybe that's right.  And maybe at that point Benthos will say

11   we are the point the diminishing return, yes, he hasn't

12   complied with this, this, and this, but we think we've got what

13   we need.

14             MR. McGUINNESS:  He is saying a slightly different

15   thing, your Honor.

16             THE COURT:  What's he saying?

17             MR. McGUINNESS:  He may be saying that as well, but he

18   is also saying this is all there is.  My laptop, my phone and

19   my online accounts, those are all now in their possession.  The

20   only thing left to happen --

21             THE COURT:  They don't have access to them.

22             MR. McGUINNESS:  Only because of this attorney-client

23   privilege.  That is the one thing that is standing in the way

24   of release of all this information, to my understanding.

25             THE COURT:  Well, I don't know that's true.

NBG4BENC

1          MR. McGUINNESS:  I don't know what other he can do to

2     prevent the disclosure of that information, your Honor, subject

3     to the Court's order on the forensic protocol other than this

4     attorney-client review.

5          THE COURT:  Well, is he seriously agreeing to let them

6     go into his gmail account?

7          MR. McGUINNESS:  I'll let him speak for himself.

8          MR. ETRA:  I understand as Mr. McLaughlin does that --

9          THE COURT:  McGuinness, Mr. McGuinness.

10         MR. ETRA:  I'm sorry.  I'm not myself today.

11         That I have turned over the only things that I used in

12    my business activities, and the cell phone.  I'm reviewing for

13    privilege or any other claim, I guess, that material.  So

14    subject to my review, the answer is yes.  Everything is there

15    and was given to them.

16         MR. POPOFSKY:  Can we just focus on that "any other

17    claim," your Honor.

18         THE COURT:  I noted it.

19         MR. ETRA:  I need to see whether anything in my email

20    is subject to that claim of privilege.  I mean, that was the

21    objective of the printout, I believe.

22         MR. McGUINNESS:  Without speaking for Mr. Etra.  I

23    don't know that the Court -- I would very strongly assume the

24    Court would not entertain a relevance or overbreadth objection

25    from him, which would be the only other thing I could think of

NBG4BENC

1    besides attorney-client privilege.  Mr. Popofsky said we are

2    passed that.  I believe the Court is of the same view.

3            THE COURT:  I think there were issues with

4    communications from members of his family that could be an

5    issue.

6            But, again, Mr. McGuinness, with all due respect, we

7    don't have to do any of this because Mr. Etra could have done

8    this himself and gone into his gmail account and pulled out the

9    email that is responsive to the order, and he chose not to do

10   that.  And he is continuing to choose not to do that.  I'm kind

11   of past being annoyed that he didn't do what he was supposed to

12   do because he is the one who is suffering the consequences of

13   it.  And that's why jail is used as a coercive sanction.

14           So at this point, it's possible.  I don't know.  Look,

15   if Mr. Popofsky is right that tryairwallet.com is a crypto

16   account and that Mr. Etra has accounts at PayPal that have

17   never been disclosed, which may well be what we find out when

18   they get into these accounts, then there is sort of big

19   categories of the order that he still hasn't complied with

20   because he was order to produce all financial record, PayPal

21   would qualify, crypto accounts would qualify.  None of that got

22   produced.  So I don't know.  I've always assumed that there was

23   a reason why he was resisting complying with those orders to

24   turnover communications about his finances and the collection

25   of the judgment.  Being a suspicious sort, I assume the reason

NBG4BENC

1   that he was being resistant was because there were other pools

2   of money somewhere that he was trying to protect, but I don't

3   know.

4           Look, again, some of this we can kind of cut to the

5   chase.  It is conceivable that, what is it, the ten email

6   accounts that Mr. Popofsky laid out, if Mr. Etra agrees now

7   that those can't possibly be privileged because he didn't

8   represent any of those people and those get turned over, this

9   may go much master than we think.  I don't know.  Rather --

10          MR. POPOFSKY:  Your Honor, I would ask for an

11  adjudication on those.  It's ten but it's really seven because

12  a Allesch is three.  I would ask you to put Mr. Etra under oath

13  and --

14          THE COURT:  He is already under oath.

15          MR. POPOFSKY:  -- and have him address that.  And then

16  if he says things, whatever he may say, I would ask for an

17  adjudication right now on those seven.

18          THE COURT:  Let's see if we can do that.

19          Mr. Etra, you heard the email accounts, what's your

20  position on them?

21          MR. ETRA:  I need time to determine which ones to

22  assert privilege on.  My --

23          THE COURT:  Hang on a second.  Assertion of privilege

24  is not just something you get to decide to do.  Did you

25  represent Tracie Evans?

NBG4BENC

```
 1              MR. ETRA:  Yes.
 2              THE COURT:  You had an attorney-client relationship
 3    with Tracie Evans?
 4              MR. ETRA:  Yes.
 5              THE COURT:  Helmet Allesch?
 6              MR. ETRA:  Yes.
 7              THE COURT:  You represented him as an attorney?
 8              MR. ETRA:  Yes.
 9              THE COURT:  I really never had anybody who sort of
10    clearly is not being this truthful or this untruthful.
11              How about Mr. Dussel?
12              MR. ETRA:  Yes.
13              THE COURT:  You represented him as an attorney?
14              MR. ETRA:  Yes.
15              THE COURT:  So when they subpoena these people for a
16    retainer agreement, they are going to have one?
17              MR. ETRA:  Your Honor, I don't know what --
18              THE COURT:  Did you have a retainer agreement with
19    them?
20              MR. ETRA:  I have to see in my correspondence what I
21    have, but definitely the relationship was attorney-client, yes.
22              THE COURT:  How about PayPal?  PayPal, OK, that
23    accountservice@paypal.com, any emails associated with that can
24    be disclosed.
25              MR. ETRA:  But, your Honor, again --
```

NBG4BENC

1              THE COURT:  How about tryairwallet.

2              MR. ETRA:  Maybe I'm wrong on this, and you are the

3    one to determine this, but, I need to review those in the same

4    ways as we've had our discussions about the bank accounts and

5    credit cards.  Those were used for client activities on behalf

6    of clients in addition to any other use.

7              THE COURT:  I don't understand what even that means.

8    This is a communication with an address called

9    service@PayPal.com.  I have no conception about how that could

10   be privileged.

11             MR. ETRA:  Again, it's the same basis for acting on

12   behalf of people with respect to accounts they would have with

13   PayPal, the bank, or credit cards.

14             THE COURT:  That's not privileged.

15             MR. ETRA:  Again, I can't determine.  I'm not -- it's

16   not -- you are just asking whether -- what the relationship was

17   and I'm trying to explain that.  I'm not the one to do the

18   adjudication.

19             THE COURT:  Same with tryairwallet?

20             MR. ETRA:  Yes.

21             THE COURT:  How about gGiorgi@reignfi?

22             MR. ETRA:  Yes, that is definitely, yes.

23             THE COURT:  What is that?

24             MR. ETRA:  Reign Financial is the plan.

25             THE COURT:  It's Reign Financial?  What is Reign

NBG4BENC

1    Financial?

2              MR. ETRA:  It's a financial company.  They have a

3    variety of activities.  I've given them legal advice.

4              THE COURT:  Again, you represented them?

5              MR. ETRA:  Yes.

6              THE COURT:  You're under oath.

7              MR. ETRA:  Yes, your Honor, yes.

8              THE COURT:  You had an attorney-client with

9    relationship with Reign Financial?

10             MR. ETRA:  Yes, with the Reign Group, Reign Financial.

11   Reign has a variety of activities and companies.  It's Giorgio.

12   Giorgio is the first name Giorgio Johnson, the CEO of the Reign

13   Financial Group.

14             THE COURT:  And how about PaulSims2?

15             MR. ETRA:  Yes.

16             THE COURT:  You had a legal attorney-client

17   relationship with Paul Sims?

18             MR. ETRA:  Yes.

19             THE COURT:  What did you represent Paul Sims for?

20             MR. ETRA:  He was a gentleman again in finance in the

21   U.K.  He had been a solicitor in the past, an attorney.  He and

22   I have worked together as attorney-client.  I've given him

23   legal services here.  He's given me financial services in the

24   U.K.  So the answer is yes.

25             THE COURT:  All right.  So he is asserted what I think

NBG4BENC

1    are entirely spurious claims, but be that as it may, I'm going

2    to read his papers with an open mind.

3            Mr. Etra, do you have a list of these or do you need

4    to give me a list?

5            MR. ETRA:  Please do give me a list.

6            THE COURT:  Do you have a separate piece of paper or

7    these written down, Mr. Popofsky?

8            MR. POPOFSKY:  We do not but we can write them down

9    before --

10           THE COURT:  We will put them in an order, which will

11   go out today.

12           Mr. Etra, I'm going to give you two weeks to provide a

13   written explanation for why these nine accounts are potentially

14   privileged.  And I recommend that you support it with evidence,

15   because to the extent it relies on your representation under

16   oath that you had an attorney-client relationship with these

17   people, that's not going to carry the day because you have no

18   credibility.  So I'm just telling you that's what you need to

19   do.  So two weeks from today is when --

20           MR. ETRA:  Your Honor, I don't have my computer.  I

21   don't have access to my records.  So asking me while in

22   incarceration in MDC, Unit K83 to provide evidence, that's

23   impossible.

24           THE COURT:  Do the best you can.

25           MR. ETRA:  I'm saying in advance, and you know perhaps

NBG4BENC

1    best of anyone in this room, the limitations of function.  And,

2    again, I don't have my computer anymore.

3                THE COURT:  I do know the limits of functioning I'm

4    confident if there is evidence that there was an

5    attorney-client relationship with any of these people, you

6    would figure out a way to get it and incorporate it into the

7    papers that you are going to file two weeks from today, which

8    is what date?

9                THE DEPUTY CLERK:  November 30.

10               THE COURT:  November 30.

11               Mr. Popofsky, how long do you want to respond, one

12   week?

13               MR. POPOFSKY:  I would ask rather than giving a date,

14   your Honor, I would say up to ten days, and I will try to get

15   it into sooner than that.  So it's not a specific day.  If you

16   are giving Mr. Etra a reply, I would ask his reply run from

17   when I respond.

18               THE COURT:  Understood.  So you'll get up to ten days

19   and Mr. Etra will get seven days from the date that you

20   respond.

21               All right.  Mr. Etra, your response needs to be

22   certified under penalty of perjury, not that I think that

23   matters to you, but it might matter for other purposes.  My

24   reason is I want you to focus on the truth of it.

25               Now, let's go to the documents.

NBG4BENC

1          MR. POPOFSKY:  Your Honor, before we get to the

2     documents, what about the other email addresses?

3          THE COURT:  I want to start with these.  I'll set a

4     date for all the other email addresses, but let's turn to the

5     documents we're going to do one global date for everything.

6          All right.  Mr. Etra, in terms of the folders of

7     documents, you have files labeled bank accounts.  Is it your

8     assertion that those files contain correspondence on behalf of

9     clients?

10          MR. ETRA:  Yes.

11          THE COURT:  How about a folder labeled "blank forms."

12          MR. ETRA:  I don't know that folder.  I don't know.

13          THE COURT:  OK.  Blank forms can be turned over.  It's

14     going to be subject to a clawback.

15          You've got a folder titled "ILSC 2019-20 Strategic

16     Plan ILSC RFPs."  What is ILSC?

17          MR. ETRA:  I don't know that folder offhand, your

18     Honor.

19          THE COURT:  Do you know who ILSC is?  Does that mean

20     anything to you?

21          MR. ETRA:  No, I would have to look at it, your Honor,

22     to understand if it means something to me.

23          THE COURT:  So that needs to be turned over as well.

24     It's going to be subject to a clawback.

25          You got a folder titled "Linda."  Who is Linda?

NBG4BENC

1          MR. ETRA:  I would have to check to see.  I believe

2     it's a person to whom I rendered services?

3          MR. POPOFSKY:  Legal services.

4          MR. ETRA:  Yes.

5          THE COURT:  You've got a folder titled "Personal"?

6          MR. ETRA:  Your Honor, with respect, I really need to

7     look at those folders.  I can't answer questions to folders

8     sitting here without them.

9          THE COURT:  I'm denying that request.  Some of these

10    are quite obviously not likely to contain privileged

11    information, and they will be produced with a clawback.

12    Meaning if anything in them might be privileged, Mr. Popofsky

13    is ordered to immediately segregate the document, not look at

14    it anymore and immediately notify me and you.  So "personal"

15    will be turned over.

16          UN 2020, what's in that folder?

17          MR. ETRA:  Again, I don't know what's in folders, just

18    sitting in here.  That's really asking too much of me.  I can't

19    do that.

20          THE COURT:  UN 2020 can get turned over.

21          LNG trial.  Do you need do you know that is?

22          MR. ETRA:  Your Honor, again, I'm not going to answer

23    under oath folders that I have not seen or looked at I think.

24    That's asking too much of me.

25          THE COURT:  I'm not going to have that one turned

NBG4BENC

1    over.  I don't know what that is, but it could be something.

2            IMAX.  What's IMAX?

3            MR. ETRA:  IMAX is an organization that deals with not

4    for profits running conferences.

5            THE COURT:  So that could be turned over.  That's what

6    you do.

7            MR. ETRA:  Again, I, your Honor I need to have the

8    opportunity to look at each of the folders that you are

9    referring to.

10           THE COURT:  I'm not going to do that.  I think you are

11   making spurious claims, and I think you are, again, just trying

12   to postpone the inevitable.  It seems highly unlikely anything

13   that it's privileged.

14           MR. ETRA:  I've worked with IMAX since 2001, your

15   Honor.

16           THE COURT:  That's lovely, but you weren't their

17   attorney.

18           MR. ETRA:  Your Honor, again, in the world of

19   associations I've been asked to give legal services and give

20   legal advice for any number of not for profits, among those are

21   IMAX members, that's the situation.  I'm not denying.  I'm not

22   avoiding, not delaying.  I'm telling you the situation.  I'm

23   not adjudicating, but if you ask me to deal with folders that I

24   haven't had a chance to look at I think that's something asking

25   something that is truly unfair.

NBG4BENC

1          THE COURT:  You've got a folder called Done Deal Aaron

2     Etra 17 October to Vegas Return 19 October.  It seems like a

3     travel folder.  Is there any reason for me to believe it's not

4     a travel folder associated with your trip to Vegas in October.

5          MR. ETRA:  I don't know.

6          THE COURT:  That folder can be turned over.

7          You got something called "September Account Analysis."

8     What's in that?

9          MR. ETRA:  You are asking me what's in a folder that I

10    don't have access to.

11         THE COURT:  You have something called, "Up To Date

12    Quote for Barcelona."  Any reason to believe that would contain

13    attorney-client privileged communication?

14         MR. ETRA:  It could.

15         THE COURT:  How could it?

16         MR. ETRA:  As I explained to you, I've given advice to

17    not for profits and different associations in different parts

18    of the world.  And those are the conferences and those were

19    things where Mr. Popofsky accused me of lavish living.  And

20    those have been working meetings.  Those were work associations

21    and working services.  And those are the folders I need to look

22    at to see what services were rendered to that conference in

23    Barcelona.

24         THE COURT:  What was the conference?

25         MR. ETRA:  Again, I would need it to see what that --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NBG4BENC

1  Barcelona is a place where many conferences take place, and

2  many associations use Barcelona as a venue for those copies.

3          THE COURT:  OK.  You've got something called, "Red

4  Asking Them GTO Do.  Ring any bells?

5          MR. ETRA:  Again, I need to look at each and every one

6  of those folders.

7          THE COURT:  Here is the thing --

8          MR. ETRA:  You are asking me on the spot to answer

9  folders that I really need to look at, and I think it's unfair

10  to not give me that opportunity.

11          THE COURT:  "Registration IQ Elite,"  What's that?

12          MR. ETRA:  Again --

13          THE COURT:  What is it?

14          MR. ETRA:  I don't know what that is until I look at

15  it.

16          THE COURT:  That will be turned over.

17          Taxes.  Any reason to believe "taxes" could be

18  privileged?

19          MR. ETRA:  It could be.

20          THE COURT:  Taxes are going to be turned over.  If

21  anything in it doesn't relate to Mr. Etra's taxes, that

22  immediately gets sealed.

23          You have something called "Teva Official Site."  What

24  is Teva?

25          MR. ETRA:  Teva is a -- it's a group and it's also a

NBG4BENC

1    company.  I don't know which one that was in reference to.

2              THE COURT:  Did you represent Teva?

3              MR. ETRA:  I've given legal services to people in the

4    group, yes.

5              THE COURT:  That's not to the group.  So Teva has to

6    be turned over.

7              MR. ETRA:  I don't know whether it is or not.  You are

8    making conclusions not having given me the chance to look at

9    the folder you are referring to.

10             THE COURT:  United e-Ticket Receipt 12 May.  That

11   can't Possibly be privileged.  That will be turned over.

12             Then you got four Zoom files.  One is for cluster for

13   global citizenship.  That's an NGO, right?

14             Are you interested in the Zoom meetings, Mr. Popofsky?

15             MR. ETRA:  I wouldn't say it's a high priority but

16   without knowing in the folder, I wouldn't want to rule it out.

17             THE COURT:  OK.  What's the Cluster for Global

18   Citizenship?

19             MR. ETRA:  That's one of many NGOs I've helped over

20   the years, and given services to people and otherwise.

21             Again, in the same way, Mr. Popofsky don't know what's

22   in the folder, I don't know what is was in the folder without

23   looking at it.  And neither one of us is really in a position

24   to answer anything without looking at that folder.

25             THE COURT:  Who is Margot Lazaro?

NBG4BENC

1          MR. ETRA:  Margot is one of my colleagues in NGO work
2     to whom I have given legal advice.
3          THE COURT:  To whom you have given legal advice?
4          MR. ETRA:  Yes.
5          THE COURT:  You have an amazing lawyer.  You have
6     advised a lot of people.
7          MR. ETRA:  I've been in practice 57 years, your Honor.
8     I'm not amazing, but I've tried to help people all my life.
9          THE COURT:  But no retainer agreements with any of
10    these people?  You never got paid for the legal advice?
11         MR. ETRA:  In the NGO World and in the world of
12    associations and not for profits, retainer agreements are an
13    exception not a rule.  It's a different world.
14         THE COURT:  Not in my experience.
15         You got something called IBOE --
16         MR. ETRA:  International Bureau of Expositions.  It's
17    A group, a conference organizers of which I've been a part in,
18    which I've rendered a variety of services.  I'm sorry if you
19    disparage that work.
20         THE COURT:  I don't disparage that work.  I just don't
21    believe you gave legal advice to any of these.
22         MR. ETRA:  Your Honor, 57 years don't really matter in
23    that.  This is something that I'm proud of my public service
24    record.  I've done it as a public service in most cases, and
25    it's an aspect of our profession where we can do that and it's

NBG4BENC

1   not --

2          THE COURT:  Mr. Etra, I do not need lectures from you

3   about what the obligations of lawyers are.  One of the

4   obligations of lawyers is not to steal from escrow.  So here is

5   the thing --

6          MR. ETRA:  I have never stolen.  I think that's an

7   acquisition that I deny totally.  I have never stolen from

8   escrow --

9          THE COURT:  Whether it was out of escrow or not.

10          MR. ETRA:  In escrow transactions, if you know them

11   well, you know that in many cases people doing a transaction,

12   funds are in escrow and your fee is taken from escrow.  So

13   that's perfectly normal and perfectly customary.  It's not

14   stealing from Escrow.

15          THE COURT:  For all of these that you say you can't do

16   anything based on the names even though it's it seems pretty

17   obvious that you could, and all of the email addresses other

18   than the nine or ten that we have spoken about that have a

19   deadline in two weeks, everything else your deadline is January

20   the 2nd.  So you need to assert privilege.  You need to, at a

21   minimum, you to have give me the legal and factual basis for

22   your assertion of privilege.  At a minimum, Mr. Etra, your

23   claim has to provide the name of the person or entity that was

24   the client that is associated with either the files in the

25   folder or the email address over which you claim there may be a

NBG4BENC

```
 1   privilege.  You also need to provide the approximate dates of

 2   the attorney-client relationship and a general description of

 3   the nature of the relationship.  It has to be better than, they

 4   asked me a question, and I provided them advice.  You need to

 5   establish that there was an attorney client or there was likely

 6   an attorney-client relationship, that's due January 2.  We will

 7   deal with your time to respond if and when he does that.

 8            Mr. Etra, I urge you to think hard about this.  I have

 9   a feeling what you are doing is trying to reverse engineer what

10   might be in these accounts and wanting to assert

11   attorney-client privilege over emails that you think might have

12   information that would be valuable to Benthos in figuring out

13   where its money went.  But be that as it may, that is your

14   deadline.

15            So Mr. Popofsky, anything further from you?

16            MR. POPOFSKY:  No.  I assume when you say "all else"

17   you are talking about the remaining email addressees and the

18   documents.

19            THE COURT:  Yes.  Because he declined to do what I was

20   hoping for which was to be able to reduce that list, and to

21   give him a reduced list, that is to pull out, what are

22   obviously not possibly privileged materials.  He chose not to

23   so that's on him.  He can deal with it as he sees fit.  Maybe

24   Mr. Sklar will sit and read to him.  Mr. McGuinness, I'm not

25   paying you to sit in the MDC and read these to him.  Not me
```

NBG4BENC

1   personally, CJA will not approve that.

2             MR. McGUINNESS:  Understood, Judge.

3             THE COURT:  This is purely the civil dispute.

4             MR. POPOFSKY:  Nothing else, your Honor.  I just want

5   to make you aware, I will be away next week through the 28th.

6   To the extent that anything you wish you may require a response

7   from me, it may be delayed.  But it sounds like we won't have

8   anything to do in the near future.

9             THE COURT:  I don't think you are going to need

10  anything.

11            Mr. McGuinness, I will continue to rely on you to

12  forward or however you have to do it, so he can get --

13  everything gets mailed to him.  But based on what I'm being

14  told by the defense bar, even legal mail is taking over a week

15  to get actually to the inmate.  If you can cut and paste it on

16  Corrlink so he can see it right away, the Court appreciates

17  that.

18            MR. McGUINNESS:  I will continue to do that.  It is

19  absolutely true it takes over a week for legal mail to reach

20  him.

21            I will note for the record, his eyes have been red

22  every time I've seen him.  And his eyes today are quite red.  I

23  don't know if I would describe them as glassy but they are

24  viscous.  There is some eye condition that i visible being near

25  him.  I've communicated snippets of his eye records to your

NBG4BENC

1    Honor, and I'm going to continue to get more updated records

2    and communicate them to the Court.  I had difficulty providing

3    providers at this outpatient clinic.

4         I do worry about his ability to read documents as he

5    brought up a normal of times.  Mr. Sklar's time is very

6    limited.  He's had less and less time to dedicate to helping as

7    would be expected as this has gone on for so long.  So that is

8    where Mr. Etra is as far as his ability to read.  I don't know

9    if there is other things that can be done that make documents

10   more accessible to him via computer or otherwise.

11        THE COURT:  I tried.  That was one of the reasons that

12   I was trying to knock out of lot of those emails so then I

13   would say put it in bigger font for him.  But since he didn't

14   cooperate, I can't help him.

15        So let me tell the government and Mr. Etra that I did

16   inquire about his medical various medical complaints.  I am

17   told relative to the hematology, that they are waiting for him

18   to be scheduled with a hematologist.  He has a dermatology

19   appointment in the near future.  He has a podiatry in the near

20   future.  He saw an ophthalmologist on the 1st of November.  The

21   doctor recommended follow up in one to two months for his

22   glaucoma and for the retina problem, four to six months.  So

23   MDC is all aware of that, and that is all on their schedule.

24        Again, if Mr. Etra wants to change his tune and

25   acknowledge that which strikes me as self-evident, that a bunch

NBG4BENC

1  of those emails accounts could be pulled off the list, which

2  would allow us to give him a list in a larger font that doesn't

3  take up a ream of paper, I would consider it.  But again,

4  Mr. Etra has a tendency to be his own worst enemy by asserting

5  things that are patently untrue and then whining because it

6  results in him having to do work.  He's made his choice.  I

7  made my ruling.

8          Anything further from you, Mr. Etra?

9          MR. ETRA:  Your Honor, I will continue to do my best.

10         THE COURT:  Good.

11         MR. ETRA:  Yes.

12         THE COURT:  Anything further from you, Mr. McGuinness?

13         MR. McGUINNESS:  No, thank you, your Honor.

14         THE COURT:  Thank you, everyone.

15         (Adjourned)

16

17

18

19

20

21

22

23

24

25