UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x
BENTHOS MASTER FUND, LTD.,

                Petitioner,

       - against -

AARON ETRA,

                Respondent.
------------------------------------- x

Case No. 20-cv-03384 (VEC)

# PETITIONER'S MEMORANDUM OF LAW IN CONNECTION WITH AARON ETRA'S RENEWED APPLICATION FOR RELEASE FROM CUSTODY

KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
500 Fifth Avenue
New York, New York  10110
Telephone:   (212) 880-9882
Facsimile:   (212) 986-8866

Attorneys for Petitioner
   BENTHOS MASTER FUND, LTD.

Petitioner Benthos respectfully submits this memorandum of law in connection with the renewed application by judgment debtor and contemnor Aaron Etra, filed on December 4, 2023, to be released from custody notwithstanding his undisputed failure even to have attempted (much less achieved) compliance with substantial aspects of the Court's repeated orders.

## Preliminary Statement

Benthos just wants to find the assets that Aaron Etra obviously did have immediately preceding his unexpected incarceration in December 2022, and therefore likely still does have, somewhere. In that effort we continue to seek the Court's assistance, which – through coercive incarceration – has generated far more than had been provided pre-incarceration but has not yet solved the riddle.

Mr. Etra continues to be in flagrant non-compliance with long-outstanding court orders. Benthos remains entitled to compliance if at all possible, and the Second Circuit directed this Court to release Mr. Etra only if it "determines that there is no . . . realistic possibility" that "continued confinement will have a coercive effect." Benthos defers to the Court's continued discretion, but based upon respondent's motion and his and his lawyers' recent statements, we are skeptical that the Court can make such a determination.

## Undisputed Pertinent Facts

The following facts (putting aside everything that happened previously) are, or cannot be, disputed:

- In the weeks and months preceding his incarceration, Mr. Etra was continuing his lavish spending habits, including but not limited to frequent trips to Europe.

- The ultimate source(s) of his funds for all that spending still has not been disclosed or discovered.

- In the spring and summer of 2023, Mr. Etra brought motions – through assigned counsel – seeking to be relieved from prior court orders on Fifth Amendment grounds (Dkt. 330)

- and seeking to be released from custody in light of his purported "substantial compliance" (Dkt. 345 at 4).

- The Court granted in part and denied in part the Fifth Amendment application (Dkt. 337), and on August 29, 2023 denied without prejudice the motion for release (Dkt. 371).

- In that August 29, 2023 order, the Court identified five items of documents and information that Mr. Etra "has made no effort to produce."

- From then until now, Mr. Etra has continued to "ma[k]e no effort to produce" any, much less all, of those items of documents or information.

- On November 16, 2023, this Court stated that "He is being held because he has not produced documents that he was ordered to produce. . . . [T]here continue[] to be materials that are not privileged and that are within Mr. Etra's ability to obtain that have not been produced and therefore he has not purged his contempt, and therefore he remains in jail as a coercive sanction to get him to comply" (11/16/23 transcript at 24, 25), and on November 30, 2023, this Court stated that "There is no question in my mind that imprisoning Mr. Etra has been coercive, and it continues to be coercive"; "What is going to get him out of jail is either me deciding that he's never going to comply – and we're not there yet, I believe that incarceration continues to be coercive – or he complies with the orders"; and "To me it is continuing to be coercive" (11/30/23 transcript at 13-14, 16, 24); and in a formal order also on November 30, 2023, the Court wrote that "Etra's continued incarceration is coercive" and that "the Court specifically finds that continued incarceration is not 'unavailing' and, to the contrary, there is a realistic possibility that continued confinement will have a coercive effect" (Dkt. 417 at 2).

- No facts have changed since November 16 or November 30.

- Mr. Etra, through (different) assigned counsel, appealed both this Court's Fifth Amendment order (Dkt. 337) and its August 29, 2023 denial of release (Dkt. 371), and those appeals received expedited treatment.  On November 20, 2023, the Second Circuit denied release without prejudice and directed this Court to "consider whether incarceration continues to serve a coercive purpose or whether the civil contempt remedy has become 'unavailing,' that is, 'whether under all the circumstances the contemnor has shown that there is no realistic possibility that *his* continued confinement will have a coercive effect upon *him*" (Dkt. 410 at 2; emphasis in original).

- The Second Circuit's order did not mention the Fifth Amendment issue.

### The Present Application

Mr. Etra's two assigned lawyers contend that "the incarceratory sanction is no longer coercive" (Dkt. 425 at p. 1) for two reasons:  First, the ordered forensic examination of Mr.

2

Etra's laptop constitutes compliance; and second, he need not comply any further on Fifth Amendment grounds. They also contend that he cannot repay the funds directed by the Court as a further condition of his release ($145,718.49, representing a portion of the funds he knowingly and improperly diverted from his judgment creditor while subject to a restraining notice).

### The Forensic Examination

The fact that the Court ordered a forensic examination of Mr. Etra's electronic devices, in light of his continued defiance of multiple orders, is hardly "compliance" by Mr. Etra with those court orders, and the forensic examination does not satisfy the court orders, for many reasons.

First – and this has been addressed several times in court already – it is not properly Benthos's burden to sift through tens of thousands of pages of material to find what is relevant and responsive to the court orders. We need not belabor this here, but see, e.g., the November 30, 2023 transcript at 11 ("Benthos is not obligated to go on an Easter egg hunt for the documents that are responsive to their subpoena and to the orders of this Court. And it is within Mr. Etra's ability to get that information"), 16 ("Rest assured that the answer of 'look at all my materials' is not going to get Mr. Etra out of jail"), 29 ("[you are trying] to turn on their head the rules of collection of judgment. And instead of the debtor providing materials that are requested [and ordered], you're arguing that your debtor should be able to load up a dump truck and say, here's the dump truck, somewhere in there is the material that has been requested [and ordered]") and 40 ("It is not their burden to find, within a million emails, the 20 or 50 or a hundred that are responsive").

Second, there are three other devices of Etra's, including his cellphone, as to which Benthos will not have even the theoretical access that it may have (in a month or two) to the contents of the laptop. Entirely apart from legal fee considerations, the hard-cost expense for the

3

forensic expert of obtaining and reviewing those materials is daunting, and Mr. Etra is not offering to pay those costs; nor are his lawyers seeking public funds to allow us to do so. Thus even on respondent's own terms, Benthos has no reasonable prospect of access anytime soon, if ever, to much of Mr. Etra's material that may be responsive to the court orders.

And third, Benthos still does not even have access to (99% of) the laptop, notwithstanding that the forensic process has been going on for a protracted period with virtually no actual availability yet. Most of that delay – which is continuing – is the result of Mr. Etra's various and sundry stalling tactics, including most recently his frivolous assertions that he has represented, in an attorney-client relationship, almost every person and entity with whom he has come into contact in recent years (characterized by the Court as "further obstruction by Mr. Etra" (see, among other places, the 11/30 transcript at 22)).[1] This too need not be belabored.

As a factual matter, Mr. Etra has not "complied" with the court orders, and the forensic examination process does not change that in any way, shape or form.[2] Indeed, it is hard to

---

[1] Benthos takes this opportunity to report, per Dkt. 417, that the forensic expert does indeed have access to the aaron@etra.com account.

[2] Benthos is not arguing, contrary to respondent's contention, that Mr. Etra has "produced too much" (id. at 39): He himself actually has not "produced" anything; as noted Benthos still does not have the contents of even his laptop; the contents of his phone and other devices are not close to being provided to Benthos; and in any event that does not address the Easter egg hunt burden-shifting issue at all. In addition, we learned very recently that Mr. Etra has not even complied with the Court's order to turn over the usernames and passwords for all his accounts (Dkt. 383 at para. 2). It turns out that several apparent "documents" in the document folders the Court ordered provided to Benthos (and likely additional documents in the other folders that will be litigated in January) are merely "placeholders" for documents actually located in an i-Cloud storage account (which in fact was one of the account types specifically identified as an "example" in Dkt. 383). The forensic expert does not have access to that i-Cloud account. As soon as we discovered that on December 7, we asked Mr. Etra's counsel to immediately obtain the username and password, but he told us he would do so only "early next week."

4

believe two lawyers wrote that "Benthos now has all relevant information in Etra's possession, custody or control" (Dkt. 425 at p. 7), since they surely know that is not remotely true.

### The Fifth Amendment

Mr. Etra's district court counsel presented his Fifth Amendment arguments, and this Court ruled on them. Mr. Etra's appellate counsel appealed that ruling, as he acknowledged on page 32 of the November 30, 2023 transcript. Either the Second Circuit rejected his appeal arguments implicitly in its recent order, and that is therefore law of the case, or it is still considering those arguments (as Mr. Silverman appears to believe from his comments on November 30), in which case (respectfully) this Court has no jurisdiction to rule on that issue at this time (see, e.g., *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982)).

Accordingly, it is unavailing for respondent's lawyers to contend that the Fifth Amendment relieves Mr. Etra of the obligation to comply with the still-outstanding orders.

### Reimbursement

With regard to the $145,718.49 – which is not a "fine" – Mr. Etra's lawyers have not come close to establishing that he cannot pay those funds to Benthos. Not only do they offer no testimony from Mr. Etra himself, but they fail to grapple with the inherent contradiction in their own position: If the Court is to infer from the blanket Fifth Amendment assertion that Mr. Etra is concealing, and/or lying about, his assets and any ill-gotten gains, then it also can (and should) infer that he has the ability to pay but is simply choosing not to do so.

The argument that his failure to pay or settle the judgment somehow proves that he cannot do so falls apart upon examination. Wholly independent of the Fifth Amendment adverse inference, a reasonable inference (as the Court itself has noted) is that he is hiding assets and hoping to get away with continuing to hide them. He thinks and hopes that one of his legal

maneuvers will get him out of jail, that Benthos will eventually give up pursuing him, and/or that the Court will finally conclude that he will not break no matter what. Whether or not some of that may prove accurate, the mere fact of non-payment cannot logically establish inability to pay.

And overarchingly, we come back to the initial point in this brief: Until the very day he was put in jail to his shock, he had been spending liberally in New York and abroad; that he had money as of late autumn 2022 is not speculation or conjecture, it is fact. Without regard to anything else, that alone provides the Court with sufficient basis to reject his lawyers' contention that he has "demonstrated" he has no access to funds. Where his money was, where it came from and what has happened to it since are the $5 million questions; and if he showed us where the assets he was spending prior to 12/14/22 were coming from, and that those assets have all been dissipated now, that might "demonstrate" his present indigency. Mr. Etra's mere "say-so" (and one random uninformative credit report from an agency without access to his byzantine maze of finances) does not do so.

## **Correcting the Record**

There are several misstatements and mischaracterizations in respondent's brief that should not go uncorrected.

"Five Outstanding Interrogatories." Respondent's repetition, over and over again, does not transmute document requests (and orders) into "interrogatories." Being ordered to produce "communications regarding his finances and Petitioner's Judgment from August 13, 2020 through December 14, 2022" (Dkt. 371, among other near-verbatim orders) is not an "interrogatory." Being ordered to produce "documents concerning his Etra's legal, paymaster, escrow-related or other services from August 1, 2017 to the present" (id.) is not an "interrogatory." Being ordered to produce "complete and final escrow agreements for the 41

6

clients that have been identified" (id.) is not an "interrogatory." Mr. Etra's brief was submitted by not one but two highly capable lawyers. They know what interrogatories are.

"[T]he premise that Etra stole Benthos' money [and is trying to track it]." Here, too, respondent's brief repeats over and over again something that his lawyers know not to be true, because Benthos's lawyer clarified in front of them in court on November 30. They wrote on December 5 that "Benthos has argued for years that Etra is a criminal who stole money he held for it in escrow, and that he is trying to hide it by refusing to respond to discovery" (Dkt. 425 at 11 (emphasis added), among many other similar statements), notwithstanding having been told five days earlier that "Mr. Etra has fostered a misconception . . . that we are talking about trying to find the $4.6 million that he [improperly] sent out of escrow. . . . We have never . . . alleged that he took that $4.6 million and has it. And we've never contended that that's what we're looking for. He was the front man. . . . [W]e've never said that he has that money. . . . [T]his is just judgment enforcement" seeking his general assets (11/30/23 transcript at 5-6).

"Benthos . . . [should] have invested resources before the Court of Appeals." Mr. Etra's two lawyers get to devote the time they see fit to his case, without their client having to authorize or make payment. While this Court has become fully familiar with the relevant history (after great effort by Benthos and its counsel, and then through the Court's own intensive attention and involvement), the Second Circuit is not so familiar, and Benthos made the decision to trust that the Court of Appeals would review this Court's thorough and comprehensive decisions and reach the appropriate conclusions. Mr. Silverman got to argue his appeal without any adversary, and still did not get the relief he sought. There are no grounds to cast aspersions on Benthos's litigation choices under very difficult circumstances.

"[H]e has not been able to take any additional steps to comply with the contempt orders." That is simply not true. He has chosen not to do so. That remained the situation even after his Fifth Amendment claims were largely rejected by this Court, and after his appellate lawyer obtained no stay or other interim relief from the Second Circuit. The Fifth Amendment is addressed above, but respondent's position at this point is that he is done – he needs do nothing else, and Benthos's judgment enforcement discovery should consist solely of sitting here bleeding fees obtaining and reviewing an undifferentiated mass of materials on his electronic device(s) (as to which review he has been maximally obstructive in any event). That is not justice. And furthermore, the implication of respondent's position is that any judgment debtor who wishes to hide his or her assets can refuse to produce documents and refuse to comply with court orders, all with total impunity, thereby rendering virtually all judgment enforcement – other than seizing all of the debtor's documents and communications, a blunt-force tool with limited utility and one that was even available here only because the debtor was already in jail and unable to secrete his devices – potentially toothless.

"Etra's compliance with the Court's forensic search orders is laudatory." Even accounting for lawyerly over-zealousness, this is a bit much. Mr. Etra has obstructed and delayed the forensic examination every step of the way, culminating in the truly unbelievable (in the literal sense of the word) scene in court on November 16, 2023 – in the presence of his counsel – when, to prevent or at least delay materials being made available (at long last) to Benthos, he put forth a series of propositions regarding his purported attorney-client relationships that moved this Court to characterize him sarcastically as an "amazing lawyer," to place him under oath and to make comments such as "cannot possibly be privileged," "spurious objections," "that's not what privilege is," "you are obviously willing to just b[a]ld-face lie to

8

me," and "I just don't believe you gave legal advice to any of these" (11/16/23 transcript at 8, 9, 10, 18, 23, 32, 36, 40; see also 11/30/23 transcript at 21 ("he apparently was never paid by any of these people" and 11/16/23 transcript at 40 ("But no retainer agreements with any of these people?")).[3]

## Conclusion

Again, this Court can release Mr. Etra only if it "determines that there is no . . . realistic possibility" that "continued confinement will have a coercive effect." The Court repeatedly has found that standard not yet met, and nothing has changed, so it is difficult to see why the Court should reach a different determination at this time.

Dated: December 11, 2023

**KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.**

By: _____
  Steven R. Popofsky

500 Fifth Avenue
New York, New York 10110
Telephone:  (212) 880-9882
Facsimile:  (212) 986-8866
Email:    SPopofsky@kkwc.com

Attorneys for Petitioner
  **BENTHOS MASTER FUND, LTD.**

---

[3] The Court nonetheless stated that "be that as it may, I'm going to read his papers with an open mind" (11/16/23 transcript at 32), and two weeks later gave him counsel on that issue.

9